MINTZ & GOLD LLP
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, N.Y. 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*VCG Special Opportunities Master Fund Ltd.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
VCG SPECIAL OPPORTUNITIES            :
MASTER FUND LIMITED,                 :     **08 CV 01563**
                                     :
                  Plaintiff,         :
                                     :     **COMPLAINT**
         - against -                 :
                                     :     **ECF CASE**
CITIBANK, N.A.,                      :
                                     :
                  Defendant.         :
------------------------------------------------------------X

Plaintiff VCG Special Opportunities Master Fund Limited ("Plaintiff"), by and through its attorneys, Mintz & Gold LLP, alleges as follows:

### Introduction

1. This action concerns two distinct disagreements regarding the scope of Plaintiff's obligations under a credit default swap. The gravamen of this action is that Defendant, Citibank, N.A. ("Citibank"), improperly demanded and extracted from Plaintiff a total of $9,960,000 of collateral for a $10,000,000 swap that it bought from the Plaintiff, based upon an erroneous reading of the swap transaction documents. Citibank then compounded its unreasonable demand for and retention of those sums by declaring a

credit default and notifying Plaintiff that it would be required to remit the entire amount of the swap.

2.  The timing and sequence of events highlights the commercially unreasonable nature of Citibank's conduct. Within scant weeks after it bought the swap from Plaintiff, Citibank ostensibly determined that the creditworthiness of the reference obligation (and/or the Plaintiff) had drastically deteriorated – even though the reference obligation was thinly traded and was still an investment-grade instrument. Citibank was more likely in a panic over recent turmoil in the debt markets connected to the sub-prime mortgage lending crisis. In any event, Citibank accelerated its demands for additional margin. For months, Plaintiff disputed Citibank's entitlement to demand the collateral but was met with silence until, in December 2007, Citibank grudgingly returned a mere $667,822.88 and otherwise refused Plaintiff's demand for a return of the balance.

3.  Then, in January 2008, Citibank notified Plaintiff that, due to an "implied write-down" of the reference obligation, a credit default had taken place, as the result of which Plaintiff owed the full $10,000,000. However, Citibank's assertion that a write-down had taken place was inaccurate. The parties have come to an impasse, with Citibank holding almost **20% of Plaintiff's total capital** hostage in a margin account.

4.  In essence, therefore, this action is about two misreadings by Citibank of the economics and structure of the swap. Citibank's first error concerns the duty to post margin and the second error concerns the events that would constitute a credit default. In light of Citibank's conduct, it is plain that there was no meeting of the minds regarding the subject matter of the transaction. Plaintiff therefore seeks, *inter alia*, declaratory relief, rescission of the swap, restitution of all sums it paid to Citibank, and damages.

**The Parties**

5.   Plaintiff is an Isle of Jersey exempted corporation having its principal place of business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.

6.   Upon information and belief, Citibank is a national banking association with a principal place of business at 399 Park Avenue, New York, N.Y. 10043.

**Jurisdiction and Venue**

7.   The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs. Accordingly, this Court possesses subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1332.

8.   In the swap agreement, the parties agreed to submit to the jurisdiction of the Courts of the State of New York and the United States District Court in the Borough of Manhattan, and stipulated to the application of New York law.

**Substantive Allegations**

*The Millstone Credit Default Swap*

9.   Plaintiff is a hedge fund with approximately $50,000,000 of capital under management.

10.   On or about June 29, 2007, Plaintiff entered into a credit default swap transaction with Citibank by which Plaintiff sold Citibank credit protection against the risk of a credit default by a collateralized debt obligation, or "CDO," up to a maximum of $10,000,000.

11.   A credit default swap is a contract under which two financial institutions trade the default risk of a debt instrument, such as a corporate bond or, in this case, a CDO. A credit default swap bears some similarities to an insurance policy, except that

neither counterparty to the swap necessarily holds the debt instrument on which the swap is based. The underlying debt instrument is called the "reference obligation." Under the credit default swap agreement, one party (the "protection buyer," which in this case is Citibank) pays a fixed, periodic fee to the seller of the swap (the Plaintiff, here). In return for receiving the fee, the seller of the swap agrees to undertake the credit exposure of the underlying debt instrument, *i.e.*, to pay all or a portion of the unpaid obligation to the buyer of the swap upon the triggering of certain credit defaults.

12. In this case, the fee to be paid to Plaintiff is 5.50% per annum, calculated on the "notional amount" of $10,000,000 of a collateralized debt obligation, Class B Notes of Millstone III CDO Ltd. III-A, which were issued pursuant to an Indenture dated July 5, 2006.[1]

13. The contract documents governing the counterparties' rights and obligations under the swap are the 2002 version of the Master Agreement of the International Swap Dealers Association ("ISDA"), dated September 1, 2006 (the "ISDA Master Agreement"), the Schedule to the ISDA Master Agreement, dated as of September 1, 2006, the 1994 ISDA Credit Support Annex and the Confirmation Letter by Citibank, dated July 5, 2007. The Confirmation Letter, in turn, incorporates the 2003 ISDA Credit Derivatives Definitions and the ISDA Standard Terms Supplement for use with Credit Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement (the "CDO PAUG Form").

---

[1] Neither the Plaintiff nor Citibank actually owns the CDO. Rather, the counterparties simply trade in, or "hedge," the CDO's credit risk. Thus, the amount of the debt obligation on which the fixed fee is calculated (and thus the amount up to which the seller agrees to undertake exposure in the event of a credit default in return) is termed the "notional" amount.

14. By the terms of the foregoing documents, in the event of any conflict between the Confirmation Letter and the ISDA Master Agreement, the terms of the Confirmation Letter control.

*Initial Margin, Variation Margin
and Floating Payments*

15. When Plaintiff and Citibank executed the swap, Plaintiff paid Citibank $2,000,000, or 20% of the $10,000,000 notional amount of the Millstone CDO. In the Confirmation Letter, this $2,000,000 in collateral is defined as the "independent amount." For purposes of clarity, however, this Complaint instead refers to the deposit of $2,000,000 as the "initial margin." The purpose of the initial margin was to secure Citibank against the credit risk of the counterparty (Plaintiff), *i.e.*, in case Plaintiff did not make good on its promise to pay in the event of a credit default by the Millstone CDO.

16. Under the Confirmation Letter, the only payments that Citibank may demand from Plaintiff *after* the initial margin are "Floating Payments." Citibank may require Floating Payments *only* on the basis of a good faith determination by the Calculation Agent (which in this case is Citibank) that a "Floating Amount Event" had taken place: (i.) the obligor on the reference obligation (the CDO) had failed to make a required principal payment, (ii) an interest shortfall had taken place, or (iii) a write-down had taken place under the reference obligation's governing instrument. However, Citibank may *not* demand a Floating Payment on the basis of the perceived creditworthiness of the counterparty (Plaintiff).[2]

---

[2] There is another scenario, not at issue in this case, whereby a counterparty that buys credit default protection may declare a "Credit Event" to have taken place and require early settlement of the trade. Such an instance would include, in addition to a write-down, or a failure to pay interest or principal, an event where one or more rating agencies downgrade the reference obligation below a certain threshold or otherwise withdraw their assigned rating (a "Distressed Ratings Downgrade").

17. Apart from the initial margin, Floating Payments and credit events, the Confirmation Letter does not otherwise authorize Citibank to demand payments of any kind to secure Citibank against the credit risk of the counterparty (Plaintiff) or the reference obligation.

18. By contrast, on other swaps, *e.g.*, interest rate swaps, additional margin may be collected after the initial margin. In such cases, the additional margin is referred to as "variation margin" and is based upon a downward movement in the daily mark-to-market value of the underlying reference obligation.

19. Plaintiff wired the $2,000,000 of initial margin to Citibank's account on or about July 3, 2007.

*Citibank Squeezes Plaintiff for More Money*

20. However, within less than a month, on August 1, 2007 Citibank demanded variation margin in the amount of $2,133,400.17, resulting in a total collateralization of over 40% of the notional amount of the swap. Citibank then ratcheted up its demands for margin over the weeks that followed:

| Date | Amount |
| --- | --- |
| July 3, 2007 | $2,000,000 (initial margin) |
| August 1, 2007 | $2,133,400.17 |
| August 23, 2007 | $2,064,534.14 |
| September 4, 2007 | $1,686,854.00 |
| November 5, 2007 | $2,075,489.47 |

21. In sum, over a period of five months Citibank demanded, and Plaintiff paid, $9,960,277.78 – as compared to a total credit risk of $10,000,000 from an investment-grade debt instrument.

22. However, upon information and belief, during the entire period described in the table above, and as of the date of this Complaint, the reference obligation (Class B Notes of Millstone III CDO Ltd. III-A) had not experienced any shortfall in principal or interest payments whatsoever.

23. Similarly, during the same period, no write-down had taken place such that Plaintiff could properly have been required to make any payment to Citibank.

24. Under paragraph 7(b) of the CDO PAUG Form, Citibank, as calculation agent, was obliged to determine Plaintiff's obligation to pay Floating Payments *solely* upon the basis of a report of the servicer of the underlying reference obligation.

25. While Plaintiff delivered the sums requested by Citibank, commencing around August 20, 2007, Plaintiff repeatedly questioned Citibank's mark-to-market calculation of the credit risk of the reference obligation.

26. While Plaintiff believed it was not obligated to pay the sums demanded by Citibank, it did so because it was concerned that Citibank might seize upon Plaintiff's refusal to post variation margin as an excuse to declare a technical default and seize Plaintiff's collateral – which ultimately, Citibank did.

27. On each such occasion, Citibank failed to provide the requested information, but instead continued to demand additional margin.

28. On or about December 19, 2007, after receiving a demand letter from the undersigned counsel, Citibank forwarded a copy of the servicer's report for the monthly period of October 31, 2007 to November 29, 2007.

29. The servicer's report revealed that no credit event had yet taken place such that Plaintiff should have been required to make a Floating Payment. Nor had any

downgrade to the Millstone reference obligation been announced by the rating agencies, Standard & Poors or Moody's.

30. It was not until December 26, 2007, that Citibank finally responded that it was entitled to require variation margin pursuant to the Credit Support Annex to the ISDA Master Agreement, due to the deterioration in the mark-to-market value of the reference obligation.

31. Thus, Citibank did not at that time claim that an actual credit default had taken place. Rather, Citibank confirmed that the entire amount that it had collected represented variation margin based on its calculation of "the current mark to market of the Transaction (or 'Secured Party's Exposure')" while conceding that, "as of last week, our calculation of this amount found that [Plaintiff] was entitled to have $667,822.88 returned."

32. Plaintiff thereupon demanded the return of all of the sums that it had paid after the initial margin, but Citibank only returned $667,822.88.

33. Even if Citibank had been entitled to demand variation margin, *i.e.*, to secure Citibank against the deteriorating credit risk of the reference obligation (which was beyond the obligations accepted by Plaintiff in the Confirmation Letter), Citibank failed even to make a proper estimate of the required collateral. Had it based its calculation on the servicer's report, it would never have demanded anything approaching the sums that it collected from Plaintiff. Indeed, by Plaintiff's calculation, using similar CDO's as a point of comparison, the reference obligation may have actually appreciated during the same period when Citibank was demanding collateral.

34. Instead, upon information and belief, Citibank contrived margin calls to require money from its counterparty so that Citibank could protect its own position in a deteriorating credit market, and/or because it was concerned about the creditworthiness of the Plaintiff.[3]

*Citibank Jumps the Gun and*
*Declares a Credit Default*

35. On January 9, 2008, Citibank sent Plaintiff a "Floating Amount Event Notice," stating, in relevant part:

> This letter is notice to you that an Implied Writedown has occurred with respect to the Reference Obligation on or about, January 4, 2008. The Implied Writedown Amount in respect of such Floating Amount Event is USD 10,000,000.00 (the "Floating Amount").

36. Citibank purportedly based its determination that an "Implied Write-down" had taken place upon an inferred under-collateralization of the CDO. Citibank informed Plaintiff that the entire $10,000,000 of the notional amount was due and payable on the ground that the reference obligation had failed the "overcollateralization test" set forth in the CDO's indenture.[4]

37. However, the agreement does not give Citibank the right to demand Floating Payments based upon an "Implied Write-down"; rather, Citibank may only require Plaintiff to pay in the event of an actual "Write-down" to the reference obligation.

---

[3] Ultimately, on January 15, 2008, Citibank announced that it had written off $18.1 billion from its investment portfolio.

[4] Generally, the overcollateralization test applicable to the Class B Notes represents the outstanding balance of the CDO's collateral assets divided by the aggregate outstanding principal amount of the Class A and Class B Notes. The test is failed if that ratio falls below 101.56%. According to the servicer, that ratio was approximately 97% in December.

9

38. According to the definition of the term "Implied Writedown Amount" provided in the CDO PAUG Form:

> "Implied Writedown Amount" means, (i) if the Underlying Instruments[5] do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent [Citibank] equal to the excess, if any, of the Current Period Implied Writedown Amount over the Previous Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, ***and (ii) in any other case, zero.***

(Emphasis added).

39. "Writedown," in turn, is defined in relevant part as "the occurrence at any time on or after the Effective Date of:

> (i) (A) a writedown or applied loss (***however described in the Underlying Instruments***) resulting in a reduction in the Outstanding Principal Amount (other than as a result of a scheduled or unscheduled payment of principal); or
>
> (B) the attribution of a principal deficiency or realized loss (***however described in the Underlying Instruments***) to the Reference Obligation resulting in a reduction or subordination of the current interest payable on the Reference Obligation; . . ."

(Emphasis added).

40. The "Underlying Instruments" of the reference obligation in this case, including the indenture, do, in fact, provide for "writedowns, applied losses, principal deficiencies and/or realized losses."

---

[5] The Underlying Instruments of the reference obligation are the "indenture, trust agreement, pooling and servicing agreement or other relevant agreement(s) setting forth the terms of the Reference Obligation."

41. Thus, Citibank erroneously issued its Floating Amount Event Notice, and no credit default has taken place requiring Plaintiff to pay the sums demanded by Citibank.

42. Plaintiff therefore immediately disputed Citibank's assertion that a Floating Amount Event had actually taken place, for the reasons set forth above.

43. However, by letter dated January 30, 2008, Citibank notified Plaintiff that it intended to treat Plaintiff's refusal to pay the sums demanded as an event of default under the swap agreement.

44. Upon an event of default under the swap agreement, Citibank would immediately terminate the swap and foreclose on the collateral.

45. On February 1, 2008, Citibank made good on its threat and issued a Notice of Default and Early Termination, stating that it intended to "liquidate, close out and/or otherwise exercise our rights and remedies with respect to the [ISDA] Agreement."

## AS AND FOR A FIRST CAUSE OF ACTION
### (For Declaratory Judgment)

46. Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

47. By reason of the foregoing, there is a live and present controversy between the parties as to: (i) whether Citibank's requests for variation margin, based upon the Credit Support Annex to the ISDA Master Agreement, are inconsistent with, and therefore superseded by, the Confirmation Letter's limitation of payments to actual write-down's, failures to pay principal and interest shortfalls; and (ii) whether the underlying instruments of the reference obligation provide for writedowns, applied losses, principal deficiencies or realized losses, such that the "Implied Writedown" is, by definition, zero.

## AS AND FOR A SECOND CAUSE OF ACTION
### (For Rescission)

48.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

49.     No meeting of the minds had been achieved at the time that the parties entered into the swap transaction.  Based upon the Confirmation Letter and the negotiations leading up to it, Plaintiff had agreed to sell credit protection on a credit default swap, not to take the risk of daily mark-to-market movements in the value of the reference obligation.  Citibank was aware that the Confirmation Letter stipulated only Floating Payments, not margin based upon daily changes in the creditworthiness of the Millstone CDO, but did not address the discrepancy until after Plaintiff had closed on the trade in June 2007.  As to Plaintiff, the mistake was honest and excusable, such that enforcement of the variation margin provision would therefore be unconscionable.

50.     Accordingly, Plaintiff is entitled to an equitable rescission of the swap agreement and restitution of all sums paid to Citibank.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Contract)

51.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

52.     Plaintiff has performed all of its obligations under the swap agreement.

53.     Citibank has breached the agreement, *inter alia*, by prematurely demanding Floating Payments and by retaining the deposit of collateral far in excess of the amount actually required.

54.     Plaintiff has been thereby damaged in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

55.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

56.     By gradually making oppressive margin demands without justification, Citibank acted in a manner so as to deprive Plaintiff of the right to receive the benefit of the swap agreement, namely, the premium to be paid by Citibank on the notional amount at a cost to Plaintiff no greater than the opportunity cost of the collateral actually required to secure counterparty risk and credit risk.

57.     To the extent that the swap agreement gave Citibank any discretion as calculation agent in the determination of the credit risk of the reference obligation, the implied covenant of good faith and fair dealing included a promise on the part of Citibank not to act arbitrarily or irrationally in exercising that discretion.

58.     By extracting sums from Plaintiff far in excess of what Citibank actually required, Citibank has damaged Plaintiff in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

59.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

60.     By extracting an unnecessarily large amount of collateral from Plaintiff, Citibank received money properly belonging to the Plaintiff.

61.     Citibank has benefited and is benefiting from the receipt of those funds and, under principles of equity and good conscience, Citibank should not be permitted to retain such collateral in any amount beyond the sums required to offset the credit risk of the reference obligation.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Conversion)

62. Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

63. Citibank intentionally retained and then, beyond the scope of its authorization, disposed of the collateral properly belonging to Plaintiff.

64. The funds in question are specifically identifiable in that they were deposited solely to collateralize the swap and were required to be returned to Plaintiff.

65. Citibank has failed and refused to comply with Plaintiff's demand that Citibank return the excess collateral.

66. Citibank has effected a set-off against and has already foreclosed (or is in the process of foreclosing) upon the collateral, without justification.

**WHEREFORE,** Plaintiff demands judgment as follows:

A. On the First Cause of Action, a judicial declaration that (i) Citibank's requests for variation margin, based upon the Credit Support Annex to the ISDA Master Agreement, are inconsistent with and superseded by the Confirmation Letter, because the Confirmation Letter limits Citibank's right to require payments to actual write-down's, failures to pay principal and interest shortfalls and distressed rating downgrades of the reference obligation; and (ii) Citibank does not have the right to declare an early termination of the trade because no Floating Amount Event or Credit Event has taken place;

B. On the Third, Fourth, and Sixth Causes of Action, damages in an amount to be determined at trial, plus interest and costs;

  C. On the Second and Fifth Causes of Action, restitution of the sums paid by Plaintiff to Citibank under the swap agreement;

  D. On the Second Cause of Action, rescission of the swap agreement;

  E. On the Sixth Cause of Action, an award of compensatory and punitive damages; and

  F. Interest, costs, and such other and further relief as to the Court may seem proper and equitable.

Dated: New York, New York
   February 14, 2008

**MINTZ & GOLD LLP**

*/s/ Terence W. McCormick*

Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, N.Y. 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*VCG Special Opportunities Master Fund Ltd.*