UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VCG SPECIAL OPPORTUNITIES
MASTER FUND LIMITED,

        Plaintiff,

      -against-

CITIBANK, N.A.,

        Defendant.

---

CITIBANK, N.A.,

        Counterclaim-Plaintiff,

      -against-

VCG SPECIAL OPPORTUNITIES
MASTER FUND LIMITED,

        Counterclaim-Defendant.

08 CV 01563 (BSJ)

---

## CITIBANK N.A.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS

PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP

1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212 373-3203
Facsimile: 212-757-3990

Attorneys for Defendant/Counterclaim-
   Plaintiff Citibank, N.A.

## Table of Contents

Page

Table of Authorities ................................................................................................. iii

Preliminary Statement ............................................................................................. 1

Statement of Facts .................................................................................................... 4

    The Parties' CDS Contract ................................................................................. 5

    The Parties' CDS Transaction ........................................................................... 6

    Citibank Demands Additional Credit Support .................................................. 7

    Subsequent Market Decline ............................................................................... 8

    The Determination of a Floating Amount Event .............................................. 10

    The Determination of the Floating Amount ..................................................... 12

    VCG Fails to Satisfy Its Floating Amount Payment Obligations .................... 18

    VCG Fails to Indemnify Citibank ..................................................................... 20

    Procedural History ............................................................................................. 20

Argument ................................................................................................................. 21

    I. CITIBANK'S REQUESTS FOR COLLATERAL WERE PROPER ............... 22

        A.    Citibank Was Entitled to Demand Additional Credit
            Support .............................................................................................. 23

        B.    VCG Never Initiated the Dispute Resolution Provisions in
            the Credit Support Annex ................................................................. 24

        C.    VCG's Collateral Claims Are Now Moot ....................................... 26

    II. A FLOATING AMOUNT EVENT IN THE FORM OF AN  IMPLIED
       WRITEDOWN OCCURRED UNDER THE CDS CONTRACT ............. 27

        A.    The Implied Writedown Feature Applies Here ............................... 27

        B.    Citibank Properly Determined the Floating Amount ...................... 29

    III. VCG FAILS TO STATE A CLAIM FOR RESCISSION ............................... 30

i

IV. VCG FAILS TO STATE A CLAIM FOR BREACH OF IMPLIED
COVENANT OF GOOD FAITH AND UNFAIR DEALING..................31

V. VCG FAILS TO STATE CLAIMS FOR UNJUST ENRICHMENT ..............32

VI. VCG FAILS TO STATE CLAIMS FOR CONVERSION ...........................32

VII. CITIBANK IS ENTITLED TO JUDGMENT IN ITS FAVOR ON
ITS COUNTERCLAIM FOR BREACH OF CONTRACT .....................33

Conclusion ......................................................................................................34

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Acme Supply Co., Ltd.* v. *City of New York*,
    834 N.Y.S.2d 142 (1st Dep't 2007) ............................................ 25

*Alexander & Alexander Servs., Inc.* v. *These Certain Underwriters at Lloyd's*,
    136 F.3d 82 (2d Cir. 1998) ............................................ 21-22

*American Motorists Ins. Co.* v. *GTE Corp.*, Nos. 99CV512 (RCC),
    99CV2214 (RCC), 2000 WL 1459813, 3 (S.D.N.Y. Sept. 29, 2000) ................ 21

*American Woolen Co. of New York* v. *Samuelsohn*,
    226 N.Y. 61 (1919) ............................................ 30

*Ari & Co., Inc.* v. *Regent Int'l Corp.*,
    273 F. Supp. 2d 518 (S.D.N.Y. 2003) ............................................ 31

*Aristocrat Leisure Ltd.* v. *Deutsche Bank Trust Co. Americas*,
    No. 04-civ-10014PKL, 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005) ........... 4, 21

*Bellino Schwartz Padob Advertising, Inc.* v. *Solaris Mktg. Group*,
    635 N.Y.S.2d 587 (1st Dep't 1995) ............................................ 32

*BGW Develop. Corp.* v. *Mount Kisco Lodge No. 1552*,
    669 N.Y.S.2d 56, *lv. to appeal denied*, 92 N.Y.2d 813,
    704 N.E.2d 227, 681 N.Y.S.2d 474 (1998) ............................................ 30

*Boucher* v. *Syracuse Univ.*,
    164 F.3d 113 (2d Cir. 1999) ............................................ 26

*Canstar* v. *J.A. Jones Constr. Co.*,
    622 N.Y.S.2d 730 (N.Y. App. Div. 1995) ............................................ 31

*Clark* v. *New York's Health and Human Service Union*,
    04 Civ. 7658 (SHS), 2006 WL 662171 (S.D.N.Y. March 15, 2006) ................ 26

*DynCorp.* v. *GTE Corp.*,
    215 F. Supp. 2d 308 (S.D.N.Y. 2002) ............................................ 22

*Excel Group, Inc.* v. *New York City Transit Authority*,
    814 N.Y.S.2d 220 (2nd Dep't 2006) ............................................ 25

*Ezrasons, Inc.* v. *Am. Credit Indem. Co.*,
    683 N.Y.S.2d 264 (N.Y. App. Div. 1999) ............................................ 31

iii

*Fasolino Foods Co. Inc.* v. *Banca Nazionale del Lavoro*,
    961 F.2d 1052 (2d Cir. 1992) ................................................................. 31

*Feigen* v. *Advance Capital Management Corp.*,
    541 N.Y.S.2d 797 (1st Dep't 1989) ...................................................... 32

*Ferguson Elec. Co. Inc.* v. *Kendal at Ithaca Inc.*,
    711 N.Y.S.2d 246 (3d Dep't. 2000) ...................................................... 25

*Flast v. Cohen*,
    392 U.S. 83 (1968) ................................................................................ 26

*Fleet Capital Corp.* v. *Yamaha Motor Corp.*,
    No. 01 Civ. 1047, 2002 WL 31174470 (S.D.N.Y. Sept. 25, 2002) ...................... 21

*Harris* v. *Provident Life & Accident Ins. Co.*,
    310 F.3d 73 (2d Cir. 2002) ................................................................... 31

*Loyalty Life Ins. Co.* v. *Fredenberg*,
    632 N.Y.S.2d 901 (3d Dep't 1995) ...................................................... 30

*NCR Corp.* v. *Lemelson Medical, Education and Research Foundation*,
    99-CV-3017, 2001 WL 1911024 (S.D.N.Y. April 2, 2001) ................................ 30

*Prentice* v. *Apfel*,
    11 F. Supp. 2d 420 (S.D.N.Y. 1998) ................................................... 4, 21

*Perl* v. *Smith Barney, Inc.*,
    646 N.Y.S.2d 678, *lv. denied*, 89 N.Y.2d 803, 675 N.E.2d 1234, 653
    N.Y.S.2d 281 (1996) ............................................................................ 22

*Richbell Info. Servs., Inc.* v. *Jupiter Partners, L.P.*,
    309 A.D.2d 288, 765 N.Y.S.2d 575 (1st Dep't 2003) ........................................ 32

*Sellers* v. *M.C. Floor Crafters Inc.*,
    842 F.2d 639 (2d Cir. 1988) ................................................................. 21

*Siradas* v. *Chase Lincoln First Bank, N.A.*,
    No. 98-cv-4028, 1999 WL 787658 (S.D.N.Y. Sept. 30, 1999) ............................ 31

*In re Tamoxifen Citrate Antitrust Litig.*,
    429 F.3d 370 (2d Cir. 2005) ................................................................. 21

*Tuosto* v. *Philip Morris USA Inc.*,
    No. 05 Civ. 9384 (PKL), 2007 WL 2398507 (S.D.N.Y. Aug. 12, 2007) ............. 21

*Wilson* v. *Hochberg*,
    665 N.Y.S.2d 653 (1st Dep't 1997) ...................................................... 22

*Wolf* v. *Nat'l. Council of Young Israel,*
    694 N.Y.S.2d 424 (2d Dep't 1999) ........................................................................ 33

## OTHER AUTHORITIES

Federal Rules of Civil Procedure 12(c) ..................................................................... 1, 4, 21

Federal Rules of Civil Procedure 12(b)(6) ..................................................................... 21

Defendant and counterclaim-plaintiff Citibank, N.A. ("Citibank") respectively submits this memorandum of law in support of its motion pursuant to Federal Rules of Civil Procedure 12(c) for judgment on the pleadings, dismissing the complaint of plaintiff and counterclaim-defendant VCG Special Opportunities Master Fund Limited (*f/k/a* CDO Plus Master Fund Ltd.) ("VCG") and entering judgment in favor of Citibank on its counterclaim in this action.

### Preliminary Statement

This action boils down to a simple contract dispute, in which the terms of the relevant contract make absolutely clear that VCG has no valid claim against Citibank. In fact, those terms (along with certain undisputed facts) make equally clear that it is VCG that has breached its contractual obligations to Citibank. Judgment should be entered accordingly.

This action arises from a credit default swap (or "CDS") transaction between VCG, a sophisticated hedge fund specializing in derivatives and other structured finance products, and Citibank. In a typical CDS transaction, a "buyer of credit protection" makes regular payments to a "seller of credit protection" with "reference" to a specific credit obligation (*e.g.,* a bond, note or other debt instrument). The credit obligation is generally referred to as the "reference obligation," and the issuer of that obligation is generally referred to as the "reference entity." A CDS transaction typically requires the seller of credit protection to provide consideration to the buyer if and when a defined event (usually some negative event regarding the reference entity or the reference obligation) occurs.

In this case, the terms of the parties' agreement with respect to their CDS transaction were set forth in various documents (collectively, the "CDS Contract"), which

1

used various industry-standard forms promulgated by the International Swaps and

Derivatives Association, Inc. (or "ISDA").[1]  Pursuant to the terms of the parties' CDS

Contract, Citibank was the defined "Buyer" of credit protection and agreed to make

periodic fixed payments to VCG, as the defined "Seller" of credit protection.  A

collateralized debt obligation (or "CDO") vehicle called the "Millstone III CDO LTD III-

A" (the "Millstone III CDO") served as the defined "Reference Entity," and its Class B

Notes due July 5, 2046 served as the defined "Reference Obligation."[2]

      The parties' CDS Contract provided that, in exchange for its receipt of

periodic payments from Citibank, VCG, among other things, would pay a "Floating

Amount" to Citibank if any of certain defined events – referred to as "Floating Amount

Events" – occurred.  Separately, VCG was also required to, and did, post collateral with

Citibank from time to time (based on changes to the CDS Contract's market value) to

secure VCG's obligations to Citibank under the CDS Contract.

      In January 2008, a Floating Amount Event – in the form of an "Implied

Writedown" with respect to the Reference Obligation – occurred under the CDS

Contract, triggering VCG's obligation to pay Citibank a Floating Amount of

$10,000,000.  VCG refused to pay that amount to Citibank.  As a result, Citibank

exercised its rights to cause the early termination of the parties' agreement and to set off,

in partial satisfaction of the amount due from VCG, the collateral VCG had posted to that

---

[1]    ISDA is a global trade association representing leading financial institutions worldwide in the privately negotiated derivatives industry.  It has developed standardized documentation for use in CDS transactions.  These widely-used ISDA forms are available to market participants on ISDA's website at www.isda.org.

[2]    A CDO is a structured finance vehicle that generally holds various assets (typically, bonds, notes or other revenue-producing assets) and issues its own equity and debt to investors.

point. VCG nonetheless continues to owe Citibank $674,252.38 – the difference between the collateral that VCG had posted and VCG's $10,000,000 "Floating Amount Event" payment obligation.

Rather than fulfill its clear, contractual obligations, VCG brought this meritless lawsuit against Citibank based on a facially erroneous interpretation of the CDS Contract. In its Complaint, VCG contends the parties have "two distinct disagreements" regarding their CDS transaction (Cplt. ¶ 1): first, VCG asserts that Citibank's requests that VCG post collateral were inconsistent with a confirmation letter Citibank and VCG signed as part of the CDS Contract (the "Confirmation"). As is clear from the face of the CDS Contract, however, no such inconsistency exists: a Credit Support Annex that formed part of the CDS Contract expressly authorized the posting of such collateral, and nothing in the Confirmation in any way contradicted that express authorization. Further, any complaint that Citibank somehow miscalculated any of the amounts of collateral it demanded can no longer be raised in light of VCG's failure to invoke the CDS Contract's dispute resolution procedure with respect to such demands. In any event, all of VCG's complaints as to the posting of collateral are now moot in light of the occurrence of a Floating Amount Event.

Second, as to the occurrence of the Floating Amount Event, VCG asserts that no Implied Writedown occurred here because the Reference Entity's "Underlying Instruments" (in this case, the Indenture for the Millstone III CDO and its Class B Notes that served as the "Reference Obligation") provided for "writedowns, applied losses, principal deficiencies and/or realized losses." (Cplt. at ¶ 40.) (Under the parties' CDS Contract, an "Implied Writedown" could only occur where the Reference Obligation's

Underlying Instruments did *not* provide for express writedowns of the Reference Obligation.) It is clear from the face of the Millstone III CDO's Indenture, however, that it contains no provisions contemplating a writedown of the outstanding principal amount of the CDO's Class B Notes. Further, VCG agreed in the Confirmation to make Implied Writedowns "[a]pplicable" to their CDS Contract, demonstrating that the parties expected the Implied Writedown feature would have effect for their transaction. In short, a Floating Amount Event no doubt occurred here.

In sum, the pleadings (and the CDS Contract documents incorporated in those pleadings) make absolutely clear that all of VCG's claims should be dismissed, and judgment should be entered in Citibank's favor on its counterclaim against VCG.

### Statement of Facts

The facts discussed below are established by the parties' pleadings, along with the documents attached or referred to in, and hence incorporated by reference in, those pleadings.[3] Indeed, most of the relevant facts are not in dispute between the parties. As set forth below, VCG has only raised certain limited arguments with respect to these matters, all of which are clearly disproven by the relevant terms of the transaction documents.

---

[3]    In considering a Rule 12(c) motion, the Court may consider "the pleadings and exhibits attached thereto, statements or documents incorporated by reference in the pleadings, matters subject to judicial notice, and documents submitted by the moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings." *Aristocrat Leisure Ltd.* v. *Deutsche Bank Trust Co. Americas*, No. 04-civ-10014PKL, 2005 WL 1950116 at *3 (S.D.N.Y. Aug. 12, 2005) (quoting *Prentice* v. *Apfel*, 11 F. Supp. 2d 420, 424 (S.D.N.Y. 1998)).

**The Parties' CDS Contract**

Effective as of June 29, 2007, VCG and Citibank entered into the CDS Contract and executed the following documents that, together, set forth the terms of the parties' CDS Contract:

- An ISDA 2002 Master Agreement, dated September 1, 2006, and an accompanying Schedule of the same date (together, the "ISDA Master Agreement"), using the forms published by ISDA, with certain changes set forth in the Schedule as negotiated and agreed to between the parties. (Ex. 1)[4];

- A 1994 ISDA Credit Support Annex to the Schedule to the ISDA Master Agreement dated as of September 1, 2006 (the "Credit Support Annex"), also using the appropriate form published by ISDA, with certain elections and changes as negotiated and agreed to between the parties (Ex. 2);

- The Confirmation, which was a confirmation letter for Credit Derivative Transactions on Collateralized Debt Obligations with Pay-As-You-Go or Physical Settlement (Dealer Form) dated July 5, 2007 with a Trade Date of June 29, 2007, again using a form published by ISDA (Ex. 3); and

- The ISDA Standard Terms Supplement For Use With Credit Derivative Transactions on Collateralized Debt Obligation with Pay-

---

[4]    Citations in the form of "Ex. __" refer to exhibits attached to the Declaration of Allan J. Arffa ("Arffa Decl."), dated July 16, 2008, in support of Citibank's Motion for Judgment on the Pleadings.

As-You-Go or Physical Settlement in the form published by ISDA on June 6, 2007 (the "Standard Terms Supplement"), which was incorporated by reference in the Confirmation (Ex. 4).

The parties agreed that the ISDA Master Agreement, along with the Credit Support Annex and the Confirmation, " form a single agreement between the parties." (Ex. 1 at ¶ 1(c).)  The Credit Support Annex "supplements, forms part of, and is subject to the [ISDA Master] Agreement, [and] is part of its Schedule." (Ex. 2 at 1.)  The Confirmation "supplements, forms a part of and is subject to, to the ISDA Master Agreement." (Ex. 3 at 1.)[5]  The Standard Terms Supplement is incorporated into the Confirmation.  (Ex. 4 at 1.)  Thus, by agreement, all four of these documents together constitute a single agreement that sets forth the terms of the parties' CDS Contract.

The parties also agreed that the CDS Contract would be governed by, and be construed in accordance with, the laws of the State of New York.  (Ex. 1 at ¶ 13(b); Schedule to the ISDA Master Agreement at Part 4(i).)

**The Parties' CDS Transaction**

Under the terms of the parties' CDS Contract, Citibank acted as the protection buyer in the parties' CDS transaction.  Citibank agreed to make, for the term of the CDS Contract, periodic "Fixed Payments" to VCG based on a fixed percentage of 5.50% per annum on an "Initial Face Amount" of $10,000,000 of the Class B Notes due July 5, 2046 issued by the Millstone III CDO.  (Ex. 3 at 2; Ex. 4 at 5.)  Thus, the Millstone III CDO served as the defined "Reference Entity," and its Class B Notes as the defined "Reference Obligation" under the parties' CDS Contract.  (Ex. 3 at 2; Ex. 4 at 2.)

---

[5]  The Confirmation references an incorrect date for the 2002 Master Agreement and the Credit Support Annex.  Both are dated as of September 1, 2006.

In return, VCG acted as the protection seller for the CDS transaction. It agreed, among other things, to make a "Floating Payment" to Citibank if any of the defined "Floating Amount Events" occurred with respect to the "Reference Obligation" during the term of the CDS Contract. (Ex. 4 at 6-7.)

The term of the CDS Contract was to run until the final maturity date of the Reference Obligation in July 2046, subject to any earlier amortization or liquidation of the Reference Obligation, or any early termination of the CDS Contract. (Ex. 3; Ex. 4 at ¶¶ 1, 2.)

**Citibank Demands Additional Credit Support**

Under the Credit Support Annex, at the outset of the CDS Contract, VCG was required to, and did, post with Citibank as security for VCG's "Obligations" under the CDS Contract, including its obligation to make a Floating Amount Payment (the "Obligations"), an amount equal to 20% of the $10,000,000 of the Initial Face Amount, or $2,000,000. (Ex. 3.) This amount is referred to in the Credit Support Annex as the "Independent Amount."

In addition, under the Credit Support Annex, Citibank was expressly authorized to require VCG to post additional collateral (or "Eligible Credit Support") under certain circumstances. (Ex. 2 at ¶ 3(a).) Specifically, Citibank could demand a "Delivery Amount" of additional collateral based, among other factors, upon Citibank's calculation of its "Exposure." Its Exposure was the amount of losses Citibank would incur, or gains Citibank would realize, in replacing the CDS transaction with an economically equivalent transaction at that time of calculation; Exposure thus essentially reflected the then current market value of the CDS Contract at the time of calculation.

(*See* Ex. 1, Part 5(l); 2002 Master Agreement Protocol, published on July 15, 2003 (Ex. 5) at Annex 14(c).)

The CDS Contract provided that Citibank would act as "Valuation Agent" under the Credit Support Annex when calculating any Delivery Amount. (Ex. 2 at ¶ 13(c)(i)). In that role, Citibank was expressly authorized to calculate its Exposure and hence any Delivery Amount on a regular basis. (Ex. 2 at ¶¶ 3, 4(c), 12.) If its Exposure increased (meaning that the cost of buying credit protection on the Reference Obligation on economically equivalent terms had increased since the last time Exposure was calculated), Citibank was entitled to demand from VCG an additional amount of collateral.

Specifically, the Exposure calculated by Citibank (along with the Independent Amount already posted) translated, according to a defined formula, to the "Credit Support Amount" VCG had to post with Citibank at any given point. If such Credit Support Amount exceeded the value of whatever collateral had been posted by VCG to date by at least $250,000 (the "Minimum Transfer Amount"), Citibank was entitled to demand from VCG the transfer of additional credit support, referred to as the Delivery Amount. (Ex. 2 at ¶¶ 3, 13((b)(i)(C), 13(b)(iv)(C).) Similarly, if such Credit Support Amount was less than the value of whatever collateral had been posted by VCG to date (again, by more than the Minimum Transfer Amount), VCG would be entitled to have collateral transferred back to it. (*Id.*)

## Subsequent Market Decline

After the parties entered into the CDS Contract, the CDO market suffered a severe decline. As a result, the cost of purchasing credit protection with respect to CDOs in general increased. Based on Citibank's calculations of its Exposure pursuant to

8

the Credit Support Annex, on several occasions during the second half of 2007, Citibank demanded additional Eligible Credit Support from VCG. (Cplt. at ¶ 20.)

As alleged in VCG's Complaint, between August and November 2007, Citibank provided VCG with Notices of Collateral Demand, which set forth the additional amount of collateral that VCG was required to deposit with Citibank:

- On or about August 1, 2007, Citibank demanded $2,133,400.17 in additional collateral from VCG. (Cplt. ¶20.)

- On or about August 23, 2007, Citibank demanded $2,064,534.14 in additional collateral from VCG. (*Id.*)

- On or about September 4, 2007, Citibank demanded $1,686,854.00 in additional collateral from VCG. (*Id.*)

- On or about November 5, 2007, Citibank demanded $2,075,489.47 in additional collateral from VCG. (*Id.*)

In response to Citibank's demands for additional collateral, between August 1, 2007 and November 5, 2007, VCG deposited a total of $7,960,277.78 (in addition to the $2,000,000 Independent Amount) with Citibank to secure VCG's obligations under the Agreement, in accordance with Paragraph 3 of the Credit Support Annex.[6] (Cplt. at ¶ 21.)

The Credit Support Annex expressly provides a mechanism whereby, among other things, the "Valuation Agent's" (*i.e.,* Citibank's) calculations of the

---

[6]    Pursuant to Citibank's calculation of its Exposure in December of 2007 based upon conditions in the market at the time, Citibank determined that it should return $667,822.88 of previously posted collateral to VCG, and Citibank promptly returned that amount to VCG. (Cplt. at ¶ 32.)

Delivery Amount (and hence additional Eligible Credit Support) could be challenged on an expedited basis by obtaining valuations from third parties. (Ex. 2 at ¶ 5.) It is undisputed that VCG never invoked the dispute resolution provisions provided in the Credit Support Annex to challenge any of Citibank's Exposure determinations or demands for additional collateral. (*See* Letter from Robert Fasulo to Citibank, dated August 20, 2007 (Ex. 6).)

**The Determination of a Floating Amount Event**

VCG and Citibank also chose Citibank to serve as the "Calculation Agent" under the CDS Contract. (Ex. 3 at 2.) The Calculation Agent is authorized to make certain calculations and determinations with respect to the CDS Contract, including, but not limited to, the determination of the occurrence of a "Floating Amount Event" and the calculation of the "Floating Amount" payable as a result. (Ex. 4 at 14-15.)

Pursuant to the Standard Terms Supplement, the Floating Amount Events under the CDS Contract included a "Failure to Pay Principal," an "Interest Shortfall" or a "Writedown," each with respect to the Reference Obligation. (Ex. 4 at 7.) A "Writedown" was further defined as the occurrence at any time on or after the Effective Date of:

(i)    (A)    a writedown or applied loss (however described in the Underlying Instruments) resulting in a reduction in the Outstanding Principal Amount (other than as a result of a scheduled or unscheduled payment of principal) or

           (B)    the attribution of a principal deficiency or realized loss (however described in the Underlying Instruments) to the Reference Obligation resulting in a reduction or subordination of the current interest payable on the Reference Obligation;

10

  (ii)  the forgiveness of any amount of principal by the holders of the Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the Outstanding Principal Amount; or

  (iii)  **if Implied Writedown is applicable and the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) above to occur in respect of the Reference Obligation, an Implied Writedown Amount being determined in respect of the Reference Obligation by the Calculation Agent.**

(Ex. 4 at 23 (emphasis added).)

    In other words, in the event: (a) the parties agreed that the "Implied Writedown" feature applied to their CDS transaction, and (b) the Reference Obligation's "Underlying Instruments" (in this case, the Indenture governing the Millstone III CDO and its Class B Notes) did not provide for express writedowns of the Reference Obligation, then an "Implied Writedown" (and hence a "Writedown") would occur if the Calculation Agent determined an "Implied Writedown Amount" with respect to the Reference Obligation.

    As reflected in the Confirmation, the parties agreed that "Implied Writedown" was "Applicable" to their CDS transaction. (Ex. 3 at 2.) Accordingly, an "Implied Writedown" would constitute a "Writedown" with respect to the Reference Obligation, and hence trigger VCG's obligation to make a Floating Payment to Citibank.

    Further, the "Underlying Instrument" with respect to the Reference Obligation — meaning the Indenture, dated July 5, 2006, between Millstone III CDO, Ltd., Millstone III CDO, LLC, and JPMorgan Chase Bank, N.A., applicable to the Millstone III Class B Notes that served as the Reference Obligation — does not, in fact,

provide for any writedowns, applied losses, principal deficiencies or realized losses with respect to those Notes.[7]  (Indenture, dated July 5, 2006 (Ex. 7).)

Thus, a "Writedown," as defined by the Standard Terms Supplement, would occur if and when the Calculation Agent (*i.e.,* Citibank) determined an "Implied Writedown Amount" with respect to the Millstone III CDO's Class B Notes.  (Ex. 4 at 23.)

## The Determination of the Floating Amount

In January of 2008, Citibank, acting as Calculation Agent, determined an Implied Writedown Amount with respect to the Reference Obligation.  Accordingly, a Floating Amount Event, in the form of an Implied Writedown, occurred, thereby triggering VCG's Floating Payment Obligation to Citibank.  (*See* Floating Amount Event Notice, dated January 9, 2008. (Ex. 8).)

Citibank's determination of an Implied Writedown Amount was based upon a straight-forward mathematical formula set forth in the parties' CDS Contract. Specifically, the CDS Contract's Standard Terms Supplement provides detailed instructions for the calculation of the Implied Writedown Amount.  (Ex. 4 at 16, 19, 20.) The numbers used in the calculation are taken directly from "Servicer Reports" issued with respect to the CDO that serves as the Reference Entity. (Ex. 4 at 20, 22.)  These

---

[7]    The documentation underlying CDOs generally does not provide for express writedowns of, or the application of realized losses to, the debt instruments issued by the CDO.  By contrast, the documentation underlying certain other instruments, such as asset-backed securities ("ABS") or residential mortgage-backed securities ("RMBS"), in many cases include provisions that permit the express writedown of certain of the subordinated classes of such securities.  For example, a trustee of a class of subordinated RMBS securities may be permitted, under the underlying instruments that govern those securities, to reduce, *i.e.* "write down," the outstanding principal amount payable to holders of those securities to reflect "realized losses" that take place when underlying mortgages are liquidated at a loss.

reports, issued by the trustee for the CDO, a third party unaffiliated with VCG and Citibank, describe the current status and financial condition of the CDO. When, using the data from these reports, application of the CDS Contract formula leads to a positive number for the "Implied Writedown Amount," such an amount is "determined," and an "Implied Writedown" occurs. (*See* Ex. 4 at 16, 19, 20.)

The formula for determining the Implied Writedown Amount principally turns on the current "Overcollateralization Ratio" with respect to the Reference Obligation, which, for this purpose, was obtained directly from the Servicer Reports. The Overcollateralization Ratio is the ratio set forth in the most recent Servicer Report of (A) the aggregate asset pool balance in the CDO securing the payment obligations for the Reference Obligation (subject to certain adjustments) to (B) the outstanding principal amount of debt the CDO has issued at the priority level of the Reference Obligation and the more senior levels. (Ex. 4 at 20.) In other words, the Overcollateralization Ratio provides a benchmark that indicates whether the CDO's assets will be sufficient to satisfy the CDO's debt obligations at the level of the Reference Obligation and more senior levels.

If an Overcollateralization Ratio is in excess of 100%, the CDO's assets are calculated to be adequate to support the principal amount of the CDO's debt obligations at the level of the Reference Obligation and above. An Overcollateralization Ratio below that amount means the CDO's assets are calculated to be insufficient to support the principal amount of its debts at the level of the Reference Obligation and above.

The Overcollateralization Ratio is calculated on a regular basis by the trustee of the Reference Entity and included in each Servicer Report. Both parties here concede that the calculation of the Overcollateralization Ratio is taken directly from the Servicer Report and is not independently calculated by any other party. (Ex. 4 at 20, 22.)

With that background, we now turn to the details of the calculation of the Implied Writedown Amount. "Implied Writedown Amount" is defined in the Standard Terms Supplements to mean:

> (i) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, **an amount determined by the Calculation Agent equal to the excess, if any, of the Current Period Implied Writedown Amount over the Previous Period Implied Writedown Amount,** in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, and (ii) in any other case, zero.

(Ex. 4 at 19 (emphasis added).)

"Current Period Implied Writedown Amount" is defined to mean:

> in respect of a Reference Obligation Calculation Period, an amount determined as of the last day of such Reference Obligation Calculation Period equal to the greater of
>
> (i) zero; and
>
> (ii) the product of:
>
>> (A)     the Implied Writedown Percentage; and
>>
>> (B)     the greater of:
>>
>>> (1)     zero; and
>>>
>>> (2)     the lesser of (x) the *Pari Passu* Amount and (y) the product of (I) the *Pari Passu* Amount plus the

Senior Amount and (II) an amount equal to one
minus the Overcollateralization Ratio.[8]

(Ex. 4 at 16.)

Essentially, the formula provides that, so long as the aggregate pool

balance of the assets supporting the Reference Obligation and more senior obligations

remains in excess of all of those obligations (that is, so long as the Overcollateralization

Ratio remained over 100%), the calculation results in an Implied Writedown Amount of

$0. Once the aggregate balance of assets falls below the principal amount of the relevant

obligations (*i.e.,* once the Overcollateralization Ratio falls below 100%), the calculation

results in a positive number, and hence an Implied Writedown Amount "is determined."

In January 2008, the Calculation Agent applied the following numbers to

the Current Implied Writedown Amount formula:

The Current Period Implied Writedown is the greater of:

(i) zero; and

(ii) the product of:

---

[8]    Pursuant to the Standard Terms Supplement, the "Implied Writedown Percentage" is
the percentage calculated by dividing the outstanding principal balance of the
Reference Obligation by the "*Pari Passu* Amount," meaning the aggregate
outstanding principal amount of all obligations of the Reference Entity, including the
Reference Obligation, ranking *pari passu* (*i.e.*, equal) in priority with the Reference
Obligation. (Ex. 4 at 19-20.) In this case, there were no other obligations of the
Millstone III CDO ranking *pari passu* with the Class B Notes that served as the
Reference Obligation. Accordingly, the *Pari Passu* Amount was equal to the
outstanding principal amount of the Reference Obligation (the Class B Notes), or
$20,000,000. The Implied Writedown Percentage was thus equal to 100%
($20,000,000/$20,000,000). The "Senior Amount" is the aggregate outstanding
principal balance of all obligations of the Reference Entity that rank senior in priority
to the Reference Obligation. (Ex. 4 at 22.) The aggregate principal balance of all
obligations of the Millstone III CDO that ranked senior in priority to the Reference
Obligation was $2,141,500,000 (consisting of $2,000,000,000 principal amount of
Class A-1A Notes, $71,500,000 of Class A-1B Notes, and $70,000,000 of Class A-2
Notes). (*See* Ex. 7 at 81.)

(A)   the Implied Writedown Percentage (100%); and

(B)   the greater of:

   (1)   zero; and

   (2)   the lesser of (x) the *Pari Passu* Amount ($20,000,000) and (y) the product of (I) the *Pari Passu* Amount ($20,000,000) plus the Senior Amount ($2,145,000,000) (or a total of $2,165,000,000) and (II) an amount equal to one minus the Overcollateralization Ratio (97.089%) (or 2.911%).

Since $2,165,000,000 times 2.911% exceeds the $20,000,000 *Pari Passu* Amount, the $20,000,000 figure is used. That amount exceeds zero, and hence is multiplied by the Implied Writedown Percentage of 100%, resulting in a Current Period Implied Writedown Amount of $20,000,000.

The Overcollateralization Ratio (of 97.089%) used in the calculation came straight from the December 2007 Servicer Report for the Millstone III CDO. According to the December 2007 Servicer Report, the aggregate asset pool balance securing the payment obligations on the Reference Obligation (and all other obligations of the Reference Entity) was $2,098,575,860.60. (Ex. 9 at 12.) The total outstanding principal amount of all senior obligations of the Reference Entity that would have to be satisfied prior to the Reference Obligation plus the outstanding principal amount of the Reference Obligation was $2,161,500,000. Because the $2,098,575,860.60 aggregate asset pool balance securing all of the obligations of the Reference Entity (which include the Reference Obligation) was less than the $2,161,500,000 outstanding principal amount of the Reference Obligation and other more senior obligations of the Reference Entity – indeed, more than $62 million less than those obligations – the Reference Obligation was

undercollateralized. Consequently, the Overcollateralization Ratio was less than 100% (in this case, 97.089%).

The Previous Period Implied Writedown Amount was calculated in the same manner as the Current Period Implied Writedown Amount, except using the inputs relating to the last day of the immediate preceding Reference Obligation Calculation Period. (Ex. 4 at ¶ 20.) According to the November 2007 Servicer Report for the Millstone III CDO, the Overcollateralization Ratio for the Reference Obligation was then 100.711%. (Ex. 10. at 9 of Note Valuation Report.) Thus, the Previous Period Implied Writedown equaled $0.[9]

As a result, Citibank, as Calculation Agent, calculated an Implied Writedown Amount of $20,000,000, representing the excess of the Current Period Implied Writedown Amount ($20,000,000) over the Previous Period Implied Writedown Amount ($0). Thus, Citibank had "determined" an Implied Writedown Amount with respect to the Reference Obligation.

On January 9, 2008, Citibank therefore provided VCG with a "Floating Amount Event Notice," informing VCG that "an Implied Writedown has occurred with respect to the Reference Obligation on or about, January 4, 2008." (Ex. 8).

---

[9] Specifically, the Previous Period Implied Writedown Amount equaled the greater of: (i) zero; and (ii) the product of the Implied Writedown Percentage (100%) and (B) the greater of: (1) zero; and (2) the lesser of (x) the *Pari Passu* Amount ($20,000,000) and (y) the product of the *Pari Passu* Amount ($20,000,000) plus the Senior Amount ($2,145,000,000) (or a total of $2,165,000,000) and (II) an amount equal to 1 minus the Overcollateralization Ratio (100.71%) (or −.711%). Since −.711% times $2,165,000,000 produces a negative number that will be less than the *Pari Passu* Amount, the Implied Writedown Percentage is multiplied by zero, which is not greater than zero, so the result of the calculation is $0. (*See* Ex. 4 at 20.)

Pursuant to the Standard Terms Supplement, "[i]f a Floating Amount Event occurs, then on the relevant Floating Rate Payer Payment Date, [VCG] will pay the relevant Floating Amount to [Citibank]." (Ex. 4 at 7.) The Floating Amount equaled the Implied Writedown Amount multiplied by the Applicable Percentage, then multiplied by the Reference Price. The Applicable Percentage in this case was 50% – the Initial Face Amount of the CDS Contract divided by the Original Principal Amount of the Reference Obligation ($10 million divided by $20 million).[10] (Ex. 4 at 2.) The Reference Price was 100%. (Ex. 3 at 2.) Accordingly, the Floating Amount was the Implied Writedown Amount ($20,000,000) multiplied by the Applicable Percentage (50%), then multiplied by the Reference Price (100%), which equaled $10,000,000.

The Floating Rate Payer Payment Date is at least two business days after delivery of a notice by the Calculation Agent that the related Floating Amount is due. (*Id.*) In its January 9, 2008 Floating Amount Event Notice, Citibank therefore notified VCG of VCG's obligation to pay Citibank $10,000,000. (Ex. 8.)

**VCG Fails to Satisfy Its Floating Amount Payment Obligations**

VCG failed to pay the Floating Amount on the Floating Rate Payer Payment Date of January 14, 2008. As a result, on January 30, 2008, Citibank provided VCG with a formal "Notice of Failure to Pay," which notified VCG of Citibank's intention to treat VCG's failure to pay as an "Event of Default" pursuant to Section 5(a)(i) of the ISDA Master Agreement, if such failure was not remedied within

---

[10]  Both the Initial Face Amount and Original Principal Amount were obtained directly from the Confirmation. (Ex. 3 at 2.)

the contractual cure period of one business day following delivery of the Notice, as provided by the CDS Contract. (Ex. 11.)

Because VCG failed to cure its prior failure to pay within the cure period (*see* Ex. 1 at ¶ 5(a)(1)), on February 1, 2008, Citibank provided VCG, pursuant to Section 5(a)(1) of the ISDA Master Agreement, with a formal "Notice of Default and Early Termination." (Ex. 12.) In that Notice, Citibank designated February 1, 2008 as the "Early Termination Date" with respect to the CDS Contract and advised VCG of Citibank's intention to close out, liquidate and otherwise exercise its contractual rights and remedies under the ISDA Master Agreement. (*Id.*)

Following the early termination of the CDS Contract, Citibank provided VCG with a "Notice of Setoff" in which it informed VCG of the set-off of a portion of the $10,000,000 Floating Amount owed by VCG against the $9,325,747.62 of collateral that VCG had posted with Citibank ($9,292,454.90 plus interest amounts of $33,292.72). (*See* Ex. 1 at ¶ 6(f); Ex. 13.) In the Notice of Setoff, Citibank reserved all of its rights and notified VCG that VCG remained liable for the outstanding balance, which was due and immediately payable. (Ex. 13.)

Following the setoff of a portion of the Floating Amount against the posted collateral, Citibank calculated the remaining balance due and payable by VCG in accordance with the terms of the ISDA Master Agreement. On February 1, 2008, Citibank provided VCG with a "Calculation Notice," informing VCG that VCG still owed $674,252.38 (the "Early Termination Amount") to Citibank, along with interest calculated at a rate of the overnight London Interbank Offered Rate plus 1% per annum, compounding daily, from the date of the failure to pay. (Ex. 14.)

**VCG Fails to Indemnify Citibank**

Finally, we note that the CDS Contract also imposes certain indemnification obligations on VCG. Pursuant to paragraph 11 of the ISDA Master Agreement, VCG agreed to indemnify and hold harmless Citibank for and against all reasonable out-of-pocket expenses, including legal fees incurred by Citibank, by reason of enforcement and protection of its rights under the CDS Contract. (Ex. 1 at ¶ 11.)

**Procedural History**

On February 14, 2008, VCG filed its complaint in this action against Citibank, asserting six causes of action: (i) declaratory judgment, (ii) rescission, (iii) breach of contract, (iv) implied covenant of good faith and fair dealing, (v) unjust enrichment, and (vi) conversion. VCG's claims relate, according to VCG's own pleading, to "two distinct disagreements": (a) according to VCG, Citibank was not authorized to request Eligible Credit Support from VCG, and VCG thus posted collateral in excess of the amount actually required, and (b) also according to VCG, Citibank incorrectly demanded a Floating Payment. (Cplt. at ¶¶ 47, 53, 56-58.)

On April 23, 2008, Citibank filed an Answer and Counterclaim against VCG, denying all of VCG's alleged claims and asserting a counterclaim for VCG's breach of contract due to VCG's failure to meet its Floating Payment obligation under the CDS Contract. On May 20, 2008, VCG filed an Answer to Citibank's Counterclaim, denying liability to Citibank.

## Argument

Judgment on the pleadings is proper "where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers* v. *M.C. Floor Crafters Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). As noted above, in considering a Rule 12(c) motion, the Court may consider "the pleadings and exhibits attached thereto, statements or documents incorporated by reference in the pleadings, matters subject to judicial notice, and documents submitted by the moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings." *Aristocrat Leisure Ltd.*, 2005 WL 1950116 at *3 (quoting *Prentice*, 11 F. Supp. 2d at 424).

On such a motion, although the Court must accept well-pleaded allegations in the complaint as true, "bald assertions and conclusions of law are not adequate [to state a claim] and a complaint consisting only of naked assertions, and setting forth no facts upon which a court could find a violation of the [law] will fail to state a claim under Rule 12(b)(6) and, therefore, also under Rule 12(c)." *Tuosto* v. *Philip Morris USA Inc.*, No. 05 Civ. 9384 (PKL), 2007 WL 2398507, *3 (S.D.N.Y. Aug. 12, 2007) (quoting *In re Tamoxifen Citrate Antitrust Litig.*, 429 F.3d 370, 384-85 (2d Cir. 2005) (internal quotation marks omitted.) Dismissal is appropriate where the plaintiff fails to assert a viable legal theory. *American Motorists Ins. Co.* v. *GTE Corp.*, Nos. 99CV512 (RCC), 99CV2214 (RCC), 2000 WL 1459813, *3 (S.D.N.Y. Sept. 29, 2000).

Under New York law, which applies here, "the initial interpretation of a contract is a matter of law for the court to decide." *Fleet Capital Corp.* v. *Yamaha Motor Corp.*, No. 01 Civ. 1047, 2002 WL 31174470, *19 (S.D.N.Y. Sept. 25, 2002) (quoting *Alexander & Alexander Servs., Inc.* v. *These Certain Underwriters at Lloyd's*, 136 F.3d

21

82-86 (2d Cir. 1998)). Dismissal of a complaint is thus appropriate where the terms of the relevant contract, incorporated by reference in the pleadings, unambiguously show that the plaintiff is not entitled to the requested relief. *DynCorp.* v. *GTE Corp.*, 215 F. Supp. 2d 308, 315 (S.D.N.Y. 2002); *see also Wilson* v. *Hochberg*, 665 N.Y.S.2d 653, 653-54 (1st Dep't 1997) (complaint should be dismissed where express terms of relevant contract flatly contradict claim); *Perl* v. *Smith Barney, Inc.*, 646 N.Y.S.2d 678, 679 (1st Dep't), *lv. denied,* 89 N.Y.2d 803, 675 N.E.2d 1234, 653 N.Y.S.2d 281 (1996) (same).

As VCG makes clear in its Complaint, the dispute between the parties involves two principal issues: (a) whether Citibank properly demanded from VCG additional collateral (beyond the $2,000,000 Independent Amount), and (b) whether Citibank properly declared a Floating Amount Event. (Cplt. at ¶ 47.) Both issues can be resolved – and should be resolved in Citibank's favor – by a careful review of the terms of the parties' CDS Contract in light of the undisputed facts.

## I.

## CITIBANK'S REQUESTS FOR COLLATERAL WERE PROPER

VCG first asserts that Citibank wrongly demanded that VCG post collateral support. (Cplt. ¶¶ 26, 47.) The contention is squarely and fully contradicted by the unambiguous language of the parties' CDS Contract. Wrongly seizing upon language in the ISDA Master Agreement stating that, in the event of an inconsistency between the Confirmation and the ISDA Master Agreement, the Confirmation controls, VCG asserts that "Citibank's requests for variation margin, based upon the Credit Support Annex to the ISDA Master Agreement, are inconsistent with, and therefore superseded by" the Confirmation. (Cplt. at ¶¶ 47, 49.)

The problem with VCG's argument is that no such contradiction exists – as is abundantly clear from the face of the relevant transaction documents.

### A.    Citibank Was Entitled to Demand Additional Credit Support

The Confirmation explicitly states that it "supplements, forms a part of and is subject to, the ISDA Master Agreement... as amended and supplemented from time to time" between the parties. (Ex. 3 at 1.)  Further, the Confirmation states clearly that "This Transaction shall be subject to the Credit Support Annex . . . between Citibank and [VCG]." (Ex. 3 at 3.)  These references to the other documents comprising the CDS Contract make clear that the Confirmation was to be read in conjunction with all of the other CDS Contract documents.  (*See* Ex. 1 at ¶ 1(c) ("All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties").

While the ISDA Master Agreement states, in paragraph 1(b), that "[i]n the event of any inconsistency between the provisions of any Confirmation and this Master Agreement [which includes the Credit Support Annex], such Confirmation will prevail for the purpose of the relevant Transaction," there is simply no inconsistency or conflict between VCG's obligations under the terms of the Credit Support Annex to post additional collateral, and anything contained in the Confirmation. (Ex. 1 at ¶ 1(b).)  In particular, nothing in the Confirmation modifies the parties' obligations to transfer Eligible Credit Support. (Ex. 3.)

As explained in detail above, under the Credit Support Annex, Citibank as the Valuation Agent for purposes of calculating a Delivery Amount was to determine Citibank's "Exposure" and, based on that, the amount of additional collateral VCG was required to post. (Ex. 1, Part 5(l); Ex. 2 at ¶¶ 3, 4(c), 12; Ex. 5 at Annex 14(c).)  As a

result of Citibank's calculation of its Exposure, Citibank demanded additional Eligible Credit Support from VCG. (Cplt. at ¶ 20.) In response to Citibank's demands for additional Eligible Credit Support, VCG posted with Citibank a total amount of $7,960,277.78 in additional collateral. (*Id.* at ¶ 21.)

There is simply nothing contained in the Confirmation that interferes with, or contradicts, the provisions of the Credit Support Annex that Citibank invoked. VCG's position thus fails in light of the language of the parties' agreements. Accordingly, all of VCG's claims for declaratory judgment, rescission, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment and conversion based on this alleged "inconsistency" fail as well.

### B.    VCG Never Initiated the Dispute Resolution Provisions in the Credit Support Annex

VCG's claims that Citibank wrongly demanded that VCG post additional collateral support and that Citibank retained collateral support in excess of the amount actually required also fail for a second, independently sufficient reason: VCG's failure to invoke the CDS Contract's dispute resolution procedures with respect to such demands.

The Credit Support Annex provided for an expedited dispute resolution process (involving the obtaining of alternative quotes from third parties) should there be a dispute over calculations of the amount of additional collateral demanded by Citibank. (Ex. 2 at ¶¶ 3, 4(c), 5, 13(f)). By its own admission, VCG did not invoke this process. (Ex. 6.) In fact, in an August 20, 2007 letter, VCG acknowledged that it "did not follow the protocol called for in the documents relating to dispute resolution." (*Id.*) Accordingly, as a matter of law, VCG is now precluded from bringing the claims to challenge Citibank's calculation of Exposure.

New York law, which governs the CDS Contract, requires compliance with contractual dispute resolution mechanisms; failure to comply results in the dismissal of the claims that should have been, but were not, submitted to such mechanisms. *See, e.g., Acme Supply Co., Ltd.* v. *City of New York*, 834 N.Y.S.2d 142 (1st Dep't 2007) (holding that "the complaint should have been dismissed because plaintiffs failed to comply fully with the contractual dispute resolution procedure"); *Excel Group, Inc.* v. *New York City Transit Authority,* 814 N.Y.S.2d 220, 223 (2nd Dep't 2006) (when city transit authority terminated contract for rehabilitation of subway stations, contractor was required to pursue its breach of contract claim through resolution procedure provided by parties' contract, and when the 10-day time period to pursue resolution procedure expired, contractor was foreclosed from pursuing that or any other remedy); *Ferguson Elec. Co. Inc.* v. *Kendal at Ithaca Inc.,* 711 N.Y.S.2d 246, 246-249 (3d Dep't. 2000) (affirming lower court's determination that dispute procedures in the underlying contract "were mandatory and obligatory" and holding that "[Alternative dispute resolution] mechanisms reflecting informed negotiation and endorsement of the parties are valid and enforceable.").

In short, VCG chose "with its business eyes open to accept the terms, specifications and risks" of the contract, including the dispute resolution provisions, and is thus bound by those aspects of the contract. *See Ferguson Elec. Co. Inc.,* 274 A.D.2d at 891.

For this reason as well, all of VCG's claims for declaratory judgment, rescission, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment and conversion that challenge Citibank's calculation of

Exposure and its resulting demands for the posting of additional collateral should be dismissed.

      **C.**    **<u>VCG's Collateral Claims Are Now Moot</u>**

      In any event, for the reasons further described below, at this point, a Floating Amount Event has occurred, and VCG owes Citibank the $10 million Floating Amount, equal to the face amount of the CDS Contract. VCG did not pay this amount and Citibank used the collateral to satisfy in part VCG's Floating Amount obligations. Even if VCG did not have to post collateral over the course of the CDS Contract, VCG would still be required to pay the Floating Amount upon the occurrence of a Floating Amount Event.

      As a result, all of VCG's complaints about its prior posting of collateral with Citibank are now moot. *See, e.g., Flast v. Cohen*, 392 U.S. 83, 95 (1968) (Federal courts do not have subject matter jurisdiction when "the question sought to be adjudicated has been mooted by subsequent developments."); *Boucher v. Syracuse Univ.*, 164 F.3d 113, 117-118 (2d Cir. 1999) (actions occurring after complaint filed that obviate injunctive relief sought render claim moot); *Clark v. New York's Health and Human Service Union*, 04 Civ. 7658 (SHS), 2006 WL 662171, *2 (S.D.N.Y. March 15, 2006) (plaintiff's suit for failure to arbitrate her claim could not be maintained once union agreed to arbitrate).

II.

**A FLOATING AMOUNT EVENT IN THE FORM OF AN**
**<u>IMPLIED WRITEDOWN OCCURRED UNDER THE CDS CONTRACT</u>**

The second "live and present controversy" between the parties, according to VCG itself, is whether Citibank properly declared a "Floating Amount Event" in the form of an "Implied Writedown" under the CDS Contract, thereby obligating VCG to make a $10,000,000 Floating Payment to Citibank. VCG's allegations (and claims) on this score are based entirely on the assertion that no Implied Writedown could occur here because, according to VCG, the Reference Entity's "Underlying Instruments" (in this case, the Indenture for the Millstone III CDO and its Class B Notes) provide for "writedowns, applied losses, principal deficiencies and/or realized losses" with respect to those Notes. (Cplt. ¶ 40.)

As with its faulty reading of the Confirmation and Credit Support Annex described above, VCG is misconstruing the relevant documents. The Millstone III CDO Indenture (like most CDO indentures) contains no such provisions. Further, in the Confirmation, the parties specifically made Implied Writedown "[a]pplicable" to their CDS transaction, and any argument that an Implied Writedown should not apply is inconsistent with the agreed upon terms of the Confirmation and the intent of the parties. (Ex. 3 at 2.) Thus, VCG fails to state a claim because its interpretation of the CDS Contract is contradicted by the plain language of the underlying instruments at issue and the agreement between both parties to apply Implied Writedowns in the Confirmation.

A.    **<u>The Implied Writedown Feature Applies Here</u>**

There is no question that, pursuant to the Standard Terms Supplement, the Floating Amount Events that would trigger VCG's Floating Payment obligation to

27

Citibank included a "Failure to Pay Principal," an "Interest Shortfall" or a "Writedown" with respect to the Reference Obligation. (Ex. 4 at 7.) As reflected in the Confirmation, the parties agreed that "Implied Writedown" was "Applicable" (Ex. 3 at 2), would constitute a "Writedown" with respect to the Reference Obligation, and would therefore trigger VCG's Floating Payment obligation to Citibank. (*Id.*)

Pursuant to the terms of the Standard Terms Supplement: if (1) the parties have elected an Implied Writedown and if (2) the Reference Obligation's "Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses ... to occur in respect of the Reference Obligation," the Calculation Agent is to determine whether an "Implied Writedown" has occurred in respect of the Reference Obligation. (Ex. 4 at 23.) There is no dispute that the parties elected in the Confirmation that the Implied Writedown feature would apply to their CDS Contract. (Ex. 3 at 2.)

Nor can there be any serious dispute (despite VCG's protestations) that the Underlying Instrument for the Reference Obligation (the Millstone III CDO Class B Notes) — the Indenture, dated July 5, 2006, between Millstone III CDO, Ltd. Millstone III CDO, LLC, and JPMorgan Chase Bank, N.A. — does *not* provide for any writedowns, applied losses, principal deficiencies or realized losses with respect to the Class B Notes other than those resulting from a scheduled or unscheduled payment of principal. (Ex. 7.) In other words, there are no provisions in the Indenture that permit any express write-downs of the principal amounts of the Class B Notes, or any of the other events referred to.

Thus, a "Writedown," as defined by the Standard Terms Supplement, occurs if the Calculation Agent determines (as it did here) the "Implied Writedown Amount." (Ex. 4 at 23.)

**B.**    **Citibank Properly Determined the Floating Amount**

Citibank properly calculated the Implied Writedown Amount resulting in the Floating Amount payment obligation. It applied the Overcollateralization Ratio with respect to the Reference Obligation, which Citibank obtained directly from the Millstone III CDO's December 2007 Servicer Report, to the formula contained in the Standard Terms Supplement. Specifically, the December 2007 Servicer Report for the Millstone III CDO indicated the Overcollateralization Ratio for the Reference Obligation had dropped to 97.089% from the Overcollateralization Ratio of 100.711% reported in the Millstone III CDO's Servicer Report for November 2007. (Exs. 6, 7.)

Applying the 97.089% Overcollateralization Ratio to the formula set forth in the Standard Terms Supplement, Citibank determined that an Implied Writedown had occurred. Specifically, as explained above, the Implied Writedown Amount was the amount equal to the excess of the Current Period Implied Writedown Amount ($20,000,000) over the Previous Period Implied Writedown Amount ($0), or $20,000,000. Thus, Citibank, as Calculation Agent, properly determined an Implied Writedown Amount of $20 million. As a result, Citibank properly determined that a Floating Amount Event had taken place, and properly calculated the Floating Amount to be the Current Period Implied Writedown Amount, as adjusted by the Applicable Percentage, or $10 million.

Because Implied Writedowns constitute Floating Amount Events under the CDS Contract, and because an Implied Writedown occurred, VCG's claims for

declaratory judgment, rescission, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and conversion based upon the alleged non-occurrence of the Floating Amount Event should all be dismissed.

### III.

### VCG FAILS TO STATE A CLAIM FOR RESCISSION

VCG also alleges, in an alternative claim for "rescission," that it made an "honest and excusable" mistake and did not intend to "take the risk of daily mark-to-mark movements in the value of the reference obligation." (Cplt. ¶ 49.) These allegations are clearly inadequate as a matter of law. The CDS Contract was "the product of an arm's length transaction between sophisticated and knowledgeable parties." *See Loyalty Life Ins. Co.* v. *Fredenberg*, 632 N.Y.S.2d 901, 903 (3d Dep't 1995) (rejecting claim of unilateral mistake), and the plain language of the CDS Contract clearly entitles Citibank to request additional Eligible Support. (Ex. 2 at ¶ 3(a).) Under such circumstances, no claim for "rescission" based on "mistake" can exist. *NCR Corp. v. Lemelson Medical, Education and Research Foundation*, 99-CV-3017, 2001 WL 1911024, *7 (S.D.N.Y. April 2, 2001) (rejecting rescission claim based on unilateral mistake where the party, a sophisticated negotiator, simply failed to review carefully unambiguous language in the parties' agreement).

Further, it has been long held under the "election of remedies" doctrine, that an action to rescind a contract is inconsistent with an action for a breach of contract. *American Woolen Co. of New York* v. *Samuelsohn*, 226 N.Y. 61 (1919); *see BGW Develop. Corp. v. Mount Kisco Lodge No. 1552*, 669 N.Y.S.2d 56 (2d Dep't) (where plaintiff had maintained a breach of contract theory, plaintiff could not simultaneously

assert a claim for rescission), *lv. to appeal denied*, 92 N.Y.2d 813, 704 N.E.2d 227, 681

N.Y.S.2d 474 (1998).[11]

      For all of these reasons, VCG's purported claim for "rescission" fails.

IV.

**VCG FAILS TO STATE A CLAIM FOR BREACH OF<br>IMPLIED COVENANT OF GOOD FAITH AND UNFAIR DEALING**

      In addition to the arguments set forth above, VCG's purported claim for

breach of implied covenant of good faith and unfair dealing should be dismissed for the

independent reason that New York "does not recognize a separate cause of action for

breach of the implied covenant of good faith and fair dealing when a breach of contract

claim, based upon the same facts, is also pled." *Harris* v. *Provident Life & Accident Ins.

Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *see also Fasolino Foods Co. Inc.* v. *Banca Nazionale

del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992); *Ezrasons, Inc.* v. *Am. Credit Indem. Co.*,

683 N.Y.S.2d 264, 266 (N.Y. App. Div. 1999); *Canstar* v. *J.A. Jones Constr. Co.*, 622

N.Y.S.2d 730, 730 (N.Y. App. Div. 1995). A claim for "breach of the implied covenant

of good faith . . . can survive a motion to dismiss 'only if it is based on allegations

different than those underlying the accompanying breach of contract claim.'" *Ari & Co.,

Inc.* v. *Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003) (quoting *Siradas* v.

*Chase Lincoln First Bank, N.A.*, No. 98-cv-4028, 1999 WL 787658, at *6 (S.D.N.Y.

Sept. 30, 1999)). Here, VCG's allegations of breach of the implied covenant of good

---

[11]  In any event, VCG's "rescission" theory appears to apply only to VCG's argument
that it should not have been required to post additional collateral – an issue that, as
noted above, is now moot in light of the occurrence of a "Floating Amount Event."

faith and fair dealing are completely identical to its allegations with respect to its breach of contract claim. Accordingly, the claim should be dismissed.

## V.

## VCG FAILS TO STATE CLAIMS FOR UNJUST ENRICHMENT

In addition to the arguments set forth above, VCG's purported unjust enrichment claim is barred by the existence of the CDS Contract. Where, as here, there is an express and enforceable contract specifically governing a particular subject matter, plaintiff may not seek recovery in quasi-contract for events arising out of the same subject matter. *See Bellino Schwartz Padob Advertising, Inc.* v. *Solaris Mktg. Group*, 635 N.Y.S.2d 587, 588 (1st Dep't 1995) (existence of express agreement between plaintiff and the signatory defendants barred quasi contract claim against both signatory and non-signatory defendants); *Feigen* v. *Advance Capital Management Corp.*, 541 N.Y.S.2d 797, 799 (1st Dep't 1989) (dismissing unjust enrichment claims against company and its directors based on express contract between company and plaintiff). Thus, the claim for unjust enrichment should be dismissed.

## VI.

## VCG FAILS TO STATE CLAIMS FOR CONVERSION

VCG's purported conversion claim, predicated on Citibank's alleged extraction of unnecessarily large amount of collateral from VCG, is also duplicative of defendant's contract claim, and accordingly should be dismissed. *See Richbell Info. Servs., Inc.* v. *Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 590 (1st Dep't 2003) ("We are not persuaded by [the] argument that conversion is a wrong qualitatively different from a mere breach of contract, so that it is not duplicative; such reasoning would resuscitate

every redundant tort claim, regardless of its theory."); *Wolf* v. *Nat'l. Council of Young Israel,* 694 N.Y.S.2d 424, 425 (2d Dep't 1999) (dismissing conversion counterclaim based upon allegations that the plaintiff improperly deducted late fees from defendant's monthly mortgage payments in a manner not authorized by the mortgage agreements because the counterclaim did not stem from a wrong independent of the alleged breach of the mortgage agreements).

## VII.

## CITIBANK IS ENTITLED TO JUDGMENT IN ITS FAVOR ON ITS COUNTERCLAIM FOR BREACH OF CONTRACT

It also follows from the matters set forth above that, because a Floating Amount Event in the form of an Implied Writedown occurred, VCG was obligated to make a payment of the Floating Amount to Citibank. (Ex. 4 at 7.) As discussed above, Citibank acted as the Calculation Agent, and calculated that the Floating Amount that VCG owed Citibank was $10,000,000. On January 9, 2008, Citibank delivered a Floating Amount Event Notice to VCG. (Ex. 8.) VCG failed to pay the Floating Amount on the related Floating Rate Payer Payment Date on January 14, 2008. (Ex. 11.)

As a result, Citibank declared an Event of Default under the CDS Contract, following which (after VCG failed to cure its breach), Citibank declared an early termination of the CDS Contract, setoff of a portion of the Floating Amount against the collateral VCG had posted, and calculated the remaining balance due and payable by VCG in accordance with the terms of the parties' CDS Contract. On February 1, 2008, Citibank provided VCG with a "Calculation Notice," informing VCG that it still owed Citibank the $674,252.38 Early Termination Amount, along with interest. (Ex. 12.)

33

VCG has not paid this amount. Accordingly, Citibank is now entitled to judgment against VCG for the remaining balance owed to Citibank under the CDS Contract.

Further, pursuant to paragraph 11 of the ISDA Master Agreement, VCG agreed to indemnify and hold harmless Citibank for and against all reasonable out-of-pocket expenses, including legal fees incurred by Citibank, by reason of enforcement and protection of its rights under the CDS Contract. (Ex. 1 at ¶ 11.) Citibank is also now entitled to judgment against VCG for such expenses.

\* \* \*

Both VCG's failure to pay its Floating Amount obligation and its failure to indemnify Citibank for costs of enforcement of the CDS Contract constitute breaches of the CDS Contract. Judgment should thus now be entered in Citibank's favor on its breach of contract counterclaim.

### Conclusion

For all of the reasons set forth above, Citibank respectfully requests that the Court grant Citibank's motion for judgment on the pleadings, and enter an order granting judgment on the pleadings in Citibank's favor dismissing all of VCG's claims and granting Citibank's counterclaim in full.

Date:   New York, New York
        July 16, 2008

                                        PAUL, WEISS, RIFKIND, WHARTON &
                                        GARRISON LLP

                                        By:_____
                                            Allan J. Arffa
                                            Karen R. King
                                            David W. Wang

                                        1285 Avenue of the Americas
                                        New York, New York  10019-6064
                                        Telephone:  212-373-3203
                                        Facsimile:  212-757-3990
                                        Email:  aarffa@paulweiss.com
                                        Email: kking@paulweiss.com
                                        Email: dwang@paulweiss.com

                                        Attorneys for Defendant/Counterclaim-
                                            Plaintiff Citibank, N.A.

35