**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
VCG SPECIAL OPPORTUNITIES          :    **08 CV 01563 (BSJ)(KNF)**
MASTER FUND LIMITED,               :
                                   :    **DECLARATION OF**
                    Plaintiff,     :    **TERENCE W. McCORMICK**
                                   :    **IN OPPOSITION TO**
         - against -               :    **CITIBANK'S MOTION FOR**
                                   :    **JUDGMENT ON THE**
CITIBANK, N.A.,                    :    **PLEADINGS**
                                   :
                    Defendant.     :
-------------------------------------------------------X

     **TERENCE W. McCORMICK** makes the following Declaration under the

penalty of perjury pursuant to 28 U.S.C. §1746 that the following is true and

correct:

     1.    I am an associate of the law firm of Mintz & Gold LLP, litigation

counsel to Plaintiff VCG Special Opportunities Master Fund Limited ("VCG"), in

the above-captioned action. I respectfully submit this Declaration in opposition to

the motion of Defendant Citibank, N.A. ("Citibank"), for judgment on the

pleadings pursuant to Fed. R. Civ. P. 12(c).

     2.    Annexed to this Declaration as Exhibit 1 is a true copy of the

Citibank confirmation letter, dated July 5, 2007, governing the swap transaction at

issue in this action.

3.      Annexed to this Declaration as <u>Exhibit 2</u> is a true copy of the 2002 Master Agreement of the International Swaps and Derivatives Association ("<u>ISDA</u>"), dated September 1, 2006 (the "<u>ISDA Master Agreement</u>"), entered into between Citibank as "Party A" and VCG (previously known as CDO Plus Master Fund, Ltd.) as "Party B."

4.      Annexed to this Declaration as <u>Exhibit 3</u> is a true copy of the Schedule to the ISDA Master Agreement, dated as of September 1, 2006.

5.      Annexed to this Declaration as <u>Exhibit 4</u> is a true copy of the 1994 ISDA Credit Support Annex (Bilateral Form – ISDA Agreements Subject to New York Law).

6.      Annexed to this Declaration as <u>Exhibit 5</u> is a true copy of the ISDA Standard Terms Supplement for use with Credit Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement (the "<u>Standard Terms Supplement</u>").

7.      Annexed to this Declaration as <u>Exhibit 6</u> is a copy of the decision in *High Risk Opportunities Hub Fund, Ltd. v. Credit Lyonnais and Société Générale*, Index No. 600229/2000 (Sup. Ct. N.Y. Co. July 6, 2005)(Ira Gammerman, *J.S.C.*)

8.      Annexed to this Declaration as <u>Exhibit 7</u> is a true copy of that certain Indenture dated as of July 5, 2006, made between Millstone III CDO, Ltd., as

Issuer, Millstone III CDO, LLC, as Co-Issuer and JPMorgan Chase Bank, National Association, as Trustee.

9.    Annexed to this Declaration as Exhibit 8 is a true copy of the decision by the High Court of Justice, Queen's Bench Division, in *Peregrine Fixed Income Limited (In Liquidation) v. Robinson Dep't Store Public Company Limited*, [2000] EWHC (QB) Commercial 99 (Eng.).

Executed at New York, New York on this 19th day of August, 2008

*Terence W. McCormick*

Terence W. McCormick



Date:       July 5, 2007

To:         CDO PLUS MASTER FUND LTD. ("Counterparty")
Attn:       Andrea Miller
Phone:      1-561-330-6999
Fax:

From:       Citibank N.A., New York ("Citibank")
            333 West 34th Street, 2nd Floor
            New York, NY 10001, USA
Phone:      1-212-615-8468/9448
Fax:        +1 (646) 2913386
Email:      creditderivconfirms@citigroup.com

RE:         Credit Derivative Transaction on Collateralized Debt Obligation with Pay-As-You-Go or
            Physical Settlement (Dealer Form)

Our Ref:    C98101459
Your Ref: Please provide

---

Dear Sir/Madam:

　　　　The purpose of this communication (the "Confirmation") is to confirm the terms and conditions of the Credit Derivative Transaction relating to a collateralized debt obligation reference obligation entered into between you CDO PLUS MASTER FUND LTD. ("Counterparty") and us Citibank N.A., New York ("Citibank") on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

　　　　The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions (the "Credit Derivatives Definitions"), as published by the International Swaps and Derivatives Association, Inc. ("ISDA") and the ISDA Standard Terms Supplement for use with Credit Derivatives Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement, as published by ISDA on June 6, 2007 (the "CDS on CDO Terms"), and, if Optional Early Termination is specified as being applicable, the Additional Provisions for Optional Early Termination published by ISDA on December 8, 2006, are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions or the CDS on CDO Terms and this Confirmation, this Confirmation will govern. In the event of any inconsistency between the CDS on CDO Terms and the Credit Derivatives Definitions, the CDS on CDO Terms will govern.

　　　　This Confirmation supplements, forms a part of, and is subject to, the ISDA Master Agreement, dated as of September 1, 1996, as amended and supplemented from time to time (the "Agreement"), between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

The terms of the Transaction to which this Confirmation relates are as follows:

    Trade Date:             June 29, 2007

    Effective Date:         July 5, 2007

Copyright © June 2007 by International Swaps & Derivatives Association, Inc.

| | | |
|---|---|---|
| Floating Rate Payer: | Counterparty | (the "Seller"). |
| Fixed Rate Payer: | Citibank | (the "Buyer"). |
| Calculation Agent: | Citibank | |
| Calculation Agent City: | New York | |
| Business Day: | New York, London | |
| Reference Entity: | MILLSTONE III CDO LTD III-A | |
| Reference Obligation: | The obligation identified as follows: | |

| | | |
|---|---|---|
| | Insurer: | N/A |
| | CUSIP/ISIN: | 60129WAD1 |
| | Bloomberg ID: | MLST III-A B |
| | Legal final maturity date: | July 5, 2046 |
| | Original Principal Amount: | USD 20,000,000 |
| | Initial Factor: | 1.0 |
| | Issuer: | The Reference Entity |

| | |
|---|---|
| Reference Policy: | Not Applicable |
| Reference Price: | 100% |
| Initial Face Amount: | USD 10,000,000.00 |
| Initial Payment: | Not Applicable |
| Fixed Rate: | 5.50% per annum |
| Implied Writedown | Applicable |
| Interest Shortfall Cap: | Applicable |

**If Interest Shortfall Cap is applicable, then specify:**

| | |
|---|---|
| Interest Shortfall Cap Annex: | Annex A |
| Interest Shortfall Cap Basis: | Fixed Cap |
| Interest Shortfall Compounding: | Applicable |
| Rate Source: | USD-LIBOR-BBA |
| **Optional** **Early** **Termination:** | Not Applicable |

**Additional Terms:**                    Credit Support Annex Provisions:

This Transaction shall be subject to the Credit Support Annex dated as of September 1, 1996 between Citibank and Counterparty, provided however, for purposes of this Transaction the Independent Amount shall be 20.00 percent of the Floating Rate Payer Calculation Amount with respect to Counterparty.

**Office, Notice and Account Details:**

The Office of Counterparty for this Transaction is:

Please advise

The Office of Citibank for this Transaction is:           New York

Telephone, Telex and/or Facsimile Numbers and Contact Details for Notices:

Counterparty:                          Please advise

Citibank:                              Telephone number:    1-212-615-8468
                                       Facsimile number:    1-646-291-3386
                                       Attention:           Laurie Hershenov

Account Details:

Account Details of Counterparty:       To be advised

Account Details of Seller:             CITIBANK N.A. NEW YORK
                                       BIC: CITIUS33
                                       ACCOUNT NO 00167679
                                       ACCOUNT NAME: FINANCIAL FUTURES

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours sincerely,
Citibank N.A., New York

By: **JUSTIN PALAMARA**
Authorized Signatory

By: _____
     Name:
     Title:

Confirmed as of the date first above written:

CDO PLUS MASTER FUND LTD.

By: _____
     Name: DAVID ZICKRATH
     Title: CFO

4

*[Execution Copy]*
*[Reference No. CB11-130]*

# ISDA

International Swaps and Derivatives Association, Inc.

# 2002 MASTER AGREEMENT

dated as of September 1, 2006

between

| **CITIBANK, N.A.** | **CDO PLUS MASTER FUND LTD.** |
|:---:|:---:|
| ("Party A") | ("Party B") |

have entered and/or anticipate entering into one or more transactions (each a "Transaction) that are or will be governed by this 2002 Master Agreement, which includes the schedule (the "Schedule), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties or otherwise effective for the purpose of confirming or evidencing those Transactions. This 2002 Master Agreement and the Schedule are together referred to as this "Master Agreement.

Accordingly, the parties agree as follows:-

### Interpretation

*(a)*      **Definitions.** The terms defined in Section 14 and elsewhere in this Master Agreement will have the meanings therein specified for the purpose of this Master Agreement.

*(b) Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement, such Confirmation will prevail for the purpose of the relevant Transaction.

*(c) Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

## 2.      Obligations

*(a)*      *General Conditions.*

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement. (ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 2002 by International Swaps and Derivatives Association, Inc.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other condition specified in this Agreement to be a condition precedent for the purpose of this Section 2(a)(iii).

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the Scheduled Settlement Date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting of Payments.* If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by which the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount and payment obligation will be determined in respect of all amounts payable on the same date in the same currency in respect of those Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or any Confirmation by specifying that "Multiple Transaction Payment Netting" applies to the Transactions identified as being subject to the election (in which case clause (ii) above will not apply to such Transactions). If Multiple Transaction Payment Netting is applicable to Transactions, it will apply to those Transactions with effect from the starting date specified in the Schedule or such Confirmation, or, if a starting date is not specified in the Schedule or such Confirmation, the starting date otherwise agreed by the parties in writing. This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

2                                                          **ISDA® 2002**

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)    *Liability.* If:—

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

## 3.    Representations

Each party makes the representations contained in Sections 3(a), 3(b), 3(c), 3(d), 3(e) and 3(f) and, if specified in the Schedule as applying, 3(g) to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement). If any "Additional Representation" is specified in the Schedule or any Confirmation as applying, the party or parties specified for such Additional Representation will make and, if applicable, be deemed to repeat such Additional Representation at the time or times specified for such Additional Representation.

(a)    *Basic Representations.*

(i)    *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

ISDA® 2002

(iii)     *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)     *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)     *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)     *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)     *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it, any of its Credit Support Providers or any of its applicable Specified Entities any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)     *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)     *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

(g)     *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

**4.     Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)     *Furnish Specified Information.* It will deliver to the other party or, in certain cases under clause (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)     any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)     any other documents specified in the Schedule or any Confirmation; and

4

**ISDA® 2002**

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply With Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled or considered to have its seat, or where an Office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction"), and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5.    Events of Default and Termination Events

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes (subject to Sections 5(c) and 6(e)(iv)) an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if such failure is not remedied on or before the first Local Business Day in the case of any such payment or the first Local Delivery Day in the case of any such delivery after, in each case, notice of such failure is given to the party;

(ii)    *Breach of Agreement; Repudiation of Agreement.*

(1)    Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied within 30 days after notice of such failure is given to the party; or

(2)    the party disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, this Master Agreement, any Confirmation executed and delivered by that party or any

ISDA® 2002

Transaction evidenced by such a Confirmation (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iii)    ***Credit Support Default.***

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document, or any security interest granted by such party or such Credit Support Provider to the other party pursuant to any such Credit Support Document, to be in full force and effect for the purpose of this Agreement (in each case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iv)    ***Misrepresentation.***  A representation (other than a representation under Section 3(e) or 3(f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    ***Default Under Specified Transaction.***  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)    defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2)    defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

(3)    defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4)    disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

ISDA® 2002

(vi)    *Cross-Default.* If "Cross-Default" is specified in the Schedule as applying to the party, the occurrence or existence of:—

(1)    a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) where the aggregate principal amount of such agreements or instruments, either alone or together with the amount, if any, referred to in clause (2) below, is not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments before it would otherwise have been due and payable; or

(2)    a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments under such agreements or instruments on the due date for payment (after giving effect to any applicable notice requirement or grace period) in an aggregate amount, either alone or together with the amount, if any, referred to in clause (1) above, of not less than the applicable Threshold Amount;

(vii)   *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4)(A) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above and either (I) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (II) is not dismissed, discharged, stayed or restrained in each case within 15 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 15 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) above (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)    *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganises, reincorporates or reconstitutes into or as, another entity and, at the time of such consolidation, amalgamation, merger, transfer, reorganisation, reincorporation or reconstitution:—

    (1)    the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party; or

    (2)    the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes (subject to Section 5(c)) an Illegality if the event is specified in clause (i) below, a Force Majeure Event if the event is specified in clause (ii) below, a Tax Event if the event is specified in clause (iii) below, a Tax Event Upon Merger if the event is specified in clause (iv) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to clause (v) below or an Additional Termination Event if the event is specified pursuant to clause (vi) below:—

    (i)    *Illegality.* After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, due to an event or circumstance (other than any action taken by a party or, if applicable, any Credit Support Provider of such party) occurring after a Transaction is entered into, it becomes unlawful under any applicable law (including without limitation the laws of any country in which payment, delivery or compliance is required by either party or any Credit Support Provider, as the case may be), on any day, or it would be unlawful if the relevant payment, delivery or compliance were required on that day (in each case, other than as a result of a breach by the party of Section 4(b)):—

        (1)    for the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction to perform any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)    for such party or any Credit Support Provider of such party (which will be the Affected Party) to perform any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, to receive a payment or delivery under such Credit Support Document or to comply with any other material provision of such Credit Support Document;

    (ii)    *Force Majeure Event.* After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, by reason of force majeure or act of state occurring after a Transaction is entered into, on any day:—

        (1)    the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction is prevented from performing any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, from receiving a payment or delivery in respect of such Transaction or from complying with any other material provision of this Agreement relating to such Transaction (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or

ISDA® 2002

impracticable for such Office so to perform, receive or comply (or it would be impossible or impracticable for such Office so to perform, receive or comply if such payment, delivery or compliance were required on that day); or

(2)       such party or any Credit Support Provider of such party (which will be the Affected Party) is prevented from performing any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, from receiving a payment or delivery under such Credit Support Document or from complying with any other material provision of such Credit Support Document (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply (or it would be impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply if such payment, delivery or compliance were required on that day),

so long as the force majeure or act of state is beyond the control of such Office, such party or such Credit Support Provider, as appropriate, and such Office, party or Credit Support Provider could not, after using all reasonable efforts (which will not require such party or Credit Support Provider to incur a loss, other than immaterial, incidental expenses), overcome such prevention, impossibility or impracticability;

(iii)       *Tax Event.* Due to (1) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (2) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Settlement Date (A) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (B) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 9(h)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iv)       *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Settlement Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets (or any substantial part of the assets comprising the business conducted by it as of the date of this Master Agreement) to, or reorganising, reincorporating or reconstituting into or as, another entity (which will be the Affected Party) where such action does not constitute a Merger Without Assumption;

(v)       *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, a Designated Event (as defined below) occurs with respect to such party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X") and such Designated Event does not constitute a Merger Without Assumption, and the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X, after taking into account any applicable Credit Support Document, is materially weaker immediately after the occurrence of such Designated Event than that of X immediately prior to the occurrence of such Designated Event (and, in any such event, such party or its successor, surviving or transferee entity, as appropriate, will be the Affected Party). A "Designated Event" with respect to X means that:—

(1)       X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the

ISDA® 2002

date of this Master Agreement) to, or reorganises, reincorporates or reconstitutes into or as, another entity;

(2)    any person, related group of persons or entity acquires directly or indirectly the beneficial ownership of (A) equity securities having the power to elect a majority of the board of directors (or its equivalent) of X or (B) any other ownership interest enabling it to exercise control of X; or

(3)    X effects any substantial change in its capital structure by means of the issuance, incurrence or guarantee of debt or the issuance of (A) preferred stock or other securities convertible into or exchangeable for debt or preferred stock or (B) in the case of entities other than corporations, any other form of ownership interest; or

(vi)    *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties will be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Hierarchy of Events.*

(i)    An event or circumstance that constitutes or gives rise to an Illegality or a Force Majeure Event will not, for so long as that is the case, also constitute or give rise to an Event of Default under Section 5(a)(i), 5(a)(ii)(1) or 5(a)(iii)(1) insofar as such event or circumstance relates to the failure to make any payment or delivery or a failure to comply with any other material provision of this Agreement or a Credit Support Document, as the case may be.

(ii)    Except in circumstances contemplated by clause (i) above, if an event or circumstance which would otherwise constitute or give rise to an Illegality or a Force Majeure Event also constitutes an Event of Default or any other Termination Event, it will be treated as an Event of Default or such other Termination Event, as the case may be, and will not constitute or give rise to an Illegality or a Force Majeure Event.

(iii)    If an event or circumstance which would otherwise constitute or give rise to a Force Majeure Event also constitutes an Illegality, it will be treated as an Illegality, except as described in clause (ii) above, and not a Force Majeure Event.

(d)    *Deferral of Payments and Deliveries During Waiting Period.* If an Illegality or a Force Majeure Event has occurred and is continuing with respect to a Transaction, each payment or delivery which would otherwise be required to be made under that Transaction will be deferred to, and will not be due until:—

(i)    the first Local Business Day or, in the case of a delivery, the first Local Delivery Day (or the first day that would have been a Local Business Day or Local Delivery Day, as appropriate, but for the occurrence of the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event) following the end of any applicable Waiting Period in respect of that Illegality or Force Majeure Event, as the case may be; or

(ii)    if earlier, the date on which the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event ceases to exist or, if such date is not a Local Business Day or, in the case of a delivery, a Local Delivery Day, the first following day that is a Local Business Day or Local Delivery Day, as appropriate.

(e)    *Inability of Head or Home Office to Perform Obligations of Branch.* If (i) an Illegality or a Force Majeure Event occurs under Section 5(b)(i)(1) or 5(b)(ii)(1) and the relevant Office is not the Affected Party's head or home office, (ii) Section 10(a) applies, (iii) the other party seeks performance of the relevant obligation or

ISDA® 2002

compliance with the relevant provision by the Affected Party's head or home office and (iv) the Affected Party's head or home office fails so to perform or comply due to the occurrence of an event or circumstance which would, if that head or home office were the Office through which the Affected Party makes and receives payments and deliveries with respect to the relevant Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and such failure would otherwise constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) with respect to such party, then, for so long as the relevant event or circumstance continues to exist with respect to both the Office referred to in Section 5(b)(i)(1) or 5(b)(ii)(1), as the case may be, and the Affected Party's head or home office, such failure will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1).

## 6.     Early Termination; Close-Out Netting

(a)     *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)     *Right to Terminate Following Termination Event.*

(i)     *Notice.* If a Termination Event other than a Force Majeure Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction, and will also give the other party such other information about that Termination Event as the other party may reasonably require. If a Force Majeure Event occurs, each party will, promptly upon becoming aware of it, use all reasonable efforts to notify the other party, specifying the nature of that Force Majeure Event, and will also give the other party such other information about that Force Majeure Event as the other party may reasonably require.

(ii)     *Transfer to Avoid Termination Event.* If a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, other than immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)     *Two Affected Parties.* If a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice of such occurrence is given under Section 6(b)(i) to avoid that Termination Event.

ISDA® 2002

(iv)    **Right to Terminate.**

    (1)    If:—

        (A)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

        (B)    a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there are two Affected Parties, or the Non-affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, if the relevant Termination Event is then continuing, by not more than 20 days notice to the other party, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

    (2)    If at any time an Illegality or a Force Majeure Event has occurred and is then continuing and any applicable Waiting Period has expired:—

        (A)    Subject to clause (B) below, either party may, by not more than 20 days notice to the other party, designate (I) a day not earlier than the day on which such notice becomes effective as an Early Termination Date in respect of all Affected Transactions or (II) by specifying in that notice the Affected Transactions in respect of which it is designating the relevant day as an Early Termination Date, a day not earlier than two Local Business Days following the day on which such notice becomes effective as an Early Termination Date in respect of less than all Affected Transactions. Upon receipt of a notice designating an Early Termination Date in respect of less than all Affected Transactions, the other party may, by notice to the designating party, if such notice is effective on or before the day so designated, designate that same day as an Early Termination Date in respect of any or all other Affected Transactions.

        (B)    An Affected Party (if the Illegality or Force Majeure Event relates to performance by such party or any Credit Support Provider of such party of an obligation to make any payment or delivery under, or to compliance with any other material provision of, the relevant Credit Support Document) will only have the right to designate an Early Termination Date under Section 6(b)(iv)(2)(A) as a result of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2) following the prior designation by the other party of an Early Termination Date, pursuant to Section 6(b)(iv)(2)(A), in respect of less than all Affected Transactions.

(c)    **Effect of Designation.**

(i)    If notice designating an Early Termination Date is given under Section 6(a) or 6(b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 9(h)(i) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date will be determined pursuant to Sections 6(e) and 9(h)(ii).

ISDA® 2002

(d)     *Calculations; Payment Date.*

    (i)     *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (l) showing, in reasonable detail, such calculations (including any quotations, market data or information from internal sources used in making such calculations), (2) specifying (except where there are two Affected Parties) any Early Termination Amount payable and (3) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation or market data obtained in determining a Close-out Amount, the records of the party obtaining such quotation or market data will be conclusive evidence of the existence and accuracy of such quotation or market data.

    (ii)     *Payment Date.* An Early Termination Amount due in respect of any Early Termination Date will, together with any amount of interest payable pursuant to Section 9(h)(ii)(2), be payable (1) on the day on which notice of the amount payable is effective in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default and (2) on the day which is two Local Business Days after the day on which notice of the amount payable is effective (or, if there are two Affected Parties, after the day on which the statement provided pursuant to clause (i) above by the second party to provide such a statement is effective) in the case of an Early Termination Date which is designated as a result of a Termination Event.

(e)     *Payments on Early Termination.* If an Early Termination Date occurs, the amount, if any, payable in respect of that Early Termination Date (the "Early Termination Amount") will be determined pursuant to this Section 6(e) and will be subject to Section 6(f).

    (i)     *Events of Default.* If the Early Termination Date results from an Event of Default, the Early Termination Amount will be an amount equal to (1) the sum of (A) the Termination Currency Equivalent of the Close-out Amount or Close-out Amounts (whether positive or negative) determined by the Non-defaulting Party for each Terminated Transaction or group of Terminated Transactions, as the case may be, and (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (2) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If the Early Termination Amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of the Early Termination Amount to the Defaulting Party.

    (ii)     *Termination Events.* If the Early Termination Date results from a Termination Event:—

        (1)     *One Affected Party.* Subject to clause (3) below, if there is one Affected Party, the Early Termination Amount will be determined in accordance with Section 6(e)(i), except that references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and to the Non-affected Party, respectively.

        (2)     *Two Affected Parties.* Subject to clause (3) below, if there are two Affected Parties, each party will determine an amount equal to the Termination Currency Equivalent of the sum of the Close-out Amount or Close-out Amounts (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions, as the case may be, and the Early Termination Amount will be an amount equal to (A) the sum of (I) one-half of the difference between the higher amount so determined (by party "X") and the lower amount so determined (by party "Y") and (II) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to Y. If the Early Termination Amount is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of the Early Termination Amount to Y.

**ISDA® 2002**

(3)      *Mid-Market Events.* If that Termination Event is an Illegality or a Force Majeure Event, then the Early Termination Amount will be determined in accordance with clause (1) or (2) above, as appropriate, except that, for the purpose of determining a Close-out Amount or Close-out Amounts, the Determining Party will:—

(A)      if obtaining quotations from one or more third parties (or from any of the Determining Party's Affiliates), ask each third party or Affiliate (I) not to take account of the current creditworthiness of the Determining Party or any existing Credit Support Document and (II) to provide mid-market quotations; and

(B)      in any other case, use mid-market values without regard to the creditworthiness of the Determining Party.

(iii)      **Adjustment for Bankruptcy.** In circumstances where an Early Termination Date occurs because Automatic Early Termination applies in respect of a party, the Early Termination Amount will be subject to such adjustments as are appropriate and permitted by applicable law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)      **Adjustment for Illegality or Force Majeure Event.** The failure by a party or any Credit Support Provider of such party to pay, when due, any Early Termination Amount will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) if such failure is due to the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event. Such amount will (1) accrue interest and otherwise be treated as an Unpaid Amount owing to the other party if subsequently an Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions and (2) otherwise accrue interest in accordance with Section 9(h)(ii)(2).

(v)      **Pre-Estimate.** The parties agree that an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks, and, except as otherwise provided in this Agreement, neither party will be entitled to recover any additional damages as a consequence of the termination of the Terminated Transactions.

(f)      **Set-Off.** Any Early Termination Amount payable to one party (the "Payee") by the other party (the "Payer"), in circumstances where there is a Defaulting Party or where there is one Affected Party in the case where either a Credit Event Upon Merger has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the option of the Non-defaulting Party or the Non-affected Party, as the case may be ("X") (and without prior notice to the Defaulting Party or the Affected Party, as the case may be), be reduced by its set-off against any other amounts ("Other Amounts") payable by the Payee to the Payer (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so set off, those Other Amounts will be discharged promptly and in all respects. X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Amounts (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) will be effective to create a charge or other security interest. This Section 6(f) will be without prejudice and in addition to any right of set-off, offset, combination of accounts, lien, right of retention or withholding or similar right or requirement to which any party is at any time otherwise entitled or subject (whether by operation of law, contract or otherwise).

**7.      Transfer**

Subject to Section 6(b)(ii) and to the extent permitted by applicable law, neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)      a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)      a party may make such a transfer of all or any part of its interest in any Early Termination Amount payable to it by a Defaulting Party, together with any amounts payable on or with respect to that interest and any other rights associated with that interest pursuant to Sections 8, 9(h) and 11.

Any purported transfer that is not in compliance with this Section 7 will be void.

**8.      Contractual Currency**

(a)      *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in good faith and using commercially reasonable procedures in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)      *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in clause (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purpose of such judgment or order and the rate of exchange at which such party is able, acting in good faith and using

commercially reasonable procedures in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, the indemnities in this Section 8 constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

## 9.    Miscellaneous

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter. Each of the parties acknowledges that in entering into this Agreement it has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in this Agreement) and waives all rights and remedies which might otherwise be available to it in respect thereof, except that nothing in this Agreement will limit or exclude any liability of a party for fraud.

(b)    *Amendments.* An amendment, modification or waiver in respect of this Agreement will only be effective if in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission and by electronic messaging system), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation will be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes, by an exchange of electronic messages on an electronic messaging system or by an exchange of e-mails, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex, electronic message or e-mail constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

(h)      *Interest and Compensation.*

(i)      **Prior to Early Termination.** Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction:—

(1)      *Interest on Defaulted Payments.* If a party defaults in the performance of any payment obligation, it will, to the extent permitted by applicable law and subject to Section 6(c), pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (3)(B) or (C) below), at the Default Rate.

(2)      *Compensation for Defaulted Deliveries.* If a party defaults in the performance of any obligation required to be settled by delivery, it will on demand (A) compensate the other party to the extent provided for in the relevant Confirmation or elsewhere in this Agreement and (B) unless otherwise provided in the relevant Confirmation or elsewhere in this Agreement, to the extent permitted by applicable law and subject to Section 6(c), pay to the other party interest (before as well as after judgment) on an amount equal to the fair market value of that which was required to be delivered in the same currency as that amount, for the period from (and including) the originally scheduled date for delivery to (but excluding) the date of actual delivery (and excluding any period in respect of which interest or compensation in respect of that amount is due pursuant to clause (4) below), at the Default Rate. The fair market value of any obligation referred to above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party that was entitled to take delivery.

(3)      *Interest on Deferred Payments.* If:—

(A)      a party does not pay any amount that, but for Section 2(a)(iii), would have been payable, it will, to the extent permitted by applicable law and subject to Section 6(c) and clauses (B) and (C) below, pay interest (before as well as after judgment) on that amount to the other party on demand (after such amount becomes payable) in the same currency as that amount, for the period from (and including) the date the amount would, but for Section 2(a)(iii), have been payable to (but excluding) the date the amount actually becomes payable, at the Applicable Deferral Rate;

(B)      a payment is deferred pursuant to Section 5(d), the party which would otherwise have been required to make that payment will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the amount of the deferred payment to the other party on demand (after such amount becomes payable) in the same currency as the deferred payment, for the period from (and including) the date the amount would, but for Section 5(d), have been payable to (but excluding) the earlier of the date the payment is no longer deferred pursuant to Section 5(d) and the date during the deferral period upon which an Event of Default or Potential Event of Default with respect to that party occurs, at the Applicable Deferral Rate; or

(C)      a party fails to make any payment due to the occurrence of an Illegality or a Force Majeure Event (after giving effect to any deferral period contemplated by clause (B) above), it will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as the event or circumstance giving rise to that Illegality or Force Majeure Event

      **ISDA® 2002**

continues and no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the date the party fails to make the payment due to the occurrence of the relevant Illegality or Force Majeure Event (or, if later, the date the payment is no longer deferred pursuant to Section 5(d)) to (but excluding) the earlier of the date the event or circumstance giving rise to that Illegality or Force Majeure Event ceases to exist and the date during the period upon which an Event of Default or Potential Event of Default with respect to that party occurs (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (B) above), at the Applicable Deferral Rate.

(4)     *Compensation for Deferred Deliveries.* If:—

(A)     a party does not perform any obligation that, but for Section 2(a)(iii), would have been required to be settled by delivery;

(B)     a delivery is deferred pursuant to Section 5(d); or

(C)     a party fails to make a delivery due to the occurrence of an Illegality or a Force Majeure Event at a time when any applicable Waiting Period has expired,

the party required (or that would otherwise have been required) to make the delivery will, to the extent permitted by applicable law and subject to Section 6(c), compensate and pay interest to the other party on demand (after, in the case of clauses (A) and (B) above, such delivery is required) if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

(ii)     **Early Termination.** Upon the occurrence or effective designation of an Early Termination Date in respect of a Transaction:—

(1)     *Unpaid Amounts.* For the purpose of determining an Unpaid Amount in respect of the relevant Transaction, and to the extent permitted by applicable law, interest will accrue on the amount of any payment obligation or the amount equal to the fair market value of any obligation required to be settled by delivery included in such determination in the same currency as that amount, for the period from (and including) the date the relevant obligation was (or would have been but for Section 2(a)(iii) or 5(d)) required to have been performed to (but excluding) the relevant Early Termination Date, at the Applicable Close-out Rate.

(2)     *Interest on Early Termination Amounts.* If an Early Termination Amount is due in respect of such Early Termination Date, that amount will, to the extent permitted by applicable law, be paid together with interest (before as well as after judgment) on that amount in the Termination Currency, for the period from (and including) such Early Termination Date to (but excluding) the date the amount is paid, at the Applicable Close-out Rate.

(iii)     **Interest Calculation.** Any interest pursuant to this Section 9(h) will be calculated on the basis of daily compounding and the actual number of days elapsed.

ISDA® 2002

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to and agrees with the other party that, notwithstanding the place of booking or its jurisdiction of incorporation or organisation, its obligations are the same in terms of recourse against it as if it had entered into the Transaction through its head or home office, except that a party will not have recourse to the head or home office of the other party in respect of any payment or delivery deferred pursuant to Section 5(d) for so long as the payment or delivery is so deferred.  This representation and agreement will be deemed to be repeated by each party on each date on which the parties enter into a Transaction.

(b)    If a party is specified as a Multibranch Party in the Schedule, such party may, subject to clause (c) below, enter into a Transaction through, book a Transaction in and make and receive payments and deliveries with respect to a Transaction through any Office listed in respect of that party in the Schedule (but not any other Office unless otherwise agreed by the parties in writing).

(c)    The Office through which a party enters into a Transaction will be the Office specified for that party in the relevant Confirmation or as otherwise agreed by the parties in writing, and, if an Office for that party is not specified in the Confirmation or otherwise agreed by the parties in writing, its head or home office.  Unless the parties otherwise agree in writing, the Office through which a party enters into a Transaction will also be the Office in which it books the Transaction and the Office through which it makes and receives payments and deliveries with respect to the Transaction.  Subject to Section 6(b)(ii), neither party may change the Office in which it books the Transaction or the Office through which it makes and receives payments or deliveries with respect to a Transaction without the prior written consent of the other party.

**11.    Expenses**

A Defaulting Party will on demand indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, execution fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness.*  Any notice or other communication in respect of this Agreement may be given in any manner described below (except that a notice or other communication under Section 5 or 6 may not be given by electronic messaging system or e-mail) to the address or number or in accordance with the electronic messaging system or e-mail details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date it is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date it is delivered or its delivery is attempted;

(v)    if sent by electronic messaging system, on the date it is received; or

(vi)     if sent by e-mail, on the date it is delivered,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication will be deemed given and effective on the first following day that is a Local Business Day.

(b)     *Change of Details.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system or e-mail details at which notices or other communications are to be given to it.

## 13.     Governing Law and Jurisdiction

(a)     *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     *Jurisdiction.* With respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("Proceedings"), each party irrevocably:—

(i)     submits:—

(1)     if this Agreement is expressed to be governed by English law, to (A) the non-exclusive jurisdiction of the English courts if the Proceedings do not involve a Convention Court and (B) the exclusive jurisdiction of the English courts if the Proceedings do involve a Convention Court; or

(2)     if this Agreement is expressed to be governed by the laws of the State of New York, to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City;

(ii)     waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party; and

(iii)     agrees, to the extent permitted by applicable law, that the bringing of Proceedings in any one or more jurisdictions will not preclude the bringing of Proceedings in any other jurisdiction.

(c)     *Service of Process.* Each party irrevocably appoints the Process Agent, if any, specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12(a)(i), 12(a)(iii) or 12(a)(iv). Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by applicable law.

(d)     *Waiver of Immunities.* Each party irrevocably waives, to the extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction or order for specific performance or recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

ISDA® 2002

**14.     Definitions**

As used in this Agreement:—

*"Additional Representation"* has the meaning specified in Section 3.

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Force Majeure Event, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event (which, in the case of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2), means all Transactions unless the relevant Credit Support Document references only certain Transactions, in which case those Transactions and, if the relevant Credit Support Document constitutes a Confirmation for a Transaction, that Transaction) and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Agreement"* has the meaning specified in Section 1(c).

*"Applicable Close-out Rate"* means:—

(a)     in respect of the determination of an Unpaid Amount:—

      (i)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

      (ii)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate;

      (iii)     in respect of obligations deferred pursuant to Section 5(d), if there is no Defaulting Party and for so long as the deferral period continues, the Applicable Deferral Rate; and

      (iv)     in all other cases following the occurrence of a Termination Event (except where interest accrues pursuant to clause (iii) above), the Applicable Deferral Rate; and

(b)     in respect of an Early Termination Amount:—

      (i)     for the period from (and including) the relevant Early Termination Date to (but excluding) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable:—

            (1)     if the Early Termination Amount is payable by a Defaulting Party, the Default Rate;

            (2)     if the Early Termination Amount is payable by a Non-defaulting Party, the Non-default Rate; and

            (3)     in all other cases, the Applicable Deferral Rate; and

**ISDA® 2002**

(ii)    for the period from (and including) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable to (but excluding) the date of actual payment:—

(1)    if a party fails to pay the Early Termination Amount due to the occurrence of an event or circumstance which would, if it occurred with respect to a payment or delivery under a Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and for so long as the Early Termination Amount remains unpaid due to the continuing existence of such event or circumstance, the Applicable Deferral Rate;

(2)    if the Early Termination Amount is payable by a Defaulting Party (but excluding any period in respect of which clause (1) above applies), the Default Rate;

(3)    if the Early Termination Amount is payable by a Non-defaulting Party (but excluding any period in respect of which clause (1) above applies), the Non-default Rate; and

(4)    in all other cases, the Termination Rate.

*"Applicable Deferral Rate"* means:—

(a)    for the purpose of Section 9(h)(i)(3)(A), the rate certified by the relevant payer to be a rate offered to the payer by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market;

(b)    for purposes of Section 9(h)(i)(3)(B) and clause (a)(iii) of the definition of Applicable Close-out Rate, the rate certified by the relevant payer to be a rate offered to prime banks by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer after consultation with the other party, if practicable, for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market; and

(c)    for purposes of Section 9(h)(i)(3)(C) and clauses (a)(iv), (b)(i)(3) and (b)(ii)(1) of the definition of Applicable Close-out Rate, a rate equal to the arithmetic mean of the rate determined pursuant to clause (a) above and a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount.

*"Automatic Early Termination"* has the meaning specified in Section 6(a).

*"Burdened Party"* has the meaning specified in Section 5(b)(iv).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs after the parties enter into the relevant Transaction.

*"Close-out Amount"* means, with respect to each Terminated Transaction or each group of Terminated Transactions and a Determining Party, the amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances (expressed as a positive number) or gains of the Determining Party that are or would be realised under then prevailing circumstances (expressed as a negative number) in replacing, or in providing for the Determining Party the economic equivalent of, (a) the material terms of that Terminated Transaction or group of Terminated Transactions, including the payments and deliveries by the parties under Section 2(a)(i) in respect of that Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date (assuming satisfaction of the conditions precedent in

Section 2(a)(iii)) and (b) the option rights of the parties in respect of that Terminated Transaction or group of Terminated Transactions.

Any Close-out Amount will be determined by the Determining Party (or its agent), which will act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result. The Determining Party may determine a Close-out Amount for any group of Terminated Transactions or any individual Terminated Transaction but, in the aggregate, for not less than all Terminated Transactions. Each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable.

Unpaid Amounts in respect of a Terminated Transaction or group of Terminated Transactions and legal fees and out-of-pocket expenses referred to in Section 11 are to be excluded in all determinations of Close-out Amounts.

In determining a Close-out Amount, the Determining Party may consider any relevant information, including, without limitation, one or more of the following types of information:—

(i)       quotations (either firm or indicative) for replacement transactions supplied by one or more third parties that may take into account the creditworthiness of the Determining Party at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Determining Party and the third party providing the quotation;

(ii)      information consisting of relevant market data in the relevant market supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other relevant market data in the relevant market; or

(iii)     information of the types described in clause (i) or (ii) above from internal sources (including any of the Determining Party's Affiliates) if that information is of the same type used by the Determining Party in the regular course of its business for the valuation of similar transactions.

The Determining Party will consider, taking into account the standards and procedures described in this definition, quotations pursuant to clause (i) above or relevant market data pursuant to clause (ii) above unless the Determining Party reasonably believes in good faith that such quotations or relevant market data are not readily available or would produce a result that would not satisfy those standards. When considering information described in clause (i), (ii) or (iii) above, the Determining Party may include costs of funding, to the extent costs of funding are not and would not be a component of the other information being utilised. Third parties supplying quotations pursuant to clause (i) above or market data pursuant to clause (ii) above may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information.

Without duplication of amounts calculated based on information described in clause (i), (ii) or (iii) above, or other relevant information, and when it is commercially reasonable to do so, the Determining Party may in addition consider in calculating a Close-out Amount any loss or cost incurred in connection with its terminating, liquidating or re-establishing any hedge related to a Terminated Transaction or group of Terminated Transactions (or any gain resulting from any of them).

Commercially reasonable procedures used in determining a Close-out Amount may include the following:—

(1)      application to relevant market data from third parties pursuant to clause (ii) above or information from internal sources pursuant to clause (iii) above of pricing or other valuation models that are, at the time of the determination of the Close-out Amount, used by the Determining Party in the regular course of its business in pricing or valuing transactions between the Determining Party and unrelated third parties that are similar to the Terminated Transaction or group of Terminated Transactions; and

(2)    application of different valuation methods to Terminated Transactions or groups of Terminated Transactions depending on the type, complexity, size or number of the Terminated Transactions or group of Terminated Transactions.

*"Confirmation"* has the meaning specified in the preamble.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Contractual Currency"* has the meaning specified in Section 8(a).

*"Convention Court"* means any court which is bound to apply to the Proceedings either Article 17 of the 1968 Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters or Article 17 of the 1988 Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Cross-Default"* means the event specified in Section 5(a)(vi).

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Designated Event"* has the meaning specified in Section 5(b)(v).

*"Determining Party"* means the party determining a Close-out Amount.

*"Early Termination Amount"* has the meaning specified in Section 6(e).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"electronic messages"* does not include e-mails but does include documents expressed in markup languages, and *"electronic messaging system"* will be construed accordingly.

*"English law"* means the law of England and Wales, and *"English"* will be construed accordingly.

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Force Majeure Event"* has the meaning specified in Section 5(b).

*"General Business Day"* means a day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits).

*"Illegality"* has the meaning specified in Section 5(b).

ISDA® 2002

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority), and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means (a) in relation to any obligation under Section 2(a)(i), a General Business Day in the place or places specified in the relevant Confirmation and a day on which a relevant settlement system is open or operating as specified in the relevant Confirmation or, if a place or a settlement system is not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) for the purpose of determining when a Waiting Period expires, a General Business Day in the place where the event or circumstance that constitutes or gives rise to the Illegality or Force Majeure Event, as the case may be, occurs, (c) in relation to any other payment, a General Business Day in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment and, if that currency does not have a single recognised principal financial centre, a day on which the settlement system necessary to accomplish such payment is open, (d) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), a General Business Day (or a day that would have been a General Business Day but for the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event) in the place specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (e) in relation to Section 5(a)(v)(2), a General Business Day in the relevant locations for performance with respect to such Specified Transaction.

*"Local Delivery Day"* means, for purposes of Sections 5(a)(i) and 5(d), a day on which settlement systems necessary to accomplish the relevant delivery are generally open for business so that the delivery is capable of being accomplished in accordance with customary market practice, in the place specified in the relevant Confirmation or, if not so specified, in a location as determined in accordance with customary market practice for the relevant delivery.

*"Master Agreement"* has the meaning specified in the preamble.

*"Merger Without Assumption"* means the event specified in Section 5(a)(viii).

*"Multiple Transaction Payment Netting"* has the meaning specified in Section 2(c).

*"Non-affected Party"* means, so long as there is only one Affected Party, the other party.

*"Non-default Rate"* means the rate certified by the Non-defaulting Party to be a rate offered to the Non-defaulting Party by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the Non-defaulting Party for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Other Amounts"* has the meaning specified in Section 6(f).

**ISDA® 2002**

*"Payee"* has the meaning specified in Section 6(f).

*"Payer"* has the meaning specified in Section 6(f).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Proceedings"* has the meaning specified in Section 13(b).

*"Process Agent"* has the meaning specified in the Schedule.

*"rate of exchange"* includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Schedule"* has the meaning specified in the preamble.

*"Scheduled Settlement Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Stamp Tax Jurisdiction"* has the meaning specified in Section 4(e).

ISDA® 2002

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means, with respect to any Early Termination Date, (a) if resulting from an Illegality or a Force Majeure Event, all Affected Transactions specified in the notice given pursuant to Section 6(b)(iv), (b) if resulting from any other Termination Event, all Affected Transactions and (c) if resulting from an Event of Default, all Transactions in effect either immediately before the effectiveness of the notice designating that Early Termination Date or, if Automatic Early Termination applies, immediately before that Early Termination Date.

*"Termination Currency"* means (a) if a Termination Currency is specified in the Schedule and that currency is freely available, that currency, and (b) otherwise, euro if this Agreement is expressed to be governed by English law or United States Dollars if this Agreement is expressed to be governed by the laws of the State of New York.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Close-out Amount is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Force Majeure Event, a Tax Event, a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Threshold Amount"* means the amount, if any, specified as such in the Schedule.

*"Transaction"* has the meaning specified in the preamble.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii) or due for Section 5(d)) to such party under Section 2(a)(i) or 2(d)(i)(4) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date, (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii) or 5(d)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered and (c) if the Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions, any Early Termination Amount due prior to such Early Termination Date and which remains unpaid as of such Early Termination Date, in each case together with any amount of interest accrued or other

**ISDA® 2002**

compensation in respect of that obligation or deferred obligation, as the case may be, pursuant to Section 9(h)(ii)(1) or (2), as appropriate. The fair market value of any obligation referred to in clause (b) above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it will be the average of the Termination Currency Equivalents of the fair market values so determined by both parties.

**"Waiting Period"** means:

(a) in respect of an event or circumstance under Section 5(b)(i), other than in the case of Section 5(b)(i)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of three Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance; and

(b) in respect of an event or circumstance under Section 5(b)(ii), other than in the case of Section 5(b)(ii)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of eight Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**CITIBANK, N.A.**

By: _____
  Cook
  Vice President
  Citibank, N.A.

Print Name: _____

Title: _____

Date: _____

**CDO PLUS MASTER FUND LTD.,** by Rekon Advisors LLC, as Investment Advisor and not in its individual capacity

By: _____

Print Name: Eric Rosenfield

Title: Director

Date: September 1, 2006

Copyright © 2002 by International Swaps and Derivatives Association, Inc.

*Execution Copy*
*[Reference No. CB11-130]*

SCHEDULE

to the

ISDA 2002 Master Agreement

dated as of September 1, 2006,

between

CITIBANK, N.A.,
a national banking association organized under the laws of the United States
("Party A")

and

CDO PLUS MASTER FUND LTD.,
an exempted company organized and existing
under the laws of Jersey
("Party B")

Part 1

Termination Provisions

In this Agreement:

(a)    **"Specified Entity"** means for the purpose of Section 5(a)(v) of this Agreement, in relation to Party A, Citigroup Global Markets Limited, Citigroup Global Markets Inc., Citigroup Forex Inc., Citigroup Global Markets Commercial Corp., Citicorp Securities Services, Inc., Citigroup Global Markets Deutschland AG, Citigroup Energy Inc., and Citigroup Financial Products Inc. (individually a "Section 5(a)(v) Affiliate"), and in relation to Party B, not applicable.

(b)    **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.  For purposes of clause (c) of such definition, Specified Transaction includes any securities options, margin loans, short sales, and any other similar transaction now existing or hereafter entered into between Party A (or any Section 5(a)(v) Affiliate) and Party B.

(c)    The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and will apply to Party B.

For purposes of Section 5(a)(vi), the following provisions apply:

**"Specified Indebtedness** shall have the meaning set forth in Section 14 of this Agreement, provided, however, that Specified Indebtedness shall not include deposits received in the course of a party's ordinary banking business.

**"Threshold Amount"** means,

(i) with respect to Party A, 2% of the stockholders' equity of Party A; and
(ii) with respect to Party B, the lessor of 2% of the Net Asset Value of Party B or 10,000,000USD;

including the U.S. Dollar equivalent on the date of any default, event of default or other similar condition or event of any obligation stated in any other currency.

For purposes of (i) above, stockholders' equity shall be determined by reference to the relevant party's most recent consolidated (quarterly, in the case of a U.S. incorporated party) balance sheet and shall include, in the case of a U.S. incorporated party, legal capital, paid-in capital, retained earnings and cumulative translation adjustments.  Such balance sheet shall be prepared in accordance with accounting principles that are generally accepted in such party's country of organization. For purposes of (ii) above, the Net Asset Value shall be determined by reference to Party B's most recent NAV and Performance Statement (as defined in Part 3(f)) delivered to Party A.

(d)    The **"Credit Event Upon Merger"** provisions of Section 5(b)(v) of this Agreement will apply to Party A and will apply to Party B.

(e)    The **"Automatic Early Termination"** provisions of Section 6(a) will not apply to Party A and will not apply to Party B; provided, however, that with respect to a party, where the Event of Default specified in Section 5(a)(vii)(1), (3), (4), (5), (6) or to the extent analogous thereto, (8) is governed by a system of law which does not permit termination to take place after the occurrence of the relevant Event of Default, then the Automatic Early Termination provisions of Section 6(a) will apply to such party.

(f)    **"Termination Currency"** means United States Dollars.

(g)    **"Additional Termination Event"** will apply.

(i) **Net Asset Value.** It shall constitute an Additional Termination Event, Party B shall be the Affected Party and Party A shall be the party entitled to designate an Early Termination Date and determine the Close-out Amount, if at any time the Net Asset Value of Party B (i) declines by 35% or more as measured at any month end as compared

to the month end 12 months prior; (ii) declines by 25% or more as measured at any month end compared to the month end 3 months prior; (iii) declines by 15% or more as measured at any month end compared to the immediately prior month end; or (iv) falls below the NAV Floor (as defined below).

The "NAV Floor" shall be defined as follows:

From and including the date of this Agreement to and including December 31, 2006, the NAV Floor shall equal 65% of the Net Asset Value of Party B as of the date of this Agreement. On January 1st of each year thereafter the NAV Floor shall be redetermined as the greater of the NAV Floor in effect for the previous year, or 65% of the Net Asset Value of Party B on December 31st of the previous year.

(ii)    **Investment Advisor.**  It shall constitute an Additional Termination Event, with each of Party A and Party B as an Affected Party and Party A shall be the party entitled to designate an Early Termination Date and determine the Close-out Amount, if at any time Party B shall have failed to maintain Rekon Advisors LLC (the "Investment Advisor") or an Affiliate thereof, or a successor thereto acceptable to Party A in its sole discretion, as investment advisor.

Part 2

Tax Representations

(a)    **Payer Representations.**    For the purpose of Section 3(e) of this Agreement, Party A will make the following representation and Party B will make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 9(h) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, except that it will not be a breach of this representation where reliance is placed on clause (ii) above and the other party does not deliver a form or documents under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    **Payee Representations.**    For the purpose of Section 3(f) of the Agreement, Party A and Party B make the representations specified below, if any:

The following representation will apply to Party A:

It is a national banking association organized under the laws of the United States and its U.S. taxpayer identification number is 13-5266470.  It is "exempt" within the meaning of Treasury Regulation sections 1.6041-3(p) and 1.6049-4(c) from information reporting on Form 1099 and backup withholding.

The following representation will apply to Party B:

Each payment received or to be received by it in connection with this Agreement will not be effectively connected with the conduct of a trade or business in the United States.

Part 3

Agreement to Deliver Documents

For the purpose of Section 4(a) of this Agreement:

I.    Tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| (i) Party B | As required under Section 4(a)(i) of the Agreement, IRS Form W-9, IRS Form W-8BEN, IRS Form W-8ECI, IRS Form W-8EXP and/or IRS Form W-8IMY, whichever is relevant. | Promptly upon execution of this Agreement; and promptly upon learning that any form previously provided by Party B has become obsolete or incorrect. |

II.  Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
| --- | --- | --- | --- |
| (a) Party A and Party B | Evidence reasonably satisfactory to the other party of the (i) authority of such party to enter into the Agreement and any Transactions and (ii) the authority and genuine signature of the individual signing the Agreement on behalf of such party to execute the same. | As soon as practicable after execution of this Agreement and, if requested by the other party, as soon as practicable after execution of any Confirmation of any other Transaction. | Yes |
| (b) Party B | A certificate of an authorized officer for such party certifying the authority, names and true signatures of the officers signing this and the officers or other entities or agents, including the Investment Advisor, authorised to sign any Confirmations or approve any Transactions, reasonably satisfactory in form and substance to Party A. | Upon execution of this Agreement and as necessary for any further documentation. | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| (c) Party B | Certified copies of (A) Party B's certificate of incorporation and by-laws (or any similar chartering documents), (B) the current Investment Advisory Agreement (or other similar agreement) between the Investment Advisor and Party B, (C) any investment policies, trading strategies or restrictions of Party B that relate to derivative transactions, and (D) the Confidential Private Placement Memorandum of Party B. | Upon execution of this Agreement and each time that any document or policy referenced therein is revised. | Yes |

| Party required To deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| (d) Party A | The party's Consolidated Reports of Condition and Income for a Bank with Domestic and Foreign Offices – FFIEC 031 | Upon request, provided, however, that such financials are "deemed " to be delivered hereunder on the date the same shall be posted on the Citibank.com website (www.citibank.com) | Yes |
| (e) Party B | The party's annual report containing audited consolidated financial statements prepared in accordance with accounting principles that are generally accepted in such party's country of organization and certified by independent certified public accountants for each fiscal year. | As soon as available and in any event within 120 days (or as soon as practicable after becoming publicly available) after the end of each of its fiscal years. | Yes |
| (f) Party B | The party's unaudited consolidated financial statements, the consolidated balance sheet and related statements of income for each fiscal quarter prepared in accordance with accounting principles that are generally accepted in Party B's country of organization. | As soon as available and in any event within 60 days (or as soon as practicable after becoming publicly available) after the end of each of its fiscal years. | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| (f) Party B | A statement including a calculation of Party B's Net Asset Value and Performance as of the end of each calendar month (the "NAV and Performance Statement"). | Within 15 days after the end of each calendar month. | Yes |
| (g) Party B | A letter from the Process Agent in the City of New York designated pursuant to paragraph (b) of Part 4 of this Schedule in which such Process Agent agrees to act as agent for service of process with respect to this Agreement and each Transaction and to forward promptly to Party B all process received by such Process Agent. | As soon as practicable after execution of this Agreement and the first Confirmation of a Transaction. | Yes |
| (h) Party A and Party B | The Credit Support Document(s) | Upon execution of this Agreement | No |
| (i) Party B | Such other documents as Party A may reasonably request in connection with any Transaction. | Promptly upon request by Party A. | Yes |

Part 4

Miscellaneous

(a) **Addresses for Notices.**  For the purpose of Section 12(a) of this Agreement:

**Address for notices or communications to Party A:**

With respect to a particular Transaction, all notices or communications to Party A shall be sent to the address or facsimile number indicated in the Confirmation of that Transaction.

In addition, in the case of notices or communications relating to Section 5, 6, 11 or 13 of this Agreement, a copy of any such notice or communication shall be addressed to the attention of:

Address:        Citibank, N.A.
                250 West Street
                10th Floor
                New York, New York  10013

Attention:      Director Derivatives Operations

Facsimile No.: 212 723 2956

(For all purposes)

In addition, in the case of notices or communications relating to Section 5, 6, 11 or 13 of this Agreement, a second copy of any such notice or communication shall be addressed to the attention of Party A's legal department as follows:

Address:        Legal Department
                77 Water Street
                9th Floor
                New York, New York 10004

Attention:      Department Head

Facsimile No.: 212 657 1452

**Address for notices or communications to Party B:**

Address:      CDP Plus Master Fund Ltd.
                   C/o Rekon Advisors LLC
                   497 S.E. 1st Street
                   Delray Beach, FL 33483

Attention:     Robert Fasulo
                   General Counsel

Facsimile No: 561 330 8006

          (b)      **Process Agent.**  For the purpose of Section 13(c) of this Agreement:

                    Party B appoints as its Process Agent:

                    CDP Plus Master Fund Ltd.
                    C/o Rekon Advisors LLC
                    497 S.E. 1st Street
                    Delray Beach, FL 33483

                    Attention:     Robert Fasulo
                                     General Counsel

                    Facsimile No: 561 330 8006

          (c)      **Offices.**  The provisions of Section 10(a) will apply to this Agreement.

          (d)      **Multibranch Party.**  For the purpose of Section 10(b) of this Agreement:

                    Party A is a Multibranch Party and may enter into a Transaction through any of the following offices:  New York, London, Tokyo, Singapore and Sydney.

                    Party B is not a Multibranch Party

          (e)      **Calculation Agent.**   The Calculation Agent will be Party A unless otherwise specified in a Confirmation in reference to the relevant Transaction.

(f)  **Credit Support Document.**  Credit Support Documents means, with respect to both parties, the ISDA Credit Support Annex between Party A and Party B annexed hereto and dated as of the date hereof.

(g)  **Credit Support Provider.**  Not Applicable.

(h)  **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York.

(i)  **Jurisdiction.**  Section 13(b)(i) of the Agreement is hereby amended by deleting in line 2 of paragraph 2 the word "non-" and by deleting paragraph (iii) thereof.  The following shall be added at the end of Section 13(b):  "Nothing in this provision shall prohibit a party from bringing an action to enforce a money judgment in any other jurisdiction."

(j)  "**Affiliate**" will have the meaning specified in Section 14 of this Agreement, provided, however that except as set forth in Part 1(g)(ii) in relation to Party B "Affiliate" shall be not applicable.

(k)  **Absence of Litigation**.  For the purpose of Section 3(c):  "Specified Entity" means in relation to Party A, any Affiliate of Party A, and in relation to Party B, not applicable.

(l)  **No Agency**.  The provisions of Section 3(g) will apply to this Agreement.

(m)  **Additional Representation** will apply.  For the purpose of Section 3 of this Agreement, the following will constitute an Additional Representation:

"(h) **Relationship Between Parties**.  Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(1) **No Reliance**.  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction.  It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

(2) **Evaluation and Understanding.**  It is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction.  It is also capable of assuming, and assumes, the financial and other risks of that Transaction.

(3) **Status of Parties.**  The other party is not acting as a fiduciary for or an advisor to  it in respect of that Transaction.

(i)  **Eligible Contract Participant Representation**.  (a)  It is an "eligible contract participant" within the meaning of Section 1(a)(12) of the Commodity Exchange Act, as amended (the "CEA"), (b) this Agreement and each Transaction is subject to individual negotiation by each party, and (c) neither this Agreement nor any Transaction will be executed or traded on a "trading facility" within the meaning of Section 1a(33) of the CEA.

(j) **Financial Institution**.  It is a "financial institution" as defined in the Federal Deposit Insurance Corporation Improvement Act of 1991 or Regulation EE promulgated by the Federal Reserve Board thereunder.

(k) **ERISA.**  The assets that are used in connection with the execution, delivery and performance of this Agreement and the Transactions entered into pursuant hereto are not the assets of an employee benefit or other plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan described in Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), an entity whose underlying assets include "plan assets" by reason of Department of Labor regulation section 2510.3-101, or a governmental plan that is subject to any federal, state, or local law that is substantially similar to the provisions of Section 406 of  ERISA or Section 4975 of the Code."

(n) **"Netting of Payments"**  Either party may notify the other in writing, not less than one Local Business Day in advance of one or more Scheduled Payment Dates, that that with regard to payments due on that date, Multiple Transaction Payment Netting will apply.  Except to the extent that such advance written notice shall have been given, subparagraph Multiple Transaction Payment Netting will not apply for purposes of Section 2(c) of this Agreement.  Provided however, that for each of the following groups of Transactions, Party A and Party B hereby elect to net payments of all amounts payable on the same day in the same currency (and through the same Office of Party A) by specifying that Section 2(c) of the Agreement will apply with respect to each of the following groups of Transactions:

(i)  FX Transactions entered into by the parties; and

(ii)  Currency Option Transactions entered into by the parties.

The starting date for the election commences upon entering the first Transaction under the Agreement with respect to either of the above groups of Transactions.

Part 5

Other Provisions

(a)    **Waiver of Right to Trial by Jury**.  Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement.

(b)    **Severability**.  Except as otherwise provided in Sections 5(b)(i) or 5(b)(ii) in the event that any one or more of the provisions contained in this Agreement should be held invalid, illegal, or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The parties shall endeavor, in good faith negotiations, to replace the invalid, illegal or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

(c)    **Netting.**    In the event that any Terminated Transaction cannot be aggregated and netted against all other Terminated Transactions under Section 6(e) of the Agreement, such excluded Terminated Transactions shall be aggregated and netted amongst themselves to the fullest extent permitted by law.

(d)    **Confirmation Procedures**.  For each Transaction that Party A and Party B enter hereunder, Party A shall promptly send to Party B a Confirmation setting forth the terms of such Transaction.  Party B shall execute and return the Confirmation to Party A or request correction of any error within five Business Days of receipt.  Failure of Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation and acceptance of such terms.

(e)    **Escrow Payments.**  If by reason of the time difference between the cities in which payments are to be made, it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may at its option and in its sole discretion notify the other party that payments on that date are to be made in escrow.  In this case the deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the party giving the notice, accompanied by irrevocable payment instructions (i) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by the irrevocable payment instructions to the same effect or (ii) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow.  The party that elects to have payments made in escrow shall pay the costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 am. local time on that day) if that payment is not released by 5:00

p.m. on the date it is deposited for any reason other than the intended recipients' failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(f) **Recording of Conversations**. Each party hereto consents to the recording of its telephone conversations relating to this Agreement or any potential Transaction. To the extent that one party records telephone conversations (the "Recording Party") and the other party does not (the "Non-Recording Party"), the Recording Party shall, in the event of any dispute, make a complete and unedited copy of such party's tape of the entire day's conversations with the Non-Recording Party's personnel available to the Non-Recording Party. The Recording Party's tapes may be used by either party in any forum in which a dispute is sought to be resolved and the Recording Party will retain tapes for a consistent period of time in accordance with the Recording Party's policy unless one party notifies the other that a particular transaction is under review and warrants further retention.

(g) **Limitation of Liability**. No party shall be required to pay or be liable to the other party for any consequential, indirect or punitive damages, opportunity costs or lost profits.

(h) **Additional Party B Covenant**. For purposes of Section 4 of this Agreement, the following shall be added immediately following paragraph (e) thereof:

"(f) **Notification Requirements**. Party B shall notify Party A in writing immediately upon the occurrence of (a) an event set forth in Part 1(g)(ii), and (b) a material change in Party B's investment policies in particular as the same relates to Party B's investment restrictions and/or trading strategies."

(i) For purposes of Section 3 of this Agreement, the following shall be added immediately following paragraph (k) thereof:

"(l) **Compliance with Investment Policies**. Party B hereby represents to Party A that the execution, delivery, and performance by it of this Agreement and each Confirmation does not conflict with or violate the investment policies, trading strategies and/or restrictions of Party B as set forth in Party B's prospectus or organizational documents as currently in effect.

(m) **Investment Advisor Authorized as Agent.** Party B represents and warrants to Party A that the Investment Advisor is duly authorized to act as Party B's agent in entering into and confirming Transactions and receiving notices to Party B under this Agreement, and that the Investment Advisor's entering into or confirmation of any Transaction shall be sufficient to bind Party B, with the result that Party B's signature shall not be required on any Confirmation."

(j) **Investment Advisor Representations**. The following representations shall be made by the Investment Advisor in accordance with Section 3 of the Agreement as if the Investment Advisor was a party to the Agreement:

"(i) Investment Advisor Representations.   The Investment Advisor represents and warrants to Party A that it is (x) duly authorized to act as Party B's agent in entering into and confirming Transactions and in receiving notices to Party B under this Agreement, and (y) that any Transaction shall be entered into in accordance with the applicable investment policies, trading strategies and/or restrictions of Party B as are then in effect.

(ii) No Investment Advice from Party A.  The Investment Advisor represents and agrees that no advice given by Party A or its Affiliates shall form a primary basis for any decision by or on behalf of the Investment Advisor relating to any Transaction under or in connection with this Agreement, that neither Party A nor any of its Affiliates is or shall be a fiduciary or advisor with respect to the Investment Advisor or Party B and that no amounts paid or to be paid to Party A or its Affiliates are attributable to any advice provided by Party A or its Affiliates."

(k) **Definitions.**   The following shall constitute additional definitions for the purposes of this Schedule and Section 14 of this Agreement.

"Net Asset Value" means as of any date the Total Assets minus Total Liabilities, in each case as of such date.  As used herein, "Total Assets" means, at any date, all assets of Party B which in accordance with generally accepted accounting principles would be classified as assets upon a balance sheet of Party B prepared as of such date.  As used herein, "Total Liabilities" means, at any date, all liabilities of Party B which in accordance with generally accepted accounting principles would be classified as liabilities upon a balance sheet of Party B prepared as of such date.

(l) **2002 Master Agreement Protocol**. The parties agree that the definitions and provisions contained in Annexes 1 to 16 and Section 6 of the 2002 Master Agreement Protocol published by the International Swaps and Derivatives Association, Inc. on 15th July, 2003 are incorporated into and apply to this Agreement.

PART 6

<u>FX Transactions and Currency Option Transactions</u>

(a)  The 1998 FX and Currency Option Definitions.

    (1)    The provisions of the 1998 FX and Currency Option Definitions as published by ISDA, Emerging Markets Traders Association and The Foreign Exchange Committee (the "FX Definitions"), are hereby incorporated herein in its entirety and shall apply to FX Transactions and Currency Option Transactions entered into by the Offices of the parties specified in Part 4 of this Schedule.  FX Transactions and Currency Option Transactions are each deemed to be "Transactions" pursuant to the ISDA Master Agreement.

    (2)    Unless otherwise agreed to by the parties, all FX and Currency Option Transactions entered into between the parties prior to the date of this Agreement shall be deemed to be Transactions for purposes of this Agreement.  The confirmation of all FX and Currency Option Transactions via any electronic media, telex, facsimile or writing shall constitute a "Confirmation" as referred to in this Agreement even where not so specified in the Confirmation.  Such Confirmations will supplement, form a part of, and be subject to this Agreement.

(b)  Article 3 General Terms Relating to Currency Option Transactions.

    The FX Definitions are hereby amended by adding the following new Section 3.9:

    Section 3.9 Discharge and Termination of Options. Unless otherwise agreed, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or Put, respectively, written by the other party, such termination and discharge to occur automatically upon the payment in full of the last Premium payable in respect of such Currency Option Transaction; <u>provided that</u> such termination and discharge may only occur in respect of Currency Option Transactions with the same material terms, including but not limited to:

    (a)    each being with respect to the same Put and the same Call (i.e., a Put may only be discharged against another Put and not against a Call);

    (b)    each having the same Expiration Date and Expiration Time;

    (c)    each being of the same style (i.e., either both being of American or European Style);

    (d)    each having the same Strike Price;

    (e)    neither of which shall have been exercised;

    (f)    each of which has been entered into by the same pair of Offices of the parties; and

(g)     each having the same procedures for exercise;

and, upon the occurrence of such termination and discharge, neither party shall have any further obligation to the other party in respect of the relevant Currency Option Transactions terminated and discharged.  In the case of a partial termination and discharge (i.e., where the relevant Currency Option Transactions are for different amounts of the Currency Pair), the remaining portion of the Currency Option Transaction shall continue to be a Currency Option Transaction for all purposes hereunder.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

CITIBANK, N.A.

By: _____

Print Name: _____
Linda Cook
Vice President
Citibank, N.A.

Title: _____

Date: _____

CDO PLUS MASTER FUND LTD., by Rekon Advisors LLC, as Investment Advisor and not in its individual capacity.

By: _____

Print Name: Eric Rosenfield

Title: Director

Date: September 1, 2006

REKON ADVISORS LLC, in its individual capacity in respect of the representations made by the Investment Advisor in Part 5 of this Schedule.

By: _____

Name: Eric Rosenfield

Title: Director

Date: September 1, 2006

[Execution Copy]
Reference No. CB11-130
(ISDA Agreements Subject to New York Law Only)

(Bilateral Form)



# ISDA
International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

.............................................ISDA Master Agreement....................................................

dated as of September 1, 2006

between

**CITIBANK, N.A.**                    **CDO PLUS MASTER FUND LTD.**
and

("Party A")                              ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

## Paragraph 1. Interpretation

(a)      *Definitions and Inconsistency.*   Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex.  In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)      *Secured Party and Pledgor.*   All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions    of law generally relating to security interests and secured parties.

## Paragraph 2. Security Interest

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder.  Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright  1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a)    *Delivery Amount.*    Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

>   (i) the Credit Support Amount

>   exceeds

>   (ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)    *Return Amount.*    Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

>   (i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

>   exceeds

>   (ii) the Credit Support Amount.

*"Credit Support Amount"*    means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)    *Conditions Precedent.*    Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

>   (i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

>   (ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)    *Transfer Timing.*    Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)    *Calculations.*    All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

ISDA®1994

**(d)    *Substitutions.***

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

ISDA®1994

**Paragraph 6. Holding and Using Posted Collateral**

(a)     *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)     *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)     *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)     *Distributions and Interest Amount.*

(i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

ISDA®1994

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a)    *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

ISDA®1994

(b)    *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

ISDA®1994

**Paragraph 10. Expenses**

(a)      *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)      *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)      *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)      *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)      *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)      *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)      *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)      *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)      *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**ISDA®1994**

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

> (i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

> (ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

> (iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

> (iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

ISDA®1994

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

    (i) Eligible Collateral or Posted Collateral that is:

        (A) Cash, the amount thereof; and

        (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

    (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

    (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

ISDA®1994

*[Reference No. CB11-130B]*

**Paragraph 13. Elections and Variables**

(a)     **Security Interest for "Obligations".**  The term "Obligations" shall have the meaning set forth in Paragraph 12.

(b)     **Credit Support Obligations.**

(i) **Delivery Amount, Return Amount and Credit Support Amount; Addition to Paragraph 3.**

(A) **"Delivery Amount"** has the meaning set forth in Paragraph 3(a).

(B) **"Return Amount"** has the meaning set forth in Paragraph 3(b).

(C) **"Credit Support Amount"** means for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) the Pledgor's Threshold, if any; provided, however, that (x) in the case where the sum of the Independent Amounts applicable to the Pledgor exceeds zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor and (y) in all other cases, the Credit Support Amount will be deemed to be zero whenever the calculation of the Credit Support Amount yields an amount less than zero.

(ii) **Eligible Collateral.**  The items set forth on Schedule I hereto will qualify as **"Eligible Collateral"** for the party specified.

(iii) **Other Eligible Support.**  There shall be no "Other Eligible Support" for either party for purposes of this Annex.

(iv) **Thresholds.**

(A) **"Independent Amount"** shall mean, with respect to Party A and Party B and with regard to any Transaction, the USD equivalent of the amount as specified in the relevant Confirmation.

(B) **"Threshold"** shall mean, with respect to both Party A and Party B, zero.

(C) **"Minimum Transfer Amount"** for purposes of computing a Delivery Amount pursuant to Paragraph 3(a) and a Return Amount pursuant to Paragraph 3(b) , as of any date shall be 250,000USD.

(D) **Rounding.** The Delivery Amount and the Return Amount will not be rounded.

(c)     **Valuation and Timing.**

(i) **"Valuation Agent"** means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraphs 4(d)(ii) and 6(d), the Secured Party receiving or deemed to receive the Substitute Credit Support or the Distributions of the Interest Amount, as applicable.

(ii) **"Valuation Date"** means each Local Business Day.

(iii) **"Valuation Time"** means, with respect to the determination of Exposure, Value of Eligible Credit Support and Posted Credit Support, the close of business on the Local Business Day immediately before the Valuation Date or date of calculation, as applicable.

(iv) **"Notification Time"** means 10:00 a.m., New York time on a Valuation Date provided, however, that, notwithstanding Paragraph 4(b), if a request for Transfer is made by the Notification Time, then the relevant Transfer shall be made not later than the close of business on such day and, if such request is received after the Notification Time, not later than the close of business on the next Local Business Day following such request. Notwithstanding anything herein to the contrary, with regard to Transfers of Independent Amounts, the relevant Transfer shall be made by the close of business on the second Local Business Day following the Trade Date of the applicable Transaction.

(d) **Conditions Precedent and Secured Party's Rights and Remedies.** Each Termination Event specified below with respect to a party will be a "*Specified Condition*" for that party (the specified party being the Affected Party if a Termination Event or Additional Termination Event occurs with respect to such party):

|  | Party A | Party B |
|---|---|---|
| Illegality | [ · ] | [ ] |
| Tax Event | [ ] | [ ] |
| Tax Event Upon Merger | [ ] | [ ] |
| Credit Event Upon Merger | [X] | [X] |
| Additional Termination Events specified in the Schedule to this Agreement | [X] | [X] |

(e) **Substitution. "Substitution Date"** has the meaning specified in Paragraph 4(d)(ii).

(f) **Dispute Resolution.**

(i) **"Resolution Time"** means 1:00 p.m., New York time, on the Local Business Day following the date on which notice is given that gives rise to a dispute under Paragraph 5.

(ii) **Value.** For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support will be calculated as follows: the sum of (i) (x) the arithmetic mean of the mid market quotations on the relevant date of three nationally recognized principal market makers (which may include an affiliate of Party A) for such security chosen by the Valuation Agent multiplied by the applicable Valuation Percentage or (y) if no quotations are available from such principal market makers on the relevant date, the arithmetic mean of the closing bid prices on the next preceding date multiplied by the applicable Valuation Percentage plus (ii) the accrued interest on such security (except to the extent Transferred to a party pursuant to any applicable provision of this Agreement or included in the applicable price referred to in (i) of this clause) as of such date.

(iii) **Alternative.** The provisions of Paragraph 5 will apply.

(g) **Holding and Using Posted Collateral**.

(i) **Eligibility to Hold Posted Collateral; Custodians**.  A party or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b) provided that such party is not a Defaulting Party.  Initially Party A shall not be using a Custodian and initially the Custodian for Party B shall be as set forth in a written notice delivered to Party A to the address and in the manner as set forth in Paragraph (k).

(ii) **Use of Posted Collateral**.  The provisions of Section 6(c) will apply to both parties.

(h)     **Distributions and Interest Amount.**

(i) **Interest Rate**.  The "Interest Rate" will be the overnight ask rate in effect for such day, as set forth opposite the caption "O/N" under the heading "USD" on Telerate Page 3750 or any successor page thereto on or about 11:00 a.m., New York time, on such day and if no successor page is quoted, as agreed by the parties.

(ii) **Transfer of Interest Amount.**  Transfers of the Interest Amount will be made in arrears on the last Local Business Day of each calendar month.

(iii) **Alternative to Interest Amount.**  The provisions of Paragraph 6(d)(ii) will apply, provided, however, that the Interest Amount will compound daily.

(i) **Additional Representations.**

(i) Notwithstanding anything to the contrary contained herein, ("X") shall be the beneficial owner, within the meaning of the U.S. tax laws, of any securities it shall Transfer as collateral to the other party ("Y") pursuant to the terms hereof.

(ii) X shall promptly provide to Y, upon written request, any tax documentation reasonably requested by Y to allow Y to make gross interest payments to X in respect of any Posted Collateral Transferred to Y pursuant hereto.

(j)     **Other Eligible Support and Other Posted Support.**

(i) **"Value"** with respect to Other Eligible Support and Other Posted Support shall not be applicable.

(ii) **"Transfer"** with respect to Other Eligible Support and Other Posted Support shall not be applicable.

(k)     **Demands and Notices.**

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Annex, provided, that the address for Party A for such purposes shall be:

Citibank N.A.
Collateral Management Group
333 West 34th Street, 2nd FL
New York, NY 10001
Telephone no. (212) 615-8406
Facsimile no. (212) 994-0727;

and the address for Party B for such purposes shall be:

CDP Plus Master Fund Ltd.
C/o Rekon Advisors LLC
497 S.E. 1st Street
Delray Beach, FL 33483
Telephone no. (561) 330 6999
Facsimile No: (561) 330 8006

(l)     **Other Provisions.**

(i) **Custodians.**   A party shall be eligible to serve as Custodian if and for so long as it (i) is not affiliated with Party A or Party B, (ii) is a trust company or commercial bank with trust powers, organized under the laws of the United States of America or any state thereof and subject to supervision or examination by federal or state authority, having a combined capital and surplus of at least $500,000,000 and (iii) shall have general unsecured short-term obligations rated at least "P-1" by Moody's or "A-2" by S&P or have outstanding long term unsecured unsubordinated debt securities rated at least "Baa2" by Moody's or "BBB" by S&P.

(ii) **Actions Hereunder.**  Either party may take any actions hereunder, including liquidation rights, through its Custodian or other agent.

(iii) **Events of Default.**  Paragraph 7(i) shall be amended and restated in its entirety as follows: "(i) that party fails (or fails to cause its Custodian) to make, when due any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount as applicable, required to be made by it and that failure continues for one Local Business Day after notice of that failure is given to that party;"

IN WITNESS WHEREOF, the parties hereto have executed this Annex as of the date first above written.

CITIBANK, N.A.

CDO PLUS MASTER FUND LTD., by Rekon Advisors LLC, as Investment Advisor and not in its individual capacity.

By: _____
Name:       Linda Cook
Title:      Vice President
            Citibank, N.A.

By: _____
Name: Eric Rosenfeld
Title: Director

Schedule I

| | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| (A)  Cash | [X] | [X] | [100%] |

(B)  (x) Negotiable debt obligations issued by the U.S. Treasury Department or the Government National Mortgage Association ("Ginnie Mae"), or (y) mortgage backed securities issued by Ginnie Mae (but with respect to either (x) or (y) excluding interest only or principal only stripped securities, securities representing residual interests in mortgage pools, or securities that are not listed on a national securities exchange or regularly quoted in a national quotation service) and in each case having a remaining maturity of:

| | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| (i)  less than one year | [X] | [X] | [100%] |
| (ii)  one year or greater but less than 10 years | [X] | [X] | [98%] |
| (iii)  10 years or greater | [X] | [X] | [95%] |
| (C)  (x) Negotiable debt obligations issued by the Federal Home Loan Mortgage Association ("Freddie Mac") or the Federal National Mortgage Association ("Fannie Mae") or (y) mortgage-backed securities issued by Freddie Mac or Fannie Mae but excluding interest only or principal only stripped securities, securities representing residual interests in mortgage pools, or securities that are not listed on a national securities exchange or regularly quoted in a national quotation service. | [X] | [X] | [95%] |

| | | | |
|---|---|---|---|
| (D)  Agency CMO. "Agency CMO" means U.S. Dollar-denominated collateralized mortgage obligations of fixed maturity with a rating classification of Aaa by Moody's and AAA by S&P (in the event of a split rating, the lower rating shall apply) and issued directly by or guaranteed by FNMA, FHLMC or Ginnie Mae which (i) is  a senior tranche security ranking pari passu with the highest debt class for payment priority in the issuance and (ii) is listed as a pac, sequential, scheduled or support obligation on Bloomberg or Intex or successor listing service excluding interest only or principal only stripped securities and securities representing residual interest on mortgage pools. | [X] | [X] | [ 95%] |
| (E)  Any other collateral acceptable to the Secured Party in its sole discretion | [X] | [X] | [*/] |

*/ The Valuation Percentage shall be determined by the Valuation Agent from time to time and in its sole discretion.

**ISDA STANDARD TERMS SUPPLEMENT FOR USE WITH CREDIT DERIVATIVE TRANSACTIONS ON COLLATERALIZED DEBT OBLIGATION WITH PAY-AS-YOU-GO OR PHYSICAL SETTLEMENT[1]**

**(published on June 6, 2007)**

This ISDA Standard Terms Supplement for use with Credit Derivative Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement (the "CDS on CDO Terms") hereby incorporates by reference the definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions as published by the International Swaps and Derivatives Association, Inc. ("ISDA") (the "Credit Derivatives Definitions"). In the event of any inconsistency between the Credit Derivatives Definitions and these CDS on CDO Terms, these CDS on CDO Terms will govern.[2]

References to the "Reference Obligation" in these CDS on CDO Terms or in the relevant Confirmation shall be to the terms of the Reference Obligation (as defined below) set out in the Underlying Instruments (as defined below) as amended from time to time unless otherwise specified below.

1.      **General Terms:**

Trade Date:                          As shown in the relevant Confirmation.

Effective Date:                      As shown in the relevant Confirmation.

Scheduled Termination Date:          The Legal Final Maturity Date of the Reference Obligation, subject to adjustment in accordance with the Following Business Day Convention.

---

THE FOOTNOTES TO THIS CDS ON CDO STANDARD TERMS SUPPLEMENT ARE PROVIDED FOR CLARIFICATION ONLY AND DO NOT CONSTITUTE ADVICE AS TO THE STRUCTURING OR DOCUMENTATION OF A CREDIT DERIVATIVE TRANSACTION.

ISDA has not undertaken to review all applicable laws and regulations of any jurisdiction in which the Credit Derivatives Definitions or these CDS on CDO Terms may be used. Therefore, parties are advised to consider the application of any relevant jurisdiction's regulatory, tax, accounting, exchange or other requirements that may exist in connection with the entering into and documenting of a privately negotiated credit derivative transaction.

[1]     The definitions and provisions in this ISDA Standard Terms Supplement for use with Credit Derivatives Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement may be incorporated into a Confirmation or other document (including in electronic form) (a "**Confirmation**") by wording in the Confirmation indicating that, or the extent to which, the Confirmation is subject to this ISDA Standard Terms Supplement for use with Credit Derivatives Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement. All definitions and provisions so incorporated in a Confirmation will be applicable to that Confirmation unless otherwise provided in that Confirmation.

[2]     Parties who wish to novate a trade documented by way of a Confirmation incorporating these CDS on CDO Terms should consider using the Form of Novation Confirmation set out in the Schedule to this ISDA Standard Terms Supplement.

Copyright © June 2007 by International Swaps & Derivatives Association, Inc.

| | |
|---|---|
| Termination Date: | The last to occur of: |

    (a)    the fifth Business Day following the Effective Maturity Date;

    (b)    the last Floating Rate Payer Payment Date;

    (c)    the last Delivery Date; and

    (d)    the last Additional Fixed Amount Payment Date.

| | |
|---|---|
| Floating Rate Payer: | As shown in the relevant Confirmation (the "Seller"). |
| Fixed Rate Payer: | As shown in the relevant Confirmation (the "Buyer"). |
| Calculation Agent: | As shown in the relevant Confirmation. |
| Calculation Agent City: | As shown in the relevant Confirmation. |
| Business Day: | As shown in the relevant Confirmation. |
| Business Day Convention: | Following (which, with the exception of the Effective Date, the Final Amortization Date, each Reference Obligation Payment Date and the period end date of each Reference Obligation Calculation Period, shall apply to any date referred to in these CDS on CDO Terms or in the relevant Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | As shown in the relevant Confirmation. |
| Reference Obligation: | As shown in the relevant Confirmation. |
| | Section 2.30 of the Credit Derivatives Definitions shall not apply. |
| Reference Policy: | As shown in the relevant Confirmation. |
| Reference Price: | As shown in the relevant Confirmation. |
| Applicable Percentage: | On any day, a percentage equal to A divided by B. |

"A" means the product of the Initial Face Amount and the Initial Factor as decreased on each Delivery Date by an amount equal to (a) the outstanding principal balance of Deliverable Obligations Delivered to Seller (as adjusted by the Relevant Amount, if any) divided by the Current Factor on such day multiplied by (b) the Initial Factor.

"B" means the product of the Original Principal Amount and the Initial Factor;

    (a)    as increased by the outstanding principal

balance of any further issues by the Reference Entity that are fungible with and form part of the same legal series as the Reference Obligation; and

(b)     as decreased by any cancellations of some or all of the Outstanding Principal Amount resulting from purchases of the Reference Obligation by or on behalf of the Reference Entity.[3]

Initial Face Amount:          As shown in the relevant Confirmation.

---

[3]     This represents the percentage covered by the relevant Transaction of the Outstanding Principal Amount. It may be more than 100%.

Reference Obligation Notional Amount:

On the Effective Date, the product of:

(a)    the Original Principal Amount;

(b)    the Initial Factor; and

(c)    the Applicable Percentage.

Following the Effective Date, the Reference Obligation Notional Amount will be:

(i)    decreased on each day on which a Principal Payment is made by the relevant Principal Payment Amount;

(ii)    decreased on the day, if any, on which a Failure to Pay Principal occurs by the relevant Principal Shortfall Amount;

(iii)    decreased on each day on which a Writedown occurs by the relevant Writedown Amount;

(iv)    increased on each day on which a Writedown Reimbursement occurs by any Writedown Reimbursement Amount in respect of a Writedown Reimbursement within paragraphs (ii) or (iii) of the definition of "Writedown Reimbursement"; and

(v)    decreased on each Delivery Date by an amount equal to the relevant Exercise Amount minus the amount determined pursuant to paragraph (b) of "Physical Settlement Amount" below, provided that if any Relevant Amount is applicable, the Exercise Amount will also be deemed to be decreased by such Relevant Amount (or increased by the absolute value of such Relevant Amount if such Relevant Amount is negative) with effect from such Delivery Date;

provided that if the Reference Obligation Notional Amount would be less than zero, it shall be deemed to be zero.

For the avoidance of doubt, the Reference Obligation Notional Amount shall not be increased by any deferral or capitalization of interest that relates to the Term of this Transaction or decreased by payment of any portion of the principal balance of the Reference Obligation that is attributable to the deferral or capitalization of interest during the Term of this Transaction.

4

Initial Payment:                    As shown in the relevant Confirmation.

2.     **Fixed Payments:**

Fixed Rate Payer:                   Buyer

Fixed Rate:                         As shown in the relevant Confirmation.

Fixed Rate Payer Period End         The first day of each Reference Obligation Calculation
Date:                               Period.

Fixed Rate Payer Payment            Each day falling five Business Days after a Reference
Dates:                              Obligation Payment Date; provided that the final Fixed
                                    Rate Payer Payment Date shall fall on the fifth
                                    Business Day following the Effective Maturity Date.

Fixed Amount:                       With respect to any Fixed Rate Payer Payment Date,
                                    an amount equal to the product of:

                                    (a)     the Fixed Rate;

                                    (b)     an amount determined by the Calculation Agent
                                            equal to:

                                            (i)     the sum of the Reference Obligation
                                                    Notional Amount as at 5:00 p.m. in the
                                                    Calculation Agent City on each day in
                                                    the related Fixed Rate Payer Calculation
                                                    Period (provided that, if the Reference
                                                    Obligation is a Delayed Payment
                                                    Reference Obligation, the Reference
                                                    Obligation Notional Amount on each
                                                    day from and including the first day of
                                                    the related Reference Obligation
                                                    Calculation Period to but excluding the
                                                    relevant Reference Obligation Payment
                                                    Date shall be deemed to be adjusted to
                                                    take into account any adjustment to the
                                                    Reference Obligation Notional Amount
                                                    on such Reference Obligation Payment
                                                    Date); divided by

                                            (ii)    the actual number of days in the related
                                                    Fixed Rate Payer Calculation Period;
                                                    and

                                    (c)     the Fixed Rate Day Count Fraction.

Additional Fixed Amount             (a)     Each Fixed Rate Payer Payment Date; and
Payment Dates:
                                    (b)     in relation to each Additional Fixed Payment
                                            Event occurring after the second Business Day
                                            prior to the last Fixed Rate Payer Payment
                                            Date, the fifth Business Day after Buyer has

5

received notification from Seller or the Calculation Agent of the occurrence of such Additional Fixed Payment Event.

Additional Fixed Payments: Following the occurrence of an Additional Fixed Payment Event in respect of the Reference Obligation, Buyer shall pay the relevant Additional Fixed Amount to Seller on the first Additional Fixed Amount Payment Date falling at least two Business Days (or in the case of an Additional Fixed Payment Event that occurs after the second Business Day prior to the last Fixed Rate Payer Payment Date, five Business Days) after the delivery of a notice by the Calculation Agent to the parties or by Seller to Buyer stating that the related Additional Fixed Amount is due and showing in reasonable detail how such Additional Fixed Amount was determined; provided that any such notice must be given on or prior to the fifth Business Day following the day that is one calendar year after the Effective Maturity Date.

Additional Fixed Payment Event: The occurrence on or after the Effective Date and on or before the day that is one calendar year after the Effective Maturity Date of a Writedown Reimbursement, a Principal Shortfall Reimbursement or an Interest Shortfall Reimbursement.

Additional Fixed Amount: With respect to each Additional Fixed Amount Payment Date, an amount equal to the sum of:

(a)    the Writedown Reimbursement Payment Amount (if any);

(b)    the Principal Shortfall Reimbursement Payment Amount (if any); and

(c)    the Interest Shortfall Reimbursement Payment Amount (if any).

For the avoidance of doubt, each Writedown Reimbursement Payment Amount, Principal Shortfall Reimbursement Payment Amount or Interest Shortfall Reimbursement Payment Amount (as applicable) shall be calculated using the Applicable Percentage which takes into account the aggregate adjustment made to the Applicable Percentage in respect of all Delivery Dates that have occurred prior to the date of such calculation.

3.    **Floating Payments:**

Floating Rate Payer: Seller.

Floating Rate Payer Payment    In relation to a Floating Amount Event, the first Fixed

| Dates: | Rate Payer Payment Date failing at least two Business Days (or in the case of a Floating Amount Event that occurs on the Legal Final Maturity Date or the Final Amortization Date, the fifth Business Day) after delivery of a notice by the Calculation Agent to the parties or a notice by Buyer to Seller that the related Floating Amount is due and showing in reasonable detail how such Floating Amount was determined; provided that any such notice must be given on or prior to the fifth Business Day following the Effective Maturity Date. |

| Floating Payments: | If a Floating Amount Event occurs, then on the relevant Floating Rate Payer Payment Date, Seller will pay the relevant Floating Amount to Buyer. For the avoidance of doubt, the Conditions to Settlement are not required to be satisfied in respect of a Floating Payment. |

| Implied Writedown: | As shown in the relevant Confirmation. |

| Floating Amount Event: | A Writedown, a Failure to Pay Principal or an Interest Shortfall. |

| Floating Amount: | With respect to each Floating Rate Payer Payment Date, an amount equal to the sum of: |

(a)    the relevant Writedown Amount (if any);

(b)    the relevant Principal Shortfall Amount (if any); and

(c)    the relevant Interest Shortfall Payment Amount (if any).

For the avoidance of doubt, each Writedown Amount, Principal Shortfall Amount or Interest Shortfall Payment Amount (as applicable) shall be calculated using the Applicable Percentage which takes into account the aggregate adjustment made to the Applicable Percentage in respect of all Delivery Dates that have occurred prior to the date of such calculation.

**4.      Credit Events and Physical Settlement**

Conditions to Settlement:            Credit Event Notice

Notifying Party:  Buyer

Notice of Physical Settlement

Notice of Publicly Available Information:  Applicable

Public Sources:        The public sources listed in Section 3.7 of the Credit Derivatives Definitions; provided that Servicer Reports in respect of the Reference Obligation and, in respect of a Distressed Ratings Downgrade Credit Event only, any public communications by any of the Rating Agencies in respect of the Reference Obligation shall also be deemed Public Sources.

Specified Number:          one

provided that if the Calculation Agent has previously delivered a notice to the parties or Buyer has previously delivered a notice to Seller pursuant to the definition of "Floating Rate Payer Payment Dates" above in respect of a Writedown or a Failure to Pay Principal, the only Conditions to Settlement with respect to any Credit Event shall be a Notice of Physical Settlement and, in relation to the Failure to Pay Interest Credit Event, the Additional Condition to Settlement specified below.

Additional Condition to Settlement for Failure to Pay Interest:

In addition to the Conditions to Settlement above, in respect of the Failure to Pay Interest Credit Event, if the Reference Obligation is PIK-able,[4] it shall be a Condition to Settlement that a period of at least 360 calendar days has elapsed since the occurrence of the Credit Event without the relevant Interest Shortfall having been reimbursed in full. For the avoidance of doubt, if it is not explicitly made clear in the Servicer Report whether or not, or to what extent, a particular Interest Shortfall has been reimbursed but the Calculation Agent determines that such Interest Shortfall has been reimbursed by a certain amount on the basis of information in such Servicer Report, then the relevant Interest Shortfall reimbursement shall be calculated by the Calculation Agent on the basis of such information.[5]

Additional agreements relating to Physical Settlement:

The parties agree that with respect to the Transaction and notwithstanding anything to the contrary in the Credit Derivatives Definitions:

(a)     the Conditions to Settlement may be satisfied on more than one occasion;

(b)     multiple Physical Settlement Amounts may be payable by Seller;

(c)     Buyer, when providing a Notice of Physical Settlement, must specify an Exercise Amount and an Exercise Percentage;

(d)     if Buyer has delivered a Notice of Physical Settlement that specifies an Exercise Amount that is less than the Reference Obligation Notional Amount as of the date on which such Notice of Physical Settlement is delivered (calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full), the rights and obligations of the parties under the Transaction shall continue and Buyer may deliver additional Notices of Physical Settlement with respect to the initial Credit Event or with respect to any additional Credit Event at any time thereafter; and

(e)     any Notice of Physical Settlement shall be delivered no later than 30 calendar days after the fifth Business Day following the Effective Maturity Date. .

---

[4]    See definition of "PIK-able" in paragraph 8(c) of these CDS on CDO Terms.
[5]    This is intended to cover any situation in which the Servicer Report does not cover Interest Shortfalls.

Section 3.2(d) of the Credit Derivatives Definitions is amended to delete the words "that is effective no later than thirty calendar days after the Event Determination Date".

Section 3.3 of the Credit Derivatives Definitions is amended so that the following is added as sub-clause (d):

"(d) the expiration of any applicable grace period for a Failure to Pay Principal Credit Event".

Credit Events:

The following Credit Events shall apply to the Transaction (and the first sentence of Section 4.1 of the Credit Derivatives Definitions shall be amended accordingly):

Failure to Pay Principal

Writedown

Failure to Pay Interest

Payment Requirement: USD 10,000

Distressed Ratings Downgrade

The definition of "Payment Requirement" in Section 4.8(d) of the Credit Derivatives Definitions shall be amended so that the words "Failure to Pay" are deleted and replaced by the words "Failure to Pay Interest".

Obligation:

Reference Obligation Only

5.  **Interest Shortfall:**

Interest Shortfall Payment Amount:

In respect of an Interest Shortfall, the relevant Interest Shortfall Amount; provided that, if Interest Shortfall Cap is specified as applicable in the relevant Confirmation and the Interest Shortfall Amount exceeds the Interest Shortfall Cap Amount, the Interest Shortfall Payment Amount in respect of such Interest Shortfall shall be the Interest Shortfall Cap Amount.

Interest Shortfall Cap:

As shown in the relevant Confirmation.

Interest Shortfall Cap Amount:

As set out in the relevant Interest Shortfall Cap Annex.

Actual Interest Amount:

With respect to any Reference Obligation Payment Date, payment by or on behalf of the Issuer of an amount in respect of interest due under the Reference Obligation (including, without limitation, any deferred interest or default interest but excluding payments in respect of prepayment penalties, yield maintenance provisions or

10

principal, except that the Actual Interest Amount shall include any payment of principal representing capitalized interest that relates to the Term of the Transaction) to the holder(s) of the Reference Obligation in respect of the Reference Obligation.

**Expected Interest Amount:**

With respect to any Reference Obligation Payment Date, the amount of current interest that would accrue during the related Reference Obligation Calculation Period calculated using the Reference Obligation Coupon on a principal balance of the Reference Obligation equal to:

(a)     the Outstanding Principal Amount taking into account any reductions due to a principal deficiency balance or realized loss amount (however described in the Underlying Instruments) that are attributable to the Reference Obligation; minus

(b)     the Aggregate Implied Writedown Amount (if any)

and that will be payable on the related Reference Obligation Payment Date assuming for this purpose that sufficient funds are available therefor in accordance with the Underlying Instruments. Except as provided in (a) in the previous sentence, the Expected Interest Amount shall be determined without regard to (i) unpaid amounts in respect of accrued interest on prior Reference Obligation Payment Dates; (ii) any prepayment penalties or yield maintenance provisions; or (iii) the effect of any provisions (however described) of such Underlying Instruments that otherwise permit the limitation of due payments to distributions of funds available from proceeds of the Underlying Assets, or that provide for the capitalization or deferral of interest on the Reference Obligation during the Term of the Transaction, or that provide for the extinguishing or reduction of such payments or distributions (each a "Limitation Provision") (but, for the avoidance of doubt, taking account of any Writedown within paragraph (i) of the definition of "Writedown" occurring in accordance with the Underlying Instruments)[6].

For the purposes of calculating the Expected Interest Amount, and notwithstanding any other provision herein, the Reference Obligation Coupon shall be deemed to include any cap stated in the Underlying Instrument that is not a Limitation Provision.

**Interest Shortfall:**

With respect to any Reference Obligation Payment Date, either (a) the non-payment of an Expected Interest Amount or (b) the payment of an Actual Interest Amount that is less than the Expected Interest Amount.

---

[6]     Note that this will not impact the determination of "Expected Interest Amount" in respect of a Reference Obligation that does not have a Limitation Provision.

For the avoidance of doubt, the occurrence of an event within (a) or (b) shall be determined taking into account any payment made under the Reference Policy, if applicable.

Interest Shortfall Amount:

With respect to any Reference Obligation Payment Date, an amount equal to the greater of:

(a)     zero; and

(b)     the amount equal to the product of:

     (i)     (A)     the Expected Interest Amount;

                    minus

          (B)     the Actual Interest Amount; and

     (ii)     the Applicable Percentage;

provided that, with respect to the first Reference Obligation Payment Date only, the Interest Shortfall Amount shall be the amount determined in accordance with (a) and (b) above multiplied by a fraction equal to:

(x)     the number of days in the first Fixed Rate Payer Calculation Period; over

(y)     the number of days in the first Reference Obligation Calculation Period.

Interest Shortfall Reimbursement:

With respect to any Reference Obligation Payment Date, the payment by or on behalf of the Issuer of an Actual Interest Amount in respect of the Reference Obligation that is greater than the Expected Interest Amount.

Interest Shortfall Reimbursement Amount:

With respect to any Reference Obligation Payment Date, the product of (a) the amount of any Interest Shortfall Reimbursement on such day and (b) the Applicable Percentage.

Interest Shortfall Reimbursement Payment Amount:

If Interest Shortfall Cap is specified as not applicable in the relevant Confirmation, the relevant Interest Shortfall Reimbursement Amount. If Interest Shortfall Cap is specified as applicable in the relevant Confirmation, the amount determined pursuant to the relevant Interest Shortfall Cap Annex.

6.     **Settlement Terms**

Settlement Method:     Physical Settlement

Terms Relating to Physical Settlement:

Physical Settlement Period:     Five Business Days

| Deliverable Obligations: | Exclude Accrued Interest |
| Deliverable Obligations: | Deliverable Obligation Category: Reference Obligation Only |
| Physical Settlement Amount: | An amount equal to: |

(a) the product of the Exercise Amount and the Reference Price; minus

(b) the sum of:

  (i) if the Aggregate Implied Writedown Amount is greater than zero, the product of (A) the Aggregate Implied Writedown Amount, (B) the Applicable Percentage, each as determined immediately prior to the relevant Delivery and (C) the relevant Exercise Percentage; and

  (ii) the product of (A) the aggregate of all Writedown Amounts in respect of Writedowns within paragraph (i)(B) of the definition of "Writedown" minus the aggregate of all Writedown Reimbursement Amounts in respect of Writedown Reimbursements within paragraph (ii)(B) of the definition of "Writedown Reimbursement" and (B) the relevant Exercise Percentage,

provided that if the Physical Settlement Amount would exceed the product of:

(1) the Reference Obligation Notional Amount as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full; and

(2) the Exercise Percentage;

then the Physical Settlement Amount shall be deemed to be equal to such product.

| Delayed Payment: | With respect to a Delivery Date, if a Servicer Report that describes a Delayed Payment is delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date, Buyer will pay the applicable Delayed Payment Amount to Seller no later than five Business Days following the later of (a) the day on which such Servicer Report is delivered and (b) the day on which such Delayed Payment is due and payable. |

Escrow:                                        Applicable

Non-delivery by Buyer or                       If Buyer has delivered a Notice of Physical Settlement and:
occurrence of the Effective
Maturity Date:                                 (a)    Buyer does not Deliver in full the Deliverable
                                                      Obligations specified in that Notice of Physical
                                                      Settlement on or prior to the Physical Settlement
                                                      Date; or

                                               (b)    the Effective Maturity Date occurs after delivery
                                                      of the Notice of Physical Settlement but before
                                                      Buyer Delivers the Deliverable Obligations
                                                      specified in that Notice of Physical Settlement;

                                               then such Notice of Physical Settlement shall be deemed
                                               not to have been delivered and any reference in these CDS
                                               on CDO Terms to a previously delivered Notice of
                                               Physical Settlement shall exclude any Notice of Physical
                                               Settlement that is deemed not to have been delivered.
                                               Sections 9.2(c)(ii) (except for the first sentence thereof),
                                               9.3, 9.4, 9.5, 9.6, 9.9 and 9.10 of the Credit Derivatives
                                               Definitions shall not apply.

7.     **Additional Provisions:**

(a)    *Delivery of Servicer Report*

       If either party makes a request in writing, the Calculation Agent agrees to provide such party
       with a copy of the most recent Servicer Report promptly following receipt of such request, if
       and to the extent such Servicer Report is reasonably available to the Calculation Agent
       (whether or not the Calculation Agent is a holder of the Reference Obligation). In addition, if
       a Floating Payment or an Additional Fixed Payment is due hereunder, then the Calculation
       Agent or the party that notifies the other party that the relevant Floating Payment or
       Additional Fixed Payment is due, as applicable, (the "Notifying Party") shall deliver a copy of
       any Servicer Report relevant to such payment that is requested by the party that is not the
       Notifying Party or by either party where the Notifying Party is the Calculation Agent, if and
       to the extent that such Servicer Report is reasonably available to the Notifying Party (whether
       or not the Notifying Party is a holder of the Reference Obligation).

(b)    *Calculation Agent and Buyer and Seller Determinations*

       The Calculation Agent shall be responsible for determining and calculating (i) the Fixed
       Amount payable on each Fixed Rate Payer Payment Date; (ii) the occurrence of a Floating
       Amount Event and the related Floating Amount and (iii) the occurrence of an Additional
       Fixed Payment Event and the related Additional Fixed Amount; provided that
       notwithstanding the above, each of Buyer and Seller shall be entitled to determine and
       calculate the above amounts to the extent that Buyer or Seller, as applicable, has the right to
       deliver a notice to the other party demanding payment of such amount. The Calculation
       Agent or Buyer or Seller, as applicable, shall make such determinations and calculations
       based solely on the basis of the Servicer Reports, to the extent such Servicer Reports are
       reasonably available to the Calculation Agent or such party. The Calculation Agent or Buyer
       or Seller, as applicable, shall, as soon as practicable after making any of the determinations or
       calculations specified in (i) and (ii) above, notify the parties or the other party, as applicable,
       of such determinations and calculations. For the avoidance of doubt, if an Interest Shortfall

Amount is not explicitly set out in the Servicer Report but the Calculation Agent determines that an Interest Shortfall has occurred on the basis of information in such Servicer Report, then the relevant Interest Shortfall Amount shall be calculated by the Calculation Agent on the basis of such information.[7]

(c)     *Adjustment of Calculation Agent Determinations*

To the extent that a Servicer furnishes any Servicer Reports correcting information contained in previously issued Servicer Reports, and such corrections impact calculations pursuant to the Transaction, the calculations relevant to the Transaction shall be adjusted retroactively by the Calculation Agent to reflect the corrected information (provided that, for the avoidance of doubt, no amounts in respect of interest shall be payable by either party and provided that the Calculation Agent in performing the calculations pursuant to this paragraph will assume that no interest has accrued on any adjusted amount), and the Calculation Agent shall promptly notify both parties of any corrected payments required by either party. Any required corrected payments shall be made within five Business Days of the day on which such notification by the Calculation Agent is effective.

**8.     Additional Definitions and Amendments to the Credit Derivatives Definitions:**

(a)     References in Sections 4.1, 8.2, 9.1 and 9.2(a) of the Credit Derivatives Definitions as well as Section 3(a)(iv) of the form of Novation Agreement set forth in Exhibit E to the Credit Derivatives Definitions to the Reference Entity shall be deemed to be references to both the Reference Entity and the Insurer in respect of the Reference Policy, if applicable.

(b)     (i)     The definition of "Publicly Available Information" in Section 3.5 of the Credit Derivatives Definitions shall be amended by (i) inserting the words "the Insurer in respect of the Reference Policy, if applicable" at the end of subparagraph (a)(ii)(A) thereof, (ii) inserting the words ", servicer, sub-servicer, master servicer" before the words "or paying agent" in subparagraph (a)(ii)(B) thereof and (iii) deleting the word "or" at the end of subparagraph (a)(iii) thereof and inserting at the end of subparagraph (a)(iv) thereof the following: "or (v) is information contained in a notice or on a website published by an internationally recognized rating agency that has at any time rated the Reference Obligation".

(ii)    The definition of "Physical Settlement" in Section 8.1 of the Credit Derivatives Definitions shall be amended by (i) deleting the words "Physical Settlement Amount" from the last line of the second paragraph thereof and (ii) inserting in lieu thereof the words "Exercise Amount".

(iii)   The definition of "Physical Settlement Date" in Section 8.4 of the Credit Derivatives Definitions shall be amended by deleting the last sentence thereof.

---

[7]     This is intended to cover any situation in which the Servicer Report does not report on Interest Shortfalls.

(c)     For the purposes of the Transaction only, the following terms have the meanings given below:

"**Actual Principal Amount**" means, with respect to the Final Amortization Date or the Legal Final Maturity Date, an amount paid on such day by or on behalf of the Issuer in respect of principal (excluding any amount representing capitalized interest that relates to the Term of the Transaction) to the holder(s) of the Reference Obligation in respect of the Reference Obligation.

"**Aggregate Implied Writedown Amount**" means the greater of (i) zero and (ii) the aggregate of all Implied Writedown Amounts minus the aggregate of all Implied Writedown Reimbursement Amounts, provided that if Implied Writedown is specified as not applicable in the relevant Confirmation, the Aggregate Implied Writedown Amount shall be deemed to be zero.

"**Current Factor**" means the factor of the Reference Obligation as specified in the most recent Servicer Report; provided that if the factor is not specified in the most recent Servicer Report or the factor specified includes deferred or capitalized interest that relates to the Term of the Transaction, then the Current Factor shall be the ratio equal to (i) the Outstanding Principal Amount as of such date, determined in accordance with the most recent Servicer Report over (ii) the Original Principal Amount.

"**Current Period Implied Writedown Amount**" means, in respect of a Reference Obligation Calculation Period, an amount determined as of the last day of such Reference Obligation Calculation Period equal to the greater of:

(i)     zero; and

(ii)    the product of:

    (A)     the Implied Writedown Percentage; and

    (B)     the greater of:

        (1)     zero; and

        (2)     the lesser of (x) the Pari Passu Amount and (y) the product of (I) the Pari Passu Amount plus the Senior Amount and (II) an amount equal to one minus the Overcollateralization Ratio.

"**Delayed Payment**" means, with respect to a Delivery Date, a Principal Payment, Principal Shortfall Reimbursement or a Writedown Reimbursement within paragraph (i) of the definition of "Writedown Reimbursement" that is described in a Servicer Report delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date.

"**Delayed Payment Amount**" means, if persons who are holders of the Reference Obligation as of a date prior to a Delivery Date are paid a Delayed Payment on or after such Delivery Date, an amount equal to the product of (i) the sum of all such Delayed Payments, (ii) the Reference Price, (iii) the Applicable Percentage immediately prior to such Delivery Date and (iv) the Exercise Percentage.

"**Delayed Payment Reference Obligation**" means a Reference Obligation with Reference Obligation Payment Dates that fall after the final day of the related Reference Obligation Calculation Periods.

"Distressed Ratings Downgrade" means that the Reference Obligation:

(i)     if publicly rated by Moody's, (A) is downgraded to "Caa2" or below by Moody's or (B) has the rating assigned to it by Moody's withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "Baa3" or higher by Moody's immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "Caa1" by Moody's within three calendar months after such withdrawal; or

(ii)    if publicly rated by Standard & Poor's, (A) is downgraded to "CCC" or below by Standard & Poor's or (B) has the rating assigned to it by Standard & Poor's withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "BBB-" or higher by Standard & Poor's immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "CCC+" by Standard & Poor's within three calendar months after such withdrawal; or

(iii)   if publicly rated by Fitch, (A) is downgraded to "CCC" or below by Fitch or (B) has the rating assigned to it by Fitch withdrawn and, in either case, not reinstated within five Business Days of such downgrade or withdrawal; provided that if such Reference Obligation was assigned a public rating of "BBB-" or higher by Fitch immediately prior to the occurrence of such withdrawal, it shall not constitute a Distressed Ratings Downgrade if such Reference Obligation is assigned a public rating of at least "CCC+" by Fitch within three calendar months after such withdrawal.

"Effective Maturity Date" means the earlier of (a) the Scheduled Termination Date and (b) the Final Amortization Date.

"Exercise Amount" means, for purposes of the Transaction, an amount to which a Notice of Physical Settlement relates equal to the product of (i) the original face amount of the Reference Obligation to be Delivered by Buyer to Seller on the applicable Physical Settlement Date; and (ii) the Current Factor as of such date. The Exercise Amount to which a Notice of Physical Settlement relates shall (A) be equal to or less than the Reference Obligation Notional Amount (determined, for this purpose, without regard to the effect of any Writedown or Writedown Reimbursement within paragraphs (i)(B) or (iii) of the definition of "Writedown" or paragraphs (ii)(B) or (iii) of the definition of "Writedown Reimbursement", respectively) as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though the Physical Settlement of all previously delivered Notices of Physical Settlement has occurred in full and (B) not be less than the lesser of (1) the Reference Obligation Notional Amount as of the date on which the relevant Notice of Physical Settlement is delivered calculated as though Physical Settlement in respect of all previously delivered Notices of Physical Settlement has occurred in full and (2) USD100,000 or its equivalent in the relevant Obligation Currency. The cumulative original face amount of Deliverable Obligations specified in all Notices of Physical Settlement shall not at any time exceed the Initial Face Amount. For the avoidance of doubt: (a) if any capitalization or deferral of interest in respect of the Reference Obligation has occurred during the Term of the Transaction and has not been recovered by holders of the Reference Obligation pursuant to the terms of the Underlying Instruments, then, for the purpose of determining the amount of Deliverable Obligations to be Delivered, the Exercise Amount (determined above by reference to the original face amount) will represent an outstanding principal balance of the Reference Obligation to be Delivered by Buyer that includes the proportion of unrecovered interest attributable to the Reference Obligation to be Delivered and (b) notwithstanding the

foregoing, the Physical Settlement Amount payable by Seller in relation to such Exercise Amount shall not include any amount in respect of such unrecovered interest.

"Exercise Percentage" means, with respect to a Notice of Physical Settlement, a percentage equal to the original face amount of the Deliverable Obligations specified in such Notice of Physical Settlement divided by an amount equal to (i) the Initial Face Amount minus (ii) the aggregate of the original face amount of all Deliverable Obligations specified in all previously delivered Notices of Physical Settlement.

"Expected Principal Amount" means, with respect to the Final Amortization Date or the Legal Final Maturity Date, an amount equal to (i) the Outstanding Principal Amount of the Reference Obligation payable on such day (excluding any amount representing capitalized interest that relates to the Term of the Transaction) assuming for this purpose that sufficient funds are available for such payment, where such amount shall be determined in accordance with the Underlying Instruments, minus (ii) the sum of (A) the Aggregate Implied Writedown Amount (if any) and (B) the net aggregate principal deficiency balance or realized loss amounts (however described in the Underlying Instruments) that are attributable to the Reference Obligation. The Expected Principal Amount shall be determined without regard to the effect of any provisions (however described) of the Underlying Instruments that permit the limitation of due payments or distributions of funds in accordance with the terms of such Reference Obligation or that provide for the extinguishing or reduction of such payments or distributions.

"Failure to Pay Interest" means the occurrence of an Interest Shortfall Amount or Interest Shortfall Amounts (calculated on a cumulative basis) in excess of the relevant Payment Requirement.

"Failure to Pay Principal" means (i) a failure by the Reference Entity (or any Insurer) to pay an Expected Principal Amount on the Final Amortization Date or the Legal Final Maturity Date, as the case may be, or (ii) payment on any such day of an Actual Principal Amount that is less than the Expected Principal Amount; provided that the failure by the Reference Entity (or any Insurer) to pay any such amount in respect of principal in accordance with the foregoing shall not constitute a Failure to Pay Principal if such failure has been remedied within any grace period applicable to such payment obligation under the Underlying Instruments or, if no such grace period is applicable, within three Business Days after the day on which the Expected Principal Amount was scheduled to be paid.

"Final Amortization Date" means the first to occur of (i) the date on which the Reference Obligation Notional Amount is reduced to zero and (ii) the date on which the assets securing the Reference Obligation or designated to fund amounts due in respect of the Reference Obligation are liquidated, distributed or otherwise disposed of in full and the proceeds thereof are distributed or otherwise disposed of in full; provided that, for the purposes of determining the date on which the Reference Obligation Notional Amount is reduced to zero where (A) the Aggregate Implied Writedown Amount is greater than zero and (B) Interest Shortfall Cap Annex B is specified as applicable in the relevant confirmation, the Reference Obligation Notional Amount shall be determined without regard to the effect of any Writedown or Writedown Reimbursement within paragraph (iii) of "Writedown" or paragraph (iii) of Writedown Reimbursement respectively, unless, prior to the date of determination, a Distressed Ratings Downgrade Credit Event has occurred or a Failure to Pay Interest Credit Event has occurred and, as of the date of determination, a period of at least 720 calendar days have elapsed since the occurrence of such Failure to Pay Interest Credit Event without the relevant Interest Shortfall, having been reimbursed in full.

"Fitch" means Fitch Ratings or any successor to its rating business.

"Interest Shortfall Cap Annex" means the Interest Shortfall Cap Annex A or the Interest Shortfall Cap Annex B as specified in the relevant Confirmation.

"Implied Writedown Amount" means, (i) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent equal to the excess, if any, of the Current Period Implied Writedown Amount over the Previous Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, and (ii) in any other case, zero.

"Implied Writedown Percentage" means (i) the Outstanding Principal Amount divided by (ii) the Pari Passu Amount.

"Implied Writedown Reimbursement Amount" means, (i) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent equal to the excess, if any, of the Previous Period Implied Writedown Amount over the Current Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, and (ii) in any other case, zero, provided that the aggregate of all Implied Writedown Reimbursement Amounts at any time shall not exceed the Outstanding Principal Amount.

"Legal Final Maturity Date" means the date set out in paragraph 1 above (subject, for the avoidance of doubt, to any business day convention applicable to the legal final maturity date of the Reference Obligation), provided that if the legal final maturity date of the Reference Obligation is amended, the Legal Final Maturity Date shall be such date as amended.

"Moody's" means Moody's Investors Service, Inc. or any successor to its rating business.

"Outstanding Principal Amount" means, as of any date of determination with respect to the Reference Obligation, the outstanding principal balance of the Reference Obligation as of such date, which shall take into account:

(i)     all payments of principal;

(ii)    all writedowns or applied losses (however described in the Underlying Instruments) resulting in a reduction in the outstanding principal balance of the Reference Obligation (other than as a result of a scheduled or unscheduled payment of principal);

(iii)   forgiveness of any amount by the holders of the Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the outstanding principal balance of the Reference Obligation;

(iv)    any payments reducing the amount of any reductions described in (ii) and (iii) of this definition; and

(v)     any increase in the outstanding principal balance of the Reference Obligation that reflects a reversal of any prior reductions described in (ii) and (iii) of this definition; and

(vi)     any increase in the outstanding principal balance of the Reference Obligation that is attributable to the deferral or capitalization of interest prior to the Effective Date.

For the avoidance of doubt, the Outstanding Principal Amount shall not include any portion of the outstanding principal balance of the Reference Obligation that is attributable to the deferral or capitalization of interest during the Term of this Transaction.

"Overcollateralization Ratio" means, in respect of a Reference Obligation Calculation Period:

(i)     if the most recent Servicer Report sets out a ratio representing the ratio of (A) the aggregate asset pool balance securing the payment obligations on the Reference Obligation (subject to certain adjustments as described in the Underlying Instruments) to (B) the Pari Passu Amount plus the Senior Amount, then such ratio; or

(ii)    if the ratio cannot be determined under (i) but the most recent Servicer Report for one or more senior Related Obligations (if any) sets out such a ratio, then a ratio equal to the ratio of (A) the product of (1) such ratio determined with respect to the senior Related Obligation ranking closest in priority of payment to the Reference Obligation for which such a ratio is set out, and (2) the aggregate outstanding principal balance of such Related Obligation and any other Related Obligations ranking in priority of payment either pari passu with or senior to such Related Obligation to (B) the sum of the Pari Passu Amount plus the Senior Amount with respect to such Reference Obligation; or

(iii)   if the ratio cannot be determined under (ii) but the most recent Servicer Report for one or more junior Related Obligations (if any) sets out such a ratio, then a ratio equal to the ratio of (A)  the product of (1) such ratio determined with respect to the junior Related Obligation ranking closest in priority of payment to the Reference Obligation for which such a ratio is set out, and (2) the aggregate outstanding principal balance of such Related Obligation and any other Related Obligations ranking in priority of payment either pari passu with or senior to such Related Obligation (including the Reference Obligation) and (B) the sum of the Pari Passu Amount plus the Senior Amount with respect to such Reference Obligation; or

(iv)    if the ratio cannot be determined under (iii), then a ratio representing the ratio of (A) the aggregate asset pool balance securing the payment obligations under the Reference Obligation to (B) the Pari Passu Amount plus the Senior Amount.

"Pari Passu Amount" means, as of any date of determination, the aggregate of the Outstanding Principal Amount of the Reference Obligation and the aggregate outstanding principal balance of all obligations of the Reference Entity secured by the Underlying Assets and ranking *pari passu* in priority with the Reference Obligation.

"PIK-able" means, in relation to a Reference Obligation, that the Underlying Instruments include provisions that provide for capitalization or deferral of interest on such Reference Obligation.

"Previous Period Implied Writedown Amount" means, in respect of a Reference Obligation Calculation Period, the Current Period Implied Writedown Amount as determined in relation to the last day of the immediately preceding Reference Obligation Calculation Period; provided that in respect of the first Reference Obligation Calculation Period only, the Previous Period Implied Writedown Amount shall be the Current Period Implied Writedown Amount determined in relation to the last day of the preceding interest accrual period of the Reference Obligation and each reference to "Reference Obligation Calculation Period" in the

definition of Current Period Implied Writedown Amount shall be deemed to be a reference to that interest accrual period.

"**Principal Payment**" means, with respect to any Reference Obligation Payment Date, the occurrence of a payment of an amount to the holders of the Reference Obligation in respect of principal (scheduled or unscheduled) in respect of the Reference Obligation other than a payment in respect of principal representing capitalized interest that relates to the Term of the Transaction, excluding, for the avoidance of doubt, any Writedown Reimbursement or Interest Shortfall Reimbursement.

"**Principal Payment Amount**" means, with respect to any Reference Obligation Payment Date, an amount equal to the product of (i) the amount of any Principal Payment on such date and (ii) the Applicable Percentage.

"**Principal Shortfall Amount**" means, in respect of a Failure to Pay Principal, an amount equal to the greater of:

(i)     zero; and

(ii)    the amount equal to the product of:

    (A)     the Expected Principal Amount minus the Actual Principal Amount;

    (B)     the Applicable Percentage; and

    (C)     the Reference Price.

If the Principal Shortfall Amount would be greater than the Reference Obligation Notional Amount immediately prior to the occurrence of such Failure to Pay Principal, then the Principal Shortfall Amount shall be deemed to be equal to the Reference Obligation Notional Amount at such time.

"**Principal Shortfall Reimbursement**" means, with respect to any day, the payment by or on behalf of the Issuer of an amount in respect of the Reference Obligation in or toward the satisfaction of any deferral of or failure to pay principal arising from one or more prior occurrences of a Failure to Pay Principal.

"**Principal Shortfall Reimbursement Amount**" means, with respect to any day, the product of (i) the amount of any Principal Shortfall Reimbursement on such day, (ii) the Applicable Percentage and (iii) the Reference Price.

"**Principal Shortfall Reimbursement Payment Amount**" means, with respect to an Additional Fixed Amount Payment Date, the sum of the Principal Shortfall Reimbursement Amounts in respect of all Principal Shortfall Reimbursements (if any) made during the Reference Obligation Calculation Period relating to such Additional Fixed Amount Payment Date, provided that the aggregate of all Principal Shortfall Reimbursement Payment Amounts at any time shall not exceed the aggregate of all Floating Amounts paid by Seller in respect of occurrences of Failure to Pay Principal prior to such Additional Fixed Amount Payment Date.

"**Rating Agencies**" means Fitch, Moody's and Standard & Poor's.

"**Reference Obligation Calculation Period**" means, with respect to each Reference Obligation Payment Date, a period corresponding to the interest accrual period relating to such Reference Obligation Payment Date pursuant to the Underlying Instruments.

"Reference Obligation Coupon" means the periodic interest rate applied in relation to each Reference Obligation Calculation Period on the related Reference Obligation Payment Date, as determined in accordance with the terms of the Underlying Instruments as at the Effective Date, without regard to any subsequent amendment.

"Reference Obligation Payment Date" means (i) each scheduled distribution date for the Reference Obligation occurring on or after the Effective Date and on or prior to the Scheduled Termination Date, determined in accordance with the Underlying Instruments and (ii) any day after the Effective Maturity Date on which a payment is made in respect of the Reference Obligation.

"Related Obligation" means, in relation to the Reference Obligation, an obligation of the Reference Entity that is also secured by the Underlying Assets but ranks senior or junior to the Reference Obligation in priority of payment. In relation to a Related Obligation, the terms "Servicer", "Servicer Report" and "Underlying Instruments" shall have the meanings set out in this Confirmation but with references in the definitions of those terms to "Reference Obligation" being deemed, solely for this purpose, to be references to the Related Obligation.

"Relevant Amount" means, if a Servicer Report that describes a Principal Payment, Writedown or Writedown Reimbursement (other than a Writedown Reimbursement within paragraph (i) of the definition of "Writedown Reimbursement"), in each case that has the effect of decreasing or increasing the interest-accruing principal balance of the Reference Obligation as of a date prior to a Delivery Date but such Servicer Report is delivered to holders of the Reference Obligation or to the Calculation Agent on or after such Delivery Date, an amount equal to the product of (i) the sum of any such Principal Payment (expressed as a positive amount), Writedown (expressed as a positive amount) or Writedown Reimbursement (expressed as a negative amount), as applicable; (ii) the Reference Price; (iii) the Applicable Percentage immediately prior to such Delivery Date; and (iv) the Exercise Percentage.

"Senior Amount" means, as of any day, the aggregate outstanding principal balance of all obligations of the Reference Entity secured by the Underlying Assets and ranking senior in priority to the Reference Obligation.

"Servicer" means any trustee, servicer, sub-servicer, master servicer, fiscal agent, paying agent or other similar entity responsible for calculating payment amounts or providing reports pursuant to the Underlying Instruments.

"Servicer Report" means a periodic statement or report regarding the Reference Obligation provided by the Servicer to holders of the Reference Obligation.

"Standard & Poor's" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. or any successor to its rating business.

"Underlying Assets" means the assets securing the Reference Obligation for the benefit of the holders of the Reference Obligation and which are expected to generate the cashflows required for the servicing and repayment (in whole or in part) of the Reference Obligation, or the assets to which a holder of such Reference Obligation is economically exposed where such exposure is created synthetically.

"Underlying Instruments" means the indenture, trust agreement, pooling and servicing agreement or other relevant agreement(s) setting forth the terms of the Reference Obligation.

"Writedown" means the occurrence at any time on or after the Effective Date of:

(i)    (A)    a writedown or applied loss (however described in the Underlying Instruments) resulting in a reduction in the Outstanding Principal Amount (other than as a result of a scheduled or unscheduled payment of principal); or

        (B)    the attribution of a principal deficiency or realized loss (however described in the Underlying Instruments) to the Reference Obligation resulting in a reduction or subordination of the current interest payable on the Reference Obligation;

(ii)    the forgiveness of any amount of principal by the holders of the Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the Outstanding Principal Amount; or

(iii)    if Implied Writedown is applicable and the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) above to occur in respect of the Reference Obligation, an Implied Writedown Amount being determined in respect of the Reference Obligation by the Calculation Agent.

"Writedown Amount" means, with respect to any day, the product of (i) the amount of any Writedown on such day, (ii) the Applicable Percentage and (iii) the Reference Price.

"Writedown Reimbursement" means, with respect to any day, the occurrence of:

(i)    a payment by or on behalf of the Issuer of an amount in respect of the Reference Obligation in reduction of any prior Writedowns;

(ii)    (A)    an increase by or on behalf of the Issuer of the Outstanding Principal Amount of the Reference Obligation to reflect the reversal of any prior Writedowns; or

        (B)    a decrease in the principal deficiency balance or realized loss amounts (however described in the Underlying Instruments) attributable to the Reference Obligation; or

(iii)    if Implied Writedown is applicable and the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (ii) above to occur in respect of the Reference Obligation, an Implied Writedown Reimbursement Amount being determined in respect of the Reference Obligation by the Calculation Agent.

"Writedown Reimbursement Amount" means, with respect to any day, an amount equal to the product of:

(i)    the sum of all Writedown Reimbursements on that day;

(ii)    the Applicable Percentage; and

(iii)    the Reference Price.

"Writedown Reimbursement Payment Amount" means, with respect to an Additional Fixed Amount Payment Date, the sum of the Writedown Reimbursement Amounts in respect of all Writedown Reimbursements (if any) made during the Reference Obligation Calculation

Period relating to such Additional Fixed Amount Payment Date, provided that the aggregate of all Writedown Reimbursement Payment Amounts at any time shall not exceed the aggregate of all Floating Amounts paid by Seller in respect of Writedowns occurring prior to such Additional Fixed Amount Payment Date.

**Interest Shortfall Cap Annex A**

If Interest Shortfall Cap is specified as applicable and Annex A is elected in the relevant Confirmation, then the following provisions will apply:

| | |
|---|---|
| Interest Shortfall Cap Basis: | As shown in the relevant Confirmation. |
| Interest Shortfall Cap Amount: | If the Interest Shortfall Cap Basis is Fixed Cap, the Interest Shortfall Cap Amount in respect of an Interest Shortfall shall be the Fixed Amount calculated in respect of the Fixed Rate Payer Payment Date immediately following the Reference Obligation Payment Date on which the relevant Interest Shortfall occurred. |

If the Interest Shortfall Cap Basis is Variable Cap, the Interest Shortfall Cap Amount applicable in respect of a Floating Rate Payer Payment Date shall be an amount equal to the product of:

(a) the sum of the Relevant Rate and the Fixed Rate applicable to the Fixed Rate Payer Calculation Period immediately preceding the Reference Obligation Payment Date on which the relevant Interest Shortfall occurs (or, in respect of the first Fixed Rate Payer Calculation Period, the Relevant Rate and the Fixed Rate as of the Effective Date);

(b) the amount determined by the Calculation Agent under sub-clause (b) of the definition of "Fixed Amount" in relation to the relevant Fixed Rate Payer Payment Date; and

(c) the Fixed Rate Day Count Fraction.

| | |
|---|---|
| Interest Shortfall Compounding: | As shown in the relevant Confirmation. |
| Interest Shortfall Reimbursement Payment Amount: | With respect to the first Additional Fixed Amount Payment Date, zero, and with respect to any subsequent Additional Fixed Amount Payment Date and calculated as of the Reference Obligation Payment Date immediately preceding such Additional Fixed Amount Payment Date, as specified by the Calculation Agent in its notice to the parties or by Seller in its notice to Buyer of the existence of an Interest Shortfall Reimbursement, an amount equal to the greater of: |

(a) zero; and

(b) the amount equal to:

(i) the product of:

(A) the Cumulative Interest Shortfall Payment Amount as of the Additional Fixed Amount Payment

Date immediately preceding such Reference Obligation Payment Date; and

(B)     either:

(1)     if Interest Shortfall Compounding is specified as applicable in the relevant Confirmation, the relevant Cumulative Interest Shortfall Payment Compounding Factor for the Fixed Rate Payer Calculation Period immediately preceding such Additional Fixed Amount Payment Date (or 1.0 in respect of any Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Payment Date); or

(2)     if Interest Shortfall Compounding is specified as not applicable in the relevant Confirmation, one;

minus

(ii)     the Cumulative Interest Shortfall Amount as of such Reference Obligation Payment Date;

provided that if the Interest Shortfall Reimbursement Payment Amount on an Additional Fixed Amount Payment Date would exceed the Interest Shortfall Reimbursement Amount in respect of the related Reference Obligation Payment Date, then such Interest Shortfall Reimbursement Payment Amount shall be deemed to be equal to such Interest Shortfall Reimbursement Amount.

26

**Cumulative Interest Shortfall Amount:**

With respect to any Reference Obligation Payment Date, an amount equal to the greater of:

(a)     zero; and

(b)     an amount equal to:

    (i)     the Cumulative Interest Shortfall Amount as of the Reference Obligation Payment Date immediately preceding such Reference Obligation Payment Date or, in the case of the first Reference Obligation Payment Date, zero; plus

    (ii)     the Interest Shortfall Amount (if any) in respect of such Reference Obligation Payment Date; plus

    (iii)     either:

        (A)     if Interest Shortfall Compounding is specified as applicable in the relevant Confirmation, an amount determined by the Calculation Agent as the amount of interest that would accrue on the Cumulative Interest Shortfall Amount immediately preceding such Reference Obligation Payment Date during the related Reference Obligation Calculation Period pursuant to the Underlying Instruments or, in the case of the first Reference Obligation Payment Date, zero; or

        (B)     if Interest Shortfall Compounding is specified as not applicable in the relevant Confirmation, 0; minus

    (iv)     the Interest Shortfall Reimbursement Amount (if any) in respect of such Reference Obligation Payment Date.

Upon the occurrence of each Delivery, the Cumulative Interest Shortfall Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a

27

fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period divided by (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

Cumulative Interest Shortfall Payment Amount:

The Cumulative Interest Shortfall Payment Amount with respect to any Fixed Rate Payer Payment Date and any Additional Fixed Amount Payment Date falling on such Fixed Rate Payer Payment Date shall be an amount equal to the greater of:

(a)    zero; and

(b)    the amount equal to:

    (i)    the sum of:

        (A)    the Interest Shortfall Payment Amount for the Reference Obligation Payment Date corresponding to such Fixed Rate Payer Payment Date; and

        (B)    the product of:

            (1)    the Cumulative Interest Shortfall Payment Amount as of the Fixed Rate Payer Payment Date immediately preceding such Fixed Rate Payer Payment Date (or zero in the case of the first Fixed Rate Payer Payment Date); and

            (2)    either:

                (AA)    if Interest Shortfall Compounding is specified as applicable in the relevant Confirmation, the relevant Cumulative Interest Shortfall Payment Compounding Factor; or

                (BB)    if Interest Shortfall Compounding is specified as not applicable in the relevant Confirmation, one;

    minus

    (ii)    any Interest Shortfall Reimbursement Payment Amount paid on such Fixed Rate Payer Payment Date.

29

With respect to any Additional Fixed Amount Payment Date falling after the final Fixed Rate Payer Payment Date, the Cumulative Interest Shortfall Payment Amount shall be equal to:

(x)     the Cumulative Interest Shortfall Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Additional Fixed Amount Payment Date (or as of the final Fixed Rate Payer Payment Date in the case of the first Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Payment Date); minus

(y)     any Interest Shortfall Reimbursement Payment Amount paid on such Additional Fixed Amount Payment Date.

Upon the occurrence of each Delivery, the Cumulative Interest Shortfall Payment Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Payment Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period divided by (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

**Cumulative Interest Shortfall Payment Compounding Factor:**     With respect to any Fixed Rate Payer Calculation Period, an amount equal to the sum of:

(a)     one;

      plus

(b)     the product of:

      (i)     the sum of (A) the Relevant Rate plus (B) the Fixed Rate; and

      (ii)     the actual number of days in such Fixed Rate Payer Calculation Period divided by 360;

provided, however, that the Cumulative Interest Shortfall Payment Compounding Factor shall be deemed to be one during the period from but excluding the Effective Maturity Date to and including the Termination Date.

30

Relevant Rate:

With respect to a Fixed Rate Payer Calculation Period, the Floating Rate, expressed as a decimal number with seven decimal places, that would be determined if:

(a)    the 2000 ISDA Definitions (and not the 2003 ISDA Credit Derivatives Definitions) applied to this paragraph;

(b)    the Fixed Rate Payer Calculation Period were a "Calculation Period" for purposes of such determination; and

(c)    the following terms applied:

(i)    the Floating Rate Option were the Rate Source;

(ii)    the Designated Maturity were the period that corresponds to the usual length of a Fixed Rate Payer Calculation Period; and

(iii)    the Reset Date were the first day of the Calculation Period;

provided, however, that the Relevant Rate shall be deemed to be zero during the period from but excluding the Effective Maturity Date to and including the Termination Date.

Rate Source:

As shown in the relevant Confirmation.

31

**Interest Shortfall Cap Annex B**

If Interest Shortfall Cap is specified as applicable and Annex B is elected in the relevant Confirmation, then the following provisions will apply:

| | |
|---|---|
| Interest Shortfall Cap Basis: | As shown in the relevant Confirmation. |
| Interest Shortfall Cap Amount: | If the Interest Shortfall Cap Basis is Fixed Cap, the Interest Shortfall Cap Amount in respect of an Interest Shortfall shall be the Fixed Amount calculated in respect of the Fixed Rate Payer Payment Date immediately following the Reference Obligation Payment Date on which the relevant Interest Shortfall occurred. |

If the Interest Shortfall Cap Basis is Variable Cap, the Interest Shortfall Cap Amount applicable in respect of a Floating Rate Payer Payment Date shall be an amount equal to the product of:

(a)    the sum of the Relevant Rate and the Fixed Rate applicable to the Fixed Rate Payer Calculation Period immediately preceding the Reference Obligation Payment Date on which the relevant Interest Shortfall occurs (or, in respect of the first Fixed Rate Payer Calculation Period, the Relevant Rate and the Fixed Rate as of the Effective Date);

(b)    the amount determined by the Calculation Agent under sub-clause (b) of the definition of "Fixed Amount" in relation to the relevant Fixed Rate Payer Payment Date; and

(c)    the Fixed Rate Day Count Fraction.

| | |
|---|---|
| Interest Shortfall Compounding: | As shown in the relevant Confirmation. |
| Interest Shortfall Reimbursement Payment Amount: | If Interest Shortfall Cap is specified as applicable in the relevant Confirmation, then with respect to the first Additional Fixed Amount Payment Date, zero, and with respect to any subsequent Additional Fixed Amount Payment Date and calculated as of the Reference Obligation Payment Date immediately preceding such Additional Fixed Amount Payment Date, as specified by the Calculation Agent in its notice to the parties or by Seller in its notice to Buyer of the existence of an Interest Shortfall Reimbursement, an amount equal to: |

(a)    the greater of:

(i)    zero; and

(ii)    (A) the product of:

(1)    the Cumulative Interest Shortfall

32

Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Reference Obligation Payment Date; and

(2)    either:

(AA) if Interest Shortfall Compounding is specified as applicable in the relevant Confirmation, the relevant Cumulative Interest Shortfall Payment Compounding Factor for the Fixed Rate Payer Calculation Period immediately preceding such Additional Fixed Amount Payment Date (or one in respect of any Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Payment Date); or

(BB) if Interest Shortfall Compounding is specified as not applicable in the relevant Confirmation, one;

minus

(B)    the Cumulative Interest Shortfall Amount as of such Reference Obligation Payment Date;

plus

(b)    the Cumulative Implied Writedown Interest Payment Amount as of such Additional Fixed Amount Payment Date without giving effect to clause (iii) or clause (y) of such definition (the "Current CIWIPA");

provided that if the Interest Shortfall Reimbursement Payment Amount on an Additional Fixed Amount Payment Date would exceed the Interest Shortfall Reimbursement Amount in respect of the related Reference Obligation Payment Date, then such Interest Shortfall Reimbursement Payment Amount shall be deemed to be equal to such Interest Shortfall Reimbursement Amount.

Cumulative Interest Shortfall Amount:       With respect to any Reference Obligation Payment Date, an amount equal to the greater of:

(a)     zero; and

(b)     an amount equal to:

      (i)     the Cumulative Interest Shortfall Amount as of the Reference Obligation Payment Date immediately preceding such Reference Obligation Payment Date or, in the case of the first Reference Obligation Payment Date, zero; plus

      (ii)     the Interest Shortfall Amount (if any) in respect of such Reference Obligation Payment Date; plus

      (iii)     either:

           (A)     if Interest Shortfall Compounding is specified as applicable in the relevant Confirmation, an amount determined by the Calculation Agent as the amount of interest that would accrue on the Cumulative Interest Shortfall Amount immediately preceding such Reference Obligation Payment Date during the related Reference Obligation Calculation Period pursuant to the Underlying Instruments or, in the case of the first Reference Obligation Payment Date, zero; or

           (B)     if Interest Shortfall Compounding is specified as not applicable in the relevant Confirmation, zero;

      minus

      (iv)     the greater of:

           (A)     zero; and

           (B)     the Interest Shortfall Reimbursement Amount (if any) in respect of such Reference Obligation Payment Date, minus the Current CIWIPA determined on the Additional Fixed Amount Payment Date immediately following such Reference Obligation Payment Date.

34

Upon the occurrence of each Delivery, the Cumulative Interest Shortfall Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period over (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

**Cumulative Interest Shortfall Payment Amount:**

The Cumulative Interest Shortfall Payment Amount with respect to any Fixed Rate Payer Payment Date and any Additional Fixed Amount Payment Date falling on such Fixed Rate Payer Payment Date shall be an amount equal to the greater of:

(a)  zero; and

(b)  the amount equal to:

　　(i)  the sum of:

　　　　(A)  the Interest Shortfall Payment Amount for the Reference Obligation Payment Date corresponding to such Fixed Rate Payer Payment Date; and

　　　　(B)  the product of:

　　　　　　(1)  the Cumulative Interest Shortfall Payment Amount as of the Fixed Rate Payer Payment Date immediately preceding such Fixed Rate Payer Payment Date (or zero in the case of the first Fixed Rate Payer Payment Date); and

　　　　　　(2)  either:

　　　　　　　　(AA)  if Interest Shortfall Compounding is specified as applicable in the relevant Confirmation, the

relevant Cumulative Interest Shortfall Payment Compounding Factor; or

(BB)  if Interest Shortfall Compounding is specified as not applicable in the relevant Confirmation, one;

minus

(ii)  the greater of:

(A)  zero; and

(B)  (1)  any Interest Shortfall Reimbursement Payment Amount paid on such Additional Fixed Amount Payment Date;

minus

(2)  the Current CIWIPA determined on such Additional Fixed Amount Payment Date.

With respect to any Additional Fixed Amount Payment Date falling after the final Fixed Rate Payer Payment Date, the Cumulative Interest Shortfall Payment Amount shall be equal to:

(x)  the Cumulative Interest Shortfall Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Additional Fixed Amount Payment Date (or as of the final Fixed Rate Payer Payment Date in the case of the first Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Payment Date); minus

(y)  the greater of:

(aa)  zero; and

(bb)  any Interest Shortfall Reimbursement Payment Amount paid on such Additional Fixed Amount Payment Date minus the Current CIWIPA determined on such

36

Additional Fixed Amount Payment Date.

Upon the occurrence of each Delivery, the Cumulative Interest Shortfall Payment Amount shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Interest Shortfall Payment Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period and (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

|  |  |
|---|---|
| **Cumulative Implied Writedown Interest Payment Amount:** | With respect to the first Fixed Rate Payer Payment Date, zero and with respect to any subsequent Fixed Rate Payer Payment Date and any Additional Fixed Amount Payment Date falling on such Fixed Rate Payer Payment Date, an amount equal to the greater of: |

(a)    zero; and

(b)    the amount equal to:

    (i)    the product of:

        (A)    the Aggregate Implied Writedown Amount as of the Reference Obligation Payment Date relating to the immediately preceding Fixed Rate Payer Payment Date;

        (B)    the Applicable Percentage;

        (C)    the sum of (1) the Relevant Rate and (2) the Fixed Rate; and

        (D)    the Fixed Rate Day Count Fraction;

        plus

    (ii)    the product of:

        (A)    the Cumulative Implied Writedown Interest Payment Amount as of the Fixed Rate Payer Payment Date immediately preceding such Fixed Rate Payer Payment Date (or zero in the case of the first Fixed Rate

Payer Payment Date); and

(B)    either:

    (1)    if Interest Shortfall Compounding is specified as applicable in the relevant Confirmation, the relevant Cumulative Interest Shortfall Payment Compounding Factor; or

    (2)    if Interest Shortfall Compounding is specified as not applicable in the relevant Confirmation, one;

minus

(iii)    the lesser of:

    (A)    any Interest Shortfall Reimbursement Payment Amount paid on such Additional Fixed Amount Payment Date; and

    (B)    the Current CIWIPA determined on such Additional Fixed Amount Payment Date.

With respect to any Additional Fixed Amount Payment Date falling after the final Fixed Rate Payer Payment Date, the Cumulative Implied Writedown Interest Payment Amount shall be equal to:

(x)    the Cumulative Implied Writedown Interest Payment Amount as of the Additional Fixed Amount Payment Date immediately preceding such Additional Fixed Amount Payment Date (or as of the final Fixed Rate Payer Payment Date in the case of the first Additional Fixed Amount Payment Date occurring after the final Fixed Rate Payer Payment Date); minus

(y)    the lesser of:

    (aa)    any Interest Shortfall Reimbursement Payment Amount paid on such Additional Fixed Amount Payment Date; and

    (bb)    the Current CIWIPA determined on such Additional Fixed Amount Payment Date.

Upon the occurrence of each Delivery, the Cumulative Implied Writedown Interest Payment Amount shall be

multiplied by a fraction equal to (a) the Applicable Percentage immediately following such Delivery divided by (b) the Applicable Percentage immediately prior to such Delivery; provided, however, that if more than one Delivery is made during a Reference Obligation Calculation Period, the Cumulative Implied Writedown Interest Payment Amount calculated as of the Reference Obligation Payment Date occurring immediately after such Reference Obligation Calculation Period shall be multiplied by a fraction equal to (a) the Applicable Percentage immediately following the final Delivery made during such Reference Obligation Calculation Period and (b) the Applicable Percentage immediately prior to the first Delivery made during such Reference Obligation Calculation Period.

| Cumulative Interest Shortfall Payment Compounding Factor: | With respect to any Fixed Rate Payer Calculation Period, an amount equal to the sum of: |
|---|---|

(a)    one;

      plus

(b)    the product of:

      (i)    the sum of (A) the Relevant Rate plus (B) the Fixed Rate; and

      (ii)    the Fixed Rate Day Count Fraction;

:    provided, however, that the Cumulative Interest Shortfall Payment Compounding Factor shall be deemed to be one during the period from but excluding the Effective Maturity Date to and including the Termination Date.

Relevant Rate:    With respect to a Fixed Rate Payer Calculation Period, the Floating Rate, expressed as a decimal number with seven decimal places, that would be determined if:

(a)    the 2000 ISDA Definitions (and not the 2003 ISDA Credit Derivatives Definitions) applied to this paragraph;

(b)    the Fixed Rate Payer Calculation Period were a "Calculation Period" for purposes of such determination; and

(c)    the following terms applied:

      (i)    the Floating Rate Option were the Rate Source;

      (ii)    the Designated Maturity were the period that corresponds to the usual length of a Fixed Rate Payer Calculation Period; and

       (iii)     the Reset Date were the first day of the
                      Calculation Period;

provided, however, that the Relevant Rate shall be deemed
to be zero during the period from but excluding the Effective
Maturity Date to and including the Termination Date.

Rate Source:                As shown in the relevant Confirmation.

**Schedule**

**Form of Novation Confirmation**

[Headed paper of Party A]

NOVATION CONFIRMATION

for use with the ISDA Standard Terms Supplement for use with Credit Derivative Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement as published by the International Swaps and Derivatives Association, Inc.


Date:


To:      [Name and Address or Facsimile Number of Party B and Party C]

From:   [Party A]

Re:      Novation Transaction

_____

_____

Dear _____:

The purpose of this [facsimile][letter] is to confirm the terms and conditions of the Novation Transaction entered into between the parties and effective from the Novation Date specified below. This Novation Confirmation constitutes a "Confirmation" as referred to in the New Agreement specified below.

1.      The definitions and provisions contained in the 2004 ISDA Novation Definitions (the "Definitions"), the terms and provisions of the 2003 ISDA Credit Derivatives Definitions (the "Credit Derivatives Definitions"), as published by the International Swaps and Derivatives Association, Inc. and amended from time to time and the Annex hereto are each incorporated in this Novation Confirmation. In the event of any inconsistency between (i) the Definitions (as amended by the Annex hereto), (ii) the Credit Derivatives Definitions and/or (iii) the Novation Agreement (as amended by the Annex hereto) and this Novation Confirmation, this Novation Confirmation will govern.

2.      The terms of the Novation Transaction to which this Novation Confirmation relates are as follows:


[Novation Trade Date:]
Novation Date:
Novated Amount:
[Transferor][Transferor 1 (and notwithstanding Section 1.5 of the Definitions)]:
[Transferor 2 (and notwithstanding Section 1.5 of the Definitions)]:
[Transferee][Transferee 1]:

41

[Remaining Party (and notwithstanding Section 1.6 of the Definitions)][Transferee 2 (and notwithstanding Section 1.6 of the Definitions)]:

[New Agreement (between [Transferee 1 and Transferee 2][Transferee and Remaining Party])]:  ISDA Master Agreement [dated as of_____ ][as per Section 1.11 of the Definitions] subject to [English law][the laws of the State of New York]

3.    The terms of each Old Transaction to which this Novation Confirmation relates[, for identification purposes, are as follows:][shall be specified in the copy of the Old Confirmation attached hereto as Exhibit A.]

Reference Entity:
Reference Obligation:
Trade Date of Old Transaction:
Effective Date of Old Transaction:
Applicable Percentage of Old Transaction:
Scheduled Termination Date of Old
Transaction:

4.    The terms of each New Transaction to which this Novation Confirmation relates [are as follows:][shall be specified in Section[s]  __ [,___and___] of the copy of the Old Confirmation attached hereto as Exhibit A.][shall be specified in the New Confirmation attached hereto as Exhibit [A][B]].

Full First Calculation Period:  Applicable, [commencing on [ ]] [commencing on [  ], with respect to any amounts to be paid by the Transferee, and [ ], with respect to any amounts to be paid by the Remaining Party].

5.    Other Provisions: [[Additional Provisions relating to the New Transaction][Credit Support Documents relating to the New Transaction]]:

6.    Miscellaneous Provisions: [Non-Reliance][       ]

7.    Notice Details:

Telephone and/or Facsimile Numbers for Notices:
Transferee:  [          ]
Remaining Party:  [          ]

8.    [The parties confirm their acceptance to be bound by this Novation Confirmation as of the Novation Date by executing a copy of this Novation Confirmation and returning it to us]. [The Transferor, by its execution of a copy of this Novation Confirmation, agrees to the terms of the Novation Confirmation as it relates to each Old Transaction. The Transferee, by its execution of a

42

copy of this Novation Confirmation, agrees to the terms of the Novation Confirmation as it relates to each New Transaction.].

9.      The Remaining Party and the Transferee agree that, notwithstanding any provision in the Old Transaction to which this Novation Confirmation relates, all rights of the Remaining Party and the Transferor in respect of Floating Amounts and Additional Fixed Amounts that arose before the Novation Date shall be deemed to have been exercised and all obligations of such parties in respect of such events that have arisen or are deemed to have arisen shall be deemed to have been satisfied in full, in each case solely for the purposes of determining the rights and obligations of the Remaining Party and the Transferee under the New Transaction.  Nothing in this paragraph shall affect the rights or obligations of the Remaining Party or the Transferor under the Old Transaction.

……… ……………………………………        …………………………………..
(Name of Remaining Party)                          (Name of Transferor)

By: ……………………………………        By: ………………………………
Name:                                              Name:
Title:                                             Title:
Date:                                              Date:

……………………………………………
(Name of Transferee)

By: ……………………………………
Name: ……………………………………
Title: ……………………………………
Date: ……………………………………

43

Annex

1.      Section 2(a) of the Novation Agreement shall be deemed to be amended as follows:

   (a)      by the insertion of "(i)" after the words "with respect to" in the fifth line thereof; and

   (b)      by the addition of the following at the end thereof:

   "and (ii) any rights or obligations arising in respect of Floating Amount Events or Additional Fixed Amount Events, in each case in respect of which the Remaining Party or the Transferor (each an "Original Party"), as applicable, had the right to deliver a notice pursuant to the terms of the Old Transaction but such notice was not delivered by that party or the Calculation Agent prior to the Novation Date (each an "Excluded Event") provided that the rights of the Original Parties to deliver a notice in respect of an Excluded Event pursuant to the Old Transaction shall expire on the 60th calendar day following the Novation Date."

2.      Section 2(b) of the Novation Agreement shall be deemed to be amended by the addition of the following after the words "Novation Date," in the last line thereof:

   "but excluding any rights or obligations in respect of Excluded Events,"

3.      Section 2.1(a)(iii)(D)(i) of the Definitions shall not apply

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 27
----------------------------------------x
THE HIGH RISK OPPORTUNITIES HUB FUND
LTD. (In Liquidation), by and through
G. James Cleaver and L. Daniel Scott,
Joint Official Liquidators,

                    Plaintiff,

          -against-                      Index No. 600229/00
                                         PC No. 16039

CREDIT LYONNAIS and SOCIETE GENERALE,

                    Defendants.
----------------------------------------x

**Ira Gammerman, J.H.O.:**

This is a breach of contract action by plaintiff The High Risk

Opportunities Hub Fund Ltd. (High Risk), through its liquidators,

arising from certain non-deliverable forward contracts entered into

with defendants Credit Lyonnais and Societe Generale. The parties

have stipulated to have this action determined on motion papers

supported by affidavits and documentary evidence, in lieu of

depositions and a trial with live testimony.[1]

According to the complaint, High Risk was a highly leveraged

Cayman Islands hedge fund in the business of speculative investing,

focused mainly on investments in Russia. It asserted in its

offering memorandum that "[a]n investment in the company is highly

_____

[1]After a lengthy delay, in which it was requested that the court
withhold decision, High Risk and defendant Societe Generale
settled their portion of this action pursuant to stipulation.

1

speculative, reflecting the risks of the unregulated, highly leveraged and frequently volatile markets" in which High Risk traded.

Credit Lyonnais is a French banking corporation. It entered into the transactions at issue through its New York offices.

Between June of 1997 and August of 1998, High Risk and Credit Lyonnais entered into several transactions called non-deliverable forward contracts (NDFs). The NDFs were currency contracts that were based on the exchange rate between the United States dollar and the Russian ruble, see, generally, Indosuez International Finance BV v National Reserve Bank, 98 NY2d 238, 241 (2002). Essentially, both parties took a position with respect to the value of the dollar versus the value of the ruble, to be determined at a specified future termination date. If the value of the ruble declined, relative to the dollar, from the commencement date of the transaction to the termination date, High Risk was entitled to a payment at termination from Credit Lyonnais in U.S. dollars reflecting the amount of that decline. If the value of the ruble increased during that time period, Credit Lyonnais was entitled to a payment from High Risk.

Each NDF transaction was governed by several documents, including an International Swaps and Derivatives Association,

2

Inc. Master Agreement (Master Agreement), which sets forth the
basic terms for NDF transactions. Among other things, the Master
Agreement provided for early termination (Early Termination) upon
the happening of certain events, including the insolvency of
either party. The Master Agreement provided in section 6(a) that

> [i]f at any time an Event of Default with
> respect to a party (the "Defaulting Party")
> has occurred and is then continuing, the
> other party (the "Non-defaulting Party")
> may...designate a day...as an Early
> Termination Date in respect of all
> outstanding Transactions.

The Master Agreement provided that on Early Termination, one
party would pay the other a "Settlement Amount", which would be
calculated as of the Early Termination Date, and include an
adjustment for any outstanding obligations that had previously
arisen under the Master Agreement. See, Master Agreement §
6(e)(i). The Settlement Amount was to be determined by the non-
defaulting party according to certain Market Quotation procedures
set forth in the Master Agreement.[2] Pursuant to the parties'
agreements here, the non-defaulting party was required to obtain
market quotations, whether positive or negative, as defined
below, from certain "Reference Market-makers" for each terminated

---

[2] The Master Agreement contains several methods for obtaining
Market Quotations. Here, the parties selected the Market
Quotation/Second Method procedure.

transaction.[3] The Master Agreement provided in § 14 that "'Market Quotation' means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers." It further stated that

> Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(I) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date.[4]

The Master Agreement provided that "[i]f more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the

---

[3] Reference market-makers were defined as four leading dealers in the relevant market selected by the non-defaulting party in good faith. See, Master Agreement § 14.

[4] Section 2(a)(I) stated that "Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement."

4

quotations having the highest and lowest values." <u>See</u>, Master
Agreement § 14.

In addition to the Master Agreement, the parties executed an
ISDA Credit Support Annex, which contained the general terms for
margin calls and payment procedures. The parties also entered
into individual confirmation agreements (Confirmations), which
set forth the terms of each individual transaction, including: 1)
the dollar notional amount of the transaction; 2) the Floating
Rate Index B, which was the exchange rate as of the trade date,
against which the eventual dollar/ruble exchange rate was to be
measured on the termination date; 3) the trade date and the
termination date; and 4) the source of the dollar/ruble exchange
rate on the termination date.[5]

Each Confirmation also contained a "Deferral or Reduction of
Payment" provision (Deferral/Reduction Clause), which stated that

> The payment obligations of [Credit Lyonnais] pursuant
> to this Transaction shall be deferred or reduced or, on
> account of fees, taxes, commissions or similar charges
> or costs imposed due to an Exchange Risk, reduced by an
> amount determined by [Credit Lyonnais] in a

---

[5] The parties here chose to reference the Moscow Interbank
Currency Exchange, which was quoted by Reuters. The Confirmations
provided several steps for ascertaining the Exchange Rate
including starting with a quote from Reuters or if no such quote
was available, obtaining quotes from Moscow banks. If no bank
quote was available of a given day, then the parties turned to
"the best rate obtainable by the Calculation Agent."

> commercially reasonable manner in an amount which is
> directly attributable to Exchange Risk until [Credit
> Lyonnais] determines, in its reasonable discretion,
> that such Exchange Risk no longer exists.

Exchange Risk was defined in the Confirmations as

> the promulgation or imposition of any law, order,
> decree or any other governmental action by any Russian
> governmental authority which prohibits, restricts,
> limits or otherwise imposes any charges or costs upon
> the ability of market participants located in Russia to
> (i) transfer [United States Dollars] to parties located
> outside of Russia, (ii) obtain [United States Dollars]
> in a lawful market located in Russia or (iii) convert
> Rubles into [United States Dollars].

It is undisputed that there were eight outstanding NDFs
between High Risk and Credit Lyonnais as of August 17, 1998 with
a total notional amount of approximately 60.8 million dollars. It
is also undisputed that on August 17, 1998, the Russian
Federation and its Central Bank issued a joint statement (Joint
Statement) that, among other things, announced a ninety-day
moratorium on payments under forward currency contracts.

High Risk contends that the restrictions set forth in the
Joint Statement caused the value of the ruble to fall
precipitously relative to the value of the dollar, resulting in
High Risk becoming increasingly "in the money" with respect to
its NDF Contracts with Credit Lyonnais. High Risk further states
that the decline in the value of the ruble resulted in it making

6

substantial margin calls on Credit Lyonnais.[6] According to High Risk, the Credit Support Annex required the party that was "out of the money" on a net basis covering all the open transactions, in this case Credit Lyonnais, to transfer margin to the other party whenever the value of the transactions exceeded certain amounts and where there was already a shortfall in posted collateral. High Risk asserts that Credit Lyonnais responded to the margin calls by asserting that Credit Lyonnais's obligation to make any margin payments were negated because Exchange Risk had occurred.

The parties unsuccessfully attempted to resolve their differences as to whether Exchange Risk, assuming it had occurred, applied to margin payments. However, it is undisputed that on August 25th, 1998 Credit Lyonnais made a single margin payment of approximately $11 million, while reserving its rights.

On September 1, 1998, non-party Credit Suisse First Boston (Europe) Limited ("CSFB"), filed for High Risk's involuntary liquidation before the Grand Court of the Cayman Islands. CSFB was a counter-party to certain debt transactions with High Risk,

---

[6] A margin call, in this context, is a demand by one of the parties to the NDF Contract on the other for the transfer of cash or cash equivalents, the amount of which is calculated pursuant to the Credit Support Annex.

known as "GKO" transactions. High Risk was "out of the money" on those transactions. High Risk asserts that CSFB's petition to have High Risk liquidated was based on CSFB's assertion that High Risk failed to meet certain margin calls made by CSFB in connection with the GKO transactions. On that same day, High Risk's shareholders resolved to place it in voluntary liquidation. The liquidation became final on September 24, 1998.

In the meantime, on September 3, 1998, Credit Lyonnais notified High Risk that it was declaring an Early Termination of the eight NDF transactions on the grounds that High Risk's insolvency constituted an Event of Default as set forth in the Master Agreement. Credit Lyonnais set the next day, September 4, 1998, as the Early Termination Date.

On September 4th, Credit Lyonnais contacted thirteen market-makers in an effort to obtain cumulative valuations of the NDF contracts, pursuant to section 6(e)(i) of the Master Agreement. It is undisputed that Credit Lyonnais instructed the market-makers, in writing, to consider the existence of Exchange Risk as a factor in valuating the NDFs. It is also undisputed that Credit Lyonnais followed the written requests with telephone calls to several of the market-makers.

Some of the Market-makers were unable or unwilling to

provide valuations of the NDFs. However, Credit Lyonnais

eventually received four quotations upon which it relied to

determine the value of the NDFs. Merrill Lynch and Goldman Sachs

both valued the contracts at zero. JP Morgan valued the contracts

at $403,180 and Societe Generale valued the contracts at

$4,097,381. Pursuant to the terms of the Master Agreement, Credit

Lyonnais dropped the highest and lowest of the quotes and then

averaged the value of the two remaining quotes, which came to

$201,590. It then deemed that to be the Settlement Amount owed to

High Risk.

On September 9, 1998, Credit Lyonnais requested that High

Risk return its collateral in excess of the Settlement Amount,

totaling $11,193,080.20. It is undisputed that the collateral was

not returned.

High Risk commenced this action, through its liquidators, in

January of 2000, asserting claims against Credit Lyonnais and

Societe Generale, which was another party to NDF transactions

with High Risk. In its first and second causes of action, High

Risk asserted that Credit Lyonnais and Societe Generale,

respectively, caused High Risk's insolvency by failing to post

margin payments after the Joint Statement was issued. On July 10,

2001, I dismissed the second cause of action, against Societe

Generale, on the grounds that High Risk failed to allege sufficient facts to support its claim that it became insolvent because it was unable to meet its obligations to third-parties because of a failure by Societe Generale to post margin payments.[7]

The third and fourth causes of action in the complaint are for breach of contract, alleging that Credit Lyonnais and Societe Generale, respectively, improperly determined the Settlement Amounts owed to High Risk under the various NDFs. High Risk and Societe Generale eventually settled their dispute. Therefore, at this point, all that remains to consider is the third cause of action against Credit Lyonnais.

As described above, there were eight outstanding NDFs between High Risk and Credit Lyonnais as of September 4, 1998, the Early Termination date chosen by Credit Lyonnais. The dispute remaining here is whether Credit Lyonnais properly valued those NDFs through the Market Quotation procedure. The parties agree that while the NDF transactions themselves are complex, the legal issue here is a fairly straightforward contract interpretation question, based on the provisions of § 14 of the Master

---

[7] High Risk and Credit Lyonnais stipulated that High Risk would stay the prosecution of its analogous claim against Credit Lyonnais, i.e. the first cause of action.

10

Agreement, which sets forth the Market Quotation procedure and based on the Exchange Risk provisions of the Confirmations.

Section 14 of the Master Agreement, pertaining to Market Quotations, while not perfectly drafted, is unambiguous.[8] It required the terminating party, in this case Credit Lyonnais, to contact Reference Market-makers in order to determine the value of each NDF as of the Termination Date.

In order to make such a valuation, each Market-maker was, in effect, required to state how much Credit Lyonnais would have to pay or expect to be paid to have the market-maker step into the shoes of Credit Lyonnais with respect to each particular transaction. This amount depended of course on whether Credit Lyonnais was "in the money" or "out of the money" with respect to the given transaction. The Market-maker was not actually being asked to enter into such a transaction, but just to give its opinion on what the transaction was worth to Credit Lyonnais,

---

[8] This section of the Master Agreement is commonly used in conjunction with NDF transactions. As such, the parties have submitted a significant number of expert affidavits and other documentary evidence in connection with the customary interpretation of this section in the relevant industry. However, the parties agree that the court need not consider such evidence unless the court determines that the contract is ambiguous, which each party contends it is not. See, Gershon v CDC Ixis Capital Markets, Inc, 1 AD3d 137, 138 (1st Dept 2003). As noted above, the contract is not ambiguous and the additional evidence is therefore not considered.

positively or negatively, as of the Termination Date.

The issue here is whether the quotations obtained by Credit Lyonnais were obtained in "good faith" as required by Section 14 of the Master Agreement. Credit Lyonnais contends that Exchange Risk was in effect on the Termination Date, which meant that its payment obligations to High Risk were deferred or reduced, which therefore significantly reduced the value of the NDFs on the Early Termination Date. It argues that the Market-makers correctly considered that factor, resulting in a termination payment amount of $201,590.

High Risk argues that Credit Lyonnais improperly influenced the Market-makers with respect to how much weight to afford the Exchange Risk factor. High Risk asserts that in its telephone calls to the Market-makers, Credit Lyonnais pressed the Market-makers to apply unduly large discounts to the value of the NDFs. It asserts that this occurred even in situations where a given Market-maker had indicated to Credit Lyonnais that such discounts were inappropriate either because Exchange Risk was not a factor to be considered or because the discount urged by Credit Lyonnais was too large.[9]

---

[9] Although the parties in the papers submitted addressed whether Exchange Risk occurred, and if so, its effects on valuation, it is not necessary to resolve these issues.

12

As noted above, section 14 of the Master Agreement is unambiguous. Written agreements that are "complete, clear and unambiguous" must be enforced according to the plain meaning of their terms, Excel Graphics Technologies, Inc v CFG/AGSCB 75 Ninth Ave, LLC, 1 AD3d 65, 69 (1st Dept 2003), citing R/S Assoc v New York Job Dev Auth., 98 NY2d 29, 32 (2002). Moreover, contract provisions must be read so as to harmonize them, if possible, so that no provision is left without force or effect, see, James v Jamie Towers Housing Co, Inc, 294 AD2d 268, 269 (1st Dept 2002), affd 99 NY2d 639 (2003); Isaacs v Westchester Wood Works, Inc, 278 AD2d 184, 185 (1st Dept 2000). Here, the Market Quotation procedure in the Master Agreement, by its terms, served to determine the final Settlement Amount that would be owed by one party to another under the NDFs as of the Early Termination Date. Of course, this value had to ultimately derive from comparing the value of the dollar to that of the ruble, according to the applicable exchange rate, which was the purpose of the NDFs.

The Market Quotation procedure does not mention Exchange Risk. Instead, Exchange Risk is described in the Deferral/Reduction Clause in the individual Confirmations, which were executed after the Master Agreement. The Deferral/Reduction Clause, by its express terms, deferred or reduced the amount of a given payment, "until Credit Lyonnais, in its reasonable

13

discretion determine[d] that...Exchange Risk no longer
exist[ed]." <u>See</u>, Confirmations, § 3(a). In other words, once the
period of Exchange Risk ended, Credit Lyonnais was still
obligated to fulfill its payment obligations.[10]

As noted above, Section 14 of the Master Agreement required
Credit Lyonnais to obtain market quotations in "good faith".   The
Market-makers' function was to provide an independent opinion as
to the value of the NDFS, and it was for the Market-makers to
evaluate how much weight, if any, to accord to the Exchange Risk
factor. Exchange Risk may have had some potential to affect the
value of the NDFS, even assuming that the effect was temporary,
because payments could be deferred or reduced.[11]

I find that Credit Lyonnais failed to obtain adequate market
quotations in good faith pursuant to section 14 of the Master
Agreement because it interfered with the Market-makers'
independence in valuing the NDFs as of the termination date.
Credit Lyonnais did so through its telephone communications with
the Market-makers in which it repeatedly emphasized the
importance of considering Exchange Risk, expressed its own

---

[10] Credit Lyonnais asserts that, in theory, Exchange Risk could
have lasted indefinitely, although it does not assert that it did
so here.

[11] High Risk has not demonstrated that Credit Lyonnais determined
in bad faith that Exchange Risk had occurred.

14

opinion as to the effect that Exchange Risk should have on the value of the NDFs, and encouraged the Market-makers to discount the value of the contracts. Even assuming that Exchange Risk existed on the Termination Date, which is vigorously disputed here, it was for the Market-makers, not Credit Lyonnais, to independently determine how to assess that factor in valuing the NDFs. The examples set forth below are illustrative.[12]

### 1. Banque Paribas

On September 4, 1998, Dave Greenberg of Credit Lyonnais telephoned one of the Market-makers, Banque Paribas (Paribas), seeking to obtain a market quotation. Mr. Greenberg spoke to Salu Manzoor of Paribas, and told Mr. Manzoor that Credit Lyonnais needed a quote with regards to the price that Paribas would hypothetically pay to step into High Risk's shoes with respect to the NDFs.[13]

During the conversation, Mr. Greenberg pointed out that Credit Lyonnais had determined that Exchange Risk had occurred,

---

[12] The telephone conversations cited in this decision were recorded and neither side disputes the accuracy of the transcripts provided to the court.

[13] The request should have been with respect to stepping into the shoes of Credit Lyonnais, according to the terms of the Master Agreement. However, it is a distinction without a difference in this case.

15

and stated that this meant that its payment obligations could be deferred or reduced. Based on that, Mr. Greenberg then told Mr. Manzoor to try to put a "haircut", i.e., a discount, on the value of the NDFs, in light of the Exchange Risk factor. Mr. Greenberg noted that Exchange Risk was a "very important feature" which should be "reflected" in the quotation.

Mr. Manzoor responded by stating that the Exchange Risk factor could be difficult to quantify because Credit Lyonnais itself was responsible for determining whether Exchange Risk existed and for how long. Mr. Greenberg responded that if that was Mr. Manzoor's "belief", then it should be reflected in the market quotations. Mr. Greenberg reiterated a few moments later that if Mr. Manzoor believed that Credit Lyonnais was responsible for determining the deferral or reduction and that such a factor didn't "make it very...interesting for [Paribas]", then that lack of interest should be "reflected" in the price that Paribas placed on the NDFs. After further discussion, Mr. Manzoor stated that he needed to discuss the matter with legal counsel.

In a later conversation that day, Mr. Manzoor told Mr. Greenberg that Paribas could provide only a "good indication" of the value of the NDFs, rather than a firm quotation, to ensure that Paribas would not become obligated to actually enter into a

16

transaction with Credit Lyonnais. A few moments later, Mr.
Greenberg asked Mr. Manzoor what percentage discount Paribas
would apply in valuing the NDFs, based on Exchange Risk. After
further discussion, Mr. Manzoor stated that it would likely apply
a 10% "haircut".

In their next conversation, Mr. Greenberg stated that his
managing director had told him to make sure that Paribas provided
a "firm quotation", even though Paribas would not actually be
required to enter into a transaction with Credit Lyonnais. Mr.
Manzoor responded by stating that he would have to turn the
matter over to legal counsel. Eventually, Paribas notified Credit
Lyonnais that it was unable to provide firm quotes for the NDFs.

### 2. Chase Manhattan

On that same day, Mr. Greenberg sought a market quotation
from Ian Edwards of Chase, with whom he had spoken previously
about the "theoretical" value of the NDFs. Mr. Edwards told Mr.
Greenberg that he had been instructed not to provide a quotation.

Despite this, Mr. Greenberg and another Credit Lyonnais
representative, Omar Abukhadra, then spoke to another Chase
representative, Bill Gilbert. Mr. Abukhadra requested a valuation
of the NDFs which included a "factoring in" of the Exchange Risk

17

clause. However, Mr. Gilbert informed them that in his opinion, Exchange Risk did not affect the value of the NDFs.

Mr. Abukhadra disagreed and stated that Exchange Risk affected the NDFs "a lot" because Credit Lyonnais could defer or reduce its payments. However, Mr. Gilbert reiterated that the Exchange Risk provision did not affect the NDFs and that he would value the NDFs as "clean", ie, with no discount. After further discussion, Mr. Gilbert declined to provide a market quotation.

### 3. Salomon Brothers

Mr. Greenberg spoke to David Rosa of Salomon, telling him that Credit Lyonnais needed a "firm market quotation". In discussing the Exchange Risk provision, Mr. Greenberg stated: "I just implore you to sort of skim...read through the confirmation and you'll see some provisions in there which I think are material okay?" Mr. Rosa responded that he would have legal counsel review it. Eventually, however, Salomon informed Credit Lyonnais that it could not give firm prices on the NDFs given the "current market environment".

### 4. Union Bank of Switzerland

Mr. Greenberg spoke to Behzad Goharian of UBS on September 4th. He pointed out the Exchange Risk provision to Mr. Goharian,

describing it as "critical factor" in evaluating the NDFs. Despite this, UBS eventually declined to provide a quotation, stating that "due to the convertibility clause" in the Confirmations, there was no market for the NDFs.

### 5. JP Morgan

On August 26, 1998, Mr. Greenberg spoke to Nick Cox of JP Morgan about the Exchange Risk provision and its effect on the value of the NDFs. This conversation took place before Credit Lyonnais formally requested a market quotation.

Mr. Greenberg stated that Credit Lyonnais had determined that Exchange Risk had occurred and opined that while this did not permit Credit Lyonnais to "cancel" the NDFs, it did permit it to delay payment indefinitely. He also stated that it would "probably" not be "prudent" to ignore Exchange Risk in trying to determine a value for the NDFs.

In a later conversation, Mr. Cox stated that he would probably apply a discount of approximately 80%, due to Exchange Risk. However, as set forth above, JP Morgan eventually valued the NDFs at $403,180, which it described as representing approximately a 99% discount.

19

### 6. Goldman Sachs

Mr. Greenberg spoke to Scott Gush of Goldman Sachs on September 4, 1998 and requested a market quotation. Mr. Greenberg stated that Credit Lyonnais had determined that Exchange Risk was in effect and requested that Goldman Sachs value the NDFs in that context, taking into account that payment might be for an "uncertain amount" at an "undetermined" time. Mr. Greenberg stated that while the Exchange Risk clause was somewhat ambiguous, he needed Goldman Sachs's "best efforts" to assign a value to the NDFs, including the possibility of putting a "distressed" value on them if necessary. Mr. Greenberg acknowledged that but for Exchange Risk, Credit Lyonnais would "probably owe a fair amount of money" on the NDFs. Goldman Sachs eventually provided a quote of zero, stating that it did so in light of the wording of the Exchange Risk clause.

### 7. Merrill Lynch

Mr. Abukhadra and Mr. Greenberg spoke to Alex Lomakin of Merrill Lynch. Mr. Abukhadra pointed out the Exchange Risk provision, stating that it allowed Credit Lyonnais to defer and reduce its payments if it incurred anything that it considered to be a cost on it. Merrill Lynch eventually provided a market quotation of zero.

20

## 8. Societe Generale

Mr. Greenberg spoke to Tom Athan of Societe Generale on September 4, 1998 and requested a market quotation. Mr. Athan pointed out that Credit Lyonnais had initially declined to provide a market quotation in connection with Societe Generale's NDFs with High Risk. Mr. Greenberg responded that Credit Lyonnais had decided to provide a quote to Societe Generale and requested that Societe Generale provide a quote with respect to the NDFs between Credit Lyonnais and High Risk. Societe Generale eventually provided a quote of approximately four million dollars, as set forth above.

It is clear from the examples cited above, as well as the full text of each telephone conversation, that Credit Lyonnais went beyond simply requesting market quotations from the Market-makers. Credit Lyonnais followed the initial requests with phone calls in which it repeatedly emphasized that it had declared Exchange Risk to be in effect and that it believed Exchange Risk could significantly affect the value of the NDFs. This resulted in a situation where some Market-makers declined to provide valuations and others did so under only after concerted efforts by Credit Lyonnais to persuade the Market-maker to substantially discount those valuations. Thus, Credit Lyonnais did not obtain

21

good faith market quotations as contemplated by the parties'
agreements. Instead, they obtained quotations which discounted
the cumulative value of the NDFs by more than forty million
dollars. Under the circumstances set forth above, that result is
not valid and was obtained in breach of the parties' contracts.

It is possible that had Early Termination not occurred, the
value of the ruble versus the dollar might have changed
significantly before the natural termination date occurred for
each NDF. However, I cannot speculate that such an event would
have occurred, and to do so would be to disregard the terms of
the parties' agreements. Moreover, Credit Lyonnais had the option
to allow the contracts to proceed until their natural termination
date which would have set the value as of that later date, rather
than declaring early termination. Credit Lyonnais chose not to do
so.

The Master Agreement provided that in the event that
adequate Market Quotations were not obtained, as here, the
parties were required to follow a valuation procedure called
Loss. This required one or both of the parties to determine the
value of the NDFs themselves, rather than by reference to Market-
makers.

On September 4, 1998, the eight outstanding NDFs had a

22

notional value of $60,828,562.43. High Risk asserts that it was "in the money" on these NDFs for a total of $41,337,108, as of September 4, 1998 and it states that this figure is supported by Credit Lyonnais's own internal marks. Credit Lyonnais disputes this assertion only on the grounds that it believed that Exchange Risk was in effect on that date, which it believed caused the value of the NDFs to be zero. Otherwise, Credit Lyonnais does not dispute that its internal marks valued the NDFs as being in High Risk's favor for $41,337,108 on the Early Termination date, i.e. September 4, 1998.

Based on the foregoing, I find that High Risk has demonstrated that it was "in the money" in the amount of $41,337,108. However, it is undisputed that High Risk failed to refund collateral payments posted by Credit Lyonnais totaling $11,394,670.20. Therefore, the amount owed to High Risk by Credit Lyonnais must be reduced by the amount of the collateral.

I also find that High Risk is entitled to interest from September 9, 1998 through December 6, 2002. September 9th was the date that Credit Lyonnais informed High Risk of the amount of the termination payment as calculated by Credit Lyonnais. See, Master Agreement § 6(d). On December 6, 2002, High Risk and Societe Generale began requesting that the court withhold decision on

their motions pending settlement efforts, which resulted in a very lengthy delay in the disposition of the instant motions.

Accordingly, it is

ORDERED that the motion for summary judgment by defendant Credit Lyonnais is denied; and it is further

ORDERED that plaintiff's motion for summary judgment is granted; and it is further

ORDERED that plaintiff's first cause of action is severed; and it is further

ORDERED that upon presentation of the requisite papers, the clerk is directed to enter judgment for the plaintiff on the third cause of action in the amount of $29,942,437.80, with interest from September 9, 1998 to December 6, 2002 as set forth above.

DATED: 7|6|05

ENTER:

_____

J.H.O.

**IRA GAMMERMAN**

24

EXECUTION VERSION

July 5, 2006


**MILLSTONE III CDO, LTD.,**
**as Issuer**


**MILLSTONE III CDO, LLC,**
**as Co-Issuer**


**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**,
**as Trustee**


_____

**INDENTURE**
_____

TABLE OF CONTENTS

Page

ARTICLE 1

DEFINITIONS AND INTERPRETATION

1.1        Definitions.................................................................................................3
1.2        Assumptions as to Collateral Assets, Etc............................................78
1.3        Rules of Construction ..........................................................................79

ARTICLE 2

THE NOTES

2.1        Forms Generally....................................................................................80
2.2        Authorized Amount; Note Interest Rate; Stated Maturity; Denominations........81
2.3        Execution, Authentication, Delivery and Dating.................................83
2.4        Registration, Transfer and Exchange of Notes ...................................84
2.5        Mutilated, Defaced, Destroyed, Lost or Stolen Notes ........................91
2.6        Payment of Principal and Interest; Rights Preserved..........................92
2.7        Persons Deemed Owners ......................................................................95
2.8        Cancellation ..........................................................................................95

ARTICLE 3

CONDITIONS PRECEDENT

3.1        General Provisions................................................................................96
3.2        Security for Notes .................................................................................99
3.3        Custodianship; Transfer of Collateral Assets and Eligible Investments...........100

ARTICLE 4

SATISFACTION AND DISCHARGE

4.1        Satisfaction and Discharge of Indenture ...........................................103
4.2        Application of Trust Cash...................................................................104
4.3        Repayment of Cash Held by Paying Agent .......................................104

# ARTICLE 5

## EVENTS OF DEFAULT; REMEDIES

| | | |
|---|---|---|
| 5.1 | Events of Default | 104 |
| 5.2 | Acceleration of Maturity; Rescission and Annulment | 106 |
| 5.3 | Collection of Indebtedness and Suits for Enforcement by Trustee | 107 |
| 5.4 | Remedies | 109 |
| 5.5 | Preservation of Collateral | 111 |
| 5.6 | Trustee May Enforce Claims Without Possession of Notes | 112 |
| 5.7 | Application of Cash Collected | 113 |
| 5.8 | Limitation on Suits | 113 |
| 5.9 | Unconditional Rights of Noteholders to Receive Principal and Interest | 114 |
| 5.10 | Restoration of Rights and Remedies | 114 |
| 5.11 | Rights and Remedies Cumulative | 114 |
| 5.12 | Delay or Omission Not Waiver | 114 |
| 5.13 | Control by Controlling Class | 115 |
| 5.14 | Waiver of Past Defaults | 115 |
| 5.15 | Undertaking for Costs | 116 |
| 5.16 | Waiver of Stay or Extension Laws | 116 |
| 5.17 | Sale of Collateral | 116 |
| 5.18 | Action on the Notes | 117 |

# ARTICLE 6

## THE TRUSTEE

| | | |
|---|---|---|
| 6.1 | Certain Duties and Responsibilities | 117 |
| 6.2 | Notice of Event of Default | 119 |
| 6.3 | Certain Rights of Trustee | 119 |
| 6.4 | Authenticating Agents | 121 |
| 6.5 | Not Responsible for Recitals or Issuance of Notes | 122 |
| 6.6 | May Hold Notes | 122 |
| 6.7 | Cash Held in Trust | 122 |
| 6.8 | Compensation and Reimbursement | 122 |
| 6.9 | Corporate Trustee Required; Eligibility | 123 |
| 6.10 | Resignation and Removal; Appointment of Successor | 124 |
| 6.11 | Acceptance of Appointment by Successor | 126 |
| 6.12 | Merger, Conversion, Consolidation or Succession to Business of Trustee | 126 |
| 6.13 | Co-Trustees | 126 |
| 6.14 | Certain Duties Related to Delayed Payment of Proceeds | 128 |
| 6.15 | Representations and Warranties of the Bank | 128 |
| 6.16 | Offers | 129 |
| 6.17 | Fiduciary for Noteholders Only; Agent for Other Secured Parties | 129 |
| 6.18 | Withholding | 129 |

ARTICLE 7

COVENANTS

| 7.1 | Payment of Principal and Interest | 130 |
| 7.2 | Maintenance of Office or Agency | 131 |
| 7.3 | Cash for Payments to be Held in Trust | 131 |
| 7.4 | Existence of Issuers; Compliance with Laws | 133 |
| 7.5 | Protection of Collateral | 134 |
| 7.6 | Opinions as to Collateral | 136 |
| 7.7 | Performance of Obligations | 136 |
| 7.8 | Negative Covenants | 137 |
| 7.9 | Statement as to Compliance | 139 |
| 7.10 | Issuer May Not Consolidate, Etc. | 139 |
| 7.11 | Co-Issuer May Not Consolidate, Etc. | 139 |
| 7.12 | [Reserved] | 139 |
| 7.13 | No Other Business | 139 |
| 7.14 | Reaffirmation of Rating; Annual Rating Review | 140 |
| 7.15 | Reporting | 140 |
| 7.16 | Calculation Agent | 140 |
| 7.17 | Modification of Certain Documents | 141 |
| 7.18 | Purchase of Collateral; Information Regarding Collateral; Rating Confirmation | 142 |
| 7.19 | Tax Matters | 143 |

ARTICLE 8

SUPPLEMENTAL INDENTURES

| 8.1 | Supplemental Indentures Without Consent of Noteholders | 143 |
| 8.2 | Supplemental Indentures with Consent of Noteholders | 147 |
| 8.3 | Execution of Supplemental Indentures | 150 |
| 8.4 | Effect of Supplemental Indentures | 150 |
| 8.5 | Reference in Notes to Supplemental Indentures | 150 |

ARTICLE 9

REDEMPTION OF NOTES

| 9.1 | Optional Redemption and Tax Redemption | 151 |
| 9.2 | Redemption Procedures | 151 |
| 9.3 | Notices of Redemption; Submission and Withdrawal | 154 |
| 9.4 | Auction Call Redemption | 155 |
| 9.5 | Clean-up Call. | 156 |
| 9.6 | Notes Payable on Redemption Date | 157 |

ARTICLE 10

ACCOUNTS, ACCOUNTINGS AND RELEASES

10.1        Collection of Cash........................................................................157
10.2        Collection Account; Collateral Account; Synthetic Security Collateral
          Account; Synthetic Security Issuer Account; Asset Reserve Account,
          Monthly Interest Reserve Account, Monthly Principal Reserve
          Account, Reserve Account...........................................................158
10.3        Payment Account........................................................................161
10.4        Hedge Replacement Account; Hedge Termination Receipts Account;
          Hedge Counterparty Collateral Account; Synthetic Security Collateral
          Account .....................................................................................162
10.5        Reports by Trustee .....................................................................165
10.6        Accountings; Payment Reports and Note Valuation Reports ..........165
10.7        Release of Collateral ..................................................................178
10.8        Reports by Independent Accountants ...........................................179
10.9        Reports to Rating Agencies, Etc. .................................................180
10.10      Notice of Noteworthy Events.......................................................180

ARTICLE 11

APPLICATION OF CASH

11.1        Disbursements of Cash from Payment Account ..............................181
11.2        Final Payment Date.....................................................................187

ARTICLE 12

PURCHASE AND SALE OF COLLATERAL ASSETS; SUBSTITUTION

12.1        Sale and Reinvestment of Collateral Assets ..................................188
12.2        Eligibility Criteria and Reinvestment Criteria ...............................192
12.3        Conditions Applicable to all Transactions Involving Sale or Grant ................197
12.4        Collateral Profile Tests. ..............................................................198

ARTICLE 13

NOTEHOLDERS' RELATIONS

13.1        Subordination ............................................................................204
13.2        Standard of Conduct ..................................................................206

# ARTICLE 14

## MISCELLANEOUS

| | | |
|---|---|---|
| 14.1 | Form of Documents Delivered to Trustee | 207 |
| 14.2 | Acts of Noteholders | 207 |
| 14.3 | Notices, Etc., to Trustee, the Issuers, the Collateral Manager, CIFG and the Rating Agencies | 208 |
| 14.4 | Notices and Reports to Noteholders; Waiver | 210 |
| 14.5 | Effect of Headings and Table of Contents | 211 |
| 14.6 | Successors and Assigns | 211 |
| 14.7 | Severability | 211 |
| 14.8 | Benefits of Indenture | 211 |
| 14.9 | Governing Law | 212 |
| 14.10 | Submission to Jurisdiction | 212 |
| 14.11 | Counterparts | 212 |
| 14.12 | Waiver of Jury Trial | 212 |
| 14.13 | Judgment Currency | 212 |
| 14.14 | Confidential Treatment of Documents | 213 |
| 14.15 | Liability of Issuers | 213 |

# ARTICLE 15

## ASSIGNMENT OF AGREEMENTS, ETC.

| | | |
|---|---|---|
| 15.1 | Assignment | 213 |
| 15.2 | No Impairment | 214 |
| 15.3 | Termination, Etc. | 214 |
| 15.4 | Issuer Agreements, Etc. | 214 |
| 15.5 | Consent to Posting of Documents on Repository; Liability | 216 |

# ARTICLE 16

## HEDGE AGREEMENTS

| | | |
|---|---|---|
| 16.1 | Hedge Agreement. | 217 |
| 16.2 | Assignment of the Hedge Agreement | 218 |
| 16.3 | Ratings Requirements and General Provisions Applicable to Hedge Agreements | 219 |

**SCHEDULES**

Schedule A     Schedule of Closing Collateral Assets
Schedule B     LIBOR Formula
Schedule C     Reserved
Schedule D     Part I: Moody's Loss Scenario Matrix
               Part II: Standard & Poor's Loss Scenario Matrix
Schedule E     Standard & Poor's Asset Classes
Schedule F     Auction Procedures
Schedule G     Moody's Notching Methodology
Schedule H     Asset Classes Not Eligible For Notching by Standard & Poor's

**EXHIBITS**

Exhibit A-1    Form of Regulation S Global Notes
Exhibit A-2    Form of Rule 144A Global Notes
Exhibit A-3    Form of Definitive Notes
Exhibit B-1    Form of Transfer Certificate for (1) Transfer at the Closing to a Regulation S
               Global Security or (2) Subsequent Transfer from a Rule 144A Global Security to
               a Regulation S Global Security
Exhibit B-2    Form of Transfer Certificate for (1) Transfer at the Closing to a Rule 144A
               Global Security or (2) Subsequent Transfer from a Regulation S Global Security
               to a Rule 144A Global Security
Exhibit B-3    Form of Transfer Certificate from a Certificated Note to a Certificated Note
Exhibit C      Form of Funding Certificate
Exhibit D      Form of Opinion of CWT
Exhibit E      Form of Opinion of CWT
Exhibit F      Form of Opinion of Walkers
Exhibit G      Form of Opinion of Gardere Wynne Sewell LLP, counsel to the Trustee
Exhibit H-1    Form of Opinion of Orrick, Herrington & Sutcliffe LLP,
                  special counsel to the Collateral Manager
Exhibit H-2    Form of Opinion of Orrick, Herrington & Sutcliffe LLP,
                  special counsel to the Collateral Manager
Exhibit I      Form of Opinion of Hedge Counterparty
Exhibit J      Investment Guidelines
Exhibit K      Form of Investor Certification

**THIS INDENTURE** dated as of July 5, 2006 is made

**BETWEEN**

(1)    **MILLSTONE III CDO, LTD.**, an exempted company incorporated and existing under the laws of the Cayman Islands (the "<u>Issuer</u>");

(2)    **MILLSTONE III CDO, LLC**, a limited liability company organized under the laws of the State of Delaware (the "<u>Co-Issuer</u>", and together with the Issuer, the "<u>Issuers</u>"); and

(3)    **JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**, a national banking association organized under the laws of the United States, as trustee (herein, together with its permitted successors in the trusts hereunder, called the "<u>Trustee</u>").

## PRELIMINARY STATEMENT

The Issuers are duly authorized to execute and deliver this Indenture to provide for the issuance of the Notes as provided in this Indenture. All covenants and agreements made by the Issuers herein are for the benefit and security of the Secured Parties. The Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Issuers in accordance with its terms have been done.

## GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Secured Parties, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, all accounts, general intangibles, instruments, investment property, chattel paper, deposit accounts, documents, goods, letter of credit rights, commercial tort claims and any and all other property (other than Excepted Property) of any type or nature owned by it, including (a) the Collateral Account, the Collateral Assets (listed, as of the Closing Date, in the Schedule of Collateral Assets) which the Issuer causes to be delivered to the Trustee (directly or through a Securities Intermediary) herewith, all Collateral Assets and Equity Securities which are delivered to the Trustee (directly or through a Securities Intermediary) after the Closing Date pursuant to the terms hereof and all payments thereon or with respect thereto, (b) the Collection Account, the Payment Account, the Hedge Termination Receipts Account, the Hedge Replacement Account, the Hedge Counterparty Collateral Account, the Synthetic Security Collateral Account, the Synthetic Security Issuer Account, the Asset Reserve Account, the Monthly Interest Reserve Account and the Monthly Principal Reserve Account, all funds and other property standing to the credit of each such account, all U.S. Agency Securities and Eligible Investments purchased with funds standing to the credit of each such account and all income from the investment of funds therein, (c) the Hedge Agreement, (d) the Collateral Management Agreement, the Collateral Administration Agreement, the Administration

Agreement and the Subscription Agreements, (e) the Securities Purchase Agreement (to the extent there are future funding obligations of the Initial Purchaser in favor of the Issuer) (f) all Cash delivered to the Trustee (directly or through a Securities Intermediary) and (g) all proceeds, accessions, profits, income benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Issuer described in the preceding clauses (collectively, the "Collateral").  Such Grants are made, however, to the Trustee to hold in trust, to secure in the case of clause (1) above, the Notes equally and ratably without prejudice, priority or distinction between (in the case of clause (1) above) any Note and any other Note by reason of difference in time of issuance or otherwise, except as expressly provided in this Indenture, and to secure (i) the payment of all amounts due on the Notes and under the Hedge Agreements in accordance with their respective terms, (ii) the payment of all other sums payable under this Indenture (including by reference to any other agreement, including the Collateral Management Agreement) and (iii) compliance with the provisions of this Indenture and the Hedge Agreements, all as provided in this Indenture (collectively, the "Secured Obligations").  The security interest granted hereunder in each Synthetic Security Collateral Account shall be subject to and subordinate to the security interest and rights of the relevant Synthetic Security Counterparty in and to such Synthetic Security Collateral Account.

Except to the extent otherwise provided in this Indenture, the Issuer does hereby constitute and irrevocably appoint the Trustee the true and lawful attorney of the Issuer, with full power (in the name of the Issuer or otherwise), to exercise all rights of the Issuer with respect to the Collateral held for the benefit and security of the Secured Parties and to ask, require, demand, receive, settle, compromise, compound and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of any of the Collateral held for the benefit and security of the Secured Parties, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings which the Trustee may deem to be necessary or advisable in the premises.  The power of attorney granted pursuant to this Indenture and all authority hereby conferred are granted and conferred solely to protect the Trustee's interest in the Collateral held for the benefit and security of the Secured Parties and shall not impose any duty upon the Trustee to exercise any power.  This power of attorney shall be irrevocable as one coupled with an interest prior to the payment in full of all the obligations secured hereby.

This Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein.  Upon the occurrence of any Event of Default with respect to the Notes, and in addition to any other rights available under this Indenture or any other instruments included in the Collateral held for the benefit and security of the Secured Parties, or otherwise available at law or in equity, the Trustee shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public or private sale.

It is expressly agreed that anything therein contained to the contrary notwithstanding, the Issuer shall remain liable under any instruments included in the Collateral to perform all the obligations assumed by it thereunder, all in accordance with and pursuant to the

terms and provisions thereof, and except as otherwise expressly provided herein, the Trustee shall not have any obligations or liabilities under such instruments by reason of or arising out of this Indenture, nor shall the Trustee be required or obligated in any manner to perform or fulfill any obligations of the Issuer under or pursuant to such instruments or to make any payment, to make any inquiry as to the nature or sufficiency of any payment received by it, to present or file any claim, or to take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

The designation of the Trustee in any transfer document or record is intended and shall be deemed, first, to refer to the Trustee as custodian on behalf of the Issuer and second, to refer to the Trustee as secured party on behalf of the Secured Parties, *provided* that the Grant made by the Issuer to the Trustee pursuant to the granting clauses hereof shall apply to any Collateral bearing such designation.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof, and agrees to perform the duties herein in accordance with the required standard of care set forth herein such that the interests of the Secured Parties may be adequately and effectively protected.

The Trustee on behalf of each of the Secured Parties hereby agrees and acknowledges that none of the Secured Parties shall have any claim on the funds and property from time to time deposited or credited, in accordance with this Indenture, in or to the Preference Share Distribution Account (as defined in the Preference Share Paying Agency Agreement) or the proceeds thereof (other than in its capacity as a Preference Shareholder, if applicable).

# ARTICLE 1

## DEFINITIONS AND INTERPRETATION

1.1     Definitions

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture. Whenever any reference is made to an amount the determination of which is governed by Section 1.2, the provisions of Section 1.2 shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

"ABS Automobile Securities" means Asset Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Asset Backed Securities) on the cash flow from installment sale loans made to finance the purchase of, or from leases of, automobiles or light duty trucks or medium duty trucks.

"ABS Car Rental Receivable Securities" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed

Securities) on the cash flow from leases and subleases of vehicles to car rental systems (such as Hertz, Avis, National, Dollar, Budget, etc.) and their franchisees, generally having the following characteristics:   (1) the leases and subleases have varying contractual maturities; (2) the subleases are obligations of numerous franchisees and accordingly represent a very diversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee or third party of the underlying vehicle; and (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the vehicle for its stated residual value, subject to payments at the end of lease term for excess mileage or use.

"ABS Credit Card Securities" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Asset-Backed Securities) on the cash flow from balances outstanding under revolving consumer credit card accounts.

"ABS Other Securities" means a Structured Finance Security or Structured Corporate Security that cannot reasonably otherwise be classified under the RMBS Security, CMBS Security, CDO Security, Insured Security or under the ABS Student Loan Security, ABS Small Business Loan Security or ABS Credit Card Security Subcategories but excluding ABS Securities which are classified under an Approved Subcategory.

"ABS Small Business Loan Securities" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from general purpose corporate loans made to "small business concerns" (generally within the meaning given to such term by regulations of the United States Small Business Administration).

"ABS Student Loan Securities" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from loans made to students (or their parents or guardians) to finance educational needs.

"ABS Whole Business Securities" means Asset-Backed Securities that entitle the holder thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to the holders of such securities) on the cash flows from a whole business enterprise (as determined by the Collateral Manager in good faith).

"Account Control Agreement" means the securities account control agreement dated as of the Closing Date among the Issuer, the Trustee and the Securities Intermediary, as the same may be amended, supplemented or otherwise modified from time to time.

"Accounts" means collectively, the Collection Account, the Payment Account, the Hedge Termination Receipts Account, the Hedge Replacement Account, the Collateral Account, the Hedge Collateral Account, the Synthetic Security Collateral Account, the Synthetic Security Issuer Account and the Asset Reserve Account.  Any account established pursuant to this Indenture may contain any number of subaccounts for the convenience of the Trustee or the Collateral Manager in administering the Collateral or such Account.

"Act" and "Acts of Noteholders" have the meanings specified in Section 14.2.

"Additional Reinvestment Criteria" has the meaning set forth in Section 12.1(a)(i).

"Administration Agreement" means the Administration Agreement dated July 5, 2006 by and between the Administrator and the Issuer, as the same may be amended, supplemented or otherwise modified from time to time in accordance with its terms, pursuant to which the Administrator shall perform various administrative functions on behalf of the Issuer, including communications with shareholders and the general public, and the provision of certain clerical, administrative and other services.

"Administrative Expenses" means amounts (including with respect to any indemnities) due or accrued with respect to any Monthly Payment Date and payable by the Issuer and/or the Co-Issuer to (i) the Trustee pursuant to Section 6.8 or any co-trustee appointed pursuant to Section 6.13; (ii) the Collateral Administrator pursuant to the Collateral Administration Agreement, the Preference Share Paying Agent pursuant to the Preference Share Paying Agency Agreement; the Administrator pursuant to the Administration Agreement, (iii) the Rating Agencies for fees and expenses in connection with any rating (including the fees payable to the Rating Agencies for the monitoring of any rating or credit estimate) of the Notes, including fees and expenses, if any, due or accrued in connection with any rating of the Collateral Assets, the Independent accountants, agents and counsel of the Issuer for fees and expenses (including amounts payable in connection with the preparation of tax forms on behalf of the Issuers); (iv) the Collateral Manager pursuant to the Collateral Management Agreement (other than the Collateral Manager Fee) including, without limitation, any fees and expenses incurred in connection with an Auction or Clean-up Call; (v) any stock exchange listing Securities at the request of the Issuer; (vi) the agents appointed for service of process; (vii) any other person in respect of any governmental fee, charge or tax in relation to the Issuer or the Co-Issuer; (viii) to the liquidator(s) of the Issuer for the fees and expenses of liquidating the Issuer following the redemption of all of the Securities; and (ix) any other person in respect of any other fees or expenses (including indemnities and fees relating to the provision of the Issuer's registered office) permitted under the Transaction Documents; *provided* that Administrative Expenses shall not include (a) any amounts due or accrued with respect to the actions taken on or in connection with the Closing Date, (b) amounts payable in respect of the Securities, (c) amounts payable under any Hedge Agreement and (d) any Collateral Manager Fee payable pursuant to the Collateral Management Agreement.

"Administrator" means Walkers SPV Limited and any successor thereto appointed under the Administration Agreement.

"Affected Class" means, in relation to any Tax Redemption, any Class of Notes that would suffer a reduction in the amount of any Distribution that would otherwise be payable in respect of such Class of Notes in accordance with the Priority of Payments by reason of the occurrence of the Tax Event that is the basis for such Tax Redemption.

"Affiliate" or "Affiliated" means, with respect to a Person, (a) any other Person who, directly or indirectly, through one or more intermediaries, is in control of, or controlled by, or is under common control with, such Person or (b) any other Person who is a director, Officer, employee, managing member or general partner of (a) such Person or (b) any such other Person described in clause (a) above. For the purposes of this definition, "control" of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise; *provided* that, for purposes of determining whether a Person is in control of, or controlled by, or is under common control with, the Collateral Manager, "control" of a Person shall mean the power, direct or indirect, (a) to vote more than 25% of the securities having ordinary voting power for the election of directors of such Person or (b) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise; *provided further* that neither the Administrator nor any other special purpose company to which the Administrator provides directors and acts as share trustee shall be an Affiliate of the Issuer or the Co-Issuer.

"Aggregate Calculation Amount of Defaulted Obligations" means the aggregate of, for each such asset, the lower of (a) the Moody's Recovery Value of each Defaulted Obligation, (b) the Standard & Poor's Recovery Value of each Defaulted Obligation, and (c) the Market Value of each Defaulted Obligation.

"Aggregate Outstanding Amount" means with respect to any of the Notes, the aggregate principal amount of such Notes outstanding at the date of determination.

"Aggregate Principal Amount" means the sum of the Principal Balances of all Collateral Assets and Eligible Investments purchased with Principal Proceeds and the amount of any cash that constitutes Principal Proceeds and all accrued interest purchased with Principal Proceeds.

"Aircraft Leasing Securities" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a portfolio consisting of aircraft leases and subleases, generally having the following characteristics: (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, sublessee or third party of the underlying equipment; (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of lease term for excess usage or wear and tear; and (5) the obligations of the lessors or sublessors may be secured not only by the leased equipment but also by other

assets of the lessee or sublessee or guarantees granted by third parties. For purposes of this definition, Aircraft Leasing Securities shall include EETC Securities with respect to aircraft.

"<u>Applicable Recovery Rate</u>" means, with respect to any Collateral Asset on any Measurement Date, the lesser of the Moody's Recovery Rate and the Standard & Poor's Minimum Average Recovery Rate.

"<u>Approved Subcategory</u>" means a Subcategory of ABS Securities, Insured Securities, RMBS Securities, CMBS Securities or CDO Securities or any other Subcategory designated by the Collateral Manager after the Closing Date as an "Approved Subcategory" in a notice to the Trustee; *provided* that each Rating Agency has confirmed in writing (either privately or in a publicly available document) to the Issuer, the Trustee, the Hedge Counterparties and the Collateral Manager that such designation has been recognized by such Rating Agency as a classification of a separate Subcategory.

"<u>Asset-Backed Securities</u>" or "<u>ABS Securities</u>" means ABS Credit Card Securities, ABS Student Loan Securities, ABS Small Business Loan Securities, ABS Other Securities and Equipment Leasing Securities or any other securities within an Approved Subcategory of Asset-Backed Securities.

"<u>Asset Reserve Account</u>" means the Securities Account referred to as the "Asset Reserve Account" and established by the Securities Intermediary in the name of the Trustee pursuant to Section 10.2(l).

"<u>Asset Reserve Schedule</u>" means a schedule prepared by the Collateral Manager and delivered to the Trustee and the Rating Agencies setting forth with respect to any Collateral Asset that pays less frequently than quarterly (x) the portion of each scheduled payment of interest in respect of such Collateral Debt Security that pays less frequently than quarterly that is to be deposited in the Collection Account when received in Cash by the Issuer, (y) the portion of such payment that is to be deposited in the Asset Reserve Account on such date and (z) the amount that is to be transferred from the Asset Reserve Account to the Collection Account on the fourth Business Day prior to any Payment Date in respect of such Collateral Asset that pays less frequently than quarterly. The Asset Reserve Schedule may be amended from time to time by the Collateral Manager; provided that written notice of any such amendments are delivered to Moody's.

"<u>Auction</u>" has the meaning specified in <u>Section 9.4</u>.

"<u>Auction Call Redemption</u>" means an auction redemption of the Notes pursuant to <u>Section 9.4</u>.

"<u>Auction Payment Date</u>" has the meaning specified in <u>Section 9.4(a)</u>.

"<u>Auction Procedures</u>" has the meaning specified in <u>Section 9.4</u>.

"<u>Auction Redemption Price</u>" means (i) with respect to the Class A-1A Notes, an amount equal to the Aggregate Outstanding Amount of the Class A-1A Notes *plus* accrued and unpaid interest thereon at the Class A-1A Note Interest Rate (including Defaulted Interest and

interest on Defaulted Interest to, but excluding, the Auction Payment Date), (ii) with respect to the Class A-1B Notes, an amount equal to the Aggregate Outstanding Amount of funded Class A-1B Notes *plus* accrued and unpaid interest thereon at the Class A-1B Note Interest Rate (including Defaulted Interest and interest on Defaulted Interest to, but excluding, the Auction Payment Date), (iii) with respect to the Class A-2 Notes, an amount equal to the Aggregate Outstanding Amount of the Class A-2 Notes *plus* accrued and unpaid interest thereon at the Class A-2 Note Interest Rate (including Defaulted Interest and interest on Defaulted Interest), to but excluding the Auction Payment Date, (iv) with respect to the Class B Notes, an amount equal to the Aggregate Outstanding Amount of the Class B Notes *plus* accrued and unpaid interest thereon at the Class B Note Interest Rate (including Defaulted Interest and interest on Defaulted Interest) to but excluding the Auction Payment Date, (v) with respect to the Class C Notes, an amount equal to the Aggregate Outstanding Amount of the Class C Notes *plus* accrued and unpaid interest thereon at the Class C Note Interest Rate (including Defaulted Interest and Class C Deferred Interest and interest on Defaulted Interest and Class C Deferred Interest) to but excluding the Auction Payment Date, (vi) with respect to the Class D-1 Notes, an amount equal to the Aggregate Outstanding Amount of the Class D-1 Notes *plus* accrued and unpaid interest thereon at the Class D-1 Note Interest Rate (including Defaulted Interest and Class D Deferred Interest and interest on Defaulted Interest and Class D Deferred Interest) to but excluding the Auction Payment Date, (vii) with respect to the Class D-2 Notes, an amount equal to the Aggregate Outstanding Amount of the Class D-2 Notes *plus* accrued and unpaid interest thereon at the Class D-2 Note Interest Rate (including Defaulted Interest and Class D Deferred Interest and interest on Defaulted Interest and Class D Deferred Interest) to but excluding the Auction Payment Date and (viii) with respect to the Preference Shares, zero.

"<u>Authenticating Agent</u>" means, with respect to the Notes or any Class of the Notes, the Person designated by the Trustee, if any, to authenticate such Notes on behalf of the Trustee pursuant to <u>Section 6.4</u>.

"<u>Authorized Officer</u>" means, with respect to the Issuer or the Co-Issuer, any Officer who is authorized to act for the Issuer or the Co-Issuer, as applicable, in matters relating to, and binding upon, the Issuer or the Co-Issuer; with respect to the Collateral Manager, any officer, employee or agent of the Collateral Manager who is authorized to act for the Collateral Manager in matters relating to, and binding upon, the Collateral Manager with respect to the subject matter of the request, certificate or order in question; and with respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"<u>Available Funds</u>" means, with respect to any Payment Date, the amount of any positive Balance (of Cash and Eligible Investments) in the Collection Account as of the Determination Date relating to such Payment Date and, with respect to any other date, such amount as of that date.

"<u>Average Life</u>" means, on any Measurement Date with respect to any Collateral Asset, the quotient obtained by *dividing* (a) the sum of the products of (i) the number of years

(rounded to the nearest one hundredth thereof) from such Measurement Date to the respective dates of each successive Scheduled Distribution of principal of such Collateral Asset and (ii) the respective amounts of principal of such Scheduled Distributions *by* (b) the sum of all successive Scheduled Distributions of principal on such Collateral Asset (as determined by the Collateral Manager).

"Balance" means, on any date, with respect to Cash or Eligible Investments in any account, the aggregate of the (i) current balance of Cash, demand deposits, time deposits, certificates of deposit and federal funds; (ii) principal amount of interest bearing corporate and government securities, money market accounts and repurchase obligations; and (iii) purchase price or accreted value (but not greater than the face amount) of non interest bearing government and corporate securities and commercial paper.

"Bank" means JPMorgan Chase Bank, National Association, a national banking association organized under the laws of the United States, in its individual capacity and not as Trustee.

"Bankruptcy Code" means the United States Bankruptcy Code, Title 11 of the United States Code, as amended or where the context requires, the applicable insolvency provisions of the laws of the Cayman Islands.

"Base Collateral Management Fee" means a fee, subject to the Priority of Payments, payable to the Collateral Manager in arrears on each Monthly Payment Date, equal to 0.09% *per annum* times the Aggregate Principal Amount and subject to the Priority of Payments, measured as of the beginning of the Due Period preceding such Monthly Payment Date; *provided* that, in calculating the Aggregate Principal Amount for purposes of determining the Base Collateral Management Fee, the Principal Balance of any Defaulted Obligation shall be the Calculation Amount therefor.

"Beneficial Owner" means any Person owning an interest in a Global Note as reflected on the books of the Depository or on the books of a Depository Participant or on the books of an indirect participant for which a Depository Participant of the Depository acts as agent.

"Benefit Plan Investor" means (i) an "employee benefit plan" (as defined in Section 3(3) of ERISA), whether or not subject to the provisions of Title I of ERISA, (ii) a "plan" described in Section 4975 of the Code or (iii) an entity whose underlying assets include "plan assets" within the meaning of ERISA by reason of a plan's investment in the entity.

"Board of Directors" means, with respect to the Issuer, the directors of the Issuer duly appointed in accordance with the Issuer Charter from time to time.

"Board Resolution" means, with respect to the Issuer, a resolution of the Board of Directors of the Issuer and, with respect to the Co-Issuer, a resolution of the sole member of the Co-Issuer.

"Business Day" means any day other than (x) Saturday or Sunday or (y) a day on which commercial banking institutions in New York, New York or the city in which the

Corporate Trust Office of the Trustee is located are authorized or obligated by law, regulation or executive order to be closed; *provided* that, if any action is required of a Listing and Paying Agent, solely for purposes of determining when such action of such Listing and Paying Agent is required, days on which commercial banking institutions are authorized or obligated by law or executive order to be closed in the city in which the Listing and Paying Agent is located will also be considered in determining whether such day is a "Business Day"; *provided, further,* that for the sole purpose of determining LIBOR, "Business Day" shall be defined as any day on which dealings in deposits in U.S. Dollars are transacted in the London interbank market.

"Calculation Agent" has the meaning specified in Section 7.16.

"Calculation Amount" means, with respect to any Defaulted Obligation at any time, the lesser of (a) the Market Value of such Defaulted Obligation or (b) the Applicable Recovery Rate multiplied by the Principal Balance of such Defaulted Obligation. For purposes of determining the Calculation Amount, the Principal Balance of a Defaulted Obligation shall be deemed to be its outstanding principal amount. For purposes of determining the Calculation Amounts for use in the Class A Overcollateralization Ratio, the Class B Overcollateralization Ratio, the Class C Overcollateralization Ratio and the Class D Overcollateralization Ratio, the Principal Balance of a Defaulted Obligation that has been defaulted for more than three years shall be zero.

"Cash" means such funds denominated with currency of the United States of America as at the time shall be legal tender for payment of all public and private debts, including funds credited to a deposit account or a Securities Account.

"Category" means with respect to a Collateral Asset, the classification of such Collateral Asset as an Asset-Backed Security, Commercial Mortgage-Backed Security, Residential Mortgage-Backed Security, CDO Security, Insured Security or Synthetic Security.

"CDO of CDO Security" means any CDO Security that entitles the holders thereof to receive payments that depend on a portfolio of which other CDO Securities comprise more than 50% of the aggregate principal balance of such CDO Security.

"CDO RMBS Securities" means CDO Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such CDO Securities) on the cash flow from (and not the Market Value of) a portfolio or synthetic portfolio of at least 80% by principal balance of RMBS Securities.

"CDO Securities" means collateralized debt obligations, collateralized bond obligations and synthetic collateralized debt obligations that may be categorized by its underlying asset type as CDO Structured Product Securities or CDO RMBS Securities or any security within an Approved Subcategory of CDO Securities and may be categorized based on its structure as a cash flow CDO or a Synthetic CDO Security.

"CDO Structured Product Securities" means CDO Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such CDO Securities) on the

-10-

cash flow from a portfolio or synthetic portfolio diversified among Categories of REIT Debt Securities, Asset Backed Securities, Residential Mortgage Backed Securities, Commercial Mortgage Backed Securities and CDO Securities or any combination of more than one of the foregoing or solely of CDO Securities and which (i) consists of less than 50% cash assets, (ii) distributes all proceeds and (iii) contains no more than 10% direct exposure to corporate debt.

"CDO Trust Preferred Securities" means CDO Securities that entitle the holder thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such CDO Securities) on the cash flow from a portfolio of trust preferred securities issued by bank, thrift, other depository institutions or trust subsidiaries.

"Certificate of Authentication" has the meaning specified in Section 2.3(f).

"Certificated Security" has the meaning specified in Section 8-102(a)(4) of the UCC.

"Class" means any or all of the Class A-1A Notes, Class A-1B Notes, Class A-2 Notes, Class B Notes, Class C Notes, Class D-1 Notes and Class D-2 Notes, as the context may require.

"Class A Note Break-Even Default Rate" means the maximum percentage of defaults that the Proposed Portfolio can sustain after giving effect to Standard & Poor's assumptions on recoveries, defaults and timing and to the Priority of Payments such that sufficient funds will remain for the payment of principal of the Class A Notes in full by their respective Stated Maturities and the timely payment of interest on the Class A Notes.

"Class A Note Default Differential" means with respect to any Measurement Date, the rate obtained by subtracting the Class A Note Scenario Default Rate from the Class A Note Break-Even Default Rate.

"Class A Note Scenario Default Rate" means an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with Standard & Poor's rating of the Class A Notes on the Closing Date, determined by application of the Standard & Poor's CDO Monitor.

"Class A Notes" means collectively, the Class A-1 Notes and the Class A-2 Notes.

"Class A Overcollateralization Ratio" means, as of any Measurement Date, the ratio (expressed as a percentage) obtained by *dividing* (i) the Net Outstanding Portfolio Collateral Balance on such Measurement Date *by* (ii) the sum of the Aggregate Outstanding Amount of the Class A Notes.

"Class A Overcollateralization Test" means a test that will be satisfied on any Measurement Date in respect of a Quarterly Payment Date occurring on or after the Effective Date on which any Class A Notes remain outstanding if the Class A Overcollateralization Ratio on such Measurement Date is equal to or greater than 102.5%.

"Class A-1 Notes" means collectively, the Class A-1A Notes and the Class A-1B Notes.

"Class A-1A Note Interest Amount" means, with respect to any Class A-1A Notes on any Monthly Payment Date, interest (including Defaulted Interest and interest on such Defaulted Interest) payable at the Class A-1A Note Interest Rate in respect of each U.S. $1,000 in Aggregate Outstanding Amount of such Class A-1A Notes (rounded to the nearest cent, with half a cent being rounded upward) on such Monthly Payment Date.

"Class A-1A Note Interest Rate" means, with respect to the Class A-1A Notes for any Interest Accrual Period, the annual rate at which interest accrues on the Notes of such Class for such Interest Accrual Period, as specified in Section 2.2(b).

"Class A-1A Notes" means the Class A-1A Floating Rate Term Notes due 2046 issued by the Issuers on the Closing Date and having the terms set forth herein.

"Class A-1B Definitive Note" has the meaning specified in Schedule II to the Securities Purchase Agreement.

"Class A-1B Funding Request" has the meaning specified in Section 2.2(h).

"Class A-1B Notes" means the Class A-1B Floating Rate Delayed Draw Notes due 2046 issued by the Issuers and having the terms set forth herein.

"Class A-1B Note Agent" has the meaning specified in Schedule II to the Securities Purchase Agreement.

"Class A-1B Note Interest Amount" means, with respect to any Class A-1B Notes on any Quarterly Payment Date, interest (including Defaulted Interest and interest on such Defaulted Interest) payable at the Class A-1B Note Interest Rate in respect of each U.S. $1,000 in Aggregate Outstanding Amount of such Class A-1B Notes (rounded to the nearest cent, with half a cent being rounded upward) on such Quarterly Payment Date.

"Class A-1B Note Interest Rate" means, with respect to the Class A-1B Notes for any Interest Accrual Period, the annual rate at which interest accrues on the Notes of such Class for such Interest Accrual Period, as specified in Section 2.2(b).

"Class A-1B Note Register" has the meaning specified in Schedule II to the Securities Purchase Agreement.

"Class A-2 Note Interest Amount" means, with respect to any Class A-2 Notes on any Payment Date, interest (including Defaulted Interest and interest on such Defaulted Interest) payable at the Class A-2 Note Interest Rate in respect of each U.S. $1,000 in Aggregate Outstanding Amount of such Class A-2 Notes (rounded to the nearest cent, with half a cent being rounded upward) on such Payment Date.

"Class A-2 Note Interest Rate" means, with respect to the Class A-2 Notes for any Interest Accrual Period, the annual rate at which interest accrues on the Notes of such Class for such Interest Accrual Period, as specified in Section 2.2(b).

"Class A-2 Notes" means the Class A-2 Floating Rate Notes due 2046 issued by the Issuers on the Closing Date and having the terms set forth herein.

"Class B Interest Coverage Ratio" means, as of any Measurement Date, the ratio (expressed as a percentage and calculated in accordance with Section 1.2) obtained by *dividing*:

(i)    (a) the sum of the cash interest payments (or any purchase discount in the case of Eligible Investments or premiums in the case of Synthetic Securities) received or expected to be received, including Proceeds of any sold Collateral Asset which represents accrued interest (unless such accrued interest is required to be classified as Principal Proceeds) and excluding any amounts credited to the Asset Reserve Account, in each case, in the Due Period in which such Measurement Date occurs on the Collateral Assets and the Eligible Investments (other than cash received from Defaulted Obligations) held in any of the Accounts, *plus*, (b) without duplication, amounts scheduled to be received by the Issuer from any Hedge Counterparty under any Hedge Agreement less any amounts scheduled to be paid to any Hedge Counterparty under any Hedge Agreement (in each case, other than termination payments and termination receipts related to such Hedge Agreements), *plus* (c) any amounts scheduled to be transferred to the Collection Account from the Asset Reserve Account in respect of such Measurement Date, *plus* (d) any amounts standing to the credit of the Monthly Interest Reserve Account *minus* (e) any amounts scheduled to be paid on the next Payment Date pursuant to clause (1) of Section 11.1(a)(i)(II) (but only to the extent such payments are applied pursuant to clauses (1) through (4) of Section 11.1(a)(i)(I)); by

(ii)    an amount not less than U.S. $1.00 equal to the sum of the interest payments due on the Class A Notes and Class B Notes on the Payment Date immediately following such Measurement Date.

"Class B Interest Coverage Test" means a test that will be satisfied on any Measurement Date in respect of a Quarterly Payment Date occurring on or after the second Quarterly Payment Date if the Class B Interest Coverage Ratio is equal to or greater than 105.5%.

"Class B Note Break-Even Default Rate" means, with respect to the Class B Notes, at any time, the maximum percentage of defaults (as determined by Standard & Poor's through application of the Standard & Poor's CDO Monitor) which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain such that, after giving effect to Standard & Poor's assumptions on recoveries and timing and to the Priority of Payments, will result in sufficient funds remaining for the ultimate payment of principal of and interest on the Class B Notes in full by their Stated Maturity and the timely payment of interest on the Class B Notes.

"Class B Note Default Differential" means, with respect to any Measurement Date, the rate calculated by subtracting the Class B Note Scenario Default Rate at such time from the Class B Note Break-Even Default Rate at such time.

"Class B Note Interest Amount" means, with respect to any Class B Notes on any Payment Date, interest (including Defaulted Interest and interest on such Defaulted Interest) payable at the Class B Note Interest Rate in respect of each U.S. $1,000 in Aggregate Outstanding Amount of such Class B Notes (rounded to the nearest cent, with half a cent being rounded upward) on such Payment Date.

"Class B Note Interest Rate" means, with respect to the Class B Notes for any Interest Accrual Period, the annual rate at which interest accrues on the Notes of such Class for such Interest Accrual Period, as specified in Section 2.2(b).

"Class B Note Scenario Default Rate" means, with respect to the Class B Notes, at any time, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with Standard & Poor's rating of the Class B Notes on the Closing Date, determined by application of the Standard & Poor's CDO Monitor at such time.

"Class B Notes" means the Class B Floating Rate Notes due 2046 issued by the Issuers on the Closing Date and having the terms set forth herein.

"Class B Overcollateralization Ratio" means, as of any Measurement Date, an amount equal to the ratio (expressed as a percentage) obtained by *dividing* (i) the Net Outstanding Portfolio Collateral Balance on such Measurement Date *by* (ii) the sum of the aggregate outstanding principal amounts of the Class A Notes and the Class B Notes.

"Class B Overcollateralization Test" means a test that will be satisfied on any Measurement Date in respect of a Quarterly Payment Date occurring on or after the Effective Date on which any Class A Notes or Class B Notes remain outstanding if the Class B Overcollateralization Ratio on such Measurement Date is equal to or greater than 101.56%.

"Class C Coverage Tests" means the Class C Interest Coverage Test and the Class C Overcollateralization Test.

"Class C Deferred Interest" has the meaning specified in Section 2.6(a).

"Class C Interest Coverage Ratio" means, as of any Measurement Date, the ratio (expressed as a percentage and calculated in accordance with Section 1.2) obtained by *dividing*:

(i)      (a) the sum of the cash interest payments (or any purchase discount in the case of Eligible Investments or premiums in the case of default swaps) received or expected to be received, including Proceeds of any sold Collateral Asset which represents accrued interest (unless such accrued interest is otherwise required to be classified as Principal Proceeds) and excluding any amounts credited to the Asset Reserve Account, in each case, in the Due Period in which such Measurement Date occurs on the Collateral Assets and the Eligible Investments (other than cash received from Defaulted Obligations) held in any of the Accounts, *plus*, (b) without duplication, amounts

scheduled to be received by the Issuer from any Hedge Counterparty under any Hedge Agreement less any amounts scheduled to be paid to any Hedge Counterparty (in each case, other than termination payments and termination receipts related to such Hedge Agreements), *plus* (c) any amounts scheduled to be transferred to the Collection Account from the Asset Reserve Account in respect of such Measurement Date *plus* (d) any amounts standing to the credit of the Monthly Interest Reserve Account *minus* (e) any amounts scheduled to be paid on the next Payment Date pursuant to clause (1) of Section 11.1(a)(i)(II) (but only to the extent such payments are applied pursuant to clauses (1) through (4) of Section 11.1(a)(i)(I)); by

(ii)     an amount equal to the sum of interest payments due on the Class A Notes, the Class B Notes and the Class C Notes on the Payment Date following such Measurement Date.

"Class C Interest Coverage Test" means a test that will be satisfied on any Measurement Date in respect of a Quarterly Payment Date occurring on or after the second Quarterly Payment Date if the Class C Interest Coverage Ratio is equal to or greater than 103%.

"Class C Note Break-Even Default Rate" means the maximum percentage of defaults that the Proposed Portfolio can sustain after giving effect to Standard & Poor's assumptions on recoveries, defaults and timing and to the Priority of Payments such that sufficient funds will remain for the payment of principal of the Class C Notes in full by their Stated Maturity and for the ultimate payment of interest on such Class C Notes.

"Class C Note Default Differential" means, with respect to any Measurement Date, the rate obtained by subtracting the Class C Note Scenario Default Rate from the Class C Note Break-Even Default Rate.

"Class C Note Interest Amount" means, with respect to any Class C Notes on any Quarterly Payment Date, interest (including Defaulted Interest and interest on such Defaulted Interest) payable at the Class C Note Interest Rate in respect of each U.S. $1,000 in Aggregate Outstanding Amount of such Class C Notes (rounded to the nearest cent, with half a cent being rounded upward) on such Quarterly Payment Date.

"Class C Note Interest Rate" means, with respect to the Class C Notes for any Interest Accrual Period, the annual rate at which interest accrues on the Notes of such Class for such Interest Accrual Period, as specified in Section 2.2(b).

"Class C Note Scenario Default Rate" means, with respect to the Class C Notes, at any time, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with Standard & Poor's rating of the Class C Notes on the Closing Date, determined by application of the Standard & Poor's CDO Monitor at such time.

"Class C Notes" means the Class C Deferrable Floating Rate Notes due 2046 issued by the Issuers on the Closing Date and having the terms set forth herein.

"Class C Overcollateralization Ratio" means, as of any Measurement Date, the ratio (expressed as a percentage) obtained by *dividing* (i) the Net Outstanding Portfolio

Collateral Balance *by* (ii) the sum of the Aggregate Outstanding Amount of the Class A Notes, the Class B Notes and the Class C Notes (including Class C Deferred Interest).

"Class C Overcollateralization Test" means a test that will be satisfied on any Measurement Date in respect of a Quarterly Payment Date occurring on or after the Effective Date on which any Class C Notes remain outstanding if the Class C Overcollateralization Ratio on such Measurement Date is equal to or greater than 100.81%.

"Class D Deferred Interest" means, (a) with respect to the Class D-1 Notes, interest payable on such Class D-1 Notes at the Class D-1 Note Interest Rate which is not available to be paid as a result of the operation of the Priority of Payments on any Quarterly Payment Date and which is deferred and added to the principal amount of the Class D-1 Notes, and that shall accrue interest at the Class D-1 Note Interest Rate, to the extent lawful and enforceable, until the Quarterly Payment Date on which such interest is available to be paid in accordance with the Priority of Payments and (b) with respect to the Class D-2 Notes, interest payable on such Class D-2 Notes at the Class D-2 Note Interest Rate which is not available to be paid as a result of the operation of the Priority of Payments on any Quarterly Payment Date and which is deferred and added to the principal amount of the Class D-2 Notes, and that shall accrue interest at the Class D-2 Note Interest Rate, to the extent lawful and enforceable, until the Quarterly Payment Date on which such interest is available to be paid in accordance with the Priority of Payments.

"Class D Note Break-Even Default Rate" means the maximum percentage of defaults that the Proposed Portfolio can sustain after giving effect to Standard & Poor's assumptions on recoveries, defaults and timing and to the Priority of Payments such that sufficient funds will remain for the payment of principal of the Class D Notes in full by their Stated Maturity and for the ultimate payment of interest on such Class D Notes.

"Class D Note Default Differential" means with respect to any Measurement Date, the rate obtained by subtracting the Class D Note Scenario Default Rate from the Class D Note Break Even Default Rate.

"Class D Note Scenario Default Rate" means an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with Standard & Poor's rating of the Class D Notes on the Closing Date, determined by application of the Standard & Poor's CDO Monitor.

"Class D Notes" means collectively, the Class D-1 Notes and the Class D-2 Notes.

"Class D Overcollateralization Ratio" means, as of any Measurement Date, the ratio (expressed as a percentage) obtained by *dividing* (i) the Net Outstanding Portfolio Collateral Balance on such Measurement Date by (ii) the sum of the Aggregate Outstanding Amount of the Class A Notes, the Class B Notes, the Class C Notes (including Class C Deferred Interest) and the Class D Notes (including Class D Deferred Interest).

"Class D Overcollateralization Test" means a test that will be satisfied on any Measurement Date in respect of a Quarterly Payment Date occurring on or after the Effective

Date on which any Class D Notes remain outstanding if the Class D Overcollateralization Ratio on such Measurement Date is equal to or greater than 100.31%.

"Class D-1 Note Interest Amount" means, with respect to any Class D-1 Notes on any Quarterly Payment Date, interest (including Defaulted Interest and interest on such Defaulted Interest) payable at the Class D-1 Note Interest Rate in respect of each $1,000 in Aggregate Outstanding Amount of such Class D-1 Notes (rounded to the nearest cent, with half a cent being rounded upward) on such Quarterly Payment Date.

"Class D-1 Note Interest Rate" means, with respect to the Class D-1 Notes for any Interest Accrual Period, the annual rate at which interest accrues on the Notes of such Class for such Interest Accrual Period, as specified in the Indenture and described herein.

"Class D-1 Notes" means the Class D-1 Deferrable Floating Rate Notes due 2046 issued by the Issuers on the Closing Date and having the terms set forth in the Indenture.

"Class D-2 Note Interest Amount" means, with respect to any Class D-2 Notes on any Quarterly Payment Date, interest (including Defaulted Interest and interest on such Defaulted Interest) payable at the Class D-2 Note Interest Rate in respect of each $1,000 in Aggregate Outstanding Amount of such Class D-2 Notes (rounded to the nearest cent, with half a cent being rounded upward) on such Quarterly Payment Date.

"Class D-2 Note Interest Rate" means, with respect to the Class D-2 Notes for any Interest Accrual Period, the annual rate at which interest accrues on the Notes of such Class for such Interest Accrual Period, as specified in the Indenture and described herein.

"Class D-2 Notes" means the Class D-2 Deferrable Fixed Rate Notes due 2046 issued by the Issuers on the Closing Date and having the terms set forth in the Indenture.

"Clean-up Call" means a redemption of the Notes pursuant to Section 9.6.

"Clean-up Call Date" means the Quarterly Payment Date on which the Aggregate Principal Amount is less than or equal to 10% of the Aggregate Principal Amount in effect on the Effective Date.

"Clean-up Call Price" means, with respect to the Class A-1 Notes, an amount equal to the aggregate of (i) interest due and unpaid on the Class A-1 Notes with respect to the Clean-up Call Date (included Defaulted Interest and interest thereon) and (ii) the Aggregate Outstanding Amount of the Class A-1 Notes as of the Clean-up Call Date. With respect to the Class A-2 Notes, an amount equal to the aggregate of (i) interest due and unpaid on the Class A-2 Notes with respect to the Clean-up Call Date (including Defaulted Interest and Interest thereon) and (ii) the Aggregate Outstanding Amount of the Class A-2 Notes as of the Clean-up Call Date. With respect to the Class B Notes, an amount equal to the aggregate of (i) interest due and unpaid on the Class B Notes with respect to the Clean-up Call Date (including Defaulted Interest and Interest thereon) and (ii) the Aggregate Outstanding Amount of the Class B Notes as of the Clean-up Call Date. With respect to the Class C Notes, an amount equal to the aggregate of (i) interest due and unpaid on the Class C Notes with respect to the Clean-up Call Date (including interest on Class C Deferred Interest previously capitalized and including Defaulted

Interest and Interest thereon, if any) and (ii) the Aggregate Outstanding Amount of the Class C Notes as of the Clean-up Call Date.  With respect to the Class D-1 Notes, an amount equal to the aggregate of (i) interest due and unpaid on the Class D-1 Notes with respect to the Clean-up Call Date (including interest on Class D Deferred Interest previously capitalized and including Defaulted Interest and Interest thereon, if any) and (ii) the Aggregate Outstanding Amount of the Class D-1 Notes as of the Clean-up Call Date.  With respect to the Class D-2 Notes, an amount equal to the aggregate of (i) interest due and unpaid on the Class D-2 Notes with respect to the Clean-up Call Date (including interest on Class D Deferred Interest previously capitalized and including Defaulted Interest and Interest thereon, if any) and (ii) the Aggregate Outstanding Amount of the Class D-2 Notes as of the Clean-up Call Date.

"Clearing Agency" means an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Clearing Corporation" has the meaning specified in Section 8-102(a)(5) of the UCC.

"Clearstream, Luxembourg" means Clearstream Banking, *société anonyme*.

"Closing Date" means July 5, 2006.

"CMBS Conduit Securities" means Commercial Mortgage Backed Securities (other than CMBS Credit Tenant Lease Securities, CMBS Large Loan Securities and CMBS RE-REMIC Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Commercial Mortgage Backed Securities) on the cash flow from a pool of commercial mortgage loans.

"CMBS Credit Tenant Lease Securities" means Commercial Mortgage Backed Securities (other than CMBS Large Loan Securities and CMBS Conduit Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Commercial Mortgage Backed Securities) on the cash flow from a pool of commercial mortgage loans made to finance the acquisition, construction and improvement of properties leased to corporate tenants (or on the cash flow from such leases).

"CMBS Franchise Securities" means Commercial Mortgage Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Commercial Mortgage Backed Securities) on the cash flow from (a) a pool of franchise loans made to operators of franchises that provide oil, gasoline, restaurant or food services and provide other services related thereto and (b) leases or subleases of equipment to such operators for use in the provision of such goods and services.

"CMBS Large Loan Securities" means Commercial Mortgage Backed Securities (other than CMBS Conduit Securities and CMBS Credit Tenant Lease Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Commercial Mortgage

Backed Securities) on the cash flow from a commercial mortgage loan or a pool of commercial mortgage loans made to finance the acquisition, construction and improvement of properties. Generally, three or fewer commercial mortgage loans shall account for more than 25% of the aggregate principal balance of the entire pool of commercial mortgage loans supporting payments on the securities.

"CMBS RE-REMIC Securities" means securities that represent an interest in a real estate mortgage investment conduit backed by CMBS Securities.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Commercial Mortgage-Backed Securities" or "CMBS Securities" means securities backed by obligations (including certificates of participation in obligations) that are principally secured by mortgages on real property or interests therein having a multifamily or commercial use, such as regional malls, other retail space, office buildings, industrial or warehouse properties, hotels, nursing homes and senior living centers and shall include, without limitation, CMBS Conduit Securities, CMBS Credit Tenant Lease Securities, CMBS Franchise Securities, CMBS Large Loan Securities or CMBS RE-REMIC Securities or any other securities within an Approved Subcategory of CMBS Securities.

"Co-Issuer" means Millstone III CDO, LLC, a limited liability company organized under the law of the State of Delaware.

"Collateral" has the meaning specified in the Granting Clauses.

"Collateral Account" means a Securities Account established by the Bank with the Custodian in the name of the Trustee, which may be divided into subaccounts (including the Collection Account) for administrative purposes, designated as the "Collateral Account", established by the Bank in the name of the Trustee into which certain of the Collateral will credited from time to time pursuant to Section 3.3(a) hereof.

"Collateral Administration Agreement" means the agreement, dated as of the Closing Date, among the Issuer, the Collateral Manager and the Collateral Administrator, as the same may be amended, supplemented or otherwise modified from time to time in accordance with its terms.

"Collateral Administrator" means the Bank and any successor appointed as Collateral Administrator pursuant to the Collateral Administration Agreement, or any successor thereunder.

"Collateral Asset" means any Commercial Mortgage Backed Security, Residential Mortgage Backed Security, CDO Security, Insured Security, Asset Backed Security or Synthetic Security that satisfies the Eligibility Criteria.

"Collateral Manager" means Church Tavern Advisors, LLC, until a successor Person shall become the Collateral Manager pursuant to the provisions of the Collateral Management Agreement, and thereafter "Collateral Manager" shall mean such successor Person.

"Collateral Manager Fee" means, collectively, the Base Collateral Management Fee and the Incentive Fee.

"Collateral Management Agreement" means the agreement entered into between the Issuer and the Collateral Manager as of the Closing Date, as amended from time to time.

"Collateral Profile Tests" has the meaning set forth in Section 12.4.

"Collateral Quality Tests" means, collectively, the Moody's Asset Correlation Test, the Moody's Maximum Rating Distribution Test, the Maximum Weighted Average Life Test, the Moody's Minimum Weighted Average Recovery Rate Test, the Weighted Average Spread Test, the Weighted Average Coupon Test, the Standard & Poor's CDO Monitor Test and the Standard & Poor's Minimum Average Recovery Rate Test.  For purposes of the Collateral Quality Tests, unless otherwise specified, a Synthetic Security shall be included as a Collateral Asset having the characteristics of the Reference Obligation and not of the Synthetic Security; *provided* that such Synthetic Security Counterparty is rated higher than the Reference Obligation or its obligor and that such Synthetic Security Counterparty is not in default under the related Synthetic Security.

"Collateralization Event" shall have the meaning set forth in the related Hedge Agreement.

"Collateralized Loan Obligations" means CDO Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such securities) on the cash flow from or Market Value of a portfolio of at least 75% by principal balance of commercial loans.

"Collection Account" means the Securities Account referred to as the "Collection Account" established by the Securities Intermediary in the name of the Trustee pursuant to Section 10.2(a).

"Commitment Termination Date" has the meaning specified in Schedule II to the Securities Purchase Agreement.

"Controlling Class" means the Class A-1 Notes voting as a single Class for so long as any Class A-1 Notes are outstanding; if no Class A-1 Notes are outstanding, then the Class A-2 Notes for so long as any Class A-2 Notes are outstanding; if no Class A-1 Notes or Class A-2 Notes are outstanding, then the Class B Notes, so long as any Class B Notes are outstanding; if no Class A Notes or Class B Notes are outstanding, then the Class C Notes, so long as any Class C Notes are outstanding; and if no Class A Notes, Class B Notes or Class C Notes are outstanding, then the Class D Notes, so long as any Class D Notes are outstanding.

"Corporate CDO Securities" means CDO Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the CDO Securities) on the market value of, credit exposure to, or cash flow from, a portfolio with respect to which the aggregate principal balance of corporate debt securities (other than REIT Debt Securities) or any

combination of the foregoing, included therein is greater than 10% of the aggregate principal balance of such portfolio.

"<u>Corporate Securities</u>" means publicly issued or privately placed debt obligations of corporate issuers which are not Insured Securities or CDO Securities.

"<u>Corporate Trust Office</u>" means the principal corporate trust office of the Trustee, currently located at 600 Travis Street, 50th Floor, Houston, Texas 77002, Attention: Worldwide Securities Services – Millstone III CDO, Ltd., or such other address as the Trustee may designate from time to time by notice to the Noteholders, the Collateral Manager, the Hedge Counterparty and the Issuers or the principal corporate trust office of any successor Trustee.

"<u>Coverage Ratios</u>" means the Interest Coverage Ratios and the Overcollateralization Ratios.

"<u>Coverage Tests</u>" means the Interest Coverage Tests and the Overcollateralization Tests.

"<u>CRE CDO Securities</u>" means collateralized debt obligations, collateralized bond obligations or collateralized loan obligations (including, without limitation, any synthetic collateralized debt obligations or synthetic collateralized loan obligations) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such CRE CDO Securities) on the cash flow from (and not the market value of) a portfolio of loans or securities related to commercial mortgage property.

"<u>Credit Improved Obligation</u>" means any Collateral Asset that the Collateral Manager believes has, since such Collateral Asset was purchased by the Issuer, significantly improved in credit quality which improvement may (but need not) be reflected in one of the following: (a) such Collateral Asset has been upgraded or put on a watchlist for possible upgrade by any of the Rating Agencies since the date on which such Collateral Asset was purchased by the Issuer, (b) the issuer of such Collateral Asset has shown improved financial results, (c) the obligor of or insurer of such Collateral Asset has raised significant equity capital or has raised other capital that in the Collateral Manager's judgment has improved the liquidity or credit standing of such obligor or insurer, (d) in the case of an Asset-Backed Security or a Mortgage-Backed Security, a statistically significant improvement in the quality of the underlying pool of assets or an increase in the level of subordination or (e) such Collateral Asset has decreased its spread over the interest rate on the applicable U.S. treasury benchmark or the applicable swap benchmark by an amount exceeding 25% compared to the credit spread at which it was purchased or has increased in price to 102% or more of the original price which increase, in the judgment of the Collateral Manager, is not primarily due to changes in market interest rates; *provided* that:

(i)     at the time of determination, Moody's has not withdrawn or reduced its long-term ratings, in the case of any of the Class A Notes and the Class B Notes, by one or more subcategories, and in the case of any of the Class C Notes or the Class D Notes, by two or more subcategories, below the ratings in effect on the Closing Date

(disregarding any withdrawal or reduction if subsequent thereto Moody's has upgraded or reinstated any such reduced or withdrawn rating of the Class A Notes, the Class B Notes, the Class C Notes or Class D Notes, as applicable, to at least their initial long-term rating); or

(ii)    if Moody's has withdrawn or reduced its long-term ratings on any of the Class A Notes, the Class B Notes, the Class C Notes or the Class D Notes by one or more subcategories below the ratings in effect on the Closing Date (disregarding any withdrawal or reduction if subsequent thereto Moody's has upgraded any such reduced or withdrawn rating of the Class A Notes, the Class B Notes, the Class C Notes or the Class D Notes, as applicable, to at least their initial long-term ratings), (a) such Collateral Asset has been upgraded by Moody's at least one rating subcategory since it was acquired by the Issuer or put on a watchlist by Moody's for possible upgrade, (b) the Holders of a Majority of the Controlling Class vote to waive the requirement of subclause (a) of this clause (ii) or (c) such Collateral Asset has experienced a decrease in credit spread of 10% or more compared to the credit spread at which such Collateral Asset was purchased by the Issuer, determined by reference to an applicable index selected by the Collateral Manager (subject to the satisfaction of the Rating Agency Condition).

"Credit Risk Obligation" means any Collateral Asset that the Collateral Manager believes has, since such Collateral Asset was purchased by the Issuer, a significant risk of declining in credit quality (or, in the case of an Asset-Backed Security or Mortgage-Backed Security, there has occurred, or is expected to occur, a deterioration in the quality of the underlying pool of assets) or, with a lapse of time, a significant risk of becoming a Defaulted Obligation and:

(i)    Moody's has not withdrawn or reduced its long-term ratings on any of the Class A Notes, the Class B Notes, the Class C Notes or the Class D Notes by one or more subcategories below the ratings in effect on the Closing Date (disregarding any withdrawal or reduction if subsequent thereto Moody's has upgraded any such reduced or withdrawn ratings of the Class A Notes, the Class B Notes, the Class C Notes or the Class D Notes, as applicable, to at least their initial long-term rating); or

(ii)    if Moody's has withdrawn or reduced its long-term ratings on any of the Class A Notes, the Class B Notes, the Class C Notes or the Class D Notes by one or more subcategories below the ratings in effect on the Closing Date (disregarding any withdrawal or reduction if subsequent thereto Moody's has upgraded any such reduced or withdrawn ratings of the Class A Notes, the Class B Notes, the Class C Notes or the Class D Notes, as applicable, to at least their initial long-term rating), (a) such Collateral Asset has been downgraded by Moody's at least one or more rating subcategories since it was acquired by the Issuer or placed by Moody's on a watchlist with negative implications since the date on which such Collateral Asset was purchased by the Issuer, (b) the Holders of a Majority of the Controlling Class vote to waive the requirement of subclause (a) of this clause (ii) or (c) such Collateral Asset has experienced an increase in credit spread of 10% or more compared to the credit spread at which such Collateral Asset was purchased by the Issuer, determined by reference to an applicable index

selected by the Collateral Manager (subject to the satisfaction of the Rating Agency Condition).

"Current Interest Rate" means, as of any Measurement Date, (i) with respect to any Collateral Asset that is a Fixed Rate Security, the stated rate at which interest accrues on such Fixed Rate Asset and (ii) with respect to any Collateral Asset that is a Deemed Fixed Collateral Asset, the Deemed Fixed Spread *plus* the Deemed Fixed Rate.

"Current Portfolio" means the portfolio (measured by Principal Balance) of Collateral Assets, Principal Proceeds held as Cash and Eligible Investments purchased with Principal Proceeds, on any Measurement Date, existing immediately prior to the sale, maturity or other disposition of a Collateral Asset or immediately prior to the acquisition of a Collateral Asset, as the case may be.

"Custodian" has the meaning specified in Section 3.3(a).

"Deemed Fixed Asset Hedge" means an interest rate swap having a notional amount (or scheduled notional amounts) approximately equal to the Principal Balance (as it may be reduced by expected amortization) of the related Floating Rate Security; *provided* that, (i) at the time of entry into the Deemed Fixed Asset Hedge, the principal payments on the Floating Rate Security comprising a Deemed Fixed Collateral Asset will not extend beyond 15 years after the Closing Date, (ii) the Rating Agencies and the Collateral Administrator are notified prior to the Issuer's entry into a Deemed Fixed Asset Hedge, and will be provided with the identity of the Hedge Counterparty, copies of the Hedge Agreement, any information for the related Floating Rate Security and the related amortization schedule, (iii) entry into such Deemed Fixed Asset Hedge shall be subject to the Issuer's satisfaction of the Rating Agency Condition to the extent the applicable master agreement or schedule attached thereto is not a Form-Approved Hedge Agreement, (iv) such Deemed Fixed Asset Hedge is priced at then-current market rate and (v) if the Deemed Fixed Asset Hedge is to be terminated, the Issuer must satisfy the Rating Agency Condition.

"Deemed Fixed Collateral Asset" means a Floating Rate Security at the time of entry into a Deemed Fixed Asset Hedge with respect to such Floating Rate Security; *provided* that at the time of entry into the Deemed Fixed Asset Hedge with respect to a Floating Rate Security that converts to payments of periodic interest at a floating rate after a designated period, the Average Life of the Deemed Fixed Collateral Asset prior to such conversion must not increase or decrease by more than one year from its expected Average Life if it were to prepay at either 200% or 50% of its pricing speed; *provided further* that (i) a separate Deemed Fixed Asset Hedge shall be entered into with respect to each Deemed Fixed Collateral Asset, (ii) the notional amortization schedule matches the expected amortization and (iii) with respect to such Deemed Fixed Collateral Asset, the short-term senior unsecured debt rating of the related Hedge Counterparty by Moody's is not less than "P-1," or the long-term senior unsecured debt rating of the related Hedge Counterparty by Moody's is not less than "A1."

"Deemed Fixed Rate" means the rate equal to the fixed rate that the Hedge Counterparty agrees to pay on the Deemed Fixed Asset Hedge at the time such hedge is executed.

"Deemed Fixed Spread" means the spread on the underlying Floating Rate Security that is a Deemed Fixed Collateral Asset.

"Deemed Floating Asset Hedge" means an interest rate swap having a notional amount (or scheduled notional amounts) approximately equal to the Principal Balance (as it may be reduced by expected amortization) of the related Fixed Rate Security; *provided* that, (i) at the time of entry into the Deemed Floating Asset Hedge, the principal payments on the Fixed Rate Security comprising a Deemed Floating Collateral Asset will not extend beyond 15 years after the Closing Date, (ii) the Rating Agencies and the Collateral Administrator are notified prior to the Issuer's entry into a Deemed Floating Asset Hedge, and will be provided with the identity of the Hedge Counterparty, copies of the Hedge Agreement, any information for the related Fixed Rate Security and the related amortization schedule, (iii) entry into such Deemed Floating Asset Hedge shall be subject to the satisfaction of the Rating Agency Condition to the extent the applicable master agreement or schedule attached thereto is not a Form-Approved Hedge Agreement, (iv) such Deemed Floating Asset Hedge is priced at then-current market rate and (v) if the Deemed Floating Asset Hedge is to be terminated, the Issuer must satisfy the Rating Agency Condition.

"Deemed Floating Collateral Asset" means a Fixed Rate Security at the time of entry into a Deemed Floating Asset Hedge with respect to such Fixed Rate Security; *provided* that at the time of entry into the Deemed Floating Asset Hedge with respect to a Fixed Rate Security that converts to payments of periodic interest at a floating rate after a designated period, the Average Life of the Deemed Floating Collateral Asset prior to such conversion must not increase or decrease by more than one year from its expected Average Life if it were to prepay at either 200% or 50% of its pricing speed; *provided further* that (i) a separate Deemed Floating Asset Hedge shall be entered into with respect to each Deemed Floating Collateral Asset, (ii) the notional amortization schedule matches the expected amortization and (iii) with respect to such Deemed Floating Collateral Asset, the short-term senior unsecured debt rating of the related Hedge Counterparty by Moody's is not less than "P-1," or the long-term senior unsecured debt rating of the related Hedge Counterparty by Moody's is not less than "A1."

"Deemed Floating Rate" means the current interest rate on a Deemed Floating Collateral Asset.

"Default" means any Event of Default or any occurrence that, with notice or the lapse of time or both, would become an Event of Default.

"Defaulted Hedge Termination Payments" means any termination payment required to be made by the Issuer to a Hedge Counterparty pursuant to a Hedge Agreement in the event of a termination of such Hedge Agreement (other than a termination for tax event or illegality) in respect of which such Hedge Counterparty is the sole Defaulting Party or the sole Affected Party (each, as defined in the applicable Hedge Agreement).

"Defaulted Interest" means any interest due and payable in respect of (i) any Class A Note or Class B Note or (ii) if there are no Class A Notes or Class B Notes outstanding, any Class C Note or if there are no Class A Notes, Class B Notes or Class C Notes outstanding, any Class D Note which, in any such case, is not punctually paid or duly provided for on the

applicable Monthly Payment Date or Quarterly Payment Date. In no event will Class C Deferred Interest or Class D Deferred Interest be considered Defaulted Interest.

"Defaulted Obligation" means any Collateral Asset with respect to which:

(a)    there has occurred and is continuing for the lesser of 3 Business Days and any applicable grace period (with respect to non-credit and non-fraud related defaults), a default with respect to the payment of interest or principal on such Collateral Asset in accordance with its terms; *provided* that, the Collateral Asset shall not constitute a Defaulted Obligation if and when such default has been cured through the payment of all past due interest and principal or waived; *provided further*, *however,* that, notwithstanding the foregoing, any Collateral Asset that is in default with respect to the payment of interest or principal as of the Measurement Date shall not be a Defaulted Obligation if such default is cured through the payment of all past due interest and principal within 3 Business Days after the Measurement Date (and the Collateral Manager shall determine whether a default has occurred on or prior to the second Business Day prior to the Payment Date) or such Collateral Asset shall not be treated as a Defaulted Obligation if the Collateral Manager believes the default on such Collateral Asset will be cured as of the next Measurement Date and the Rating Agency Condition with respect to Standard & Poor's has been satisfied relative to such treatment;

(b)    if such Collateral Asset is a Synthetic Security, either (i) it is a Defaulted Synthetic Security, (ii) it is a Synthetic Security Counterparty Defaulted Obligation or (iii) any Deliverable Obligation delivered to the Issuer in connection with a "credit event" with respect to such Synthetic Security does not meet the Eligibility Criteria (and provided that such Deliverable Obligation shall not be required to satisfy clause (xx) of the Eligibility Criteria) or causes the Issuer to fail the Collateral Profile Test;

(c)    any bankruptcy, insolvency or receivership proceeding has been initiated in connection with the issuer of such Collateral Asset and is unstayed and undismissed; *provided*, that, if such proceeding is an involuntary proceeding, the condition of this clause (c) will not be satisfied until the earliest of the following: (i) the issuer consents to such proceeding, (ii) an order for relief under the Bankruptcy Code, or any similar order under a proceeding not taking place under the Bankruptcy Code, has been entered, or (iii) such proceeding remains unstayed and undismissed for 45 days;

(d)    such Collateral Asset has an Standard & Poor's Rating of "CC" or lower or a rating of "D" or "SD" or has had its rating withdrawn after being rated "CCC" or lower or "D" or "SD" or has a Moody's Rating of "Ca" or lower; or

(e)    the Collateral Manager knows the issuer thereof is (or is reasonably expected by the Collateral Manager to be, as of the next scheduled payment distribution date) in default (if, in the Collateral Manager's judgment, such default is due to non-credit related reasons, beyond the lesser of (i) the

number of days until the next Measurement Date and (ii) five Business Days) as to payment of principal and/or interest on another obligation (and such default has not been cured through the payment of all past due interest and principal), but only if one of conditions (I) or (II) is met: (I) (A) both such other obligation and the Collateral Asset are full recourse unsecured obligations and the other obligation is senior to or *pari passu* with the Collateral Asset in right of payment or (B) (x) such other obligation is a full recourse secured obligation and the Collateral Asset is a full recourse secured obligation or (y) the Collateral Asset is a full recourse unsecured obligation and the other obligation is senior to or *pari passu* (except that it is secured) with the Collateral Asset in right of payment; or (II) all of the following conditions (A), (B) and (C) are satisfied:  (A) both such other obligation and the Collateral Asset are full recourse secured obligations secured by common collateral;  (B) the security interest securing the other obligation is senior to or *pari passu* with the security interest securing the Collateral Asset; and (C) the other obligation is senior to or *pari passu* with the Collateral Asset in right of payment, except that a Collateral Asset shall not constitute a "Defaulted Obligation" under this clause (e) if (a) the Collateral Manager has notified each Rating Agency in writing of its decision not to treat the Collateral Asset as a Defaulted Obligation or (b) the Collateral Manager certifies to the Trustee (such certification subject to certain constraints and provisions as detailed herein), with notice to the Rating Agencies, that, on the next scheduled distribution date of such Collateral Asset, such issuer will make payments required to be made on such Collateral Asset on such date, *provided, however,* that this exception will not apply where the issuer of such Collateral Asset is (or is reasonably expected by the Collateral Manager to be) in default as to payment of principal and/or interest of another obligation that is senior in right of payment to such security;

*provided* that, notwithstanding the satisfaction of all of the foregoing items (a) through (e), the Collateral Manager may declare any Collateral Asset to be a Defaulted Obligation if, in the Collateral Manager's sole determination, the credit quality of the issuer of such Collateral Asset (or, in the case of a Synthetic Security, the credit quality of the counterparty or issuer of the Reference Obligation with respect thereto) has significantly deteriorated such that there is a reasonable expectation of payment default as of the next scheduled payment date with respect to such Collateral Asset.

Nothing in this definition will require any employee (including any portfolio manager or credit analyst) of the Collateral Manager to obtain, use, share or otherwise distribute (a) any information that he or she would be prohibited from obtaining, using, sharing or otherwise distributing by virtue of the Collateral Manager's internal policies relating to confidential communications, or (b) material non-public information with any other person.

"Defaulted Synthetic Security" means (a) a Synthetic Security referencing a Reference Obligation that would constitute a "Defaulted Obligation" under the definition thereof and (b) any Synthetic Security as to which a "credit event" (as defined in the Synthetic Security) has occurred; *provided* that, if the Synthetic Security Counterparty has or has caused Eligible Investments to be credited to a Synthetic Security Collateral Account, in an amount equal to or

greater than the total amount of obligations that could be owed to the Issuer by such Synthetic Security Counterparty pursuant to the terms of the related Synthetic Security, such Synthetic Security shall not be considered a Defaulted Synthetic Security.

"Defeased Synthetic Security" means any Synthetic Security that requires payment by the Issuer after the date upon which it is pledged to the Trustee and that satisfies the following:

        (a)     the Issuer has caused to be deposited in a Synthetic Security Collateral Account an amount at least equal to the aggregate of all further payments (contingent or otherwise) that the Issuer is or may be required to make to the Synthetic Security Counterparty under the Synthetic Security;

        (b)     the agreement relating to such Synthetic Security contains "non-petition" provisions with respect to the Issuer and "limited recourse" provisions limiting the Synthetic Security Counterparty's rights in respect of the Synthetic Security to the funds and other property credited to the Synthetic Security Collateral Account related to such Synthetic Security; and

        (c)     the agreement relating to such Synthetic Security contains provisions to the effect that upon the occurrence of an "Event of Default" or "Termination Event" (other than an "Illegality" or "Tax Event"), if any, where the Synthetic Security Counterparty is the  sole "Defaulting Party" or the sole "Affected Party" ("Event of Default", "Termination Event", "Illegality", "Tax Event", "Defaulting Party" or "Affected Party", as applicable, as such terms are defined in the ISDA Master Agreement relating to such Synthetic Security) (x) the Issuer may terminate its obligations under such Synthetic Security and upon such termination, any lien in favor of the Synthetic Security Counterparty over its related Synthetic Security Collateral Account will be terminated and (y) the Issuer will no longer be obligated to make any payments to the Synthetic Security Counterparty with respect to such Synthetic Security.

"Definitive Note" has the meaning specified in Section 2.1(c).

"Delayed Funding Condition" has the meaning specified in Section 2.2(h).

"Deliverable Obligation" means a debt obligation that may be or is delivered to the Issuer upon the occurrence of a "credit event" under a Synthetic Security that may be delivered to the Issuer notwithstanding the fact that the delivery of such Collateral Asset may cause the Issuer to fail a Collateral Profile Test.

"Depository" means, with respect to the Notes issued in the form of one or more Global Notes, the Person designated as Depository pursuant to Section 2.2(e) or any successor thereto appointed pursuant to the applicable provisions of this Indenture.

"Depository Participant" means a broker, dealer, bank or other financial institution or other Person for whom from time to time the Depository effects book-entry transfers and pledges of notes deposited with the Depository.

"Determination Date" means the last day of a Due Period or, if such day is not a Business Day, the immediately succeeding Business Day.

"Distribution" means any payment of principal, interest or fee or any dividend or premium payment made on, or any other distribution in respect of, an obligation or security.

"Dollar" or "U.S.$" means a dollar or other equivalent unit in such coin or currency of the United States as at the time shall be legal tender for all debts, public and private.

"DTC" means The Depository Trust Company, a New York corporation.

"Due Date" means each date on which a Distribution is due on a Pledged Security.

"Due Period" means, with respect to each Payment Date, the period ending on (and including) the fourth Business Day prior to such Payment Date (or, in the case of a Due Period that is applicable to the Payment Date relating to the Stated Maturity of any Security, ending on (and including) the day preceding such Payment Date) and commencing on the day immediately following the fourth Business Day prior to the preceding Payment Date (or, in the case of the Due Period relating to the first Payment Date, on the Closing Date).

"EETC Security" means an enhanced equipment trust certificate.

"Effective Date" means the date that is the earlier of (a) January 5, 2007 and (b) the first date on which the sum of (1) the Aggregate Principal Amount of the Pledged Collateral Assets purchased on the Closing Date or during the Ramp-Up Period (including Collateral Assets not yet purchased, but as to which the Issuer has entered into binding agreements for regular settlement) *plus* (2) the Aggregate Principal Amount of all Eligible Investments purchased with Principal Proceeds on deposit in the Principal Collection Account *plus* (3) the aggregate amount of all Principal Proceeds distributed on any prior Payment Date is at least equal to U.S.$2,200,000,000.

"Eligibility Criteria" has the meaning specified in Section 12.2(a).

"Eligible Bidders" are institutions, which may include affiliates of the Initial Purchasers or the Collateral Manager, or Holders of Securities, whose short term unsecured debt obligations have a rating of at least "P-1" by Moody's and "A-1+" by Standard & Poor's (and if rated "P-1" by Moody's and "A-1+" by Standard & Poor's, such rating is not on credit watch for possible downgrade). If any single bid, or the aggregate amount of multiple bids, does not equal or exceed the Minimum Bid Amount or if there is a failure at settlement, then the redemption of Securities on the related Auction Payment Date will not occur and a new Auction will be conducted on the following Auction Payment Date.

"Eligible Depositary" shall be a financial institution organized under the laws of the United States or any state thereof, authorized to accept deposits, having a combined capital and surplus of at least U.S.$200,000,000, that is subject to supervision by federal or state banking authorities, having (or if its obligations are guaranteed by its parent company, its parent having), a long term debt rating of at least "Baa1" by Moody's (and if rated "Baa1", such rating

is not on watch for downgrade) and "BBB+" by Standard & Poor's and a short term debt rating of "P-1" by Moody's (and not on watch for downgrade) and at least "A-1" by Standard & Poor's.

"Eligible Investment" means any U.S. Dollar denominated investment that, at the time it is delivered to the Trustee, is one or more of the following obligations or securities (including security entitlements thereto): (i) direct Registered obligations of, and Registered obligations fully guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States; (ii) demand and time deposits in, certificates of deposit of, or banker's acceptances issued by, any depository institution or trust company incorporated in the United States or any state thereof, which depository institution or trust company is subject to supervision and examination by federal or state banking authorities, with a maturity not in excess of 183 days; and with a credit rating by Standard & Poor's of at least "A-1+" or at least "AA-", as applicable, a credit rating by Moody's of at least "P-1" or at least "Aa3" (and if rated "Aa3," not on watch for downgrade), as applicable, in the case of a maturity in excess of 30 days, and a credit rating by Standard & Poor's of at least "A-1" and a credit rating by Moody's of at least "P-1" (and not on watch for downgrade) in the case of a maturity of less than 30 days; (iii) repurchase obligations with respect to (a) any security described in clause (i) above or (b) any other security issued or guaranteed by an agency or instrumentality of the United States, entered into with a depository institution or trust company described in clause (ii) above or entered into with a corporation whose long term senior unsecured rating is at least "A1" (and if rated "A1," not on watch for downgrade) by Moody's and "AA-" by Standard & Poor's and whose short term credit rating is "P-1" (and not on watch for downgrade) by Moody's and "A-1" by Standard & Poor's at the time of such investment, with a term not in excess of 91 days; (iv) Registered debt securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States or any state thereof that have a credit rating of at least "Aa3" (and if rated "Aa3," not on watch for downgrade) or "P 1" (and not on watch for downgrade) by Moody's or A-1 by Standard & Poor's or, if there is no short term rating by Standard & Poor's, has a long-term rating of "AA-" by Standard & Poor's; (v) commercial paper or other short term obligations of a corporation, partnership, limited liability company or trust, or any branch or agency thereof located in the United States or any of its territories, such commercial paper or other short term obligations having a credit rating of "P-1" (and not on watch for downgrade) by Moody's and "A-1" by Standard & Poor's, and that are Registered and either are interest bearing or are sold at a discount from the face amount thereof and have a maturity of not more than 91 days from their date of issuance; and (vi) offshore money market funds which have a credit rating of not less than "Aaa/MR1+" by Moody's and "AAA" or "AAAm" or "AAAm G" by Standard & Poor's, provided that (a) each rating in clauses (iii) through (vi) above by Moody's or Standard & Poor's shall be a public rating, (b) any such investment purchased on the basis of Standard & Poor's short term rating of "A-1" shall mature no later than 30 days after the date of purchase and may not exceed 20% of the Aggregate Outstanding Amount of the Notes rated by Standard & Poor's and (c) no Eligible Investment may be subject to an Offer. Eligible Investments shall not include any Mortgage-Backed Security, any inverse floater, any Interest Only Security, any Principal Only security (other than treasury bills or commercial paper) or any security with a price in excess of par or any security the repayment of which is dependent on substantial non credit related risk as determined by the Collateral Manager. Each such Eligible Investment shall mature no later than the second Business Day immediately preceding the Monthly Payment Date next following the Due Period in which the date of investment occurs, unless such Eligible

Investment is issued by the institution acting as Trustee, in which event such Eligible Investment may mature on the Business Day preceding such Monthly Payment Date. Eligible Investments may include those investments with respect to which the Trustee, the Collateral Manager or the Initial Purchasers or an affiliate of the Trustee, the Collateral Manager or the Initial Purchasers provides services. As used in this definition, ratings may not include ratings with a "p," "pi," "q," "r" or "t" subscript. Eligible Investments shall not be purchased in excess of 100% of par. Eligible Investments either shall be treated as indebtedness for U.S. federal income tax purposes, or the Issuer has received advice from Cadwalader, Wickersham & Taft LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters to the effect that such investment shall not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes or otherwise subject the Issuer to U.S. federal income tax on a net income tax basis and Eligible Investments shall not be subject to deduction or withholding for or on account of any withholding or similar tax, unless the payor is required to make "gross up" payments that ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding been required.

"<u>Entitlement Holder</u>" has the meaning specified in Section 8-102(a)(7) of the UCC.

"<u>Equipment Leasing Securities</u>" means Asset-Backed Securities (other than Aircraft Leasing Securities, Healthcare Securities, Oil and Gas Securities and Restaurant and Food Services Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from leases and subleases of equipment (other than automobiles) to commercial and industrial customers, generally having the following characteristics: (1) the leases and subleases have varying contractual maturities; (2) the leases or subleases are obligations of a relatively limited number of obligors and accordingly represent an undiversified pool of obligor credit risk; (3) the repayment stream on such leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly depending upon the disposition to a lessee, sublessee or third party of the underlying equipment; and (4) such leases or subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of lease term for excess usage.

"<u>Equity Security</u>" means any security, obligation or other property (other than Cash) acquired by the Issuer as a result of the exercise or conversion of a Collateral Asset, in conjunction with the purchase of a Collateral Asset or in exchange for a Defaulted Obligation.

"<u>ERISA</u>" means the United States Employee Retirement Income Security Act of 1974, as amended.

"<u>Euroclear</u>" means Euroclear Bank S.A./N.V., as operator of the Euroclear System.

"<u>Event of Default</u>" has the meaning specified in <u>Section 5.1</u>.

"Excepted Property" means (a) the U.S.$300 of capital contributed by the owners of the Issuer's ordinary shares in accordance with the Issuer Charter and U.S.$300 representing a profit fee to the Issuer for issuing the Notes, together with, in each case, any interest accruing thereon and the bank account in which such Cash is held (b) the shares of the Co-Issuer and any assets of the Co-Issuer and (c) any amounts standing to the credit of the Preference Share Distribution Account.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended.

"FICO Score" means the numerical consumer credit score on a scale between 300 and 850 based on the proprietary credit scoring system developed by Fair, Isaac & Co.

"Final Payment Date" means a Payment Date with respect to an Optional Redemption, Tax Redemption, Auction, Clean-up Call or a redemption due to an Event of Default resulting in acceleration of the Securities and liquidation of the Collateral.

"Financial Asset" has the meaning specified in Section 8-102(a)(9) of the UCC.

"Financing Statement" means a financing statement relating to the Collateral naming the Issuer as debtor and the Trustee on behalf of the Secured Parties as secured party.

"Fitch" means Fitch Ratings and any successor or successors thereto.

"Fixed Payment Rate" will equal the fixed rate that the Issuer agrees to pay on the Deemed Floating Asset Hedge at the time such swap is executed.

"Fixed Rate Assets" means the sum of the Principal Balances of Collateral Assets that are Fixed Rate Securities less the aggregate Principal Balance of Deemed Floating Collateral Assets.

"Fixed Rate Security" means any Collateral Asset which is not a Floating Rate Security; *provided* that the Collateral Manager may reclassify any Fixed Rate Security as a Floating Rate Security if such reclassification satisfies the Rating Agency Condition.

"Floating Rate Assets" means the sum of the Principal Balances of Collateral Assets that are Floating Rate Securities less the sum of the Principal Balances of Deemed Fixed Collateral Assets.

"Floating Rate Security" means (i) Any Collateral Asset or Eligible Investment that is expressly stated to bear interest based upon a floating rate index for Dollar-denominated obligations commonly used as a reference rate in the United States or the United Kingdom, (ii) any Collateral Asset or Eligible Investment the interest payments on which are derived primarily from underlying assets that bear interest based on a floating rate index, (iii) any Cash held in any Account (other than any Synthetic Security Collateral Account) or (iv) any Hybrid Security with respect to which, on any applicable date of determination, more than 50% of the assets from which cashflows are dependent bear, or have borne at any time prior to such date of determination, interest at a floating or adjustable rate.

"Flow-Through Investment Vehicle" means any entity (i) that would be an investment company but for the exception in Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act and the amount of whose investment in the Notes (including in all Classes of the Notes) and Preference Shares exceeds 40% of its total assets (determined on a consolidated basis with its subsidiaries), (ii) as to which any Person owning any equity or similar interest in the entity has the ability to control any investment decision of such entity or to determine, on an investment-by-investment basis, the amount of such Person's contribution to any investment made by such entity, (iii) that was organized or reorganized for the specific purpose of acquiring a Note or Preference Share or (iv) as to which any Person owning an equity or similar interest in which was specifically solicited to make additional capital or similar contributions for the purpose of enabling such entity to purchase a Note or Preference Share.

"Form-Approved Hedge Agreement" means a Deemed Floating Asset Hedge with respect to which the related Fixed Rate Security could be purchased by the Issuer without satisfaction of the Rating Agency Condition in the specific instance because the documentation conforms to a form for which the Issuer has satisfied the Rating Agency Condition as a Form-Approved Hedge Agreement for use in this transaction (as certified to the Trustee by the Collateral Manager); provided, that Standard & Poor's shall be notified of any use of a Form-Approved Hedge Agreement and provided, further, that any Rating Agency may withdraw its consent to user any new Form-Approved Hedge Agreement at any time by giving prior notice to the Collateral Manager.

"Form-Approved Synthetic Security" means a Synthetic Security (a) the Reference Obligation of which, if it were a Collateral Asset, could be purchased by the Issuer without any required action by the Rating Agencies or which would not cause the Rating Agency Condition to be not satisfied, (b) the documentation of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date and other similarly necessary changes) to a form which has satisfied the Rating Agency Condition as a Form-Approved Synthetic Security for use in this transaction (as certified to the Trustee by the Collateral Manager) and (c) for which the Issuer has provided each Rating Agency with written notice of the purchase of such Synthetic Security at least five Business Days prior to such purchase, *provided* that the Standard & Poor's Minimum Average Recovery Rate or the Moody's Recovery Rate, as applicable, for such Synthetic Security shall be zero until provided by such Rating Agency to the Collateral Manager or the Trustee.

"Funding Certificate" means a certificate delivered by the Issuer to the Trustee in substantially the form set out in Exhibit C.

"GAAP" has the meaning specified in Section 6.3(k).

"Global Notes" means the Regulation S Global Notes and the Rule 144A Global Notes.

"Grant" means to grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of set off against, deposit, set over and confirm. A Grant of the Pledged Securities, or of any other

item of the Collateral, shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including without limitation the immediate continuing right to claim for, collect, receive and receipt of principal and interest payments in respect of the Collateral, and all other funds payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Gross Fixed Rate Excess" as of any Measurement Date will equal the product of (i) the greater of zero and the excess, if any, of the Weighted Average Coupon for such Measurement Date over the Minimum Weighted Average Coupon for such Measurement Date and (ii) the Aggregate Principal Amount of all Collateral Assets that are Fixed Rate Assets or Deemed Fixed Collateral Assets (excluding all Defaulted Obligations that are Floating Rate Assets or Deemed Floating Rate Assets held by the Issuer). For purposes of reporting, any Gross Fixed Rate Excess necessary to satisfy the Weighted Average Spread Test will be subtracted, in percentage form, from the alternative test so as not to double count the application of such excess.

"Gross Spread Excess" as of any Measurement Date will equal the product of (i) the greater of zero and the excess, if any, of the Weighted Average Spread for such Measurement Date over the Minimum Weighted Average Spread for such Measurement Date and (ii) the Aggregate Principal Amount of all Collateral Assets that are Floating Rate Assets or Deemed Floating Collateral Assets (excluding all Defaulted Obligations that are Fixed Rate Assets or Deemed Fixed Rate Assets held by the Issuer). For purposes of reporting, any Gross Spread Excess necessary to satisfy the Weighted Average Coupon Test will be subtracted, in percentage form, from the alternative test so as not to double count the application of such excess.

"Healthcare Securities" means Asset Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset Backed Securities) on the cash flow from (i) leases and subleases of equipment to hospitals, non-hospital medical facilities, physicians and physician groups for use in the provision of healthcare services or (ii) Medicare, Medicaid or any other third-party payor receivables related to medical, hospital or other health care related expenses, charges or fees.

"Hedge Agreement" means the ISDA Master Agreement, entered into by the Issuer and the Initial Hedge Counterparty on or prior to the Closing Date, including the schedules thereto and related confirmations dated as of the Closing Date between the Issuer and the Initial Hedge Counterparty, as amended or supplemented in accordance with the terms hereof.

"Hedge Collateral" means, any cash, securities or other collateral delivered and/or pledged by a Hedge Counterparty to or for the benefit of the Issuer, including, without limitation, any up-front payment of cash or delivery of securities made by the Hedge Counterparty to satisfy or secure its payment obligations pursuant to the terms of the related Hedge Agreement.

"Hedge Counterparty Collateral Account" means a Securities Account designated the "Hedge Counterparty Collateral Account" and established in the name of the Trustee pursuant to Section 10.4(c).

"Hedge Counterparty" means any counterparty to a Hedge Agreement that satisfies the Hedge Counterparty Ratings Requirement.

"Hedge Counterparty Ratings Requirement" means (i) with respect to the rating of a Hedge Counterparty or its guarantor (or any replacement pursuant to the relevant Hedge Agreement), as an issuer or with respect to (A) the long-term senior unsecured debt of such party, "Aa3" (and not on credit watch for possible downgrade) or better by Moody's, if such party has a long-term rating only or (B) the long-term senior unsecured debt of such party, as applicable, "A1" (and not on credit watch for possible downgrade) or better by Moody's; (ii) with respect to the short-term debt of a Hedge Counterparty or its guarantor (or any replacement pursuant to the relevant Hedge Agreement), "P-1" (and not on credit watch for possible downgrade) by Moody's, or, if no such rating is available, a guaranteed affiliate thereof from Moody's, if so rated by Moody's; and (iii) with respect to a Hedge Counterparty or its guarantor (who satisfies Standard & Poor's then-current criteria with respect to guarantees) (or any replacement pursuant to the relevant Hedge Agreement) as an issuer or with respect to the short-term unsecured debt of such party, "A-1" by Standard & Poor's or, if no such short-term rating is available, the long-term senior unsecured debt of such party, "A+" by Standard & Poor's" (so long as any of the Notes outstanding hereunder are rated by such Rating Agency); *provided*, that should a Rating Agency effect an overall downward adjustment of its required ratings for hedge counterparties in collateralized debt obligation transactions, then the applicable Hedge Counterparty Ratings Requirement shall be adjusted downward accordingly; *provided further*, that any adjustment to the Hedge Counterparty Ratings Requirement will be subject to the satisfaction of the Rating Agency Condition with respect to the applicable Rating Agency.

"Hedge Rating Determining Party" means, with respect to the Hedge Counterparty, (a) unless clause (b) applies with respect to the Hedge Agreement, the Hedge Counterparty or any transferee thereof or (b) any Affiliate of the Hedge Counterparty or any transferee thereof that unconditionally and absolutely guarantees (with such form of guarantee satisfying Standard & Poor's then-current criteria with respect to guarantees) the obligations of such Hedge Counterparty or such transferee, as the case may be, under such Hedge Agreement. For the purpose of this definition, no direct or indirect recourse against one or more shareholders of the Hedge Counterparty or any such transferee (or against any Person in control of, or controlled by, or under common control with, any such shareholder) shall be deemed to constitute a guarantee, security or support of the obligations of the Hedge Counterparty or any such transferee.

"Hedge Receipt Amount" means, with respect to the Hedge Agreements and any Monthly Payment Date, any hedge receipts, including any other amounts received by the Issuer in respect of a termination of any Hedge Agreement.

"Hedge Replacement Account" means a Securities Account, designated as the "Hedge Replacement Account," established by the Trustee pursuant to Section 10.4(b) herein.

"Hedge Termination Receipts Account" means a Securities Account, designated as the "Hedge Termination Receipts Account," established by the Trustee pursuant to Section 10.4(a) herein.

"Highest Auction Price" means, with respect to an Auction Call Redemption, the greater of (a) the highest price bid by any Listed Bidder for all of the Collateral Assets and (b) the sum of the highest prices bid by one or more Listed Bidders for each Subpool. In each case, the price bid by a Listed Bidder shall be the Dollar amount determined by the Trustee based on the Trustee's review of the bids, which determination shall be binding and conclusive.

"Holder" means, with respect to any Security, the person in whose name such Security is registered in the Note Register or Share Register, as the case may be, or, for purposes of voting, the granting of consents and other similar determinations under the Indenture and the Preference Share Paying Agency Agreement, with respect to any Notes or Preference Shares in global form, a beneficial owner thereof.

"Hybrid Security" means any Collateral Asset (as determined by the Collateral Manager in its discretion and including but not limited to Asset-Backed Securities the payments on which depend on the cash flow from adjustable rate mortgages) that, pursuant to its Underlying Instruments, bears interest at a fixed rate for a limited period of time, after which it bears interest based upon a floating rate index for Dollar-denominated obligations commonly used as a reference rate in the United States or the United Kingdom.

"Incentive Fee" means a fee, subject to the Priority of Payments and subordinated to certain payments to the Preference Share Paying Agent for distribution to the Preference Shareholders, payable to the Collateral Manager in arrears on each Quarterly Payment Date, equal to 20% of remaining proceeds pursuant to the Priority of Payments on such Quarterly Payment Date.

"Indenture" means this instrument and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"Independent" means, as to any Person, any other Person (including, in the case of an accountant, or lawyer, a firm of accountants or lawyers and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person, and (ii) is not connected with such Person as an Officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions. "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants.

"Initial Hedge Counterparty" means Calyon New York Branch, as the counterparty under the Hedge Agreement.

"Initial Purchasers" means CALYON and Calyon Securities (USA) Inc.

"Institutional Accredited Investor" has the meaning set forth in Rule 501(a)(1), (2) (3) or (7) of Regulation D under the Securities Act.

"Instrument" has the meaning specified in Section 9-102(a)(47) of the UCC.

"Insured Securities" means structured finance securities (other than RMBS Agency Securities) which have the benefit of a financial guarantee insurance policy, or surety bond or corporate guarantee insuring or guaranteeing the timely payment of interest and the ultimate payment of principal. For avoidance of doubt, a Collateral Asset that satisfies the requirements of this definition shall be considered to be only an Insured Security for purposes of the Collateral Profile Tests and Eligibility Criteria and not as any other category of Collateral Asset.

"Interest Accrual Period" means (a) with respect to any Class A-1A Notes and any Monthly Payment Date in respect thereof, the period commencing on and including the immediately preceding Monthly Payment Date (or the Closing Date in the case of the first Interest Accrual Period) and ending on and including the day immediately preceding such Monthly Payment; (b) with respect to those Class A-1B Notes funded on the Closing Date, the Class A-2 Notes, Class B Notes, Class C Notes, Class D-1 Notes or Class D-2 Notes and any Quarterly Payment Date in respect thereof, the period commencing on and including the immediately preceding Quarterly Payment Date (or the Closing Date in the case of the first Interest Accrual Period) and ending on and including the day immediately preceding such Quarterly Payment Date; and (c) in the case of the Class A-1B Notes funded after the Closing Date, is the first Subsequent Funding Date and, in each case ending on and including the day immediately preceding such Quarterly Payment Date.

"Interest Coverage Ratios" means the Class B Interest Coverage Ratio and the Class C Interest Coverage Ratio.

"Interest Coverage Tests" means the Class B Interest Coverage Test and the Class C Interest Coverage Test.

"Interest Only Security" means any security that by its terms provides for periodic payments of interest and does not provide for the repayment of a stated principal amount.

"Interest Proceeds" means all Proceeds other than Principal Proceeds.

"Investment Company Act" means the United States Investment Company Act of 1940, as amended, and the rules thereunder.

"Issue" of Collateral Assets means Collateral Assets issued by the same issuer, secured by the same collateral pool.

"Issuer" means Millstone III CDO, Ltd., an exempted company with limited liability incorporated under the law of the Cayman Islands.

"Issuer Charter" means the Memorandum and Articles of Association of the Issuer, filed under the Companies Law (2004 Revision) of the Cayman Islands, as modified and supplemented and in effect from time to time.

"Issuer Order" and "Issuer Request" mean, respectively, a written order or a written request (which may be in the form of a standing order or request), in each case dated and signed in the name of the Issuer by an Authorized Officer with respect to the Issuer and (if appropriate) the Co-Issuer.

"Issuers" means the Issuer and the Co-Issuer.

"LIBOR" has the meaning specified in Schedule B.

"LIBOR Determination Date" has the meaning specified in Schedule B.

"Listing and Paying Agent" means, for so long as any Class of Securities are listed on any stock exchange and the rules of such stock exchange so require, the listing agent and a paying agent appointed by the Issuer.

"Majority" means (a) with respect to any Class or Classes of Notes, the Holders of more than 50% of the aggregate outstanding principal amount of such Class or Classes of Notes and (b) with respect to the Preference Shares, the Holders of more than 50% of the issued and Outstanding Preference Shares.

"Margin Stock" means any asset that constitutes "margin stock" as defined in Regulation U issued by the Board of Governors of the Federal Reserve System; *provided* that "Margin Stock" shall not include any equity security received pursuant to an offer by an issuer of a Defaulted Obligation.

"Market Value" means, on any date of determination, with respect to any Collateral Assets and/or Eligible Investments, (i) the average of three *bona fide* bids for such Collateral Asset or Eligible Investment obtained by the Collateral Manager at such time from any three nationally recognized dealers, which dealers are Independent from one another and from the Collateral Manager, or (ii) if the Collateral Manager is unable to obtain three such bids, the lesser of two *bona fide* bids for such Collateral Asset or Eligible Investment obtained by the Collateral Manager at such time from any two nationally recognized dealers acceptable to the Collateral Manager, which dealers are Independent from one another and from the Collateral Manager, or (iii) if the Collateral Manager is unable to obtain two such bids, the *bona fide* bid for such Collateral Asset or Eligible Investment obtained by the Collateral Manager at such time from any nationally recognized dealer acceptable to the Collateral Manager, which dealer is Independent from the Collateral Manager, or (iv) in the event the Collateral Manager is unable to obtain one such bid, the price on such date provided to the Collateral Manager by an independent pricing service selected by the Collateral Manager and acceptable to Standard & Poor's, or (v) in the event the Collateral Manager cannot determine the market value of such Collateral Asset or Eligible Investment using efforts to apply the methods specified in clauses (i) through (iv) above, the lower of (x) the Market Value as determined by the Collateral Manager using its reasonable business judgment and (y) the Applicable Recovery Rate for such Collateral Asset. In the event the Collateral Manager has determined the value of such Collateral Asset and such determination

has been in effect for 30 days, the Market Value of such Collateral Asset shall be deemed to be equal to zero.

"Market Value CDO Security" means any collateralized debt obligation with respect to which the coverage ratios are determined by reference to the market value of the underlying portfolio of investments as prescribed by the applicable rating agencies.

"Maturity" means, with respect to any Note, the date on which all Outstanding unpaid principal of such Note becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, call for redemption or otherwise.

"Maximum Weighted Average Life Test" means a test that will be satisfied if, as of any Measurement Date, the Weighted Average Life of the Collateral Assets is less than or equal to, on any Measurement Date (a) after the Closing Date up to (but excluding) the Payment Date occurring in July 2009, 6.5 years, (b) from (and including) the Payment Date occurring in July 2009 to (but excluding) the Payment Date occurring in July 2010, 5.5 years, (c) from (and including) the Payment Date occurring in July 2010 to (but excluding) the Payment Date occurring in July 2011, 4.0 years and (d) thereafter, 3.5 years.

"Measurement Date" means any of the following: (i) the Closing Date; (ii) any date upon which a sale, purchase or substitution of Collateral Assets (giving effect to such sale, purchase or substitution) occurs; (iii) each Determination Date; (iv) any date the Collateral Asset becomes a Defaulted Obligation; and (v) with reasonable notice to the Issuer, any other Business Day that any Rating Agency or the Holders of at least 66-2/3% in Aggregate Outstanding Amount of any Class of Notes requests be a Measurement Date; *provided* that, if any such date would otherwise fall on a day that is not a Business Day, the relevant Measurement Date will be the first following day that is a Business Day.

"Minimum Bid Amount" has the meaning specified in Section 9.4(a).

"Minimum Weighted Average Coupon" means 5.58%.

"Minimum Weighted Average Spread" means 0.44%.

"Monthly Asset Amount" means, with respect to any Monthly Payment Date, the Aggregate Principal Amount on the first day of the related Due Period.

"Monthly Interest Reserve Account" means the Securities Account designated the "Monthly Interest Reserve Account" and established in the name of the Trustee pursuant to Section 10.2(m).

"Monthly Payment Date" means the 5th day of every month, or if any such date is not a Business Day, the immediately following Business Day, commencing in October 2006.

"Monthly Principal Reserve Account" means the Securities Account designated the "Monthly Principal Reserve Account" and established in the name of the Trustee pursuant to Section 10.2(n).

"Moody's" means Moody's Investors Service, Inc. and any successor or successors thereto.

"Moody's Asset Correlation Factor" or "MAC Factor" means a single number determined in accordance with the asset correlation methodology provided from time to time to the Collateral Manager by Moody's (a copy of which the Collateral Manager shall promptly provide to the Trustee).

"Moody's Asset Correlation Test" or "Moody's MAC Test" means a test that will be satisfied on any Measurement Date if the Moody's Asset Correlation Factor is less than or equals 28.0%; *provided* that the Moody's Asset Correlation Factor is based on a number of Collateral Assets equal to 175.

"Moody's Expected Loss Rate" means, with respect to any Collateral Asset, the percentage set forth in Appendix E, based upon (i) the lower of the rating assigned by Moody's (without giving effect to any "notched" ratings) assigned to such Collateral Asset by either Moody's or Standard & Poor's and (ii) the remaining expected average life of such Collateral Asset as determined by the Collateral Manager at least once a year for the purposes of this calculation.

"Moody's/S&P Haircut Amount" means the sum of (a) 1% of the Principal Balance of each Collateral Asset with a Moody's Rating below "A3" and above "Baa2" or a Standard & Poor's Rating below "A-" and above "BBB", (b) 2% of the Principal Balance of each Collateral Asset with a Moody's Rating of "Baa2" or a Standard & Poor's Rating of "BBB", (c) 5% of the Principal Balance of each Collateral Asset with a Moody's Rating of "Baa3" or a Standard & Poor's Rating of "BBB-", (d) 10% of the Principal Balance of each Collateral Asset with a Moody's Rating below "Baa3" but above "Ba3" or a Standard & Poor's Rating below "BBB-" but above "BB-", (e) 20% of the Principal Balance of each Collateral Asset with a Moody's Rating of "Ba3" or a Standard & Poor's Rating of "BB-", (f) 30% of the Principal Balance of each Collateral Asset with a Moody's Rating below "Ba3" and above "Caa1" or a Standard & Poor's Rating below "BB-" and above "CCC+" and (g) 50% of the Principal Balance of each Collateral Asset with a Moody's Rating below "B3" or a Standard & Poor's Rating below "B-".

"Moody's Maximum Rating Distribution" means, on any Measurement Date, the number obtained by *dividing* (i) the summation of the series of products obtained for any Collateral Asset that is not a Defaulted Obligation by *multiplying* (a) the Principal Balance on such Measurement Date of each such Collateral Asset *by* (b) its respective Moody's Rating Factor on such Measurement Date by (ii) the aggregate Principal Balance on such Measurement Date of all Collateral Assets that are not Defaulted Obligations and rounding the result up to the nearest whole number.

"Moody's Maximum Rating Distribution Test" means a test that will be satisfied on any Measurement Date if the Moody's Maximum Rating Distribution of the Collateral Assets is equal to or less than 16.

"Moody's Minimum Weighted Average Recovery Rate Test" means a test that will be satisfied as of any Measurement Date if the Moody's Weighted Average Recovery Rate is greater than or equal to 53.0%.

"Moody's Rating" means, with respect to any Collateral Asset, for determining the Moody's Rating of such Collateral Asset as of any date of determination:

(i)       if such Collateral Asset is rated by Moody's, the Moody's Rating shall be such rating, or if such Collateral Asset is not rated by Moody's, but the Issuer or the Collateral Manager on behalf of the Issuer has requested that Moody's assign a rating to such Collateral Asset, the Moody's Rating shall be the rating so assigned by Moody's; *provided* that for purposes of this definition, (a) the rating assigned  by Moody's to a Collateral Asset placed on watch for possible downgrade by Moody's will be deemed to have been downgraded by one subcategory, (b) the rating for a CDO Security rated "Aa1" or lower by Moody's and placed on watch for a possible downgrade by Moody's will be deemed to have been downgraded by two subcategories and (c) the rating assigned by Moody's to a Collateral Asset placed on watch for possible upgrade by Moody's will be deemed to have been upgraded by one subcategory;

(ii)      (a)  if such Collateral Asset is not rated by Moody's but is rated by Standard & Poor's, then the Moody's Rating of such Collateral Asset may be an Implied Rating determined by subtracting the number of subcategories from the Moody's equivalent rating according to the following table ("notching"):

| ASSET CLASS | AAA to AA- | A+ to BBB- | Below BBB- |
|---|---|---|---|
| **Asset Backed** | | | |
| Agricultural and Industrial Equipment loans | 1 | 2 | 3 |
| Aircraft and Auto leases | 2 | 3 | 4 |
| Arena and Stadium Financing | 1 | 2 | 3 |
| Auto loan | 1 | 2 | 3 |
| Boat, Motorcycle, RV, Truck | 1 | 2 | 3 |
| Computer, Equipment and Small-ticket item leases | 1 | 2 | 3 |
| Consumer Loans | 1 | 3 | 4 |
| Credit Card | 1 | 2 | 3 |
| Cross-border transactions | 1 | 2 | 3 |
| Entertainment Royalties | 1 | 2 | 3 |
| Floor Plan | 1 | 2 | 3 |
| Franchise Loans | 1 | 2 | 4 |
| Future Receivables | 1 | 1 | 2 |
| Health Care Receivables | 1 | 2 | 3 |
| Manufactured Housing | 1 | 2 | 3 |
| Mutual Fund Fees | 1 | 2 | 4 |
| Small Business Loans | 1 | 2 | 3 |
| Stranded Utilities | 1 | 2 | 3 |
| Structured Settlements | 1 | 2 | 3 |

| ASSET CLASS | AAA to AA- | A+ to BBB- | Below BBB- |
|---|---|---|---|
| Student Loan | 1 | 2 | 3 |
| Tax Liens | 1 | 2 | 3 |
| Trade Receivables | 2 | 3 | 4 |
| **Residential Mortgage Related** | | | |
| Jumbo A | 1 | 2 | 3 |
| RMBS Prime Mortgage Securities or mixed pools | 1 | 3 | 4 |
| Home Equity Loans (including RMBS Mid-Prime Mortgage Securities and RMBS Subprime Mortgage Securities) | 1 | 2 | 3 |

(b)     if such Collateral Asset is not rated by Moody's but is rated by Fitch, then the Moody's Rating of such Collateral Asset may be determined by subtracting the number of subcategories from the Moody's equivalent rating according to the following table:

| | AAA | AA+ to BBB- | Below BBB- |
|---|---|---|---|
| **Residential Mortgage Related** | | | |
| Jumbo A | 1 | 2 | 4 |
| RMBS Prime Mortgage Securities or mixed pools | 1 | 3 | 5 |
| Home Equity Loans (including RMBS Mid-Prime Mortgage Securities and RMBS Subprime Mortgage Securities) | No notching permitted | No notching permitted | No notching permitted |

(c)     if such Collateral Asset is dual-rated Jumbo A or RMBS Prime Mortgage Security, the Moody's Rating shall be the lower of the two ratings as determined in clauses (i) and (ii) above, *plus* one-half of a subcategory;

(d)     if such Collateral Asset is not rated by Moody's but is rated by Standard & Poor's and Fitch and is a CMBS Security, the Moody's Rating of such Collateral Asset may be determined by subtracting the number of subcategories from the Moody's equivalent rating according to the following table:

|  | Tranche rated by Fitch and Standard & Poor's; no tranche in deal rated by Moody's | Tranche rated by Fitch and/or Standard & Poor's; at least one other tranche in deal rated by Moody's |
|---|---|---|
| **Commercial Mortgage Backed Securities** | | |
| Conduit[1] | 2 notches from lower of Fitch/Standard & Poor's | 1.5 notches from lower of Fitch/Standard & Poor's |
| Credit Tenant Lease | Follow corporate notching practice | Follow corporate notching practice |
| Large Loan | Notching permitted | |

---

1. For this purpose, conduits are defined as fixed rate, sequential pay, multi borrower transactions having a Herfindahl score of 40 or higher at the loan level with all collateral (conduit loans, A notes, large loans, CTLs and any other real estate collateral) factored in.

(e)    if such Collateral Asset is a CDO Security, no notching is permitted and the Moody's Rating shall be the rating so assigned by Moody's;

*provided* that any ratings by Standard & Poor's or Fitch used to determine a Moody's Rating shall (a) address the full return of interest and principal; (b) be for the benefit of multiple investors and remain valid if the Collateral Asset is transferred to subsequent investors; (c) be a public rating and (d) be monitored through the life of the Collateral Asset; and

*provided, further,* that (w) the aggregate Principal Balance of Collateral Assets that may be given a Moody's Rating based on Collateral Assets rated by both Standard & Poor's and Fitch may not exceed 20% of the Aggregate Principal Amount, (x) the aggregate Principal Balance of Collateral Assets that may be given a Moody's Rating based on Collateral Assets rated by only one of Standard & Poor's or Fitch may not exceed 10% of the Aggregate Principal Amount, (y) the aggregate Principal Balance of Collateral Assets that may be given a Moody's Rating based on Collateral Assets rated by only Standard & Poor's or only Fitch may not exceed 7.5% of the Aggregate Principal Amount and (z) Asset-Backed Securities or Mortgage-Backed Securities, other than the Specified Types referred to in paragraphs (a) through (e) above and any RMBS Agency Securities, have a Moody's Rating;

(iii)    with respect to corporate guarantees on Asset-Backed Securities or obligations, if such corporate guarantees or obligations are not rated by Moody's but another security or obligation of the guarantor or obligor (an "other security") is rated by Moody's, and no rating has been assigned in accordance with clause (i), the Moody's Rating of such Collateral Asset shall be determined as follows:

(a)    if the corporate guarantee or obligation is a senior secured obligation of the guarantor or obligor and the other security is also a senior secured obligation, the Moody's Rating of such Collateral Asset shall be the rating of the other security;

(b)      if the corporate guarantee or obligation is a senior unsecured obligation of the guarantor or obligor and the other security is a senior secured obligation, the Moody's Rating of such Collateral Asset shall be one rating subcategory below the rating of the other security;

(c)      if the corporate guarantee or obligation is a subordinated obligation of the guarantor or obligor and the other security is a senior secured obligation:

(1)      rated "Ba3" or higher by Moody's, the Moody's Rating of such corporate guarantee shall be three rating subcategories below the rating of the other security; or

(2)      rated "B1" or lower by Moody's, the Moody's Rating of such corporate guarantee shall be two rating subcategories below the rating of the other security;

(d)      if the corporate guarantee or obligation is a senior secured obligation of the guarantor or obligor and the other security is a senior unsecured obligation:

(1)      rated "Baa3" or higher by Moody's, the Moody's Rating of such corporate guarantee shall be the rating of the other security; or

(2)      rated "Ba1" or lower by Moody's, the Moody's Rating of such corporate guarantee shall be one rating subcategory above the rating of the other security;

(e)      if the corporate guarantee or obligation is a senior unsecured obligation of the guarantor or obligor and the other security is also a senior unsecured obligation, the Moody's Rating of such corporate guarantee shall be the rating of the other security;

(f)      if the corporate guarantee or obligation is a subordinated obligation of the guarantor or obligor and the other security is a senior unsecured obligation:

(1)      rated "B1" or higher by Moody's, the Moody's Rating of such corporate guarantee shall be two rating subcategories below the rating of the other security; or

(2)      rated "B2" or lower by Moody's, the Moody's Rating of such corporate guarantee shall be one rating subcategory below the rating of the other security;

(g)      if the corporate guarantee or obligation is a senior secured obligation of the guarantor or obligor and the other security is a subordinated obligation:

(1)    rated "Baa3" or higher by Moody's, the Moody's Rating of such corporate guarantee shall be one rating subcategory above the rating of the other security;

(2)    rated below "Baa3" but not rated "B3" by Moody's, the Moody's Rating of such corporate guarantee shall be two rating subcategories above the rating of the other security; or

(3)    rated "B3" by Moody's, the Moody's Rating of such corporate guarantee shall be "B2";

(h)    if the corporate guarantee or obligation is a senior unsecured obligation of the guarantor or obligor and the other security is a subordinated obligation:

(1)    rated "Baa3" or higher by Moody's, the Moody's Rating of such corporate guarantee shall be one rating subcategory above the rating of the other security;

(2)    rated "Ba1" or lower by Moody's, the Moody's Rating of such corporate guarantee shall also be one rating subcategory above the rating of the other security; or

(i)    if the Collateral Asset is a subordinated obligation of the guarantor or obligor and the other security is also a subordinated obligation, the Moody's Rating of such corporate guarantee or obligation shall be the rating of the other security;

(ii)    with respect to corporate obligations or guarantees issued by U.S., U.K. or Canadian obligors or guarantors or by any other Qualifying Foreign Obligor, if such corporate obligation or guarantee is not rated by Moody's, and no other security or obligation of the guarantor is rated by Moody's, then the Moody's Rating of such corporate obligation or guarantee may be determined using any one of the methods below:

(a)    (1) if such corporate obligation or guarantee is rated by Standard & Poor's, then the Moody's Rating of such corporate obligation or guarantee will be (x) one subcategory below the Moody's equivalent of the rating assigned by Standard & Poor's if such security is rated "BBB–" or higher by Standard & Poor's and (y) two subcategories below the Moody's equivalent of the rating assigned by Standard & Poor's if such security is rated "BB+" or lower by Standard & Poor's; *provided* that the Aggregate Principal Amount that may be given a rating based on an Standard & Poor's rating as provided in this

subclause (a)(1) may not exceed 10% of the Aggregate Principal Amount; and

(2)    if such corporate obligation or guarantee is not rated by Standard & Poor's but another security or obligation of the guarantor is rated by Standard & Poor's (a "parallel security"), then the Moody's equivalent of the rating of such parallel security will be determined in accordance with the methodology set forth in subclause (a)(1) above, and the Moody's Rating of such corporate obligation or guarantee will be determined in accordance with the methodology set forth in clause (iii) above (for such purpose treating the parallel security as if it were rated by Moody's at the rating determined pursuant to this subclause (2));

(b)    if such corporate obligation or guarantee is not rated by Moody's or Standard & Poor's, and no other security or obligation of the guarantor is rated by Moody's or Standard & Poor's, then the Issuer or the Collateral Manager, on behalf such of the Issuer, may present such corporate obligation or guarantee to Moody's for an estimate of such Collateral Asset's rating factor, from which its corresponding Moody's rating may be determined, which shall be its Moody's Rating;

(c)    with respect to a corporate obligation or guarantee issued by a U.S. corporation, if (1) neither the guarantor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings, (2) no debt securities or obligations of the guarantor are in default, (3) neither the guarantor nor any of its Affiliates has defaulted on any debt during the past two years, (4) the guarantor has been in existence for the past five years, (5) the guarantor is current on any cumulative dividends, (6) the fixed-charge ratio for the guarantor exceeds 125% for each of the past two fiscal years and for the most recent quarter, (7) the guarantor had a net profit before tax in the past fiscal year and the most recent quarter and (8) the annual financial statements of the guarantor are unqualified and certified by a firm of independent accountants of national reputation, and quarterly statements are unaudited but signed by a corporate officer, the Moody's Rating of such corporate obligation or guarantee will be "B3";

(d)    with respect to a corporate obligation or guarantee issued by a non-U.S. guarantor, if (1) neither the guarantor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings and (2) no debt security or obligation of the guarantor has been in default during the past two years, the Moody's Rating of such Collateral Asset will be "Caa2"; and

(e)    if a debt security or obligation of the guarantor has been in default during the past two years, the Moody's Rating of such Collateral Asset will be "Ca".

(v)    with respect to a Collateral Asset that is an RMBS Agency Security, the Moody's Rating of such Collateral Asset will be the rating assigned by Moody's to the agency which guarantees such RMBS Agency Security; and

(vi)    if such Collateral Asset is a Synthetic Security, the Moody's Rating of such Synthetic Security shall be the rating assigned thereto by Moody's in connection with the acquisition thereof by the Issuer upon the request of the Issuer or the Collateral Manager; *provided* that the Moody's Rating of any Form-Approved Synthetic Security not rated by Standard & Poor's or Moody's will be the rating assigned by Moody's to the Reference Obligation.

"Moody's Rating Factor" relating to any Collateral Asset is the number set forth in the table below opposite the Moody's Rating of such Collateral Asset.

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1,350 |
| Aa2 | 20 | Ba3 | 1,766 |
| Aa3 | 40 | B1 | 2,220 |
| A1 | 70 | B2 | 2,720 |
| A2 | 120 | B3 | 3,490 |
| A3 | 180 | Caa1 | 4,770 |
| Baa1 | 260 | Caa2 | 6,500 |
| Baa2 | 360 | Caa3 | 8,070 |
| Baa3 | 610 | Ca or lower | 10,000 |

The diversity score methodology and correlation coefficient's methodology may be updated from time to time by Moody's as demonstrated by a published report distributed by Moody's and applied across all collateralized debt obligation transactions.

For purposes of the Moody's Maximum Rating Distribution Test, if a Collateral Asset does not have a Moody's Rating assigned to it at the date of acquisition (other than RMBS

Agency Securities), the Moody's Rating Factor with respect to such Collateral Asset shall be 10,000 for a period of 90 days from the acquisition of such Collateral Asset. After such 90 day period, if such Collateral Asset is not rated by Moody's and no other security or obligation of the issuer thereof or obligor thereon is rated by Moody's and the Issuer or the Collateral Manager seeks to obtain an estimate of a Moody's Rating Factor, then the Moody's Rating Factor of such Collateral Asset will be deemed to be such estimate thereof as may be assigned by Moody's upon the request of the Issuer or the Collateral Manager.

"Moody's Recovery Rate" means, with respect to a Collateral Asset, an amount equal to the percentage for such Collateral Asset set forth in the recovery rate assumptions for Moody's attached as Part I of Schedule A to the Indenture, in (x) the table corresponding to the relevant classification of such Collateral Asset, (y) the column in such table setting forth the Moody's Rating of such Collateral Asset as of the date on which such Collateral Asset was originally issued and (z) the row in such table opposite the percentage of the Issue of which such Collateral Asset is a part relative to the total capitalization of (including both debt and equity securities issued by) the relevant issuer of or obligor on such Collateral Asset determined on the date on which such Collateral Asset was obtained in accordance with Part I of Schedule A to the Indenture.

"Moody's Weighted Average Recovery Rate" will equal the number obtained by summing the products obtained by *multiplying* the Principal Balance of each Collateral Asset *by* its Moody's Recovery Rate (determined for purposes of this definition pursuant to clause (a) of the definition of Applicable Recovery Rate), *dividing* such sum *by* the aggregate Principal Balance of all such Collateral Assets, *multiplying* the result *by* 100 and *rounding up* to the first decimal place. For purposes of the Moody's Weighted Average Recovery Rate, the Principal Balance of a Defaulted Obligation will be deemed to be equal to its outstanding principal amount (without regard to any deferred and capitalized interest).

"Mutual Fund Fees Securities" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of brokerage fees and costs relating to various mutual funds, generally having the following characteristics: (1) the brokerage arrangements have standardized payment terms and require minimum payments; (2) the brokerage fees and costs arise out of numerous mutual funds and accordingly represent a very diversified pool of credit risk; and (3) the collection of brokerage fees and costs can vary substantially from the contractual payment schedule (if any), with collection depending on numerous factors specific to the particular mutual funds, interest rates and general economic matters.

"Mortgage-Backed Securities" means any Residential Mortgage-Backed Securities or Commercial Mortgage-Backed Securities.

"Necessary Fixed Crossover Amount" means an amount equal to (x) if (i) the sum of (a) a number obtained by summing the products obtained by *multiplying* (1) the Current Interest Rate on each Collateral Asset that is a Fixed Rate Asset or Deemed Fixed Collateral Asset (excluding all Defaulted Obligations) by (2) the Principal Balance of each such Collateral Asset plus (b) the payments in such period applicable to any interest rate cap *divided* by (ii) the

aggregate Principal Balance of all Collateral Assets that are Fixed Rate Assets or Deemed Fixed Collateral Assets (excluding Defaulted Obligations), is less than the Minimum Weighted Average Coupon for such Measurement Date, the lesser of (I) the Gross Spread Excess, if any, as of such Measurement Date and (II) an amount, if added to clauses (a) and (b) and then *divided* by (ii) would equal the Minimum Weighted Average Coupon, or (y) otherwise, zero.

"Necessary Spread Crossover Amount" means an amount equal to (x) if (a) a number obtained by summing the products obtained by multiplying (1) the Spread on each Collateral Asset that is a Floating Rate Asset or a Deemed Floating Collateral Asset (other than a Defaulted Obligation) as of such date by (2) the Principal Balance of each such Collateral Asset divided by (b) the aggregate Principal Balance of all Collateral Assets that are Floating Rate Assets or Deemed Floating Collateral Assets (excluding Defaulted Obligations), is less than the Minimum Weighted Average Spread for such Measurement Date, the lesser of (i) the Gross Fixed Rate Excess, if any, as of such Measurement Date and (ii) an amount, if added to clause (a) and then divided by (b) would equal the Minimum Weighted Average Spread, or (y) otherwise, zero.

"Negative Amortization Security" means an RMBS Security which (a) permits the related mortgage loan or mortgage loan obligor for a specified period of time to make no repayments of principal and payments of interest in amounts that are less than the interest payments that would otherwise be payable thereon based upon the stated rate of interest thereon, (b) to the extent that interest proceeds received in respect of the related underlying collateral are insufficient to pay interest that is due and payable thereon, permits principal proceeds received in respect of the related underlying collateral to be applied to pay such interest shortfall and (c) to the extent that the aggregate amount of interest proceeds and principal proceeds received in respect of the related underlying collateral are insufficient to pay interest that is due and payable thereon, permits such unpaid interest to be capitalized as principal and itself commence accruing interest at the applicable interest rate, in each case pursuant to the related Underlying Instruments.

"Net Outstanding Portfolio Collateral Balance" means, on any Measurement Date, an amount equal to (i) the aggregate Principal Balance on such Measurement Date of all Collateral Assets, *plus* (ii) the aggregate Principal Balance of all Principal Proceeds held as Cash and Eligible Investments purchased with Principal Proceeds, *minus* (iii) the aggregate Principal Balance on such Measurement Date of all Collateral Assets that are Defaulted Obligations or Written Down Securities, *plus* (iv) the Aggregate Calculation Amount of Defaulted Obligations *plus* (v) with respect to Written Down Securities, the Written Down Amount, *minus* (vi) any portion of the Principal Balance of a Collateral Asset which is comprised of principal carryforward amounts. For the purpose of calculating the Net Outstanding Portfolio Collateral Balance in connection with the Overcollateralization Tests, the Principal Balance of any Negative Amortization Security shall be deemed to be (i) 99% of par value of such Negative Amortization Security if its Principal Balance equals at least 106% but less than 107% of par value; (ii) 98% of par value of such Negative Amortization Security if its Principal Balance equals at least 107% but less than 108% of par value; or (iii) 97% of par value of such Negative Amortization Security if its Principal Balance equals at least 108% of par value and the Principal Balance of any Collateral Asset shall be (A) discounted by the Moody's/S&P Haircut Amount, if applicable and (B) deemed to be, with respect to Collateral Assets with a Moody's Rating

(1) above *"A1"* that was purchased by the Issuer at a purchase price equal to or greater than (x) in the case of a Floating Rate Security, 92% of the Outstanding Principal Amount (as of the trade date) and (y) in the case of a Fixed Rate Security, 85% of the Outstanding Principal Amount (as of the trade date), the Outstanding Principal Amount of such Collateral Asset, (2) above *"A1"* that was purchased by the Issuer at a purchase price lower than (x) in the case of a Floating Rate Security, 92% of the Outstanding Principal Amount (as of the trade date) and (y) in the case of a Fixed Rate Security, 85% of the Outstanding Principal Amount (as of the trade date), the purchase price paid by the Issuer for such Collateral Asset, (3) below *"Aa3"* that was purchased by the Issuer at a purchase price equal to or greater than 75% of the Outstanding Principal Amount (as of the trade date), the lesser of (x) the Outstanding Principal Amount of such Collateral Asset and (y) the Outstanding Principal Amount of such Collateral Asset discounted by the Moody's portion of the Moody's/S&P Haircut Amount applicable to such Collateral Asset and (4) below *"Aa3"* that was purchased by the Issuer at a purchase price lower than 75% of the Outstanding Principal Amount (as of the trade date), the lesser of (x) the purchase price paid by the Issuer for such Collateral Asset and (y) the Outstanding Principal Amount of such Collateral Asset discounted by the Moody's portion of the Moody's/S&P Haircut Amount applicable to such Collateral Asset; *provided* that, if any Collateral Asset falls under more than one of clauses (A) or (B) above (or any subclause thereof), the Principal Balance of any such Collateral Asset shall be discounted only once at the rate that results in the greatest single reduction of its Principal Balance.

"NIM Security" means a net-interest margin security.

"Non-Call Period" means the period from the Closing Date to but excluding the Payment Date in July 2011.

"Non-U.S. Securities" means securities that are issued outside of the United States by issuers other than issuers organized under the laws of a commonly used domicile for a structured product transaction.

"Note Interest Rate" means, with respect to the Notes of any Class or Sub-class for any Interest Accrual Period, the annual rate at which interest accrues on the Notes of such Class or Sub-class for such Interest Accrual Period, as specified in Section 2.2(b).

"Noteholder" means the person in whose name a Note is registered, or, for purposes of voting, the granting of consents and other similar determinations under the Indenture, with respect to any Notes in global form, a beneficial owner thereof according to the Procedures of the Depository.

"Note Register" and "Note Registrar" have the respective meanings specified in Section 2.4(a).

"Note Valuation Report" has the meaning specified in Section 10.6.

"Notes" means the Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C Notes, Class D-1 Notes and Class D-2 Notes constituted by, and authenticated and delivered under this Indenture.

"<u>Obligor</u>" means, with respect to any Collateral Asset, the entity or company that issued the asset; *provided* that a unique Obligor represents all assets backed by a unique pool of underlying collateral and two single special purpose entities will not be deemed to be the same issuer if they are backed by separate pools of assets only available to make required payments in respect of the applicable securitization.

"<u>Offer</u>" means, with respect to any security, (i) any offer by the issuer of such security or by any other person made to all of the holders of such security to purchase or otherwise acquire such security (other than pursuant to any redemption in accordance with the terms of its Underlying Instruments) or to convert or exchange such security into or for cash, securities or any other type of consideration or (ii) any solicitation by the issuer of such security or any other person to amend, modify or waive any provision of such security or any of its Underlying Instruments.

"<u>Offering</u>" means the offering of the Notes and the Preference Shares under the Offering Circular.

"<u>Offering Circular</u>" means the Offering Circular, dated as of July 3, 2006, prepared and delivered in connection with the offer and sale of the Notes and the Preference Shares, as amended or supplemented.

"<u>Officer</u>" means, with respect to the Issuer, the Co-Issuer and any other corporation, any Director, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer of such entity; with respect to any partnership, any general partner thereof; and with respect to any bank or trust company acting as trustee of an express trust or as custodian, any Trust Officer.

"<u>Oil and Gas Securities</u>" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from (a) a pool of franchise loans made to operators of franchises that provide oil and gasoline and provide other services related thereto and (b) leases or subleases of equipment to such operators for use in the provision of such goods and services. They generally have the following characteristics: (1) the loans, leases or subleases have varying contractual maturities; (2) the loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the obligations of the lessors or sublessors of the equipment may be secured not only by the leased equipment but also the related real estate; (4) the loans, leases and subleases are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; (5) payment of the loans can vary substantially from the contractual payment schedule (if any), with prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans include an effective prepayment premium; (6) the repayment stream on the leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, a sublessee or third party of the underlying equipment; (7) such leases and subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to

payments at the end of a lease term for excess usage or wear and tear; and (8) the ownership of a franchise right or other similar license and the creditworthiness of such franchise operators is the primary factor in any decision to invest in these securities.

"Opinion of Counsel" means a written opinion addressed to the Trustee, the Hedge Counterparty and each Rating Agency (each, a "Recipient"), in form and substance reasonably satisfactory to each Recipient, of an attorney at law admitted to practice before the highest court of any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer or the Co-Issuer, as the case may be, and which attorney shall be reasonably satisfactory to the Trustee. Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to each Recipient or shall state that each Recipient shall be entitled to rely thereon.

"Optional Redemption" has the meaning specified in Section 9.1.

"Optional Redemption Price" means (i) with respect to the Class A-1A Notes, an amount equal to the Aggregate Outstanding Amount of the Class A-1A Notes plus accrued and unpaid interest thereon at the Class A-1A Note Interest Rate (including Defaulted Interest and interest on Defaulted Interest) to but excluding the Redemption Date, (ii) with respect to the Class A-1B Notes, an amount equal to the Aggregate Outstanding Amount of the funded Class A-1B Notes plus accrued and unpaid interest thereon at the Class A-1B Note Interest Rate (including Defaulted Interest and interest on Defaulted Interest) to but excluding the Redemption Date, (iii) with respect to the Class A-2 Notes, an amount equal to the Aggregate Outstanding Amount of the Class A-2 Notes plus accrued and unpaid interest thereon at the Class A-2 Note Interest Rate (including Defaulted Interest and interest on Defaulted Interest) to but excluding the Redemption Date, (iv) with respect to the Class B Notes, the Aggregate Outstanding Amount of the Class B Notes plus accrued and unpaid interest thereon at the Class B Note Interest Rate (including Defaulted Interest and interest on Defaulted Interest) to but excluding the Redemption Date, (v) with respect to the Class C Notes, the Aggregate Outstanding Amount of the Class C Notes plus accrued and unpaid interest thereon at the Class C Note Interest Rate (including Class C Deferred Interest) to but excluding the Redemption Date, (vi) with respect to the Class D-1 Notes, the Aggregate Outstanding Amount of the Class D-1 Notes plus accrued and unpaid interest thereon at the Class D-1 Note Interest Rate (including Class D Deferred Interest) to but excluding the Redemption Date, (vii) with respect to the Class D-2 Notes, the Aggregate Outstanding Amount of the Class D-2 Notes plus accrued and unpaid interest thereon at the Class D-2 Note Interest Rate (including Class D Deferred Interest) to but excluding the Redemption Date and (viii) with respect to each of the Preference Shares, any amounts remaining after payment of (x) U.S.$600 to the holders of the Issuer's Ordinary Shares and (y) amounts set forth in clauses (i) through (vii) above.

"Ordinary Shares" means the 300 ordinary shares of the Issuer with par value of $1.00 per share.

"Outstanding" or "outstanding" means with respect to any Class of Notes, as of any date of determination, all of the Notes of such Class theretofore authenticated and delivered under this Indenture as of such date except:

       (a)      Notes theretofore canceled by the Note Registrar or delivered to the Note Registrar for cancellation;

       (b)      Notes or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee in trust for the Holders of such Notes; *provided*, that, if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to the Indenture or provision therefor satisfactory to the Trustee has been made;

       (c)      Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a holder in due course;

       (d)      Notes alleged to have been mutilated, destroyed, lost or stolen for which replacements have been issued as provided in Section 2.5 hereof;

       (e)      in connection with any waiver, (i) all Notes (if any) held by the Trustee and its Affiliates if the relevant waiver relates to a default arising primarily from any act or omission of the Trustee and (ii) all Notes (if any) held by the Collateral Manager and its Affiliates if the relevant waiver relates to a default arising primarily from any act or omission of the Collateral Manager; and

       (f)      in connection with the termination of the Trustee or the Collateral Manager, as applicable, (i) all Notes (if any) held by the Trustee and its Affiliates if the termination relates to a default arising primarily from any act or omission of the Trustee and (ii) all Notes (if any) held by the Collateral Manager and its Affiliates; and

*provided*, that in determining whether the Holders of the requisite aggregate outstanding principal amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Notes owned by the Issuer or the Co-Issuer or any other obligor upon the Notes or any Affiliate thereof shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that the Trustee knows to be so owned shall be so disregarded.  Notes so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Securities and that the pledgee is not the Issuer, the Co-Issuer, the Collateral Manager or any other obligor upon the Notes or any Affiliate of the Issuer, the Co-Issuer, the Collateral Manager or such other obligor.

"Overcollateralization Ratio" means the Class A Overcollateralization Ratio, the Class B Overcollateralization Ratio, the Class C Overcollateralization Ratio and the Class D Overcollateralization Ratio.

"Overcollateralization Tests" means the Class A Overcollateralization Test, the Class B Overcollateralization Test, the Class C Overcollateralization Test and the Class D Overcollateralization Test.

"Paying Agent" means any Person authorized by the Issuer to pay the principal of and interest on any Notes on behalf of the Issuers as specified in Section 7.2.

"Payment Account" means the Securities Account designated the "Payment Account" and established in the name of the Trustee pursuant to Section 10.3(a).

"Payment Date" means any Monthly Payment Date or Quarterly Payment Date, as the context may require.

"Payment Report" has the meaning specified in Section 10.6(a).

"Permitted Offer" means an offer (i) pursuant to the terms of which the offeror offers to acquire a debt obligation (including a Collateral Asset) in exchange for consideration consisting solely of cash in an amount equal to or greater than the full face amount of such debt obligation *plus* any accrued and unpaid interest and (ii) as to which the Collateral Manager has determined in its judgment that the offeror has sufficient access to financing to consummate the offer.

"Person" means an individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"Pledged Collateral Asset" means as of any date of determination, any Collateral Asset that has been Granted to the Trustee and has not been released from the lien of this Indenture pursuant to Section 10.7.

"Pledged Securities" means, on any date of determination, the Collateral Assets and the Eligible Investments that have been Granted to the Trustee and any equity security which forms part of the Collateral.

"Preference Share Documents" means the Issuer Charter and related resolutions, the Preference Share Paying Agency Agreement and certain resolutions passed by the Issuer's Board of Directors concerning the Preference Shares.

"Preference Share Hurdle Return" means, with respect to each Quarterly Payment Date, the discount rate that would result in a net present value of zero, assuming (i) an aggregate purchase price of US $1,000 per Preference Share for the Preference Shares as the initial negative cash flow on the Closing Date and all distributions by way of dividends to the Holder of the Preference Shares on such Quarterly Payment Date and each preceding Quarterly Payment Date as positive cash flows, (ii) the Closing Date as the initial date of calculation and (iii) the number of days to each subsequent Payment Date from the Closing Date being calculated on the basis of a 360-day year consisting of four 90-day quarters; *provided* that the number of days from the Closing Date to the first Quarterly Payment Date shall be treated as 92 days.  Such

Preference Share Hurdle Return shall be calculated on a corporate bond equivalent basis for the Preference Shares.

"Preference Share Paying Agency Agreement" means the Preference Share paying agency agreement dated as of the Closing Date between the Issuer, the Preference Share Paying Agent and the Preference Share Registrar.

"Preference Share Paying Agent" means JPMorgan Chase Bank, National Association (or any successor thereto), as Preference Share Paying Agent for the Preference Shares, or any Person authorized by the Issuer from time to time to make payments on the Preference Shares and to deliver notices to the Preference Shareholders on behalf of the Issuer.

"Preference Share Register" means the register maintained by the Preference Share Registrar that provides for the registration of the Preference Shares and Ordinary Shares and registration of transfers of Preference Shares and Ordinary Shares.

"Preference Share Registrar" means Walkers SPV Limited and any successor thereto.

"Preference Shareholders" means Persons in whose names the Preference Shares are registered in the ownership register relating to the Preference Shares maintained by the Preference Share Registrar.

"Preference Shares" means the 9,500 Preference Shares, par value U.S.$0.01 per share and having a liquidation preference of U.S.$1,000 per share.

"Principal Balance" means, with respect to any Collateral Asset or Eligible Investment, as of any date of determination, the outstanding principal amount of such Collateral Asset or Eligible Investment; subject to the following exceptions: (i) the Principal Balance of any Synthetic Security in the form of a derivative contract (or, if the Issuer paid such notional amount to the Synthetic Security Counterparty when it entered into the Synthetic Security, the aggregate amount of the repayment obligations of the Synthetic Security Counterparty payable to the Issuer through the maturity of such Synthetic Security) will be the notional amount of such Synthetic Security and any Synthetic Security in the form of a note will be equal to the principal amount of the Synthetic Security; (ii) the Principal Balance of a Collateral Asset received upon acceptance of an Offer to exchange a Collateral Asset for such Collateral Asset shall be deemed to be the percentage of the outstanding principal amount equal to the lesser of (a) the amount equal to the Applicable Recovery Rate times the outstanding principal amount and (b) if provided, the Market Value of such Collateral Asset, determined according to commercially reasonable standards, until such time, in each case, as Proceeds are first received when due with respect to such Collateral Asset; (iii) the Principal Balance of each Defaulted Obligation shall (A) for purposes of the Calculation Amount and any Collateral Profile Test, be its outstanding principal amount without giving effect to any deferred or capitalized interest, (B) for purposes of calculating any trustee fees and the Collateral Manager Fee, the Principal Balance of each Defaulted Obligation shall equal the Applicable Recovery Rate for each such Defaulted Obligation; (iv) the Principal Balance of any cash shall be the amount of such cash; (v) the Principal Balance of any Collateral Assets and any Eligible Investments in which the Trustee

does not have a perfected security interest shall be deemed to be zero; (vi) the Principal Balance of any Collateral Asset that is an equity security or an Interest Only Security shall be deemed to be zero; and (vii) the Principal Balance of any Synthetic Security Collateral shall be deemed to be zero as long as the related Synthetic Security is outstanding.

"Principal Only Security" means any Collateral Debt Security that does not provide for the periodic payment of interest.

"Principal Proceeds" means, with respect to any Due Period, the sum (without duplication) of: (i) the net proceeds from the sale of Securities (including any net proceeds from any subsequent issuance or funding of Notes); (ii) all payments of principal on the Collateral Assets and Eligible Investments received in cash by the Issuer during such Due Period, including principal payments received on any Synthetic Security Collateral if the related Synthetic Security has terminated and the Issuer has no further payment obligations thereunder, prepayments or mandatory sinking fund payments, or payments in respect of optional redemptions, exchange offers, tender offers, (other than payments of principal of Eligible Investments acquired with Proceeds other than Principal Proceeds), Unscheduled Principal Payments and recoveries on Defaulted Obligations; (iii) all payments of interest on the Collateral Assets and Eligible Investments received in cash by the Issuer during such Due Period to the extent such payments constitute proceeds from accrued interest purchased with Principal Proceeds (subject to the last sentence below); (iv) Sale Proceeds received by the Issuer during such Due Period (excluding accrued interest on sold or disposed of Collateral Assets or Eligible Investments other than accrued interest that was purchased with Principal Proceeds (subject to the last sentence below)) including any proceeds from the sale of any interest rate caps; (v) all interest, amendment, waiver, late payment fees, restructuring and other fees and commissions collected in cash during the related Due Period in respect of Defaulted Obligations; (vi) any proceeds resulting from the termination, replacement, partial reduction or liquidation of any Hedge Agreement, to the extent such proceeds exceed the cost of entering into a replacement Hedge Agreement; (vii) after the Reinvestment Period, with respect to any Collateral Asset, any prepayment premiums, received but not in excess of the purchase premium paid thereon and (viii) Unused Proceeds.  For avoidance of doubt, all amounts credited to the Reserve Account will be treated as Interest Proceeds only and, with respect to any Collateral Asset, Principal Proceeds (i) will include (a) the interest payment actually received on the first payment date of such Collateral Asset occurring after the date of acquisition by the Issuer, but only to the extent such interest payment represents accrued interest outstanding on such Collateral Asset at the time it was acquired, and (b) if such Collateral Asset is sold prior to the first payment date of such Collateral Asset occurring after the date of acquisition by the Issuer, that portion of the Sale Proceeds representing compensation to the Issuer for accrued but unpaid interest on such sold Collateral Asset, but only to the extent that such amount represents accrued interest outstanding on such Collateral Asset at the time it was acquired by the Issuer; and (ii) will not include (a) any interest payment actually received with respect to such Collateral Asset on any payment date of such Collateral Asset other than the first payment date of such Collateral Asset occurring after the date of acquisition by the Issuer, and (b) if such Collateral Asset is sold after the first payment date of such Collateral Asset occurring after the date of acquisition by the Issuer, any portion of the Sale Proceeds representing compensation to the Issuer for accrued but unpaid interest.

"Priority of Payments" has the meaning specified in Section 11.1(a).

-55-

"Proceeding" means any suit in equity, action at law or other judicial or administrative proceeding.

"Proceeds" means, with respect to any Due Period, without duplication, all amounts received by the Trustee with respect to the Collateral Assets (excluding amounts received on any related Synthetic Security in Collateral for so long as the related Synthetic Security remains outstanding unless otherwise provided in the related Synthetic Security), all amounts received as amendment, waiver, late payment fees and commissions collected during the Due Period on Collateral Assets, all amounts received with respect to Eligible Investments in the Accounts and all amounts received under any Hedge Agreement relating to the Due Period, including Principal Proceeds.

"Project Finance Securities" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from (1) the sale of products, such as electricity, nuclear energy, steam or water, in the utility industry by a special purpose entity formed to own the assets generating or otherwise producing such products and such assets were or are being constructed or otherwise acquired primarily with the proceeds of debt financing made available to such entity on a limited-recourse basis (including recourse to such assets and the land on which they are located) or (2) fees or other usage charges, such as tolls collected on a highway, bridge, tunnel or other infrastructure project, collected by a special purpose entity formed to own one or more such projects that were constructed or otherwise acquired primarily with the proceeds of debt financing made available to such entity on a limited-recourse basis (including recourse to the project and the land on which it is located).

"Proposed Portfolio" means the portfolio (measured by Principal Balance) of Collateral Assets and Principal Proceeds held as Cash and Eligible Investments purchased with Principal Proceeds, on any Measurement Date, resulting from the sale, maturity or other disposition of a Collateral Asset or a proposed acquisition of a Collateral Asset, as the case may be.

"Qualified Institutional Buyer" has the meaning given in Rule 144A under the Securities Act.

"Qualified Purchaser" means (a) a "qualified purchaser" as defined in the Investment Company Act, (b) a company beneficially owned exclusively by one or more "qualified purchasers", (c) a "knowledgeable employee" with respect to the Issuer as specified in Rule 3c-5 promulgated under the Investment Company Act or (d) a company owned exclusively by one or more "knowledgeable employees" with respect to the Issuer.

"Qualifying Foreign Obligor" means a corporation, partnership or other entity organized in any of Australia, Canada, France, Germany, Ireland, New Zealand, Sweden, Switzerland or the United Kingdom, so long as the unguaranteed, unsecured and otherwise unsupported long-term Dollar sovereign debt obligations of such country are rated "Aa2" or better by Moody's (and, if rated "Aa2", are not on watch for possible downgrade by Moody's), "AA" or better by Standard & Poor's and "AA" or better by Fitch.

"Qualifying Investment Vehicle" means a Flow-Through Investment Vehicle as to which all of the beneficial owners of any securities issued by the Flow-Through Investment Vehicle have made, and as to which (in accordance with the document pursuant to which the Flow-Through Investment Vehicle was organized or the agreement or other document governing such securities) each such beneficial owner must require any transferee of any such security to make, to the Issuer or the Issuers, as the case may be, and the Note Registrar (or, with respect to the Preference Shares, the Preference Share Registrar) each of the representations set forth herein and in (a) the Offering Circular and an Subscription Agreement or (b) the transfer certificate pursuant to which Notes or Preference Shares were transferred to such Flow-Through Investment Vehicle (in each case, with appropriate modifications to reflect the indirect nature of their interests in the Notes or the Preference Shares and including any modification permitting an initial beneficial owner of securities issued by such entity to represent that it is an Institutional Accredited Investor).

"Quarterly Payment Date" means, the 5th day of every January, April, July and October, or if any such date is not a Business Day, the immediately following Business Day, commencing in October 2006.

"Ramp-Up Notice" has the meaning specified in Section 7.18(d).

"Ramp-Up Period" means the period from, and including, the Closing Date to, and including, the Effective Date.

"Rating Agency" means each of (a) Moody's, for so long as any of the Outstanding Notes are rated by Moody's (including any private or confidential rating) and (b) Standard & Poor's, for so long as any of the Outstanding Notes are rated by Standard & Poor's (including any private or confidential rating) or, with respect to Pledged Securities generally, if at any time Moody's or Standard & Poor's ceases to provide rating services with respect to Asset-Backed Securities, any other nationally recognized investment rating agency selected by the Issuer and reasonably satisfactory to a Majority of each Class of Notes. In the event that at any time Moody's or Standard & Poor's ceases to be a Rating Agency, references to rating categories of Moody's or Standard & Poor's in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and Moody's or Standard & Poor's published ratings for the type of security in respect of which such alternative rating agency is used.

"Rating Agency Condition" means, with respect to any action taken or to be taken under the Transaction Documents, a condition that is satisfied when each of Moody's and Standard & Poor's, unless expressly required otherwise by the Transaction Documents, has confirmed in writing to the Issuer and the Collateral Manager that such action will not result in the immediate withdrawal, reduction or other adverse action with respect to any then current long term rating (including any private or confidential rating) of the Notes by such Rating Agency. As specified in the Transaction Documents, the Rating Agency Condition may apply only with respect to a particular Rating Agency, and Holders of a Class of Notes may waive satisfaction of the Rating Agency Condition with respect to their Class of Notes and if the Rating Agency Condition is so waived by the Notes, the Rating Agencies will still be given notice.

"Rating Confirmation Failure" has the meaning specified in Section 7.18(d).

"Ratings Event" means, with respect to any Hedge Agreement, the occurrence of any of the following: (i) the long-term senior unsecured debt rating of the Hedge Rating Determining Party from Moody's is withdrawn, suspended or falls to or below "A2", if its Hedge Rating Determining Party has no short-term senior unsecured debt rating; (ii) the long-term senior unsecured debt rating of its Hedge Rating Determining Party from Moody's is withdrawn, suspended or falls to or below "A3" or the short-term senior unsecured debt rating of the Hedge Rating Determining Party from Moody's falls to or below "P-2"; (iii) the long-term senior unsecured debt rating of its Hedge Rating Determining Party from Standard & Poor's is withdrawn, suspended or falls below "BBB-"; or (v) the failure of the Hedge Counterparty to satisfy the requirements under Part 5(b)(1)(ii) of the Schedule to the Master Agreement forming part of the Hedge Agreement.

"Record Date" means, (i) with respect to any Payment Date and any Securities issued in book entry form, the close of business on the Business Day prior to such Payment Date, and (ii) with respect to any Payment Date and any Securities issued in definitive form, the close of business 15 days (whether or not a Business Day) prior to such Payment Date.

"Recreational Vehicle Securities" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from installment sale loans made to finance the acquisition of, or from leases of, recreational vehicles, generally having the following characteristics: (1) the loans or leases may have varying contractual maturities; (2) the loans or leases are obligations of numerous borrowers or lessors and accordingly represent a very diversified pool of obligor credit risk; (3) the borrowers or lessees under the loans or leases generally do not have a poor credit rating; (4) the repayment stream on such loans or leases is primarily determined by a contractual payment schedule, with early repayment on such loans or leases predominantly dependent upon the disposition of the underlying recreational vehicle; and (5) such leases typically provide for the right of the lessee to purchase the recreational vehicle for its stated residual value, subject to payments at the end of lease term for excess mileage or use.

"Redemption" means, collectively, an Optional Redemption, a Tax Redemption, a redemption pursuant to an Auction or a redemption pursuant to a Clean-up Call.

"Redemption Date" means any date set for a Redemption of Notes pursuant to Sections 9.1, 9.4, 9.5 or 9.6 or, if such date is not a Business Day, the next following Business Day.

"Redemption Date Statement" has the meaning specified in Section 10.6(c).

"Redemption Price" means the Optional Redemption Price, Tax Redemption Price, Auction Call Redemption Price or Clean-up Call Redemption Price, as applicable.

"Reference Banks" means four major banks in the London interbank market selected by the Calculation Agent.

"Reference Obligation" means a Residential Mortgage Backed Security, Commercial Mortgage Backed Security, CDO Security, Insured Security or Asset Backed Security upon which a Synthetic Security is based and that satisfies the criteria set forth in the definition of Synthetic Security.

"Reference Obligor" means the obligor on a Reference Obligation.

"Registered" means in registered form for U.S. Federal income tax purposes and issued after July 18, 1984, *provided* that a certificate of interest in a grantor trust for U.S. Federal income tax purposes shall not be treated as Registered unless each of the obligations or securities held by the trust was issued after that date.

"Registered Form" has the meaning specified in Section 8-102(a)(13) of the UCC.

"Regulation S" means Regulation S under the Securities Act.

"Regulation S Definitive Note" has the meaning specified in Section 2.4(b)(i)(F).

"Regulation S Global Note" has the meaning specified in Section 2.1(a).

"Regulation S Note" has the meaning specified in Section 2.1(a).

"Regulation S Transfer Certificate" has the meaning specified in Section 2.4(b)(i)(C).

"Regulation U" means Regulation U of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 221, or any successor regulation.

"Reinvestment Criteria" has the meaning specified in Section 12.2(e).

"Reinvestment Period" means the period from the Closing Date and ending on the first to occur of (i) the end of the Due Period related to the Payment Date in July 2011, (ii) the occurrence of an Event of Default resulting in acceleration of the Notes, (iii) the Payment Date immediately following the date on which the Collateral Manager notifies the Trustee in writing that the Reinvestment Period should terminate because investments in additional Collateral Assets within the foreseeable future would either be impractical or not beneficial.

"REIT Debt Security" means a debt security issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision).

"Relevant Persons" has the meaning specified in Section 2.7.

"Repository" means the internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at www.cdolibrary.com.

"Reserve Account" means the Securities Account referred to as the "Reserve Account" and established by the Securities Intermediary in the name of the Trustee pursuant to Section 10.2(o).

"Residential Mortgage Backed Securities" or "RMBS Securities" means securities that represent interests in pools of residential mortgage loans secured by 1- to 4-family residential real estate in the judgment of the Collateral Manager and shall include, without limitation, RMBS Prime Mortgage Securities, RMBS Home Equity Loan Securities and RMBS Agency Securities or any other securities within an Approved Subcategory of RMBS Securities.

"Restaurant and Food Services Securities" means Asset Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset Backed Securities) on the cash flow from (a) a pool of franchise loans made to operators of franchises that provide goods and services relating to the restaurant and food services industries and (b) leases or subleases of equipment to such operators for use in the provision of such goods and services.  They generally have the following characteristics:  (1) the loans, leases or subleases have varying contractual maturities; (2) the loans are secured by real property purchased or improved with the proceeds thereof (or to refinance an outstanding loan the proceeds of which were so used); (3) the obligations of the lessors or sublessors of the equipment may be secured not only by the leased equipment but also the related real estate; (4) the loans, leases and subleases are obligations of a relatively limited number of obligors and accordingly represent a relatively undiversified pool of obligor credit risk; (5) payment of the loans can vary substantially from the contractual payment schedule (if any), with prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans include an effective prepayment premium; (6) the repayment stream on the leases and subleases is primarily determined by a contractual payment schedule, with early termination of such leases and subleases predominantly dependent upon the disposition to a lessee, a sublessee or third party of the underlying equipment; (7) such leases and subleases typically provide for the right of the lessee or sublessee to purchase the equipment for its stated residual value, subject to payments at the end of a lease term for excess usage or wear and tear; and (8) the ownership of a franchise right or other similar license and the creditworthiness of such franchise operators is the primary factor in any decision to invest in these securities.

"Restricted ABS Asset Type" means ABS Automobile Securities, Aircraft Leasing Securities, ABS Car Rental Receivable Securities, CMBS Franchise Securities, Healthcare Securities, Interest Only Securities, RMBS Manufactured Housing Securities, Mutual Fund Fees Security, NIM Securities, Oil and Gas Securities, Project Finance Securities, Recreational Vehicle Securities, Restaurant & Food Services Securities, Structured Settlement Securities and Tax Lien Securities.

"RMBS Agency Security" means a security issued or fully and unconditionally guaranteed by the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation or the Government National Mortgage Association.

"RMBS Home Equity Loan Securities" means Residential Mortgage Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Residential Mortgage Backed Securities) on the cash flow from balances (including revolving balances) outstanding under lines of credit secured by a first and/or subordinate lien on 1- to 4-family residential real estate, the proceeds of which lines of credit are not used to purchase such real estate or to purchase or construct dwellings thereon (or to refinance indebtedness previously so used).

"RMBS Manufactured Housing Security" means Residential Mortgage-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such Residential Mortgage-Backed Securities) on the cash flow from manufactured housing (also known as mobile homes and prefabricated homes) installment sales contracts and installment loan agreements, generally having the following characteristics: (i) the contracts and loan agreements have varying, but typically lengthy contractual maturities; (ii) the contracts and loan agreements are secured by the manufactured homes and, in certain cases, by mortgages and/or deeds of trust on the real estate to which the manufactured homes are deemed permanently affixed; (iii) the contracts and/or loans are obligations of a large number of obligors and accordingly represent a relatively diversified pool of obligor credit risk; (iv) repayment thereof can vary substantially from the contractual payment schedule, with early prepayment of individual loans depending on numerous factors specific to the particular obligors and upon whether, in the case of loans bearing interest at a fixed rate, such loans or securities include an effective prepayment premium; and (v) in some cases, obligations are fully or partially guaranteed by a governmental agency or instrumentality.

"RMBS Mid-Prime Mortgage Securities" means Residential Mortgage-Backed Securities that entitles the holder thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such securities) on the cash flow from balances (including revolving balances) outstanding under loans or lines of credit secured by single family residential real estate the proceeds of which loans or lines of credit are used to purchase such real estate or to purchase or construct dwellings thereon (or to refinance indebtedness previously so used), and that generally have the following characteristics: (1) the weighted average FICO Score with respect to the obligors on all such underlying loans is greater than or equal to 625 and such security is ineligible to be classified as a RMBS Prime Mortgage Security; (2) the balances have standardized payment terms and require minimum monthly payments; (3) the balances are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; (4) the repayment stream on such balances does not depend on a contractual repayment schedule, with early repayment depending primarily on interest rates, availability of credit against a maximum line of credit and general economic matters; (5) the line of credit or loan may be secured by residential real estate with a market value (determined on the date of origination of such line of credit or loan) that is less than the original proceeds of such line of credit or loan; and (6) where applicable, the weighted average FICO Score with respect to the obligors on all such underlying loans is greater than 625.

"RMBS Prime Mortgage Securities" means Residential Mortgage-Backed Securities (other than Collateral Assets that, if owned by the Issuer, would constitute RMBS Subprime Mortgage-Backed Securities or RMBS Mid Prime Mortgage-Backed Securities) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such securities) on the cash flow from residential mortgage loans secured (subject to permitted liens, easements and other encumbrances) by residential real estate (single or multifamily properties) the proceeds of which are used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used), generally having the following characteristics: (1) the mortgage loans have generally been underwritten to the standards of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (without regard to the size of the loan); (2) the mortgage loans have standardized payment terms and require minimum monthly payments; (3) the mortgage loans are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; (4) the repayment of such mortgage loans is subject to a contractual payment schedule, with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling; and (5) where applicable, the weighted average FICO Score with respect to the obligors on all such underlying loans is 700 or higher.

"RMBS Subprime Mortgage Securities": means Residential Mortgage-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such securities) on the cash flow from residential mortgage loans secured by subprime residential real estate (single or multi-family properties) the proceeds of which are used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used), generally having the following characteristics: (1) the mortgage loans have generally not been underwritten to the standards of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (without regard to the size of the loan); (2) the mortgage loans have standardized payment terms and require minimum monthly payments of interest and minimum monthly payments of principal each month; (3) the mortgage loans are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; (4) the repayment of such mortgage loans is subject to a contractual payment schedule, with early repayment depending primarily on interest rates and the sale of the mortgaged real estate and related dwelling; and (5) the weighted average FICO Score with respect to the obligors on all such underlying loans is 625 or lower.

"Rule 144A Definitive Note" has the meaning specified in Section 2.4(b)(i)(F).

"Rule 144A Global Note" has the meaning specified in Section 2.1(b).

"Rule 144A Note" has the meaning specified in Section 2.1(b).

"Rule 144A" means Rule 144A under the Securities Act.

"Rule 144A Information" means such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

"Rule 144A Transfer Certificate" has the meaning specified in Section 2.4(b)(i)(B).

"Sale" has the meaning specified in Section 5.17(a).

"Sale Proceeds" means all proceeds received as a result of sales of Pledged Securities pursuant to Section 12.1(a), 12.1(b) or 12.1(e) or an Auction or otherwise which shall include all amounts representing Proceeds (including accrued interest) from the sale or other disposition of any Collateral Asset or Eligible Investment received during such Due Period (other than proceeds from the sale or other disposition of any Defaulted Obligation), net of any reasonable amounts expended by the Collateral Manager or the Trustee in connection with such sale or other disposition.

"Scheduled Distribution" means, with respect to any Pledged Security, for each Due Date, the scheduled payment in Cash of principal and/or interest and/or fee or other scheduled payment due on such Due Date with respect to such Pledged Security, determined in accordance with the assumptions specified in Section 1.2.

"Schedule of Collateral Assets" means the list of Collateral Assets securing the Notes that is attached as Schedule A, which Schedule shall include the purchase price, Principal Balance, interest rate, the Stated Maturity, the Moody's Rating, the Standard & Poor's Rating and the Fitch Rating of each Collateral Asset.

"Second Currency" has the meaning specified in Section 14.13.

"Secured Parties" means the Noteholders, the Hedge Counterparties, the Collateral Manager, the Trustee, the Collateral Administrator and any Synthetic Security Counterparties (but, in the case of a Synthetic Security Counterparty, only to the extent of Collateral posted to a Synthetic Security Collateral Account to which a Synthetic Security Counterparty is entitled under the terms of such Synthetic Security).

"Securities" means, collectively, the Notes and the Preference Shares.

"Securities Account" has the meaning specified in Section 8-501(a) of the UCC.

"Securities Act" means the United States Securities Act of 1933, as amended.

"Securities Intermediary" has the meaning specified in Section 8-102(a)(14) of the UCC.

"Securities Purchase Agreement" means a Securities Purchase Agreement dated as of July 5, 2006, by and between the Issuers and the Initial Purchasers, relating to the offer, sale and purchase of the Securities, as the same may be amended, supplemented or otherwise modified from time to time in accordance with its terms.

"Security" has the meaning specified in Section 8-102(a)(15) of the UCC.

"Security Entitlement" has the meaning specified in Section 8-102(a)(17) of the UCC.

"Sequential Pay Trigger Event" means an event that occurs upon the earliest of (a) the first Measurement Date on which the Net Outstanding Portfolio Collateral Balance, calculated pro forma on such Measurement Date, taking into effect the expected application of funds from the Payment Account on the related Payment Date, is less than 50% of the Net Outstanding Portfolio Collateral Balance as of the Effective Date, (b) the occurrence of an Event of Default and (c) the Issuer fails to satisfy any of the Coverage Tests; *provided* that if a Sequential Pay Trigger Event has occurred due solely to the Issuer's failure to satisfy any Coverage Test, such Sequential Pay Trigger Event shall terminate upon the Issuer both (1) either (x) satisfying the Coverage Tests solely through the application of Interest Proceeds or (y) applying Interest Proceeds and/or Principal Proceeds until the Coverage Ratios equal or exceed their respective levels on the Effective Date and (2) demonstrating that it is in compliance with the Moody's Maximum Ratings Distribution Test and *provided further* that no event described in clause (a) or (b) of this definition has occurred.

"Servicer" means, with respect to any Collateral Asset, the entity that, absent any default, event of default or similar condition (however described), is primarily responsible for managing, servicing, monitoring and otherwise administering the cash flows from which payments to investors in such Collateral Asset are made.

"Similar Law" has the meaning specified in Section 2.4(b)(ix).

"Specified Change" means any amendment or waiver of, or supplement to, an Underlying Instrument governing or relating to a Collateral Asset that (a) reduces the principal amount of such Collateral Asset, (b) reduces the rate of interest or any fee payable on such Collateral Asset, (c) postpones the Due Date of any Scheduled Distribution in respect of such Collateral Asset, (d) alters the *pro rata* allocation or sharing, or the relative priorities, of Distributions required by such Underlying Instrument, (e) releases any guarantor of such Collateral Asset from its obligations, (f) terminates or releases any lien or security interest securing such Collateral Asset or (g) changes any of the provisions of such Underlying Instrument specifying the number or percentage of lenders or holders required to effect any of the foregoing.

"Specified Currency" has the meaning specified in Section 14.13.

"Specified Person" has the meaning specified in Section 2.5.

"Specified Place" has the meaning specified in Section 14.13.

"Spread" means, as of any date of determination, with respect to (a) any Floating Rate Collateral Asset that bears interest based on a stated spread above the applicable LIBOR, the current *per annum* rate in excess of LIBOR and, in the case of any Floating Rate Collateral Asset paying interest at a floating rate that does not bear interest at a rate expressed as a stated spread above the applicable LIBOR, the spread on such Collateral Asset on any Measurement Date shall be calculated as the difference between the coupon on such Collateral Asset and LIBOR and if on such Measurement Date such rate is calculated as a spread below LIBOR, such

spread shall be expressed as a negative number and (b) any Deemed Floating Rate Collateral Asset, the Deemed Floating Rate minus the Fixed Payment Rate.

"Standard & Poor's" or "S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor or successors thereto.

"Standard & Poor's CDO Monitor" means the model used to estimate the default rate the portfolio is likely to experience and which will be provided to the Collateral Manager and the Trustee on or before the first Payment Date (or such later Payment Date as first provided by Standard & Poor's) together with such instructions and assumptions as are needed to use such model. The Standard & Poor's CDO Monitor calculates the projected cumulative default rate of a pool of Collateral Assets consistent with a specified benchmark rating level based upon Standard & Poor's proprietary corporate debt default studies. In calculating the Class A Note Scenario Default Rate, the Class B Note Scenario Default Rate, the Class C Note Scenario Default Rate and the Class D Note Scenario Default Rate, the Standard & Poor's CDO Monitor considers each obligor's issuer rating, the number of obligors in the portfolio, the obligor and industry concentrations in the portfolio and the remaining weighted average maturity of the Collateral Assets and Eligible Investments and calculates a cumulative default rate based on the statistical probability of distributions or defaults on the Collateral Assets and Eligible Investments.

"Standard & Poor's CDO Monitor Test" means the test which is satisfied as of any Measurement Date, if each of the Class A Note Default Differential, the Class B Note Default Differential, the Class C Note Default Differential and the Class D Note Default Differential of the Current Portfolio or the Proposed Portfolio, as applicable, is positive. The Standard & Poor's CDO Monitor Test will be considered to be improved if the Class A Note Default Differential of the Proposed Portfolio is greater than the Class A Note Default Differential of the Current Portfolio, the Class B Note Default Differential of the Proposed Portfolio is greater than the Class B Note Default Differential of the Current Portfolio, the Class C Note Default Differential of the Proposed Portfolio is greater than the Class C Note Default Differential of the Current Portfolio and the Class D Note Default Differential of the Proposed Portfolio is greater than the Class D Note Default Differential of the Current Portfolio.

"Standard & Poor's Excel Default Model Input File" means an electronic spreadsheet file to be provided to Standard & Poor's, which file shall include the following information (to the extent such information is not confidential) with respect to each Collateral Asset and in case of Synthetic Securities the related Reference Obligation(s): (a) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (b) the CUSIP or other applicable identification number associated with such Collateral Asset, (c) the par value of such Collateral Asset, (d) the type of issue (including, by way of example, whether such Collateral Asset is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee, (e) a description of the index or other applicable benchmark upon which the interest payable on such Collateral Asset is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR), (f) the coupon (in the case of a Collateral Asset which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Asset which bears interest at a floating rate), (g) the Standard & Poor's Industry Classification Group for such Collateral Asset, (h) the stated maturity date of such Collateral

Asset, (i) the Standard & Poor's Rating of such Collateral Asset or the issuer thereof, as applicable, and of the Synthetic Security Counterparty, as applicable, (j) the priority category assigned by Standard & Poor's to such Collateral Asset, if available, and (k) such other information as the Trustee may determine to include in such file.

"Standard & Poor's Minimum Average Recovery Rate" means, with respect to a Collateral Asset on any Measurement Date, an amount equal to the percentage for such Collateral Asset set forth in the Standard & Poor's Minimum Average Recovery Rate Matrix attached as Part II of Schedule A to the Indenture, as partially reproduced in Appendix D hereto, in (x) the applicable table set forth therein and (y) the row in such table opposite the Standard & Poor's Rating (determined in accordance with procedures prescribed by Standard & Poor's for such Collateral Asset on the date of its purchase by the Issuer or, in the case of a Defaulted Obligation, the Standard & Poor's Rating immediately prior to default).

"Standard & Poor's Minimum Average Recovery Rate Test" means a test satisfied on any Measurement Date on or after the Effective Date, if the S&P Minimum Average Recovery Rate is greater than or equal to 58% (calculated using the AAA stress case) for the Class A Notes, 65% (calculated using the AA stress case) for the Class B Notes, 75% (calculated using the A stress case) for the Class C Notes and 80% (calculated using the BBB stress case) for the Class D Notes.

"Standard & Poor's Rating" means, with respect to any Collateral Asset, the Rating thereof determined as follows:

(a)    (1)  if Standard & Poor's has assigned a rating to such Collateral Asset either publicly or privately (for the benefit of the Collateral Manager and Standard & Poor's or, in the case of a private rating assigned to an obligor, such obligor has consented to the disclosure of any such private rating), the Standard & Poor's Rating shall be the rating assigned thereto by Standard & Poor's; *provided, however,* that if the rating assigned to such Collateral Asset by Standard & Poor's is on the then-current credit rating watch list with negative implications, then the rating of such Collateral Asset will be one subcategory below the rating then assigned to such Collateral Asset by Standard & Poor's and if the rating assigned to such Collateral Asset by Standard & Poor's is on the then-current credit rating watch list with positive implications, then the rating of such Collateral Asset will be one subcategory above the rating then assigned to such Collateral Asset by Standard & Poor's;

(2)    if such Collateral Asset is not rated by Standard & Poor's (other than an RMBS Agency Security), then the Issuer or the Collateral Manager on behalf of the Issuer may apply to Standard & Poor's for a confidential credit estimate prior to or promptly upon acquisition of such Collateral Asset, which shall be the Standard & Poor's Rating of such Collateral Asset; *provided* that such confidential credit estimate shall expire one year after receipt thereof (and the Issuer or the Collateral Manager on behalf of the Issuer may reapply for a new confidential credit estimate upon each anniversary of the acquisition of such Collateral

Asset); and *provided further* that pending receipt from Standard & Poor's of such estimate, such Collateral Asset shall have an Standard & Poor's Rating of "CCC-" if the Collateral Manager believes that such estimate will be at least "CCC-"; or

(3)    if such Collateral Asset is not rated by Standard & Poor's and neither the Issuer nor the Collateral Manager obtains an Standard & Poor's Rating for such Collateral Asset pursuant to subclause (2) above, then the Standard & Poor's Rating of such Collateral Asset may be implied only by reference to the chart set forth below so long as such referenced rating is a publicly monitored rating; *provided* that if such Collateral Asset is not rated by Standard & Poor's, and neither the Issuer nor the Collateral Manager obtains an Standard & Poor's Rating for such Collateral Asset pursuant to this clause (a), then no more than 20% of the Aggregate Principal Amount may imply an Standard & Poor's Rating pursuant to this clause (a)(3) and *provided* further that if the Collateral Asset is rated only by either Moody's or Fitch, then no more than 10% of the Aggregate Principal Amount may imply a Standard & Poor's Rating pursuant to this clause (a)(3);

(b)    if such Collateral Asset is a Synthetic Security, the Standard & Poor's Rating of such Synthetic Security shall be the rating assigned thereto by Standard & Poor's in connection with the acquisition thereof by the Issuer upon the request of the Issuer or the Collateral Manager.

Asset classes are eligible for notching if they are not first loss tranches or combination securities and not listed on <u>Schedule H</u>.  Notwithstanding the foregoing, no Structured Finance Security that is a Non-U.S. Dollar Denominated Asset, no Synthetic Security and no CDO Security the underlying assets of which are CDO Securities shall be eligible for notching unless the Rating Agency Condition with regard to Standard & Poor's has been satisfied in connection with such treatment.  If the security is publicly rated by two agencies, notch down as shown below will be based on the lowest rating.  If publicly rated only by one agency, then notch down what is shown below *minus* one additional notch based on the public rating.

|  | Issued prior to 8/1/01 and the current rating is investment grade | Issued prior to 8/1/01 and the current rating is non investment grade | Issued after 8/1/01 and the current rating is investment grade | Issued after 8/1/01 and the current rating is non investment grade |
|---|---|---|---|---|
| 1. <u>CONSUMER ABS</u> | -1 | -2 | -2 | -3 |
| Automobile Loan Receivable Securities | | | | |
| Automobile Lease Receivable Securities | | | | |
| Car Rental Receivable Securities | | | | |
| Credit Card Securities | | | | |
| Healthcare Securities | | | | |
| Student Loan Securities | | | | |

| | Issued prior to 8/1/01 and the current rating is investment grade | Issued prior to 8/1/01 and the current rating is non investment grade | Issued after 8/1/01 and the current rating is investment grade | Issued after 8/1/01 and the current rating is non investment grade |
|---|:---:|:---:|:---:|:---:|
| 2. <u>COMMERCIAL ABS</u><br>Cargo Securities<br>Equipment Leasing Securities<br>Aircraft Leasing Securities<br>Small Business Loan Securities<br>Restaurant and Food Services Securities<br>Tobacco Litigation Securities | -1 | -2 | -2 | -3 |
| 3. <u>Non RE REMIC RMBS</u><br>Manufactured Housing Loan Securities | -1 | -2 | -2 | -3 |
| 4. <u>Non RE REMIC CMBS</u><br>CMBS – Conduit<br>CMBS – Credit Tenant Lease<br>CMBS – Large Loan<br>CMBS – Single Borrower<br>CMBS – Single Property | -1 | -2 | -2 | -3 |
| 5. <u>CDO/CLO CASH FLOW SECURITIES</u>*<br>Cash Flow CDO - at least 80% High Yield<br>Cash Flow CDO - at least 80% Investment<br>Cash Flow CLO   at least 80% High Yield<br>Cash Flow CLO   at least 80% Investment | -1 | -2 | -2 | -3 |
| 6. <u>REITs</u><br>REIT – Multifamily and Mobile Home Park<br>REIT – Retail<br>REIT – Hospitality<br>REIT – Office<br>REIT – Industrial<br>REIT – Healthcare<br>REIT – Warehouse<br>REIT – Self Storage<br>REIT – Mixed Use | -1 | -2 | -2 | -3 |
| 7. <u>SPECIALTY STRUCTURED</u><br>Stadium Financings<br>Project Finance<br>Future Flows | -3 | -4 | -3 | -4 |
| 8. <u>RESIDENTIAL MORTGAGES</u><br>Residential "A"<br>Residential "B/C"<br>Home equity loans | -1 | -2 | -2 | -3 |
| 9. <u>REAL ESTATE OPERATING COMPANIES</u> | -1 | -2 | -2 | -3 |

*    No notching permitted with respect to CDO Securities issued after 8/1/01.

(c)    if such Collateral Asset is a Synthetic Security, Future Flow Security or Project Finance Security the Standard & Poor's Rating of such Synthetic Security shall be the rating assigned thereto by Standard & Poor's in connection with the acquisition thereof by the Issuer upon the request of the Issuer or the Collateral Manager.

"Stated Maturity" means, with respect to (a) any security (other than a Note), the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, (b) any repurchase obligation, the repurchase date thereunder on which the final repurchase obligation thereunder is due and payable, and (c) any Note, July 5, 2046, or, in each case, if such date is not a Business Day, the next following Business Day.

"Step-Down Security" means a security which by the terms of the related Underlying Instrument provides for a decrease, in the case of a Fixed Rate Security, in the per annum interest rate on such security or, in the case of a Floating Rate Security, in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; provided that (i) a Step-Down Security shall not include any such security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer or any such security where the decrease is linked to a clean-up call or certain events as laid out in the Underlying Instruments or (ii) with respect to which in calculating any Overcollateralization Test or Collateral Quality Test by reference to the spread (in the case of a floating rate Step-Down Security) or coupon (in the case of a fixed rate Step-Down Security) of a Step-Down Security, the spread or coupon on any date shall be deemed to be the lowest spread or coupon, respectively, scheduled to apply to such Step-Down Security on or after such date.

"Step-Up Security" means a security which by the terms of the related Underlying Instrument provides for an increase, in the case of a Fixed Rate Security, in the per annum interest rate on such security or, in the case of a Floating Rate Security, in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; provided that a Step-Up Security shall not include any such security (i) that provides for payment of a constant rate of interest at all times after the date of acquisition by the Issuer or any such security where the decrease is linked to a clean-up call or certain events as laid out in the Underlying Instruments or (ii) with respect to which, in calculating any Overcollateralization Test or Collateral Quality Test that is determined in part by reference to the spread thereon (in the case of a floating rate Step-Up Security) or coupon thereon (in the case of a fixed rate Step-Up Security), the Collateral Manager elects to apply on the relevant Measurement Date the stated spread or coupon in effect on such date.

"Structured Corporate Security" means a security that represents the debt of a corporate obligor through the creation of a trust and the pledge of specific corporate assets.

"Structured Finance Security" means any security that is an asset-backed security, mortgage-backed security, enhanced equipment trust certificate, collateralized bond obligation, collateralized loan obligation or similar instrument.

"Structured Settlement Securities" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to

assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from receivables representing the right of litigation claimants to receive future scheduled payments under settlement agreements that are funded by annuity contracts, which receivables may have varying maturities.

"Subcategory" means, with respect to a Collateral Asset, the classification of a Collateral Asset within a Category as a specific type of Commercial Mortgage-Backed Security, Residential Mortgage-Backed Security and CDO Security and including any Approved Subcategories.

"Subordinate Interests" has the meaning specified in Section 13.1(a), (b), (c), (d) or (e), as applicable.

"Subscription Agreements" means the several Subscription Agreements that collectively account for all of the Preference Shares to be issued on the Closing Date, each dated on or prior to the Closing Date, executed by the respective subscribers for the Preference Shares, as modified and supplemented and in effect from time to time.

"Subpool" means each of the groups of Collateral Assets designated by the Collateral Manager in accordance with the Auction Procedures on which Listed Bidders may provide a separate bid in an Auction.

"Subsequent Funding Date":  Any date during the Ramp-Up Period identified as a Subsequent Funding Date in a Subsequent Funding Request.

"Subsequent Funding Request" has the meaning specified in Section 2.2(h).

"Substitute Collateral Assets" means the Collateral Assets that are acquired on or after the Effective Date pursuant to the applicable provisions of this Indenture.

"SupraMajority" means with respect to any Class of Notes, the Holders of at least 66-2/3% of the aggregate outstanding principal amount of such Class of notes and with respect to the Preference Shares, the Holders of at least 66-2/3% of the issued and Outstanding Preference Shares.

"Synthetic CDO Security" means any CDO Security that entitles the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of CDO Securities) on the market value of and cash flow from underlying assets of which greater than 50% of its aggregate principal balance (or notional balance) consists of one or more credit defaults swaps that reference a portfolio of Reference Obligations based upon the notional amount (or "Floating Rate Payer Calculation Amount" as such term is defined in the underlying credit default swap); *provided*, that the characteristics of such portfolio of Reference Obligations including, without limitation, its portfolio characteristics, investment and reinvestment criteria and credit profile (*e.g.,* probability of default recovery upon default and expected loss characteristics) shall be those normally associated with CDO Securities with current market practice; and (ii) invests the proceeds of such CDO Security in Eligible Investments to secure the issuer's obligations under the credit default swaps, other than any  Synthetic CDO Security that contains an underlying

derivative transaction (or an instrument the underlying assets of which comprise one or more underlying derivative transactions) for which the seller of credit protection (the "Protection Seller") under a credit derivative transaction (or any other derivative transaction that contains characteristics of a credit derivative transaction) undertakes to make payments to the buyer of credit protection in respect of interest shortfalls on one or more Reference Obligations under such derivative transaction.

"Synthetic Security" means (a) any single name credit default swap entered into by the Issuer with a Synthetic Security Counterparty pursuant to an ISDA Master Agreement that may be in the form of a 1992 ISDA Master Agreement (Multicurrency-Cross Border) or an ISDA-2002 Master Agreement or any successor form published by the International Swap and Derivatives Association, Inc. ("ISDA" and each such Agreement, a "Master Agreement") and one or more confirmations thereunder (each, a "Confirmation"), which investment, unless otherwise specified or meeting the Rating Agency Condition with respect to Standard & Poor's or constituting a Form-Approved Synthetic Security, contains equivalent probability of default, recovery upon default (or a specific percentage thereof) and expected loss characteristics as those of a single related Reference Obligation (without taking account of such considerations as they relate to the Synthetic Security Counterparty), but which will contain a maturity, interest rate and other non-credit characteristics which may be different than the Reference Obligation to which the credit risk of the Synthetic Security relates or (b) a Synthetic CDO Security; *provided* that the (i) the acquisition, ownership or disposition of such Synthetic Security will not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes or otherwise subject the Issuer to net income tax, and (ii) amounts receivable by the Issuer will not be subject to withholding tax in respect of the Synthetic Security or the Synthetic Security Counterparty or the Reference Obligor is required to make "gross-up" payments that cover the full amount of any such withholding tax, (iii) such Synthetic Security shall not provide for any payment by the Issuer after the date on which it is pledged to the Trustee unless such security is a Defeased Synthetic Security, (iv) each Synthetic Security contains appropriate limited recourse and non petition provisions (to the extent that the Issuer has contractual payment or other obligations to the Synthetic Security Counterparty) equivalent (*mutatis mutandis*) to those contained herein, (v) such Synthetic Security will not be leveraged, (vi) the terms of such Synthetic Security may require that settlement be by "physical settlement" only, if on the date such Synthetic Security is entered into either (A) the related Reference Obligation is an obligation for which firm offer price quotations can be obtained from at least two dealers or (B) the Issuer or the Investment Adviser has received the advice of both United States federal income tax and insurance counsel of nationally recognized standing experienced in such matters that, under the relevant facts and circumstances with respect to such Synthetic Security, the acquisition of such Synthetic Security will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis and should not cause the Issuer to be treated as writing insurance in the United States, (vii) neither the terms of such Synthetic Security nor any other agreement, provision, term, arrangement or understanding will legally or economically require or compel the Synthetic Security Counterparty to own or hold the related Reference Obligation, (viii) the credit events specified in such Synthetic Security will not include "Implied Writedown" and (ix) if the Issuer is the seller of credit protection under any Synthetic Security, a fixed interest shortfall cap (rather than a variable interest shortfall cap) applies; *provided, further,* that either Moody's or Standard &

Poor's may revoke its consent to the documentation underlying a Form Approved Synthetic Security upon 30 days' prior notice; *provided, further, however,* that, if the Synthetic Security is not a Form Approved Synthetic Security, the Rating Agency Condition with respect to Standard & Poor's shall have been satisfied.  If the Issuer enters into one or more Hedge Agreements and/or Synthetic Securities with the same counterparty, the Hedge Agreements will be required to be documented under a separate Master Agreement from the Synthetic Securities; *provided* that all Confirmations between the Issuer and a particular counterparty relating to Hedge Agreements or Synthetic Securities, respectively, may be under a single Master Agreement.

"Synthetic Security Collateral" means, in respect of any Defeased Synthetic Security entered into by the Issuer, (i) any Eligible Investment that (A) matures prior to next Payment Date and (B) has a Moody's Rating of "Aaa" or "P-1" or (ii) any CDO Security or ABS Other Security pledged by the Issuer to or for the benefit of the related Synthetic Security Counterparty that (A) satisfies the Eligibility Criteria, (B) is approved by the Rating Agencies, (C) has a Moody's Rating of "Aaa" and (D) matures prior to the Stated Maturity of the Notes.

"Synthetic Security Collateral Account" means a Securities Account, designated as the "Synthetic Security Collateral Account," established by the Bank in the name of the Trustee pursuant to Section 10.4(d).

"Synthetic Security Counterparty" means an entity required to make payments on a Synthetic Security pursuant to the terms of such Synthetic Security or any guarantee thereof to the extent that a Reference Obligor makes payments on a related Reference Obligation, unless the related Synthetic Security is a Defeased Synthetic Security (i) which entity, or the long term senior unsecured debt of such entity, shall meet the Synthetic Security Counterparty Required Ratings; *provided, however,* that for purposes of determining the rating of a Synthetic Security Counterparty, a Synthetic Security Counterparty that is placed on "credit watch" with negative implications by Moody's shall be deemed to have a rating one notch below its then current rating and if such Synthetic Security Counterparty is placed on "credit watch" with positive implications such Synthetic Security Counterparty shall be deemed to have a rating one notch above its then current rating and (ii) with respect to which the Rating Agency Condition has been satisfied; *provided* that, in the case of a Synthetic Security for which the related Synthetic Security Collateral is held in a Synthetic Security Collateral Account, no public rating by Standard & Poor's is required for the related Synthetic Security Counterparty; *provided* that each Synthetic Security Counterparty shall be a dealer in derivatives (and not a trust or similar special purpose entity) or that the Issuer has received an opinion of United States federal income tax counsel of nationally recognized standing experienced in such matters that the entering into the Synthetic Security with such Synthetic Security Counterparty will not result in the Issuer being treated as engaged in a trade or business within the United States; *provided further* that at any time any Synthetic Security is acquired by the Issuer, the percentage of the Aggregate Principal Amount that represents Synthetic Securities (other than Defeased Synthetic Securities) entered into by the Issuer with one or more Synthetic Security Counterparties will not exceed the aggregate percentage set forth below for the credit rating by Standard & Poor's and Moody's of such Synthetic Security Counterparty (or its Affiliates) and the percentage of the Aggregate Principal Balance that represents Synthetic Securities where the Issuer is selling credit protection to any single Synthetic Security Counterparty will not exceed the aggregate percentage set forth

below for the credit rating by Standard & Poor's and Moody's of such Synthetic Security Counterparty (or its Affiliates):

| Long Term Senior Unsecured Debt Rating of Synthetic Security Counterparty | | Aggregate Synthetic Security Counterparty Limit | Aggregate Synthetic Security Counterparty Limit Excluding Defeased Synthetic Securities |
|---|---|---|---|
| S&P | Moody's | | |
| AAA | Aaa | 20.0% | 15.0% |
| AA | Aa | 15.0% | 10.0% |
| A | A | 10.0% | 5.0% |

"Synthetic Security Counterparty Defaulted Obligation" means a Synthetic Security (other than a Defaulted Synthetic Security) with respect to which:

(a)     (x) the Synthetic Security Counterparty fails, at any time, to satisfy the Synthetic Security Counterparty Required Ratings and, in the case of a Synthetic Security in the form of a swap or other derivative instrument, an "additional termination event" (as defined in such Synthetic Security) has occurred under the documentation for such Synthetic Security as a result of the failure of such Synthetic Security Counterparty to take the actions required thereunder following such downgrade or withdrawal or (y) the long-term senior unsecured rating of the Synthetic Security Counterparty is "D" or "SD" by Standard & Poor's or such Synthetic Security Counterparty ceases to be rated by Standard & Poor's; *provided* that no such Synthetic Security shall be considered a Synthetic Security Counterparty Defaulted Obligation if, within 10 Business Days' (1) the Synthetic Security Counterparty posts collateral in accordance with the terms of the Synthetic Security or (2) a replacement Synthetic Security Counterparty satisfying the Synthetic Security Counterparty Required Ratings is appointed pursuant to the terms of the Synthetic Security ; or

(b)     the Synthetic Security Counterparty has defaulted in the performance of any of its payment obligations under the Synthetic Security.

"Synthetic Security Counterparty Required Ratings" means a minimum rating, or the Synthetic Security Counterparty's long term senior unsecured debt shall be rated (which ratings must, with respect to any Synthetic Security Counterparty, be a public rating) not less than "Aa3" by Moody's (unless the Rating Agency Condition with respect to Moody's is satisfied) and "AA-" by Standard & Poor's (or if the short term unsecured commercial paper rating of such Synthetic Security Counterparty is at least "P-1" by Moody's and "A-1" by Standard & Poor's, it may have, for the long term senior unsecured debt of such entity, a rating of at least "Aa2" by Moody's and "A" by Standard & Poor's; provided that (i) no more than 10% of the Aggregate Principal Amount may consist of Synthetic Securities with a Synthetic Security Counterparty that has long term senior unsecured debt ratings or an issuer rating of (which ratings must, with respect to any Synthetic Security Counterparty, be a public ratings) less than "AA-" by Standard & Poor's and (ii) no more than 5% of the Aggregate Principal Amount may

consist of Synthetic Securities with a Synthetic Security Counterparty that has long term senior unsecured debt ratings of less than "A" by Standard & Poor's; provided, further, that in each case the Synthetic Security Counterparty shall have at least one rating from Moody's and Standard & Poor's; provided, further, however, that the rating of a Synthetic Security Counterparty which has been placed on "credit watch" with negative implications by Moody's or Standard & Poor's shall be deemed to be one notch below its then current rating by such Rating Agency, and the rating of a Synthetic Security Counterparty which has been placed on "credit watch" with positive implications by Moody's, or Standard & Poor's, shall be deemed to be one notch above its then current rating by such Rating Agency, or (ii) shall satisfy the Rating Agency Condition.

"Tax Event" means when (i) any obligor (including any Synthetic Security Counterparty) is, or on the next scheduled payment date under any Collateral Asset, will be, required to deduct or withhold from any payment under any Collateral Asset to the Issuer for or on account of any tax for whatever reason and such obligor is not required to pay to the Issuer such additional amount as is necessary to ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding been required, (ii) any jurisdiction imposes net income, profits, or similar tax on the Issuer, (iii) the Issuer is required to deduct or withhold from any payment under a Hedge Agreement for or on account of any tax and the Issuer is obligated to make a gross up payment (or otherwise pay additional amounts) to the Hedge Counterparty, or (iv) a Hedge Counterparty is required to deduct or withhold from any payment under a Hedge Agreement for or on account of any tax for whatever reason and such Hedge Counterparty is not required to pay to the Issuer such additional amount as is necessary to ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding been required.

"Tax Lien Securities" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of tax obligations owed by businesses and individuals to state and municipal governmental taxing authorities, generally having the following characteristics: (1) the obligations have standardized payment terms and require minimum payments; (2) the tax obligations are obligations of numerous borrowers and accordingly represent a very diversified pool of obligor credit risk; and (3) the repayment stream on the obligation is primarily determined by a payment schedule entered into between the relevant tax authority and obligor, with early repayment on such obligation predominantly dependent upon interest rates and the income of the obligor following the commencement of amortization.

"Tax Materiality Condition" means a condition that will be satisfied if a Tax Event occurs and (i) such a tax or taxes imposed on the Issuer or withheld from payments to the Issuer and with respect to which the Issuer receives less than the full amount that the Issuer would have received had no such deduction occurred, and (ii) "gross up payments" required to be made by the Issuer exceed the amounts that the Issuer would have been required to pay had no deduction or withholding been required exceeds, in the aggregate, U.S. $5,000,000 during any 12-month period.

"Tax Redemption" has the meaning specified in Section 9.1.

"Tax Redemption Price" means (i) with respect to the Class A-1A Notes, an amount equal to the Aggregate Outstanding Amount of the Class A-1A Notes plus accrued and unpaid interest thereon at the Class A-1A Note Interest Rate (including Defaulted Interest and interest on Defaulted Interest) to but excluding the Redemption Date, (ii) with respect to the Class A-1B Notes, an amount equal to the Aggregate Outstanding Amount of the funded Class A-1B Notes plus accrued and unpaid interest thereon at the Class A-1B Note Interest Rate (including Defaulted Interest and interest on Defaulted Interest), to but excluding the Redemption Date, (iii) with respect to the Class A-2 Notes, an amount equal to the Aggregate Outstanding Amount of the Class A-2 Notes plus accrued and unpaid interest thereon at the Class A-2 Note Interest Rate (including Defaulted Interest and interest on Defaulted Interest) to but excluding the Redemption Date, (iv) with respect to the Class B Notes, an amount equal to the Aggregate Outstanding Amount of the Class B Notes plus accrued and unpaid interest thereon at the Class B Note Interest Rate (including Defaulted Interest and interest on Defaulted Interest) to but excluding the Redemption Date, (v) with respect to the Class C Notes, the Aggregate Outstanding Amount of the Class C Notes plus accrued and unpaid interest thereon at the Class C Note Interest Rate (including Class C Deferred Interest) to but excluding the Redemption Date, (vi) with respect to the Class D-1 Notes, the Aggregate Outstanding Amount of the Class D-1 Notes plus accrued and unpaid interest thereon at the Class D-1 Note Interest Rate (including Class D Deferred Interest) to but excluding the Redemption Date, (vii) with respect to the Class D-2 Notes, the Aggregate Outstanding Amount of the Class D-2 Notes plus accrued and unpaid interest thereon at the Class D-2 Note Interest Rate (including Class D Deferred Interest) to but excluding the Redemption Date and (viii) with respect to each of the Preference Shares, any amounts remaining after payment of amounts set forth in clauses (i) through (vii) above and other amounts senior thereto in accordance with Section 11.2 herein.

"Total Redemption Amount" means the sum of all amounts payable by the Issuer pursuant to the Priority of Payments prior to the payment of the Notes (including any termination payments payable by the Issuer pursuant to the Hedge Agreements (other than Defaulted Hedge Termination Payments) and any fees and expenses incurred by the Trustee and the Collateral Manager in connection with the sale of Collateral Assets pursuant to the related Redemption), and all amounts payable to the Noteholders on any Final Payment Date pursuant to the Priority of Payments (which will include, in the case of an Optional Redemption, the Optional Redemption Prices for all of the Securities, and in the case of a Tax Redemption, the Tax Redemption Prices for all of the Securities).

"Trading Plan" means series of sales and/or purchases of Collateral Assets (a) that is completed within the lesser of five Business Days and the period of time between the date on which the first purchase or sale is made pursuant to such Trading Plan and the next succeeding Determination Date and (b) that results in the purchase of Collateral Assets having an Aggregate Principal Amount of not more than 5% of the Net Outstanding Portfolio Collateral Balance. The time period for a Trading Plan shall commence on the first date on which the Issuer sells or purchases (or commits to sell or purchase) a Collateral Asset included in such Trading Plan and shall end on the last day on which the Issuer sells or purchases (or commits to sell or purchase) a Collateral Asset included in such Trading Plan.

"<u>Transaction Documents</u>" means the Indenture, the Preference Share Paying Agency Agreement, the Collateral Management Agreement, the Hedge Agreements, the Administration Agreement, the Collateral Administration Agreement and the Account Control Agreement.

"<u>Transfer Agent</u>" means the Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"<u>Treasury</u>" means the United States Department of the Treasury.

"<u>Trustee</u>" means JPMorgan Chase Bank, National Association, a national banking association, organized under the laws of the United States, solely in its capacity as trustee hereunder, unless a successor Person shall have become the Trustee pursuant to the applicable provisions of this Indenture, and thereafter Trustee shall mean such successor Person.

"<u>Trust Officer</u>" means, when used with respect to the Trustee, any Officer within the Worldwide Securities Services Group of the Corporate Trust Office (or any successor group of the Trustee) authorized to act for and on behalf of the Trustee, including any vice president, assistant vice president or other Officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such Officers, respectively, or to whom any corporate trust matter is referred at the Worldwide Securities Services Group of the Corporate Trust Office because of such person's knowledge of and familiarity with the particular subject and who has direct responsibility for the administration of this Indenture.

"<u>UCC</u>" means the Uniform Commercial Code as in effect in the State of New York.

"<u>Underlying Instruments</u>" means the indenture or other agreement pursuant to which a Collateral Asset or Eligible Investment has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such Collateral Asset or Eligible Investment or of which holders of such Collateral Asset or Eligible Investment are the beneficiaries.

"<u>United States</u>" and "<u>U.S.</u>" means the United States of America, including the States thereof and the District of Columbia.

"<u>Unregistered Securities</u>" has the meaning specified in Section 5.17(c).

"<u>Unscheduled Principal Payments</u>" means any proceeds received by the Issuer from a prepayment or redemption (in whole but not in part) by the obligor of a Collateral Asset prior to the stated maturity date of such Collateral Asset.

"<u>U.S. Agency Securities</u>" means Registered obligations of (a) the U.S. Treasury, (b) any Federal agency or instrumentality of the United States of America or (c)(i) the Federal National Mortgage Association, (ii) the Student Loan Marketing Association or (iii) the Federal Home Loan Mortgage Corporation, in the case of each of (a), (b) and (c) with a Stated Maturity that does not exceed the Stated Maturity of the Notes.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56 (2001).

"U.S. Person" has the meaning given in Regulation S under the Securities Act.

"Weighted Average Coupon" means, as of any Measurement Date will equal a fraction (expressed as a percentage) obtained by *dividing* (I) by (II) where (I) equals the sum of (a) a number obtained by (i) summing the products obtained by *multiplying* (x) the Current Interest Rate (adjusted for any withholding tax withheld on the Collateral Asset during the related period) on each Collateral Asset that is a Fixed Rate Asset or Deemed Fixed Collateral Asset (excluding all Defaulted Obligations) *by* (y) the Principal Balance of each such Collateral Asset *plus* (b) the payments in such period applicable to any interest rate cap *plus* (c) the Necessary Fixed Crossover Amount *minus* (d) the Necessary Spread Crossover Amount and (II) equals the aggregate Principal Balance of all Collateral Assets that are Fixed Rate Assets or Deemed Fixed Collateral Assets (excluding all Defaulted Obligations) held by the Issuer as of such Measurement Date.

"Weighted Average Coupon Test" means a test that will be satisfied as of any Measurement Date if the Weighted Average Coupon as of such Measurement Date is greater than or equal to the Minimum Weighted Average Coupon.

"Weighted Average Life" means, as of any Measurement Date in respect of any Collateral Asset other than a Defaulted Obligation, the number obtained by (a) summing the products obtained by *multiplying* (a) the Average Life at such time of each such Collateral Asset *by* (b) the outstanding Principal Balance of such Collateral Asset and (ii) *dividing* such sum *by* the aggregate Principal Balance at such time of all such Collateral Assets other than Defaulted Obligations.

"Weighted Average Spread" means as of any Measurement Date will equal a fraction (expressed as a percentage) obtained by *dividing* (I) by (II) where (I) equals the sum of (a) a number obtained by summing the products obtained by *multiplying* (x) the Spread (adjusted for any withholding tax withheld on the Collateral Asset during the related period) on each Collateral Asset that is a Floating Rate Asset or a Deemed Floating Collateral Asset (other than a Defaulted Obligation) as of such date *by* (y) the Principal Balance of each such Collateral Asset *plus* (b) the Necessary Spread Crossover Amount *minus* (c) the Necessary Fixed Crossover Amount and (II) equals the aggregate Principal Balance of all Collateral Assets that are Floating Rate Assets and Deemed Floating Collateral Assets (excluding all Defaulted Obligations but including Fixed Rate Assets that are CMBS Securities) held by the Issuer as of such Measurement Date.

"Weighted Average Spread Test" means a test that will be satisfied as of any Measurement Date if the Weighted Average Spread as of such Measurement Date is greater than or equal to the Minimum Weighted Average Spread.

"Written Down Amount" means the sum, respect to each Written Down Security, of the amount to which the original Principal Balance of such Written Down Security is reduced

as notified by or on behalf of the related issuer or trustee to the holders of such Written Down Security (including appraisal reductions on CMBS Securities).

"Written-Down Security" means any Collateral Asset (other than a Defaulted Obligation) as to which the aggregate par amount of such Collateral Asset and all other securities secured by the same pool of collateral that rank *pari passu* with or senior in priority of payment to such Collateral Asset exceeds the aggregate par amount (including reserved interest or other amounts available for overcollateralization) of all collateral securing such securities (excluding defaulted collateral).

### 1.2    Assumptions as to Collateral Assets, Etc.

(a)    All calculations by or on behalf of the Issuer with respect to scheduled distributions on the Collateral Assets shall be made on the basis of information as to the terms of each such Collateral Asset and upon report of payments, if any, received on such Collateral Asset that are furnished by or on behalf of the issuer of such Collateral Assets and, to the extent they are not manifestly in error, such information or report may be conclusively relied upon in making such calculations.

(b)    For accounting and reporting purposes only, for each Pledged Security that bears interest based on a floating rate index, all calculations involving such floating rate index shall be assumed to be equal to the then current rate as had been set in accordance with the terms of the Pledged Security.

(c)    For the purposes of calculating the Class B Interest Coverage Ratio and the Class C Interest Coverage Ratio (i) expected interest payments on the Collateral Assets and the Eligible Investments and payments from Hedge Counterparties scheduled to be received will not include any scheduled interest payments or Hedge Agreement payments that the Collateral Manager does not expect will be made in cash during the applicable Due Period (including scheduled payments on any assets currently deferring interest unless and until such assets actually pay interest); (ii) the expected interest payments on any Floating Rate Assets, Deemed Floating Collateral Assets and Eligible Investments, the expected amounts payable under any Hedge Agreement and the expected interest payable on the Class A Notes, Class B Notes, Class C Notes (solely with respect to the Class C Interest Coverage Ratio) and the Class D Notes will be calculated using the then current interest rates (or currency exchange rates) applicable thereto and (iii) interest scheduled to be paid on the Class C Notes and Class D Notes (in each case, excluding any previously capitalized interest) on the following Payment Date shall be considered due on any Measurement Date prior to or on such Payment Date even if all or a portion of such interest shall become Class C Deferred Interest or Class D Deferred Interest, as applicable, on such Payment Date.

(d)    For purposes of the Coverage Tests, (i) unless otherwise specified, a Synthetic Security shall be included as a Collateral Asset having the characteristics of the Reference Obligation and not of the Synthetic Security; *provided*, that if such Synthetic Security Counterparty is in default under the related Synthetic Security, such Synthetic Security shall not be included in the Coverage Tests or such Synthetic Security will be treated in such a way that will satisfy the Rating Agency Condition and (ii) the calculation of the Class A

Overcollateralization Ratio, the Class B Overcollateralization Ratio, the Class C Overcollateralization Ratio and the Class D Overcollateralization Ratio on any Measurement Date or prior to the end of the Reinvestment Period shall include in the numerator Principal Proceeds held for reinvestment; *provided* that, for purposes of calculating the Class A Overcollateralization Ratio, the Class B Overcollateralization Ratio, the Class C Overcollateralization Ratio and the Class D Overcollateralization Ratio, after the end of the Reinvestment Period, Principal Proceeds will not be included in the numerator and will be subtracted from the denominator.

(e)     With respect to any Collateral Asset as to which any interest or other payment thereon is subject to withholding tax of any relevant jurisdiction, each expected distribution thereon shall, for purposes of the Collateral Profile Tests, the Reinvestment Criteria, the Coverage Tests and the Collateral Quality Tests, be deemed to be payable net of such withholding tax unless the issuer thereof or obligor thereon is required to make additional payments to fully compensate the Issuer for such withholding taxes (including in respect of any such additional payments).  On any date of determination, the amount of any scheduled distribution due on any future date shall be assumed to be made net of any such uncompensated withholding tax based upon withholding tax rates in effect on such date of determination.

(f)     For purposes of determining the Collateral Profile Tests and the Collateral Quality Tests, all percentage calculations shall be rounded off to the nearest one-tenth of 1%.

(g)     For purposes of determining compliance with the Collateral Profile Tests, the Coverage Tests and the Collateral Quality Tests in connection with the purchase of a Collateral Asset such compliance shall be measured as of the settlement date, not the trade date, unless the context indicates otherwise.

(h)     All dates and times referred to herein shall be to dates and times as they occur in the City of New York, unless otherwise expressly stated herein

1.3     Rules of Construction

Unless the context otherwise clearly requires:

(i)     the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(ii)     whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(iii)     the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(iv)     the word "will" shall be construed to have the same meaning and effect as the word "shall";

(v)     any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other

document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein);

(vi)    any reference herein to any Person, or to any Person in a specified capacity, shall be construed to include such Person's successors and assigns or such Person's successors in such capacity, as the case may be; and

(vii)    all references in this instrument to designated "Sections", "clauses" and other subdivisions are to the designated Sections, clauses and other subdivisions of this instrument as originally executed (notwithstanding clause (v) above), and the words "herein", "hereof", "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Section, clause or other subdivision.

## ARTICLE 2

## THE NOTES

2.1    Forms Generally

(a)    Notes offered and sold in reliance on Regulation S (each, a "Regulation S Note") shall be issued in fully Registered Form without interest coupons substantially in the form of the note attached as Exhibit A-1 (each, a "Regulation S Global Note") with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, which shall be deposited with the Trustee at its Corporate Trust Office, as custodian for DTC and registered in the name of DTC or a nominee of DTC, duly executed by the Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided. The aggregate principal amount of each Regulation S Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC or its nominee, as the case may be.

(b)    Notes offered and sold in the United States pursuant to an exemption from the registration requirements of the Securities Act ("Rule 144A Notes") shall be issued in fully Registered Form without interest coupons substantially in the form of the note attached as Exhibit A-2 (each, a "Rule 144A Global Note"), with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, which shall be deposited with the Trustee at its Corporate Trust Office, as custodian for DTC and registered in the name of DTC or a nominee of DTC, duly executed by the Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided. The aggregate principal amount of each Rule 144A Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC or its nominee, as the case may be.

(c)    Regulation S Global Notes and Rule 144A Global Notes may also be exchanged under the limited circumstances set forth in Section 2.4 for notes in definitive fully Registered Form without interest coupons, substantially in the form of the certificated note attached as Exhibit A-3 (each a "Definitive Note"), which may be either a Regulation S Definitive Note or a Rule 144A Definitive Note, with such legends as may be applicable thereto,

which shall be duly executed by the Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.

(d)     Notwithstanding Sections 2.1(a) and (b) above, Class A-1B Notes shall be issued on the Closing Date only in fully registered, definitive form without interest coupons attached, registered in the name of the legal and beneficial owner thereof, in the form attached as Exhibit A to the Securities Purchase Agreement.  Unfunded amounts of the Class A-1B Notes may not be assigned or transferred other than in accordance with the restrictions set forth in Schedule II of the Securities Purchase Agreement until the Commitment Termination Date has occurred.  Purchasers of Class A-1B Notes in Definitive form may transfer or exchange the funded portions of the Class A-1B Notes or, after the Commitment Termination Date has occurred, any of the Class A-1B Notes, to investors taking an interest in such Class A-1B Notes in the form of Rule 144A Global Notes or Regulation S Global Notes subject to Section 2.4(b)(v) hereof.

(e)     The Issuers in issuing the Notes may use "CUSIP" or "private placement" numbers (if then generally in use), and, if so, the Trustee will indicate the "CUSIP" or "private placement" numbers of the Notes in notices of redemption and related materials as a convenience to Holders; *provided* that any such numbers may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption and related materials.

2.2     Authorized Amount; Note Interest Rate; Stated Maturity; Denominations

(a)     The aggregate principal amount of Notes which may be issued under this Indenture may not exceed U.S.$2,190,500,000, excluding Notes issued upon registration of, transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.4, 2.5 or 8.5.

(b)     As provided pursuant to the terms of the Notes, the Notes shall be divided into four Classes and, with respect to the Class A Notes, two Sub-classes thereof, with respect to the Class A-1 Notes, two further Sub-classes thereof, and with respect to the Class D Notes, two Sub-classes thereof having designations, original principal amounts, original Note Interest Rates *per annum* and Stated Maturities as follows:

| Designation | Original Principal Amount | Note Interest Rate (other than for first Interest Accrual Period) | Note Interest Rate for first Interest Accrual Period | Stated Maturity |
|---|---|---|---|---|
| 1. Class A-1A Notes | $2,000,000,000 | 1-month LIBOR *plus* 0.22% | 5.27% | July 5, 2046 |
| 2. Class A-1B Notes | $71,500,000* | 3-month LIBOR *plus* 0.22% | 5.36% | July 5, 2046 |
| 2. Class A-2 Notes | $70,000,000 | 3-month LIBOR *plus* 0.40% | 5.54% | July 5, 2046 |
| 3. Class B Notes | $20,000,000 | 3-month LIBOR *plus* 0.50% | 5.64% | July 5, 2046 |
| 4. Class C Notes | $16,000,000 | 3-month LIBOR *plus* 1.35% | 6.49% | July 5, 2046 |
| 5. Class D-1 Notes | $7,450,000 | 3-month LIBOR *plus* 2.95% | 8.09% | July 5, 2046 |
| 6. Class D-2 Notes | $5,550,000 | 8.60% | 8.60% | July 5, 2046 |

*     Maximum funded aggregate principal amount of Class A-1B Notes.  All amounts under the Class A_1B Notes will be funded after the Closing Date.

The Notes will be issuable in minimum denominations of U.S.$250,000 and will be offered only in such minimum denominations or an integral multiple of U.S.$1,000 in excess thereof; *provided* that, after issuance, (x) a Note may fail to be in compliance with the minimum denomination requirement as a result of the repayment of principal thereof in accordance with the Priority of Payments, and (y) Class C Notes and Class D Notes may fail to be in an amount which is an integral multiple of U.S.$1,000 due to the addition to the principal amount thereof of Class C Deferred Interest or Class D Deferred Interest, as applicable.

(c)    As provided in the Notes, interest shall accrue on the Aggregate Outstanding Amount of each Class or Sub-class of Notes (determined as of the first day of each applicable Interest Accrual Period or, in the case of the Class A-1B Notes, from each applicable Subsequent Funding Date) and after giving effect to any payment of principal occurring on such day) from the Closing Date until such Notes are paid in full and, except as provided in Section 11.1(a), will be payable quarterly in arrears on each Payment Date.  To the extent lawful and enforceable, interest shall accrue on Defaulted Interest in respect of any Note at the Note Interest Rate applicable to such Note until such Defaulted Interest is paid in full.  Interest accruing for any Interest Accrual Period shall accrue for the period from and including the first day of such Interest Accrual Period (or, in the case of the Class A-1B Notes, from each applicable Subsequent Funding Date) to and including the last day of such Interest Accrual Period.  Interest on the Notes and interest on Defaulted Interest in respect thereof will be computed on the basis of a 360-day year and the actual number of days elapsed.

(d)    The Notes shall be redeemable as provided in Sections 9 and 12.

(e)    The Depository for the Global Notes shall initially be DTC.

(f)    The Notes shall be numbered, lettered or otherwise distinguished in such manner as may be consistent herewith, determined by the Authorized Officers of the Issuers executing such Notes as evidenced by their execution of such Notes.

(g)    All of the Notes will be issued on the Closing Date and all of the Notes other than the Class A-1B Notes will be fully funded on the Closing Date.

(h)    Delayed Funding of Class A-1B Notes.  By written notice to the Class A-1B Note Agent, in substantially the form attached as Exhibit B to the Securities Purchase Agreement (the "Subsequent Funding Request"), delivered no later than noon (New York City time) on the third Business Day prior to any proposed Subsequent Funding Date, the Issuer may request a funding from the Class A-1B Noteholder at any time prior to the Commitment Termination Date, so long the Delayed Funding Conditions are satisfied; *provided* that the total funded amount of the Class A-1B Notes shall not exceed the maximum principal amount (irregardless of any principal prepayments) of the Class A-1B Notes set forth in the table appended to Section 2.2(b).  On each Subsequent Funding Date, provided the Delayed Funding Conditions are satisfied, the Class A-1B Noteholders shall ratably remit the amount requested by the Issuer in the related Class A-1B Funding Request no later than 12:00 p.m. (New York City time) in immediately available funds in accordance with the payment instructions specified in the related Class A-1B Funding Request and upon such remittance the funded amount of the Class A-1B Notes held by such Noteholders shall be ratably increased by the amount of such

remittance, all in accordance with the procedures set forth in Schedule II of the Securities Purchase Agreement. Each Class A-1B Note shall have identical terms except for the principal amount and the date interest begins to accrue on such principal amount (which shall be the applicable Subsequent Funding Date for each Class A-1B Note). All Class A-1B Notes shall vote together as a single Class. The Trustee shall immediately credit all amounts received from any Class A-1B Noteholder on any Subsequent Funding Date to the Collection Account and shall treat any such amounts as Principal Proceeds to be available for purchase of additional Collateral Assets during the Ramp-Up Period and as otherwise permitted under this Indenture. Amounts funded pursuant to Subsequent Funding requests shall be recorded by the Class A-1B Note Agent pursuant to Schedule II of the Securities Purchase Agreement.

2.3    Execution, Authentication, Delivery and Dating

(a)    The Notes shall be executed on behalf of the Issuers by an Authorized Officer of each of the Issuers. The signatures of such Authorized Officers on the Notes may be manual or facsimile (including in counterparts).

(b)    Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of either of the Issuers shall bind such Person, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

(c)    At any time and from time to time after the execution and delivery of this Indenture, the Issuers may deliver Notes executed by the Issuers to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

(d)    Each Note authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

(e)    Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original aggregate principal amount of the Notes so transferred, exchanged or replaced, but shall represent only the current Aggregate Outstanding Amount of the Notes so transferred, exchanged or replaced. In the event that any Note is divided into more than one Note in accordance with this Section 2.3, the original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the original aggregate principal amount of such subsequently issued Notes.

(f)    No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication (the "Certificate of Authentication"), substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized

Officers, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

2.4    <u>Registration, Transfer and Exchange of Notes</u>

(a)    <u>Registration of Notes</u>.  The Trustee is hereby appointed on behalf of the Issuer as the registrar of the Notes (the "<u>Note Registrar</u>").  The Trustee is hereby appointed on behalf of the Issuer as a Transfer Agent with respect to the Notes (but with respect to the Class A-1B Notes prior to the Commitment Termination Date, only such Notes as are transferred or exchanged for Rule 144A Global Notes or Regulation S Global Notes pursuant to Section 2.4(b)(v)).  The Note Registrar shall keep, on behalf of the Issuer, a register (the "<u>Note Register</u>") for the Classes of Notes for which it is the Note Registrar in its Corporate Trust Office in which, subject to such reasonable regulations as it may prescribe, the Note Registrar shall provide for the registration of and the registration of transfers of Notes (but with respect to the Class A-1B Notes, only to the extent funded and transferred or exchanged for Rule 144A Global Notes or Regulation S Global Notes pursuant to Section 2.4(b)(v)).  From the Closing Date to the Commitment Termination Date, the Class A-1B Note Agent shall maintain the Class A-1B Note Register for all unfunded Class A-1B Notes pursuant to the terms of Schedule II of the Securities Purchase Agreement.  Upon any resignation or removal of the Note Registrar, the Issuer shall promptly appoint a successor or, in the absence of such appointment, assume the duties of the Note Registrar.  The Issuers may not terminate the appointment of the Note Registrar or any Transfer Agent without the consent of a Majority of each Class of Notes. Within 10 Business Days following the Commitment Termination Date, the Class A-1B Note Agent shall deliver the Class A-1B Note Register to the Note Register and the Note Register shall immediately assume the Class A-1B Note Agent's duties as registrar of all of the Class A-1B Notes.

Subject to this <u>Section 2.4</u>, upon surrender for registration of transfer of any Notes at the office or agency of the Issuers to be maintained as provided in <u>Section 7.2</u>, the Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denomination and of a like aggregate principal amount.

At the option of the Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like aggregate principal amount, upon surrender of the Notes to be exchanged at such office or agency.  Whenever any Note is surrendered for exchange, the Issuers shall execute and the Trustee shall authenticate and deliver the Notes that the Noteholder making the exchange is entitled to receive.

All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the Issuers evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Issuers and the Note Registrar duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith and expenses of delivery (if any) not made by regular mail.

(b)     <u>Transfers of Notes</u>.

(i)     Subject to <u>Section 2.4(b)(iv)</u>, exchanges or transfers of beneficial interests in a Global Note may be made only in accordance with the rules and regulations of the Depository and the transfer restrictions contained in the legend on such Global Note and exchanges or transfers of interests in a Global Note may be made only in accordance with the following:

(A)     Subject to clauses (B) through (F) of this <u>Section 2.4(b)(i)</u>, transfers of a Global Note shall be limited to transfers of such Global Note in whole, but not in part, to nominees of the Depository or to a successor of the Depository or such successor's nominee.

(B)     The Trustee shall cause the exchange or transfer of any beneficial interest in a Regulation S Global Note for a beneficial interest in a Rule 144A Global Note upon provision to the Trustee and the Issuers of a written certification in the form of <u>Exhibit B-1</u> (a "<u>Rule 144A Transfer Certificate</u>").

(C)     The Trustee shall cause the exchange or transfer of any beneficial interest in a Rule 144A Global Note for a beneficial interest in a Regulation S Global Note upon provision to the Trustee and the Issuers of a written certification substantially in the form of <u>Exhibit B-2</u> (a "<u>Regulation S Transfer Certificate</u>").

(D)     An owner of a beneficial interest in a Regulation S Global Note may transfer such interest in the form of a beneficial interest in such Regulation S Global Note without the provision of written certification, *provided* that (1) such transfer is not made to a U.S. Person or for the account or benefit of a U.S. Person and is effected through Euroclear or Clearstream, Luxembourg in an offshore transaction as required by Regulation S and (2) any transfer not effected in an offshore transaction in accordance with Regulation S may be made only upon provision to the Trustee, the Issuers and the Note Registrar of a Regulation S Transfer Certificate.

(E)     An owner of a beneficial interest in a Rule 144A Global Note may transfer such interest in the form of a beneficial interest in such Rule 144A Global Note without the provision of written certification if the transferee is both a Qualified Institutional Buyer and a Qualified Purchaser;

(F)     In the event Definitive Notes are issued pursuant to <u>Section 2.4(b)(vi)</u>, the Trustee shall cause the transfer of (i) any beneficial interest in a Global Note for a Definitive Note that is a Regulation S Note (a "<u>Regulation S Definitive Note</u>"), upon provision to the Trustee and the Issuers of a Regulation

S Transfer Certificate or (ii) any beneficial interest in a Global Note for a Definitive Note that is a Rule 144A Note (a "Rule 144A Definitive Note"), upon provision to the Trustee, the Issuers and the Note Registrar of a Rule 144A Transfer Certificate;

(ii)    Subject to Section 2.4(b)(iv), in the event Definitive Notes are issued pursuant to Section 2.4(b)(vi), the Trustee shall cause the transfer of (i) any Definitive Note for a beneficial interest in a Regulation S Global Note, upon provision to the Trustee and the Issuers of a Regulation S Transfer Certificate or (ii) any Definitive Note for a beneficial interest in a Rule 144A Global Note, upon provision to the Trustee and the Issuers of a Rule 144A Transfer Certificate.

(iii)    Upon acceptance for exchange or transfer of a beneficial interest in a Global Note for a Definitive Note, or upon acceptance for exchange or transfer of a Definitive Note for a beneficial interest in a Global Note, each as provided herein, the Trustee shall approve the instruction at the Depository to adjust the principal amount of such Global Note on its records to evidence the date of such exchange or transfer and the change in the principal amount of such Global Note.

(iv)    Subject to the restrictions on transfer and exchange set forth in this Section 2.4 and to any additional restrictions on transfer or exchange specified in the Definitive Notes, the Holder of any Definitive Note may transfer or exchange the same in whole or in part (in a principal amount equal to the minimum authorized denomination or any larger authorized amount) by surrendering such Definitive Note at the Corporate Trust Office or at the office of any Transfer Agent, together with (x) in the case of any transfer, an executed instrument of assignment, (y) in the case of any exchange, a written request for exchange and (z) provision to the Trustee and the Issuers of a written certification in the form of Exhibit B-3.  Following a proper request for transfer or exchange, the Trustee shall (provided it has available in its possession an inventory of Definitive Notes), within five Business Days of such request if made at such Corporate Trust Office, or within ten Business Days if made at the office of a Transfer Agent (other than the Trustee), authenticate and make available at such Corporate Trust Office or at the office of such Transfer Agent, as the case may be, to the transferee (in the case of transfer) or Noteholder (in the case of exchange) or send by first Class mail (at the risk of the transferee in the case of transfer or Noteholder in the case of exchange) to such address as the transferee or Noteholder, as applicable, may request, a Definitive Note or Notes, as the case may require, for a like aggregate principal amount and in such authorized denomination or denominations as may be requested.  The presentation for transfer or exchange of any Definitive Note shall not be valid unless made at the Corporate Trust Office or at the office of a Transfer Agent by the registered Noteholder in person, or by a duly authorized attorney-in-fact.  Beneficial interests in Global Notes shall be exchangeable for Definitive Notes only under the limited circumstances described in Section 2.4(b)(vi).

(v)    Subject to the restrictions on transfer and exchange set forth in this Section 2.4 and to any additional restrictions on transfer or exchange specified in Schedule II to the Securities Purchase Agreement, the Holder of any Class A-1B

Definitive Note may transfer or exchange the same in whole or in part (in a principal amount equal to (i) if the Commitment Termination Date has not occurred, the outstanding funded amount of such Class A-1B Definitive Note or (ii) if the Commitment Termination Date has occurred, the lesser of (x) the minimum denomination of the Class A-1B Notes and (y) the outstanding principal amount of such Class A-1B Note) by surrendering such Definitive Note at the Corporate Trust Office or at the office of any Transfer Agent, together with (x) in the case of any transfer, an executed instrument of assignment (which may be by way of standing order), (y) in the case of any exchange, a written request for exchange (which request may be by way of standing order) and (z) provision to the Trustee and the Issuers of a written certification in the form of Exhibit B-1 (in the case of a transfer to a purchaser taking such Note in the form of a Regulation S Global Note) or Exhibit B-2 (in the case of a purchaser taking such Note in the form of a Rule 144A Global Note), with such modifications to such as exhibits as may be deemed necessary or desirable under the circumstances and are acceptable in form and substance to the Trustee.

(vi)    Interests in a Global Note deposited with or on behalf of the Depository pursuant to Section 2.1 hereunder shall be transferred (A) to the owners of such interests in the form of Definitive Notes only if such transfer otherwise complies with this Section 2.4 (including clauses (b)(i) and (b)(ii)) and (1) the Depository notifies the Issuer that it is unwilling or unable to continue as Depository for the Notes, (2) the Depository ceases to be a "clearing agency" registered under the Exchange Act and a successor Depository is not appointed by the Issuer within 90 days of such notice, (3) if the transferee of an interest in a Global Note is required by law to take physical delivery of securities in definitive form or (4) if the transferee is unable to pledge its interest in a Global Note or (B) to the purchaser thereof in the form of one or more Definitive Notes in accordance with the provisions of Section 2.4(b)(i).

(vii)    If interests in any Global Note are to be transferred to the Beneficial Owners thereof in the form of Definitive Notes pursuant to Section 2.4(b)(vi), such Global Note shall be surrendered by the Depository, or its custodian on its behalf, at the Corporate Trust Office or at the office of the Transfer Agent and the Trustee shall authenticate and deliver without charge, upon such transfer of interests in such Global Note, an equal aggregate principal amount of Definitive Notes of authorized denominations. The Definitive Notes transferred pursuant to this Section 2.4 shall be executed, authenticated and delivered only in the denominations specified in Section 2.2(b) and registered in such names as the Depository shall direct in writing.

(viii)    For so long as one or more Global Notes are Outstanding:

(A)    the Trustee and its directors, Officers, employees and agents may deal with the Depository for all purposes (including the making of distributions on, and the giving of notices with respect to, the Global Notes);

(B)    unless otherwise provided herein, the rights of Beneficial Owners shall be exercised only through the Depository and shall be limited to those

established by law and agreements between such Beneficial Owners and the Depository;

(C)    for purposes of determining the identity of and principal amount of Notes beneficially owned by a Beneficial Owner, the records of the Depository shall be conclusive evidence of such identity and principal amount and the Trustee may conclusively rely on such records when acting hereunder;

(D)    the Depository will make book-entry transfers among the Depository Participants of the Depository and will receive and transmit distributions of principal of and interest on the Global Notes to such Depository Participants; and

(E)    the Depository Participants of the Depository shall have no rights under this Indenture under or with respect to any of the Global Notes held on their behalf by the Depository, and the Depository may be treated by the Trustee and its agents, employees, Officers and directors as the absolute owner of the Global Notes for all purposes whatsoever.

(ix)    Each purchaser or transferee of a Class A Note or Class B Note, or any interest therein, will be deemed, by its purchase and holding of such Note or interest therein, to have represented and warranted that either (i) the purchaser is not and will not be an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, a plan which is subject to Section 4975 of the Code, any entity whose underlying assets include "plan assets" by reason of any such plan's investment in the entity, or any employee benefit or other plan which is subject to any federal, state, local or foreign law or regulation that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code ("Similar Law") or (ii) the purchaser's purchase and holding of such Note or interest therein do not and will not constitute or result in a prohibited transaction under Section 406 of ERISA, Section 4975 of the Code or Similar Law for which an exemption is not available. The purchaser understands and agrees that any purported transfer of a Class A Note or Class B Note to a purchaser that does not comply with the requirements of this paragraph shall be null and void *ab initio*.

(x)    Each purchaser or transferee of a Class C Note or Class D Note, or any interest therein, will be deemed by its purchase and holding of such Note or interest therein to have represented and warranted that it is not a Benefit Plan Investor. If such purchaser is an insurance company acting on behalf of its general account, such purchaser will be deemed to have represented and warranted that none of the assets of such general account are or will become "plan assets." The purchaser agrees that it will not offer, sell, pledge or otherwise transfer any interest in the Class C Notes or Class D Notes, as applicable, to a Benefit Plan Investor. The purchaser understands and agrees that any purported transfer of a Class C Note or Class D Note to a purchaser that does not comply with the requirements of this paragraph shall be null and void *ab initio*.

(c)    Denominations; Flow-Through Investment Vehicles; Qualified Purchaser Status; Forced Sale.    No Person may hold a beneficial interest in any Note except in a

denomination authorized for the Notes of such Class under Section 2.2(b). No transfer of a Note may be made to a Flow-Through Investment Vehicle other than a Qualifying Investment Vehicle. Any purported transfer that is not in compliance with this Section 2.4 will be void and shall not be given effect for any purpose hereunder.

If, notwithstanding the restrictions set forth in this Section 2.4, either of the Issuers determines that any Beneficial Owner or Holder of a Rule 144A Note (or any interest therein) (A) is a U.S. Person and (B) is not both a Qualified Institutional Buyer (unless such Beneficial Owner is an Institutional Accredited Investor that purchased such Rule 144A Note or interest therein directly from the Issuers or the Initial Purchasers) and also a Qualified Purchaser, either of the Issuers may require, by notice to such Beneficial Owner or Holder, as the case may be, that such Beneficial Owner or Holder sell all of its right, title and interest to such Note (or interest therein) to a Person that is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser, with such sale to be effected within 30 days after notice of such sale requirement is given. If such Beneficial Owner or Holder fails to effect the transfer required within such 30-day period, (i) upon written direction from the Issuer, the Trustee shall, on behalf of and at the expense of the Issuer, and is hereby irrevocably authorized by such Beneficial Owner or Holder, as the case may be, to cause its interest in such Note to be transferred in a commercially reasonable sale (conducted by the Trustee in accordance with Section 9-610(b) of the UCC as in effect in the State of New York as applied to securities that are sold on a recognized market or the subject of widely distributed standard price quotations) to a Person that certifies to the Trustee and the Issuers, in connection with such transfer, that such Person is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser and (ii) pending such transfer, no further payments will be made in respect of such Note (or beneficial interest therein) held by such Holder or Beneficial Owner and such Note shall be deemed not to be Outstanding for the purpose of any vote or consent of the Noteholders.

(d)    Legends.    Any Note issued upon the transfer, exchange or replacement of Notes shall bear such applicable legend set forth in the relevant Exhibit hereto unless there is delivered to each of the Trustee, the Note Registrar and the Issuers such satisfactory evidence, which may include an Opinion of Counsel, as may be reasonably required by any of the Trustee, the Note Registrar and the Issuers to the effect that neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A and to ensure that neither of the Issuers nor the pool of Collateral becomes an investment company required to be registered under the Investment Company Act. Upon provision of such satisfactory evidence, the Trustee, at the direction of the Issuers, shall authenticate and deliver Notes that do not bear such applicable legend.

(e)    Expenses; Acknowledgment of Transfer.    Transfer, registration and exchange shall be permitted as provided in this Section 2.4 without any charge to the Noteholder except for a sum sufficient to cover any tax or other governmental charge payable in connection therewith or the expenses of delivery (if any) not made by regular mail. Registration of the transfer of a Note by the Trustee shall be deemed to be the acknowledgment of such transfer on behalf of the Issuers.

(f)     Surrender upon Final Payment.  Upon final payment due on the Maturity of a Note, the Holder thereof shall present and surrender such Note at the Corporate Trust Office of the Trustee or at the office of any Paying Agent.

(g)     Repurchase and Cancellation of Notes.  The Issuers will not purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the Outstanding Notes except upon the redemption of the Notes in accordance with the terms of this Indenture and the Notes. The Issuers will promptly cancel all Notes acquired by them pursuant to any payment, purchase, redemption, prepayment or other acquisition of Notes pursuant to any provision of this Indenture and no Notes may be issued in substitution or exchange for any such Notes.

(h)     Compliance with Transfer Restrictions.  Notwithstanding anything contained herein to the contrary, neither the Trustee nor the Note Registrar shall be responsible for ascertaining whether any transfer complies with the registration provisions of or exemptions from the Securities Act, applicable state securities laws, the rules of any Depository, ERISA, the Code or the Investment Company Act; *provided* that if a certificate is specifically required by the express terms of this Section 2.4 to be delivered to the Trustee or the Note Registrar by a purchaser or transferee of a Note, the Trustee or the Note Registrar, as the case may be, shall be under a duty to receive and examine the same to determine whether the certificate substantially complies on its face with the express terms of this Indenture and shall promptly notify the party delivering the same if such transfer does not comply with such terms.  To the extent applicable to the Issuer, the Issuer shall impose additional transfer restrictions necessary to comply with the USA PATRIOT Act, and any such transfer restrictions shall be binding on each Noteholder.  The Issuer shall notify the Trustee and the Note Registrar of the imposition of any such transfer restrictions.

(i)     Physical Notes.  The Issuers will promptly make available to the Trustee without charge a reasonable supply of Definitive Notes in definitive, fully Registered Form, without interest coupon.

(j)     Transfers Null and Void.  Any purported transfer of a Note not in accordance with this Section 2.4 shall be null and void and shall not be given effect for any purpose hereunder.

(k)     Transfers of Class A-1B Notes.  Notwithstanding anything to the contrary, the Class A-1B Notes may not be transferred until the earlier to occur of (a) the last Subsequent Funding Date, (b) the receipt by the Trustee and the Holders of the Class A-1B Notes of written notice that the Issuer does not intend to require any further funding for the Class A-1B Notes on any upcoming Subsequent Funding Date, (c) the occurrence of any event that results in the failure of a requested funding on a Subsequent Funding Date or (d) the Effective Date.

(l)     The Purchaser agrees that, for purposes of U.S. federal, state and local income and franchise tax and any other income taxes, (i) the Issuer will be treated as a corporation, (ii) the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes will be treated as indebtedness of the Issuer, and (iii) the Preference Shares will be treated as equity in the Issuer; the Purchaser agrees to such treatment and agrees to take no action inconsistent with such treatment, unless required by law.

(m)    The Purchaser understands that each of the Co-Issuers, the Trustee or the Preference Share Paying Agent shall require certification acceptable to it (i) as a condition to the payment of principal of and interest on any Note without, or at a reduced rate of, U.S. withholding or backup withholding tax, and (ii) to enable each of the Co-Issuers, the Trustee and the Preference Share Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments in respect of such Notes or the holder of such Notes under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.    Such certification may include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms).    In addition, each of the Co-Issuers, the Trustee or the Preference Share Paying Agent may require certification acceptable to it to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets.    Each purchaser agrees to provide any certification requested pursuant to this paragraph and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

2.5    Mutilated, Defaced, Destroyed, Lost or Stolen Notes

If (a) any mutilated or defaced Note is surrendered to a Transfer Agent, or if there shall be delivered to the Issuers, the Trustee and the Transfer Agent (each, a "Specified Person") evidence to their reasonable satisfaction of the destruction, loss or theft of any Note, and (b) there is delivered to the Specified Persons such security or indemnity as may reasonably be required by them to save each of them harmless then, in the absence of notice to the Specified Persons that such Note has been acquired by a *bona fide* purchaser, the Issuers shall execute and shall direct the Trustee to authenticate, and upon Issuer Request the Trustee shall authenticate and deliver, in lieu of any such mutilated, defaced, destroyed, lost or stolen Note, a new Note of the same Class as such mutilated, defaced, destroyed, lost or stolen Note, of like tenor (including the same date of issuance) and equal principal amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a number not contemporaneously outstanding.

If, after delivery of such new Note, a *bona fide* purchaser of the predecessor Note presents for payment, transfer or exchange such predecessor Note, the Specified Persons shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Specified Persons in connection therewith.

In case any such mutilated, defaced, destroyed, lost or stolen Note has become due and payable, the Issuers in their discretion may, instead of issuing a new Note, pay such Note without requiring surrender thereof except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this <u>Section 2.5</u>, the Issuers, the Trustee or any Transfer Agent may require the payment by the registered Holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this <u>Section 2.5</u> in lieu of any mutilated, defaced, destroyed, lost or stolen Note, shall constitute an original additional contractual obligation of the Issuers and such new Note shall be entitled, subject to the second paragraph of this <u>Section 2.5</u>, to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this <u>Section 2.5</u> are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

2.6    <u>Payment of Principal and Interest; Rights Preserved</u>

(a)    As provided under the terms of each Note, each Class or Sub-class of Notes shall accrue interest during each Interest Accrual Period applicable to such Class or Sub-class at the applicable Note Interest Rate specified in <u>Section 2.2</u>. As provided under the terms of each Note, interest on each Class or Sub-class of Notes shall be due and payable on each Payment Date; *provided* that (i) payment of interest on the funded amount of the Class A-1B Notes will be subordinated to the payment on each Payment Date of the interest due and payable on the Class A-1A Notes, (iii) payment of interest on the Class A-2 Notes is subordinated to the payment on each Payment Date of the interest due and payable on the Class A-1 Notes (together with Defaulted Interest thereon and interest on such Defaulted Interest, if any) on each Payment Date, (iv) payment of interest on the Class B Notes is subordinated to the payment on each Payment Date of the interest due and payable on the Class A Notes (together with Defaulted Interest thereon and interest on such Defaulted Interest, if any) on each Payment Date, (v) payment of interest on the Class C Notes is subordinated to the payment on each Payment Date of the interest due and payable on the Class A Notes and Class B Notes (together with Defaulted Interest thereon and interest on such Defaulted Interest, if any) on each Payment Date, (vi) payment of interest on the Class D Notes is subordinated to the payment on each Payment Date of the interest due and payable on the Class A Notes, Class B Notes and Class C Notes (together with Defaulted Interest thereon and interest on such Defaulted Interest, if any) on each Payment Date, and (vii) payments of interest on all Notes are subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments. Except as provided in <u>Sections 5.5</u>, <u>11.1(a)</u>, <u>12.2</u> and <u>12.3</u>, no payment shall be made by the Issuers hereunder other than on a Payment Date.

As provided under the terms of the Notes, so long as any Class A-1 Notes, Class A-2 Notes or Class B Notes are Outstanding, any interest due on the Class C Notes that is not available to be paid as a result of the operation of the Priority of Payments on any Payment Date (any such interest, "<u>Class C Deferred Interest</u>") shall be deferred and added to the Aggregate Outstanding Amount of the Class C Notes and shall not be considered "due and payable" for the purposes of <u>Section 5.1(a)</u> until the Quarterly Payment Date on which such Class C Deferred Interest is available to be paid in accordance with the Priority of Payments;

*provided* that no accrued interest on the Class C Notes shall become Class C Deferred Interest unless Class A-1 Notes, Class A-2 Notes or Class B Notes are then Outstanding. Class C Deferred Interest accrued to any Payment Date shall bear interest at a rate equal to 3-month LIBOR *plus* 1.35% *per annum* and shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. Upon the payment of Class C Deferred Interest, the Aggregate Outstanding Amount of the Class C Notes will be reduced by the amount of such payment.

As provided under the terms of the Notes, so long as any Class A-1 Notes, Class A-2 Notes, Class B Notes or Class C Notes are Outstanding, any interest due on the Class D Notes that is not available to be paid as a result of the operation of the Priority of Payments on any Payment Date (any such interest, "Class D Deferred Interest") shall be deferred and added to the Aggregate Outstanding Amount of the Class D Notes and shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Payment Date on which such Class D Deferred Interest is available to be paid in accordance with the Priority of Payments; *provided* that no accrued interest on the Class D Notes shall become Class D Deferred Interest unless Class A-1 Notes, Class A-2 Notes, Class B Notes or Class C Notes are then Outstanding. Class D Deferred Interest accrued to any Payment Date shall bear interest at a rate equal to 3-month LIBOR *plus* 2.95% *per annum* with respect to the Class D-1 Notes and shall bear interest at a rate equal to 8.6% with respect to the Class D-2 Notes and shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. Upon the payment of Class D Deferred Interest, the Aggregate Outstanding Amount of the Class D Notes will be reduced by the amount of such payment.

(b)    As provided under the terms of the Notes, the principal of each Note shall be payable no later than the Stated Maturity thereof unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

(c)    As provided under the terms of the Notes, so long as the Coverage Tests are satisfied, principal will not be payable on any Class or Sub-class of Notes from Interest Proceeds except (i) upon the occurrence of an Optional Redemption, Auction Call Redemption or a Tax Redemption, (ii) upon the occurrence of a Rating Confirmation Failure, (iii) during the Reinvestment Period in the case of the Class D Notes, in the manner set forth in Section 11.1(a)(i) and (iv) in the case of the Class C Notes and Class D Notes, to pay amounts in respect of Class C Deferred Interest and Class D Deferred Interest, as applicable.

(d)    As provided under the terms of the Notes, as a condition to the payment of any principal of, interest on any Note without the imposition of withholding tax, any Paying Agent shall require the previous receipt of properly completed and signed applicable U.S. Federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or applicable successor form)) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or the applicable Internal Revenue Service Form W-8 (or applicable successor form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) or other certification acceptable to it to enable the Issuers, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in

respect of such Note or the Holder of such Note under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

(e)     As provided under the terms of the Notes, the Issuer shall not be obligated to pay any additional amounts to the Holders or Beneficial Owners of the Notes as a result of deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges with respect to the Notes.

(f)     As provided under the terms of the Notes, payments in respect of principal of and interest on the Notes shall be payable by wire transfer in immediately available funds to a Dollar account maintained by the Noteholders in accordance with wire transfer instructions received by any Paying Agent on or before the Record Date or, if no wire transfer instructions are received by a Paying Agent on or before the Record Date, by a Dollar check drawn on a bank in the United States mailed by first Class mail to the address of such Noteholder as it appears on the Note Register at the close of business on the Record Date for such payment.

(g)     As provided under the terms of the Notes, the principal of and interest on any Note that is payable on a Redemption Date or in accordance with the Priority of Payments on a Payment Date and is punctually paid or duly provided for on such Redemption Date or Payment Date shall be paid to the Person in whose name such Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such payment.  All such payments that are mailed or wired and returned to the Paying Agent shall be held for payment as herein provided at the office or agency of the Issuers to be maintained as provided in <u>Section 7.2</u>.

As provided under the terms of the Notes, payments to Holders of the Notes of each Class or Sub-class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of such Class or Sub-class registered in the name of each such Holder on the Record Date for such payment bears to the Aggregate Outstanding Amount of all Notes of such Class or Sub-class on such Record Date.

(h)     As provided under the terms of the Notes, Payment of any Defaulted Interest may be made in any other lawful manner in accordance with the Priority of Payments if notice of such payment is given by the Trustee to the Issuers and the Noteholders, and such manner of payment shall be deemed practicable by the Trustee.

(i)     As provided under the terms of the Notes, all reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(j)     As provided under the terms of the Notes, the obligations of the Issuers under the Notes and this Indenture are limited-recourse obligations of the Issuers payable solely from the Collateral and following realization of the Collateral, any claims of the Noteholders and the other Secured Parties shall be extinguished and shall not revive.  No recourse shall be had

against any Officer, member, director, manager, employee, security holder or incorporator of the Issuers, the Trustee, the Collateral Manager, Collateral Administrator, the Administrator, any Rating Agency, or any of their respective successors or assigns for the payment of any amounts payable under the Notes or this Indenture.  It is understood that the foregoing provisions of this Section 2.6(j) shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Collateral has been realized, whereupon any outstanding indebtedness or obligation shall be extinguished.  It is further understood that the foregoing provisions of this Section 2.6(j) shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any action or suit or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

(k)     Subject to the foregoing provisions of this Section 2.6 and the provisions of Sections 2.4 and 2.5, each Note delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest and principal that was carried by such other Note.

2.7     Persons Deemed Owners

As provided under the terms of the Notes, the Issuers, the Trustee and any agent of any of them (collectively, the "Relevant Persons") may treat the Person in whose name any Note on the Note Register is registered as the owner of such Note on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and no Relevant Person shall be affected by notice to the contrary.

2.8     Cancellation

All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee, shall promptly be canceled by it and may not be reissued or resold.  No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.8, except as expressly permitted by this Indenture.  All canceled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Issuers shall direct by an Issuer Order that they be returned to them.  Any Notes purchased by the Issuers shall be immediately delivered to the Trustee for cancellation.

# ARTICLE 3

## CONDITIONS PRECEDENT

3.1    <u>General Provisions</u>

The Notes may be executed by the Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee (or an Authenticating Agent on its behalf) upon Issuer Request, upon receipt by the Trustee of the following:

(a)    (i)    (A) an Officer's certificate of the Issuer, (1) evidencing the authorization by Board Resolution of the execution and delivery of, and the performance of the Issuer's obligations under, this Indenture, the Collateral Administration Agreement, the Administration Agreement, the Account Control Agreement, the Preference Share Paying Agency Agreement, the Collateral Management Agreement, the Subscription Agreements and the Hedge Agreement, in each case as may be amended on or prior to, and as in effect on, the Closing Date, and the execution, authentication and delivery of the Notes and the issuance of the Preference Shares, and (2) certifying that (x) the attached copy of such Board Resolution is a true and complete copy thereof, (y) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (z) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon and (B) a director's certificate of the Issuer specifying the Stated Maturity, the principal amount and the Note Interest Rate with respect to each Class or Sub-class of Notes to be authenticated and delivered; and

(ii)    an Officer's certificate of the Co-Issuer (A) evidencing the authorization by the Sole Manager of the execution and delivery of, and the performance of the Co-Issuer's obligations under, this Indenture, as may be amended on or prior to, and as in effect on, the Closing Date, and the execution, authentication and delivery of the Notes and specifying the Stated Maturity, the principal amount and Note Interest Rate of each such Class or Sub-class of Notes to be authenticated and delivered, and (B) certifying that (1) the attached copy of such Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(b)    (i)    either (A) a certificate of the Issuer, or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel to the Issuer, satisfactory in form and substance to the Trustee and on which the Trustee is entitled to rely, to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes and the Preference Shares or (B) an Opinion of Counsel to the Issuer, on which the Trustee is entitled to rely, to the effect that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Notes or the Preference Shares except as may have been given; and

(ii)    either (A) a certificate of the Co-Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel to the Co-Issuer, satisfactory in form and substance to the Trustee and on which the Trustee is entitled to rely, to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes, or (B) an Opinion of Counsel to the Co-Issuer, on which the Trustee is entitled to rely, to the effect that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Notes;

(c)    (i)    opinions of Cadwalader, Wickersham & Taft LLP, special New York counsel to the Issuers, dated the Closing Date, substantially in the forms of Exhibit D and Exhibit E; and

(ii)    an opinion of Walkers, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of Exhibit F;

(iii)    an opinion of Gardere Wynne Sewell LLP, counsel to the Trustee, dated as of the Closing Date, substantially in the form of Exhibit G;

(iv)    an opinion of Orrick, Herrington & Sutcliffe LLP, special counsel to the Collateral Manager, dated the Closing Date, substantially in the form of Exhibit H-1 and an opinion of counsel to the Collateral Manager, dated the Closing Date, substantially in the form of Exhibit H-2; and

(v)    an opinion of in-house counsel to the Initial Hedge Counterparty, dated as of the Closing Date, substantially in the form of Exhibit I.

(d)    an Officer's certificate of the Issuer, stating that the Issuer is not in Default under this Indenture and that the issuance of the Notes and the Preference Shares will not result in a breach of any of the terms, conditions or provisions of, or constitute a Default under, the Issuer Charter, any indenture or other agreement or instrument to which the Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Issuer is a party or by which it may be bound or to which it may be subject; that no Event of Default shall have occurred and be continuing; that all of the representations and warranties contained herein are true and correct as of the Closing Date; that all conditions precedent provided in this Indenture and the Preference Share Documents relating to the authentication and delivery of the Notes and the delivery of the Preference Shares applied for (including in Section 3.2) have been complied with; and that all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid;

(e)    an Officer's certificate of the Co-Issuer stating that the Co-Issuer is not in Default under this Indenture and that the issuance of the Notes will not result in a breach of any of the terms, conditions or provisions of, or constitute a Default under, the Certificate of Formation or Limited Liability Company Agreement of the Co-Issuer, any indenture or other agreement or instrument to which the Co-Issuer is a party or by which it is bound, or any order of

any court or administrative agency entered in any Proceeding to which the Co-Issuer is a party or by which it may be bound or to which it may be subject; that no Event of Default shall have occurred and be continuing; that all of the representations and warranties contained herein are true and correct as of the Closing Date; that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Notes applied for have been complied with; and that all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid;

(f)     an accountants' report (A) confirming the information with respect to each Collateral Asset set forth on the Schedule of Collateral Assets attached hereto as Schedule A (other than the information relating to the price of such Collateral Asset) and the information provided by or on behalf of the Issuer with respect to every other asset forming part of the Collateral, by reference to such sources as shall be specified therein, (B) confirming by reference to an Officer's certificate of the Issuer, that the Aggregate Principal Amount of the Collateral Assets which the Issuer has purchased or entered into binding commitments to purchase on or prior to the Closing Date is at least U.S.$2,123,595,985, (C) confirming compliance with each Collateral Quality Test (except the Standard & Poor's CDO Monitor Test and the Moody's Asset Correlation Test applicable) on the Closing Date and (D) specifying the procedures undertaken by them to review data and computations relating to the foregoing statements;

(g)     an executed copy of each of the Collateral Administration Agreement, the Account Control Agreement, the Collateral Management Agreement, the Securities Purchase Agreement and the Administration Agreement;

(h)     if any Collateral Assets that pay less frequently than quarterly are purchased by the Issuer on the Closing Date, a copy of the Asset Reserve Schedule with respect to such Collateral Assets; and

(i)     an executed copy of any Hedge Agreements and each document to be delivered on the Closing Date pursuant thereto;

(j)     evidence of delivery of the Financing Statement for filing with the Recorder of Deeds in the District of Columbia;

(k)     a copy of the form of registration of charge specifying the particulars of the security interests granted in favor of the Trustee hereunder to be entered on the register of mortgages and charges maintained by the Issuer in accordance with the Companies Law (2004 Revision) of the Cayman Islands on or promptly following the Closing Date;

(l)     an executed copy of the Preference Share Paying Agency Agreement and executed copies of the Subscription Agreements from each purchaser of the Preference Shares; and

(m)     an Issuer Order executed by the Issuers directing the Trustee to (i) authenticate the Notes specified therein, in the amounts set forth therein and registered in the name(s) set forth therein and (ii) deliver the authenticated Notes to the Issuer to hold on behalf of the Co-Issuer or as otherwise directed by the Issuer or the Co-Issuer.

3.2     <u>Security for Notes</u>

Prior to the issuance of the Notes on the Closing Date, the Issuer shall cause the following conditions to be satisfied:

(a)    <u>Grant of Security Interest; Delivery of Collateral Assets</u>.  The Grant pursuant to the Granting clauses of this Indenture of all of the Issuer's right, title and interest in and to the Collateral and the transfer of all Collateral Assets purchased by the Issuer on the Closing Date and any Equity Securities acquired in connection therewith (as set forth in the Schedule of Collateral Assets) to the Trustee in the manner provided in <u>Section 3.3(b)</u>.

(b)    <u>Certificate of the Issuer</u>.  The delivery to the Trustee of a certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, in the case of each Collateral Asset pledged to the Trustee for inclusion in the Collateral on the Closing Date and immediately prior to the delivery thereof on the Closing Date:

(i)    the Issuer is the owner of such Collateral Asset free and clear of any liens, claims or encumbrances of any nature whatsoever except for those which are being released on the Closing Date and except for those Granted pursuant to this Indenture and encumbrances arising from due bills, if any, with respect to interest, or a portion thereof, accrued on such Collateral Asset prior to the first Payment Date and owed by the Issuer to the seller of such Collateral Asset;

(ii)    the Issuer has acquired its ownership in such Collateral Asset in good faith without notice of any adverse claim (within the meaning given to such term by Section 8-102(a)(1) of the UCC), except as described in clause (i) above;

(iii)    the Issuer has not assigned, pledged or otherwise encumbered any interest in such Collateral Asset (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(iv)    the Issuer has full right to Grant a security interest in and assign and pledge all of its right, title and interest in such Collateral Asset to the Trustee;

(v)    the information set forth with respect to such Collateral Asset in the Schedule of Collateral Assets is correct;

(vi)    each Collateral Asset included in the Collateral satisfies the requirements of the definition of "Collateral Asset", none of the Collateral Assets are Discount Securities and each Collateral Asset is transferred to the Trustee as required by <u>Section 3.2(a)</u>;

(vii)    each Collateral Asset was acquired in accordance with all applicable requirements of <u>Section 12.2</u>; and

(viii)    upon Grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral subject in the case of any Synthetic Security Collateral Account to the security interest of the related Synthetic Security Counterparty in such Account

(assuming that any Clearing Corporation, Securities Intermediary or other entity not within the control of the Issuer involved in the Grant of Collateral takes the actions required of it under Section 3.3(b) for perfection of that interest) and a Security Entitlement with respect to Financial Assets.

(c)    Rating Letters.  The delivery to the Trustee of an Officer's certificate of the Issuer, to the effect that (i) attached thereto are true and correct copies of (A) one or more letters signed by Moody's confirming that the Class A-1 Notes and the Class A-2 Notes have been rated "Aaa" by Moody's, that the Class B Notes have been rated at least "Aa2" by Moody's, that the Class C Notes have been rated at least "A2" by Moody's and that the Class D-1 Notes and Class D-2 Notes have been rated at least "Baa2" by Moody's and (B) a letter signed by Standard & Poor's confirming that the Class A-1 Notes and the Class A-2 Notes have been rated "AAA" by Standard & Poor's, that the Class B Notes have been rated at least "AA" by Standard & Poor's, that the Class C Notes have been rated at least "A" by Standard & Poor's and that the Class D-1 Notes and Class D-2 Notes have been rated at least "BBB" by Standard and Poor's.

(d)    Accounts.  The delivery by the Trustee of evidence of the establishment of the Payment Account, the Collection Account, the Collateral Account, the Hedge Termination Receipts Account, the Hedge Replacement Account, the Hedge Collateral Account, each Synthetic Security Issuer Account, each Synthetic Security Collateral Account and the Asset Reserve Account, each to be established on the Closing Date.

(e)    Funding Certificate.  The delivery to the Trustee of a Funding Certificate, duly executed by an Authorized Officer of the Issuer, relating to, among other things, the disposition of the proceeds of the issuance of the Notes and the Preference Shares, dated the Closing Date.

(f)    Purchases.  The delivery to the Trustee of a certification of the Issuer that the Issuer shall have entered into one or more agreements to purchase, for settlement on or following the Closing Date in accordance with customary settlement procedures in the relevant markets, Collateral Assets having an Aggregate Principal Amount of not less than U.S.$2,123,595,985.

(g)    Proceeds of the Preference Shares.  The Issuer has received the aggregate issue price of U.S.$9,500,000 from the issuance of the Preference Shares.

3.3    Custodianship; Transfer of Collateral Assets and Eligible Investments

(a)    The Trustee shall hold all Certificated Securities and Instruments in physical form at the office of a custodian appointed by it (together with any successor, the "Custodian").  Initially, such Custodian shall be JPMorgan Chase Bank, National Association with its address at 4 New York Plaza, Ground Floor, New York, New York 10004, Attention: Worldwide Securities Services – Millstone III CDO, Ltd.  Any successor custodian shall be a state or national bank or trust company which is not an Affiliate of the Issuer or the Co-Issuer and has a combined capital and surplus of at least U.S.$250,000,000, is subject to supervision or examination by Federal or state authority, has a long-term debt rating of at least "Baa1" by

Moody's (and, if rated "Baa1", is not on watch for possible downgrade by Moody's), at least "BBB+" by Standard & Poor's and a short-term debt rating of at least "P-1" by Moody's (and, if rated "P-1", is not on watch for possible downgrade by Moody's), and at least "A-1+" by Standard & Poor's and has an office in the Borough of Manhattan, City of New York.

(b)     Each Collateral Asset, Equity Security and Eligible Investment shall be credited to the appropriate Account.   Each time that the Issuer shall direct or cause the acquisition of any Collateral Asset, Equity Security or Eligible Investment, the Issuer shall, if such Collateral Asset, Equity Security or Eligible Investment has not already been transferred to the Collateral Account or a Synthetic Security Collateral Account and credited thereto, cause the transfer of such Collateral Asset, Equity Security or Eligible Investment to the Custodian to be held in and credited to the Collateral Account for the benefit of the Trustee in accordance with the terms of this Indenture.   The security interest of the Trustee in the funds or other property utilized in connection with such acquisition shall, immediately and without further action on the part of the Trustee, be released.   The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Asset, Equity Security or Eligible Investment so acquired, including all rights of the Issuer in and to any contracts related to and proceeds of such Collateral Asset, Equity Security or Eligible Investment.   On the Closing Date and on each day any Collateral is acquired or otherwise becomes subject to the lien of this Indenture, the Issuer represents and warrants to the Trustee as follows:

(i)     This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Collateral in favor of the Trustee, which security interest has priority over all other claims, encumbrances and liens on the Collateral (except for the security interest in favor of the relevant Synthetic Security Counterparty in the case of any Synthetic Security Collateral Account), and is enforceable as such against creditors of, and purchasers from, the Issuer.

(ii)     All of the Collateral consists of either "general intangibles", "security entitlements", "financial assets" (each within the meaning of the applicable Uniform Commercial Code) or Instruments.

(iii)     (a) The Issuer's rights under the Hedge Agreement, the Collateral Administration Agreement, the Collateral Management Agreement, Synthetic Securities, the Administration Agreement and the Subscription Agreements constitute "general intangibles" (as defined in the applicable Uniform Commercial Code) and (b) the assets credited to the Accounts constitute "financial assets" under the applicable Uniform Commercial Code.

(iv)     All Cash, Eligible Investments, Equity Securities and Collateral Assets will be credited to one of the Accounts.   The Custodian for each Account has agreed to treat all assets credited to the Accounts as "financial assets" (within the meaning of the applicable Uniform Commercial Code) pursuant to the terms of the Account Control Agreement.

(v)     The Issuer has received all consents and approvals required by the terms of the Underlying Instrument of each item of Collateral to pledge to the Trustee its rights and interests in each Collateral.

(vi)     In order to perfect the security interest in the Collateral granted to the Trustee hereunder, the Issuer shall:

(A)     in the case of a "financial asset" credited to one of the Accounts, (1) deliver on the Closing Date to the Trustee a fully executed Account Control Agreement pursuant to which the Custodian, as Securities Intermediary, has agreed to comply with all instructions originated by the Trustee directing disposition of the funds in the Accounts without further consent by the Issuer and (2) take all steps necessary to cause the Custodian, as Securities Intermediary, to identify in its records the Trustee as the person having a security entitlement against the Custodian, as Securities Intermediary, in each of the Accounts;

(B)     in the case of a "general intangible" (within the meaning of the applicable Uniform Commercial Code), cause, within 10 days of the Closing Date (or 10 days of the acquisition date of such general intangible), the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law; and

(C)     in the case of an Instrument, cause all original executed copies of each document that constitutes or evidences such Instrument to be delivered to the Custodian.

(vii)     The Accounts are not maintained in the name of any person other than the Issuer or the Trustee.  The Issuer has not consented to the Securities Intermediary of any Account complying with entitlement orders of any Person other than the Trustee.

(viii)     Other than the security interest granted to the Trustee pursuant to this Indenture, the Issuer owns and has good and marketable title to the Collateral free and clear of any lien, claim or encumbrance of any Person.

(ix)     Other than the security interest granted to the Trustee pursuant to this Indenture the Issuer has not pledged, assigned, sold or granted any security interest in, or otherwise conveyed, any of the Collateral.  The Issuer has not authorized the filing of, and is not aware of, any financing statements against it that include a description of collateral covering the Collateral other than any financing statement relating to the security interest granted to the Trustee hereunder.

(x)     The Issuer is not aware of any judgment lien or tax lien filed against the Issuer.

(xi)     The Issuer shall receive a written acknowledgement from the Custodian that, when holding any Instrument in physical form, the Custodian is acting solely as agent of the Secured Parties.

(xii)    In the case of any Instruments forming part of the Collateral, no such Instrument shall have any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Trustee.

The Trustee and the Issuers (x) shall not, without satisfying the Rating Agency Condition, waive any of the representations and warranties set forth in this Section 3.3(b) or a breach thereof and (y) shall provide each Rating Agency with prompt written notice of any breach of the representations and warranties set forth in this Section 3.3(b).

# ARTICLE 4

## SATISFACTION AND DISCHARGE

4.1    Satisfaction and Discharge of Indenture

This Indenture shall be discharged and shall cease to be of further effect with respect to the Collateral securing the Notes and the Notes except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, defaced, destroyed, lost or stolen Notes, (iii) rights of Noteholders to receive payments of principal thereof and interest thereon, (iv) the rights, obligations and immunities of the Trustee hereunder and (v) the rights of the Secured Parties as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them; and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

(a)    either:

(i)    all Notes theretofore authenticated and delivered (other than (A) Notes which have been mutilated, defaced, destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.5 and (B) Notes for whose payment Cash has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.3) have been delivered to the Trustee for cancellation; or

(ii)    all Notes not theretofore delivered to the Trustee for cancellation (A) have become due and payable, (B) will become due and payable at their Stated Maturity within one year, or (C) are to be called for redemption pursuant to Section 9.1 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Issuers pursuant to Section 9.4 and the Issuer has irrevocably deposited or caused to be deposited with the Trustee on behalf of the Issuer, in trust for such purpose, Cash or noncallable direct obligations of the United States in an amount sufficient, as verified by a firm of nationally recognized Independent certified public accountants, to pay and discharge the entire indebtedness on all Notes not theretofore delivered to the Trustee for cancellation, including all principal and interest (including Class C Deferred Interest, Class D Deferred Interest, Defaulted Interest and interest on Defaulted Interest, if any) accrued to the date of such deposit (in the case of Notes which have become due and payable) or to the Stated Maturity or the Redemption Date, as the case may be; *provided*

that (x) such obligations are entitled to the full faith and credit of the United States and (y) this subclause (ii) shall not apply if an election to act in accordance with the provisions of Section 5.5(a) shall have been made and not rescinded;

        (b)      the Issuer has paid or caused to be paid all other sums payable hereunder (including amounts payable pursuant to any Hedge Agreements (including all termination payments), the Collateral Administration Agreement, the Administration Agreement, the Preference Share Paying Agency Agreement and the Collateral Management Agreement and no other amounts will become due and payable by the Issuer; and

        (c)      the Issuers have delivered to the Trustee Officer's certificates and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with.

        Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Issuers, the Trustee, the Hedge Counterparty, the Collateral Manager and, if applicable, the Noteholders, as the case may be, under Sections 2.6, 4.2, 5.4(d), 5.9, 5.18, 6.7, 6.8, 7.1, 7.3 and 14.15 shall survive.

        4.2      Application of Trust Cash

        All Cash deposited with the Trustee on behalf of the Issuer pursuant to Section 4.1 on behalf of the Issuer for the payment of principal of and interest on the Notes and amounts payable pursuant to the Hedge Agreement, the Administration Agreement, the Collateral Administration Agreement, the Preference Share Paying Agency Agreement and the Collateral Management Agreement shall be held in trust on behalf of the Issuer and applied by it in accordance with the provisions of the Notes, the Preference Share Paying Agency Agreement and this Indenture, including the Priority of Payments, for the payment either directly or through any Paying Agent, as the Trustee may determine, to the Person entitled thereto of the respective amounts in respect of which such Cash has been deposited with the Trustee; but such Cash need not be segregated from other funds held by the Trustee except to the extent required herein or required by law.

        4.3      Repayment of Cash Held by Paying Agent

        In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all Cash then held on behalf of the Issuer by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Issuers, be paid to the Trustee to be held on behalf of the Issuer and applied pursuant to Section 7.3 and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such Cash.

# ARTICLE 5

# EVENTS OF DEFAULT; REMEDIES

        5.1      Events of Default

"Event of Default", wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    a default in the payment, when due and payable, of any interest on any Class A Note or Class B Note or, if there are no Class A Notes or Class B Notes outstanding, any Class C Note or, if there are no Class A Notes, Class B Notes or Class C Notes outstanding, any Class D Note, which default continues for a period of seven days;

(b)    a default in the payment of principal due on any Note at its Stated Maturity or on any Redemption Date and, if such default is not due to credit-related reasons or fraud, the continuation of such default for a period of seven days;

(c)    the failure to disburse any amount on deposit in the Payment Account in excess of $500 on any Payment Date, and the continuation of such failure for a period of three days (from the date such error is found) or seven days (from the date such error is found) if such failure to disburse is not due to credit-related reasons or fraud;

(d)    a circumstance in which either of the Issuers or the Collateral or any portion thereof becomes an investment company required to be registered under the Investment Company Act;

(e)    a default, which has a material adverse effect on the Holders of the Notes (as determined by the Trustee on behalf of the Holders of the Notes or by the Holders of at least 25% in aggregate outstanding principal amount of the Controlling Class), in the performance, or breach, of any covenant, representation, warranty or other agreement of the Issuers in the Indenture (it being understood that a failure to satisfy a Collateral Quality Test, a Collateral Profile Test, any Coverage Test or any of the Reinvestment Criteria is not a default or breach), or if any representation or warranty of the Issuers made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith proves to be incorrect in any material respect when made, and the continuation of such default or breach for a period of 30 days after notice thereof shall have been given to the Issuers and the Collateral Manager by the Trustee or to the Issuers, the Collateral Manager and the Trustee by the Holders of at least 25% in aggregate outstanding principal amount of the Controlling Class;

(f)    the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Issuer or the Co-Issuer under the Bankruptcy Code or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 90 consecutive days;

(g)    the institution by the Issuer or the Co-Issuer of proceedings to be adjudicated as bankrupt or insolvent, or the consent by it to the institution of bankruptcy or

insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Code or any other similar applicable law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, respectively, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of any action by the Issuer or the Co-Issuer in furtherance of any such action; and

(h)    on any Measurement Date, if the ratio (expressed as a percentage) obtained by *dividing* (A) an amount equal to the aggregate par value on such Measurement Date of all (i) Collateral Assets, (ii) Principal Proceeds held as Cash and (iii) Eligible Investments purchased with Principal Proceeds by (B) the Aggregate Outstanding Amount of the Class A-1 Notes, is less than 100%.

If either of the Issuers shall obtain actual knowledge that an Event of Default shall have occurred and be continuing, the Issuer or the Co-Issuer, as the case may be, shall (unless the Trustee shall have provided notice of such Event of Default pursuant to <u>Section 6.2</u>) promptly notify the Trustee, the Noteholders, the Collateral Manager, the Hedge Counterparty, the Preference Share Paying Agent and each Rating Agency in writing of such Event of Default.

5.2    <u>Acceleration of Maturity; Rescission and Annulment</u>

(a)    If an Event of Default occurs and is continuing (other than an Event of Default specified in <u>Section 5.1(f)</u> or <u>5.1(g)</u>), (i) the Trustee (at the direction of the Holders of a Majority of the Controlling Class by notice to the Issuers) shall or (ii) Holders of a Majority of the Controlling Class, by notice to the Issuers and the Trustee, may (A) declare the principal of all of the Notes to be immediately due and payable, and upon any such declaration such principal, together with all accrued and unpaid interest thereon, and other amounts payable hereunder, shall become immediately due and payable and (B) terminate the Reinvestment Period. If an Event of Default specified in <u>Section 5.1(f)</u> or <u>5.1(g)</u> occurs, (A) all unpaid principal, together with all accrued and unpaid interest thereon, of all the Notes, and other amounts payable hereunder, shall automatically become due and payable without any declaration or other act on the part of the Trustee or any Noteholder and (B) the Reinvestment Period shall terminate. Notwithstanding the preceding sentence, if an Event of Default specified in <u>Section 5.1(a)</u> or <u>5.1(b)</u> occurs and is continuing solely with respect to a default in the payment of any principal of or interest on Notes of a Class other than the Controlling Class, neither the Trustee nor the Holders of such non-Controlling Class shall have the right to declare such principal and other amounts to be immediately due and payable.

(b)    At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the Cash due has been obtained by the Trustee as hereinafter provided in this <u>Section 5.2</u>, a Majority of the Controlling Class, by written notice to the Issuers and the Trustee, may rescind and annul such declaration and its consequences if:

(i)    the Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)    all overdue installments of principal of and interest on the Notes (including interest upon Class C Deferred Interest and Class D Deferred Interest);

(B)    any accrued and unpaid amounts (including termination payments, if any) payable by the Issuer pursuant to the Hedge Agreement, and

(C)    all accrued and unpaid taxes and Administrative Expenses and other sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel;

(ii)    the Trustee has determined that all Events of Default of which it has actual knowledge, other than the nonpayment of the principal of or interest on the Notes that have become due solely by such acceleration, have been cured and a Majority of the Controlling Class by written notice to the Trustee has agreed with such determination or waived as provided in Section 5.14.

At any such time as the Trustee shall rescind and annul such declaration and its consequences, the Trustee shall preserve the Collateral in accordance with the provisions of Section 5.5 and, following such rescission and annulment, the Substitution Period shall be restored, if it had not already ended otherwise than as a result of such declaration; *provided* that, if such preservation of the Collateral is rescinded pursuant to Section 5.5, the Notes may be accelerated pursuant to Section 5.2(a), notwithstanding any previous rescission and annulment of a declaration of acceleration pursuant to this Section 5.2(b).

No such rescission and annulment shall affect any subsequent Default or impair any right consequent thereon.

(c)    Any Hedge Agreement in effect immediately prior to a declaration of acceleration shall not be terminable unless the liquidation of the Collateral has begun and such declaration is no longer capable of being rescinded or annulled.

5.3    Collection of Indebtedness and Suits for Enforcement by Trustee

The Issuers covenant that if a Default shall occur in respect of the payment of any principal of or interest on any Class A-1 Note, the payment of principal of or interest on any Class A-2 Note (but with respect to interest, only after the Class A-1 Notes and all interest accrued thereon have been paid in full), or the payment of principal of or interest, if any, on any Class B Note (but with respect to interest, only after the Class A-1 Notes and Class A-2 Notes and all interest accrued thereon have been paid in full), or the payment of principal of or interest, if any, on any Class C Note (but with respect to interest, only after the Class A Notes and Class B Notes and all interest accrued thereon have been paid in full and), or the payment of principal of or interest, if any, on any Class D Note (but with respect to interest, only after the Class A Notes, the Class B Notes and the Class C Notes and all interest accrued thereon have been paid in full), the Issuers will upon demand of the Trustee or any affected Noteholder, pay to the Trustee, for the benefit of the Holder of such Note, the whole amount, if any, then due and payable on such Note for principal, interest with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of

interest at the applicable Note Interest Rate and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and such Noteholder and their respective agents and counsel.

If the Issuer or the Co-Issuer fails to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a Proceeding for the collection of the sums so due and unpaid, and may, and shall, upon the direction by a Majority of the Controlling Class, prosecute such Proceeding to judgment or final decree, and may enforce the same against the Issuers or any other obligor upon the Notes and collect the Cash adjudged or decreed to be payable in the manner provided by law out of the Collateral.

If an Event of Default occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Secured Parties by such appropriate Proceedings as the Trustee shall deem most effectual (if no direction by a Majority of the Controlling Class is received by the Trustee) or as the Trustee may be directed by a Majority of the Controlling Class, to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

In case there shall be pending Proceedings relative to the Issuer or the Co-Issuer or any other obligor upon the Notes under the Bankruptcy Code or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Notes, or the creditors or property of the Issuer, the Co-Issuer or such other obligor, the Trustee, regardless of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of this Section 5.3, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(a)    to file and prove a claim or claims for the whole amount of principal, interest owing and unpaid in respect of the Notes upon direction by a Majority of the Controlling Class, and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee) and of the Noteholders allowed in any Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Notes or to the creditors or property of the Issuer, the Co-Issuer or such other obligor;

(b)    unless prohibited by applicable law and regulations, to vote on behalf of the Holders of the Notes, upon the direction of such Holders, in any election of a trustee or a

standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or person performing similar functions in comparable Proceedings; and

(c)    to collect and receive any Cash or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Noteholders and of the Trustee on behalf of the Noteholders and the Trustee; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Noteholders to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Noteholders, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person.

In any Proceedings brought by the Trustee on behalf of the Holders, the Trustee shall be held to represent, subject to Section 6.17, all the Secured Parties, if applicable, pursuant to Section 6.17.

Notwithstanding anything in this Section 5.3 to the contrary, the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.3 except in accordance with Section 5.5(a).

5.4    Remedies

(a)    If an Event of Default shall have occurred and be continuing, and the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Issuers agree that the Trustee may after notice to the Noteholders, the Preference Share Paying Agent, the Collateral Manager, the Rating Agencies and the Hedge Counterparty, and shall, upon direction by a Majority of the Controlling Class, to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

(i)    institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral any Cash adjudged due;

(ii)    sell all or a portion of the Collateral or rights of interest therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17;

-109-

(iii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

(iv)    exercise any remedies of a secured party under the UCC (whether or not the UCC applies to the affected Collateral) and take any other appropriate action to protect and enforce the rights and remedies of the Secured Parties hereunder; and

(v)    exercise any other rights and remedies that may be available at law or in equity;

*provided* that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.4 except in accordance with Section 5.5(a).

The Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking firm of national reputation as to the feasibility of any action proposed to be taken in accordance with this Section 5.4 and as to the sufficiency of the proceeds and other amounts receivable with respect to the Collateral to make the required payments of principal of, interest on all the Notes to be redeemed, which opinion shall be conclusive evidence as to such feasibility or sufficiency.

(b)    If an Event of Default as described in Section 5.1(e) shall have occurred and be continuing, the Trustee may, and at the request of the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class or the Hedge Counterparty shall, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under such Section, and enforce any equitable decree or order arising from such proceeding; *provided* that if the Trustee shall receive conflicting or inconsistent requests (each with indemnity provisions) from two or more groups of Holders of the Notes of the Controlling Class, each representing not less than 25% of the Aggregate Outstanding Amount of the Controlling Class, the Trustee shall follow the instructions of the group representing the higher percentage of interest in the Controlling Class, notwithstanding any other provisions of this Indenture.

(c)    Upon any sale, whether made under the power of sale hereby given or by virtue of judicial proceedings, any Noteholder or Noteholders may bid for and purchase the Collateral or any part thereof and, upon compliance with the terms of sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability.

Upon any sale, whether made under the power of sale hereby given or by virtue of judicial proceedings, the receipt of Cash by the Trustee, or by the Officer making a sale under judicial proceedings, shall be a sufficient discharge to the purchaser or purchasers at any sale for its or their purchase and such purchaser or purchasers shall not be obliged to see to the application thereof.

Any such sale, whether under any power of sale hereby given or by virtue of judicial proceedings, shall bind the Issuers, the Trustee and the Noteholders, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them

and their successors and assigns, and against any and all Persons claiming through or under them.

(d)    Notwithstanding any other provision of this Indenture, neither the Trustee nor any Holders of the Notes may, prior to the date which is one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Federal or state bankruptcy or similar laws of any jurisdiction.  Nothing in this Section 5.4 shall preclude, or be deemed to stop, the Trustee (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (A) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency proceeding filed or commenced by a Person other than the Trustee, or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding.

5.5    Preservation of Collateral

(a)    If an Event of Default shall have occurred and be continuing when any Class of Notes is Outstanding, the Trustee shall retain the Collateral securing the Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes in accordance with the Priority of Payments and the provisions of Sections 10, 12 and 13 unless:

(i)    the Trustee determines that the anticipated proceeds of a sale or liquidation of the Collateral (after deducting the reasonable expenses of such sale or liquidation) would be sufficient to discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Class C Deferred Interest or Class D Deferred Interest, as applicable and, in each case, Defaulted Interest and interest on Defaulted Interest, if any), due and unpaid Administrative Expenses, due and unpaid Base Collateral Management Fee, and any accrued and unpaid amounts payable by the Issuer pursuant to the Hedge Agreement, including termination payments, if any (assuming, for this purpose, that the Hedge Agreement has been terminated by reason of the occurrence of an event of default or termination event thereunder with respect to the Issuer); or

(ii)    the Holders of at least 66-2/3% in Aggregate Outstanding Amount of each Class of Notes, voting as a separate Class and any Hedge Counterparty (unless no early termination or liquidation payment, including any accrued and unpaid amounts, would be owing by the Issuer to any Hedge Counterparty upon the termination thereof by reason of the occurrence of an event of default under any Hedge Agreement with respect to the Issuer), subject to the provisions hereof, direct the sale and liquidation of the Collateral.

For purposes of clause (ii) of the preceding sentence, if the Hedge Counterparty shall fail to respond to the Trustee within three Business Days after written notice from the Issuer or the Trustee requesting a vote pursuant to such clause (ii), such Hedge Counterparty shall not

be entitled to participate in the vote requested by such notice.  The Trustee shall give written notice of the retention of the Collateral to the Issuer with a copy to the Co-Issuer, the Hedge Counterparty and the Holder of the Notes of the Controlling Class.  So long as such Event of Default is continuing, any such retention pursuant to this <u>Section 5.5(a)</u> may be rescinded at any time when the conditions specified in clause (i) or (ii) exist.

(b)    Nothing contained in <u>Section 5.5(a)</u> shall be construed to require the Trustee to preserve the Collateral securing the Notes if prohibited by applicable law.

(c)    In determining whether the condition specified in <u>Section 5.5(a)(i)</u> exists, the Trustee shall obtain bid prices with respect to each security contained in the Collateral from two nationally recognized dealers which are Independent from each other and the Trustee, at the time making a market in such securities and shall compute the anticipated proceeds of sale or liquidation on the basis of the lower of such bid prices for each such security.  In addition, for the purposes of determining issues relating to the execution of a sale or liquidation of the Pledged Securities and the execution of a sale or other liquidation thereof in connection with a determination whether the condition specified in <u>Section 5.5(a)(i)</u> exists, the Trustee may, but shall not be required to, retain and rely on an opinion of an investment banking firm of national reputation that is Independent from the Issuer and the Collateral Manager.

The Trustee shall deliver to the Noteholders, each Hedge Counterparty, the Collateral Manager and the Issuers a report stating the results of any determination required pursuant to <u>Section 5.5(a)(i)</u> no later than 10 days after making such determination.  The Trustee shall make the determinations required by <u>Section 5.5(a)(i)</u> within 30 days after an Event of Default and at the request of a Majority of the Controlling Class at any time during which the Trustee retains the Collateral pursuant to <u>Section 5.5(a)(i)</u>.  In the case of each determination made by the Trustee pursuant to <u>Section 5.5(a)(i)</u>, the Trustee shall obtain a letter of an Independent certified public accountant confirming the accuracy of the computations of the Trustee and certifying their conformity to the requirements of this Indenture.  In determining whether the Holders of the requisite Aggregate Outstanding Amount of any Class of Notes have given any direction or notice or have agreed pursuant to <u>Section 5.5(a)</u>, any Holder of a Note of a Class who is also a Holder of Notes of another Class or any Affiliate of any such Holder shall be counted as a Holder of each such Note for all purposes.

(d)    If an Event of Default shall have occurred and be continuing at a time when no Note is Outstanding, the Trustee shall retain the Collateral securing the Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes in accordance with the Priority of Payments and the provisions of <u>Section 10</u> and <u>Section 12</u> unless a Majority of Preference Shareholders direct the sale and liquidation of the Collateral.

5.6    <u>Trustee May Enforce Claims Without Possession of Notes</u>

All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the

Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in <u>Section 5.7</u>.

### 5.7    Application of Cash Collected

Any Cash collected by the Trustee with respect to the Notes pursuant to this <u>Section 5.7</u> and any Cash that may then be held or thereafter received by the Trustee with respect to the Notes hereunder shall be applied subject to <u>Section 13.1</u> and in accordance with the provisions of <u>Section 11.2</u>, at the date or dates fixed by the Trustee *provided* that (a) subject to clause (b), no such date may be fixed by the Trustee unless the Trustee has given the Hedge Counterparty no less than six New York Business Days' prior written notice of such date, which notice shall set forth in reasonable detail the expected applications of Cash on such date and (b) no failure by the Trustee to deliver the notice required pursuant to the foregoing clause (a) will affect the application of Interest Proceeds and Principal Proceeds in accordance with the Priority of Payments on the next succeeding Payment Date.

### 5.8    Limitation on Suits

No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)    such Holder has previously given to the Trustee written notice of an Event of Default;

(b)    except as otherwise provided in <u>Section 5.9</u>, the Holders of at least 25% of the then Aggregate Outstanding Amount of the Notes of the Controlling Class shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(c)    such Holder or Holders have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)    the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(e)    no direction inconsistent with such written request has been given to the Trustee during such 30-day period by a Majority of the Controlling Class;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders of the Notes or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with <u>Section 13.1</u> and the Priority of Payments.

If the Trustee shall receive conflicting or inconsistent requests (each with indemnity provisions) from two or more groups of Holders of the Notes of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall follow the instructions of the group representing the higher percentage of interest in the Controlling Class, notwithstanding any other provisions of this Indenture.

5.9    Unconditional Rights of Noteholders to Receive Principal and Interest

(a)    Notwithstanding any other provision in this Indenture (other than Section 2.6(j)), the Holder of any Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Note as such principal and interest become due and payable in accordance with Section 13.1 and the Priority of Payments and, subject to the provisions of Section 5.8, to institute proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

(b)    If collections in respect of the Collateral are insufficient to make payments due in respect of the Notes, no other assets will be available for payment of the deficiency following realization of the Collateral and application of the proceeds thereof in accordance with Section 13.1 and the Priority of Payments, and the obligations of the Issuers to pay any deficiency shall thereupon be extinguished and shall not thereafter revive.

5.10    Restoration of Rights and Remedies

If the Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Noteholder, then and in every such case the Issuers, the Trustee and the Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Secured Parties shall continue as though no such Proceeding had been instituted.

5.11    Rights and Remedies Cumulative

No right or remedy herein conferred upon or reserved to the Trustee or to the Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

5.12    Delay or Omission Not Waiver

No delay or omission of the Trustee or of any Noteholder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Section 5.12 or by law to the Trustee or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Noteholders, as the case may be.

### 5.13    Control by Controlling Class

Notwithstanding any other provision of this Indenture (but subject to the proviso in the definition of "Outstanding" in Section 1.1), a Majority of the Controlling Class shall have the right to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee or for exercising any trust, right, remedy or power conferred on the Trustee; *provided* that:

(a)    such direction shall not conflict with any rule of law or with this Indenture;

(b)    the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; *provided* that, subject to Section 6.1, the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received satisfactory indemnity against such liability as set forth below);

(c)    the Trustee shall have been provided with indemnity satisfactory to it; and

(d)    any direction to the Trustee to undertake a Sale of the Collateral shall be made only pursuant to, and in accordance with, Sections 5.4 and 5.5.

### 5.14    Waiver of Past Defaults

Prior to the time a judgment or decree for payment of the Cash due has been obtained by the Trustee, as provided in this Section 5.14, a Majority of the Controlling Class, acting together with the Hedge Counterparty, may on behalf of the Holders of all the Notes waive any past Default and its consequences (including rescinding the acceleration of the Notes), except a Default:

(a)    in the payment of the principal of any Note or in the payment of interest (including Defaulted Interest and interest on Defaulted Interest) on the Notes; or

(b)    in respect of a covenant or provision hereof that under Section 8.2 cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note affected thereby; or

(c)    arising under Section 5.1(f) or 5.1(g).

In the case of any such waiver, (i) the Issuers, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto, and (ii) the Trustee shall promptly give written notice of any such waiver to each Holder of Notes.  The Rating Agencies shall be notified by the Issuer of any such waiver.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

### 5.15     Undertaking for Costs

All parties to this Indenture agree, and each Holder of any Note by its acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.15 shall not apply to any suit instituted by the Trustee or any Noteholder, or group of Noteholders, holding in the aggregate more than 10% in Aggregate Outstanding Amount of the Controlling Class, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of, interest on any Note on or after the Stated Maturity expressed in such Note (or, in the case of redemption, on or after the applicable Redemption Date).

### 5.16     Waiver of Stay or Extension Laws

The Issuers covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force (including filing a voluntary petition under Chapter 11 of the Bankruptcy Code and by the voluntary commencement of a proceeding or the filing of a petition seeking winding up, liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect), which may affect the covenants, the performance of or any remedies under this Indenture; and the Issuers (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

### 5.17     Sale of Collateral

(a)     The power to effect any sale (a "Sale") of any portion of the Collateral pursuant to Sections 5.4 and 5.5 shall not be exhausted by any one or more Sales as to any portion of such Collateral remaining unsold, but shall continue unimpaired until the entire Collateral shall have been sold or all amounts secured by the Collateral shall have been paid. The Trustee may upon notice to the Noteholders and the Hedge Counterparty, and shall, upon direction of a Majority of the Controlling Class from time to time postpone any Sale by announcement made at the time and place of such Sale; *provided* that, if the Sale is rescheduled for a date more than ten Business Days after the date of the determination by the Trustee pursuant to Section 5.5, such Sale shall not occur unless and until the Trustee has again made the determination required by Section 5.5. The Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any Sale; *provided* that the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such Sale from the proceeds thereof notwithstanding the provisions of Section 6.7.

(b)     The Trustee may bid for and acquire any portion of the Collateral in connection with a public Sale thereof, by crediting all or part of the net proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7.  The Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes.  The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)     If any portion of the Collateral consists of securities not registered under the Securities Act ("Unregistered Securities"), the Trustee may, but shall not be required to, seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained and with the consent of a Majority of the Controlling Class, seek a no-action position from the United States Securities and Exchange Commission or any other relevant Federal or state regulatory authorities, regarding the legality of a public or private sale of such Unregistered Securities (the costs of which, in each case, shall be reimbursable to the Trustee pursuant to Section 6.8).  In no event will the Trustee be required to register Unregistered Securities under the Securities Act.

(d)     The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Collateral in connection with a sale thereof.  In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Collateral in connection with a sale thereof, and to take all action necessary to effect such sale.  No purchaser or transferee at such a sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent or see to the application of any Cash.

5.18     Action on the Notes

The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Secured Parties shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of the Issuer or the Co-Issuer.

## ARTICLE 6

## THE TRUSTEE

6.1     Certain Duties and Responsibilities

(a)     Except during the continuance of an Event of Default:

(i)     the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; *provided* that, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they substantially conform on their face to the requirements of this Indenture and shall promptly, but in any event within three Business Days in the case of an Officer's certificate furnished by the Issuer, notify the party delivering the same if such certificate or opinion does not conform.  If a corrected form shall not have been delivered to the Trustee within 15 days after such notice from the Trustee, the Trustee shall so notify the Noteholders.

(b)     In case an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from a Majority of the Controlling Class, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)     this subclause (c) shall not be construed to limit the effect of subclause (a) of this Section 6.1;

(ii)     the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer in accordance with this Indenture and/or a Majority (or such other percentage as may be required by the terms hereof) of the Controlling Class (or other Class if required or permitted by the terms hereof) relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(iv)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it unless such risk or liability relates to performance of its ordinary non-remedial services, including under Section 5, under this Indenture; and

(v)     the Trustee shall not be liable to the Noteholders for any action taken or omitted by it at the direction of the Issuer, the Co-Issuer and/or the Holders of the Notes

under the circumstances in which such direction is required or permitted by the terms of this Indenture.

(d)    For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Default or Event of Default described in Section 5.1(d), 5.1(e), 5.1(f), 5.1(g) or 5.1(h) unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default or such a Default, as the case may be, is received by the Trustee at the Corporate Trust Office.  For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or such a Default, as the case may be, such reference shall be construed to refer only to such an Event of Default or such a Default, as the case may be, of which the Trustee is deemed to have notice as described in this Section 6.1(d).

(e)    Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of Section 6.1.

(f)    The Trustee shall, upon receipt of reasonable (but no less than three Business Days') prior written notice to the Trustee, permit any representative of the Collateral Manager, the Hedge Counterparty or of a Holder of a Note, during the Trustee's normal business hours, to examine all books of account, records, reports and other papers of the Trustee relating to the Notes, to make copies and extracts therefrom (the reasonable out-of-pocket expenses incurred in making any such copies or extracts to be reimbursed to the Trustee by such Hedge Counterparty or such Holder, as the case may be) and to discuss the Trustee's actions, as such actions relate to the Trustee's duties with respect to the Notes, with the Trustee's Officers and employees responsible for carrying out the Trustee's duties with respect to the Notes.

6.2    Notice of Event of Default

Promptly (and in no event later than two Business Days) after the occurrence of any Event of Default actually known to a Trust Officer of the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to Section 5.2, the Trustee shall mail to each Rating Agency (for so long as any Class of Notes is Outstanding), the Collateral Manager, the Hedge Counterparty, the Preference Share Paying Agent and to all Holders of Notes, as their names and addresses appear on the Note Register, notice of all Events of Default hereunder known to the Trustee, unless such Event of Defaults shall have been cured or waived (except with respect to the Rating Agencies, which shall receive such notice despite an Event of Default being cured or waived).

6.3    Certain Rights of Trustee

Except as otherwise provided in Sections 6.1, 8.1 and 8.2:

(a)    the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)    any request or direction of the Issuer or the Co-Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c)    whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's certificate or (ii) be required to determine the value of any Collateral or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other Persons qualified to provide the information required to make such determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)    as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)    the Trustee shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction;

(f)    the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper documents, but the Trustee, in its discretion, may and, upon the written direction of a Majority of any Class or any Rating Agency shall make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and, the Trustee shall be entitled, on reasonable prior notice to the Issuers, to examine the books and records of the Issuers relating to the Notes and the Collateral, personally or by agent or attorney during normal business hours; *provided* that the Trustee shall, and shall cause its agents to, hold in confidence all such information, except (i) to the extent disclosure may be required by law, by any regulatory authority or by the documents delivered pursuant to or in connection with this Indenture and the Notes and (ii) to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g)    the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys; *provided* that the Trustee shall not be responsible for any misconduct or negligence on the part of any agent (other than any Affiliate of the Trustee) appointed and supervised, or attorney appointed, with due care by it hereunder;

(h)    in the absence of bad faith, the Trustee shall not be liable for any action it takes or omits to take that it reasonably and, after the occurrence and during the continuance of an Event of Default, prudently believes to be authorized or within its rights or powers hereunder;

(i)    nothing herein shall be construed to impose an obligation on the part of the Trustee to recalculate, evaluate or verify any report, certificate or information received from the Issuer (unless and except to the extent otherwise expressly set forth herein);

(j)    the Trustee shall not be responsible or liable for the actions or omissions of, or any inaccuracies in the records of, any non-Affiliated custodian, clearing agency, common depository, Euroclear or Clearstream, Luxembourg or for the acts or omissions of the Issuers;

(k)    to the extent any defined term hereunder, or any calculation required to be made or determined by the Trustee hereunder, is dependent upon or defined by reference to generally accepted accounting principles in the United States ("GAAP"), the Trustee shall be entitled to request and receive (and rely upon) instruction from the Issuer or the accountants appointed pursuant to 10.9(a) as to the application of GAAP in such connection, in any instance;

(l)    to the extent permitted by law, the Trustee shall not be required to give any bond or surety in respect of the execution of this Indenture or otherwise; and

(m)    the permissive right of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty.

### 6.4    Authenticating Agents

Upon the request of the Issuers and on their behalf, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes in connection with issuance, transfers and exchanges under Sections 2.4, 2.5 and 8.5, as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by those Sections to authenticate such Notes.  For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this Section 6.4 shall be deemed to be the authentication of Notes "by the Trustee".

Any entity into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any entity succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing or any further act on the part of the parties hereto or such Authenticating Agent or such successor entity.

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer.  The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Issuers.  Upon receiving such notice of resignation or upon such a termination, the Trustee shall promptly appoint a successor Authenticating Agent and shall give written notice of such appointment to the Issuers.

The Trustee agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating thereto and the Trustee shall be entitled to be reimbursed for such payments, subject to

Section 6.8.  The provisions of <u>Sections 2.8</u>, <u>6.5</u> and <u>6.6</u> shall be applicable to any Authenticating Agent.

6.5     <u>Not Responsible for Recitals or Issuance of Notes</u>

The recitals contained herein and in the Notes, other than the Certificate of Authentication thereon, shall be taken as the statements of the Issuers, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), of the Collateral or of the Notes.  The Trustee shall not be accountable for the use or application by the Issuers of the Notes or the proceeds thereof or any Cash paid to the Issuers pursuant to the provisions hereof.

6.6     <u>May Hold Notes</u>

The Trustee, any Paying Agent, the Note Registrar or any other agent of the Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and, may otherwise deal with the Issuers or any of their Affiliates, with the same rights it would have if it were not Trustee, Paying Agent, Note Registrar or such other agent.

6.7     <u>Cash Held in Trust</u>

Cash held by the Trustee hereunder shall be held in trust to the extent required herein.  The Trustee shall be under no liability for interest on any Cash received by it hereunder except as otherwise agreed upon with the Issuer and except to the extent of income or other gain on investments which are deposits in or certificates of deposit of the Trustee in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments.

6.8     <u>Compensation and Reimbursement</u>

(a)     The Issuer agrees, subject to the Priority of Payments provisions:

(i)     to pay the Trustee on each Payment Date reasonable compensation for all services, including custodial services, rendered by it hereunder as set forth in that separate agreement between the Trustee and the Collateral Manager dated December 20, 2005 (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(ii)     except as otherwise expressly provided herein, to reimburse the Trustee (subject to any written agreement between the Issuer and the Trustee) in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture or in the enforcement of any provision hereof and expenses related to the maintenance and administration of the Collateral (including (i) securities transaction charges (but only to the extent any such securities transaction charges have not been waived during a Due Period due to the Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments) and (ii) the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment

-122-

banking firm employed by the Trustee pursuant to <u>Section 5.4</u>, <u>5.5</u>, <u>6.3(c)</u>, <u>10.7</u> or <u>10.9</u>, except any such expense, disbursement or advance as may be attributable to its negligence, willful misconduct or bad faith;

(iii)    to indemnify the Trustee and its Officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses (including reasonable counsel fees) of defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder; and

(iv)    to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees) for any collection action taken pursuant to <u>Section 6.14</u>.

(b)    The Issuer may remit payment for such fees, expenses and other amounts to the Trustee or, in the absence thereof, the Trustee may on any Payment Date deduct payment of its fees and expenses hereunder from Cash credited to the Payment Account pursuant to <u>Section 11.1</u>.

(c)    The Trustee hereby agrees not to cause the filing of a petition in bankruptcy against the Issuer for the non-payment to the Trustee of any amounts provided by this <u>Section 6.8</u> until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under this Indenture.

(d)    The amounts payable to the Trustee pursuant to <u>Sections 6.8(a)(i)</u> through <u>(iv)</u> (other than amounts received by the Trustee from financial institutions under clause (a)(ii) above) shall not, except as provided by <u>Section 11.1(a)(i)(II)(N)</u> and <u>Section 11.1(a)(ii)(II)(D)</u>, exceed on any Payment Date the Dollar limitation described in <u>Section 11.1(a)(i)(I)(B)</u> for such Payment Date.

Subject to <u>Section 6.10</u>, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee shall not have received amounts due it hereunder and hereby agrees not to cause the filing of a petition in bankruptcy against the Issuers for the nonpayment to the Trustee of any amounts provided by this <u>Section 6.8</u> until at least one year and one day, or if longer, the applicable preference period then in effect, after the payment in full of all Notes issued under this Indenture.  No direction by a Majority of the Controlling Class shall affect the right of the Trustee to collect amounts owed to it under this Indenture.

The indemnifications in favor of the Trustee in this <u>Section 6.8</u> shall (i) survive any resignation or removal of any Person acting as Trustee (to the extent of any indemnified liabilities, costs, expenses and other amounts arising or incurred prior to, or arising out of actions or omissions occurring prior to, such resignation or removal) and (ii) apply to the Trustee in its capacities as Custodian, Paying Agent, Calculation Agent and Authenticating Agent.

6.9    <u>Corporate Trustee Required; Eligibility</u>

There shall at all times be a Trustee hereunder which shall be a bank, corporation or trust company organized and doing business under the laws of the United States or of any State thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$250,000,000, subject to supervision or examination by Federal or state banking authority, having a long-term debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", is not on watch for possible downgrade by Moody's), at least "BBB+" by Standard & Poor's and a short-term debt rating of at least "P-1" by Moody's (and, if rated "P-1", is not on watch for possible downgrade by Moody's) and having an office within the United States.  If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 6.9, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.9, it shall resign immediately in the manner and with the effect hereinafter specified in Section 6.10.

> 6.10    Resignation and Removal; Appointment of Successor

(a)    No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Section 6.10 shall become effective until the acceptance of appointment by the successor Trustee under Section 6.11.

(b)    The Trustee may resign at any time by giving 30 days' prior written notice thereof to the Issuers, the Noteholders, the Hedge Counterparty, each Rating Agency, the Collateral Manager and the Preference Share Paying Agent.  Upon receiving such notice of resignation, the Issuers shall promptly appoint a successor trustee or trustees by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor trustee or trustees, together with a copy to each Noteholder; *provided* that such successor Trustee shall be appointed only upon the written consent of a Majority of each Class or, at any time when an Event of Default shall have occurred and be continuing, by a Majority of the Controlling Class.  If no successor trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee, any Holder of a Note, on behalf of itself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)    Subject to Section 6.10(a), the Trustee may be removed at any time by Act of Holders of at least 66-2/3% of the Aggregate Outstanding Amount of Notes of any Class or, at any time when an Event of Default shall have occurred and be continuing, by Act of Holders of at least 66-2/3% of the Aggregate Outstanding Amount of Notes of the Controlling Class, delivered to the Trustee and to the Issuers.

(d)    If at any time:

(i)    the Trustee shall cease to be eligible under Section 6.9 and shall fail to resign after written request therefor by the Issuers or by any Holder; or

(ii)     the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation; or

(iii)     the Trustee shall commence a voluntary case under any federal or state banking or bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, conservator, sequestrator or other similar official for the Trustee or for any substantial part of the Trustee's property, or shall make any assignment for the benefit of its creditors or shall fail generally to pay, or shall admit in writing its inability to pay, its debts as such debts become due or shall take any corporate action in furtherance of any of the foregoing;

then, in any such case (subject to Section 6.10(a)), (A) the Issuers, by Issuer Order, may remove the Trustee or (B) subject to Section 5.15, the Trustee or any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any reason, the Issuers, by Issuer Order, shall promptly appoint a successor Trustee; *provided* that such successor Trustee shall be appointed only upon the consent of a Majority of each Class or, at any time when an Event of Default shall have occurred and be continuing, by a Majority of the Controlling Class.  If the Issuers shall fail to appoint a successor Trustee within 60 days after such resignation, removal or incapability or the occurrence of such vacancy, a successor Trustee may be appointed by Act of a Majority of the Controlling Class delivered to the Issuer and the retiring Trustee.  The successor Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Trustee and supersede any successor Trustee proposed by the Issuers.  If no successor Trustee shall have been so appointed by the Issuers or such Holders and shall have accepted appointment in the manner hereinafter provided, subject to Section 5.15, any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)     The Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first class mail, postage prepaid, to each Rating Agency, the Collateral Manager, the Hedge Counterparty and the Holders as their names and addresses appear in the Note Register.  Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.  If the Issuers fail to mail such notice within ten days after the acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Issuers.

If the Trustee shall resign or be removed, the Trustee shall also resign or be removed as Paying Agent, Calculation Agent, Registrar and any other capacity in which the

Trustee is then acting pursuant to this Indenture, the Preference Share Paying Agency Agreement, the Collateral Administration Agreement and the Account Control Agreement.

6.11    Acceptance of Appointment by Successor

Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Issuers and the retiring Trustee (with copies to the Hedge Counterparty and the Holders of the Notes of the Controlling Class) an instrument accepting such appointment. Upon delivery of the required instruments and the appointment of a successor Trustee becoming effective, the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any other act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee, but, on request of the Issuers or a Majority of any Class or the successor Trustee, such retiring Trustee shall, upon payment of its charges, fees, indemnities and expenses then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and Cash held by such retiring Trustee hereunder, subject nevertheless to its lien, if any, provided for in Section 6.8(d). Upon request of any such successor Trustee, the Issuers shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

No successor Trustee shall accept its appointment unless (a) at the time of such acceptance such successor shall (i) have long term debt rated at least "Baa1" by Moody's (and, if rated "Baa1", not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's and (ii) be qualified and eligible under this Section 6.11 and (b) the Rating Agency Condition with respect to the appointment of such successor Trustee shall have been satisfied. No appointment of a successor Trustee shall become effective if a Majority of the Controlling Class objects to such appointment; and no appointment of a successor Trustee shall become effective until the date ten days after notice of such appointment has been given to each Noteholder. Any successor Trustee shall be deemed to have made the representations set forth in Section 6.15 as of the effective date of the appointment of such successor Trustee.

6.12    Merger, Conversion, Consolidation or Succession to Business of Trustee

Any Person into which the Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder; provided such Person shall be otherwise qualified and eligible under this Section 6.12, without the execution or filing of any paper or any further act on the part of any of the parties hereto. In case any of the Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

6.13    Co-Trustees

At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Issuers and the Trustee shall have power to appoint one or more Persons to act as co-trustee, jointly with the Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to <u>Section 5.6</u> and to make such claims and enforce such rights of action on behalf of the Holders of the Notes subject to the other provisions of this <u>Section 6.13</u> and *provided* that prior notice thereof is provided to Standard & Poor's.

The Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee. If the Issuers do not join in such appointment within 15 days after the receipt by them of a request to do so, the Trustee shall have power to make such appointment.

Should any written instrument from the Issuers be required by any co-trustee so appointed for more fully confirming to such co-trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Issuers. The Issuers agree to pay (subject to the Priority of Payments) for any reasonable fees and expenses in connection with such appointment.

Every co-trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(a)     the Notes shall be authenticated and delivered and all rights, powers, duties and obligations hereunder in respect of the custody of securities, Cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely by the Trustee;

(b)     the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee jointly, as shall be provided in the instrument appointing such co-trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed, the Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by a co-trustee;

(c)     the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this <u>Section 6.13</u>, and in case an Event of Default has occurred and is continuing, the Trustee shall have the power to accept the resignation of, or remove, any such co-trustee without the concurrence of the Issuers. A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this <u>Section 6.13</u>;

(d)     no co-trustee hereunder shall be personally liable by reason of any act or omission of the Trustee or any other co-trustee hereunder;

(e)     the Trustee shall not be liable by reason of any act or omission of a co-trustee (other than any Affiliate of the Trustee) appointed in accordance with this <u>Section 6.13</u>;

(f)     any Act of Noteholders delivered to the Trustee shall be deemed to have been delivered to each co-trustee; and

(g)     any co-trustee shall make the representations set forth in Section 6.15.

6.14     Certain Duties Related to Delayed Payment of Proceeds

In the event that the Trustee shall not have received a payment with respect to any Pledged Security within two Business Days after its Due Date, (a) the Trustee shall promptly notify the Issuer and the Holders of the Notes of the Controlling Class in writing and (b) promptly request the issuer of such Pledged Security, the trustee under the related Underlying Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request.  In the event that such payment is not made within such time period, the Trustee, subject to the provisions of Section 6.1(c)(iv), shall take such action as a Majority of the Controlling Class shall direct in writing.  Any such action shall be without prejudice to any right to claim a Default under this Indenture.

6.15     Representations and Warranties of the Bank

(a)     Organization.  The Bank has been duly organized and is validly existing as a national banking association under the laws of the United States and has the power to conduct its business and affairs as a trustee.

(b)     Authorization; Binding Obligations.  The Bank has the power and authority to perform the duties and obligations of Trustee, Note Registrar and Transfer Agent under this Indenture.  The Bank has taken all necessary action to authorize the execution, delivery and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant hereto.  This Indenture has been duly executed and delivered by the Bank.  Upon execution and delivery by the Issuers, this Indenture will constitute the legal, valid and binding obligation of the Bank enforceable in accordance with its terms.

(c)     Eligibility.  The Bank is eligible under Section 6.9 to serve as Trustee hereunder.

(d)     No Conflict.  Neither the execution, delivery and performance of this Indenture, nor the consummation of the transactions contemplated by this Indenture, (i) is prohibited by, or requires the Bank to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon the Bank or any of its properties or assets, or (ii) will violate any provision of, result in any default or acceleration of any obligations under, result in the creation or imposition of any lien pursuant to, or require any consent under, any agreement to which the Bank is a party or by which it or any of its property is bound.

(e)     No Proceedings.  There are no proceedings pending, or to the best knowledge of the Bank, threatened against the Bank before any Federal, state or other governmental agency, authority, administrator or regulatory body, arbitrator, court or other

tribunal, foreign or domestic, that could be reasonably expected to have a material adverse effect on the Collateral or any action taken or to be taken by the Bank under this Indenture.

6.16    Offers

In the event that the Trustee receives written notice of any Offer or other request for consent, vote or waiver in respect of any Collateral Asset, the Trustee shall promptly deliver copies of such notice to the Issuer and the Collateral Manager (and, if an Event of Default has occurred and is continuing, the Holders of the Notes of the Controlling Class). Subject to Section 7.7, the Issuer (acting at the direction of the Collateral Manager or, if an Event of Default has occurred and is continuing and the notice referred to in Section 10.7(c) has been given by a Majority of the Controlling Class, a Majority of the Controlling Class) may direct the Trustee to take any of the following actions with respect to a Collateral Asset or Equity Security as to which an Offer or other request for consent, vote or waiver in respect of any Collateral Asset has been made: (i) exchange such instrument for other securities or a mixture of securities and other consideration pursuant to such Offer (and in making a determination whether or not to exchange any security, none of the restrictions set forth in Section 12 shall be applicable); or (ii) give consent, grant waiver, vote or exercise any or all other rights or remedies with respect to any such Collateral Asset or Equity Security.

6.17    Fiduciary for Noteholders Only; Agent for Other Secured Parties

With respect to the security interests created hereunder, the pledge of any portion of the Collateral to the Trustee is to the Trustee as representative of the Noteholders and agent for other Secured Parties. In furtherance of the foregoing, the possession by the Trustee of any portion of the Collateral and the endorsement to or registration in the name of the Trustee of any portion of the Collateral (including as Entitlement Holder of the Collateral Account) are all undertaken by the Trustee in its capacity as representative of the Noteholders and as agent for the other Secured Parties. The Trustee shall not by reason of this Indenture be deemed to be acting as fiduciary for the Hedge Counterparty or the Collateral Manager, *provided* that the foregoing shall not limit any of the express obligations of the Trustee under this Indenture.

6.18    Withholding

If any amount is required to be deducted or withheld from any payment to any Noteholder, such amount shall reduce the amount otherwise distributable to such Noteholder. The Trustee is hereby authorized on behalf of the Issuer to withhold or deduct from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is legally required to be withheld or deducted (but such authorization shall neither prevent the Trustee from contesting nor require the Trustee to contest any such tax in appropriate proceedings and legally withholding payment of such tax, pending the outcome of such proceedings). The amount of any withholding tax imposed with respect to any Noteholder shall be treated as Cash distributed to such Noteholder at the time it is deducted or withheld by the Issuer or the Trustee on behalf of the Issuer, as applicable, and remitted to the appropriate taxing authority. If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion on behalf of the Issuer withhold such amounts in accordance with this Section 6.18. If any Noteholder wishes to apply for a refund of any such

withholding tax, the Trustee shall reasonably cooperate with such Noteholder if such Noteholder determines to make any such claim so long as such Noteholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred. The Trustee shall be entitled to withhold amounts otherwise payable to any Noteholder if any such Noteholder fails to provide the Trustee with copies of appropriate tax certifications requested by the Trustee.

## ARTICLE 7

## COVENANTS

7.1     Payment of Principal and Interest

The Issuers will duly and punctually pay all principal (including Class C Deferred Interest and Class D Deferred Interest), interest (including Defaulted Interest and interest thereon, if any) in accordance with the terms of the Notes and this Indenture.

Amounts properly withheld under the Code or other applicable law by any Person from a payment to any Noteholder of principal and/or interest shall be considered as having been paid by the Issuers to such Noteholder for all purposes of this Indenture. The Trustee hereby provides notice to each Noteholder that the failure of such Noteholder to provide the Trustee with appropriate tax certifications may result in amounts being withheld from payments to such Noteholder under this Indenture and that amounts withheld pursuant to applicable tax laws shall be considered as having been paid by the Issuer as provided above.

As a condition to the payment of principal of and interest on any Note without the imposition of U.S. withholding tax, each of the Co-Issuers, the Trustee or any Paying Agent shall require certification acceptable to it to enable each of the Co-Issuers, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments in respect of such Note or the Holder of such Note under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation. Such certification may include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms). In addition, each of the Co-Issuers, the Trustee or any Paying Agent may require certification acceptable to it to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. Each Holder agrees to provide any certification requested pursuant to this paragraph and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

The Issuer shall not be obligated to pay any additional amounts to the Holders or beneficial owners of the Notes as a result of any withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges.

7.2    <u>Maintenance of Office or Agency</u>

The Issuers hereby appoint the Trustee as Paying Agent for the payment of principal of, interest on the Notes.  The Issuers hereby appoint JPMorgan Chase Bank, National Association, with an address at 600 Travis Street, 50th Floor, Houston, Texas 77002, Attention: Worldwide Securities Services - Millstone III CDO, Ltd., as the Issuers' agent where notices and demands to or upon the Issuers in respect of the Notes or this Indenture may be served and where such Notes may be surrendered for registration of transfer or exchange.

The Issuers may at any time and from time to time vary or terminate the appointment of any such agent or appoint any additional agents for any or all of such purposes; *provided* that (A) the Issuers will maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands to or upon the Issuers in respect of the Notes and this Indenture may be served, (B) no Paying Agent shall be appointed in a jurisdiction which would subject payments on the Notes to withholding tax as a result of the Paying Agent being located therein and (C) the Issuers may not terminate the appointment of any Paying Agent without the consent of each Preference Shareholder.  The Issuers shall give prompt written notice to the Trustee, each Rating Agency, the Hedge Counterparty and the Noteholders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Issuers shall fail to maintain any such required office or agency in the Borough of Manhattan, The City of New York or shall fail to furnish the Trustee with the address thereof, presentations and surrenders may be made at and notices and demands may be served on the Issuers, and Notes may be presented and surrendered for payment to the Paying Agent at its office (and the Issuers hereby appoint the same as their agent to receive such respective presentations, surrenders, notices and demands).

7.3    <u>Cash for Payments to be Held in Trust</u>

All payments of amounts due and payable with respect to any Notes and Preference Shares that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Issuers  by the Trustee or a Paying Agent with respect to payments on the Notes or to the Preference Share Paying Agent for distribution by the Preference Share Paying Agent in respect of payments on the Preference Shares in accordance with the Preference Share Paying Agency Agreement.

When the Issuers shall have a Paying Agent that is not also the Note Registrar, they shall furnish, or cause the Note Registrar to furnish, no later than the fifth calendar day after each Record Date a list, if necessary, in such form as such Paying Agent may reasonably request, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each such Holder.

Whenever the Issuers shall have a Paying Agent other than the Trustee, they shall, on or before the Business Day next preceding each Payment Date or Redemption Date, as the case may be, direct the Trustee to deposit on such Payment Date or Redemption Date, as the case may be, with such Paying Agent, if necessary, an aggregate sum sufficient to pay the amounts

then becoming due (to the extent funds are then available for such purpose in the Payment Account or the Collection Account, as the case may be), such sum to be held in trust for the benefit of the Persons entitled thereto and (unless such Paying Agent is the Trustee) the Issuers shall promptly notify the Trustee of its action or failure so to act.  Any Cash deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which such deposit was made shall be paid over by such Paying Agent to the Trustee for application in accordance with Section 10.

The initial Paying Agent shall be as set forth in Section 7.2.  Any additional or successor Paying Agents shall be appointed by Issuer Order with written notice thereof to the Trustee; *provided* that so long as any Class of Notes is rated by the Rating Agencies and with respect to any additional or successor Paying Agent for the Notes, either (i) the Paying Agent for the Notes has a rating of not less than "Aa3" (and, if rated "Aa3", is not on watch for downgrade) and not less than "P-1" (and, if rated "P-1", is not on watch for downgrade) by Moody's, a rating of not less than "AA-" and not less than "A-1+" by Standard & Poor's or (ii) the Rating Agency Condition with respect to the appointment of such Paying Agent shall have been satisfied.  In the event that (i) such successor Paying Agent ceases to have a rating of at least "Aa3" (and, if rated "Aa3", is not on watch for downgrade) and "P-1" (and, if rated "P-1", is not on watch for downgrade) by Moody's, a rating of at least "AA-" and of "A-1+" by Standard & Poor's or (ii) the Rating Agency Condition with respect to the appointment of such Paying Agent shall not have been satisfied, the Issuers shall promptly remove such Paying Agent and appoint a successor Paying Agent.  The Issuers shall not appoint any Paying Agent (other than an initial Paying Agent) that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by Federal and/or state and/or national banking authorities.  The Issuers shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee (and if the Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 7.3, that such Paying Agent will:

(a)    allocate all sums received for payment to the Holders of Notes for which it acts as Paying Agent on each Payment Date and Redemption Date among such Holders in the proportion specified in the instructions set forth in the applicable Note Valuation Report or Redemption Date Statement or as otherwise provided herein, in each case to the extent permitted by applicable law;

(b)    hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(c)    if such Paying Agent is not the Trustee, immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards set forth above required to be met by a Paying Agent at the time of its appointment;

(d)     if such Paying Agent is not the Trustee, immediately give the Trustee notice of any Default by the Issuer or the Co-Issuer (or any other obligor upon the Notes) in the making of any payment required to be made; and

(e)     if such Paying Agent is not the Trustee at any time during the continuance of any such Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Issuers may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Issuers or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Issuers or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such Cash.

Except as otherwise required by applicable law, any Cash deposited with the Trustee or any Paying Agent in trust for the payment of the principal of, interest on any Note and remaining unclaimed for two years after such principal or interest has become due and payable shall be paid to the Issuer on Issuer Request; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer or the Co-Issuer for payment of such amounts and all liability of the Trustee or such Paying Agent with respect to such trust Cash (but only to the extent of the amounts so paid to the Issuers) shall thereupon cease.  The Trustee or such Paying Agent, before being required to make any such release of payment, may, but shall not be required to, adopt and employ, at the expense of the Issuers, any reasonable means of notification of such release of payment, including mailing notice of such release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in Cash due and payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each such Holder.

7.4     Existence of Issuers; Compliance with Laws

The Issuer and the Co-Issuer shall, to the maximum extent permitted by applicable law, maintain in full force and effect their existence and rights as an exempted company incorporated and registered under the laws of the Cayman Islands and as a limited liability company formed under the laws of the State of Delaware, respectively, and shall obtain and preserve their qualification to do business in each jurisdiction in which such qualifications are or shall be necessary to protect the validity and enforceability of this Indenture, the Notes or any of the Collateral.

The Issuer and the Co-Issuer shall ensure that all corporate or other formalities regarding their respective existences (including, if required, holding regular board of directors' and shareholders', or other similar, meetings) are followed.  Neither the Issuer nor the Co-Issuer shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding.  Without limiting the foregoing, (a) the Issuer shall not have any subsidiaries other than the Co-Issuer, (b) the Co-Issuer shall not have any subsidiaries and (c) the Issuer and the

Co-Issuer shall not (i) have any employees, (ii) engage in any transaction with any ordinary shareholder that would constitute a conflict of interest or (iii) pay dividends other than in accordance with the terms of this Indenture, *provided* that the foregoing shall not prohibit the Issuer from entering into the transactions contemplated by the Administration Agreement with the Administrator or the Preference Share Paying Agency Agreement with the Preference Share Registrar.

The Issuer and the Co-Issuer shall comply with all applicable laws, rules, regulations, orders, writs, judgments, injunctions, decrees, determinations and awards (including any fiscal and accounting rules and regulations and any foreign or domestic law, rule or regulation), including, in connection with the issuance, offer and sale of the Notes.

7.5     <u>Protection of Collateral</u>

(a)     The Issuer shall from time to time at the request of any Secured Party execute and deliver all such supplements and amendments hereto and shall execute and file all such Financing Statements, continuation statements, instruments of further assurance and other instruments (and which describes the property covered by the financing statement as all assets or all personal property of the Issuer, or words of similar effect, or as being of an equal or lesser scope or with greater detail) and shall take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder and to:

(i)     Grant more effectively all or any portion of the Collateral;

(ii)     maintain, preserve and perfect the lien (and the first priority nature thereof) of this Indenture or to carry out more effectively the purposes hereof;

(iii)     perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture (including any and all actions necessary or desirable as a result of changes in law or regulations);

(iv)     enforce any of the Pledged Securities or other securities, instruments or property included in the Collateral;

(v)     preserve and defend title to the Collateral and the rights therein of the Trustee and the Holders of the Notes against the claims of all persons and parties; or

(vi)     pursuant to <u>Section 11.1(a)</u>, pay or cause to be paid any and all taxes levied or assessed upon all or any part of the Collateral.

The Issuer hereby designates the Trustee as its agent and attorney-in-fact to execute, if required, and/or file, upon receipt of Issuer Order or an Opinion of Counsel, any Financing Statement, continuation statement or other instrument delivered to it pursuant to this <u>Section 7.5</u>; *provided*, *however*, that such designation shall not impose upon the Trustee any affirmative duty hereunder. The Trustee shall be entitled to rely on an Opinion of Counsel as to the need to file any financing statements and continuation statements, the dates by which such filings are required to be made and the jurisdiction in which such filings are required to be made. The Issuer, agrees to file such continuation statements as are necessary to maintain perfection of

the Collateral perfected by the filing of Financing Statements.  The Trustee agrees that it will from time to time, at the written direction of any Secured Party, cause to be filed Financing Statements and continuation statements.  The Issuer shall otherwise cause the perfection and priority of the security interest in the Collateral and the maintenance of such security interest at all times.  Notwithstanding anything to the contrary herein, the right of a Secured Party to provide direction to the Trustee shall not impose upon the Trustee as Secured Party, any obligation to provide any such direction.  The Issuer agrees that a carbon, photographic, photostatic or other reproduction of this Indenture or of a Financing Statement is sufficient as a Financing Statement.

(b)     Notwithstanding the foregoing, the Issuer may appoint counsel from time to time to execute and file all such financing statements.  Failing such appointment, the Trustee may upon receipt of an Opinion of Counsel make such necessary filings as described in Section 7.5(a) above.

(c)     The Trustee shall not (i) except in accordance with Section 10.7(a), (b) or (c), as applicable, remove any portion of the Collateral that consists of Cash or is evidenced by an Instrument, certificate or other writing (A) from the jurisdiction in which it was held at the date the most recent Opinion of Counsel was delivered pursuant to Section 7.6 (or from the jurisdiction in which it was held as described in the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.1(c), if no Opinion of Counsel has yet been delivered pursuant to Section 7.6) or (B) from the possession of the Person who held it on such date or (ii) cause or permit ownership or the pledge of any portion of the Collateral that consists of book-entry securities to be recorded on the books of a Person (A) organized in a different jurisdiction from the jurisdiction in which such ownership or pledge was recorded at such date or (B) other than the Person on whose books such ownership or pledge was recorded at such date, unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

(d)     The Issuer shall pay or cause to be paid taxes, if any, levied on account of the beneficial ownership by the Issuer of any Pledged Securities that secure the Notes; *provided* that the Issuer shall not be required to pay or discharge or cause to be paid or discharged any such tax whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which disputed amounts or adequate reserves have been made.

(e)     The Issuer shall enforce all of its material rights and remedies under each Subscription Agreement, the Hedge Agreements, the Administration Agreement, the Collateral Administration Agreement, the Collateral Management Agreement and the Preference Share Documents.  Except as provided in Section 7.16, the Issuer will not enter into any agreement amending, modifying or terminating the Account Control Agreement, the Hedge Agreements, the Collateral Administration Agreement, the Collateral Management Agreement or the Preference Share Paying Agency Agreement without (i) 10 days' prior notice to each Rating Agency and the Hedge Counterparty, (ii) 10 days' prior notice thereof to the Trustee, which notice shall specify the action proposed to be taken by the Issuer (and the Trustee shall promptly deliver a copy of such notice to each Noteholder) and (iii) the Rating Agency Condition with respect to such amendment, modification or termination having been satisfied.

(f)    Without at least 30 days' prior written notice to the Trustee and each Rating Agency, the Issuer shall not change its name, or the name under which it does business, from the name shown on the signature pages hereto or re-incorporate, re-form or re-organize itself under the law of a different jurisdiction; *provided* that, the Issuer shall not re-incorporate, re-form or re-organize itself under the law of a different jurisdiction unless it satisfies the Rating Agency Condition.

(g)    The Issuer shall ensure that particulars of the security interests granted in favor of the Trustee hereunder or in any instrument executed pursuant to Section 7.5(a) are promptly entered on the register of mortgages and charges maintained by the Issuer in accordance with the Companies Law (2004 Revision) of the Cayman Islands.

7.6    Opinions as to Collateral

On or before December 31 of each calendar year, commencing in 2006, the Issuer shall furnish to the Trustee, each Rating Agency and the Hedge Counterparty an Opinion of Counsel (which shall include assumptions and qualifications substantially similar to those set forth in Exhibit I) stating that, in the opinion of such counsel, as of the date of such opinion, the lien and security interest created by this Indenture with respect to the Collateral remains a valid and perfected first priority lien and describing the manner in which such security interest shall remain perfected.

7.7    Performance of Obligations

(a)    The Issuer may not enter into any amendment or waiver of or supplement to any Underlying Instrument included in the Collateral without the prior consent of a Majority of the Controlling Class and the Hedge Counterparty; *provided* that, notwithstanding anything in this Section 7.7(a) to the contrary, the Issuer may enter into any amendment or waiver of or supplement to any such Underlying Instrument:

(i)    if such amendment, supplement or waiver is required by the provisions of any Underlying Instrument or by applicable law, including the USA PATRIOT Act (other than pursuant to an Underlying Instrument);

(ii)    if such amendment, supplement or waiver is necessary to cure any ambiguity, inconsistency or formal defect or omission in such Underlying Instrument;

(iii)    to the extent expressly permitted or authorized by any amendment of or supplement to this Indenture entered into in accordance with Section 8.1 or 8.2 (but subject to the conditions therein specified); or

(iv)    to make any other change deemed necessary by the Collateral Manager (but only if (A) such proposed amendment, waiver or supplement does not effect a Specified Change and (B) the Collateral Manager determines that such change does not materially adversely affect the interests of the Noteholders in the Collateral).

When used in connection with a Collateral Asset that is a Synthetic Security, each reference in this Section 7.7 to any Underlying Instrument shall include reference to the

Underlying Instrument pursuant to which any related Reference Obligation(s) has been issued or created as well as any agreement creating or otherwise governing such Synthetic Security.

The Issuer shall be entitled to rely on an Opinion of Counsel to the effect that the entry into an amendment, supplement or waiver is permitted pursuant to clause (i) or (ii) above.

(b)     The Issuer or the Co-Issuer may, with the prior written consent of a Majority of the Holders of the Notes of the Controlling Class and the Hedge Counterparty contract with other Persons, including the Collateral Administrator, the Collateral Manager and the Bank, for the performance of actions and obligations to be performed by the Issuer or the Co-Issuer hereunder by such Persons.  Notwithstanding any such arrangement, the Issuer or the Co-Issuer, as the case may be, shall remain liable for all such actions and obligations.  In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the Issuer or the Co-Issuer; and the Issuer or Co-Issuer, as the case may be, will punctually perform, and use its best efforts to cause such other Person to perform, all of their obligations and agreements contained in any related agreement.

(c)     The Issuers shall treat all acquisitions of Collateral Assets as a "purchase" for tax, accounting and reporting purposes.

7.8     <u>Negative Covenants</u>

(a)     The Issuer will not and, with respect to clauses (iii), (iv), (v), (ix), (x) and (xi), the Co-Issuer will not:

(i)     operate so as to be subject to U.S. Federal income taxes on its net income;

(ii)     sell, assign, participate, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Collateral, except (a) as expressly permitted by this Indenture and (b) a security interest in a Synthetic Security Collateral Account to secure the Issuer's obligations to a Synthetic Security Counterparty arising under a Defeased Synthetic Security;

(iii)     claim any credit on, make any deduction from, or dispute the enforceability of, the payment of the principal, interest, or any other amount payable in respect of the Notes (other than amounts required to be paid, deducted or withheld in accordance with any applicable law or regulation of any governmental authority) or assert any claim against any present or future Noteholder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(iv)     (A) incur or assume or guarantee any indebtedness, other than the Notes and this Indenture and the transactions contemplated hereby; (B) issue any additional Class of securities; or (C) issue any additional shares or membership interests other than the Preference Shares;

(v)    (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be expressly permitted hereby; (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Collateral or any part thereof, any interest therein or the proceeds thereof; or (C) take any action that would permit the lien of this Indenture not to constitute a valid first priority security interest in the Collateral;

(vi)    use any of the proceeds of the Notes issued hereunder (A) to extend "purpose credit" within the meaning given to such term in Regulation U or (B) to purchase or otherwise acquire any Margin Stock;

(vii)    permit the aggregate book value of all Margin Stock held by the Issuer on any date to exceed the net worth of the Issuer on such date (excluding any unrealized gains and losses) on such date;

(viii)    dissolve or liquidate the Issuer in whole or in part, except as permitted under Section 7.10;

(ix)    except for any agreements involving the purchase and sale of Collateral Assets having customary purchase or sale terms and documents with customary loan trading documentation (but not excepting any agreement relating to Synthetic Securities or the Hedge Agreement), enter into any agreements unless such agreements contain "non-petition" and "limited recourse" provisions with respect to the Issuer;

(x)    amend the "non-petition" or "limited recourse" provisions contained in this Indenture, the Notes, the Hedge Agreement, the Preference Shares (and any agreement relating thereto), the Collateral Management Agreement, the Account Control Agreement, the Administration Agreement or the Collateral Administration Agreement or amend the "non-petition" or "limited recourse" provisions of any other documents relating to this transaction to which it is a party without satisfying the Rating Agency Condition; or

(xi)    fail to maintain at least one director that is Independent from all Persons a party to any Transaction Document.

(b)    Neither the Issuer nor the Trustee shall sell, transfer, exchange or otherwise dispose of Collateral, or enter into or engage in any business with respect to any part of the Collateral except as expressly permitted by this Indenture.

(c)    The Co-Issuer will not invest any of its assets in "securities" (as such term is defined in the Investment Company Act), and will keep all of its assets in Cash.

(d)    For so long as any of the Notes are Outstanding, the Issuer shall not transfer or otherwise dispose of the membership interests of the Co-Issuer issued to it and the

Issuer shall not permit the Co-Issuer to issue any membership interests of the Co-Issuer to any Person other than the Issuer.

(e)     Neither the Issuer nor the Co-Issuer may acquire or form any subsidiary or employ any employees (other than its directors), except that the Issuer may acquire all of the issued and outstanding capital stock of the Co-Issuer.

(f)     For so long as any Notes are outstanding, the Issuer shall not issue or register the transfer of any ordinary shares of the Issuer to a U.S. person (as defined in Section 7701(a)(30) of the Code) and the Co-Issuer shall not issuer or register the transfer of any shares of the Co-Issuer to a U.S. person (as defined in Section 7701(a)(30) of the Code).

7.9     Statement as to Compliance

On or before December 31 in each calendar year commencing in 2006, or immediately if there has been an Event of Default under this Indenture, the Issuer shall deliver to the Trustee, and the Trustee shall provide to the Preference Share Paying Agent, each Hedge Counterparty, each Noteholder and Preference Shareholder making a written request therefor and each Rating Agency an Officer's certificate stating that:

(a)     a review of the activities of the Issuer and of the Issuer's performance under this Indenture during the twelve-month period ending on December 31st of the previous year has been made under such Officer's supervision (or from the Closing Date until December 31, 2006 in the case of the first such certificate) based on reports and other information delivered to such Officer by the Trustee and the Collateral Administrator and a review of the accountants' reports prepared pursuant to Section 10.8; and

(b)     to the best of such Officer's knowledge, based on such review, the Issuer has fulfilled all of its obligations under this Indenture throughout the period, or, if there has been an Event of Default, specifying each such Event of Default known to such Officer and the nature and status thereof, including actions undertaken to remedy the same.

7.10     Issuer May Not Consolidate, Etc.  The Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person.

7.11     Co-Issuer May Not Consolidate, Etc.  The Co-Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person.

7.12     [Reserved]

7.13     No Other Business

(a)     The Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture and the Preference Shares pursuant to the Preference Share Documents and acquiring, holding, pledging and selling, solely for its own account, Collateral Assets and other Collateral described in clauses (a) through (e) of the first

sentence of the Granting Clauses and the membership interests of the Co-Issuer, and the Co-Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture and, with respect to the Issuer and the Co-Issuer, such other activities as are incidental thereto. The holder of the Ordinary Shares has covenanted, in the declaration of trust pursuant to which it holder such shares for charitable purposes, that it will not amend the Issuer Charter while any Notes are outstanding when directed to do so in writing by the Trustee, and the Co-Issuer will not amend its Certificate of Incorporation or By-Laws, if such amendment would result in the rating (including any private or confidential rating) of any Class of Notes being reduced or withdrawn. The Issuers shall conduct business solely under their respective names.

(b)    The Issuer shall not engage in any business or activity or hold any asset that would cause the Issuer to be treated as engaged in a trade or business for U.S. Federal income tax purposes, except as the result of ownership of Equity Securities, Deliverable Obligations that do not satisfy paragraph (9) of <u>Section 12.2(a)</u> or equity securities received in an Offer in accordance with the provisions of this Indenture. The Issuer shall be deemed to be in compliance with this Section 7.13(b) if it acts in accordance with the standards of conduct set forth in <u>Exhibit J</u>.

### 7.14    Reaffirmation of Rating; Annual Rating Review

(a)    So long as any Class or Sub-class of the Notes remains Outstanding, on or before December 31 in each year commencing in 2006, the Issuers shall obtain and pay for an annual review or ongoing surveillance of the rating of each Class or Sub-class of Notes from each Rating Agency that rated such Class or Sub-class of Notes on the Closing Date.

(b)    The Issuers shall promptly notify the Trustee in writing and upon receipt of such notice the Trustee shall promptly notify the Noteholders, the Preference Shareholders and the Hedge Counterparty if at any time the rating of any Class of Notes has been, or is known will be, changed or withdrawn.

### 7.15    Reporting

At any time when the Issuers are neither subject to Section 13 or 15(d) of the Exchange Act nor exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder or Beneficial Owner of a Note, the Issuers shall promptly furnish or cause to be furnished Rule 144A Information to such Holder or Beneficial Owner, to a prospective purchaser of such Note designated by such Holder or Beneficial Owner or to the Trustee for delivery to such Holder or Beneficial Owner or a prospective purchaser designated by such Holder or Beneficial Owner, as the case may be, in order to permit compliance by such Holder or Beneficial Owner with Rule 144A under the Securities Act in connection with the resale of such Note by such Holder or Beneficial Owner.

### 7.16    Calculation Agent

(a)    The Issuers hereby agree that for so long as any of the Notes remain Outstanding, the Issuers will at all times cause there to be an agent appointed to calculate LIBOR in respect of each Interest Accrual Period in accordance with the terms of <u>Schedule B</u> (the

"Calculation Agent"), which agent shall be a financial institution, subject to supervision or examination by federal or state authority, having a rating of at least "Baa1" by Moody's (and, if rated "Baa1", not be on watch for possible downgrade by Moody's) and "BBB+" by Standard & Poor's and having an office within the United States. The Issuers have initially appointed the Trustee as Calculation Agent for purposes of determining LIBOR for each Interest Accrual Period. The Calculation Agent may be removed by the Issuers at any time. If the Calculation Agent is unable or unwilling to act as such, is removed by the Issuers or fails to determine the Note Interest Rate for any Class or Sub-class of Notes for any Interest Accrual Period, the Issuers will promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in Dollar deposits in the international Eurodollar market and which does not control or is not controlled by or under common control with the Issuers or any of their Affiliates. The Calculation Agent may not resign its duties without a successor having been duly appointed. The determination of the Note Interest Rate for the Notes for each Interest Accrual Period by the Calculation Agent shall (in the absence of manifest error) be final and binding on all parties.

(b)    The Calculation Agent shall, as soon as possible after 11:00 a.m. (London time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (New York time) on the Business Day immediately following each LIBOR Determination Date, calculate the Note Interest Rate for the Notes for the related Interest Accrual Period and the amount of interest for the related Interest Accrual Period payable in respect of each U.S.$1,000 in principal amount of each Class or Sub-class of Notes (in each case rounded to the nearest cent, with half a cent being rounded upward) on the related Payment Date and will communicate such rates and amounts and the related Payment Date to the Issuers, the Trustee, the Hedge Counterparty, each Paying Agent (other than the Preference Share Paying Agent), the Depository, Euroclear and Clearstream, Luxembourg. The Calculation Agent will also specify to the Issuers the quotations upon which the Note Interest Rate for each Class or Sub-class of Notes is based, and in any event the Calculation Agent shall notify the Issuers before 5:00 p.m. (New York time) on each LIBOR Determination Date if it has not determined and is not in the process of determining such Note Interest Rates, together with its reasons therefor.

7.17    Modification of Certain Documents

Prior to entering into any amendment, modification or termination to the Account Control Agreement, the Collateral Administration Agreement, the Collateral Management Agreement, the Administration Agreement or the Hedge Agreements, the Issuer shall obtain the written confirmation of each Rating Agency that the entry by the Issuer into such amendment, modification or termination will not adversely affect such Rating Agency's then-current rating, if any, of any Class of Notes; *provided* that (a) any amendment to, modification or termination of the Hedge Agreement shall have been consented to by each applicable Hedge Counterparty and (b) the Issuer and the Hedge Counterparty may from time to time enter into additional interest rate swap or rate cap transactions under the Hedge Agreement. Prior to entering into any amendment, modification, termination or waiver in respect of any of the foregoing agreements, the Issuer shall provide each Rating Agency, the Hedge Counterparty and the Trustee with written notice thereof and otherwise comply with the requirements of Section 7.5(d).

-141-

7.18    Purchase of Collateral; Information Regarding Collateral; Rating Confirmation

(a)    The Issuer will use commercially reasonable efforts to purchase on or before the Effective Date, Collateral Assets (including Collateral Assets as to which settlement has not yet occurred, but as to which the Issuer has entered into binding Securities Purchase Agreements on or prior to the Effective Date for regular settlement thereafter) having an Aggregate Principal Amount *plus* the Aggregate Principal Amount of all Eligible Investments purchased with Principal Proceeds on deposit in the Principal Collection Account *plus* the aggregate amount of all Principal Proceeds distributed on any prior Payment Date, of not less than U.S.$2,200,000,000 (in each case, assuming for these purposes (i) settlement in accordance with customary settlement procedures in the relevant markets on the Effective Date of all agreements entered into by the Issuer to acquire Collateral Assets scheduled to settle on or following the Effective Date and (ii) that each such Collateral Asset is a Pledged Collateral Asset.

(b)    On or before the Effective Date, the Issuer shall deliver to the Trustee, and the Trustee shall provide to the Hedge Counterparty and each Rating Agency an Officer's certificate demonstrating compliance as of such date by the Issuer with its obligations under Section 7.18(a) and satisfaction of each applicable Collateral Quality Test and each Coverage Test or, if the Issuer shall be in default in the performance of its obligations under Section 7.18(a) or any of the Collateral Quality Tests or Coverage Tests shall fail to be satisfied, the Issuer shall deliver to the Trustee, and the Trustee shall provide to the Hedge Counterparty and each Rating Agency an Officer's certificate specifying the details of such default or failure (and a statement in reasonable detail of a plan intended to comply with this Section 7.l8(b) and each of the Collateral Quality Tests and each Coverage Test).  In addition, the Trustee on behalf of the Issuers shall promptly notify each Rating Agency if a Collateral Asset becomes a Written Down Security.

(c)    No later than seven Business Days after the Effective Date, the Issuer shall notify the Trustee, and the Trustee shall notify each of the Rating Agencies and the Hedge Counterparty of the occurrence of the Effective Date and request in writing attaching each of the required items in Sections 17.8(b), (c) and (e) (such notification, a "Ramp-Up Notice") that each of the Rating Agencies confirm in writing that the Rating Agency Condition has been satisfied. Moody's shall be deemed to have confirmed the satisfaction of the Rating Agency Condition on the Closing Date if Moody's has not otherwise advised the Issuer within 35 days of the Effective Date and (i) the Issuer is in compliance with each Coverage Test, each Collateral Quality Test and each of the Collateral Profile Tests and (ii) the Issuer has satisfied all requirements set forth in the definition "Effective Date".  In the event that the Issuer (i) fails to satisfy the Rating Agency Condition from Standard & Poor's prior to the 35th day after the Effective Date, (ii) obtains written notice from Moody's within 35 days after the Effective Date that Moody's cannot confirm satisfaction of the Rating Agency Condition on the Closing Date or (iii) cannot certify compliance with clauses (i) and (ii) of the immediately preceding sentence (each, a "Rating Confirmation Failure"), proceeds from the issuance of the Securities that have not been invested in Collateral Assets, Interest Proceeds and Principal Proceeds (in that order) shall be applied, on the first Quarterly Payment Date following the occurrence of such Rating Confirmation Failure, as provided in Section 11.1(a), to the extent necessary for each of the Rating Agencies to provide

-142-

confirmation of the Issuer's satisfaction of the Rating Agency Condition and the notional amount of the Hedge Agreement will be reduced by an amount which is proportionate to the amount by which the Aggregate Outstanding Amount of the Notes is reduced by reason of such payment of principal of the Notes in connection with a Rating Confirmation Failure or, if necessary to obtain confirmation of the Issuer's satisfaction of the Rating Agency Condition, subject to the prior consent of the Hedge Counterparty, increase the notional amount of a Hedge Agreement in order to provide interest rate protection for the same percentage of Fixed Rate Securities as contemplated by the projections made as of the Closing Date.

(d)     No later than seven Business Days following the Effective Date, the Collateral Administrator shall, on behalf of the Issuer, provide Standard & Poor's the Standard & Poor's Excel Default Model Input File and any other information in electronic form concerning the Collateral that Standard & Poor's may reasonably request to run the Standard & Poor's CDO Monitor.

7.19    Tax Matters

It is the intent of the Issuer that, for U.S. federal, state and local income and franchise tax purposes, (a) the Issuer will be treated as a corporation and (b) the Notes will be treated as debt solely of the Issuer.  The Issuer, the Co-Issuer and the Trustee agree, and each Holder agrees by its acceptance of a Note, to such treatment, to report all income (or loss) in accordance with such treatment and to take no action inconsistent with such treatment unless otherwise required by any relevant taxing authority.

(a)     If required to prevent the withholding or imposition of United States income tax, the Issuer shall deliver or cause to be delivered a United States Internal Revenue Service Form W-8BEN or successor applicable form, to each issuer, counterparty or paying agent with respect to any Collateral Asset at the time such Collateral Assets is purchased or entered into and thereafter prior to the expiration or obsolescence of such form.

(b)     The Issuer shall not file, or cause to be filed, any income or franchise tax return in the United States or any state of the United States unless it shall have obtained advice from Cadwalader, Wickersham & Taft LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

(c)     The Issuer agrees not to elect to be treated as other than a corporation for U.S. Federal income tax purposes.

(d)     The Co-Issuer agrees not to elect to be treated as a corporation or a partnership for U.S. federal income tax purposes.

# ARTICLE 8

# SUPPLEMENTAL INDENTURES

8.1     Supplemental Indentures Without Consent of Noteholders

Without the consent of the Noteholders, the Preference Shareholders or the Hedge Counterparty (except to the extent otherwise required under the Hedge Agreement), the Issuers, when authorized by Board Resolutions, and the Trustee, at any time and from time to time subject to the requirement provided below in this <u>Section 8.1</u> with respect to the ratings of the Notes and subject to <u>Section 8.3</u>, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, (i) if such supplemental Indentures would have no material adverse effect on any of the Noteholders or Preference Shareholders (as evidenced, with respect to legal issues only, by an Opinion of Counsel or, with respect to any issue of fact, an officer's certificate delivered by the Issuer (or the Collateral Manager on behalf of the Issuer) to the Trustee) or (ii) for any of the following purposes:

(a)     to evidence the succession of any person to either the Issuer or Co-Issuer and the assumption by any such successor of the covenants of the Issuer or Co-Issuer, as applicable, in the Notes and the Indenture pursuant to <u>Sections 7.10</u> or <u>7.11</u>;

(b)     to add to the covenants of the Issuers or the Trustee for the benefit of the Holders of all of the Notes or to surrender any right or power herein conferred upon the Issuers;

(c)     to convey, transfer, assign, mortgage or pledge any property to the Trustee, or add to the conditions, limitations or restrictions on the authorized amount, terms and purposes of the issue, authentication and delivery of the Securities;

(d)     to evidence and provide for the acceptance of appointment by a successor trustee, Collateral Manager, listing agent, calculation agent, note registrar, note paying agent or Trustee and to add to or change any of the provisions of the Indenture as necessary to facilitate the administration of the trusts under the Indenture by more than one Trustee pursuant to the requirements of <u>Sections 6.10</u>, <u>6.12</u> and <u>6.13</u>;

(e)     to correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey and confirm unto the Trustee any property subject or required to be subjected to the lien of this Indenture (including any and all actions necessary or desirable as a result of changes in law or regulations) or to subject to the lien of this Indenture any additional property;

(f)     to cure any ambiguity or manifest error or correct or supplement any provisions contained in this Indenture which may be defective or inconsistent with any provision contained in this Indenture or make any modification that is of a formal, minor or technical nature or which is made to correct a manifest error;

(g)     to modify the restrictions on and procedures for resale and other transfer of the Notes in accordance with any change in any applicable law or regulation (or the interpretation thereof) or in accordance with the USA PATRIOT Act, the Proceeds of Criminal Conduct Law (2005 Revision) (enacted in the Cayman Islands), The Money Laundering Regulations, (2005 Revision) of the Cayman Islands and any other similar applicable laws or regulations (or the interpretation thereof) or enable the Issuer to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(h)    to take any action necessary or advisable to prevent the Issuers, the Trustee or Preference Share Paying Agent from becoming subject to withholding or other taxes, fees or assessments or to prevent the Issuer, the Noteholders, the Preference Shareholders or the Trustee from being subject to withholding or other taxes, fees or assessments or to prevent the Issuer from being treated as engaged in a United States trade or business for U.S. federal income tax purposes or otherwise subject to U.S. federal, state, local or foreign income or franchise tax on a net income basis; *provided* that such action will not cause the Noteholders to experience any material change to the timing, character or source of the income from the Notes;

(i)    to avoid the Issuer or the Co-Issuer or the Collateral from being required to register as an investment company under the Investment Company Act;

(j)    to conform the Indenture to the description contained in the Offering Circular;

(k)    to accommodate the issuance of any Class or Sub-class of Notes as Definitive Notes;

(l)    to obtain ratings on one or more Classes or Sub-classes of the Notes from any rating agency;

(m)    to amend the reporting requirements or procedures contained in the Indenture to comply with such requirements and procedures as required by the Bond Market Association or as required to post any documents on the Repository; or

(n)    to comply with any requests made by any stock exchange in order to list or maintain the listing of any Securities on such stock exchange or to de list the Securities pursuant to the Indenture.

Notwithstanding the foregoing, the Trustee shall not enter into any such supplemental indenture if, as a result of such supplemental indenture, the interests of any Noteholder, Preference Shareholder or Hedge Counterparty would be materially and adversely affected thereby. Unless notified by (i) a Majority of any Class or Sub-class of Notes or a Majority of Preference Shareholders that such Class or Sub-class or the Preference Shares would be materially and adversely affected or (ii) the Hedge Counterparty that the Hedge Counterparty would be materially and adversely affected, the Trustee shall be entitled to rely upon an Officer's Certificate of the Issuer, with respect to factual matters, and an Opinion of Counsel, with respect to legal matters at the expense of the party requesting such supplemental indenture, as to whether the interests of any Noteholder or Preference Shareholder would be materially and adversely affected, or the Hedge Counterparty would be materially and adversely affected, by any such supplemental indenture (after giving notice of such change to the Noteholders, Preference Shareholders or Hedge Counterparties, as the case may be) and the Trustee may rely upon an Opinion of Counsel to the effect that such supplemental indenture or amendment or modification is permitted under the terms of this Indenture and all conditions precedent thereto are satisfied. Such determination shall be conclusive and binding on all present and future Noteholders and Preference Shareholders.

The Trustee shall not enter into any such supplemental indenture unless the Trustee has received advice from Cadwalader, Wickersham & Taft LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters that (i) the modification will not cause the Noteholders to experience any material change to the timing, character or source of the income from the Notes, and (ii) the proposed supplemental indenture will not cause the Issuer to be treated as engaged in a U.S. trade or business or otherwise subject to U.S. federal income tax on a net income tax basis.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or indemnities under this Indenture or otherwise, except to the extent required by law.

Prior to entering into any such supplemental indenture, the Trustee will give written notice of such supplemental indenture to each Rating Agency (*provided* that a supplemental indenture relating to <u>Section 8.1(a)</u> shall require satisfaction of the Rating Agency Condition with respect to Standard & Poor's).

Unless otherwise specified in a Transaction Document, the Issuer will not consent to any modification of any Transaction Document (other than this Indenture) and, in the case of the Memorandum and Articles of Association of the Issuer, shall procure that its shareholders shall not so consent, unless the Rating Agency Condition with respect to Standard & Poor's and, if such modification requires the consent of any Noteholders, with respect to Moody's, has been satisfied with respect to such modification of such Transaction Document; *provided, however,* that satisfaction of the Rating Agency Condition will not be required for amendment to the Transaction Documents (i) in order to further effectuate the grant of, or further perfect, any security interest of the Secured Parties in, any item of Collateral, (ii) to amend the terms of such Transaction Documents for the purpose of facilitating compliance by the Issuer with any exemption from registration under the Investment Company Act, (iii) to cure any ambiguity or manifest error or correct or supplement any provision contained in the Transaction Documents which may be defective or inconsistent with any other provision contained in the Transaction Documents or make any modification that is of a formal, minor or technical nature or which is made to correct a manifest error (except with respect to the Collateral Management Agreement or any Hedge Agreement), (iv) to comply with any reasonable requests made by any stock exchange in order to list or maintain the listing of any Notes or Preference Shares thereon or to de-list the Notes or Preference Shares, (v) to conform the terms of the Transaction Documents with the terms described in the offering circular (except with respect to the Collateral Management Agreement or any Hedge Agreement) or (vi) to amend the reporting requirements or procedures contained in this Indenture to comply with such requirements and procedures as required by the Bond Market Association or as required to post any documents on the Repository.  Prior to entering into any waiver in respect of any of the foregoing agreements, the Issuer shall provide each Rating Agency, each Hedge Counterparty, the Collateral Manager and the Trustee with written notice thereof which shall specify the action proposed to be taken by the Issuer (and the Trustee shall promptly deliver a copy of such notice to each Noteholder and to the Preference Share Paying Agent, for delivery to the Preference Shareholders pursuant to the Preference Share Paying Agency Agreement).

At the cost of the Issuers, the Trustee shall provide the Noteholders, Preference Shareholders, Collateral Manager and Hedge Counterparties a copy of any proposed supplemental indenture at least 10 days prior to the execution thereof by the Trustee. The Trustee will, for so long as the Notes are rated by the Rating Agencies, mail a copy of any proposed supplemental indenture (whether or not required to be approved by the Noteholders or Preference Shareholders) to the Rating Agencies not later than 10 Business Days prior to the execution of such proposed supplemental indenture. Unless a supplemental indenture is approved by 100% of the Noteholders (in which case notice shall be provided to Standard & Poor's), any supplemental indenture must also satisfy the Rating Agency Condition unless otherwise expressly provided herein. The Trustee must provide notice of any amendment or modification of this Indenture (whether or not required to be approved by any Noteholders or Preference Shareholders) to the Collateral Manager, each Hedge Counterparty and, for so long as any Notes or Preference Shares are listed on any stock exchange, the Listing and Paying Agent promptly upon the execution of such supplemental indenture. The Trustee will not enter into any such supplemental indenture if, with respect to such supplemental indenture, the Rating Agency Condition is required to be satisfied, but would not be satisfied; *provided* that the Trustee shall, with the consent of the Holders of 100% of the Aggregate Outstanding Amount of Notes of each Class, the Collateral Manager and each Hedge Counterparty, enter into any such supplemental indenture notwithstanding any such reduction or withdrawal of the ratings of any outstanding Class of Notes.

No amendment to this Indenture will be effective until the Collateral Manager has received written notice of such proposed amendment, has consented in writing to the terms of the proposed amendment and has received a copy of the final version thereof from the Issuer or the Trustee.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or indemnities under this Indenture or otherwise, except to the extent required by law.

8.2     Supplemental Indentures with Consent of Noteholders

Except as otherwise provided in this Article 8, with (i) the written consent of (a) the Holders of not less than a Majority of the Aggregate Outstanding Amount of each Class of Notes (with the Holders of the Class C Notes and the Class D Notes voting together as a single class) materially adversely affected thereby and (b) the Holders of not less than a Majority of the Preference Shareholders materially and adversely affected thereby and (ii) the consent of the Collateral Manager and the Trustee, the Issuers may, subject to Section 8.3, execute a supplemental indenture to add provisions to, or change in any manner or eliminate any provisions of, this Indenture or modify in any manner the rights of the Holders of such Class or the Preference Shareholder, as applicable, *provided* that the Rating Agency Condition would be satisfied after such addition, change or elimination.

Notwithstanding any other provision of this Indenture, subject to Section 8.3, without the written consent of 100% of the Holders of each materially adversely affected Class

of Notes (such consent not to be unreasonably withheld) or 100% of the Preference Shareholders, if materially and adversely affected thereby (which consent shall, in each case, be evidenced by an Officer's certificate of the Issuer certifying that such consent has been obtained), and each materially adversely affected Hedge Counterparty, and unless the Rating Agency Condition has been satisfied, no supplemental indenture may:

(a)     change the Stated Maturity of the principal of or the due date of any installment of interest or additional distributions on a Note or Preference Share; reduce the principal amount thereof, the rate of interest or distributions thereon, or the applicable Optional Redemption Price, Tax Redemption Price, Auction Redemption Price or Clean-up Call Redemption Price with respect thereto; change the earliest date on which a Note or a Preference Share may be redeemed; change the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest or distributions on the Notes or Preference Shares, or change any place where, or the coin or currency in which, Notes, Preference Shares or the principal thereof or interest or distributions thereon are payable; or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the Redemption Date);

(b)     reduce the percentage of the Aggregate Outstanding Amount of Holders of the Notes of each Class, or the Holders of the Preference Shares whose consent is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or for the waiver of certain defaults hereunder or their consequences provided for in this Indenture;

(c)     impair or adversely affect the Collateral except as otherwise expressly permitted in this Indenture;

(d)     permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral (it being understood that the addition of Synthetic Security Counterparties and Hedge Counterparties does not require consent under this Clause) or terminate such lien on any property at any time subject hereto (other than in connection with the sale thereof in accordance with this Indenture) or deprive the Holder of any Note, the Trustee or any other Secured Party of the security afforded by the lien of this Indenture;

(e)     reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required to request that the Trustee preserve the Collateral or rescind the Trustee's election to preserve the Collateral pursuant to Section 5.5 or to sell or liquidate the Collateral pursuant to Section 5.4 or 5.5;

(f)     modify any of the provisions of this Section 8.2, except to increase any such percentage or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note affected thereby;

(g)     modify the definition of the term "Outstanding", Section 11.1 or Section 13.1;

(h)    change the permitted minimum denominations of any Class or Sub-class of Notes; or

(i)    modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of interest on or principal of any Note or the rights of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained herein;

*provided, further,* that no such supplemental indenture shall modify the rights of the Preference Shareholders or the terms of the Preference Shares without the written consent of each Preference Shareholder.  The Trustee may not enter into any supplemental indenture unless the Rating Agency Condition shall have been satisfied with respect to such supplemental indenture, unless consent from each affected Holder of Notes is obtained.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Issuers, shall mail to the Noteholders, the Preference Share Paying Agent, the Collateral Manager, the Hedge Counterparties and each Rating Agency a copy of such proposed supplemental indenture (or a description of the substance thereof) and shall request that the Rating Agency Condition with respect to such supplemental indenture be satisfied.  If any Class or Sub-class of Notes is then rated by any Rating Agency, the Trustee shall not enter into any such supplemental indenture if, as a result of such supplemental indenture, the Rating Agency Condition would not be satisfied with respect to such supplemental indenture, unless each Holder of Notes of each Class or Sub-class whose rating will be reduced or withdrawn has, after notice that the proposed supplemental indenture would result in such reduction or withdrawal of the rating of the Class or Sub-class of Notes held by such Holder, consented to such supplemental indenture.  Unless notified by a Majority of any Class of Notes or the Preference Shares that such Class will be adversely affected or the Preference Shares will be materially and adversely affected, the Trustee shall be entitled to rely on an Officer's Certificate of the Issuer, with respect to factual matters, an Officer's Certificate of the Issuer and, with respect to legal matters, an Opinion of Counsel, as to whether or not such Class of Notes would be adversely affected or the Preference Shares would be materially and adversely affected by such supplemental indenture (after giving notice of such supplemental indenture to the Holders of the Notes and the Preference Shares).  Such determination shall be conclusive and binding on all present and future Holders.  The Trustee shall not be liable for any such determination made in good faith and in reliance in good faith upon an Opinion of Counsel delivered to the Trustee as described in Section 8.3.

It shall not be necessary for any Act of Noteholders or any consent of Preference Shareholders under this Section 8.2 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act or consent shall approve the substance thereof.

Promptly after the execution by the Issuers and the Trustee of any supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Issuers, shall mail to the

Noteholders, the Preference Share Paying Agent (for forwarding to the Preference Shareholders), the Collateral Manager, the Hedge Counterparties and each Rating Agency a copy thereof.  As promptly as possible following the execution of any supplemental indenture or other modification pursuant to this Section 8.2, the Issuer shall deliver a copy of such supplemental indenture or other modification to the Repository for posting on the Repository in the manner described in Section 14.3.  Any failure of the Trustee to publish or mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

### 8.3    Execution of Supplemental Indentures

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Section 8.3 or the modifications thereby of the trusts created by this Indenture, the Trustee shall receive, and (subject to Sections 6.1 and 6.3) shall be fully protected in relying in good faith upon an Opinion of Counsel, provided by and at the expense of the party requesting such supplemental indenture, stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent thereto have been complied with.  The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or indemnities under this Indenture or otherwise.  The Trustee shall not enter into any supplemental indenture (including a supplemental indenture entered into pursuant to Section 8.1 or 8.2) that modifies the rights or increases the obligations of the Collateral Manager or adversely affects the manner in which the Collateral Manager manages the portfolio of Collateral Assets in any respect without the written consent of the Collateral Manager, and the Collateral Manager shall not be bound by any amendment to this Indenture which reduces the rights or increases the obligations of the Collateral Manager or adversely affects the manner in which the Collateral Manager manages the portfolio of Collateral Assets unless the Collateral Manager shall have consented thereto in writing.

### 8.4    Effect of Supplemental Indentures

Upon the execution of any supplemental indenture under this Article 8, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder, and every Holder of Preference Shares shall be bound thereby.

### 8.5    Reference in Notes to Supplemental Indentures

Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article 8 may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Issuers to any such supplemental indenture, may be prepared and executed by the Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

## ARTICLE 9

## REDEMPTION OF NOTES

9.1     Optional Redemption and Tax Redemption

(a)     The Notes shall be redeemable (in whole but not in part) on any Payment Date (such redemption, an "Optional Redemption") on any Quarterly Payment Date after the Non-Call Period at the written direction of Holders owning a SupraMajority of Preference Shares, at the applicable Optional Redemption Price (exclusive of installments of principal, interest due on or prior to such date, payment of which shall have been made or duly provided for, to the Holders of the Notes as provided in this Indenture).

(b)     The Notes may be redeemed by the Issuers, in whole but not in part, at the applicable Tax Redemption Prices on any Quarterly Payment Date during or after the Non Call Period, at (i) the written direction of a SupraMajority of the affected Preference Shares or (ii) a Majority of the Aggregate Outstanding Amount of any other Class of Notes that, as a result of the occurrence of a Tax Event, have not received 100% of the aggregate amount of principal and interest or other amounts due and payable on such Notes; *provided* that no such redemption shall be effected unless the Tax Materiality Condition is satisfied.

(c)     In the event of an Optional Redemption or Tax Redemption pursuant to this Section 9.1, unless Holders owning a Majority of Preference Shares have directed the Issuer to redeem the Preference Shares on such Quarterly Payment Date, the amount of Collateral Assets sold in connection with such Optional Redemption or Tax Redemption shall not exceed the amount necessary for the Issuer to obtain the Optional Redemption Price or the Tax Redemption Price, as applicable.

(d)     Notwithstanding anything herein to the contrary, in connection with any Tax Redemption, holders of 100% of the aggregate outstanding principal amount of any affected Class of Notes may elect to receive less than 100% of the Tax Redemption Price that would otherwise be payable to them.

9.2     Redemption Procedures

(a)     If any Preference Shareholder, in the case of an Optional Redemption, or any Noteholder affected by a Tax Event in the case of a Tax Redemption, desires to direct the Issuers to optionally redeem the Notes, such person shall notify the Trustee and Preference Share Paying Agent (with a copy to the Issuer, the Collateral Manager and each Hedge Counterparty) of such desire in writing no less than thirty (30) Business Days prior to a Payment Date.  Such notice shall be irrevocable.  The Preference Share Paying Agent shall, within two (2) Business Days after receiving such notice, notify the other Preference Shareholders of the receipt of such notice.

(b)     Subject to the receipt of the notice referred to above and an Issuer Order, the Trustee will provide notice of any Optional Redemption or Tax Redemption by first-Class mail, postage prepaid, mailed not less than ten (10) Business Days prior to the scheduled Redemption Date, to the Preference Share Paying Agent, to each Noteholder at such

Noteholder's address in the Note Register as of the date of such notice, to each Rating Agency and the Trustee will also give notice to the Listing and Paying Agent if any Notes or Preference Shares are then listed on a stock exchange.

(c)     Notes called for redemption must be surrendered at the Corporate Trust Office of the Trustee.

(d)     The Notes shall not be redeemed pursuant to an Optional Redemption or a Tax Redemption and final distributions on the Preference Shares shall not be made unless either (i) at least seven (7) Business Days before the scheduled Redemption Date the Collateral Manager shall have furnished to the Trustee evidence, in form satisfactory to the Trustee, that the Collateral Manager on behalf of the Issuer has entered into a binding agreement or agreements (including a confirmation of sale) with a financial institution or institutions having a short-term rating, or whose short-term unsecured debt obligations have a short-term credit rating, of "P-1" from Moody's and "A-1" from Standard & Poor's, to purchase, not later than the Business Day immediately preceding the scheduled Redemption Date, in immediately available funds, all of the Collateral Assets and/or Eligible Investments at a purchase price at least equal to an amount sufficient, together with any other amounts available to be used for such redemption, to pay the Total Redemption Amount or (ii) at least ten (10) Business Days prior to the scheduled Redemption Date and prior to selling any Collateral Assets and/or Eligible Investments, the Trustee determines (which determination may be based upon a certificate from the Collateral Manager) that the expected proceeds from such sale (calculated as provided in the next succeeding sentence), together with any other amounts available to be used for such redemption, will be deposited into the Payment Account not later than the Business Day immediately preceding the scheduled Redemption Date, in immediately available funds, and will equal or exceed 100% of the Total Redemption Amount.  In each case the Hedge Agreements shall be marked to market on the date the value of the Collateral Assets is determined.  In addition, all Fixed Rate Securities shall be priced using a spread to a swap benchmark.  For purposes of determining the expected proceeds from a sale for purposes of clause (ii) of the immediately preceding sentence, the expected proceeds shall be deemed to be (a) the Market Value (as defined herein) of the Collateral Assets and/or Eligible Investments if such Collateral Assets and/or Eligible Investments are to be sold on the Business Day of the certification or (b) the percentage of the Market Value of the Collateral Assets and/or Eligible Investments set forth in the applicable column of the table set forth below, based upon the period of time between the certification and the expected date of sale.  For purposes of this determination, the "Market Value" of the Collateral Assets and/or Eligible Investments shall mean (i) the average of three *bona fide* bids for such Collateral Asset or Eligible Investment obtained by the Collateral Manager at such time from any three nationally recognized dealers, which dealers are independent from one another and from the Collateral Manager, or (ii) if the Collateral Manager is unable to obtain three such bids, the lesser of two *bona fide* bids for such Collateral Asset or Eligible Investment obtained by the Collateral Manager at such time from any two nationally recognized dealers acceptable to the Collateral Manager, which dealers are independent from one another and from the Collateral Manager, or (iii) in the event the Collateral Manager is unable to obtain two such bids, the price on such date provided to the Collateral Manager by an independent pricing service selected by the Collateral Manager, or (iv) in the event the Collateral Manager cannot determine the market value of such Collateral Asset or Eligible Investment using efforts to apply the methods specified in clauses (i) through (iii) above, as determined by

the Collateral Manager using its reasonable business judgment. If the method of determining Market Value is based solely on the Collateral Manager's determination, such Market Value shall not exceed the Moody's Recovery Rate and shall be considered zero after 60 days or until such time as the Collateral Manager obtains a bid for such Collateral Asset or Eligible Investment.

| | Number of Business Days Between Certification and Expected Date of Sale | | |
| --- | --- | --- | --- |
| **Type of Collateral** | **0 to 2** | **3 to 5** | **6 to 15** |
| Performing Bonds and Synthetic Securities with a rating of "B3" or higher by Moody's or a rating of "B-" or higher by Standard & Poor's* | 89% | 85% | 75% |
| Distressed Bonds and Bonds and Synthetic Securities with rating of "Caa" or lower by Moody's or a rating of "CCC" or lower by Standard & Poor's* | 65% | 50% | 30% |

\* If a Collateral Asset has a "split rating" (i.e. the ratings from the two Rating Agencies are not equivalent), the lowest available rating will be used to determine the appropriate collateral category. Such percentages may be changed to the extent Moody's provides the Collateral Manager with higher percentages applicable to performing bonds and Synthetic Securities with ratings higher than "B3" by Moody's or ratings higher than "B" by Standard & Poor's.

Notwithstanding the foregoing paragraph, in connection with any Tax Redemption Holders of at least 100% of the Aggregate Outstanding Amount of an Affected Class of Notes may elect to receive less than 100% of the portion of the Total Redemption Amount that would otherwise be payable to Holders of such Affected Class (and the Total Redemption Amount will be reduced accordingly).

(e)     Installments of principal, interest due on or prior to a Redemption Date shall continue to be payable to the Holders of such Notes as of the relevant Record Dates according to their terms. The election of the Issuer to redeem any Notes pursuant to <u>Section 9.1</u> shall be evidenced by an Issuer Order directing the Trustee to make the payment to the Paying Agent of the Redemption Price of all of the Notes to be redeemed from funds in the Payment Account in accordance with <u>Section 10.2(h)</u>. The Issuer shall deposit, or cause to be deposited, the funds required for an Optional Redemption pursuant to <u>Section 9.1</u> in the Payment Account on or before the fifth Business Day prior to the Redemption Date or, if later, upon receipt.

(f)     The Issuer shall set the Redemption Date and the applicable Record Date and give notice thereof to the Trustee pursuant to <u>Section 9.3</u>.

(g)     Any amounts applied to the redemption of the Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C Notes, Class D-1 Notes and Class D-2 Notes pursuant to <u>Section 9.1</u> or <u>Section 9.7</u> shall be applied to the Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C Notes, Class D-1 Notes and Class D-2 Notes, respectively, in each case, *pro rata* in accordance with the Aggregate Outstanding Amounts of such Class of Notes on the date of such redemption.

(h)     Amounts due and payable on the Notes on or prior to a Redemption Date shall continue to be payable to the Noteholders as of the relevant Record Date according to their terms.  The election of the Issuer to redeem any of the Notes pursuant to this Article 9 shall be evidenced by an Issuer Order from the Collateral Manager on behalf of the Issuer directing the Trustee to credit the Optional Redemption Price or Tax Redemption Price, applicable, to the Payment Account.  The Issuer shall instruct the Trustee to credit the funds required for an Optional Redemption or a Tax Redemption, as the case may be, in the Payment Account on or before the Business Day prior to the Redemption Date.  Proceeds received in connection with any redemption or Defeasance shall be payable as set forth in the Priority of Payments.

9.3     Notices of Redemption; Submission and Withdrawal

(a)     Any notice of redemption may be withdrawn by the Issuers on or prior to the seventh Business Day prior to the scheduled Redemption Date by written notice from the Issuers to the Noteholders with a copy to each Hedge Counterparty, the Trustee, the Preference Share Paying Agent (for delivery to the Preference Shareholders) and the Collateral Manager, but only if the Collateral Manager shall be unable to deliver such sale agreement or agreements or certifications, as the case may be, in form satisfactory to the Trustee.  None of the Hedge Agreements shall terminate upon notice to the respective counterparties of redemption until the time for withdrawal of notice has expired.  The Collateral Manager shall be liable only for the failure to effect an Optional Redemption or Tax Redemption due to the Collateral Manager's gross negligence or willful misconduct.  Notice of any such withdrawal shall be given at the Issuer's expense by the Trustee to each Noteholder and the Preference Share Paying Agent (for delivery to each Preference Shareholder) at the address appearing in the Note Register or Preference Share Register, as applicable, by overnight courier guaranteeing next day delivery sent not later than the third Business Day prior to the scheduled Redemption Date, with a copy by facsimile transmission to each Hedge Counterparty.  The Trustee will also give notice to the Listing and Paying Agent if any of the Securities are then listed on any stock exchange.

(b)     All notices of redemption and Defeasance shall set forth:  (A) the applicable Redemption Date; (B) the applicable Optional Redemption Price or Tax Redemption Price, as applicable; (C) that all the Notes of the relevant Class are being paid in full and that interest on such Notes shall cease to accrue on the date specified in the notice; and (D) the place or places where such Notes to be redeemed are to be surrendered for payment of the Optional Redemption Price or Tax Redemption Price, as the case may be, which shall be the Corporate Trust Office of the Trustee.

(c)     Notice of redemption shall be given by the Issuers or, at the Issuers' request, by the Trustee in the name and at the expense of the Issuers.  Failure to give notice of redemption, or any defect therein, to any Noteholder or Preference Shareholder shall not impair or affect the validity of the redemption of any other Securities.

(d)     Notice of redemption having been given as aforesaid, the Notes and Preference Shares to be redeemed shall, on the Redemption Date become due and payable at the applicable Optional Redemption Price or Tax Redemption Price therein specified, as applicable, and from and after the Redemption Date (unless the Issuer shall default in the payment of such Redemption Price), such Notes shall cease to bear interest on such Redemption Date and such

Preference Shares shall not be entitled to any further distributions. Upon final payment on a Note or Preference Share to be redeemed in full, the Holder shall present and surrender such Security, or arrange for the global note representing such Securities to be presented, at the place specified in the notice of redemption on or prior to such Redemption Date; *provided, however,* that if there is delivered to the Issuers such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such Security, then, in the absence of notice to the Issuers that the applicable Security has been acquired by a *bona fide* purchaser, such final payment shall be made without presentation or surrender.

9.4     Auction Call Redemption

(a)     Sixty days prior to each Quarterly Payment Date, commencing sixty days prior to the Quarterly Payment Date occurring in July of 2015 (each, an "Auction Payment Date"), the Collateral Manager will take steps to conduct an auction (the "Auction") of the Collateral Assets in accordance with procedures specified herein. If the Collateral Manager receives one or more bids from Eligible Bidders (as defined below) not later than ten Business Days prior to an Auction Payment Date equal to or greater than the Minimum Bid Amount (as defined below), it will sell the Collateral Assets for settlement on or before the fifth Business Day prior to the Auction Payment Date and the Securities, to the extent not redeemed prior thereto, will be redeemed in whole on the Auction Payment Date. "Eligible Bidders" are institutions, which may include affiliates of the Initial Purchasers or the Collateral Manager, or Holders of Securities, whose short-term unsecured debt obligations have a rating of at least "P-1" by Moody's and "A-1+" by Standard & Poor's (and if rated "P-1" by Moody's and "A-1+" by Standard & Poor's, such rating is not on watch for possible downgrade). If any single bid, or the aggregate amount of multiple bids, does not equal or exceed the Minimum Bid Amount or if there is a failure at settlement, then the redemption of Securities on the related Auction Payment Date will not occur and a new Auction will be conducted on the following Auction Payment Date. The aggregate minimum bid amount (the "Minimum Bid Amount") is an amount equal to (x) the sum of (a) the Auction Redemption Prices for all the Securities, (b) any amount payable to all Hedge Counterparties in connection with the termination of the Hedge Agreements, less any amounts to be received from all Hedge Counterparties in connection with the termination of the Hedge Agreements, (c) any accrued and unpaid Base Collateral Management Fee on the related Auction Payment Date, after giving effect to all other payments to be made on such Auction Payment Date in accordance with the Priority of Payments and (d) 101% of all other unpaid fees and expenses of the Issuer, including all expenses reasonably expected to be incurred by the Issuer through the related Auction Payment Date less (y) the sum of all other amounts on deposit in the Accounts that may be used to redeem the Securities. The Minimum Bid Amount does not include any amounts for the payment of distributions to the Preference Shareholders; *provided* that with respect to any Auction occurring prior to the Auction occurring in connection with the Payment Date occurring in July 2015, the Minimum Bid Amount shall include amounts for the payment of distributions to the Preference Shareholders in an amount necessary for the Preference Shareholders to achieve a 12% internal rate of return.

(b)     The Securities will be redeemed following a successful Auction at their Auction Redemption Prices. The amount distributable as the final redemption payment on the Preference Shares will equal any amount remaining after the redemption of the Notes at the Auction Redemption Prices, the payment of any amounts due in connection with the termination

of any Hedge Agreements and the payment of fees and expenses, all in accordance with the Priority of Payments and the payment to the holder of the Ordinary Shares of U.S. $2 per share.

(c)     The Collateral Manager will, not later than nine Business Days prior to a relevant Auction Payment Date, give the Trustee and the Preference Share Paying Agent notice of the redemption of the Securities and the amount of any redemption payment on the Preference Shares on such Auction Payment Date.  If the Minimum Bid Amount is not offered by any Eligible Bidder on or before the tenth Business Day before a relevant Auction Payment Date or if there is a failed settlement on or before the last day of a Due Period before a relevant Auction Payment Date, the Securities shall not be redeemed and a redemption payment on the Preference Shares shall not be made and the Collateral Manager shall give notice thereof as promptly as practicable to the Trustee and the Preference Share Paying Agent.  Each Hedge Agreement and Synthetic Security shall provide that, until such time as the Minimum Bid Amount is received, the Issuer shall not allow any termination of the obligations of any Synthetic Security Counterparties or any Hedge Counterparties unless termination of the related Synthetic Securities or Hedge Agreements, respectively, is otherwise permitted under this Indenture.

9.5     <u>Clean-up Call</u>.

(a)     The Notes will be redeemed by the Issuer, in whole but not in part, on the Quarterly Payment Date on which the Aggregate Outstanding Amount is less than or equal to 10% of the Aggregate Outstanding Amount in effect on the Effective Date, if the liquidation proceeds are at least equal to the applicable Clean-up Call Price and if all payments, fees and expenses, including amounts due and payable by the Issuer pursuant to the Hedge Agreements (including any Hedge Termination Amounts due to a Hedge Counterparty), are paid in full. The Issuer may use all Available Funds in the Collection Account to provide for payment of the Clean-up Call Price. If there are not sufficient Available Funds in the Collection Account as of the date the notice of redemption is distributed to pay the Clean-up Call Price on the Clean-up Call Date, the Collateral Manager is required to give the Trustee written direction to sell Collateral Assets and Eligible Investments.

(b)     The Trustee shall make the payment of the Clean-up Call Price for all Notes from funds in the Collection Account and/or from monies deposited with the Trustee by the Issuer pursuant to <u>Section 9.3</u> hereof.

(c)     The Issuer shall give notice of the Clean-up Call Date and the Redemption Record Date to the Trustee pursuant to <u>Section 9.3</u> hereof.

(d)     On the Clean-up Call Date, the Clean-up Call Price shall be distributed to the Noteholders in the order of priority set forth in <u>Section 11.1(a)(ii)</u> after payment of all fees and expenses of the Issuers, the Base Collateral Management Fee and payment of any Hedge Termination Amounts and any other amounts due to any Hedge Counterparty.

(e)     Each Hedge Agreement will terminate upon any redemption pursuant to this <u>Article 9</u>.  Each Hedge Agreement and Synthetic Security shall provide that, until such time as the Clean-Up Call is effected, the Issuer shall not allow any termination of the obligations of any Synthetic Security Counterparties or any Hedge Counterparties unless termination of the

related Synthetic Securities or Hedge Agreements, respectively, is otherwise permitted under this Indenture.

9.6    Notes Payable on Redemption Date

Notice of redemption having been given as aforesaid, the Notes so to be redeemed shall, on the Redemption Date, become due and payable at the applicable Redemption Price therein specified, and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest, if any) such Notes shall cease to bear interest on the Redemption Date. Upon final payment on a Note to be redeemed, the Holder shall present and surrender such Note at the place specified in the notice of redemption on or prior to such Redemption Date; *provided* that if there is delivered to the Issuers and the Trustee (i) in the case of a Holder that is not a Qualified Institutional Buyer, such security or indemnity as may be required by them to save each of them harmless and (ii) an undertaking thereafter to surrender such Note, then, in the absence of notice to the Issuers and the Trustee that the applicable Note has been acquired by a *bona fide* purchaser, such final payment shall be made without presentation or surrender. Installments of interest on Notes of a Class or Sub-class so to be redeemed whose Stated Maturity is on or prior to the Redemption Date shall be payable to the Holders of such Notes, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date according to the terms and provisions of Section 2.6(e).

If any Note called for redemption shall not be paid upon surrender thereof for redemption, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Note Interest Rate for each successive Interest Accrual Period the Note remains Outstanding.

# ARTICLE 10

## ACCOUNTS, ACCOUNTINGS AND RELEASES

10.1    Collection of Cash

(a)    Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Cash and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Securities, in accordance with the terms and conditions of such Pledged Securities. The Trustee shall segregate and hold all such Cash and property received by it in trust for the Secured Parties and shall apply it as provided in this Indenture.

(b)    Each of the parties hereto hereby agrees to cause the Custodian and any other Securities Intermediary that holds any Cash or other property for the Issuer or the Co-Issuer in an Account to agree with the parties hereto that (x) each Account is a Securities Account in respect of which the Trustee is the Entitlement Holder, (y) the Cash, Securities and other property credited to any Account is to be treated as a Financial Asset under Article 8 of the UCC and (z) the "securities intermediary's jurisdiction" (within the meaning of Section 8-110 of the UCC) for that purpose will be the State of New York. In no event may any Financial Asset

held in any Account be registered in the name of, payable to the order of, or specially Indorsed to, the Issuer unless such Financial Asset has also been Indorsed in blank or to the Custodian or other Securities Intermediary that holds such Financial Asset in such Account.

10.2    Collection Account; Collateral Account; Synthetic Security Collateral Account; Synthetic Security Issuer Account; Asset Reserve Account, Monthly Interest Reserve Account, Monthly Principal Reserve Account, Reserve Account

(a)    The Trustee shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "Collection Account", which may be a subaccount of the Collateral Account for administrative purposes and which shall be held in the name of the Issuer.  The Issuer, the Trustee and the Securities Intermediary shall agree in the Account Control Agreement that the Securities Intermediary shall comply with entitlement orders (within the meaning of Section 8-102(a)(8) of the UCC) originated by the Trustee, including without limitation, orders directing transfer or redemption of any financial asset credited to any Securities Account, without further consent by the Debtor, and the Securities Intermediary shall not comply with entitlement orders originated by Debtor.  The Trustee shall from time to time credit (i) all distributions on Collateral Assets and any proceeds received from the disposition of any Collateral Assets (unless simultaneously reinvested in Substitute Collateral Assets, subject to the Reinvestment Criteria), (ii) any amounts transferred from other Accounts, as set forth in this Article 10 and in Article 16 and (iii) any other amounts provided for herein.

(b)    Upon an Issuer Order being executed by the Issuer (or the Collateral Manager on behalf of the Issuer), after the Closing Date all or a portion of the net proceeds from, and associated with (i) the issuance of the Securities on the Closing Date and (ii) the initial payment to the Issuer in respect of the Hedge Agreements and not used on the Closing Date to purchase Collateral Assets, enter into Hedge Agreements or fund the Synthetic Security Collateral Account (amounts in clauses (i) and (ii), "Unused Proceeds"), shall be released from the Collection Account and applied by the Trustee in accordance with such Issuer Order in payment for Collateral Assets purchased in accordance with this Indenture and granted to the Trustee for the benefit of the Secured Parties.  On the first Determination Date on or after the Effective Date, the Trustee shall apply all of the Unused Proceeds standing to the credit of the Collection Account as Principal Proceeds, all of which shall be applied pursuant to Section 11.1(a)(ii) on the related Payment Date.

(c)    During each Due Period during the Reinvestment Period, the Issuer (or the Collateral Manager on behalf of the Issuer) may reinvest an amount equal to the Principal Proceeds standing to the credit of the Collection Account in Substitute Collateral Assets as permitted under and in accordance with the requirements of Article 12, and pending such reinvestment, such amount shall be invested in Eligible Investments pursuant to Section 10.2(g) of this Indenture.

(d)    An Authorized Officer of the Issuer or the Collateral Manager shall direct the Trustee in writing to, and upon the receipt of such written instructions (which may be in the form of standing instructions), the Trustee shall, transfer to the Payment Account, for application pursuant to Section 11.1(a) of this Indenture, on the Business Day prior to each Payment Date,

any amounts then held in the Collection Account other than proceeds received after the end of the Due Period with respect to such Payment Date.

(e)        All Cash deposited from time to time in a Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes herein provided.  The Collection Accounts shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's and a combined capital and surplus in excess of U.S.$250,000,000.  The Trustee agrees to give the Issuer prompt notice (with a copy to the Collateral Manager, the Hedge Counterparties, each Rating Agency, the Preference Share Paying Agent and the Holders of the Notes of the Controlling Class) if either Collection Account or any funds on deposit therein, or otherwise standing to the credit of a Collection Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.

(f)        All distributions on the Collateral, any deposit required pursuant to Section 10.2(g) of this Indenture, all net proceeds from, and associated with, the issuance of the Securities that are not used on the Closing Date to purchase Collateral Assets or enter into Hedge Agreements, any Hedge Receipt Amounts and any net proceeds from the sale or disposition of a Collateral Asset received by the Trustee (other than Hedge Termination Receipts and Hedge Replacement Proceeds, which shall be credited to the Accounts specified in Section 16.1 of this Indenture) shall be immediately credited to the Collection Account and the Synthetic Security Collateral Account, as provided herein.  Subject to Sections 10.2(g), 10.2(h), 10.3(b), 10.3(c), 10.3(d) and 12.2 of this Indenture, all property remitted to the Collection Account, together with any securities in which funds included in such property are or will be invested or reinvested during the term of this Indenture, and any income or other gain realized from such investments, shall be held by the Trustee in the Collection Account as part of the Collateral subject to disbursement and withdrawal as provided in Section 10.3.

(g)        By Issuer Order (which may be in the form of standing instructions, but shall include any other requirements hereunder), the Issuer (or Collateral Manager on behalf of the Issuer) shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received in the Accounts (other than the Payment Account) during a Due Period, and amounts received in prior Due Periods and retained in such Accounts, as so directed in Eligible Investments maturing no later than the second Business Day immediately preceding the next Payment Date, unless such Eligible Investment is issued by the institution acting as Trustee, in which event such Eligible Investment may mature on the Business Day preceding such Payment Date.  The Trustee, within one Business Day after receipt of any distribution or other proceeds not in Cash, shall so notify the Issuer and the Issuer (or Collateral Manager on behalf of the Issuer) shall, within thirty (30) Business Days after receipt of such notice from the Trustee, sell such distribution or other proceeds for Cash in an arm's length transaction to a Person that is not an Affiliate of the Issuer or the Collateral Manager and credit the proceeds thereof to the related Account for investment pursuant to this Section 10.2; *provided, however,* that the Issuer (or Collateral Manager on behalf of the Issuer) need not sell such distributions or other proceeds if it delivers an Officer's certificate to the Trustee certifying that such distributions or other proceeds constitute Collateral Assets or Eligible Investments.

(h)     If the Issuer (or the Collateral Manager on behalf of the Issuer) shall not have given any investment directions pursuant to <u>Section 10.2(g)</u> of this Indenture, or if an Event of Default has occurred and is continuing, the Trustee shall automatically invest any funds credited to the Accounts (other than the Payment Account) in Eligible Investments that satisfy the criteria described in clause (ii) of the definition of "Eligible Investments" and that mature not later than the second Business Day immediately preceding the next Payment Date, unless such Eligible Investment is issued by the institution acting as Trustee, in which event such Eligible Investment may mature on the Business Day immediately preceding such Payment Date.  Unless an Event of Default has occurred and is continuing, the Issuer (or the Collateral Manager on behalf of the Issuer) may at any time direct the Trustee to reinvest amounts automatically invested by the Trustee in other Eligible Investments.  All interest and other income from such investments shall be credited to the Account through which such investments were made, any gain realized from such investments shall be credited to such Account, and any loss resulting from such investments shall be charged to such Account.  The Trustee shall not in any way be held liable by reason of any insufficiency of any of the foregoing Accounts resulting from any loss relating to any such Eligible Investment, except with respect to investments in obligations of the Trustee or any Affiliate thereof.

(i)     The Trustee shall, on behalf of the Issuer, transfer to the Payment Account (i) for application pursuant to <u>Section 11.1(a)</u> and in accordance with the calculations contained in the Note Valuation Report prepared by the Issuer pursuant to <u>Section 10.6(b)</u>, on or prior to the Business Day prior to each Payment Date, any amounts then held in the Collection Accounts other than Interest Proceeds or Principal Proceeds received after the end of the Due Period with respect to such Payment Date.

(j)     The Trustee shall, on behalf of the Issuer, transfer amounts credited to the Collection Account to the Payment Account and apply the same in accordance with any Redemption Date Statement delivered to the Trustee in connection with the redemption of Notes pursuant to <u>Sections 9.1</u>, <u>9.2</u>, <u>9.4</u> or <u>9.5</u>.

(k)     The Trustee shall, prior to the Closing Date, establish with the Securities Intermediary a Securities Account in the name of the Trustee that shall be designated as the "<u>Collateral Account</u>" to which the Collateral Assets will be credited.  Any amounts paid to the Issuer as dividends or other distributions on any Collateral Assets credited to the Collateral Account shall be credited to the Collection Account.  The Account established pursuant to this <u>Section 10.2(k)</u> may contain any number of sub accounts (which may include the Collection Account) for the convenience of the Trustee or the Collateral Manager in administering the Collateral.  The Collateral Account shall remain at all times with an Eligible Depositary which shall be the Securities Intermediary.  The Collateral Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's, and a combined capital and surplus in excess of U.S.$250,000,000.

(l)     The Trustee shall, prior to the Closing Date, cause to be established with the Securities Intermediary a Securities Account in the name of the Trustee that shall be designated as the "<u>Asset Reserve Account</u>", into which the Trustee shall from time to time deposit a portion of the amount received in respect of all payments of interest in respect of a

Collateral Asset that pays less frequently than quarterly in accordance with the Asset Reserve Schedule.  On the fourth Business Day prior to each Payment Date, the Trustee shall transfer from the Asset Reserve Account to the Collection Account, for distribution in accordance with the Priority of Payments, the amounts specified in the Asset Hedge Schedule.  All funds on deposit in the Asset Reserve Account will be invested in Eligible Investments until released to the Issuer pursuant to the Asset Reserve Schedule.  The Asset Reserve Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's, and a combined capital and surplus in excess of U.S.$250,000,000.

(m)     The Trustee shall, prior to the Closing Date, cause to be established with the Securities Intermediary a Securities Account in the name of the Trustee that shall be designated as the "Monthly Interest Reserve Account", into which the Trustee shall, on each Monthly Payment Date, deposit a portion of the Interest Proceeds from the Payment Account in accordance with the Priority of Payments. Amounts credited to the Monthly Interest Reserve Account on any Monthly Payment Date shall be applied by the Trustee to make payments in accordance with the Priority of Payments.

(n)     The Trustee shall, prior to the Closing Date, cause to be established with the Securities Intermediary a Securities Account in the name of the Trustee that shall be designated as the "Monthly Principal Reserve Account", into which the Trustee shall, on each Monthly Payment Date, deposit a portion of the Principal Proceeds from the Payment Account in accordance with the Priority of Payments. Amounts credited to the Monthly Principal Reserve Account on any Monthly Payment Date shall be applied by the Trustee to make payments in accordance with the Priority of Payments.

(o)     The Trustee shall, prior to the Closing Date, cause to be established with the Securities Intermediary a Securities Account in the name of the Trustee that shall be designated as the "Reserve Account", into which the Trustee shall from time to time deposit amounts received from the Initial Purchaser.  On the fourth Business Day prior to each Quarterly Payment Date, the Trustee shall transfer from the Reserve Account to the Collection Account, for distribution in accordance with the Priority of Payments, all amounts credited to the Reserve Account.

10.3     Payment Account

(a)     The Trustee shall, prior to the Closing Date, establish a Securities Account that shall be designated as the "Payment Account."  The Payment Account shall be maintained by the Securities Intermediary in the name of the Issuer.  The Issuer, the Trustee and the Securities Intermediary shall agree in the Account Control Agreement that the Securities Intermediary shall comply with entitlement orders (within the meaning of Section 8-102(a)(8) of the UCC) originated by the Trustee, including without limitation, orders directing transfer or redemption of any financial asset credited to any Securities Account, without further consent by the Debtor, and the Securities Intermediary shall not comply with entitlement orders originated by Debtor.  The Trustee shall from time to time credit to the Payment Account, in addition to any amount transferred to the Payment Account pursuant to Section 10.2(d) hereof, any Hedge

-161-

Receipt Amount that is received on or after the Determination Date related to a Payment Date. Any and all funds at any time credited to the Payment Account shall be held in trust for the benefit of the Secured Parties. The only permitted withdrawal from or application of funds credited to the Payment Account shall be to pay amounts due and payable on the Notes and Preference Shares and other payments set forth in the Priority of Payments. The Payment Account shall remain at all times with an Eligible Depositary which shall be the Securities Intermediary.

(b)     The Trustee agrees to give the Issuers, the Collateral Manager, the Hedge Counterparty and the Holders of the Notes of the Controlling Class immediate notice if the Payment Account or any funds on deposit therein, or otherwise standing to the credit of the Payment Account, shall become subject to, any writ, order, judgment, warrant of attachment, execution or similar process. The Issuers shall not have any legal, equitable or beneficial interest in the Payment Account other than in accordance with the Priority of Payments. The Payment Account shall remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", not be on watch for possible downgrade by Moody's) and at least "BBB+" by Standard & Poor's, and a combined capital and surplus in excess of U.S.$250,000,000. If amounts on deposit in the Payment Account are invested pending payments to the Noteholders on each Payment Date, such amounts shall be invested for the benefit of the Trustee in Eligible Investments with maturities no later than the next Payment Date; *provided* that the Trustee shall not be under an obligation to invest amounts standing to the credit of the Payment Account.

10.4    Hedge Replacement Account; Hedge Termination Receipts Account; Hedge Counterparty Collateral Account; Synthetic Security Collateral Account

(a)     The Trustee shall on behalf of the Issuer, prior to the Closing Date, cause the Securities Intermediary to establish a Securities Account in the name of the Issuer that shall be designated as the "Hedge Termination Receipts Account." The Issuer, the Trustee and the Securities Intermediary shall agree in the Account Control Agreement that the Securities Intermediary shall comply with entitlement orders (within the meaning of Section 8-102(a)(8) of the UCC) originated by the Trustee, including without limitation, orders directing transfer or redemption of any financial asset credited to any Securities Account, without further consent by the Debtor, and the Securities Intermediary shall not comply with entitlement orders originated by Debtor. The Hedge Termination Receipts Account shall be subject to the provisions of Section 16.1 hereof, and shall be maintained by the Securities Intermediary for the benefit of the Secured Parties. A separate sub-account of the Hedge Termination Receipts Account shall be established for each Hedge Agreement that is terminated prior to its scheduled termination date. In the event of any early termination of a Hedge Agreement, any Hedge Termination Receipts not concurrently applied in connection with the Issuer's entry into a replacement Hedge Agreement will be credited to the Hedge Termination Receipts Account for the benefit of the Secured Parties. The only permitted withdrawals from the Hedge Termination Receipts Account shall be upon Issuer Order in accordance with Section 16.1 of this Indenture.

(b)     The Trustee shall on behalf of the Issuer, prior to the Closing Date, cause the Securities Intermediary to establish a Securities Account that shall be designated as the "Hedge Replacement Account." The Hedge Replacement Account will be subject to the

provisions of <u>Section 16.1</u> hereof, and shall be maintained by the Securities Intermediary in the name of the Issuer.  The Issuer, the Trustee and the Securities Intermediary shall agree in the Account Control Agreement that the Securities Intermediary shall comply with entitlement orders (within the meaning of Section 8-102(a)(8) of the UCC) originated by the Trustee, including without limitation, orders directing transfer or redemption of any financial asset credited to any Securities Account, without further consent by the Debtor, and the Securities Intermediary shall not comply with entitlement orders originated by Debtor.  A separate sub-account of the Hedge Replacement Account shall be established for each Hedge Agreement that is terminated prior to its scheduled termination date.  Any Hedge Replacement Proceeds received from a replacement counterparty will be credited to the Hedge Replacement Account for the benefit of the Hedge Counterparty under the terminated Hedge Agreement.  The only permitted withdrawals from the Hedge Replacement Account shall be upon Issuer Order in accordance with <u>Section 16.1</u> of this Indenture.

(c)     The Trustee shall on behalf of the Issuer, prior to the Closing Date, cause the Securities Intermediary to establish a Securities Account in the name of the Issuer that shall be designated as the "<u>Hedge Counterparty Collateral Account</u>." The Issuer, the Trustee and the Securities Intermediary shall agree in the Account Control Agreement that the Securities Intermediary shall comply with entitlement orders (within the meaning of Section 8-102(a)(8) of the UCC) originated by the Trustee, including without limitation, orders directing transfer or redemption of any financial asset credited to any Securities Account, without further consent by the Debtor, and the Securities Intermediary shall not comply with entitlement orders originated by Debtor. The Hedge Counterparty Collateral Account shall be maintained by the Securities Intermediary for the benefit of the Secured Parties.  The Issuer shall credit all amounts received as Hedge Collateral to the Hedge Counterparty Collateral Account.  A separate sub-account of the Hedge Counterparty Collateral Account shall be established for each Hedge Counterparty. Amounts credited to the Hedge Counterparty Collateral Account shall be held for the benefit of the Secured Parties subject to the rights of the Hedge Counterparties under the Hedge Agreements.  Investment earnings on amounts credited to the Hedge Counterparty Collateral Account shall be transferred to the Collection Account on the Determination Date unless released to the applicable Hedge Counterparty as provided in the applicable Hedge Agreement. The only permitted withdrawal from or application of funds credited to the Hedge Counterparty Collateral Account shall be as so directed, upon Issuer Order executed by the Issuer (or the Collateral Manager on behalf of the Issuer) in accordance with <u>Section 16.1</u> of this Indenture and the terms of the Hedge Agreements.

(d)     The Trustee shall on behalf of the Issuer, prior to the Closing Date, cause the Securities Intermediary to establish a Securities Account in the name of the Issuer that shall be designated as the "Synthetic Security Collateral Account." The Issuer, the Trustee and the Securities Intermediary shall agree in the Account Control Agreement that the Securities Intermediary shall comply with entitlement orders (within the meaning of Section 8-102(a)(8) of the UCC) originated by the Trustee, including without limitation, orders directing transfer or redemption of any financial asset credited to any Securities Account, without further consent by the Debtor, and the Securities Intermediary shall not comply with entitlement orders originated by Debtor.  At the time the Issuer enters into a Synthetic Security, the Trustee shall on behalf of the Issuer, at the direction of the Collateral Manager, credit to a sub-account of the Synthetic Security Collateral Account for the benefit of the Secured Parties and the related Synthetic

Security Counterparty, cash, securities or other collateral for the benefit of the Synthetic Security Counterparty, including without limitation an up-front payment of cash or delivery of securities by the Issuer ("Synthetic Security Collateral") with a Principal Balance equal to the notional amount of such Synthetic Security. Amounts credited to a sub-account of the Synthetic Security Collateral Account will be held for the benefit of the Secured Parties subject to the rights of the related Synthetic Security Counterparty. A separate sub-account of the Synthetic Security Collateral Account shall be established for each Synthetic Security. Investment earnings on amounts credited to the Synthetic Security Collateral Account shall be credited to the Collection Account and applied on each Payment Date in accordance with the Priority of Payments. The Synthetic Security Collateral Account established pursuant to this Section 10.4(d) may contain any number of sub-accounts for the convenience of the Trustee or as requested by the Collateral Manager for convenience in administering the Collateral. The only permitted withdrawal from or application of funds credited to the Synthetic Security Collateral Account shall be as so directed, upon Issuer Order executed by the Issuer (or the Collateral Manager on behalf of the Issuer) in accordance with the provision of the Synthetic Security pursuant to which such collateral was credited to the Synthetic Security Collateral Account.

(e)    The Hedge Replacement Account; Hedge Termination Receipts Account, Hedge Counterparty Collateral Account and Synthetic Security Collateral Account shall each remain at all times with a financial institution having a long-term debt rating of at least "Baa1" by Moody's (and, if rated "Baa1", not be on watch for possible downgrade by Moody's), at least "BBB+" by Standard & Poor's and at least "BBB+" by Fitch, and a combined capital and surplus in excess of U.S.$250,000,000.

(f)    The Trustee shall on behalf of the Issuer, prior to the Closing Date, cause the Securities Intermediary to establish a Securities Account in the name of the Issuer that shall be designated as the "Synthetic Security Issuer Account." The Issuer, the Trustee and the Securities Intermediary shall agree in the Account Control Agreement that the Securities Intermediary shall comply with entitlement orders (within the meaning of Section 8-102(a)(8) of the UCC) originated by the Trustee, including without limitation, orders directing transfer or redemption of any financial asset credited to any Securities Account, without further consent by the Debtor, and the Securities Intermediary shall not comply with entitlement orders originated by Debtor. At the time the Issuer enters into a Synthetic Security, the Trustee shall on behalf of the Issuer, at the direction of the Collateral Manager, credit to a sub-account of the Synthetic Security Issuer Account for the benefit of the Secured Parties, cash, securities or other collateral for the benefit of the Issuer, including without limitation an up-front payment of cash or delivery of securities by the related Synthetic Security Counterparty ("Synthetic Security Issuer Collateral"). Amounts credited to a sub-account of the Synthetic Security Issuer Account will be held for the benefit of the Secured Parties. A separate sub-account of the Synthetic Security Issuer Account shall be established for each Synthetic Security. Investment earnings on amounts credited to the Synthetic Security Issuer Account shall be credited to the Collection Account and applied on each Payment Date in accordance with the Priority of Payments. The Synthetic Security Issuer Account established pursuant to this Section 10.4(f) may contain any number of sub-accounts for the convenience of the Trustee or as requested by the Collateral Manager for convenience in administering the Collateral. Amounts contained in any Synthetic Security Issuer Account shall not be considered to be an asset of the Issuer for purposes of any of the Collateral Quality Tests or the Coverage Tests, but the Synthetic Security that relates to such Synthetic

-164-

Security Issuer Account shall be considered an asset of the Issuer. In accordance with the terms of the applicable Synthetic Security (including in connection with an event of default or a termination event under the related Synthetic Security), amounts contained in the related Synthetic Security Issuer Account shall, as directed by the Collateral Manager by Issuer Order, be withdrawn by the Trustee and applied to the payment of any amount payable by the related Synthetic Security Counterparty to the Issuer. Any excess amounts held in a Synthetic Security Issuer Account after payment of all amounts owing from the related Synthetic Security Counterparty to the Issuer as a result of an event of default or termination event under the related Synthetic Security shall be withdrawn from such Synthetic Security Issuer Account and paid to the related Synthetic Security Counterparty in accordance with the applicable Synthetic Security.

10.5     Reports by Trustee

The Trustee shall supply in a timely fashion to the Collateral Manager, each Rating Agency, the Hedge Counterparty, the Preference Share Paying Agent and the Issuer any information regularly maintained by the Trustee that the Issuer may from time to time request with respect to the Pledged Securities, and each Account, reasonably needed to complete the Note Valuation Report or to provide any other information reasonably available to the Trustee by reason of its acting as Trustee hereunder and required to be provided by Section 10.6 or to permit the Issuer to perform its obligations hereunder. The Trustee, upon request therefor, shall forward to the Collateral Manager, any Hedge Counterparty and, upon request therefor, to any Holder of a Note shown on the Note Register or any Preference Shareholder, copies of notices and other writings received by it from the issuer of any Collateral Asset or from any Clearing Agency with respect to any Collateral Asset advising the holders of such security of any rights that the holders might have with respect thereto (including notices of calls and redemptions of securities) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer; *provided* that the Trustee shall not disclose any unpublished Rating or credit estimate assigned by any Rating Agency with respect to any Collateral Asset without the prior written consent of such Rating Agency or the issuer of such Collateral Asset, as applicable. Notwithstanding anything contrary contained herein, hard copies of all notices and reports to Standard & Poor's and Moody's shall be delivered at their respective addresses set forth in Section 14.3; *provided* that the Monthly Reports and the Note Valuation Report, each together with an Standard & Poor's Excel Default Model Input File shall be sent electronically to Standard & Poor's at cdomonitoring@sandp.com and to cdomonitoring@moodys.com. In addition, the Trustee shall be entitled to send a copy of each Monthly Report to Bloomberg Financial Markets Commodities News.

Each of the Issuers acknowledges and agrees that each Monthly Report and Note Valuation Report shall be posted to the Repository for use in the manner described in the section headed "Terms of Use" on the Repository. In connection therewith, the Issuer agrees to cause to be delivered or otherwise made available each Monthly Report and Note Valuation Report to the operator of the Repository for posting on the Repository in the manner described in Section 14.3.

10.6     Accountings; Payment Reports and Note Valuation Reports

(a)     Commencing with the Payment Date in October 2006, the Issuer shall deliver an account of the amounts that will be paid in accordance with the Priority of Payments

(each, a "<u>Payment Report</u>").  Each Payment Report shall be delivered to the Collateral Manager, the Issuer, the Trustee, the Preference Share Paying Agent (for distribution to the Preference Shareholders), the Hedge Counterparties and the Depository (accompanied by a request that it be transmitted to the Holders of Notes on the books of the Depository).  Not later than the close of business on the Business Day preceding each Payment Date commencing for the Payment Date in October 2006, the Issuer shall deliver an accounting (each, a "<u>Note Valuation Report</u>"), determined as of the preceding Determination Date, and deliver the Note Valuation Reports, after the reconciliation process described in this <u>Section 10.6(a)</u>, to the Collateral Manager, the Trustee, the Preference Share Paying Agent (for distribution to the Preference Shareholders), the Hedge Counterparties and the Depository (accompanied by a request that it be transmitted to the Holders of Notes on the books of the Depository) and the Rating Agencies, and shall transmit a copy of the data contained in such reports formatted in Microsoft Excel to Standard & Poor's and Moody's (or in any other electronic format agreed upon by the Trustee and such Rating Agency) by e-mail.  Such electronic file shall contain the names of obligors (if not confidential), a security identifier (such as CUSIP) and a designation of whether each Collateral Asset is senior secured, secured or subordinated.  The Collateral Manager shall provide any information reasonably requested by or on behalf of the Issuer for preparation of a Note Valuation Report in accordance with this <u>Section 10.6(a)</u>.  Upon receipt of each Note Valuation Report, the Trustee, in the name and at the expense of the Issuers, shall notify any Listing and Paying Agent for a stock exchange, so long as any Securities are listed thereon, of the Aggregate Outstanding Amount or notional amount, as applicable, of the Securities of each Class after giving effect to the principal payments, if any, on the applicable Payment Date to which such Note Valuation Report relates. The Note Valuation Report shall contain the following information:

(1)    the Aggregate Principal Amount, together with a calculation, in reasonable detail, of the sum of (A) the aggregate Principal Balance of all Collateral Assets (other than Defaulted Obligations) *plus* (B) the Aggregate Calculation Amount of Defaulted Obligations;

(2)    with respect to each Defaulted Obligation, the Calculation Amount of such Defaulted Obligation;

(3)    with respect to each Collateral Asset that is a Defaulted Obligation (A) the date such Collateral Asset became a Defaulted Obligation, (B) the Principal Balance of each such Collateral Asset as of the date it became a Defaulted Obligation, (C) the sum of the Principal Balances of each Defaulted Obligation along with a line-item breakdown for each such Defaulted Obligation that has been a Defaulted Obligation for (x) more than three years, (y) more than two years, but less than three years, (z) more than one year but less than two years and (D) the sum of the Principal Balances of all Defaulted Obligations;

(4)    the Principal Balance of all Eligible Investments and Cash in each of the Collection Account, the Hedge Termination Receipts Account, the Hedge Replacement Account, the Hedge Counterparty Collateral Account and the Synthetic Security Collateral Account;

(5)     the nature, source and amount of any proceeds in the Collection Account, including Proceeds, Principal Proceeds and Sale Proceeds, received since the date of determination of the last Note Valuation Report;

(6)     with respect to each Collateral Asset and each Eligible Investment that is part of the Collateral, its Principal Balance, annual interest rate, expected average life, issuer, and rating (noting each rating, shadow rating or credit estimate) by each Rating Agency;

(7)     to the extent any Collateral Assets are subject to withholding tax, the identity and Principal Balance of each asset that is subject to withholding tax and the rate of withholding thereon;

(8)     the identity of each Collateral Asset that was sold or disposed of pursuant to Section 12.1 of this Indenture (indicating whether such Collateral Asset was a Defaulted Obligation, Credit Improved Obligation, Credit Risk Obligation or whether such Collateral Asset was sold pursuant to Section 12.1(a)(i) or (ii) Section 12.1(b) or 12.1(e) of this Indenture) or Granted to the Trustee since the date of determination of the most recent Note Valuation Report;

(9)     (a) the sum of the Principal Balances of all Collateral Assets that are given a Moody's Rating based on a Standard & Poor's Rating, as described in the definition of "Moody's Rating," and (b) the sum of the Principal Balances of all Collateral Assets that are given a Standard & Poor's Rating based on a Moody's Rating as described in the definition of "Standard & Poor's Rating";

(10)     a calculation showing the determination of the Net Outstanding Portfolio Collateral Balance;

(11)     (a) the identity and Market Value of each Collateral Asset that became a Defaulted Obligation since the date of determination of the last Note Valuation Report and (b) the aggregate Market Value of the Collateral Assets which became Defaulted Obligations since the date of determination of the last Note Valuation Report;

(12)     the aggregate Principal Balance of all (A) Fixed Rate Securities; (B) Fixed Rate Assets; (C) Fixed Rate Assets *plus* Deemed Fixed Collateral Assets; and (D) Deemed Floating Collateral Assets *minus* Deemed Floating Asset Hedges;

(13)     the aggregate Principal Balance of all (A) Floating Rate Securities, (B) Floating Rate Assets, (C) Floating Rate Assets *plus* Deemed Floating Collateral Assets and (D) Deemed Fixed Collateral Assets *minus* Deemed Fixed Asset Hedges;

(14)    the aggregate Principal Balance of all Collateral Assets that are guaranteed by the same corporate guarantor;

(15)    the aggregate Principal Balance of all Collateral Assets that (a) were not issued pursuant to an effective registration statement under the Securities Act or (b) were privately placed Collateral Assets that are eligible for resale under Rule 144A or Regulation S under the Securities Act;

(16)    the aggregate Principal Balance of all Collateral Assets that are (a) Non-U.S. Securities, other than sovereign obligors; and (b) Deemed Floating Collateral Assets and Deemed Fixed Collateral Assets that are with a Hedge Counterparty other than the initial Hedge Counterparty (or its assignee or successor);

(17)    the rating of each Hedge Counterparty (and any guarantor thereof), and Synthetic Securities Counterparty by Moody's and Standard & Poor's;

(18)    the aggregate Principal Balance of all Collateral Assets that are Synthetic Securities and Synthetic Security Collateral;

(19)    the aggregate Principal Balance of all Collateral Assets with a rating of less than "Aaa" by Moody's and less than "AAA" by Standard & Poor's (excluding RMBS Agency Securities);

(20)    the aggregate Principal Balance of all Collateral Assets with a rating of less than "Aa3" by Moody's and less than "AA-" by Standard & Poor's (excluding RMBS Agency Securities);

(21)    the aggregate Principal Balance of all Collateral Assets with a rating of less than "A3" by Moody's and less than "A-" by Standard & Poor's (excluding RMBS Agency Securities);

(22)    the aggregate Principal Balance of all Collateral Assets that have either a Moody's Rating of less than "Baa3", or an Standard & Poor's Rating of less than "BBB-";

(23)    the aggregate Principal Balance of all Single B Rated Assets and their identity, and for each such Collateral Asset, the rating of such Collateral Asset by each of Moody's and Standard & Poor's, and the Single B Calculation Amount;

(24)    the aggregate Principal Balance of all Double B Rated Assets and their identity, and for each such Collateral Asset, the rating of such Collateral Asset by each of Moody's and Standard & Poor's, and the Double B Calculation Amount;

(25)    the aggregate Principal Balance of all Triple C Rated Assets and their identity, and for each such Collateral Asset, the ratings of such Collateral Asset by each of Moody's and Standard & Poor's, and the Triple C Calculation Amount;

(26)    the aggregate Principal Balance of all Collateral Assets other than RMBS Agency Securities that are from the same Class or series or issued by the same obligor or its affiliates (interests in the same master trust being considered the same Class or series);

(27)    the aggregate Principal Balance of all Collateral Assets that are RMBS Agency Securities and have the same CUSIP;

(28)    the aggregate Principal Balance of all Collateral Assets (including for this purpose, with respect to Synthetic Securities, the Reference Obligations and excluding any RMBS Agency Securities) that are rated less than "Aaa" by Moody's and less than "AAA" by Standard & Poor's and that are from the same Class or series or issued by the same obligor or its affiliates (interests in the same master trust being considered the same Class or series);

(29)    the identity, rating and aggregate Principal Balance of all Collateral Assets (including with respect to Synthetic Securities, the Reference Obligations) (I) that are RMBS Securities or CMBS Securities and serviced by a single Servicer which is rated "Average" or better by Standard & Poor's and (II) that are RMBS Securities or CMBS Securities and serviced by a single Servicer which is rated below "Average" by Standard & Poor's or not rated by Standard & Poor's;

(30)    with respect to each CDO Security, (A) the rating, if any, thereof by each of Moody's and Standard & Poor's, (B) the Aggregate Principal Amount of CDO Securities which are not CDO Structured Product Securities, CDO RMBS Securities or CDO Commercial Real Estate Securities, (C) the Aggregate Principal Amount of the Collateral Assets that are CDO Structured Product Securities;

(31)    with respect to each Synthetic Security Counterparty, (A) the rating, if any, thereof by each of Moody's and Standard & Poor's (or if no such rating is available, the rating of the related Reference Obligation) and (B) the aggregate Principal Balance of all Collateral Assets that are Synthetic Securities from the same counterparty or the same reference credit (including any affiliate of such counterparty or such reference credit);

(32)    the identity, and aggregate Principal Balance of, the (A) CMBS Securities, (B) RMBS Securities, (C) CDO Securities,

(D) Asset-Backed Securities, (E) Insured Securities and (F) Synthetic Securities;

(33) the identity of, and aggregate Principal Balance of (A) all Collateral Assets that are Non-U.S. Securities; (B) all Collateral Assets that are Non-U.S. Securities representing exposure to Qualified Foreign Obligors; and (C) all Collateral Assets issued by an issuer incorporated or organized under the laws of the United States, a state thereof, the District of Columbia, the Bahamas, Bermuda, the Cayman Islands, the Channel Islands, Ireland, the Netherlands Antilles, or any other commonly used domicile for structured product transactions *provided* that such domicile has satisfied the Rating Agency Condition;

(34) the identity of, and aggregate Principal Balance of all Collateral Assets (including with respect to Synthetic Securities, the Reference Obligations) that belong to the same Subcategory;

(35) the identity of, and aggregate Principal Balance of all Collateral Assets that are CDO Securities of the same Subcategory;

(36) the aggregate Principal Balance of all Insured Securities (including with respect to Synthetic Securities, the Reference Obligations) that are insured by multi-line insurers and the aggregate Principal Balance of all Insured Securities (including with respect to Synthetic Securities, the Reference Obligations) that are insured by monoline financial insurance companies;

(37) the aggregate Principal Balance of all Insured Securities (including with respect to Synthetic Securities, the Reference Obligations) that are insured or guaranteed by the same insurer (including any affiliate of such insurer), and the aggregate Principal Balance of all Insured Securities that are guaranteed by each affiliate;

(38) the Class A Overcollateralization Ratio and a statement as to whether the Class A Overcollateralization Test is satisfied, the Class B Overcollateralization Ratio and a statement as to whether the Class B Overcollateralization Test is satisfied, the Class C Overcollateralization Ratio and a statement as to whether the Class C Overcollateralization Test is satisfied, the Class D Overcollateralization Ratio and a statement as to whether the Class D Overcollateralization Test is satisfied, the Class B Interest Coverage Ratio and a statement as to whether the Class B Interest Coverage Test is satisfied and the Class C Interest Coverage Ratio and a statement as to whether the Class C Interest Coverage Test is satisfied;

(39) the Moody's Maximum Rating Distribution and a statement as to whether the Moody's Maximum Rating Distribution Test is satisfied;

(40)    the Moody's Asset Correlation Factor and a statement as to whether the Moody's Asset Correlation Factor Test is satisfied;

(41)    the Moody's Weighted Average Recovery Rate and a statement as to whether the Moody's Minimum Weighted Average Recovery Rate Test is satisfied;

(42)    the identity, legal maturity and aggregate Principal Balance of all Collateral Assets having a stated legal maturity later than July 5, 2046;

(43)    the Weighted Average Life of the Collateral Assets and a statement whether the Maximum Weighted Average Life Test is satisfied; the percentage of the Aggregate Principal Amount of the Collateral Assets that have a Weighted Average Life greater than 12 years; the percentage of the Aggregate Principal Amount of the Collateral Assets that have a Weighted Average Life greater than 10 years; the percentage of the Aggregate Principal Amount of the Collateral Assets that have a Weighted Average Life greater than 8 years; the percentage of the Aggregate Principal Amount of the Collateral Assets that have a Weighted Average Life equal to or less than 5 years;

(44)    the Weighted Average Spread and a statement whether the Weighted Average Spread Test is satisfied;

(45)    the Weighted Average Coupon and a statement whether the Weighted Average Coupon Test is satisfied;

(46)    the applicable Standard & Poor's Minimum Average Recovery Rate and a statement whether the applicable Standard & Poor's Minimum Average Recovery Rate Test is satisfied;

(47)    commencing with the first Note Valuation Report due 30 days after receipt of the final Standard & Poor's CDO Monitor Test working model, (A) the Class A Note Scenario Default Rate, (B) the Class A Note Break-Even Default Rate, (C) the Class B Note Scenario Default Rate, (D) the Class B Note Break-Even Default Rate, (E) the Class C Note Scenario Default Rate, (F) the Class C Note Break-Even Default Rate, (G) the Class D Note Scenario Default Rate and (H) the Class D Note Break-Even Default Rate;

(48)    the Class A Note Default Differential of the Current Portfolio, (B) the Class B Note Default Differential, (C) the Class C Note Default Differential, (D) the Class D Note Default Differential and (E) commencing with the first Note Valuation Report due 30 days after receipt of the final Standard & Poor's CDO Monitor Test working model, a statement whether the Standard & Poor's CDO Monitor Test is satisfied;

(49)    (A) the Class A-1 Note Interest Amount, if any (B) the Class A-2 Note Interest Amount, (C) the Class B Note Interest Amount, (D) the Class C Note Interest Amount, (E) the Class D-1 Note Interest Amount, (F) the Class D-2 Note Interest Amount and (G) the amount of principal to be paid by the Issuer on the Class A-1 Notes, if any, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D-1 Notes and the Class D-2 Notes stated separately to the extent such Notes are outstanding;

(50)    pursuant to each Hedge Agreement, the amount payable to each Hedge Counterparty including any applicable Defaulted Hedge Termination Payments or other termination payments separately stated, and the amount payable by each Hedge Counterparty, including any applicable termination receipts separately stated;

(51)    with respect to each Synthetic Security for which Synthetic Security Collateral has been posted, the amount payable to and from each Synthetic Security Counterparty;

(52)    the Administrative Expenses payable on the next Payment Date on an itemized basis;

(53)    for the Collection Account:

(A)    the Balance on deposit in the Collection Account at the end of the related Due Period;

(B)    the sum of amounts transferred to the Collection Account from the Asset Reserve Account at the end of the related Due Period;

(C)    the amounts payable from the Payment Account pursuant to each clause of Section 11.1(a) hereof on the next Payment Date (assuming that each Hedge Counterparty will make any scheduled payments due on the related Payment Date);

(D)    the Balance remaining in the Collection Account immediately after all payments and deposits to be made on such Payment Date;

(E)    the Balance of Principal Proceeds not invested in Collateral Assets; and

(F)    the amount available for distribution on the related Payment Date assuming all payments from Hedge Counterparties and Synthetic Security Counterparties are paid when due;

(54)    the Balance on deposit in the Collection Account at the end of the related Due Period and deposits to be made in each such account on the Payment Date;

(55)    the amount on deposit in the Asset Reserve Account and the identity of any Collateral Asset added to the Asset Reserve Schedule;

(56)    the amount on deposit in each sub-account of the Synthetic Security Collateral Account, including all items of Synthetic Security Collateral deposited to such Account since the date of determination of the last Note Valuation Report and, if applicable, the principal balance, annual interest rate or yield, stated maturity, issuer and rating of each item of Synthetic Security Collateral;

(57)    the amount of the Base Collateral Management Fee for the related Due Period;

(58)    the amount of the Incentive Fee for the related Due Period;

(59)    the Preference Share Hurdle Return earned on the Preference Shares as of the time immediately before and immediately after giving effect to any distributions to the Preference Shares on the related Payment Date;

(60)    the amount paid to the Preference Share Paying Agent for distribution to the Preference Shareholders on such Payment Date;

(61)    with respect to each Collateral Asset, its maturity date, Moody's industry category and Standard & Poor's industry category;

(62)    the par value of any Collateral Asset acquired since the previous Note Valuation Report;

(63)    the purchase price or sale price of any Collateral Asset purchased or sold since the previous Note Valuation Report (expressed as a percentage of par) and, if the seller or purchaser is an affiliate of the Collateral Manager or the Issuers, the identity of such seller or purchaser;

(64)    the identity and aggregate Principal Balance of Collateral Assets with respect to which their ratings have been (a) upgraded, (b) placed on a watchlist for potential upgrade, (c) downgraded, or (d) placed on a watchlist for potential downgrade, since the previous Note Valuation Report;

(65)    the Aggregate Outstanding Amount of the Class A-1 Notes, if any Class A-2 Notes, Class B Notes, Class C Notes, Class D-1 Notes and Class D-2 Notes;

(66)    the current rating and original rating of each Class of Notes;

(67)    amounts received or paid on any Hedge Agreement since the previous Note Valuation Report;

(68)    the amount of Proceeds and the amount of Principal Proceeds received during the related Due Period;

(69)    the level of compliance with each Collateral Profile Test;

(70)    the identity of any equity securities received in exchange offers and Margin Stock sold in accordance with Section 12.1(c) hereof since the date of the last Note Valuation Report;

(71)    the identity of any Synthetic Security assigned, terminated or sold in accordance with Section 11.1(d) hereof since the date of the last Note Valuation Report;

(72)    information regarding the status and compliance of any Trading Plan initiated since the last Note Valuation Report to the extent provided by the Collateral Manager; and

(73)    such other information as the Collateral Manager, the Trustee, any Hedge Counterparty or any Rating Agency may reasonably request.

If any Moody's Rating or Standard & Poor's Rating for any Collateral Asset is set forth in any Note Valuation Report and such rating is an "estimated" or "shadow" rating, such rating shall not disclosed, but shall be identified with an asterisk.

Upon receipt of each Note Valuation Report, the Trustee shall compare the information contained therein to the information contained in its records with respect to the Collateral and shall, within one Business Day after receipt of such Note Valuation Report, notify each of the Issuer, the Collateral Manager and the Preference Share Paying Agent if the information contained in the Note Valuation Report does not conform to the information maintained by it with respect to the Collateral. In the event that any discrepancy exists, the Trustee and the Issuer, or the Collateral Manager on behalf of the Issuer, shall attempt to promptly resolve the discrepancy. If such discrepancy cannot be resolved within two Business Days, the Trustee shall cause the Independent accountants appointed pursuant to Section 10.8 to review such Note Valuation Report and the Trustee's and Collateral Manager's records to determine the cause of such discrepancy. If such review reveals an error in the Note Valuation Report or the Trustee's or the Collateral Manager's records, the Note Valuation Report or the Trustee's or the Collateral Manager's records, as the case may be, shall be revised as soon as practicable and, as so revised, shall be utilized in making all calculations pursuant to this Indenture.

Subject to the terms of this Indenture, the Trustee and Collateral Administrator shall rely on the information supplied to it by the Collateral Manager in relation to the preparation of the Note Valuation Report and shall not be liable for the accuracy or completeness of such information.

In addition, in conjunction with the delivery of each Monthly Report, the Trustee on behalf of the Issuer shall provide to Standard & Poor's the Standard & Poor's Excel Default Model Input File.

In addition to the Note Valuation Report, upon the written request of any Holder of a Note shown on the Note Register, the Hedge Counterparty or any Rating Agency, the Issuer shall deliver to such Holder, Hedge Counterparty or Rating Agency, as the case may be, a report containing the number and identity of each Collateral Asset held by the Issuer on the last day of the Due Period most recently ended (indicating whether any such Collateral Asset is, to the actual knowledge of the Trustee, a Defaulted Obligation).

In addition to the foregoing information, each Note Valuation Report shall include a statement to the following effect:

"The Investment Company Act of 1940, as amended (the "Investment Company Act"), requires that each holder of a Note issued by the Issuers (or beneficial interest therein) that is a U.S. Person be (x) a "qualified purchaser" ("Qualified Purchaser") as defined in Section 2(a)(51)(A) of the Investment Company Act and related rules or (y) a company each of whose beneficial owners is a Qualified Purchaser.  Under the rules, each of the Issuers or an agent acting on its behalf must have a "reasonable belief" that each holder of its outstanding securities that is a U.S. Person, including transferees, is a Qualified Purchaser or a company each of whose beneficial owners is a Qualified Purchaser.  Consequently, each resale of a Note in the United States or to a U.S. Person must be made pursuant to Rule 144A or another exemption from the registration requirements under the Securities Act of 1933, as amended (the "Securities Act"), solely to a purchaser that is a "qualified institutional buyer" ("Qualified Institutional Buyer") within the meaning of Rule 144A and a Qualified Purchaser or a company each of whose beneficial owners is a Qualified Purchaser.  Each transferee of a Rule 144A Note will be deemed to represent and warrant at the time of purchase that: (i) the transferee is a Qualified Institutional Buyer and also a Qualified Purchaser; (ii) the transferee is not a dealer described in paragraph (a)(1)(ii) of Rule 144A unless such transferee owns and invests on a discretionary basis at least U.S.$25,000,000 in securities of issuers that are not affiliated persons of the dealer; (iii) the transferee is not a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, unless investment decisions with respect to the plan are made solely by the fiduciary, trustee or sponsor of such plan; (iv) the transferee and each account for which it is purchasing, is required to hold and transfer at least the minimum denominations of the Notes specified in this Indenture and (v) the transferee will provide written notice of the foregoing, and of any applicable restrictions on transfer, to any subsequent transferee.

The Issuers direct that the recipient of this notice, and any recipient of a copy of this notice, provide a copy to any person having an interest in the Note with respect to which this Note Valuation Report is delivered, as indicated on the books of The Depository Trust Company or on the books of a participant in The Depository Trust Company or on the books of an indirect participant for which such participant in The Depository Trust Company acts as agent.

Notwithstanding any other restrictions on transfer contained in this Indenture, if either of the Issuers determines that any beneficial owner of a Rule 144A Note (or any interest therein) (A) is a U.S. Person and (B) is not both a Qualified Institutional Buyer (unless such beneficial owner is an Institutional Accredited Investor that purchased such Rule 144A Note or interest therein in connection with the initial distribution thereof) and also a Qualified Purchaser or a company owned exclusively by Qualified Purchasers, either of the Issuers may require, by notice to such Holder, that such Holder sell all of its right, title and interest to such Rule 144A Note (or interest therein) to a Person that is both a Qualified Institutional Buyer and a Qualified Purchaser or a company owned exclusively by Qualified Purchasers, with such sale to be effected within 30 days after notice of such sale requirement is given.  If such beneficial owner fails to effect the transfer required within such 30-day period, (a) upon written direction from the Issuer, the Trustee shall, and is hereby irrevocably authorized by such beneficial owner, to cause its interest in such Note to be transferred in a commercially reasonable sale (conducted by the Trustee in accordance with Section 9-610(b) of the Uniform Commercial Code as in effect in the State of New York as applied to securities that are sold on a recognized market or the subject of widely distributed standard price quotations) to a Person that certifies to the Trustee and the Issuer, in connection with such transfer, that such Person is both a Qualified Institutional Buyer and a Qualified Purchaser or a company owned exclusively by Qualified Purchasers and (b) pending such transfer, no further payments will be made in respect of such Note held by such beneficial owner.  As used in this paragraph, the term "U.S. Person" has the meaning given such terms in Regulation S under the Securities Act."

(b)    Payment Date Instructions.  Each Note Valuation Report shall constitute instructions to the Trustee to withdraw on the related Payment Date from the Payment Account and pay or transfer amounts set forth in such report in the manner specified, and in accordance with the Priority of Payments established in, Section 11.1(a).  The Issuer (or the Collateral Manager on behalf of the Issuer) shall instruct the Trustee by approval of the Note Valuation Report to apply on the related Payment Date from the Payment Account to the payment or transfer, as applicable, of amounts set forth in such Note Valuation Report in the manner specified in, and in accordance with, the Priority of Payments.

(c)    Redemption Date Instructions.  Not later than five Business Days after receiving an Issuer Request (executed by the Issuer or the Collateral Manager on behalf of the Issuer) requesting information regarding an Optional Redemption or Tax Redemption of the Securities set forth in such Issuer Request, the Trustee shall provide the necessary information (to the extent it is available to it) to the Issuers and the Collateral Administrator on behalf of the

Issuer shall compute or cause to be computed the following information and provide or cause to be provided such information in a statement (the "Redemption Date Statement") delivered to the Issuers, the Collateral Manager, the Trustee, the Hedge Counterparties, the Preference Share Paying Agent, each Rating Agency and, so long as the Securities are listed on a stock exchange, the Listing and Paying Agent:

(i)    the aggregate outstanding principal amount of the Securities to be redeemed as of such Redemption Date (including in the case of the Class C Notes and the Class D Notes, any Class C Deferred Interest and Class D Deferred Interest, respectively);

(ii)    the amount of accrued interest due on such Notes at the applicable Note Interest Rate as of the last day of the Interest Accrual Period immediately preceding such Redemption Date (including any Defaulted Interest and interest thereon with respect to any Notes) and the amount of the payment to the Preference Share Paying Agent for distribution to the Preference Shareholders;

(iii)    the Optional Redemption Prices or Tax Redemption Prices, as applicable, for each Class of Securities;

(iv)    the sum of all amounts due and unpaid under clauses (A), (B), (C) and (U) of Section 11.1(a)(i) (without regard to the limitations contained therein) and the corresponding clauses of Section 11.1(a)(ii), and all Incentive Fees to be paid to the Collateral Manager;

(v)    the amount due and payable to any Hedge Counterparty pursuant to any Hedge Agreement and the amount due and payable from any Hedge Counterparty pursuant to any Hedge Agreement; and

(vi)    the amount on deposit in the Collection Account available for application to the redemption of such Securities (including all transaction costs and expenses).

(d)    Appointment of Agent.  The Issuer may appoint an administrator or other agent to perform its obligations to provide reports pursuant to this Section 10.6(d) and certain calculations related thereto.  Pursuant and subject to the terms of the Collateral Administration Agreement, the Issuer has appointed the Bank as its initial agent for such purposes, and the Bank has accepted such appointment and has agreed to perform such obligations, as provided therein. Notwithstanding any such arrangement, the Issuer shall remain liable for all such actions and obligations and the performance of such actions and obligations by the Bank shall be deemed to be performance of such actions and obligations by the Issuer; and the Issuer will punctually perform, and use its best efforts to cause the Bank to perform, all of its obligations and agreements contained in the Collateral Administration Agreement.  The Issuer may, without removing the Bank as Custodian, and pursuant to the terms of the Collateral Administration Agreement, terminate such appointment of the Bank as agent for such purpose, and appoint an administrator or other agent to perform such obligations to prepare reports pursuant to this Section 10.6(d).

(e)    Notwithstanding anything to the contrary, for so long as the Bank is the Collateral Administrator, the Collateral Administrator shall, on behalf of the Issuer, make available to Noteholders (including any beneficial owners that have provided to the Trustee a beneficial owner certification in the form set forth in Exhibit K) and any other Person entitled to receipt thereof, all Payment Reports and Note Valuation Reports available at the time required to be made available in accordance with Section 10.6(a) and, with the consent or at the direction of the Issuer, such other information regarding the Notes and/or the Collateral as the Collateral Administrator may have in its possession.    The Collateral Administrator will make no representation or warranties as to the accuracy or completeness of such documents and will assume no responsibility therefor.  Notwithstanding the foregoing, nothing in this Section 10.6(e) shall relieve the Collateral Administrator or the Trustee from providing, at the request of a Noteholder, a paper copy of such report to the Holder of the Note shown on the Note Register in the manner described in Section 14.4.

In connection with providing access to the Collateral Administrator's website, the Collateral Administrator may require registration and the acceptance of a disclaimer.  In connection with providing access to the Collateral Administrator's Internet Website, the Collateral Administrator shall not be liable for the dissemination of information in accordance with this Indenture.

10.7    Release of Collateral

(a)    If no Event of Default has occurred and is continuing, the Issuer (or the Collateral Manager on behalf of the Issuer) may, by Issuer Order or other written instructions, delivered to the Trustee at least two Business Days prior to the settlement date for any sale of a Pledged Security certifying that (i) the Issuer (or the Collateral Manager on behalf of the Issuer) has determined that such Pledged Security has become a Credit Risk Obligation (which certification shall contain a short statement of the reason for such determination), a Credit Improved Obligation (which certification shall contain a short statement of the reason for such determination), a Defaulted Obligation or is an equity security and that the Issuer (or the Collateral Manager on behalf of the Issuer) has directed the Trustee to sell such Pledged Security pursuant to Section 12.1(a) of this Indenture, (ii) the Collateral Manager on the Issuer's behalf has directed the Trustee to sell such Pledged Security pursuant to Section 12.1(b) of this Indenture or (iii) the Issuers are redeeming the Securities in whole pursuant to an Optional Redemption, Tax Redemption, Auction or Clean-up Call and that the sale is in compliance with Article 9 of this Indenture and, with respect to Auctions, Schedule C of this Indenture, direct the Trustee to release such Pledged Security and, upon receipt of such Issuer Order, the Trustee shall deliver or otherwise transfer such Pledged Security to the broker or purchaser designated in such Issuer Order against receipt of the sales price therefor as set forth in such Issuer Order; *provided, however,* that the Trustee may deliver any such Pledged Security in physical form for examination in accordance with street delivery custom.

(b)    The Issuer (or the Collateral Manager on behalf of the Issuer) may, by Issuer Order delivered to the Trustee at least two Business Days prior to the date set for redemption or payment in full of a Pledged Security, certifying that such Pledged Security is being redeemed or paid in full, direct the Trustee to deliver or otherwise transfer such Pledged Security to the appropriate paying agent therefor on or before the date set for redemption or

payment, in each case against receipt of the redemption price or payment in full thereof; *provided* that if an Event of Default has occurred and is continuing, the Issuer shall only deliver or otherwise transfer such Pledged Collateral Asset at the order of, or with the consent of, a Majority of the Controlling Class.

(c)     The Issuer (or the Collateral Manager on behalf of the Issuer) may, by Issuer Order delivered to the Trustee at least two Business Days prior to the date set for an exchange, tender or sale, certifying that a Pledged Security is subject to an Offer and setting forth in reasonable detail the procedure for response to such Offer, direct the Trustee to deliver or otherwise transfer such Pledged Security in accordance with such Issuer Order, in each case against receipt of payment therefor; *provided* that if an Event of Default has occurred and is continuing, the Issuer shall only deliver or otherwise transfer such Pledged Collateral Asset at the order of, or with the consent of, a Majority of the Controlling Class.

(d)     The Trustee shall credit any proceeds received by it from the disposition of a Pledged Security to the Collection Account, unless simultaneously applied to the purchase of Substitute Collateral Assets or Eligible Investments as permitted under and in accordance with requirements of <u>Article 12</u> and this <u>Article 10</u>.  Neither the Trustee nor the Securities Intermediary shall be responsible for any loss resulting from delivery or transfer of any security prior to receipt of payment in accordance herewith.

(e)     The Trustee shall, upon receipt of an Issuer Order at such time as there are no Notes Outstanding and all obligations of the Issuer hereunder have been satisfied, release the Collateral from the lien of this Indenture.

10.8     <u>Reports by Independent Accountants</u>

(a)     On the Closing Date, the Collateral Manager on behalf of the Issuer shall appoint a firm of Independent certified public accountants of recognized international reputation for purposes of preparing and delivering the reports or certificates of such accountants required by this Indenture.  The Issuer, or the Collateral Manager on the Issuer's behalf, may remove such firm upon notice to the Rating Agencies and the Trustee.  Upon any removal of or resignation by such firm, the Collateral Manager on behalf of the Issuer shall promptly appoint by Issuer Order delivered to the Trustee and the Rating Agencies, a successor thereto that shall also be a firm of Independent certified public accountants of recognized international reputation.  If the Collateral Manager shall fail to appoint a successor to a firm of Independent certified public accountants which has resigned or been removed within 30 days after such resignation or removal, the Collateral Manager shall promptly notify the Trustee of such failure.  If the Collateral Manager shall not have appointed a successor within 10 days thereafter, the Issuer shall recommend a successor firm of Independent certified public accountants of recognized international reputation whom, following such recommendation, the Issuer shall engage.  The fees of such Independent certified public accountants and its successor shall be payable by the Issuer in accordance with the Priority of Payments.

(b)     At least one Business Day prior to each Payment Date occurring prior to or in October 2006, and then quarterly until the Stated Maturity of each Class of Notes, the Collateral Manager on behalf of the Issuer shall cause to be delivered to the Trustee, Preference

Share Paying Agent (for distribution to the Preference Shareholders), the Hedge Counterparties and each of the Rating Agencies, a statement from a firm of Independent certified public accountants, at the expense of the Issuer, indicating (i) that such firm has reviewed a Note Valuation Report received since the last review and applicable information from the Trustee, (ii) that the calculations within those Note Valuation Reports have been performed in accordance with the applicable provisions of this Indenture, (iii) the Aggregate Principal Amount as of the immediately preceding Payment Date, (iv) whether the remaining scheduled distributions on the Collateral Assets will be sufficient to pay the principal amount of each Class of Notes by their Stated Maturity and interest due thereon at the applicable Class A-1A Note Interest Rate, Class A-1B Note Interest Rate, Class A-2 Note Interest Rate, Class B Note Interest Rate, Class C Note Interest Rate, Class D-1 Note Interest Rate and Class D-2 Note Interest Rate, as applicable, (v) whether after payment in full of the Notes, the remaining scheduled distributions on the Collateral Assets will be sufficient to pay the Preference Share Paying Agent the Preference Share Hurdle for each Preference Shareholder by their Final Redemption Date and (vi) whether based on a sample of Collateral Assets purchased during the periods covered by such Note Valuation Reports, the Eligibility Criteria and Reinvestment Criteria were satisfied in connection with such purchases; *provided, however,* for purposes of the sample in clause (vi), the Reinvestment Criteria described in <u>Sections 12.2(e)(iv)</u>, <u>(v)</u>, <u>(vi)</u> and <u>(vii)</u> with respect to an acquisition of a Collateral Asset will be deemed satisfied to the extent the Trustee has verified that prior to and after such acquisition, the criteria described in such clauses was satisfied.

(c)     Any statement delivered to the Trustee pursuant to clause (b) above shall be delivered by the Trustee to any Holder of Securities upon written request thereof using the form attached hereto as <u>Schedule H</u>.

10.9    <u>Reports to Rating Agencies, Etc.</u>

In addition to the information and reports specifically required to be provided to the Rating Agencies pursuant to the terms of this Indenture, the Issuer (or the Collateral Manager on behalf of the Issuer) shall provide each Rating Agency with all information or reports delivered to the Trustee hereunder, and such additional information as each Rating Agency may from time to time reasonably request.  The Issuer (or the Collateral Manager on behalf of the Issuer) shall promptly notify the Trustee in writing if the rating on any of the Notes has been, or it is known by the Issuer that such rating will be, changed or withdrawn.  Upon receipt of such notice, the Trustee, in the name and at the expense of the Issuers, shall notify the Listing and Paying Agent, so long as any Securities are listed on any exchange, of any reduction or withdrawal in the rating on any of the Notes.

10.10    <u>Notice of Noteworthy Events</u>

The Issuer shall provide each Rating Agency notice of the following events:  (i) in respect of the resignation or removal of (A) the Collateral Manager pursuant to the terms of the Collateral Management Agreement or (B) the Trustee pursuant to the terms of this Indenture, (ii) appointment of any successor (A) Collateral Manager pursuant to the terms of the Collateral Management Agreement or (B) Trustee pursuant to the terms of this Indenture, (iii) a default in the payment when due and payable of any interest on any Note  and (iv) the modification or amendment of any Transaction Document and final executed copies of any modification or

amendment to any Transaction Document. In addition, the Issuer (or the Collateral Manager on its behalf) shall notify each of the Rating Agencies and the Trustee whenever the Issuer enters into a Deemed Floating Asset Hedge or Deemed Fixed Asset Hedge, and shall provide the identity of the Hedge Counterparty and copies of the Hedge Agreement along with any confirmation and schedule thereto; *provided*, that if such Deemed Floating Asset Hedge or Deemed Fixed Asset Hedge is with a new Hedge Counterparty or amends or modifies an existing Hedge Agreement (other than with respect to rate, term and any provision for deferral of amounts otherwise payable to the Hedge Counterparty), the Issuer shall not enter into such Deemed Floating Asset Hedge or Deemed Fixed Asset Hedge without satisfaction of the Rating Agency Condition (to the extent required).

## ARTICLE 11

### APPLICATION OF CASH

11.1    Disbursements of Cash from Payment Account

(a)    Notwithstanding any other provision in this Indenture and as provided in the Notes with respect to the Noteholders, but subject to the other subsections of this Section 11.1 and Section 13.1 of this Indenture, on each applicable Payment Date (other than a Final Payment Date), the Trustee shall, on behalf of the Issuer, disburse, on behalf of the Issuer, amounts, if any, standing to the credit of the Payment Account and, where applicable, the Monthly Interest Reserve Account and the Monthly Principal Reserve Account, as follows and for application by the Trustee in accordance with the priorities set forth below: (such priorities, the "Priority of Payments"):

(i)    (I) On each applicable Monthly Payment Date that is not also a Quarterly Payment Date, Interest Proceeds with respect to the related Due Period and amounts credited to the Monthly Interest Reserve Account, will be applied in the order of priority stipulated below:

(A)    to the payment of Taxes and government filing and registration fees (including without limitation, annual return fees) owed by the Issuers, if any;

(B)    to the payment of (A) accrued and unpaid fees of the Trustee, the Collateral Administrator and the Preference Share Paying Agent up to a maximum amount on any Payment Date equal to no more than 1/12 of 0.006% of the Monthly Asset Amount for the related Due Period and (B) any accrued and unpaid Administrative Expenses of the Issuers, excluding any indemnities (and legal expenses related thereto) payable by the Issuers, *first*, *pro rata*, to the Trustee, Preference Share Paying Agent and the Collateral Administrator and *then*, *pro rata*, to any other parties entitled thereto; *second*, to the payment of any indemnities (and legal expenses related thereto) payable by the Issuers, *pro rata*, to the Trustee, the Preference Share Paying Agent and the Collateral Administrator and *then*, *pro rata*, to any other parties entitled thereto; *provided*, that the aggregate payments pursuant to this subclause (B) on such Payment Date,

together with the 11 immediately preceding Monthly Payment Dates, shall not exceed U.S.$250,000;

(C)    to the payment to the Collateral Manager of the accrued and unpaid Base Collateral Management Fee, *plus* interest due on any portion of such fee not paid on a prior Payment Date at a rate equal to LIBOR;

(D)    to the payment of *pro rata* (based on amounts due) amounts, if any, scheduled to be paid to the Hedge Counterparties pursuant to the Hedge Agreements (other than Defaulted Hedge Termination Payments);

(E)    to the payment of interest on the Class A-1A Notes (including any Defaulted Interest and interest thereon) in the Class A-1A Note Interest Amount;

(F)    so long as any Class A-1A Notes are Outstanding, if any Coverage Test was not satisfied on the prior Quarterly Payment Date and, after giving effect to all payments of principal and reinvestments anticipated on any applicable Monthly Payment Date (without giving effect to any payments pursuant to this clause (F)) such Coverage Test is still not satisfied, then, to the payment of principal of all outstanding Class A-1A Notes to the extent necessary to cause each such Coverage Test to be satisfied; and

(G)    all remaining amounts to the Monthly Interest Reserve Account for application to the Payment Account on the next Quarterly Payment Date only for application to amounts payable pursuant to Section 11.1(a)(i)(II) below.

(II) On each applicable Quarterly Payment Date, Interest Proceeds with respect to the related Due Period and amounts credited to the Monthly Interest Reserve Account, will be applied in the order of priority stipulated below:

(A)    to the payment of amounts due and payable pursuant to clauses (A) through (E) of Section 11.1(a)(i)(I) above;

(B)    to the payment of interest on the Class A-1B Notes (including any Defaulted Interest and interest thereon) in the Class A-1B Note Interest Amount;

(C)    to the payment of interest on the Class A-2 Notes (including any Defaulted Interest and interest thereon) in the Class A-2 Note Interest Amount;

(D)    to the payment of interest on the Class B Notes (including any Defaulted Interest and any interest thereon) in the Class B Note Interest Amount;

(E)    if the Class A Overcollateralization Test is not satisfied on the Measurement Date with respect to the related Payment Date after giving effect to all payments of principal and reinvestments anticipated on such Payment Date (without giving effect to any payments pursuant to this clause (E)) then, *first,* to the payment of principal of all outstanding Class A-1A Notes, *second*, to the payment of principal of all outstanding funded Class A-1B Notes and *third*, to the

-182-

payment of principal of all outstanding Class A-2 Notes to the extent necessary to cause the Class A Overcollateralization Test to be satisfied;

(F)    if either the Class B Overcollateralization Test is not satisfied on the Measurement Date with respect to the related Payment Date after giving effect to all payments of principal and reinvestments anticipated on such Payment Date (without giving effect to any payments pursuant to this clause (F)) or if the Class B Interest Coverage Test is not satisfied on the Measurement Date with respect to the related Payment Date, then *first*, to the payment of principal of all outstanding Class A-1A Notes, *second*, to the payment of principal of all outstanding funded Class A-1B Notes, *third*, to the payment of principal of all outstanding Class A-2 Notes and *fourth*, to the payment of principal of all outstanding Class B Notes to the extent necessary to cause the Class B Overcollateralization Test and the Class B Interest Coverage Test to be satisfied;

(G)    to the payment of interest (including Defaulted Interest and any interest thereon but not including Class C Deferred Interest) on the Class C Notes in the Class C Note Interest Amount;

(H)    to the payment of Class C Deferred Interest;

(I)    if either the Class C Overcollateralization Test is not satisfied on the Measurement Date with respect to the related Measurement Date after giving effect to all payments of principal and reinvestments anticipated on such Payment Date (without giving effect to any payments pursuant to this clause (I)) or if the Class C Interest Coverage Test is not satisfied on the Measurement Date with respect to the related Payment Date, then, *first*, to the payment of principal of all outstanding Class A-1A Notes, *second*, to the payment of principal of all outstanding funded Class A-1B Notes and, *third*, to the payment of principal of all outstanding Class A-2 Notes, *fourth*, to the payment of principal of all outstanding Class B Notes, and *fifth*, to the payment of principal of all outstanding Class C Notes to the extent necessary to cause the Class C Overcollateralization Test and the Class C Interest Coverage Test to be satisfied;

(J)    to the payment of interest (including Defaulted Interest and any interest thereon but not including Class D Deferred Interest) on the Class D-1 Notes in the Class D-1 Note Interest Amount *pari passu* with the Class D-2 Notes at the Class D-2 Note Interest Amount;

(K)    to the payment of Class D Deferred Interest;

(L)    (a) if the Class D Overcollateralization Test is not satisfied on the Measurement Date with respect to the related Payment Date after giving effect to all payments of principal and reinvestments anticipated on such Payment Date (without giving effect to any payments pursuant to this clause (L)) then, *first*, to the payment of principal of all outstanding Class A-1A Notes, *second*, to the payment of principal of all outstanding funded Class A-1B Notes, *third*, to the

payment of principal of all outstanding Class A-2 Notes, *fourth*, to the payment of principal of all outstanding Class B Notes, *fifth*, to the payment of principal of all outstanding Class C Notes and *sixth*, to the payment of principal *pari passu* of all outstanding Class D-1 Notes and all outstanding Class D-2 Notes to the extent necessary to cause the Class D Overcollateralization Test to be satisfied or (b) in the event of a Rating Confirmation Failure, *first*, to the payment of principal of all outstanding Class A-1A Notes, *second*, to the payment of principal of all outstanding funded Class A-1B Notes, *third*, to the payment of principal of all outstanding Class A-2 Notes, *fourth*, the to the payment of principal of all outstanding Class B Notes, *fifth*, to the payment of principal of all outstanding Class C Notes and *sixth*, to the payment of principal *pari passu* of all outstanding Class D-1 Notes and all outstanding Class D-2 Notes, in each case, until and to the extent necessary for each of the Rating Agencies to confirm the ratings assigned by it on the Closing Date to each Class of Notes or until the Aggregate Outstanding Amount of each Class of Notes has been reduced to zero;

(M)    on or prior to the last day of the Reinvestment Period, to the payment of principal *pro rata* on the Class D-1 Notes and Class D-2 Notes in an amount equal to 30% of Interest Proceeds remaining in the Payment Account after payment of amounts set forth in paragraphs (A) through (L) above;

(N)    to the payment, in the order of priority set forth in the definition thereof, of any remaining accrued and unpaid Administrative Expenses of the Issuers not paid pursuant to clause (B) of <u>Section 11.1(a)(i)(I)</u> above or clause (A) of this <u>Section 11.1(a)(i)(II)</u> (as the result of the limitations on amounts set forth in <u>Section 11.1(a)(i)(I)</u>);

(O)    to the Preference Share Paying Agent for payment to Holders of the Preference Shares as a distribution by way of dividends in accordance with the provisions of the Preference Share Documents, in the amount necessary for the Preference Shares to achieve a Preference Share Hurdle Return equal to 11%;

(P)    to the payment to the Collateral Manager of the Incentive Fee;

(Q)    to the *pari passu* payment of any Defaulted Hedge Termination Payments; and

(R)    all remaining amounts to the Preference Share Paying Agent for payment to the Holders of the Preference Shares.

(ii)    (I) On each applicable Monthly Payment Date that is not also a Quarterly Payment Date, Principal Proceeds with respect to the related Due Period will be applied in the order of priority stipulated below:

(A)    to the payment of the amounts referred to in clauses (A) through (F) of <u>Section 11.1(a)(i)(I)</u> above (and in the same manner and order of priority) to the extent not previously paid in full thereunder;

(B)　　on or prior to the last day of the Reinvestment Period, *first*, to the Quarterly Principal Reserve Account, any amounts due and payable in respect of the Class A-1B Notes pursuant to clause (B) of <u>Section 11.1(a)(i)(II)</u> to the extent not previously paid in full thereunder and, *second*, any remaining Principal Proceeds, to the Collection Account for the reinvestment by the Collateral Manager on behalf of the Issuer in additional Collateral Assets and Eligible Investments;

(C)　　after the last day of the Reinvestment Period (1) if no Sequential Pay Trigger Event has occurred and is continuing or would occur as a result of such payment, to the payment of principal of the outstanding Class A-1A Notes *pro rata* in an amount equal to the proportion of the Aggregate Outstanding Amount of such Class A-1A Notes compared against the Aggregate Outstanding Amount of all of the Notes of each Class (but in the case of the Class A-1B Notes, only the funded amount thereof) or (2) if a Sequential Pay Trigger Event has occurred and is continuing, to the payment of principal of the Class A-1A Notes until the Aggregate Outstanding Amount of the Class A-1A Notes have been reduced to zero; and

(D)　　all remaining amounts to the Monthly Principal Reserve Account for application to the Payment Account on the next Quarterly Payment Date pursuant to <u>Section 11.1(a)(ii)(II)</u> below.

(II) On each applicable Quarterly Payment Date, Principal Proceeds with respect to the related Due Period and amounts credited to the Monthly Principal Reserve Account, will be applied in the order of priority stipulated below; *provided* that, amounts credited to the Monthly Principal Reserve Account shall only be applied to the Class A-1B Notes and those Classes of Notes subordinate thereto:

(A)　　to the payment of the amounts referred to in clauses (A) through (L) of <u>Section 11.1(a)(i)(II)</u> above (and in the same manner and order of priority) to the extent not previously paid in full thereunder;

(B)　　on or prior to the last day of the Reinvestment Period, to the Collection Account for the reinvestment by the Collateral Manager on behalf of the Issuer in additional Collateral Assets and Eligible Investments;

(C)　　after the last day of the Reinvestment Period (1) if no Sequential Pay Trigger Event has occurred and is continuing or would occur as a result of such payments, to the payment of principal of all outstanding Class A-1A Notes, funded amount of Class A-1B Notes, Class A-2 Notes, Class B Notes, Class C Notes and Class D Notes, in each case, *pro rata* in an amount equal to the proportion of the Aggregate Outstanding Amount of each such Class of Notes compared against the Aggregate Outstanding Amount of all of the Notes of each Class (but in the case of the Class A-1B Notes, only the funded amount thereof) or (2) if a Sequential Pay Trigger Event has occurred and is continuing, to the payment of, *first*, principal of the Class A-1A Notes until the Aggregate

-185-

Outstanding Amount of the Class A-1A Notes have been reduced to zero, *second*, principal of the Class A-1B Notes until the Aggregate Outstanding Amount of the Class A-1B Notes have been reduced to zero, *third*, principal of the Class A-2 Notes until the Aggregate Outstanding Amount of the Class A-2 Notes have been reduced to zero, *fourth*, principal of the Class B Notes until the Aggregate Outstanding Amount of the Class B Notes have been reduced to zero, *fifth*, principal of the Class C Notes until the Aggregate Outstanding Amount of the Class C Notes have been reduced to zero and *sixth*, principal of the Class D Notes until the Aggregate Outstanding Amount of the Class D Notes have been reduced to zero;

(D)    to the payment of all amounts due pursuant to clause (N) of Section 11.1.(a)(i)(II) above (but without giving effect to any of the limitations set forth in such clause), in the same order of priority set forth therein, to the extent not paid in full thereunder;

(E)    to the Preference Share Paying Agent for payment to the Holders of the Preference Shares as a distribution by way of dividends in accordance with the provisions of the Preference Share Documents, in the amount necessary for the Preference Shares to achieve a Preference Share Hurdle Return equal to 11%;

(F)    to the payment to the Collateral Manager of the Incentive Fee;

(G)    to the payment of all amounts due pursuant to clause (Q) of Section 11.1.(a)(i)(II) above to the extent not paid in full thereunder; and

(H)    all remaining amounts to the Preference Share Paying Agent for payment to Holders of the Preference Shares in accordance with the provisions of the Preference Share Documents.

No Principal Proceeds shall be applied to pay Class C Deferred Interest or Class D Deferred Interest on any Payment Date unless, in each such case, *pro forma* calculations as of the Measurement Date related to such Payment Date demonstrate the payment of such Class C Deferred Interest or Class D Deferred Interest will not cause the Issuer to fail the Class A Overcollateralization Test or Class B Overcollateralization Test on such Payment Date.

Notwithstanding anything else in this Indenture, no amounts shall be paid to the Preference Share Paying Agent pursuant to clauses (N) and (R) of Section 11.1(a)(i)(II) and clauses (E) and (H) of Section 11.1(a)(ii)(II) on any Payment Date prior to the Effective Date unless the Issuer (i) prepares or causes to be prepared a report demonstrating the Issuer's compliance with the Coverage Tests, Collateral Quality Tests and Portfolio Profile Tests, which report shall be reviewed and approved by a firm of independent accountants and (ii) satisfies the Rating Agency Condition with respect to Standard & Poor's in connection with such distribution. Any amounts paid to the Preference Share Paying Agent pursuant to clauses (N) and (R) of Section 11.1(a)(i)(II) and clauses (E) and (H) of Section 11.1(a)(ii)(II) will be released from the lien of the Indenture. For purposes of this Section 11.1, Interest Proceeds will be assumed to be applied prior to any Principal Proceeds.

(b)    Not later than 12:00 p.m., New York time, on or before the Business Day preceding each Payment Date, the Issuer shall, pursuant to <u>Section 10.3(a)</u>, remit or cause to be remitted to the Trustee for deposit in the Payment Account an amount of Cash sufficient to pay the amounts described in <u>Section 11.1(a)</u> required to be paid on such Payment Date.

(c)    If, on any Payment Date, the amount available in the Payment Account from amounts received in the related Due Period is insufficient to make the full amount of the disbursements required by the statements furnished by the Issuer pursuant to <u>Section 10.6(b)</u>, the Trustee shall make the disbursements called for in the order and according to the priority set forth under <u>Section 11.1(a)</u>, subject to <u>Section 13.1</u>, to the extent funds are available therefor.

(d)    Except as otherwise expressly provided in this <u>Section 11.1</u>, if on any Payment Date the amount available in the Payment Account from amounts received in the related Due Period is insufficient to make the full amount of the disbursements required by any paragraph of <u>Section 11.1(a)(i)</u> or <u>Section 11.1(a)(ii)</u> to different Persons, the Trustee shall make the disbursements called for by such paragraph ratably in accordance with the respective amounts then due and payable to such Person to the extent funds are available therefor.

(e)    Upon prior written notice delivered to the Trustee at least two Business Days prior to any Measurement Date, the Collateral Manager may, in its sole discretion, elect to defer payment to it of any Base Collateral Management Fee or Incentive Fee which would otherwise be payable to the Collateral Manager on such Payment Date.  Any Base Collateral Management Fee or Incentive Fee deferred pursuant to this clause (e) will be paid on the next succeeding Payment Date to the extent funds are available for such purpose in accordance with the Priority of Payments and shall not accrue interest.

(f)    Notwithstanding anything to the contrary in this Indenture, the Issuer may apply amounts credited to the Payment Account outside of the Priority of Payments on any date other than a Payment Date in order to make payments due to the Hedge Counterparty (other than Defaulted Hedge Termination Payments otherwise payable in accordance with <u>Section 11.1(a)(i)(II)(Q)</u> or <u>Section 11.1(a)(ii)(II)(G)</u>) on the relevant payment date provided for in the related Hedge Agreement.

11.2    <u>Final Payment Date</u>.  On a Final Payment Date and as provided in the Notes with respect to the Noteholders, all available amounts in the Payment Account will be applied by the Trustee on behalf of the Issuer in the Priority of Payments set forth below:

(1)    to the payment of the amounts referred to in clauses (A) through (G) of <u>Section 11.1(a)(i)(I)</u> and clauses (A) through (N) of <u>Section 11.1(a)(i)(II)</u>, in that order (without regard to the limitations in clause (B));

(2)    to the payment of *first*, principal of all outstanding Class A-1A Notes until the Aggregate Outstanding Amount of Class A-1A Notes are reduced to zero, *second*, principal of all outstanding Class A-1B Notes until the Aggregate Outstanding Amount of Class A-1B Notes are reduced to zero, *third*, to the payment of principal of all outstanding Class

A-2 Notes until the Aggregate Outstanding Amount of Class A-2 Notes are reduced to zero, *fourth*, to the payment of principal of all outstanding Class B Notes until the Aggregate Outstanding Amount of Class B Notes are reduced to zero, *fifth*, to the payment of principal of all outstanding Class C Notes until the Aggregate Outstanding Amount of Class C Notes are reduced to zero and *sixth*, to the payment of principal of all outstanding Class D Notes until the Aggregate Outstanding Amount of Class D Notes are reduced to zero;

(3)    to the Preference Share Paying Agent for payment to the Holders of the Preference Shares as a distribution by way of dividends in accordance with the provisions of the Preference Share Documents, in the amount necessary for the Preference Shares to achieve a Preference Share Hurdle Return equal to 11%;

(4)    to the Collateral Manager of the Incentive Fee; and

(5)    all remaining amounts to the Preference Share Paying Agent for payment to the Holders of the Preference Shares in accordance with the provisions of the Preference Share Documents.

# ARTICLE 12

## PURCHASE AND SALE OF COLLATERAL ASSETS; SUBSTITUTION

### 12.1    Sale and Reinvestment of Collateral Assets

(a)    Provided that no Event of Default has occurred and is continuing and subject to the satisfaction of the conditions specified in Section 10.7, this Section 12.1 and Sections 12.2 and 12.3, the Collateral Manager, on behalf of the Issuer, may direct the Trustee to sell, and the Trustee shall sell, on behalf of the Issuer, in the manner directed by the Collateral Manager, any Defaulted Obligation, Credit Risk Obligation or Credit Improved Obligation; *provided, however,* that the Collateral Manager may not direct the Trustee to sell a Credit Improved Obligation or a Credit Risk Obligation unless the Collateral Manager certifies to the Trustee that, in the judgment of the Collateral Manager (which shall not be called into question solely as a result of subsequent events) the applicable criteria specified in clauses (i) and (ii) are met:

(i)    A Credit Improved Obligation may be sold during the Reinvestment Period and only if in the Collateral Manager's judgment one or more Substitute Collateral Assets can be purchased such that (i) the Principal Balance of one or more such Substitute Collateral Assets is at least equal to 100% of the Principal Balance of the Credit Improved Obligation being sold unless the Class A Overcollateralization Ratio is at least equal to 102.5%, the Class B Overcollateralization Ratio is at least equal to 101.56%, the Class C Overcollateralization Ratio is at least equal to 100.81% and the Class D Overcollateralization Ratio is at least equal to 100.31% and (ii) immediately before giving effect to such sale and after the purchase of Substitute Collateral Assets

with the Sale Proceeds thereof, the Reinvestment Criteria will be satisfied.  A Credit Improved Obligation may be sold after the Reinvestment Period provided that the Issuer complies with the following criteria (the "Additional Reinvestment Criteria"), in each case as determined both prior to the disposition of any Credit Improved Obligation and after the purchase and Grant of the applicable Substitute Collateral Asset: (1) the Issuer is in compliance with the Moody's Maximum Rating Distribution Test; the Maximum Weighted Average Life Test and the Standard & Poor's CDO Monitor Test, (2) the Issuer is in compliance with the Class A Overcollateralization Test, the Class B Overcollateralization Test, the Class C Overcollateralization Test and the Class D Overcollateralization Test, (3) the Issuer is in compliance with the Collateral Profile Tests, (4) the ratings assigned by Moody's to the Class A Notes and Class B Notes have not been reduced or withdrawn since the Closing Date and the ratings assigned by Moody's to the Class C Notes and Class D Notes have not been reduced by more than one subcategory below the ratings assigned to such Notes on the Closing Date and such ratings have not been withdrawn and (5) the Stated Maturity of the applicable Substitute Collateral Asset is not later than the Stated Maturity of the Credit Improved Obligation being sold.

(ii)    A Credit Risk Obligation may be sold at any time during the Reinvestment Period if the Collateral Manager agrees to use commercially reasonable efforts to purchase on behalf of the Issuer one or more Substitute Collateral Assets that (i) have a Principal Balance of not less than 100% of the Sale Proceeds (net of any accrued interest included therein) received from the sale of the Credit Risk Obligation and (ii) satisfy the Reinvestment Criteria prior to the end of the Due Period following the Due Period in which such Credit Risk Obligation is sold.  A Credit Risk Obligation may be sold after the Reinvestment Period so long as the foregoing criteria and the Additional Reinvestment Criteria are satisfied.  When calculating the Standard & Poor's CDO Monitor Test in connection with the sale of a Credit Risk Obligation, any Collateral Asset acquired with Sale Proceeds of a Credit Risk Obligation or Defaulted Obligation need not comply with the Standard & Poor's CDO Monitor Test.

(b)    Defaulted Obligations and equity securities may be sold at any time during or after the Reinvestment Period without regard to the restrictions contained in clauses (i) and (ii) of subsection (a) above (without regard to the restrictions set forth in Section 10.7); *provided*, that Substitute Collateral Assets purchased to replace sold Defaulted Obligations have a Principal Balance of not less than 100% of the Sale Proceeds (net of any accrued interest included therein) received from the sale of such Defaulted Obligations.  During the Reinvestment Period, proceeds from the sale of Defaulted Obligations may be reinvested in Collateral Assets that satisfy the Reinvestment Criteria, including without limitation satisfaction of the Coverage Tests.  After the Reinvestment Period, the proceeds from the sale of Defaulted Obligations shall be applied as Principal Proceeds on the Payment Date following the Due Period in which such sale occurs and may not be reinvested.

(c)    Notwithstanding subsection (b) above (without regard to the restrictions set forth in Section 10.7), equity securities received in exchange offers shall be sold as soon as commercially practicable in the Collateral Manager's judgment, but in any event within one year from the later of the date of acquisition and the date they are legally permitted to be sold.

Subject to applicable law, the Issuer shall sell any Margin Stock acquired by it by a date not later than 45 days after the date of the Issuer's acquisition of such Margin Stock. The limits and time periods provided in this Section 12.1(c) may be extended subject to satisfaction of the Rating Agency Condition.

(d)    If no Event of Default has occurred and is continuing, a Synthetic Security may, in accordance with this Indenture, be assigned, terminated or sold (treating such assignment or termination as a sale for purposes of this Article 12). Any cash received in payment of principal on or upon the liquidation of Synthetic Security Collateral (net of any amounts payable to the Synthetic Securities Counterparty) shall be deemed to be (a) Principal Proceeds, if the Synthetic Security was terminated at its scheduled maturity, (b) Sale Proceeds, if the Synthetic Security was terminated, sold or assigned by the Collateral Manager prior to its scheduled maturity, or (c) Unscheduled Principal Payments, if the Synthetic Security was subject to early termination other than by the Collateral Manager.

(e)    If no Event of Default has occurred and is continuing, during the Reinvestment Period, in addition to the permitted sales of Collateral Assets pursuant to Section 12.1(a), (b), (c) and (d), any other Collateral Asset that is not a Defaulted Obligation, a Credit Risk Obligation, a Credit Improved Obligation or equity security may be disposed of in a Discretionary Sale so long as (i) the aggregate Principal Balance of Collateral Assets sold in Discretionary Sales during the annual period from and including the Closing Date to but excluding the date that is one year following the Closing Date does not exceed 20% of the Aggregate Principal Amount measured as of the Closing Date and during each successive one-year period from and including such anniversary date to but excluding the anniversary date occurring in the following calendar year (an "Annual Period") through the end of the Reinvestment Period does not exceed 20% of the Aggregate Principal Amount measured as of the beginning of each Annual Period (such percentage, the "Discretionary Trading Percentage"); and (ii) (x) the ratings assigned to the Class A Notes or Class B Notes by Moody's as of the Closing Date have not been withdrawn or reduced (or placed on watchlist for potential downgrade by Moody's) by one or more subcategories since the Closing Date and the ratings assigned to the any of the Class C Notes or Class D Notes by Moody's as of the Closing Date have not been withdrawn or reduced by two or more subcategories (or reduced by one subcategory and placed on a watchlist for potential downgrade by Moody's) (in each case without subsequent reinstatement at or to the Closing Date levels for the Class A Notes and Class B Notes and at or to at least one subcategory below their initial levels for the Class C Notes or Class D Notes) by Moody's (or taken off a watchlist for potential downgrade by Moody's after being reduced by one subcategory) or (y) the Holders of a Majority of the Class A Notes vote to waive the requirement of subclause (x) of this clause (ii); *provided* that any disposition of a Collateral Asset shall not count towards the Discretionary Trading Percentage if the Issuer obtains a position with respect to such Collateral Asset by selling protection on such Collateral Asset pursuant to a credit default swap agreement where the notional amount applicable to the new related Reference Obligation is equal to the Principal Balance of such Collateral Asset as of the time immediately prior to the sale of such Collateral Asset and (ii) the Issuer may purchase a Collateral Asset without regard to the Discretionary Trading Percentage if such Collateral Asset represents the cash position of a Reference Obligation with respect to which the Issuer was the seller of protection pursuant to a credit default swap agreement and the Issuer traded out of such synthetic position within 30 days prior to the purchase of such

Collateral Asset.  During the Reinvestment Period, the Sale Proceeds of any Discretionary Sale may be reinvested; *provided* that the portion of the Sale Proceeds that constitutes Principal Proceeds to be received in connection therewith (together with such amounts from concurrent sales) can be used to purchase one or more Substitute Collateral Assets such that after giving effect to the purchase and Grant of such asset, the Reinvestment Criteria are satisfied and, unless the Class A Overcollateralization Ratio is at least equal to 102.5%, the Class B Overcollateralization Ratio is at least equal to 101.56%, the Class C Overcollateralization Ratio is at least equal to 100.81% and the Class D Overcollateralization Ratio is at least equal to 100.31%, the Principal Balance of the Substitute Collateral Assets will not be less than 100% of the Principal Balance of the Collateral Assets being sold.

(f)     Notwithstanding clauses (a) through (e) above, the Collateral Manager may instruct the Issuer to reinvest any Scheduled Distributions or proceeds received in respect of recoveries on any Defaulted Obligations, only if (x) each Coverage Test is satisfied both immediately before giving effect to such reinvestment and after giving effect to the purchase and Grant of any Collateral Assets purchased with such proceeds and (y) the Average Life of any Collateral Asset purchased with such proceeds is less than the Maturity Date.

(g)     The Issuer, or the Collateral Manager on behalf of the Issuer, may also,

(i)     in the case of an Optional Redemption pursuant to Section 9.1(a), and the Trustee shall sell in the manner directed by the Collateral Manager in writing, the Collateral Assets without respect to the limitations of Section 12.1(a), (b), (c), (d) or (e) above and liquidate the remaining Collateral; *provided*, that the criteria for an Optional Redemption can be demonstrably met prior to any such sale, and that the proceeds from such sale, determined in accordance with the criteria for an Optional Redemption, will equal or exceed the Total Redemption Amount, and upon such sale the Trustee shall release such Collateral from the lien of this Indenture;

(ii)     in the case of a Tax Redemption pursuant to Section 9.1(a), direct the Trustee to sell, and the Trustee shall sell in the manner directed by the Collateral Manager in writing, the Collateral Assets without respect to the limitations of Section 12.1(a), (b), (c), (d) or (e) above and the remaining Collateral; *provided*, that the criteria for a Tax Redemption can be demonstrably met prior to any such sale, and that the proceeds from such sale will equal or exceed the Total Redemption Amount, and upon such sale the Trustee shall release such Collateral from the lien of this Indenture;

(iii)     if, in connection with an Auction, the Collateral Manager receives timely bids (which are each "firm offers") that are, in the aggregate, at least equal to the Minimum Bid Amount, direct the Trustee to sell on behalf of the Issuer, and the Trustee shall so sell the Collateral in the manner directed by the Collateral Manager in writing; *provided further* that, the procedures set forth in Section 9.4 and in Schedule C of this Indenture, as applicable, are satisfied; and

(iv)     if, in connection with a Clean-up Call, pursuant to Section 9.6, direct the Trustee to sell, and the Trustee shall sell the Collateral in the manner directed by the

Collateral Manager in writing; *provided further* that, the procedures set forth in Section 9.6 of this Indenture are satisfied.

12.2    Eligibility Criteria and Reinvestment Criteria

(a)    Starting on the Closing Date, if the Issuer enters into a commitment to acquire an obligation or security for inclusion in the Collateral, then the Issuer must comply with each of the Reinvestment Criteria on the date on which the Issuer entered into such commitment, and need not comply with the Reinvestment Criteria with respect to such obligation or security on the date of acquisition.  A Collateral Asset to be Granted to the Trustee will be eligible for inclusion in the Collateral as a Pledged Security only if an Officer's certificate of the Collateral Manager on behalf of the Issuer is delivered to the Trustee as of the date of such Grant certifying that the following criteria (collectively, the "Eligibility Criteria") are satisfied:

(i)    it can be classified in one of the following Categories: Commercial Mortgage Backed Security (CMBS Security), Residential Mortgage Backed Security (RMBS Security), CDO Security, Insured Security, Asset Backed Security (ABS Security) or Synthetic Security whose Reference Obligation and Deliverable Obligation can be classified in one of the previous Categories; and

(A)    if it is a CMBS Security, it can be classified in an Approved Subcategory of CMBS Securities or one of the following Subcategories: CMBS Conduit Security, CMBS Large Loan Security, CMBS Credit Tenant Lease Security or CMBS RE REMIC Security;

(B)    if it is a RMBS Security, (x) it can be classified in an Approved Subcategory of RMBS Securities or one of the following Subcategories: RMBS Agency Security, RMBS Prime Mortgage Security, RMBS Mid-Prime Mortgage Security, RMBS Sub Prime Mortgage Security or RMBS Home Equity Loan Security; and (y) it is not an RMBS Manufactured Housing Security;

(C)    if it is a CDO Security, (x) it can be classified (A) based on its underlying asset type in an Approved Subcategory of CDO Securities or one of the following Subcategories:  CDO Structured Product Security or CDO RMBS Security and (B) based on its structure as either a cashflow CDO Security or a Synthetic CDO Security; provided, that any Synthetic CDO Security shall also be subject to the applicable Collateral Profile Test and (y) it is not a Market Value CDO Security, Corporate CDO Security, CDO Trust Preferred Security or CDO of CDO Security;

(D)    if it is an Insured Security, it is rated "Aa3" by Moody's (if rated by Moody's) and "AA-" by Standard & Poor's (and, in each case, is not on credit watch for possible downgrade), except that if an Insured Security is an Aircraft Leasing Security (including any EETC Security), RMBS Manufactured Housing Security, Mutual Fund Fees Security or ABS Whole Business Security, in each case, without the protection of an insurance policy provided by an insurer rated at least "Aaa" by Moody's or "Aaa" by S&P and guaranteeing timely payment of

principal and interest due on such security; it shall be rated "Aaa" by Moody's (if rated by Moody's) and "AAA" by Standard & Poor's and, in each case, is not on credit watch for possible downgrade;

(E)    if it is an Asset Backed Security, it can be classified in an Approved Subcategory of ABS Securities or is a Subcategory of ABS Securities; *provided*, that, with respect to any Approved Subcategory of ABS Securities, such Approved Subcategory of ABS Securities shall not be a Restricted ABS Asset Type unless prior written notice is provided to Standard & Poor's and such Approved Subcategory of ABS Securities shall be approved in writing by the initial Hedge Counterparty; provided, further, that no more than 3% of the Aggregate Principal Amount may consist of Equipment Leasing Securities;

(F)    if it is a Synthetic Security, the Reference Obligation and Deliverable Obligation of the Synthetic Security can be classified as a RMBS Security, CMBS Security, a CDO Security, an Insured Security or an Asset Backed Security that satisfies the Eligibility Criteria and Collateral Profile Tests;

(ii)    either (A) such Collateral Asset is issued by an entity that is treated as a corporation that is not a United States real property holding corporation as defined in Section 897(c)(2) of the Code for U.S. federal income tax purposes, (B) such Collateral Asset is treated as indebtedness for U.S. federal income tax purposes, or (C) the Issuer has received advice from Cadwalader, Wickersham & Taft LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters to the effect that the acquisition, ownership or disposition of such security will not cause the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes or otherwise subject the Issuer to U.S. federal income tax on a net income basis;

(iii)    it is not a Non-U.S. Security;

(iv)    it does not provide for any payments which are or will be subject to deduction or withholding for or on account of any withholding or similar tax, unless the issuer of such security is required to make "gross up" payments that ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding been required;

(v)    either (x) it was issued pursuant to an effective registration statement under the Securities Act in a "firm commitment" underwriting or (y) it was issued in a transaction exempt from registration under the Securities Act pursuant to an offering memorandum, private placement memorandum or similar document;

(vi)    its acquisition would not cause the Issuer or the pool of Collateral to be required to register as an investment company under the Investment Company Act;

(vii)    it is not (a) a Collateral Asset issued by an issuer located in a country that imposes foreign exchange controls that effectively limit the availability or use of U.S.

Dollars to make when due the scheduled payments of principal of and interest on such Collateral Asset; (b) a financing by a debtor in possession in any insolvency proceeding; or (c) the subject of an Offer other than a Permitted Offer (and it has not been called for redemption);

(viii)    the Issuer is not required by the terms of the related Underlying Instruments to make any payment or advance to the issuer of any Collateral Asset under the terms of its Underlying Instruments after its acquisition thereof or to any Synthetic Security Counterparty, other than any requirement to transfer Synthetic Security Collateral under the terms of a Synthetic Security and unless a subaccount has been fully funded to cover any such payments or advances;

(ix)    it provides for periodic payments of interest no less frequently than semiannually;

(x)    it was issued after July 18, 1984, and is in registered form for purposes of the Code;

(xi)    it is U.S. Dollar denominated and it is not convertible into, or payable in, any other currency;

(xii)    if it is a Deemed Floating Collateral Asset, the Deemed Floating Asset Hedge entered into with respect to such Deemed Floating Collateral Asset conforms to all requirements set forth in the definition of "Deemed Floating Asset Hedge" and if it is a Deemed Fixed Collateral Asset, the Deemed Fixed Asset Hedge entered into with respect to such Deemed Fixed Collateral Asset conforms to all requirements set forth in the definition of "Deemed Fixed Asset Hedge";

(xiii)    if it is a Floating Rate Asset, its interest rate (or the interest rate on the underlying pool of loans and securities) adjusts by reference to one month, three month or six month LIBOR or, if such Floating Rate Assets adjusts based on a rate other than LIBOR, such Floating Rate Asset adjusts according to an index based on the federal funds rate or another index commonly used in the United States or United Kingdom;

(xiv)    it is not a Written Down Security, Defaulted Obligation or a security currently deferring interest or an obligation which, in the Collateral Manager's judgment, has a significant risk of declining in credit quality and, with the lapse of time, becoming a Defaulted Obligation;

(xv)    it is not a Collateral Asset that is ineligible under its Underlying Instruments to be purchased by the Issuer and pledged to the Trustee;

(xvi)    it is not a Collateral Asset comprising an economic interest in a combination of two or more other classes of securities of the same issuance as such Collateral Asset;

(xvii)    it is not preferred or common stock, a security convertible into preferred or common stock or a security combined with any of the preceding preferred or common

stock or "margin stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System;

(xviii)     it is not a Restricted ABS Asset Type;

(xix)     it provides for the payment of principal at not less than par upon maturity, redemption or acceleration;

(xx)     it is rated as least "Aa3" by Moody's and such rating is as to both principal and interest or is rated at least "AA-" by Standard & Poor's and if the Standard & Poor's rating (if any) includes an "r", "t", "pi", "p" or "q" subscript, it satisfies the Rating Agency Condition with respect to Standard & Poor's;

(xxi)     it is not a Collateral Asset that, pursuant to the terms of the related Underlying Instruments, permits the payment of interest thereon to be deferred or capitalized as additional principal thereof or that issues identical securities in place of payments of interest in cash;

(xxii)     it is not a CDO Security backed by a pool of collateral managed by the Collateral Manager; and

(xxiii)     is not subject to an Offer.

(b)     During the Reinvestment Period, any Principal Proceeds may be reinvested in Collateral Assets to be Granted to the Trustee if the Reinvestment Criteria, are satisfied as of the date the Issuer enters into a commitment to acquire such Collateral Asset, which compliance shall be evidenced by an Officer's Certificate of Issuer or the Collateral Manager that is delivered to the Trustee,.

(c)     After the Reinvestment Period, Unscheduled Principal Payments and Sale Proceeds from the disposition of Credit Risk Obligations may be reinvested in Collateral Assets to be Granted to the Trustee, *provided* that in each case such reinvestment occurs on or before the last day of the Due Period following the Due Period in which such amounts were received, and after such reinvestment, the Reinvestment Criteria, as evidenced by an Officer's Certificate of the Issuer or the Collateral Manager to the Trustee, are satisfied.

(d)     With respect to any "package trade" in which multiple Collateral Assets are purchased and/or sold on the same trade date (regardless of whether the settlement dates are the same), compliance with the Reinvestment Criteria shall be measured by determining the aggregate effect of such "package trade" on the Issuer's level of compliance with the applicable Reinvestment Criteria rather than considering the effect of each purchase and sale of a Collateral Asset individually.  No two Trading Plans will be permitted at any one time.  If at any time any a Trading Plan that was previously implemented resulted in the deterioration in the Issuer's level of compliance with any of the Eligibility Criteria, other than due to (x) a failure of a counterparty or issuer to comply with any of its payment or delivery obligations to the Issuer or any other default by such counterparty or issuer for reasons beyond the control of the Issuer or any other terms that were agreed with the Issuer at or prior to the commencement of such Trading Plan or (y) an error or omission of an administrative or operational nature made by any bank, broker-

dealer, clearing corporation or other similar financial intermediary holding funds, securities or other property directly or indirectly for the account of the Issuer, the Issuer will be prohibited from entering into any additional Trading Plans notwithstanding that such Trading Plan was executed in good faith.  The time period for each such Trading Plan shall be measured from the earliest trade date to the latest trade date of any such amounts. The Collateral Manager may only specify one Trading Plan per trade date.  The Collateral Manager will provide notice to Standard & Poor's of any failed Trading Plan.  Once compliance is restored to its prior level the Collateral Manager may request, and Standard & Poor's may restore the Issuer's ability to implement Trading Plans.

With respect to any series of trades in which the Issuer commits to purchase and or sell multiple Collateral Assets pursuant to a Trading Plan, compliance with the Reinvestment Criteria may, at the option of the Collateral Manager, be measured by determining the aggregate effect of such on the Issuer's level of compliance with the Reinvestment Criteria rather than considering the effect of each purchase and sale of such Collateral Assets individually.  The Issuer (or the Collateral Manager on its behalf) may only enter into a Trading Plan if (i) as evidenced by an officer's certificate of the Collateral Manager delivered to the Trustee and Standard & Poor's on or prior to the earliest event specified in the related Trading Plan, the Reinvestment Criteria are expected to be satisfied as of the scheduled completion date of the related Trading Plan, (ii) the Coverage Tests are in compliance, (iii) the ratings by Moody's on the Notes are not one or more rating subcategories below the applicable ratings in effect on the Closing Date and such ratings have not been withdrawn by Moody's and (iv) if after completion of any previous Trading Plan, any of the Reinvestment Criteria were not satisfied, the level of compliance with each of such Reinvestment Criteria is equal to or better than the level of compliance with such Reinvestment Criteria prior to the initiation of such previous Trading Plan. Upon completion of a Trading Plan, an officer's certificate of the Collateral Manager will be delivered to the Trustee specifying whether each of the Reinvestment Criteria were satisfied. The Collateral Administrator will provide written notice to Standard & Poor's and Moody's if, upon completion of a Trading Plan, any of the Reinvestment Criteria is not met.

(e)    The following criteria shall be "satisfied" if the same are satisfied, maintained or improved after reinvestment in a Collateral Asset (except as otherwise provided in such criteria) (the "Reinvestment Criteria"):

(i)    such security is a Collateral Asset;

(ii)    such Collateral Asset meets all of the Eligibility Criteria;

(iii)    each of the Collateral Profile Tests is satisfied or if immediately prior to such acquisition one or more of such Collateral Profile Tests was not satisfied, the level of compliance with respect to each such Collateral Profile Test not satisfied must be maintained or improved;

(iv)    if such Collateral Asset is acquired after the Closing Date, (a) each of the Collateral Quality Tests is satisfied or (b) if immediately prior to such acquisition one or more of such Collateral Quality Tests was not satisfied, the level of compliance with respect to each such Collateral Quality Test not satisfied must be maintained or

improved; *provided*, that any Collateral Asset acquired with Sale Proceeds of a Credit Risk Obligation or Defaulted Obligation need not comply with the Standard & Poor's CDO Monitor Test;

(v)    no Event of Default has occurred and is continuing on such date (unless the Collateral Asset was the subject of a binding commitment entered into by the Issuer prior to an Event of Default);

(vi)    each of the Coverage Tests is satisfied following any investment, *provided, however,* with respect to any reinvestment of Sale Proceeds (other than Sale Proceeds from Equity Securities, Defaulted Obligations or Credit Risk Obligations), if, as calculated immediately prior to such reinvestment, any Coverage Test was not satisfied prior to such reinvestment, the coverage ratio relating to such test will be at least maintained or improved after giving effect to such reinvestment as it was before giving effect to the transaction that generated such Sale Proceeds; *provided further* that, with respect to reinvestment of Sale Proceeds from Equity Securities, Defaulted Obligations or Credit Risk Obligations, if measured immediately after the sale of such Equity Securities, Defaulted Obligations or Credit Risk Obligation but prior to any reinvestment, any Coverage Test was not satisfied, the coverage ratio relating to such test will be at least maintained or improved after giving effect to such reinvestment as it was immediately before giving effect to such reinvestment; and

(vii)    the Standard & Poor's Rating of any Collateral Asset acquired after the Reinvestment Period is at least equal to the Standard & Poor's Rating with respect to the Collateral Asset which gave rise to the proceeds used to acquire such Collateral Asset.

(f)    For purposes of determining whether a Collateral Asset may be sold as described in <u>Section 12.1</u> or this <u>Section 12.2</u>, Synthetic Securities shall be treated as Collateral Assets containing the same coupon, maturity and Principal Balance of such Synthetic Security.

12.3    <u>Conditions Applicable to all Transactions Involving Sale or Grant</u>

(a)    Any transaction effected under this Article shall be conducted on an arm's length basis, and, if effected with a Person affiliated with the Collateral Manager or any fund or account for which the Collateral Manager or any of its affiliates acts as investment adviser, the Issuer or the Trustee, shall be effected on terms no less favorable to the Issuer as would be the case if such Person were not so affiliated.  The Collateral Manager will be permitted to acquire an obligation (which obligation must meet the "Eligibility Criteria") on behalf of the Issuer to be included in the Collateral from its Permitted Affiliates as principal or as agent or from funds or accounts for which any Permitted Affiliate acts as Collateral Manager or to sell an obligation to its Permitted Affiliates as principal or agent or to funds or accounts for which any Permitted Affiliate acts as Collateral Manager; *provided, further,* that, the Collateral Manager may acquire an obligation (which obligation must meet the "Eligibility Criteria") on behalf of the Issuer to be included in the Collateral from itself or from any of its Non-Permitted Affiliates as principal or as agent, or from funds or accounts for which the Collateral Manager or any of its Non-Permitted Affiliates acts as an Collateral Manager, or sell an obligation on behalf of the Issuer to itself, or to any of its Non-Permitted Affiliates as principal or as agent or to funds or accounts for which

the Collateral Manager or any of its Non-Permitted Affiliates acts as an Collateral Manager, *provided, further,* that any such acquisition or disposition must be ratified or approved by the Board of Directors of the Issuer.

(b)     Upon any substitution pursuant to this Article, all of the Issuer's right, title and interest to the Pledged Security or Pledged Securities shall be Granted by the Issuer to the Trustee pursuant to this Indenture, such Pledged Securities shall be Delivered by the Trustee and, if applicable, to the Securities Intermediary.  The Trustee shall also receive, not later than the Subsequent Delivery Date, an Officer's certificate of the Collateral Manager demonstrating compliance with the provisions of this Article.  In the event of a substitution involving a Collateral Asset pursuant to this Article, the Trustee shall retain such Officer's certificate and promptly forward, upon request, a copy of such Officer's certificates to the Rating Agencies.

(c)     Notwithstanding anything contained in this Article to the contrary, the Issuer shall have the right to effect any transaction which has been consented to by Holders of Notes evidencing 100% of the Aggregate Outstanding Amount of each Class of Notes of which the Rating Agencies have been notified.

### 12.4     Collateral Profile Tests.

The Collateral Profile Tests must be satisfied upon the purchase of a Collateral Asset on and after the Closing Date; *provided* that, if any of the limits of one or more of the Collateral Profile Tests are not satisfied prior to any acquisition of a Collateral Asset, the level of compliance with such Collateral Profile Test must be maintained or improved after giving effect to the purchase and Grant of such Collateral Asset.  Each calculation made to determine compliance with the Collateral Profile Tests will be made with the assumption that the Aggregate Principal Amount will remain unchanged by the sale or purchase of the relevant Collateral Asset and for purposes of determining compliance with the Collateral Profile Tests, all percentage calculations shall be rounded off to the nearest tenth of 1%.  The "Collateral Profile Tests" require that:

| | |
|---|---|
| **Aaa/AAA Rated Securities** | not less than 40% of the Aggregate Principal Amount will consist of Collateral Assets rated at least "Aaa" by Moody's (if rated by Moody's) or "AAA" by Standard & Poor's (if rated by Standard & Poor's); |
| **Single Servicer** | not more than 8.0% of the Aggregate Principal Amount may consist of Collateral Assets (including for this purpose, with respect to Synthetic Securities, the Reference Obligations) which are RMBS Securities or CMBS Securities serviced by a single Servicer; *provided, however,* that notwithstanding the foregoing (A) up to 20% of the Aggregate Principal Amount may consist of Collateral Assets (including for this purpose, with respect to Synthetic Securities, the Reference Obligations) that are RMBS Securities or CMBS Securities serviced by Countrywide Home Loans Servicing, LP, or its affiliates; (B) up to 12% of the Aggregate Principal Amount may consist of |

Collateral Assets (including for this purpose, with respect to Synthetic Securities, the Reference Obligations) that are RMBS Securities or CMBS Securities serviced by EMC Mortgage Corp., or its affiliates, (C) up to 15% of the Aggregate Principal Amount may consist of Collateral Assets (including for this purpose, with respect to Synthetic Securities, the Reference Obligations) that are RMBS Securities or CMBS Securities serviced by any Servicer that (x) is rated "Strong" or better by Standard & Poor's, or if such Servicer has no Standard & Poor's Servicer rating, it has an Standard & Poor's long term credit rating of "AA-" or better or (y) is rated at least "SQ1" or "Aa3" by Moody's; and (D) up to 10% of the Aggregate Principal Amount may consist of Collateral Assets (including for this purpose, with respect to Synthetic Securities, the Reference Obligations) that are RMBS Securities or CMBS Securities serviced by any Servicer that (x) is rated "Above Average" or better by Standard & Poor's, or if such Servicer has no Standard & Poor's Servicer rating, it has an Standard & Poor's long term credit rating of "A-" or better or (y) is rated at least "SQ2" or "A3" by Moody's;

**Single Obligor**

not more than 2.0% of the Aggregate Principal Amount may consist of Collateral Assets (including for this purpose, with respect to Synthetic Securities, the Reference Obligations and excluding all RMBS Agency Securities) that are issued by the same Obligor;

**Aa/AA Rated Single Obligor**

not more than 1.5% of the Aggregate Principal Amount may consist of Collateral Assets (including for this purpose, with respect to Synthetic Securities, the Reference Obligations and excluding any RMBS Agency Securities) that are rated less than "Aaa" by Moody's (if rated by Moody's) and rated less than "AAA" by Standard & Poor's (if rated by Standard & Poor's) and are issued by the same Obligor; *provided* that Collateral Assets issued by up to three such Obligors may be up to 2% of the Aggregate Principal Amount;

**Floating Rate Assets/ Floating Rate Securities**

not less than 85% of the Aggregate Principal Amount may consist of Collateral Assets which are (i) Floating Rate Assets or (ii) Deemed Floating Collateral Assets; *provided* that no more than 5% of the Aggregate Principal Amount may consist of Collateral Assets that are Deemed Floating Collateral Assets; *provided further* that no more than 5% of the Aggregate Principal Amount may consist of Collateral

Assets that are both RMBS Agency Securities and Floating Rate Securities;

**Fixed Rate Assets/**
    **Fixed Rate Securities**

not less than 9% and not more than 15% of the Aggregate Principal Amount may consist of Collateral Assets which are (i) Fixed Rate Assets or (ii) Deemed Fixed Collateral Assets; *provided* that no more than 5% of the Aggregate Principal Amount may consist of Collateral Assets that are Deemed Fixed Collateral Assets;

**Weighted Average Life**

not more than 5.0% of the Aggregate Principal Amount may consist of Collateral Assets that have a Weighted Average Life greater than 12 years, not more than 10% of the Aggregate Principal Amount may consist of Collateral Assets that have a Weighted Average Life greater than 10 years, not more than 25% of the Aggregate Principal Amount may consist of Collateral Assets that have a Weighted Average Life greater than 8 years, not less than 28% of the Aggregate Principal Amount may consist of Collateral Assets that have a Weighted Average Life equal to or less than 5 years;

**Bivariate Basket Limitation**

not more than 20% of the Aggregate Principal Amount may consist of Collateral Assets that are (i) Synthetic Securities or (ii) issued by obligors domiciled in jurisdictions where the sovereign is rated below "AA" by Standard & Poor's and "Aa2" by Moody's;

**Synthetic Securities**
    **Limitation**

not more than 20% of the Aggregate Principal Amount may consist of Collateral Assets that are Synthetic Securities;

**Number of Obligors**

not less than 120 separate Obligors shall be represented in the Aggregate Principal Amount of Collateral Assets during the Reinvestment Period; *provided* that with respect to RMBS Agency Securities, each CUSIP number shall be considered a separate Obligor;

**Insured Securities**

not more than 7.5% of the Aggregate Principal Amount may consist of Collateral Assets (including for this purpose, with respect to Synthetic Securities, the Reference Obligations) that are Insured Securities (excluding RMBS Agency Securities);

**Downgraded Securities**

not more than 5.0% of the Aggregate Principal Amount may consist of Collateral Assets that have been

downgraded at least one rating sub-category (and have not been restored) from their rating at the time of purchase or are currently put on credit watch with negative implications; *provided* that (i) any such security may be downgraded by no more than two rating sub-categories from its rating at the time of purchase and may have been downgraded a maximum of one time each by Moody's or Standard & Poor's, (ii) any such security must currently have a rating of at least "Aa2" by Moody's (if rated by Moody's) and a rating of at least "AA" by Standard & Poor's (if rated by Standard & Poor's) and, if so rated, must not be on credit watch with negative implications, and (iii) any such security that is a CDO Security that is on credit watch with negative implications will be deemed to have been downgraded by two rating sub-categories by the relevant rating agencies;

**Implied Rating Securities**

not more than 10% of the Aggregate Principal Amount may consist of Collateral Assets that are not publicly rated by Moody's and not more than 10% of the Aggregate Principal Amount may consist of Collateral Assets that are not publicly rated by Standard & Poor's;

**Assets Paying Monthly**

not less than 87% of the Aggregate Principal Amount shall consist of Collateral Assets that pay on a monthly basis;

**Frequency of Payments**

not more than 5.0% of the Aggregate Principal Amount may consist of Collateral Assets that pay less frequently than quarterly; *provided* that any such security shall be included on the Asset Reserve Schedule;

**Long-Dated Securities**

if such security matures after, but no more than 5 years after, the Stated Maturity Date, then the aggregate Principal Balance of all such Collateral Assets does not exceed 10% of the Net Outstanding Portfolio Collateral Balance (inclusive of the securities described in the following proviso); *provided* that if such security matures more than 5 years after but not more than 10 years after the Stated Maturity Date, then the aggregate Principal Balance of all such Collateral Assets does not exceed 5% of the Net Outstanding Portfolio Collateral Balance; and *provided further* that, in each case, such Collateral Asset's expected maturity date occurs prior to the Stated Maturity; *provided further* that if such security is a CMBS Security, the stated maturity of such CMBS Security shall be deemed to be the earlier of (i) the stated maturity of such CMBS Security as specified in the related Underlying Instruments and (ii) the date which is five years after the later of (A) the latest

occurring balloon date with respect to any balloon loan securing such CMBS Security and (B) the last scheduled amortization date with respect to any other loans securing such CMBS Security;

| | |
|---|---|
| **Negative Amortization Securities** | not more than 12.5% of the Aggregate Principal Amount may consist of Collateral Assets that are Negative Amortization Securities that are RMBS Securities publicly rated at least "Aa3" by Moody's and "AA-" by Standard & Poor's; |
| **Equipment Leasing Securities** | not more than 3.0% of the Aggregate Principal Amount may consist of Collateral Assets that are Equipment Leasing Securities rated at least "Aaa" by Moody's and "AAA" by Standard & Poor's; |
| **Step-Up Securities** | not more than 5.0% of the Aggregate Principal Amount may consist of Collateral Assets that are Step-Up Securities; |
| **Step-Down Securities** | not more than 5.0% of the Aggregate Principal Amount may consist of Collateral Assets that are Step-Down Securities; |
| **CMBS Securities** | not more than 15% of the Aggregate Principal Amount may consist of Collateral Assets that are CMBS Securities; |
| **CMBS Conduit Securities** | not more than 15% of the Aggregate Principal Amount may consist of Collateral Assets that are CMBS Conduit Securities; |
| **CMBS Large Loan Securities** | not more than 5.0% of the Aggregate Principal Amount may consist of Collateral Assets that are CMBS Large Loan Securities; |
| **CMBS Credit Tenant Lease Securities** | not more than 2.5% of the Aggregate Principal Amount may consist of Collateral Assets that are CMBS Credit Tenant Lease Securities; |
| **Moody's Sub-Prime RMBS** | not more than 30% of the Aggregate Principal Amount may consist of Collateral Assets that are RMBS Securities with a FICO Score under 625; |
| **Moody's Mid-Prime RMBS** | not more than 65% of the Aggregate Principal Amount may consist of Collateral Assets that are RMBS Securities with a FICO Score higher than or equal to 625 but lower than 700; |

-202-

**Moody's Prime RMBS**

not more than 40% of the Aggregate Principal Amount may consist of Collateral Assets that are RMBS Securities with a FICO Score higher than or equal to 700 or higher;

**CDO Securities**

not more than 15% of the Aggregate Principal Amount may consist of Collateral Assets that are CDO Securities;

**Single CDO Security Issuer**

not more than 1% of the Aggregate Principal Amount may consist of Collateral Assets that are CDO Securities that are issued by the same Obligor; *provided* that up to 2% of the Aggregate Principal Amount may consist of Collateral Assets that are CDO Securities that are issued by up to three Obligors;

**CDO Structured Product Securities**

not more than 15% of the Aggregate Principal Amount may consist of Collateral Assets that are CDO Structured Product Securities;

**CRE CDO Securities**

not more than 3.0% of the Aggregate Principal Amount may consist of Collateral Assets that are CRE CDO Securities;

**Single Collateral Manager**

not more than 2.5% of the Aggregate Principal Amount may consist of Collateral Assets which are CDO Securities backed by collateral managed by a single collateral manager;

**Asset Backed Securities**

not more than 15% of the Aggregate Principal Amount may consist of Collateral Assets that are Asset-Backed Securities;

**ABS Student Loan Securities**

not more than 5.0% of the Aggregate Principal Amount may consist of Collateral Assets that are ABS Student Loan Securities; *provided* that not less than 80.0% of the Aggregate Principal Amount of all ABS Student Loan Securities shall consist of ABS Student Loan Securities that carry a guarantee by the U.S. Department of Education and any ABS Student Loan Security without such guarantee is rated "Aaa" (and not on credit watch with negative implications) by Moody's;

**ABS Small Business Loan Securities**

not more than 10% of the Aggregate Principal Amount may consist of Collateral Assets that are ABS Small Business Loan Securities; and

**Collateralized Loan Obligations**  not more than 3.0% of the Aggregate Principal Amount may consist of Collateral Assets that are Collateralized Loan Obligations.

## ARTICLE 13

## NOTEHOLDERS' RELATIONS

13.1    Subordination

(a)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Notes agree for the benefit of the Hedge Counterparty that the Notes and the Issuer's rights in and to the Collateral (solely with respect to all amounts payable to the Hedge Counterparty pursuant to Sections 11.1(a)(i)(I)(E) and 11.1(a)(ii)(I)(C), the "Subordinate Interests") shall be subordinate and junior to the rights of the Hedge Counterparty with respect to payments to be made to the Hedge Counterparty pursuant to the Hedge Agreement to the extent and in the manner set forth in Section 11.1(a) and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Section 5, including as a result of an Event of Default specified in Section 5.1(f) or (g), all amounts payable to the Hedge Counterparty pursuant to Section 11.1(a) shall be paid in Cash or, to the extent the Hedge Counterparty consents, other than in Cash, provided that the fair market value of such receipts should not be greater than the cash amounts, before any further payment or distribution is made on account of the Subordinate Interests.

(b)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class A-2 Notes, Class B Notes, Class C Notes and Class D Notes agree for the benefit of the Holders of the Class A-1 Notes that, in the event of a failure of a Coverage Test or Rating Confirmation Failure, the Class A-2 Notes, Class B Notes, Class C Notes and Class D Notes and the Issuer's rights in and to the Collateral (with respect to the Class A-1 Notes, the "Subordinate Interests") shall be subordinate and junior to the Class A-1 Notes to the extent and in the manner set forth in Section 11.1(a).

(c)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class A-2 Notes, Class B Notes, Class C Notes and Class D Notes agree for the benefit of the Holders of the Class A-1 Notes that the Class A-2 Notes, Class B Notes, Class C Notes and Class D Notes and the Issuer's rights in and to the Collateral (with respect to the Class A-1 Notes, the "Subordinate Interests") shall be subordinate and junior to the Class A-1 Notes to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1(a) and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Section 5, including as a result of an Event of Default specified in Section 5.1(f) or (g), the Class A-1 Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests.  The Holders of Notes evidencing Subordinate Interests and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class A-1 Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class A-1 Notes and not before one year and one day have elapsed since such payment or, if

-204-

longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(d)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class B Notes, Class C Notes and Class D Notes agree for the benefit of the Holders of the Class A-2 Notes that the Class B Notes, Class C Notes and Class D Notes and the Issuer's rights in and to the Collateral (with respect to the Class A-2 Notes, the "Subordinate Interests") shall be subordinate and junior to the Class A-2 Notes to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1(a) and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Section 5, including as a result of an Event of Default specified in Section 5.1(f) or (g), the Class A-2 Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests.  The Holders of Notes evidencing Subordinate Interests and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class A-2 Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class A-2 Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(e)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class C Notes and Class D Notes agree for the benefit of the Holders of the Class B Notes that the Class C Notes and Class D Notes and the Issuer's rights in and to the Collateral (with respect to the Class B Notes, the "Subordinate Interests") shall be subordinate and junior to the Class B Notes to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1(a) and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Section 5, including as a result of an Event of Default specified in Section 5.1(f) or (g), the Class B Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests.  The Holders of Notes evidencing Subordinate Interests and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class B Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class B Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(f)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class D Notes agree for the benefit of the Holders of the Class B Notes and the Class C Notes that the Class D Notes and the Issuer's rights in and to the Collateral (with respect to the Class B Notes and Class C Notes, the "Subordinate Interests") shall be subordinate and junior to the Class B Notes and the Class C Notes to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1(a) and hereinafter provided.  If any Event of Default has not been cured or waived and acceleration occurs in accordance with Section 5, including as a result of an Event of Default specified in Section 5.1(f) or (g), the Class D Notes shall be paid in full in Cash before any further payment or distribution

is made on account of the Subordinate Interests. The Holders of Notes evidencing Subordinate Interests and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class D Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Notes evidencing such Subordinate Interests or hereunder until the payment in full of the Class D Notes and not before one year and one day have elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(g)    In the event that notwithstanding the provisions of this Indenture, any holder of any Subordinate Interests shall have received any payment or distribution in respect of such Subordinate Interests contrary to the provisions of this Indenture, then, unless and until all amounts payable to the Hedge Counterparty pursuant to the order specified in Section 11.1(a)(i) and 11.1(a)(ii) or to the Class A-1 Notes or to the Class A-2 Notes or to the Class B Notes or to the Class C Notes, or to the Class D Notes as the case may be, shall have been paid in full in Cash, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver on behalf of the Issuer the same to the Hedge Counterparty or the Holders of Class A-1 Notes or the Class A-2 Notes or the Class B Notes or the Class C Notes or the Class D Notes, in accordance with this Indenture; *provided* that, if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including this Section 13.1.

(h)    Each Holder of Subordinate Interests agrees with the Hedge Counterparty and all Holders of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D Notes, as the case may be, that such Holder of Subordinate Interests shall not demand, accept, or receive any payment or distribution in respect of such Subordinate Interests in violation of the provisions of this Indenture including this Section 13.1; *provided* that after all amounts payable pursuant to Section 11.1(a)(i)(I)(E), the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D Notes, as the case may be, have been paid in full, the Holders of Subordinate Interests shall be fully subrogated to the rights of the Hedge Counterparty or the Holders of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D Notes, as the case may be. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of Subordinate Interests.

13.2    Standard of Conduct

In exercising any of its or their voting rights, rights to direct and consent or any other rights as a Secured Party under this Indenture, subject to the terms and conditions of this Indenture, including Section 5.9, a Secured Party or Secured Parties shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any Secured Party, the Issuer, or any other Person.

# ARTICLE 14

# MISCELLANEOUS

14.1    <u>Form of Documents Delivered to Trustee</u>

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer or the Co-Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate of an Authorized Officer of the Issuer or the Co-Issuer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of the Issuer, the Co-Issuer or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Co-Issuer or such other Person, unless such Authorized Officer of the Issuer or the Co-Issuer or such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.  Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of the Issuer or the Co-Issuer, stating that the information with respect to such matters is in the possession of the Issuer or the Co-Issuer, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture it is *provided* that the absence of the occurrence and continuation of a Default is a condition precedent to the taking of any action by the Trustee at the request or direction of the Issuer or the Co-Issuer, then notwithstanding that the satisfaction of such condition is a condition precedent to the Issuers' rights to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have knowledge of the occurrence and continuation of such Default as provided in <u>Section 6.1(d)</u>.

14.2    <u>Acts of Noteholders</u>

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such

Noteholders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer.  Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders signing such instrument or instruments.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuers, if made in the manner provided in this Section 14.2.

(b)     The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)     The principal amount and registered numbers of Notes held by any Person, and the date of his holding the same, shall be proved by the Note Register.

(d)     Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of such Note and of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Issuers in reliance thereon, whether or not notation of such action is made upon such Note.

14.3     Notices, Etc., to Trustee, the Issuers, the Collateral Manager, CIFG and the Rating Agencies

Any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(a)     the Trustee or the Preference Share Paying Agent by any Noteholder or by the Issuer or the Co-Issuer shall be sufficient for every purpose hereunder if in writing and sent by facsimile in legible form and confirmed by overnight courier service guaranteed next day delivery to the Trustee or the Preference Share Paying Agent addressed to it at 600 Travis Street, 50th Floor, Houston, Texas 77002, Attention: Worldwide Securities Services – Millstone III CDO, or at any other address previously furnished in writing to the Issuers or Noteholder by the Trustee or Preference Share Paying Agent;

(b)     the Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first Class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Issuer addressed to it at c/o Walkers SPV Limited, Walker House, P.O. Box 908 GT, Mary Street, George Town, Grand Cayman, Cayman Islands, Attention:  The Directors, telecopy no. (345) 945-4757, or at any other address previously furnished in writing to the Trustee by the Issuer;

(c)     the Co-Issuer by the Trustee or by any Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first- Class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Co-Issuer addressed to it at 850 Library Avenue, Suite 204, Newark,

Delaware 19711, Attention: Donald Puglisi, Esq., facsimile no. 302-738-7210, or at any other address previously furnished in writing to the Trustee by the Co-Issuer;

(d)      the Rating Agencies by the Issuers or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-Class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, (i) in the case of Moody's, addressed to Moody's Investors Service, 99 Church Street, New York, New York 10007, facsimile no. 212-553-0355, Attention: CBO/CLO Monitoring (e-mail: cdomonitoring@moodys.com) and (ii) in the case of Standard & Poor's, addressed to Standard & Poor's, 55 Water Street, New York, New York, 10041, Attention: CDO Surveillance and all Monthly Reports and Note Valuation Reports shall be sent to Standard & Poor's electronically at cdo_surveillance@sandp.com;

(e)      the Hedge Counterparty by the Issuers or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first Class postage prepaid, hand delivered or sent by overnight courier service or by facsimile in legible form to the Hedge Counterparty addressed to it at the address specified in the Hedge Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by the Hedge Counterparty;

(f)      the Collateral Manager by the Issuers or by the Trustee or by the Collateral Administrator shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and sent by facsimile in legible form and confirmed by overnight courier service guaranteed next day delivery, or by electronic mail (where expressly provided herein) to the Collateral Manager addressed to it at the address specified in the Collateral Management Agreement or at any other address previously furnished in writing to the Issuers or the Trustee by the Collateral Manager;

(g)      the Preference Share Paying Agent by the Trustee in writing sent by telecopy confirmed by overnight courier guaranteed next day delivery;

(h)      to the Repository by the Issuer pursuant to this Indenture shall be delivered to the Repository by electronic mail as a pdf (portable document format) file to the following address (or such other address as may be provided in writing from time to time by the operator of the Repository to the Trustee): CDO Library, c/o The Bond Market Association, 360 Madison Avenue (18th Floor), New York, NY 10017; Electronic mail address: admin@cdolibrary.com; *provided* that the Issuer shall be identified by its full legal name in the electronic mail message that accompanies the delivery of any document and shall apply the following procedures in converting the document to a pdf file:

(i)      the pdf file shall be made from the original document by printing directly from the application in which the document was created (Microsoft Word, Quark Xpress, *etc.*) or by using Adobe Acrobat Distiller; and

(ii)      all fonts shall be embedded when converting the original document to a pdf file using Adobe Acrobat Distiller;

*provided* that any document required to be made available to the operator of the Repository by the Issuer shall be made available by providing the operator of the Repository with access to a website containing such report in a format that permits the user to download the document as a pdf file.

Delivery of any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents made as provided above will be deemed effective: (i) if in writing and delivered in person or by overnight courier service, on the date it is delivered; (ii) if sent by facsimile transmission, on the date that transmission is received by the recipient in legible form (as evidenced by the sender's written confirmation of delivery); and (iii) if sent by mail, on the date that mail is delivered or its delivery is attempted; in each case, unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Business Day.

Any report, statement or other information required to be provided by the Trustee may be provided by permitting access to the Trustee's website containing such information.

14.4    Notices and Reports to Noteholders; Waiver

Except as otherwise expressly provided herein, where this Indenture provides for a report to Holders or for a notice to Holders of Notes of any event,

(a)    such notice shall be sufficiently given to all Holders of Notes if in writing and mailed, first-Class postage prepaid, to each Holder of a Note affected by such event, at the address of such Holder as it appears in the Note Register, not earlier than the earliest date and not later than the latest date, prescribed for the giving of such report or notice;

(b)    such report shall be available each month to Noteholders via the Trustee's internet website.  The Trustee shall have the right to change the method such reports are distributed in order to make such distribution more convenient and/or more accessible to the Noteholders and the Trustee shall provide timely notification (in any event, not less than 30 days) to all Noteholders; and

(c)    such report or notice shall be in the English language.

Such reports and notices will be deemed to have been given on the date of such mailing or availability.

The Trustee will deliver to the Holder of any Note shown on the Note Register any readily available information or notice requested to be so delivered, at the expense of the Issuer.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder of a Note shall affect the sufficiency of such notice with respect to other Holders of Notes.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Noteholders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In the event that, by reason of the suspension of the regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

It is the intention of the parties to this Indenture, and each Noteholder by acceptance of its Note agrees, that for U.S. federal, state and local tax purposes, the Notes shall be treated as indebtedness of the Issuer and not as indebtedness of or an interest in the Trustee, the Issuer, or any other entity, or in any asset or assets.  It is the further intention of the parties hereto, and each Noteholder by acceptance of its Note agrees, that (i) for U.S. federal, state and local tax purposes, the Issuer shall be treated as a mere security device for the enforcement of the Noteholders' rights under the Notes, (ii) for U.S. federal, state and local tax purposes, the Collateral shall be treated as legally and beneficially owned by the Issuer, except following an Event of Default, as provided in Article V, and (iii) the Trustee shall be the agent of the Issuer except following an Event of Default or as otherwise provided herein.

14.5    Effect of Headings and Table of Contents

The Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

14.6    Successors and Assigns

All covenants and agreements in this Indenture by the Issuers shall bind their respective successors and assigns, whether so expressed or not.

14.7    Severability

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

14.8    Benefits of Indenture

The Collateral Manager, the Hedge Counterparty, each Preference Shareholder shall be a third party beneficiary of each agreement or obligation in this Indenture.  Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Noteholders, the Collateral Manager, each Preference Shareholder and the Hedge Counterparty, any benefit or any legal or equitable right, remedy or claim under this Indenture.

14.9    Governing Law

This Indenture and each Note shall be construed in accordance with, and this Indenture and each Note and all matters arising out of or relating in any way whatsoever (whether in contract, tort or otherwise) to this Indenture and each Note shall be governed by, the law of the State of New York.

14.10    Submission to Jurisdiction

The Issuers and the Trustee hereby irrevocably submit to the non-exclusive jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Notes or this Indenture, and the Issuers and Trustee hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court. The Issuers and the Trustee hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. The Issuers irrevocably consent to the service of any and all process in any action or proceeding by the mailing (by registered or certified mail or by overnight courier service) or delivery of copies of such process to it at the office of the Issuers' agent in New York set forth in Section 7.2.  The Issuers agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

14.11    Counterparts

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

14.12    Waiver of Jury Trial

EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING.  Each party hereby (i) certifies that no representative, agent or attorney of the other has represented, expressly or otherwise, that the other would not, in the event of a Proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it has been induced to enter into this Indenture by, among other things, the mutual waivers and certifications in this paragraph.

14.13    Judgment Currency

This is an international financing transaction in which the specification of Dollars (the "Specified Currency"), and the specification of the place of payment, as the case may be (the "Specified Place"), is of the essence, and the Specified Currency shall be the currency of account in all events relating to payments of or on the Notes.  The payment obligations of the Issuers under this Indenture and the Notes shall not be discharged by an amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on conversion to the Specified Currency and transfer to the Specified Place under normal

banking procedures does not yield the amount of the Specified Currency at the Specified Place. If for the purpose of obtaining judgment in any court it is necessary to convert a sum due hereunder or under the Notes in the Specified Currency into another currency (the "Second Currency"), the rate of exchange which shall be applied shall be that at which in accordance with normal banking procedures the Trustee could purchase the Specified Currency with the Second Currency on the Business Day next preceding that on which such judgment is rendered.  The obligation of the Issuers in respect of any such sum due from the Issuers hereunder shall, notwithstanding the rate of exchange actually applied in rendering such judgment, be discharged only to the extent that on the Business Day following receipt by the Trustee of any sum adjudged to be due hereunder or under the Notes in the Second Currency the Trustee may in accordance with normal banking procedures purchase and transfer to the Specified Place the Specified Currency with the amount of the Second Currency so adjudged to be due; and the Issuers hereby, as a separate obligation and notwithstanding any such judgment (but subject to the Priority of Payments as if such separate obligation in respect of each Class or Sub-class of Notes constituted additional principal owing in respect of such Class or Sub-class of Notes), agree to indemnify the Trustee and each Noteholder against, and to pay the Trustee or such Noteholder, as the case may be, on demand in the Specified Currency, any difference between the sum originally due to the Trustee or such Noteholder, as the case may be, in the Specified Currency and the amount of the Specified Currency so purchased and transferred.

14.14    Confidential Treatment of Documents

Except as otherwise provided in this Indenture or as required by law, this Indenture and the Hedge Agreement shall be treated by the Trustee as confidential.  The Trustee shall provide a copy of this Indenture to any Holder of a beneficial interest in any Note upon written request therefor certifying that it is such a Holder.

14.15    Liability of Issuers

Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into between, *inter alia*, the Issuers or otherwise, neither of the Issuers shall have any liability whatsoever to the other of the Issuers under this Indenture and the Notes, and, without prejudice to the generality of the foregoing, neither of the Issuers shall be entitled to take any action to enforce, or bring any action or proceeding, in respect of this Indenture or the Notes against the others of the Issuers.  In particular, neither of the Issuers shall be entitled to the petition or take any other steps for the winding up or bankruptcy of the other of the Co-Issuers or shall have any claim in respect of any assets of the other Issuers while this Indenture or any of the Notes are outstanding.

# ARTICLE 15

# ASSIGNMENT OF AGREEMENTS, ETC.

15.1    Assignment

The Issuer, in furtherance of the covenants of this Indenture and as security for the Notes and amounts payable to the Noteholders hereunder and the performance and

observance of the provisions hereof, hereby assigns, transfers, conveys and sets over to the Trustee, for the benefit of the Secured Parties, all of the Issuer's estate, right, title and interest in, to and under the Collateral Administration Agreement, the Collateral Management Agreement and the Hedge Agreement, including (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination, including the commencement, conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; *provided* that the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Collateral Management Agreement, the Hedge Agreement, without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture, including as set forth in Section 15.4), which license shall be and is hereby deemed to be automatically revoked (A) upon the occurrence of an Event of Default hereunder until such time, if any, as such Event of Default is cured or waived, (B) the occurrence of a termination event specified in the Collateral Management Agreement or (C) upon a default in the performance of, or breach of, any material covenant, representation, warranty or other agreement of the Collateral Manager under the Collateral Management Agreement or in any certificate or writing delivered pursuant thereto if Holders of at least 25% of the Aggregate Outstanding Amount of the Notes of any Class give notice of such default or breach to the Trustee and the Collateral Manager and such default or breach (if remediable) continues for a period of 30 days after receipt of such notice. In no event will the Trustee be required to assume any of the obligations or responsibilities of the Collateral Manager under the Collateral Management Agreement.

15.2    No Impairment

The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Collateral Administration Agreement, the Collateral Management Agreement and the Hedge Agreement.

15.3    Termination, Etc.

Upon the redemption and cancellation of the Notes and the payment of all other Secured Obligations and the release of the Collateral from the lien of this Indenture, this assignment and all rights herein assigned to the Trustee for the benefit of the Secured Parties shall cease and terminate and all the estate, right, title and interest of the Trustee in, to and under the Collateral Administration Agreement, the Collateral Management Agreement and the Hedge Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

15.4    Issuer Agreements, Etc.

The Issuer represents that it has not executed any other assignment of the Collateral Administration Agreement, the Collateral Management Agreement or the Hedge Agreement. The Issuer agrees that this assignment is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer will, from time to time upon the request of the Trustee, execute all

instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may reasonably specify.  The Issuer hereby agrees, and hereby undertakes to obtain the agreement and consent of the Collateral Manager in the Collateral Management Agreement to the following:

(a)     the Collateral Manager shall consent to the provisions of this assignment and shall agree to perform any provisions of this Indenture expressly applicable to the Collateral Manager;

(b)     the Collateral Manager shall acknowledge that the Issuer is assigning all of its right, title and interest in, to and under the Collateral Management Agreement to the Trustee for the benefit of the Secured Parties, and the Collateral Manager shall agree that all of the representations, covenants and agreements made by the Collateral Manager in the Collateral Management Agreement are also for the benefit of the Trustee and the other Secured Parties;

(c)     the Collateral Manager shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Collateral Management Agreement;

(d)     after the Closing Date, neither the Issuer nor the Collateral Manager will enter into any agreement amending, modifying or waiving any provision of the Collateral Management Agreement other than an amendment or modification of the type permitted to be made under Section 8.1 or selecting or consenting to a successor Collateral Manager, (i) without 10 days' prior written notice to each Rating Agency and the Hedge Counterparty, (ii) without 10 days' prior written notice thereof to the Trustee, which notice shall specify the action proposed to be taken by the Issuer (and the Trustee shall promptly deliver a copy of such notice to each Noteholder), (iii) without satisfaction of the Rating Agency Condition with respect to any amendment, modification, termination or selection of or consent to a successor Collateral Manager and (iv) in the case of the selection of or consent to an Eligible Successor or an Approved Replacement (each as defined in the Collateral Management Agreement) to the Collateral Manager's duties, if Holders of at least 66-2/3% in Aggregate Outstanding Amount of Notes the Controlling Class shall, by notice to the Issuer and the Trustee within 30 days after the date of the related notice to the Trustee given as provided in clause (ii) above, object to such successor Collateral Manager or Approved Replacement;

(e)     the Collateral Management Agreement will provide for removal of the Collateral Manager for "cause" (as defined therein) upon 15 days' prior written notice given by the Issuer to the Collateral Manager; *provided* that any such notice may be given only at the direction of (i) Holders of at least 66-2/3% in Aggregate Outstanding Amount of each Class of Notes (voting as a single class) and (ii) holders of at least 66 2/3% of the Preference Shares;

(f)     except as otherwise set forth herein and therein, the Collateral Manager shall continue to serve as Collateral Manager under the Collateral Management Agreement notwithstanding that the Collateral Manager shall not have received amounts due it under the Collateral Management Agreement because sufficient funds were not then available hereunder to pay such amounts; and the Collateral Manager shall agree not to institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization,

arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under any bankruptcy, insolvency, reorganization or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under this Indenture; *provided* that nothing in this clause shall preclude, or be deemed to estop, the Collateral Manager from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (x) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer, as the case may be, by a Person other than the Collateral Manager or any of its Affiliates;

(g)    if the Collateral Manager determines that it or any of its Affiliates have a material conflict of interest between the Noteholders and any other account or portfolio for which the Collateral Manager or any of its Affiliates is serving as Collateral Manager which relates to any action to be taken with respect to any Pledged Security, then the Collateral Manager will give written notice to the Trustee briefly describing such conflict and the action it proposes to take; and the Collateral Manager shall perform its obligations with respect to any such conflict with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use in the resolution of such conflict; and

(h)    the Collateral Manager shall irrevocably submit (i) to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, and any appellate court therefrom, in any action or proceeding arising out of or relating to the Notes or this Indenture; (ii) waive any objection which it may have at any time to the laying of venue of any such action or proceeding brought in any such court, waive any claim that such action or proceeding has been brought in an inconvenient forum and waive the right to object, with respect to such action or proceeding, that such court does not have any jurisdiction over it; and (iii) consent to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the office of the Collateral Manager.

15.5    Consent to Posting of Documents on Repository; Liability

The Issuer and the Co-Issuer hereby consent to (a) the posting of the Offering Circular, this Indenture and the confirmations to the Hedge Agreement and the Monthly Reports and Note Valuation Reports to be delivered pursuant hereto and any amendments or other modifications to any such documents and agreements on the Repository for use in the manner provided in the Repository; and (b) the display of its name on the Repository in connection therewith.

Notwithstanding anything herewith to the contrary, none of the Issuer, the Co-Issuer or the Trustee makes any representation or warranty to the Bond Market Association (or any successor thereto) or any affiliate thereof or any Person having or obtaining access to the information maintained in the Repository or to any of such Person's affiliates regarding the accuracy or completeness of any information, document, report or other communication transmitted to the Repository, and no Person having or obtaining access to the information maintained in the Repository shall have any rights under this Indenture or any other Transaction

Document, or otherwise by reason of the transmission of any such information, document, report or other communication to the Repository.

## ARTICLE 16

## HEDGE AGREEMENTS

16.1    Hedge Agreement.

(a)    On the Closing Date, the Issuer shall execute and deliver the Hedge Agreement, the Confirmation of which may contain (i) an interest rate cap pursuant to which the Issuer shall make an up-front payment to the Initial Hedge Counterparty in exchange for a contingent monthly payment in the event that LIBOR exceeds a strike price specified in the related Confirmation, (ii) a fixed/floating portfolio hedge pursuant to which the Issuer shall make monthly payments to the Initial Hedge Counterparty, which monthly payments will be based on a percentage of the notional amount related to a portfolio of Fixed Rate Securities that pay interest on a monthly basis in exchange for an up-front payment from the Initial Hedge Counterparty and a monthly payment from the Initial Hedge Counterparty, which monthly payments will be equal to one-month LIBOR for such monthly period and (iii) six Deemed Floating Asset Hedges pursuant to which the Issuer shall make an up-front payment to the Initial Hedge Counterparty and make monthly payments to the Initial Hedge Counterparty, which monthly payments will be based on a percentage of the notional amount related to six individual Fixed Rate Securities that pay interest on a monthly basis in exchange for a quarterly payment from the Initial Hedge Counterparty, which quarterly payments will be equal to three-month LIBOR for such quarterly period.

(b)    Subject to Section 16.1 hereof, the Trustee, at the expense of and as directed by the Issuer, shall take all steps necessary to enforce the Issuer's rights under the Hedge Agreement, including receiving payments from the Hedge Counterparty when due under the Hedge Agreement and exercising the Issuer's rights under the Hedge Agreement.

(c)    If, at any time, the Aggregate Principal Amount of the Notes is less than the Notional Amounts under the Confirmation, the Trustee may, at the direction of the Issuer, sell the Issuer's right to receive payments with respect to the Hedge Agreement, but only to the extent that the Notional Amounts under the Hedge Agreement exceeds the Aggregate Principal Balance of the Notes. Proceeds from any such sale will be distributed as Collateral Interest Collections on the Payment Date relating to the Due Period in which such sale occurs.

(d)    In accordance with Sections 9.1, 9.5 or 9.6 herein, as applicable, the Trustee shall notify the Hedge Counterparty upon the occurrence of a Tax Redemption, Clean-up Call or an Auction Call Redemption. Each Hedge Agreement shall terminate upon the occurrence of a Clean-up Call pursuant to Section 9.6, a Tax Redemption pursuant to Section 9.1 or an Auction Call Redemption pursuant to Section 9.5, in each case, in accordance with the terms thereof.

(e)    In the event of any transfer, assignment or replacement of a Hedge Agreement following the occurrence of a "Collateralization Event" or "Ratings Event"

thereunder, the Issuer and the Trustee shall use (and cause its agents to use) reasonable commercial efforts to incur only reasonable costs and expenses in connection with such transfer, assignment or replacement including, without limitation, costs and expenses of legal counsel.

16.2    <u>Assignment of the Hedge Agreement</u>

(a)    Pursuant to the Granting Clauses, the Issuer has hereby assigned, transferred, conveyed and set over to the Trustee, for the benefit of the Noteholders and the other Secured Parties hereunder, all of the Issuer's right, title and interest in, to and under the Hedge Agreement, including, without limitation, (i) all of the Issuer's interest in all securities, Cash and proceeds held by the Hedge Counterparty thereunder, (ii) the right to give all notices, consents and releases thereunder, (iii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Hedge Counterparty thereunder, including the commencement, conduct and consummation of proceedings at law or in equity, (iv) the right to receive all notices, accountings, consents, releases and statements thereunder and (v) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; provided so long as no Event of Default has occurred and is continuing hereunder, the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Hedge Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture), which license shall be and is hereby deemed to be automatically revoked upon the occurrence of any Event of Default hereunder until such time, if any, as the Event of Default is cured or waived. The Trustee shall have no liability with respect to any act or failure to act by the Issuer under the Hedge Agreement (*provided* that this sentence shall not limit or relieve the Trustee from any responsibility it may have under this Indenture upon the occurrence of and during the continuance of any Event of Default hereunder).

(b)    The assignment made pursuant to the Granting Clauses is executed as collateral security, and shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Hedge Agreement, nor shall any of the obligations contained in the Hedge Agreement be imposed on the Trustee.

(c)    Upon the retirement of the Notes and the release of the Collateral from the lien of this Indenture, all rights herein assigned to the Trustee for the benefit of the Noteholders shall cease and terminate and all the estate, right, title and interest of the Trustee and the Noteholders in, to and under the Hedge Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

(d)    The Issuer represents that the Issuer has not executed any other assignment of the Hedge Agreement.

(e)    The Issuer agrees that the assignment set forth in the Granting Clauses is irrevocable, and that it will not take any action which is inconsistent with such assignment or make any other assignment inconsistent herewith. The Issuer will, upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to such assignment as the Trustee may specify.

(f)    The Issuer further agrees, with respect to the Hedge Agreement, as follows:

(i)    The Issuer will obtain on or before the Closing Date the acknowledgement by the Hedge Counterparty that the Issuer is assigning all of its right, title and interest in, to and under the Hedge Agreement to the Trustee for the benefit of the Noteholders.

(ii)    Prior to the occurrence of an Event of Default the Issuer will deliver to the Trustee copies of all notices and communications delivered or required to be delivered to the Issuer pursuant to the Hedge Agreement, but only if such notice or communication relates to any (x) default under, (y) early termination of or (z) amendment of, the Hedge Agreement.

(iii)    Subject to <u>Section 16.1(c)</u>, the Issuer will not enter into any agreement amending, modifying or terminating the Hedge Agreement, without prior written consent of the Requisite Noteholders and satisfaction of the Rating Agency Condition; *provided* (A) that the consent of Requisite Noteholders and satisfaction of the Rating Agency Condition shall not be required for an amendment or modification to cure any ambiguity or to correct or supplement any provision with respect to matters or questions arising under the Hedge Agreement which shall not be inconsistent with the provisions thereof or of this Indenture, in each case so long as such amendment or modification does not adversely affect in any material respects the interests of any Noteholder (as evidenced by an Opinion of Counsel acceptable to the Trustee) and prior written notice is provided to Standard & Poor's and (B) neither the consent of the Requisite Noteholders, satisfaction of the Rating Agency Condition nor an Opinion of Counsel shall be required with respect to any amendment or modification that either only corrects a manifest error or is principally and manifestly for the benefit of the Noteholders so long as prior written notice is provided to Standard & Poor's.

16.3    <u>Ratings Requirements and General Provisions Applicable to Hedge Agreements</u>

(a)    Each Hedge Agreement shall provide that if the Hedge Ratings Determining Party fails, at any time that a Hedge Agreement with respect to which it is the Hedge Ratings Determining Party, fails to satisfy the Hedge Counterparty Ratings Requirement, then the Hedge Counterparty (or the Hedge Ratings Determining Party, as applicable) shall be required to within 30 days,

(i)    provide sufficient collateral as required under the Hedge Agreements and which satisfies the Rating Agency Condition,

(ii)    upon 10 days prior written notice to the Issuer and the Trustee (which notice shall be delivered by the Trustee to the Rating Agencies upon receipt thereof) (but in no event longer than the 30 day period referred to above), assign, at no cost to the Issuer, its rights and obligations to a replacement Hedge Counterparty having the required ratings in accordance with the related Hedge Agreement; *provided* that

(A)    as of the date of such assignment, such replacement Hedge Counterparty will not, as a result of such assignment, be required to withhold or deduct on account of tax under the Hedge Agreement in excess of what would have been required to be withheld or deducted in the absence of such transfer,

(B)    a termination event or event of default does not occur under the Hedge Agreement as a result of such assignment and

(C)    the Rating Agency Condition is satisfied;

(iii)    obtain a guarantor (with such form of guaranty meeting Standard & Poor's then-current criteria on guarantees) for the Hedge Counterparty's obligations under the Hedge Agreement who satisfies the Hedge Counterparty Ratings Requirement, or

(iv)    take such other steps to allow the Issuer (as confirmed by the Collateral Manager in writing) to satisfy the Rating Agency Condition.

If the Hedge Counterparty fails to comply with at least one of the obligations as set forth in clauses (i) through (iv) of the preceding sentence for a period of 30 days, the Issuer shall have the right to terminate the Hedge Agreement.  If a Ratings Event shall occur with respect to such Hedge Counterparty or its Hedge Ratings Determining Party, a substitution event shall have occurred (a "Hedge Counterparty Substitution Event").  Upon the occurrence of a Hedge Counterparty Substitution Event, the Hedge Counterparty will be required, at its sole cost and expense, to assign its rights and obligations under such Hedge Agreement to a new Hedge Counterparty in accordance with the terms of the Hedge Agreement within 10 Business Days, *provided* that such substitute Hedge Counterparty or its guarantor satisfies the Hedge Counterparty Ratings Requirement, and the Rating Agency Condition is satisfied with respect to such assignment.  Each Hedge Agreement shall also provide that the failure of a Hedge Counterparty to assign its rights and obligations under the related Hedge Agreement in accordance with the terms thereof following the occurrence of a Hedge Counterparty Substitution Event shall constitute a Termination Event thereunder.

(b)    The Collateral Manager may cause the Issuer, promptly following the early termination of a Hedge Agreement (other than on a Final Payment Date) and to the extent possible through application of funds available in the Hedge Termination Receipts Account, to enter into a replacement hedge agreement (a "Replacement Hedge") which may have different terms, including different notional amounts; *provided* that the Rating Agency Condition has been satisfied; *provided further* that the Issuer will not have to satisfy the Rating Agency Condition for entering into or amending or modifying an existing Hedge Agreement (other than with respect to rate, term, notional and any provisions for deferral of amounts otherwise payable) in connection with Deemed Floating Asset Hedges or Deemed Fixed Asset Hedges unless such Hedge Agreement is with a new Hedge Counterparty or unless such action would require the Issuer to make a termination payment and so long as prior written notice is provided to Standard & Poor's.  The Issuer will be required to satisfy the Rating Agency Condition when terminating in whole or in part an existing Hedge Agreement in connection with a Deemed Floating Asset Hedge or Deemed Fixed Asset Hedge or when terminating in whole or in part any Form-Approved Hedge Agreement.

(c)    If (A) the funds available in the Hedge Termination Receipts Account exceed the costs of entering into a Replacement Hedge, (B) the Collateral Manager determines not to replace the terminated Hedge Agreement and the Rating Agency Condition is satisfied, or (C) the termination is occurring with respect to a Final Payment Date, then amounts in the Hedge Termination Receipts Account (after providing for the costs of entering into a Replacement Hedge, if any) shall be transferred to the Collection Account on the next following Determination Date and shall be treated as Principal Proceeds and distributed in accordance with the Priority of Payments on the next Payment Date (or on such Final Payment Date, in the event the Securities are redeemed in full thereon).

(d)    If a Hedge Agreement is terminated and the costs of entering into a Replacement Hedge exceed the funds credited to and available therefor in the Hedge Termination Receipts Account, then, after using the funds in the Hedge Termination Receipts Account, then, after using the funds in the Hedge Termination Receipts Account, the Issuer may enter into a Replacement Hedge with such amounts payable to the replacement Hedge Counterparty in accordance with clause (E) of Section 11.1(a)(i) and clause (C) of Section 11.1(a)(ii) (in the priority and manner set forth in such clause) on subsequent Payment Dates.

IN WITNESS WHEREOF, we have set our hands as of the date first above written.

MILLSTONE III CDO, LTD.,
    as Issuer


By: _____
    Name: David Egglishaw
    Title:  Director


MILLSTONE III CDO, LLC,
    as Co-Issuer



By: _____
    Name: Donald J. Puglisi
    Title:  Manager


JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,
    as Trustee



By: _____
    Name:
    Title:


Indenture

IN WITNESS WHEREOF, we have set our hands as of the date first above written.

MILLSTONE III CDO, LTD.,
    as Issuer


By: _____
    Name:
    Title:

MILLSTONE III CDO, LLC,
    as Co-Issuer

By: _____
    Name: Donald J. Puglisi
    Title:  Manager


JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,
    as Trustee


By: _____
    Name:
    Title:

Indenture

IN WITNESS WHEREOF, we have set our hands as of the date first above written.

MILLSTONE III CDO, LTD.,
    as Issuer


By: _____
    Name:
    Title:


MILLSTONE III CDO, LLC,
    as Co-Issuer


By: _____
    Name: Donald J. Puglisi
    Title:   Manager

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,
    as Trustee


By: _____
    Name:
    Title:     **MARIA D. CALZADO**
                 **Vice President**

Indenture

**SCHEDULE A**

**COLLATERAL ASSETS**

| No. | Bond | Cusip | Issuer | Par Amount | Coupon / Spread | Maturity | Moodys Rating | Standard & Poor's Rating |
|-----|------|-------|--------|------------|-----------------|----------|---------------|--------------------------|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

A-1

**SCHEDULE B**

**LIBOR FORMULA**

With respect to each Interest Accrual Period except for the first Interest Accrual Period, "LIBOR" for purposes of calculating the Note Interest Rate for each Class or Sub-class of Notes for such Interest Accrual Period will be determined by the Calculation Agent in accordance with the following provisions:

       (i)     On the LIBOR Determination Date, LIBOR shall equal the rate, as obtained by the Calculation Agent, for Eurodollar deposits for, with respect to the Class A-1 Notes, a one-month period and, for the Class A-2 Notes, Class B Notes, Class C Notes and the Class D-1 Notes, a three-month period, which appears on Bridge Telerate Page 3750 (as Telerate is defined in the International Swaps and Derivatives Association, Inc. Annex to the 2000 ISDA Definitions (June 2000 version)), or such page as may replace Bridge Telerate Page 3750, as of 11:00 a.m. (London time) on such LIBOR Determination Date.

       (ii)    If, on any LIBOR Determination Date, such rate does not appear on Bridge Telerate Page 3750, or such page as may replace Bridge Telerate Page 3750, the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks (as defined below) to leading banks in the London interbank market for Eurodollar deposits for, with respect to the Class A-1 Notes, a one-month period and, for the Class A-2 Notes, Class B Notes, Class C Notes and the Class D-1 Notes, a three-month period in an amount determined by the Calculation Agent by reference to requests for quotations as of approximately 11:00 a.m. (London time) on the LIBOR Determination Date made by the Calculation Agent to the Reference Banks. If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean of such quotations. If, on any LIBOR Determination Date, only one or none of the Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in the City of New York selected by the Calculation Agent are quoting on the relevant LIBOR Determination Date for Eurodollar deposits for the applicable period in an amount determined by the Calculation Agent by reference to the principal London offices of leading banks in the London interbank market; *provided, however,* that if the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures provided above, LIBOR shall be LIBOR as determined on the most recent date LIBOR was available.

       As used herein:

       "LIBOR Determination Date" means, except with respect to the first Interest Accrual Period, the tenth Business Day prior to the Payment Date.

       "LIBOR Business Day" means a day on which commercial banks and foreign exchange markets settle payments in Dollars in New York and London.

"London Banking Day" means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

"Reference Banks" means four major banks in the London interbank market, selected by the Calculation Agent.

"Reference Dealers" means three major dealers in the secondary market for Dollar certificates of deposit, selected by the Calculation Agent.

The determination of the Note Interest Rate for each Class or Sub-class of Notes by the Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

**SCHEDULE C**

**[Reserved]**

**SCHEDULE D**

Recovery Rate Tables
PART I – Moody's Recovery Rate

*Moody's Recovery Rate Assumptions.*

For Diversified Securities, the recovery rate is assumed as follows:

| Tranche as % of capital structure at issuance | Rating of a Tranche at Issuance | | | | | |
|---|---|---|---|---|---|---|
| | **Aaa** | **Aa** | **A** | **Baa** | **Ba** | **B** |
| greater than 70% | 85% | 80% | 70% | 60% | 50% | 40% |
| greater than 10% and less than or equal to 70% | 75% | 70% | 60% | 50% | 40% | 30% |
| less than or equal to 10% | 70% | 65% | 55% | 45% | 35% | 25% |

For Residential Mortgage-Backed Securities, the recovery rate is assumed as follows:

| Tranche as % of capital structure at issuance | Rating of a Tranche at Issuance | | | | | |
|---|---|---|---|---|---|---|
| | **Aaa** | **Aa** | **A** | **Baa** | **Ba** | **B** |
| greater than 70% | 85% | 80% | 65% | 55% | 45% | 30% |
| greater than 10% and less than or equal to 70% | 75% | 70% | 55% | 45% | 35% | 25% |
| greater than 5% and less than or equal to 10% | 65% | 55% | 45% | 40% | 30% | 20% |
| greater than 2% and less than or equal to 5% | 55% | 45% | 40% | 35% | 25% | 15% |
| less than or equal to 2% | 45% | 35% | 30% | 25% | 15% | 10% |

For Undiversified Securities, the recovery rate is assumed as follows:

| Tranche as % of capital structure at issuance | Rating of a Tranche at Issuance | | | | | |
|---|---|---|---|---|---|---|
| | **Aaa** | **Aa** | **A** | **Baa** | **Ba** | **B** |
| greater than 70% | 85% | 80% | 65% | 55% | 45% | 30% |
| greater than 10% and less than or equal to 70% | 75% | 70% | 55% | 45% | 35% | 25% |
| greater than 5% and less than or equal to 10% | 65% | 55% | 45% | 35% | 25% | 15% |
| greater than 2% and less than or equal to 5% | 55% | 45% | 35% | 30% | 20% | 10% |
| less than or equal to 2% | 45% | 35% | 25% | 20% | 10% | 5% |

For Low-Diversity CDOs, the recovery rate is assumed as follows:

| | Rating of a Tranche at Issuance | | | | | |
|---|---|---|---|---|---|---|
| Tranche as % of capital structure at issuance | Aaa | Aa | A | Baa | Ba | B |
| greater than 70% | 80% | 75% | 60% | 50% | 45% | 30% |
| greater than 10% and less than or equal to 70% | 70% | 60% | 55% | 45% | 35% | 25% |
| greater than 5% and less than or equal to 10% | 60% | 50% | 45% | 35% | 25% | 15% |
| greater than 2% and less than or equal to 5% | 50% | 40% | 35% | 30% | 20% | 10% |
| less than or equal to 2% | 30% | 25% | 20% | 15% | 7% | 4% |

For High-Diversity CDOs, the recovery rate is assumed as follows:

| | Rating of a Tranche at Issuance | | | | | |
|---|---|---|---|---|---|---|
| Tranche as % of capital structure at issuance | Aaa | Aa | A | Baa | Ba | B |
| greater than 70% | 85% | 80% | 65% | 55% | 45% | 30% |
| greater than 10% and less than or equal to 70% | 75% | 70% | 60% | 50% | 40% | 25% |
| greater than 5% and less than or equal to 10% | 65% | 55% | 50% | 40% | 30% | 20% |
| greater than 2% and less than or equal to 5% | 55% | 45% | 40% | 35% | 25% | 10% |
| less than or equal to 2% | 45% | 35% | 30% | 25% | 10% | 5% |

Using such recovery rate assumptions, a High-Diversity CDO would have a diversity score of 20 or higher and a Low-Diversity CDO would have a diversity score of less than 20.

The Moody's Recovery rate for Corporate Securities is 30% for corporate bonds issued by U.S. obligors and for other issuers such amount as determined in consultation with Moody's. The Moody's Recovery Rate for REIT unsecured debt securities is 40% (other than for mortgage and healthcare related REIT debt securities, for which it is 10%).

The Recovery Rate for EETC Securities will be the greater of (x) 30% and (y) the Recovery Rate assigned by Moody's.

The Recovery Rate for ABS Future Flow Securities and Project Finance Securities will be 0% until the Rating Agency Condition with respect to Moody's is satisfied.

The following definitions apply with respect to the Moody's Recovery Rate:

"Diversified Securities" means (i) ABS Automobile Securities; (ii) ABS Car Rental Receivable Securities; (iii) ABS Credit Card Securities; (iv) ABS Student Loan Securities; and (v) any other type of Collateral Assets that are designated as Diversified Securities after the Closing date by Moody's and notified to the Collateral Agent and the Collateral Manager.

"Undiversified Securities" means any Commercial Mortgage-Backed Securities and CDO Securities and those Collateral Assets not included in Diversified Securities and any

other type of Asset-Backed Securities that are designated as Undiversified Securities after the Closing Date by Moody's and notified to the Collateral Agent and the Collateral Manager.

"Low-Diversity CDOs" means CDO Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the CDO Securities) on the cash flow from a portfolio of commercial and industrial bank loans, asset-backed securities, mortgage-backed securities or corporate debt securities or any combination of the foregoing, generally having the following characteristics: (1) the bank loans and debt securities have varying contractual maturities; (2) the loans and securities are obligations of a pool of obligors or issuers that represent a relatively undiversified pool of obligor credit risk having a Moody's diversity score of 20 or lower or a MAC Factor of 15% or more; (3) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of individual bank loans or debt securities depending on numerous factors specific to the particular issuers or obligors and upon whether, in the case of loans or securities bearing interest at a fixed rate, such loans or securities include an effective prepayment premium; and (4) proceeds from such repayments can for a limited period and subject to compliance with certain eligibility criteria be reinvested in additional bank loans and/or debt securities.

"High-Diversity CDOs" means CDO Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the CDO Securities) on the cash flow from a portfolio of commercial with industrial bank loans, asset-backed securities, mortgage-backed securities or corporate debt securities or synthetic securities or any combination of the foregoing, generally having the following characteristics: (1) the bank loans and debt securities have varying contractual maturities; (2) the loans and securities are obligations of obligors or issuers that represent a relatively diversified pool of obligor credit risk having a Moody's diversity score higher than 20 or a MAC Factor of less than 15%; (3) repayment thereof can vary substantially from the contractual payment schedule (if any), with early prepayment of individual bank loans or debt securities depending on numerous factors specific to the particular issuers or obligors and on whether, in the case of loans or securities bearing interest at a fixed rate, such loans or securities include an effective prepayment premium; and (4) proceeds from such repayments can for a limited period and subject to compliance with certain eligibility criteria be reinvested in additional bank loans and/or debt securities.

Recovery Rate Tables
PART II – Standard & Poor's Minimum Average Recovery Rate

**Standard & Poor's Recovery Matrix**

The following information has been provided to the Issuer by Standard & Poor's and the asset classes and related capitalized terms have the meanings ascribed thereto by Standard & Poor's.

A.    **If the Collateral Asset is the senior-most tranche of securities issued by the issuer of such Collateral Asset:**

| | Stress Case Equal to AAA rating | Stress Case Equal to AA rating | Stress Case Equal to A rating | Stress Case Equal to BBB rating | Stress Case Equal to BB rating | Stress Case Equal to B rating | Stress Case Equal to CCC rating |
|---|---|---|---|---|---|---|---|
| Collateral Asset Rating at the time of acquisition by the Issuer | | | | | | | |
| AAA | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| AA | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| A | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| BBB | 50.0% | 55.0% | 65.0% | 75.0% | 85.0% | 85.0% | 85.0% |

B.    **If the Collateral Asset is not the senior-most tranche of securities issued by the issuer of such Collateral Asset\*:**

| | Stress Case Equal to AAA rating | Stress Case Equal to AA rating | Stress Case Equal to A rating | Stress Case Equal to BBB rating | Stress Case Equal to BB rating | Stress Case Equal to B rating | Stress Case Equal to CCC rating |
|---|---|---|---|---|---|---|---|
| Collateral Asset Rating at the time of acquisition | | | | | | | |
| AAA | 65.0% | 70.0% | 80.0% | 85.0% | 85.0% | 85.0% | 85.0% |
| AA | 55.0% | 65.0% | 75.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| A | 40.0% | 45.0% | 55.0% | 65.0% | 80.0% | 80.0% | 80.0% |
| BBB | 30.0% | 35.0% | 40.0% | 45.0% | 50.0% | 60.0% | 70.0% |
| BB | 10.0% | 10.0% | 10.0% | 25.0% | 35.0% | 40.0% | 50.0% |
| B | 2.5% | 5.0% | 5.0% | 10.0% | 10.0% | 20.0% | 25.0% |
| CCC | 0.0% | 0.0% | 0.0% | 0.0% | 2.5% | 5.0% | 5.0% |

---

\*    If the Collateral Asset is a Project Finance Security, an ABS Future Flow Security, a Synthetic Security or a CDO Security the underlying assets of which are CDO Securities, Market Value CDO Securities or Principal Only Securities, the recovery rate for such Collateral Asset will be zero until a recovery rate is assigned by Standard & Poor's and if such Collateral Asset is an Insured Security (other than a monoline insurer as set forth in paragraph D below), the recovery rate will be determined by Standard & Poor's on a case by case basis.  If the Collateral Asset is a REIT Debt Security which is the most senior class of an issue, the recovery rate will be 40%.

**C.**     If the Collateral Asset is a CMBS Security:

| Collateral Asset Rating at the time of acquisition | Stress Case Equal to AAA rating | Stress Case Equal to AA rating | Stress Case Equal to A rating | Stress Case Equal to BBB rating | Stress Case Equal to BB rating | Stress Case Equal to B rating | Stress Case Equal to CCC rating |
|---|---|---|---|---|---|---|---|
| AAA | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| AA | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| A | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| BBB | 45.0% | 50.0% | 55.0% | 60.0% | 65.0% | 70.0% | 75.0% |
| BB | 35.0% | 40.0% | 45.0% | 45.0% | 50.0% | 50.0% | 50.0% |
| B | 20.0% | 25.0% | 30.0% | 35.0% | 35.0% | 40.0% | 40.0% |
| CCC | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| NR | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

**D.**     If the underlying instruments of the Collateral Assets permit more than 20% of the underlying collateral by principal amount to be non-U.S. assets, the recovery rate will in accordance be as described in clauses (A) and (B) above, as applicable.

**E.**     If the Collateral Asset has its payment obligations guaranteed by a primary monoline insurer, then

(1)     If the Collateral Asset has its payment obligations guaranteed by a primary monoline insurer, then the recovery rate is such primary insurer's recovery rate multiplied by (one *minus* the recovery rate of the related Collateral Asset) *plus* the recovery rate of the related Collateral Asset.  The primary insurer's recovery rate for purposes of calculating the foregoing is 44% if such recovery rate is not assignable or if the primary insurer is one of the following entities:

> Ambac Assurance Corp.
> Financial Guaranty Insurance Co.
> Financial Security Assurance Inc.
> MBIA Insurance Corps.
> XL Capital Assurance Inc.

(2)     Otherwise, the recovery rate will be assigned by Standard & Poor's upon the acquisition of such Collateral Asset by the Issuer and upon request by the Collateral Manager.

**SCHEDULE E**

**STANDARD & POOR'S ASSET CLASSES**

**Part A**

(1) <u>Consumer ABS</u>
Automobile Loan Receivable Securities
Automobile Lease Receivable Securities
Car Rental Receivables Securities
Credit Card Securities
Healthcare Securities
Student Loan Securities

(2) <u>Commercial ABS</u>
Cargo Securities
Equipment Leasing Securities
Aircraft Leasing Securities
Small Business Loan Securities
Restaurant and Food Services Securities
Tobacco Litigation Securities

(3) <u>Non-RE-REMIC RMBS</u>
Manufactured Housing Loan Securities

(4) <u>Non-RE-REMIC CMBS</u>
CMBS - Conduit
CMBS - Credit Tenant Lease
CMBS - Large Loan
CMBS - Single Borrower
CMBS - Single Property

(5) <u>CBO/CLO Cashflow Securities</u>
Cash Flow CBO - at least 80% High Yield Corporate
Cash Flow CBO - at least 80% Investment Grade Corporate
Cash Flow CLO - at least 80% High Yield Corporate
Cash Flow CLO - at least 80% Investment Grade Corporate

(6) <u>REITs</u>
REIT - Multifamily & Mobile Home Park
REIT - Retail
REIT - Hospitality
REIT - Office
REIT - Industrial
REIT - Healthcare
REIT - Warehouse
REIT - Self Storage
REIT - Mixed Use

(7) <u>Real Estate Operating Companies</u>

**Part B**

<u>Residential Mortgages</u>
Residential "A"
Residential "B/C"
Home equity loans

**Part C**

<u>Specialty Structured</u>
Stadium Financings
Future flows

## SCHEDULE F

## AUCTION PROCEDURES

The following sets forth the auction procedures (the "Auction Procedures") to be followed in connection with a sale effected pursuant to Section 9.7 of the Indenture (the "Indenture") dated as of the Closing Date, between Millstone III CDO, Ltd., Millstone III CDO, LLC and JPMorgan Chase Bank, National Association, as trustee (the "Trustee"). Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Indenture.

## I.     Pre-Auction Process

(a)     The Collateral Manager will initiate the Auction procedures at least 60 days before the Payment Date occurring in January of each year, commencing on the Quarterly Payment Date in January 2016 (each, an "Auction Call Redemption Date") by: (i) preparing a list of the Collateral Assets (including CUSIP Number, if any, par amount and issuer name for each Collateral Asset), by type of each Collateral Asset; (ii) deriving a list of not less than three Eligible Bidders (the "Selected Bidders") not Affiliates of the Collateral Manager and any additional Eligible Bidders, which may include Affiliates of the Collateral Manager, any Holder and/or the Initial Purchasers (such additional Eligible Bidders, together with the Selected Bidders, the "Listed Bidders") and requesting bids on a date (the "Auction Date") at least ten Business Days before the Auction Call Redemption Date, and (iii) notifying the Trustee of the list of Listed Bidders (the "List").

(b)     The general solicitation package which the Collateral Manager shall deliver to the Listed Bidders will include:   (1) a form of a Securities Purchase Agreement ("Securities Purchase Agreement") provided to the Trustee by the Collateral Manager (which shall provide that (A) upon satisfaction of all conditions precedent therein, the purchaser is irrevocably obligated to purchase, and the Issuer is irrevocably obligated to sell, the Collateral Assets on the date and on the terms stated therein, (B) if Collateral Assets are to be sold to multiple different bidders, that the consummation of the purchase of all Collateral Assets must occur simultaneously and that the closing of each purchase is conditional on the closing of all other purchases, (C) if for any reason whatsoever the Trustee has not received, by a specified Business Day (which shall be ten or more Business Days before the Auction Call Redemption Date), payment in full in immediately available funds of the aggregate purchase price for all Collateral Assets, at least equal to the Minimum Bid Amount, the obligations of the parties shall terminate and the Issuer shall have no obligation or liability whatsoever, (2) the minimum aggregate cash purchase price (which shall be determined by the Collateral Manager for the various Collateral Assets or group thereof); (3) the list of Collateral Assets; (4) a formal bid sheet (which shall permit the bidder to bid for some or all of the Collateral Assets provided to the Trustee by the Collateral Manager, including a representation from the bidder that it is an Eligible Bidder; (5) a detailed timetable; and (6) copies of a Securities Purchase Agreement and all other transfer documents provided to the Trustee by the Collateral Manager (including transfer certificates and subscription agreements which a bidder must execute and a list of the requirements which the bidder must satisfy (i.e., Qualified Institutional Buyer, Qualified Purchaser, etc.)).

(c) The Collateral Manager will send solicitation packages to all Listed Bidders on the List at least 20 Business Days before the Auction Call Redemption Date. Listed Bidders will be required to submit any due diligence questions (or comments on the draft Securities Purchase Agreement) in writing to the Collateral Manager by a date specified in the solicitation package. The Collateral Manager will be required to answer all relevant questions by a date specified in the solicitation package and will distribute the revised final Securities Purchase Agreement to all Listed Bidders (with a copy to the Issuer).

## II.    Auction Process

(a) To the extent the Collateral Manager, any Holder, the Initial Purchasers and any of their respective Affiliates are Eligible Bidders, such parties will be allowed to bid in the Auction, but will not be required to do so.

(b) On the Auction Date, all bids will be due by facsimile to the offices of the Trustee (with a copy by facsimile to the Trustee) by 11:00 a.m. New York City time, with the winning bidder to be notified by 3:00 p.m. New York City time. All bids from Listed Bidders on the List will be due on the bid sheet contained in the solicitation package. Each bid shall be for the purchase and delivery to one purchaser (i) of all (but not less than all) of the Collateral Assets or (ii) identified Collateral Assets.

(c) Unless the Trustee receives at least one bid from a Listed Bidder for some or all of the Collateral Assets which is not the Collateral Manager or an Affiliate (as certified by the Collateral Manager) thereof to purchase all of the Collateral Assets, the Trustee shall decline to consummate the sale.

(d) Subject to clause (c), the Collateral Manager shall instruct the Trustee to select the specific bid or bids which result in the Highest Auction Price (in excess of the specified Minimum Bid Amount) from one or more Listed Bidders.

(e) Upon notification to the winning bidder or bidders, the winning bidder or bidders will be required to deliver to the Trustee a signed counterpart of the Securities Purchase Agreement no later than 4:00 p.m. New York City time on the Auction Date. Each winning bidder shall make payment in full of the purchase price on the Business Day (the "Auction Purchase Closing Date") specified in the general solicitation package (which shall be the tenth Business Day before the Auction Call Redemption Date). If a winning bidder so requests, the Trustee and the Issuer will enter into a bailee letter with the winning bidder and its designated bank (which bank shall be subject to approval by the Issuer or the Collateral Manager on behalf of the Issuer); *provided*, that such bank enters into an account control agreement with the Trustee and the Issuer and has been assigned ratings at least equal to those required for a successor Trustee pursuant to Article 6 of the Indenture. If the above requirements are satisfied, the Trustee shall deliver the Collateral Assets (to be sold to such bidder) pursuant thereto to the bailee bank at least one Business Day prior to the closing on the sale of the Collateral Assets and accept payment of the purchase price pursuant thereto. If payment in full of the purchase price is not made by the Auction Purchase Closing Date for any reason whatsoever by any winning bidder, the Issuer shall decline to consummate the sale of any Collateral Assets, the Trustee and the Issuer shall direct the bailee bank to return the Collateral Assets to the Trustee, and (if notice

of redemption has been given by the Trustee) the Trustee shall give notice (in accordance with the Indenture) that the Auction Call Redemption will not occur.

As used in this Schedule C, "<u>Highest Auction Price</u>" means, whichever is higher, (i) the highest price bid by any Listed Bidder for all of the Collateral Assets, or (ii) the sum of the highest prices bid by a Listed Bidder for each Collateral Asset or group of Collateral Assets. In any case in which more than one bidder bids for one or more Collateral Assets in combination with other Collateral Assets, the Collateral Manager will select the bids which maximize the net sales proceeds to be received by the Auction.  In each case, the price bid by a bidder shall be the dollar amount which the Collateral Manager certifies to the Trustee based on the Collateral Manager's review of the bids, which certification shall be binding and conclusive.

## SCHEDULE G

## MOODY'S NOTCHING OF ASSET BACKED SECURITIES

The following notching conventions are appropriate for Standard & Poor's-only rated tranches. The figures represent the number of notches to be subtracted from the Standard & Poor's rating. (For example, a "1" applied to a Standard & Poor's rating of "BBB" implies a Moody's rating of "Baa3".)

| ASSET CLASS | "AAA" to"AA-" | "A+" to "BBB-" | Below "BBB-" |
|---|---|---|---|
| **Asset Backed** | | | |
| Agricultural and Industrial Equipment loans | 1 | 2 | 3 |
| Aircraft and Auto leases and Car Rental Receivable Securities | 2 | 3 | 4 |
| Arena and Stadium Financing | 1 | 2 | 3 |
| Financing Auto loan | 1 | 2 | 3 |
| Boat, Motorcycle, RV, Truck | 1 | 2 | 3 |
| Computer, Equipment and Small-ticket item leases | 1 | 2 | 3 |
| Consumer Loans | 1 | 3 | 4 |
| Credit Card | 1 | 2 | 3 |
| Cross-border transactions | 1 | 2 | 3 |
| Entertainment Royalties | 1 | 2 | 3 |
| Floorplan | 1 | 2 | 3 |
| Franchise Loans | 1 | 2 | 4 |
| Future Receivables | 1 | 1 | 2 |
| Health Care Receivables | 1 | 2 | 3 |
| Manufactured Housing | 1 | 2 | 3 |
| Mutual Fund Fees | 1 | 2 | 4 |
| Small Business Loans | 1 | 2 | 3 |
| Stranded Utilities | 1 | 2 | 3 |
| Structured Settlements | 1 | 2 | 3 |
| Student Loan | 1 | 2 | 3 |
| Tax Liens | 1 | 2 | 3 |
| Time Share Securities | 1 | 2 | 3 |
| Trade Receivables | 2 | 3 | 4 |

(A)    The following notching conventions are with respect to Fitch:

| **Residential Mortgage Related** | | | |
|---|---|---|---|
| "BBB-" | "AAA" | "AA+" to "BBB-" | Below |
| Jumbo A | 1 | 2 | 4 |
| RMBS Prime Mortgage Securities or mixed pools | 1 | 3 | 5 |
| HEL (including RMBS Mid-Prime Mortgage Securities or RMBS Subprime Mortgage Securities) | No notching | No notching | No notching |

For dual-rated Jumbo A or RMBS Prime Mortgage Securities transactions, take the lower of the two ratings on the security, apply the appropriate single-rated notching guideline as set forth in the definition of Moody's Rating, then go up by 1/2 notch.

## SCHEDULE H

## ASSET CLASSES NOT ELIGIBLE FOR NOTCHING

The following types of Asset-Backed Securities are not eligible to be notched in accordance with <u>Schedule H</u> unless otherwise agreed to by Standard & Poor's.  Accordingly, the Standard & Poor's Rating of such Asset-Backed Securities must be determined pursuant to clause (i) or (ii) of paragraph (b) of the definition of "Rating" in <u>Section 1.1</u> of this Indenture. This schedule may be modified from time to time by Standard & Poor's and its applicability should be confirmed with Standard & Poor's prior to use.

(1)     Structured Finance Securities that are Non-U.S. Securities
(2)     Guaranteed Securities
(3)     CDOs of Structured Finance and Real Estate Securities
(4)     CBOs of CDOs
(5)     CLOs of Distressed Debt
(6)     Mutual Fund Fee Securities
(7)     Catastrophe Bonds
(8)     First Loss Tranches of any Securitization
(9)     Synthetics
(10)    Synthetic CBOs
(11)    Combination Securities
(12)    RE-REMICs
(13)    Market Value CDOs
(14)    Net Interest Margin Securities (NIMs)
(15)    Any asset Class not listed on <u>Schedule H</u>
(16)    Principal Only Securities
(17)    Negative Amortization Securities



# England and Wales High Court (Commercial Court) Decisions

[New search] [Help]

## Peregrine Fixed Income Ltd v. Robinson Department Store Public Co. Ltd [2000] EWHC Commercial 99 (18th May, 2000)

IN THE HIGH COURT OF JUSTICE Claim No.2000 - Folio 277

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

THE HONOURABLE MR JUSTICE MOORE-BICK

BETWEEN

PEREGRINE FIXED INCOME LIMITED (IN LIQUIDATION)

Claimant

and

ROBINSON DEPARTMENT STORE PUBLIC COMPANY LIMITED

Defendant

Defendant

JUDGMENT

_____

1. Mr. Mark Hapgood Q.C. and Mr. Michael Swainston instructed by Clifford Chance appeared for the claimant.

2. Mr. Iain Milligan Q.C. and Mr. Andrew Baker instructed by Slaughter and May appeared for the defendant

3. Pursuant to the Practice Statement issued by the Master of the Rolls on 9th July 1990 I hereby certify that the attached text records my judgment in this matter and direct that no further record or transcript of the same need be made.

The Hon. Mr. Justice Moore-Bick

1. This matter comes before the court by way of the trial of a claim under Part 8 of the Civil Procedure Rules in which the claimant, Peregrine Fixed Income Ltd ("Peregrine") seeks the determination of a number of issues between itself and the defendant, Robinson Department Store Public Company Ltd ("Robinson"), relating to the construction of the Master Agreement (Multicurrency - Cross Border) (1992) of the International Swaps and Derivatives Association Inc. ("the Agreement"). The facts giving rise to the dispute are set out in a long and carefully drafted agreement between the parties from which the following summary is derived.

2. Peregrine is a company incorporated in Hong Kong which up to 12th January 1998 carried on business as a provider of finance and financial products, including swaps and other derivatives. On 12th January 1998 the board of directors of its parent company resolved to seek the appointment of a provisional liquidator to the company and on 16th January 1998 provisional liquidators of Peregrine were appointed following the presentation of a winding-up petition against it in the High Court of the Hong Kong SAR on 15th January 1998.

3. Robinson is a company incorporated in Thailand and carries on business as an operator of department stores in that country. It is currently in the process of initiating a restructuring of its debts under the supervision of the court. It has been accepted by Robinson and its creditors that under the proposed restructuring arrangement the creditors' claims will be converted into equity. The eventual value of those claims will therefore depend on the performance of Robinson's shares.

4. On various occasions prior to December 1997 Peregrine and Robinson entered into derivatives transactions. In particular, on or about 20th November 1997 Peregrine and Robinson executed and exchanged the execution copy of a letter dated 20th November 1997 ("the Confirmation Letter") which was expressed to confirm a swap transaction under which, inter alia, Robinson agreed to pay Peregrine 25 annual instalments of US$6.85 million beginning in November 1998 and ending in November 2022. The Confirmation Letter incorporated the 1991 Definitions published by the International Swaps and Derivatives Association and provided that if they were not already parties

to a 1992 Master Agreement the parties would use their best endeavours to enter into one. On or about 16th December 1997 Peregrine and Robinson executed a copy of the Agreement and Schedule dated 17th February 1997. It is common ground that the terms of the Agreement and Schedule govern the contract between them and that English law is the proper law of the contract.

5.  The Agreement and Schedule are highly complex documents which give the parties the opportunity to choose how the contract is to operate under certain defined circumstances. The parties exercise that choice through the Schedule. In order to understand the issues to which this claim gives rise it is necessary to set out some of the terms of the Agreement at length, but in the interests of brevity I shall confine myself to those that are central to the dispute and summarise others where I think that may be of assistance. Most of the terms used in this judgment are defined in the Agreement and such defined terms are denoted by initial capitals. For ease of understanding I have adopted that convention throughout this judgment and accordingly expressions which have been given initial capitals should be understood as referring to those expressions as defined in the Agreement.

6.  Section 2 of the Agreement is headed "Obligations" and includes the following provisions:

    "(a) General Conditions

    (i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

    . . . . . . . . . . . . . . . . . . . . . . .

    (iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default . . . . . with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred . . . . . . . . . ."

7.  Section 5 is headed "Events of Default and Termination Events". It sets out a number of situations which constitute Events of Default; these include an application by a party for the appointment of a provisional liquidator for itself or for all or substantially all of its assets. It is common ground that steps were taken by Peregrine on 15th January 1998 to seek the appointment of a provisional liquidator which fell within this provision. It is also important to note, however, that Section 5 also provides for what are called "Termination Events" which may lead to the termination of outstanding transactions but do not constitute Events of Default. Termination Events fall into five categories described as "Illegality", "Tax Event", "Tax Event Upon Merger", "Credit Event Upon Merger" and "Additional Termination Event", the last of these being additional circumstances agreed by the parties to constitute Termination Events.

8.  Section 6 deals with "Early Termination". It is important to note at the outset that it provides for Early Termination of transactions under a variety of different circumstances. The first is on the occurrence of an Event of Default for which Section 6(a) provides as follows:

    Right to terminate Following Event of Default. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early

Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii) . . . . . (6) [an application for the appointment of a provisional liquidator]".

In the present case the parties had specified Automatic Early Termination in the Schedule to the Agreement.

9.   Section 6(b) deals with the right to terminate transactions following the occurrence of one of the Termination Events already mentioned. It recognises that one or other or both of the parties may be affected by the event in question. Such a party is described as an "Affected Party".

10.  Section 6(e) is headed "Payments on Early Termination". Again, it is important to note that it deals separately with termination following Events of Default in sub-paragraph (i) and termination following Termination Events in sub-paragraph (ii). Moreover, sub-paragraph (ii) contains different provisions depending on whether there are one or two Affected Parties. In the case of termination resulting from Events of Default the parties have the opportunity at the time of entering into the Agreement to choose between different formulae for calculating and paying the amount due from one to the other. It is unnecessary at this point to analyse the different formulae; it is sufficient for the moment to say that these parties chose what is described in Section 6(e)(i)(3) as the "Second Method and Market Quotation" formula which provides as follows:

"Second Method and Market Quotation. If the Second Method and Market Quotation apply an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the [US dollar] equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the [US dollar] equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party."

The parties had chosen the United States dollar as the Termination Currency Equivalent, that is, the currency in which all outstanding obligations should be expressed for the purposes of this calculation. I have therefore inserted references to the US dollar in this sub-paragraph for the sake of simplicity. The expression "Unpaid Amount" is self-explanatory, but in fact Peregrine had fulfilled all its payment obligations under the contract and there were therefore no Unpaid Amounts outstanding in favour of Robinson as the Non-defaulting Party.

11.  In order to understand the effect of Section 6(e)(i)(3) it is necessary to turn next to the definitions of "Settlement Amount" and "Market Quotation". It is also convenient at this stage to consider the definition of "Loss". These are all defined in Section 14 of the Agreement.

12.  "Settlement Amount" is defined as follows:

"Settlement Amount" means, with respect to a party and any Early Termination Date, the sum of:-

(a) The [US dollar] Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined;

and

(b) such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result."

13.  The definition of "Market Quotation" is very long and complex. The concept behind it is that of obtaining an open market valuation of the obligation which the Non-defaulting party has lost as a result of the default by obtaining from a representative number of first-class market - makers (the "Reference Market-makers") quotations for replacing the Defaulting party in the transaction. The material parts of the definition for present purposes provide as follows:

"Market Quotation" means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from [not less than three] Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery ( . . . . assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction . . . . . . . . . . that would, but for the occurrence of the relevant Early Termination Date, have been required after that date."

14.  The definition of "Loss" is also long and complex. For present purposes it is sufficient to quote the following parts:

"Loss" means, with respect to . . . . . . . . . . a party, the [US dollar] Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with the Terminated Transaction . . . . . . . . . including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining, or reestablishing any hedge or related trading position (or any gain resulting from any of them). . . . . . . . . . . ."

15.  In the present case the transaction embodied in the Confirmation Letter automatically terminated on 15th January 1998 when Peregrine took steps to seek the appointment of a provisional liquidator. That was the combined effect of the occurrence of an Event of Default falling within Section 5(a)(vii)(6) and the parties' specifying Automatic Early Termination as contemplated in Section 6(a). There were no other outstanding transactions between the parties at that date and it was therefore for Robinson as the Non-defaulting Party to determine the Settlement Amount in accordance with Section 6(e)(i)(3) of the Agreement. Quotations were sought from a number of Reference Market-makers who were asked to quote a price for entering into a replacement transaction, that is, to purchase Robinson's outstanding obligations. Three quotations were provided which, after disregarding the highest and lowest as required by the Agreement, produced a figure of US$9,694,901. In other words, those who were agreed to represent the market for these purposes valued Robinson's obligation to pay US$6.85 million each year for twenty five years (a total of US$171.25 million, or a little over US$87.3 million at present day values using conventional discounting methods) at just over US$9.5 million. If one adopts the Market

Quotation measure as the basis for calculating the Settlement Amount, the amount payable by Robinson to Peregrine under Section 6(e)(i)(3) is US$9,694,901. That, therefore, is the amount for which Peregrine would be entitled to prove in the liquidation (or in this case the reconstruction) of Robinson.

16.   Against that background Mr. Hapgood Q.C. on behalf of Peregrine submitted that in this case the use of the Market Quotation measure to calculate the amount payable under Section 6(e) does not produce a commercially reasonable result because it grossly undervalues Robinson's obligation, or more accurately, what Robinson has gained as a result of the termination of the transaction. That much, he said, is demonstrated by the extent of the discrepancy between the present discounted value of Robinson's obligation and the figure obtained by Market Quotation. The possibility that a Market Quotation might not produce a commercially reasonable result is one which is expressly contemplated in the definition of the Settlement Amount. In such cases, he submitted, the definition requires that the Settlement Amount be calculated by reference to the Defaulting Party's actual Loss rather than a Market Quotation. Accordingly, instead of using Market Quotation Robinson should have used the alternative measure, Loss, for the purposes of calculating the Settlement Amount. That would have resulted in the amount payable under Section 6(e) being US$87.3 million.

17.   This is all very well as far as it goes, but it is important not to lose sight of the fact that the calculation of the amount payable under Section 6 is the responsibility of the Non-defaulting Party and in cases where the parties have chosen the Market Quotation measure the Agreement only requires the calculation of the Settlement Amount to be made by reference to the Loss measure if in that party's reasonable belief the use of Market Quotation would not produce a commercially reasonable result. Robinson has said that it does believe that Market Quotation produces a commercially reasonable result and Mr. Milligan Q.C. on its behalf has explained why, in his submission, the result which it produces is both reasonable and in accordance with the wider principles of the Agreement.

18.   Against this background Peregrine has asked the court to determine the following five questions:

(1) Is Peregrine entitled to challenge Robinson's belief that the Market Quotation payment measure has produced a commercially reasonable result?

(2) If so, does the Market Quotation payment measure produce a commercially reasonable result?

(3) If the answer to question (2) is 'No', is Peregrine entitled to require Robinson, and/or is Robinson bound, to use the Loss payment measure in determining the Settlement Amount?

(4) If the answer to question (3) is 'Yes', or if the court is willing to determine this question in any event, is Loss to be determined

(a) as Peregrine contends; or

(b) as Robinson contends?

(5) Without prejudice to the generality of question (4), is the creditworthiness of Robinson relevant to the assessment of Loss, and if so, is there any condition, limitation or restriction on the extent to which, or in respect of the manner in which, such creditworthiness should be considered as relevant or taken into account?

19. On the face of it one can well see why Peregrine considers that the use of Market Quotation as the basis for calculating the amount payable under Section 6 produces an unreasonable result in this case. Two closely related questions immediately spring to mind: how can an obligation which has a nominal present value of US$87.3 million be worth only US$9.7 million; and why does a valuation derived from the market (which in principle ought to provide a reliable assessment of the value of the transaction) apparently fall so far short of the figure which would ordinarily be attributed to the contract if one were valuing the loss of the bargain?

20. I think the answer to both of these questions lies partly in the fact that Robinson is itself in serious financial difficulties, as the restructuring arrangements demonstrate. By seeking quotations from a group of Reference Market-makers in accordance with the Agreement Robinson was effectively asking the market how much it would pay to take over the benefit of its obligation. Unless precluded from doing so, it is inevitable that when answering that question the market would consider not just the nominal amount of the obligation but many other factors as well, including the period over which the payments were due to be made and the risk of default on the part of Robinson. It has to be remembered that in this case none of Peregrine's obligations remained outstanding and there was no form of security or credit support in place. In reality Peregrine was simply holding a long-term unsecured debt due from Robinson. If the debtor is financially weak, the market cannot be expected to regard his unsecured debt in the same way as it might regard the debt of a first-class financial institution.

21. It was common ground that Reference Market-makers who are approached for quotations under the terms of this Agreement are not required or expected to ignore the financial standing of the Non-defaulting Party when considering what they would pay, or demand, as the price of entering into a Replacement Transaction. The definition of Market Quotation expressly requires them to quote on the basis of entering into a contract with the Non-defaulting party that would have the effect of preserving for that party the economic equivalent of any payment due under the original contract and when doing so to take into account any existing Credit Support Document relating to that party's obligations. As both parties recognised, this reflects an assumption that the financial status of the Non-defaulting Party will be taken into account. The Reference Market-makers are required to assume the satisfaction of each applicable condition precedent, but that only requires them to assume that all conditions precedent to performance by the Non-defaulting party have been, or will be, performed. It has no bearing on the ability of the Non-defaulting Party to perform when the time comes. The Market Quotation measure is, therefore, one which in certain circumstances may result in the payment which has to be made by the Non-defaulting Party to the Defaulting Party under Section 6(e) failing to a substantial degree to reflect fully the nominal value of the obligation owed by the Non-defaulting Party.

22. It was fundamental to Mr. Hapgood's argument that the Market Quotation and Loss measures should lead to a broadly similar result, and indeed he relied in part on the difference in the results he said they produced in this case as evidence of the fact that the result produced by the Market Quotation measure is commercially unreasonable. Whether any given result is in fact commercially unreasonable must very largely depend on the extent to which it departs from the result which the parties must be taken to have had in mind, and that, of course, is a matter which has to be determined by reference to the terms of the Agreement. One of the interesting characteristics of the Agreement is that on Early Termination as a result of an Event of Default the Non-defaulting Party may be required to make a payment to the Defaulting Party. Mr. Hapgood submitted that where the parties have specified Automatic Early Termination the occurrence of an Event of Default effectively closes out all their open transactions at once and a payment will then become due from the Non-defaulter to the Defaulter if, taken overall, the Defaulter is "in the money", as was the case here. Mr. Milligan, on the other hand, submitted that an important

distinction is drawn in the Agreement between termination as a result of an Event of Default and termination following a Termination Event. In the former case the Agreement, he submitted, is only concerned with preventing the Non-defaulting Party from obtaining a windfall benefit as a result of the other party's default. It was not intended to enable the Defaulting Party to obtain the full benefit of any obligations owed to him. In this respect it seemed that there might be a clear difference between the parties as to the philosophy of the Agreement.

23. In Section 6(e) the Agreement provides for two fundamentally different methods of handling payments on Early Termination. Under what is termed the "First Method" the Defaulting Party pays the Non-defaulting Party an amount equal to the value of the outstanding obligations under the transactions which have been terminated less any unpaid amounts owed to him by the Non-defaulting Party. The Defaulting Party recovers nothing in respect of the loss of his bargain, notwithstanding that he may have been "in the money" at the time of default. This reflects the position under English law following the repudiation of a contract: accrued liabilities are unaffected and the defaulter must compensate the non-defaulter for the loss of any unperformed obligations but he is not entitled to receive anything himself in respect of the lost bargain. Under the "Second Method" a payment may be made either way depending on whether the net balance of gain and loss favours the Defaulting or Non-defaulting Party. That appears most clearly from Section 6(e)(i)(4) and the definition of Loss from which it is clear that the Non-defaulting Party's "loss" in respect of the Terminated Transactions may be a negative amount (i.e. a gain), in which case a payment of that amount must be made to the Defaulting Party.

24. These provisions seem to me to support Mr. Hapgood's submission that the object of the Second Method of payment (whether combined with Market Quotation or Loss as the basis of measurement) is to move away from a simple breach-based approach towards one under which all the transactions covered by the Agreement are effectively closed out. I think that it would be going too far to say that they are intended in all cases to operate neutrally as between the parties, but the fact that the Non-defaulting Party must account to the Defaulting Party for any gain clearly deprives the Event of Default of most of its characteristics as a breach of contract. However, the parties are free to agree to that and there are no doubt good commercial reasons for doing so. It is interesting to note that in the absence of any other choice Section 6(e) provides that the Second Method is to apply. It is necessary, however, in order to give full consideration to Mr. Milligan's argument, also to examine Section 6(e)(ii) which deals with Early Termination resulting from Termination Events, i.e. events which do not constitute Events of Default.

25. Section 6(e)(ii) distinguishes between the situation in which there is one Affected Party and the situation where there are two. To understand the operation of Section 6(e)(ii), therefore, it is necessary first to turn to Section 5(b) which describes what constitute Termination Events and defines the term "Affected Party". Termination Events fall into four categories: (i) Illegality, (ii) Tax Event, (iii) Tax Event Upon Merger and (iv) Credit Event Upon Merger. (One can ignore for present purposes the fifth category of Additional Termination Events which covers additional events specified by the parties. There were none in the present case.) The definition of Affected Party differs in each case to reflect the nature of the event in question. For the purposes of Illegality it is defined as a party which is prevented by supervening illegality from further performance; for the purposes of Tax Event it is defined as a party which becomes liable to bear an additional tax burden as a result of some supervening change in the applicable tax régime; for the purposes of Tax Event Upon Merger it is defined as a party which becomes subject to an additional tax burden as a result of a merger; and for the purposes of Credit Event Upon Merger it is defined as a party whose creditworthiness is materially weakened as a result of a merger. The one thing these four categories have in common is that they all involve a material alteration in the position of one party as a result of an event which does not amount to an Event of Default. They

give rise to a right to terminate the transaction under certain circumstances which are set out in Section 6(b).

26. Section 6(e)(ii) deals with the consequences of termination arising from a Termination Event. If there is only one Affected Party the amount payable as a result of early termination is determined in accordance with Section 6(e)(i)(3) if the Market Quotation payment measure has been chosen and in accordance with Section 6(e)(i)(4) if the Loss payment measure has been chosen. For these purposes references in those sub-paragraphs to the Defaulting Party and the Non-defaulting Party are to be read as references to the Affected Party and the party which is not the Affected Party respectively. In either case, however, the Second Method of payment applies. If there are two Affected Parties, the position is more complicated. Each party determines it own loss in relation to the Terminated Transaction (using the Market Quotation or Loss payment measure as appropriate) and a payment of half the difference is then made by one to the other to balance the gains and losses equally between the two parties.

27. Mr. Milligan submitted that an Event of Default is a breach of contract and that the way in which the Agreement deals with Termination Events shows that a different régime was intended to apply where neither party was at fault from that which applies when there has been an Event of Default. In my view, however, when one examines Section 6(e)(ii) as a whole one can see that that is only partly true. One of the striking features of these provisions is that where there is only one Affected Party the position exactly mirrors that under Sections 6(e)(i)(3) and (4). This strikes me as significant in two respects. In the first place, having regard to the fact that Termination Events occur without fault of either party, it is perhaps not surprising that the Affected Party should retain the benefit of the transaction if it is "in the money" at the date of termination and should not be penalised by the occurrence of an event for which he is not in legal terms responsible. That is presumably why the calculation of the amount to be paid must be carried out in accordance with sub-paragraphs (3) and (4) of Section 6(e)(i) to the exclusion of sub-paragraphs (1) and (2). In the second place, however, it underlines the similarity between the treatment of the parties in the case of a Termination Event where only one of them is affected and the case of default on the part of one party where the parties have chosen the Second Method of payment. In other words, where, for example, the transaction is terminated as a result of supervening illegality affecting only one party the transaction is closed out in just the same way as it would be if that party were in default. This in turn highlights the distinction between the First and Second Methods of payment. Where there are two Affected Parties they are both in precisely the same position and neither can be equated to the Defaulting or Non-defaulting Party. I think that provides a sufficient explanation for the particular way of calculating the payment in that particular case. In the event, therefore, I do not think that Mr. Milligan gains much assistance from the provisions relating to Termination Events.

28. Finally some further indication of the general purpose of Section 6(e) can be found in sub-paragraph (iv) which provides as follows:

"Pre-Estimate. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses."

This, of course, provides further support for Mr. Hapgood's submission that the payment called for under Section 6(e) is intended broadly to reflect the loss of bargain.

29. Much of Mr. Hapgood's argument in the present case proceeded on the premise that the object of Section 6(e)(i)(3) is to preserve the benefit of the bargain for the party "in the money" at the time of termination. However, although that is no doubt how it will work in most cases, it is not the way in which this part of the Agreement is constructed. Section 6(e)(i) does not require the Non-defaulting Party to compensate the Defaulting Party for the loss of the bargain he suffers by reasons of his own default; it requires the Non-defaulting party to calculate his loss and to account to the Defaulting Party for any gain he has made by being relieved of further performance. That appears most clearly from Section 6(e)(i)(4) in which the Loss measure is used, but applies equally to Section 6(e)(i)(3). A payment will therefore only become due to the Defaulting Party if and insofar as it represents a gain to the Non-defaulting Party resulting from its being relieved of a disadvantageous contract.

30. I think Mr. Hapgood was right in saying that when one is seeking to determine what outcome is broadly contemplated by the Agreement when Market Quotation is used in the calculation of the Settlement Amount and hence the amount payable under Section 6(e)(i)(3) some assistance can be derived from Section 6(e)(i)(4) which is concerned with the alternative calculation based on the Loss payment measure. I say that because Loss is defined in terms which make it clear that loss of bargain is one of the principal heads of damage intended to be covered and both Section 6(e)(i)(3) and Section 6(e)(iv) indicate that the Market Quotation measure and the Loss measure are intended to lead to broadly the same result. My attention has also been drawn to Australia and New Zealand Banking Group Ltd v Société Général (Court of Appeal, 29th February 2000, unreported) in which the Court of Appeal considered the definition of Loss in this form of Agreement with reference to certain hedging contracts. The details of the case do not matter for present purposes, but it is interesting to note that Mance L.J., with whose judgment the only other member of the court, Kennedy L.J., agreed, also considered that the Market Quotation measure and the Loss measure were intended to lead to broadly the same result. If the parties had chosen to adopt the Loss measure for these purposes the primary element in Robinson's calculation would have been the gain represented by being relieved of the obligation to perform the contract. In this case the termination of the transaction has relieved Robinson from the performance of an obligation whose present nominal value is US$87.3 million. When assessing damages for the loss of a bargain one does not normally discount its nominal value for the chance that the obligor will fail to perform and I can see nothing in the definition of Loss to suggest that a different approach is called for under this Agreement. By normal standards, therefore, the present value of its obligation, US$87.3 million, reflects the amount Robinson has gained by being relieved of the requirement to perform its obligations and I find it difficult to accept that it has gained only to the extent that it might actually have been capable of performing those obligations. If Robinson were financially strong, it is likely that Market Quotation would have produced a Settlement Amount somewhere near that figure, although there would presumably always have been some discount for contingencies.

31. Mr. Milligan submitted, however, that even applying the Loss measure Robinson's gain was far less that the full nominal value of the obligation. He submitted that allowance should be made for the cost of funding an immediate payment of US$87.3 million which would itself cost Robinson a total of US$71.436 million because of its poor credit rating. That, he said, reduced Robinson's net gain to a little under US$15.9 million.

32. I am unable to accept that argument. I think it is clear both from the language of the definition itself and from the wider context of the Agreement that the definition of Loss is directed to identifying the loss which a party has suffered as a result of the termination of the transaction or transactions in question and is not concerned with the steps which a party may take to fund any payment required pursuant to Section 6(e). Loss is simply one step on the road which leads to the

assessment of the amount payable by one party to the other in respect of Early Termination. It must be remembered that in many cases an Event of Default will result in the termination of several transactions between the same parties and the calculation by the Non-defaulting Party of his overall loss or gain may call for an analysis of the position under each one. The definition of Loss is in my view intended to go some way towards identifying the heads of loss which can properly be taken into account when analysing the position under any one transaction. It has nothing to do with the means by which the amount, if any, ultimately payable by the Non-defaulting Party to the Defaulting Party is funded.

33.  In these circumstances I think Mr. Hapgood is right in saying that in the present case the Market Quotation measure and the Loss measure yield significantly different results when calculating the amount to be paid by Robinson to Peregrine. Is that something which is consistent with the wider objects of the Agreement? I do not think it is. This case is far from being typical of those to which these provisions are likely to apply. Only one transaction between these two parties has been affected by the Early Termination provisions of Section 6 and that transaction is itself far from being a typical swap transaction. Moreover, the discrepancy between the results produced by adopting these different measures results from an unusual combination of factors, namely, the extreme financial weakness of the Non-defaulting Party and an Event of Default brought about by the party which was not simply the party "in the money" but which had already performed the whole of its side of the bargain.

34.  With this in mind I turn again to the language of Section 6(e)(i)(3) and thence to the definition of "Settlement Amount". The critical words are

"Settlement Amount" means . . . . . the sum of:-

(a) the [US dollar] Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction . . . . . . . . for which a Market Quotation is determined;

and

(b) such party's Loss . . . . . . . . . . for each Terminated Transaction . . . . . for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result."

35.  The first thing to notice is that the Agreement here recognises that it may be appropriate to adopt the Loss measure even in a case where a Market Quotation could be obtained. The second is that the definition itself recognises that there may be circumstances in which the Market Quotation measure will not operate satisfactorily. This provides further support for the proposition that Loss as defined in the Agreement provides a benchmark by reference to which the Market Quotation measure should be judged. It is clear, however, that whether Market Quotation would or would not produce a commercially reasonable result is a matter of judgment and is a matter to be determined by the Non-defaulting Party. Mr. Milligan submitted that the option to move to the Loss measure had no application once a Market Quotation had been obtained. He submitted that paragraph (a) of the definition of Settlement Amount makes it clear that if a Market Quotation has been obtained, the situation contemplated by paragraph (b) cannot arise and the calculation proceeds automatically in accordance with the prescribed formula. The use of the words "would not" in the phrase "would not produce a commercially reasonable result", which pointed to the obtaining of a Market Quote at some time in the future, should therefore be read as meaning "would not, if obtained, produce a commercially reasonable result". It follows, he submitted, that,

once obtained, a Market Quotation necessarily produced a commercially reasonable result.

36.    I am unable to accept this submission which in my view fails to give sufficient weight to the underlying objective of Section 6(e). There are various circumstances in which a Market Quotation may not produce a commercially reasonable result, some of which were canvassed in argument, and paragraph (b) of the definition of Settlement Amount recognises that that is so. If, when he comes to determine the Settlement Amount, the Non-defaulting party already believes that to be the case, he is relieved of the need to obtain a Market Quotation, but at that time he may be unaware of the existence of circumstances which would cause it to have that effect. Alternatively, he may be unaware of the extent to which factors of which he is generally aware will influence the market. Or again, he may not have fully in mind all the factors which he ought to take into account when forming an opinion about whether the result would be commercially unreasonable. For my own part I think the phrase "would not produce a commercially reasonable result" can equally well be construed as meaning "would not, if used, produce a commercially reasonable result". If that is so, the obtaining of a Market Quotation as contemplated by paragraph (a) does not inevitably preclude the use of the Loss measure in the circumstances contemplated by paragraph (b). Such a construction is in my view more conducive to the object of the Agreement which is to assess with reasonable accuracy the loss or gain to the Non-defaulting party as a result of the termination of the transaction. I see no reason why the parties should be taken to have agreed that they should in effect be bound by the decision of the Non-defaulting Party to seek a Market Quotation even if, for some reason which that party failed to appreciate at the time, it would produced an obviously unreasonable result and I can find nothing in the language of the Agreement which compels me to that conclusion.

37.    I come next to the question whether the use of a Market Quotation would in fact produce a commercially unreasonable result in this case and, if so, what if any steps can be taken by Peregrine to challenge the calculation by Robinson of the amount payable under Section 6(e)(i) of the Agreement. As to the first of these, although I am aware that commercial men are generally by far the best judges of what is and is not commercially reasonable, I am satisfied that the use of Market Quotation would not produce a commercially reasonable result in this case. This is a matter which has to be judged not simply by reference to the interests of one or other party but by reference to the aims and objects of the Agreement insofar as they are to be gathered from its terms as a whole. Adopting that approach it seems to me that where Market Quotation produces a result as far removed from that which would be produced by the use of the Loss measure as it does in this case it is possible to say with some confidence that the result is commercially unreasonable by the standards of the Agreement.

38.    That of itself is not enough, however. The Non-defaulting Party is responsible for determining the Settlement Amount and the Agreement provides for the use of the Loss measure only if Market Quotation would not, in the reasonable belief of that party, produce a commercially reasonable result. The court cannot, therefore, simply substitute its own judgment of what is commercially reasonable for that of the Non-defaulting Party. However, I do think that the Agreement by necessary implication requires the Non-defaulting Party to consider whether the Market Quotation measure would produce a commercially reasonable result and to adopt the Loss measure instead if it does not believe that it would. Moreover, there is some protection for the Defaulting Party in the fact that the view taken by the Non-defaulting Party must be "reasonable", that is, it must be based on reasonable grounds. That in turn requires that it must be one which can reasonably be held taking into account all the factors which ought properly be taken into account. In many cases there may well be room for different opinions, but in others it may be possible to say that a view one way or the other cannot reasonably be justified. If in such a case the Non-defaulting Party acted on the basis of a view of the matter which could not reasonably be justified, the Defaulting Party

would in my view be entitled to relief on the basis that the adoption of the wrong measure in determining the Settlement Amount would amount to a breach of the Agreement.

39. Leaving aside cases where there is or may be a lack of honest belief, when the court is asked to decide in a case of this kind whether a person has acted in breach of contract it should in my view adopt a similar approach to that taken in the well-known case of Associated Provincial Picture Houses Ltd v Wednesbury Corporation [1948] 1 K.B. 223. It should not regard any act done by him honestly and in good faith as unjustified or involving a breach of contract unless it is clear that the belief in which he acted was flawed in one of the ways identified in that case. Mr. Hapgood submitted that the established approach to judicial review of discretionary decisions represented by the Wednesbury case was the proper approach in a case of this kind and Mr. Milligan did not disagree. In order for Peregrine to challenge the calculation of the amount payable under Section 6(e)(i)(3), therefore, it is necessary for it to show that the decision to use a Market Quotation for the purpose was flawed in the sense I have just indicated. It has been agreed in this case that Robinson believes that the use of the Market Quotation measure has produced a commercially reasonable result and it has not been suggested that that belief is not honestly held. However, in reaching that conclusion I do not think that Robinson can have taken proper account of the various terms of the Agreement to which I have referred, to the gain which accrued to it as a result of its having been relieved of the obligation to perform its contract or to the purpose behind the calculation of the Settlement Amount. It must also have failed, in my judgment, to take proper account of the discrepancy both between the nominal value of the obligation and the amount payable under Section 6(e) which is produced by using the Market Quotation measure, and also the substantial difference between the amount payable to Peregrine under Section 6(e) produced by using the Market Quotation measure and that produced by using the Loss measure. These are all factors which ought to be taken into account when considering whether the result is commercially reasonable by the standards of the Agreement and I do not think that anyone who had taken them into account could have formed the view that the use of Market Quotation in this case would produce a commercially reasonable result. In these circumstances I do not think that Robinson's belief was one which a reasonable person in its position, properly directing himself in accordance with the Agreement, could hold. In adopting the Market Quotation measure for the purposes of calculating the Settlement Amount rather than the Loss measure, therefore, Robinson acted in breach of the Agreement.

40. I therefore answer the questions set out in the claim form as follows:

(1) 'Yes';

(2) 'No';

(3) 'Yes';

(4) 'Loss is to be determined as the claimant contends and in accordance with the principles set out in this judgment';

(5) 'No'.

© 2000 Crown Copyright

URL: *http://www.bailii.org/ew/cases/EWHC/Comm/2000/99.html*