**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
VCG SPECIAL OPPORTUNITIES          :
MASTER FUND LIMITED,             :     **08 CV 01563 (BSJ)(KNF)**
                                  :
                Plaintiff,      :     **ECF CASE**
                                  :
        - against -         :
                                  :
CITIBANK, N.A.,                   :
                                  :
               Defendant.     :
----------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION**
**OF DEFENDANT CITIBANK, N.A. FOR JUDGMENT ON THE PLEADINGS**

MINTZ & GOLD LLP
Steven G. Mintz
Terence W. McCormick

470 Park Avenue South
10th Floor North
New York, New York 10016-6819
Tel:   (212) 696-4848
Fax:  (212) 696-1231

*Attorneys for Plaintiff*
*VCG Special Opportunities*
*Master Fund Limited*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ................................................................................ 3

ARGUMENT ................................................................................................... 14

I.    THE COMPLAINT STATES A CAUSE OF ACTION ARISING OUT OF
CITIBANK'S IMPROPER DEMANDS FOR CREDIT SUPPORT ........................ 15

    A.    The Confirmation Letter Does Not Authorize Demands for Credit
Support After the Posting of the Independent Amount ................................ 15

    B.    Even if Citibank's Claims for Credit Support Were Permissible
Under the ISDA Master Agreement, the Complaint States a Cause
of Action for Breach of Contract .................................................... 18

        1.    The Complaint Adequately Alleges that Citibank Breached the
Swap Agreement by Improperly Valuing the Reference
Obligation ................................................................................ 18

        2.    Citibank's Self-Serving Valuation of the Reference Obligation
Was Commercially Unreasonable and Undertaken in Bad Faith ........... 19

    C.    VCG's Remedy for Citibank's Improper Margin Practices Has Been
Neither "Waived" Nor "Mooted" .................................................. 22

II.    CITIBANK WAS NOT ENTITLED TO TERMINATE THE
SWAP BECAUSE NO FLOATING AMOUNT EVENT EVER
TOOK PLACE ................................................................................ 23

III.    VCG HAS STATED A CLAIM FOR RESCISSION ................................ 27

IV.    VCG HAS STATED A CLAIM FOR BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING ........................ 30

V.    VCG HAS STATED VALID CLAIMS FOR UNJUST
ENRICHMENT AND CONVERSION .................................................. 32

VI.    CITIBANK IS NOT ENTITLED TO JUDGMENT IN ITS FAVOR
ON ITS COUNTERCLAIM FOR BREACH OF CONTRACT ................ 33

CONCLUSION ............................................................................................... 38

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Albert Elia Building Co. v. American Sterilizer Co.*,
622 F.2d 655 (2nd Cir. 1980) .................................................................................. 28

*American Woolen Co. of N.Y. v. Samuelsohn*,
226 N.Y. 61, 123 N.E. 154 (1919) ........................................................................ 30

*Aon Financial Products, Inc. v. Société Générale*,
476 F.3d 90 (2d Cir. 2007) .............................................................................. 4, 16

*Bell Atlantic Corp. v. Twombly*,
– U.S. – , 127 S.Ct. 1955 (2007) ................................................................ 14, 18, 27

*BGW Develop. Corp. v. Mount Kisco Lodge No. 1552*,
247 A.D.2d 565, 669 N.Y.S.2d 56 (N.Y. App. Div. 2nd Dep't),
*lv. denied*, 92 N.Y.2d 813, 704 N.E.2d 227, 681 N.Y.S.2d 474 (1998) ............ 29, 30

*Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.*,
873 F. Supp. 808 (S.D.N.Y. 1994) ........................................................................ 31

*Chimart Assocs. v. Paul*,
66 N.Y.2d 570, 498 N.Y.S.2d 344 (1986) .............................................................. 28

*Curtis Properties Corp. v. Grief Companies*,
236 A.D.2d 237, 653 N.Y.S.2d 569 (N.Y. App. Div. 1st Dep't 1997) .................... 33

*Dalton v. Educational Testing Services*,
87 N.Y.2d 384, 663 N.E.2d 289, 639 N.Y.S.2d 977 (1995) .............................. 31, 37

*Dargahi v. Hymas*,
No. 05 Civ. 8500 (BSJ), 2007 WL 2274861 (S.D.N.Y. Feb. 9, 2007) .................... 14

*Desiano v. Warner-Lambert & Co.*,
467 F.3d 85 (2d Cir. 2006) ................................................................................... 14

*EBC I, Inc. v. Goldman Sachs & Co.*,
5 N.Y.3d 11, 799 N.Y.S.2d 170 (2005) ................................................................. 32

*Enron Power Marketing, Inc. v. Nevada Power Co.*,
    No. 03 Civ. 9318 (BSJ), 2004 WL 2290486 (S.D.N.Y. Oct. 12, 2004) .................. 37

*Feigen v. Advance Capital Management Corp.*,
    150 A.D.2d 281, 541 N.Y.S.2d 797 (N.Y. App. Div. 1st Dep't),
    *lv. dismissed in part and denied in part*,
    74 N.Y.2d 874, 547 N.Y.S.2d 840 (1989) ............................................................... 33

*Goldman v. Metropolitan Life Ins. Co.*,
    5 N.Y.3d 561, 807 N.Y.S.2d 583 (2005) ............................................................... 32

*Gross v. Empire Healthchoice Assurance, Inc.*,
    16 Misc. 3d 1112(A), 847 N.Y.S.2d 896,
    2007 WL 2066390 (Sup. Ct. N.Y. Co. 2007) ........................................................ 31

*Gulf Ins. Co. v. Transatlantic Reinsurance Co.*,
    13 A.D.3d 278, 788 N.Y.S.2d 44 (N.Y. App. Div. 1st Dep't 2004) ........................ 29

*High Risk Opportunities Hub Fund, Ltd. v. Credit Lyonnais and Société Générale*,
    Index No. 600229/2000 (Sup. Ct. N.Y. Co. July 6, 2005) ................................ 19, 35

*Kirke La Shelle Co. v. Armstrong Co.*,
    263 N.Y. 79, 87, 188 N.E. 163 (1933) ................................................................... 30

*Koam Produce, Inc. v. DiMare Homestead, Inc.*,
    329 F.3d 123 (2d Cir. 2003) ........................................................................... 27, 29

*Kraft Foods, Inc. v. All These Brand Names, Inc.*,
    213 F. Supp. 2d 326 (S.D.N.Y. 2002) .................................................................... 28

*Lanni v. Smith*,
    89 A.D.2d 782, 453 N.Y.S.2d 497 (4th Dep't 1982) ............................................... 16

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*,
    507 U.S. 163 (1993) ............................................................................................... 27

*Libasssi v. Chelli*,
    206 A.D.2d 508, 615 N.Y.S.2d 77 (N.Y. App. Div. 2nd Dep't 1994) ..................... 29

*Loyalty Life Ins. Co. v. Fredenberg*,
    214 A.D.2d 297, 632 N.Y.S.2d 901 (N.Y. App. Div. 3rd Dep't 1995) .................... 28

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*,
    41 A.D.3d 269, 838 N.Y.S.2d 536 (N.Y. App. Div. 1st Dep't 2007) ...................... 31

*Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland*,
    768 F. Supp. 115 (S.D.N.Y. 1991) ................................................................. 29

*NCR Corp. v. Lemelson Medical, Education and Research Foundation*,
    No. 99 Civ. 3017 (KFN), 2001 WL 1911024 (S.D.N.Y. 2001),
    *aff'd*, 33 Fed. Appx. 7 (2nd Cir. 2002) ...................................................... 28

*Outback/Empire I, Partnership v. Kamitis, Inc.*,
    35 A.D.3d 563, 825 N.Y.S.2d 747 (N.Y. App. Div. 2nd Dep't 2006) ............... 30, 31

*Patel v. Contemporary Classics of Beverly Hills*,
    259 F.3d 123 (2d Cir. 2001) ...................................................................... 27

*Peregrine Fixed Income Limited v. Robinson Dep't Store Public Company Limited*,
    [2000] EWHC (QB) Commercial 99 (Eng.) ...................................................... 34, 35

*Richbell Information Services, Inc. v. Jupiter Partners, LP*,
    309 A.D.2d 288, 765 N.Y.S.2d 575 (N.Y. App. Div. 1st Dep't 2003) .............. 31, 32

*Rowe v. Great Atlantic & Pacific Tea Co.*,
    46 N.Y.2d 62, 412 N.Y.S.2d 827 (1978) .................................................... 30

*Ruiz v. Chwatt Associates*,
    247 A.D.2d 308, 669 N.Y.S.2d 47 (N.Y. App. Div. 1st Dep't 1998) ...................... 15

*Sergeants Benevolent Association Annuity Fund v. Renck*,
    19 A.D.3d 107, 796 N.Y.S.2d 77 (N.Y. App. Div. 1st Dep't 2005) ........................ 33

*SportsChannel Assoc's v. Sterling Mets, L.P.*,
    25 A.D.3d 314, 807 N.Y.S.2d 61 (N.Y. App. Div. 1st Dep't 2006) ........................ 15

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) .......................................................................... 14, 27

*Trans Pacific Leasing Corp. v. Aero Micronesia, Inc.*,
    26 F.Supp.2d 698 (S.D.N.Y. 1998) ............................................................ 15

*Travellers Intern., A.G. v. Trans World Airlines, Inc.*,
    41 F.3d 1570 (2d Cir. 1994) ...................................................................... 37

*Ungewitter v. Toch*,
  31 A.D.2d 583, 294 N.Y.S.2d 1013 (N.Y. App. Div. 1968),
  *aff'd*, 26 N.Y.2d 687, 308 N.Y.S.2d 858 (1970) ..................................................... 29

*Zuccarini v. Ziff-Davis Media, Inc.*,
  306 A.D.2d 404, 762 N.Y.S.2d 621 (N.Y. App. Div. 2nd Dep't 2003) ................... 33

## Statutes and Other Authorities

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 14

Fed. R. Civ. P. 12(c) ................................................................................................ 14, 27

22 N.Y. Jur.2d Contracts § 254 .................................................................................... 16

Restatement (Second) of Contracts § 151 .................................................................... 28

Restatement (Second) of Contracts § 153 .................................................................... 28

Restatement (Second) of Contracts §203(d) ................................................................ 15

Restatement (Second) of Contracts § 237 .................................................................... 23

John P. Doherty and Richard F. Hans, *The Changing Landscape of Subprime Litigation*,
14 No. 6 Andrews Derivatives Litig. Rep. 2 (Feb. 4, 2008) ........................................ 18

# PRELIMINARY STATEMENT

This case is about Citibank's use of its immense leverage to extort from the plaintiff millions of dollars in collateral to which Citibank was never entitled. Citibank then seized the collateral under the pretext that a credit default had occurred in its underlying swap transaction with the plaintiff. Citibank committed this act of commercial piracy because, like many other major banks, its portfolio of investments was weighted down with billions of dollars of subprime mortgage debt. By squeezing every penny it could from its counterparties (such as plaintiff, a small hedge fund), Citibank sought to minimize the amount of the write-downs it would have to announce to Wall Street as the result of its exposure in the credit markets.

This action presents several issues of first impression concerning the industry-wide rights and obligations of counterparties in credit derivative transactions governed by, *inter alia*, the standard form "Master Agreement" and Credit Support Annex designed by the International Swaps and Derivatives Association, Inc. ("ISDA"). A parallel action between the plaintiff and Wachovia Bank, N.A., is currently pending in this District before Hon. Laura Taylor Swain, *U.S.D.J.*, and presents similar issues.[1] It is significant that in the *Wachovia* matter, Magistrate Judge Peck earlier this month rejected Wachovia's challenges to a number of discovery requests regarding Wachovia's conduct with respect to similarly situated swap counterparties.[2] By the same token, the complaint

---

[1] That action, also brought by the plaintiff in this case, is pending under the caption *CDO Plus Master Fund Ltd. v. Wachovia Bank*, 07 Civ. 11078 (LTS)(AJP).

[2] Significantly, Judge Peck ruled that VCG would be entitled to obtain evidence tending to show that the bank in that case was engaged in bad faith and/or commercially unreasonable behavior in demanding payments under the swap, including evidence of its dealings with similarly situated swap counterparties.

in this action presents important questions of fact and industry practice that do not lend themselves to summary disposition.

Citibank simply contrived to call in collateral on the swap even though the confirmation letter governing the swap did not authorize any such demand, *i.e.,* other than a one-time deposit of collateral that plaintiff delivered on the closing of the trade. Furthermore, even if the form ISDA documents that accompanied the confirmation letter entitled Citibank to collect collateral during the life of the transaction – which plaintiff disputes – Citibank nevertheless grossly undervalued the reference security of the transaction in order to inflate the amount of collateral that it could demand from plaintiff. Having locked plaintiff into the swap and obtained substantial leverage through the collection of the initial margin deposit, Citibank gradually squeezed almost the full amount of the trade from the plaintiff through subsequent collateral demands, closed out the trade and effectively stole $10,000,000.  In essence, Citibank rode out the debt crisis of 2007 on the back of a far less powerful counterparty.  In so doing, Citibank breached the contract, entitling plaintiff to suspend its performance and seek rescission of the swap.  While Citibank would like the Court to believe that this case "boils down to a simple contract dispute," in reality it is much more than that: it is a rare occasion on which a federal court may pry open the lid on certain sharp practices in the banking industry – a factually intense inquiry that Citibank would dearly like to foreclose.

---

Judge Peck authorized discovery into, for example, "[a]nything that is corporate-wide, that is to say a memo from the board of directors to whatever department is in charge of these, that says let's get more security whatever the contracts say or anything along those lines."  Citibank has already signaled to this Court that it will fight any such discovery tooth and nail.

## THE FACTS

### *The Millstone Credit Default Swap*

Plaintiff, VCG Special Opportunities Master Fund Limited, which was formerly known as CDO Plus Master Fund Ltd., (hereafter, "VCG") is a hedge fund with approximately $50,000,000 of capital under management. (Complaint at ¶9). Effective as of June 29, 2007, VCG entered into a credit default swap transaction with Citibank by which VCG sold Citibank credit protection against the risk of a credit default by a collateralized debt obligation ("CDO") up to a maximum of $10,000,000. (Complaint at ¶10). CDOs are a form of securitization. CDOs are typically structured as several classes of asset-backed notes, having a prescribed priority of entitlement to payments of interest and principal, and are secured by the expected future stream of interest and principal generated by an underlying pool of loans. The relevant CDO in this action is the Millstone III CDO Ltd. III-A (the "Millstone CDO").

A credit default swap, or "CDS," is a derivative contract in which Party A (the "protection buyer," which in this case was Citibank) transfers to Party B (the "protection seller") the default risk of a particular third-party debt obligation. Here, the protection seller is the plaintiff, VCG. The protection buyer pays a fee (called a "Fixed Payment"), which is a percentage of a certain dollar amount (the "notional amount") of the principal of an underlying debt obligation, such as a bond, note or, in this case, the Class B Notes of the Millstone CDO. (Complaint at ¶11, 12). In swap terminology, the Millstone CDO is called the "reference entity" and the Class B Notes, which constitute the particular default risk transferred under the swap, are referred to as the "reference obligation."

3

In return for receiving Fixed Payments, the protection seller (VCG) undertakes the default risk of the reference obligation, *i.e.*, it agrees to pay all or a portion of the unpaid obligation – up to the notional amount – to the protection buyer if certain credit events take place during the term of the swap. In such an event, the sums due to the protection buyer are called "Floating Payments." Sometimes the protection buyer in a CDS requires the seller to deposit collateral at the time of contracting to secure the protection buyer against the risk that the protection seller will not be in a position to make the Floating Payments. This collateral is called the "Independent Amount," or "initial margin."

The specifically negotiated terms of the swap, including the Fixed Payments, the Independent Amount and the conditions under which Floating Payments may become due and payable are set forth in the principal contract document of the CDS, which is the confirmation letter exchanged between the counterparties at the time the trade is executed. In this case, the Citibank confirmation letter, dated July 5, 2007 (the "Confirmation Letter") set the rate of Fixed Payments owed to VCG in the amount of 5.50% per annum of the notional amount of $10,000,000 of the Class B Notes of the Millstone CDO. A copy of the Confirmation Letter is annexed as Exhibit 1 to the accompanying Declaration of Terence W. McCormick ("McCormick Decl."). The Notes of the Millstone CDO were issued pursuant to an Indenture dated July 5, 2006.[3] (Complaint at ¶12).

---

[3] Sometimes the protection buyer in a swap does not even own the underlying reference obligation. Rather, the counterparties simply trade in, or "hedge," the CDO's credit risk. *Aon Fin'l Products, Inc. v. Société Générale*, 476 F.3d 90, 96 (2d Cir. 2007). The swap is not a contract of indemnity, but an instrumentality to shift default risk. Thus, the amount of the debt obligation upon which the fixed fee is calculated (which

Thus, if the Class B Notes experience certain credit events amounting to a credit default, VCG has to pay Citibank a Floating Payment up to $10,000,000 of the notional amount. In this respect, a credit default swap bears some similarities to an insurance policy.[4]

The other contract documents governing the counterparties' rights and obligations under the swap are the standard pre-printed 2002 version of the Master Agreement of the International Swaps and Derivatives Association ("ISDA"), dated September 1, 2006 (the "ISDA Master Agreement"), the Schedule to the ISDA Master Agreement, dated as of September 1, 2006, and the standard 1994 ISDA Credit Support Annex (Bilateral Form – ISDA Agreements Subject to New York Law). In addition, the Confirmation Letter incorporates the 2003 ISDA Credit Derivatives Definitions and the ISDA Standard Terms Supplement for use with Credit Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement (the "Standard Terms Supplement"). (Complaint at ¶13). Copies of the ISDA Master Agreement, the Schedule thereto, the Credit Support

---

is the amount up to which the seller agrees to undertake exposure in the event of a credit default in return) is termed the "notional" amount.

[4] The earlier, more traditional forms of derivative transactions included derivatives such as "interest rate swaps," or "currency swaps," in which each party traded streams of cash flows. Thus, under a "plain vanilla interest rate swap," the owner of a fixed-rate debt interest instrument would trade the payments on the notional amount of a loan having a fixed interest rate for floating rate payments (*e.g.*, based on the London Interbank Offering Rate, or LIBOR). So, if a corporation has borrowed money at a floating rate of interest but would prefer to lock in at a fixed rate, it can "swap" its floating rate payments into fixed rate payments, provided it can find a willing counterparty to swap the corresponding "Floating Payments." The two interest streams net out against each other and, depending upon the movement in interest rates, one counterparty or the other will receive the difference at the end of a given interest period. Credit default swaps are somewhat akin to traditional swaps in that the protection buyer pays a fixed percentage of the notional amount to the protection seller (Fixed Payments), but instead of netting Fixed Payments against Floating Payments in each period, the protection buyer receives a promise to pay the full outstanding notional amount if the debt instrument experiences a credit event. Credit default swap documents use the same terminology to describe the amount due from the protection seller, calling it a Floating Payment, except in the case of a credit default swap, the term "Floating Payment" is something of a misnomer. Under a credit default swap, the protection seller only pays the Floating Payment if the reference obligation defaults, not periodically as under other forms of credit derivative transactions.

Annex and the Standard Terms Supplement are annexed to the McCormick Declaration

as Exhibits 2, 3, 4 and 5, respectively.

Of critical importance, by the terms of the foregoing documents, in the event of

any inconsistency between the Confirmation Letter and the ISDA Master Agreement

(which includes the Credit Support Annex), ***the terms of the Confirmation Letter***

***control***.  (Complaint at ¶14).

The ISDA 2002 Master Agreement provides, in pertinent part:

(b) ***Inconsistency***. In the event of any inconsistency between  provisions of
the Schedule and the other provisions of this Master Agreement, the
Schedule will prevail.  In the event of any inconsistency between the
provisions of any Confirmation and this Master Agreement, such
Confirmation will prevail for the purpose of the relevant Transaction.

*See* McCormick Decl., <u>Exhibit 2</u> at p.1.

*Part One of the Controversy: Initial Margin versus Variation Margin*
<u>*and Floating Payments*</u>

As stated above, sometimes (but not always), the protection buyer requires the

protection seller to deposit collateral (the Independent Amount) at the time of the trade as

a condition to entering into the swap.  In this case, the Independent Amount was

identified in the Confirmation Letter, and was also referred to in the ISDA Credit Support

Annex.  The sole purpose of the Independent Amount is to secure the protection buyer

against ***counterparty risk***, *i.e.*, the possibility that the protection seller might not be good

for the money if the reference obligation (the Class B Notes) actually experiences one or

more specified credit events in the future.  (Complaint at ¶15).[5]

---

[5]    The initial margin may loosely be compared to the down-payment on a house.  Once the down-payment is
made, the borrower does not deposit additional security with the mortgage lender even if the value of the

Thus, when VCG and Citibank executed the swap trade, VCG paid Citibank the negotiated Independent Amount of $2,000,000, or 20% of the $10,000,000 notional amount of the swap.  (Complaint at ¶15, 19).

Unlike the CDS negotiated between VCG and Citibank, some swaps allow the protection buyer to demand additional collateral, *i.e.*, after the Independent Amount. Such an arrangement would be appropriate if the confirmation letter governing the swap transaction contained an express undertaking on the part of the protection seller to bear more than simply the default risk of the reference obligation.  In such cases, the additional collateral is referred to as "<u>Eligible Credit Support</u>," or "<u>variation margin</u>," and is based upon a downward movement in the daily mark-to-market value of the underlying reference obligation.  (Complaint at ¶18).

"Mark-to-market" is a term of art in the financial and accounting industries.  When an institution marks an asset to market, it assesses and records on its books a change in the asset's value since the last time a valuation took place, whether the gain (or loss) is realized or not.  Where the asset is actively traded on a given market, current values can be assessed on a daily basis and the asset may be marked-to-market at the close of trading every day.   In that case, the mark-to-market is based upon independent pricing data (*i.e.*, the last price at the close of trading on a given day when the markets are open). However, if the asset is illiquid, the process will not necessarily take place on a daily

---

house rises or falls during the term of the loan.  VCG asserts that the same concept applies to the credit default swap.

basis, and it will require resort to other methods of valuation, which may not be as
objective – or reliable.

Under the Confirmation Letter, the only payments that Citibank may demand from
VCG *after* the initial margin are Floating Payments, and then ***only*** on the basis of a good
faith determination by the Calculation Agent (which in this case is Citibank) that a
"Floating Amount Event" had taken place: (i.) the obligor on the reference obligation (the
Millstone CDO) had failed to make a required principal payment to the holders of the
Class B Notes, (ii) an interest shortfall had taken place, or (iii) a write-down had taken
place under the reference obligation's governing instrument (the Indenture).  However,
Citibank may ***not*** demand a Floating Payment on the basis of the perceived
creditworthiness of the counterparty (VCG).[6]  (Complaint at ¶16).  ***That*** issue is resolved
at the time when the parties negotiate the Independent Amount.  If collateral may be
demanded after the Independent Amount – and VCG disputes that it can be under the
contract it made with Citibank – any such collateral could only be based upon an
objective, good faith measure of the credit risk of the reference obligation and not on the
basis of any perceived risk concerning the protection seller.

Apart from the initial margin, Floating Payments and credit events not at issue
here, the Confirmation Letter does not otherwise authorize Citibank to demand collateral

---

[6]    There is another scenario, not at issue in this case, whereby a counterparty that buys credit default
protection may declare a "Credit Event" to have taken place and require early settlement of the trade.  Such
an instance would include, in addition to a write-down, or a failure to pay interest or principal, an event
where one or more rating agencies downgrade the reference obligation below a certain threshold or
otherwise withdraw their assigned rating (a "Distressed Ratings Downgrade").

or payments of any kind to secure Citibank against changes in the valuation of the reference obligation during the life of the swap. (Complaint at ¶17).

### *Citibank Squeezes VCG for More Money*

Within less than a month of the CDS trade, on August 1, 2007, Citibank demanded additional collateral in the amount of $2,133,400.17 – even though the Confirmation Letter identified no such obligation on the part of VCG – resulting in a total collateralization of over 40% of the notional amount of the swap. Citibank then ratcheted up its demands for margin over the weeks that followed:

| Date | Amount |
| --- | --- |
| July 3, 2007 | $2,000,000 (initial margin) |
| August 1, 2007 | $2,133,400.17 |
| August 23, 2007 | $2,064,534.14 |
| September 4, 2007 | $1,686,854.00 |
| November 5, 2007 | $2,075,489.47 |

In sum, over a period of five months Citibank demanded, and VCG paid, $9,960,277.78 – as compared to a total credit risk of $10,000,000 from an investment-grade debt instrument. (Complaint at ¶21). However, during the entire period described in the table above, the reference obligation (the Class B Notes) had not experienced any shortfall in principal or interest payments whatsoever. (Complaint at ¶22). Similarly, during the same period, no write-down had taken place such that VCG could properly have been required to make any payment to Citibank. (Complaint at ¶23).

Under paragraph 7(b) of the Standard Terms Supplement (which is incorporated in the Confirmation Letter), Citibank, as calculation agent, was obliged to determine VCG's

9

obligation to pay Floating Payments **solely** upon the basis of a report of the servicer of the Millstone CDO.  (Complaint at ¶24).  While VCG delivered the sums requested by Citibank, commencing around August 20, 2007, VCG repeatedly questioned Citibank's mark-to-market calculation of the credit risk of the reference obligation.  (Complaint at ¶25).  While VCG believed it was not obligated to pay the sums demanded by Citibank, it did so because it was concerned that Citibank might seize upon VCG's refusal to post variation margin as an excuse to declare a technical default and seize VCG's collateral – which ultimately, Citibank did.  (Complaint at ¶26).  On each such occasion, Citibank failed to provide the requested information, but instead continued to demand additional credit support.  (*Id*. at ¶27).

On or about December 19, 2007, Citibank forwarded a copy of the servicer's report for the monthly period of October 31, 2007 to November 29, 2007.  (Complaint at ¶28).  The Millstone CDO servicer's report revealed that no Floating Amount Event had yet taken place such that VCG should have been required to make a Floating Payment. Nor had any downgrade to the reference obligation been announced by the rating agencies, Standard & Poors or Moody's.  (*Id.* at ¶29).

It was not until December 26, 2007, that Citibank finally responded that it was entitled to require Eligible Credit Support pursuant to the Credit Support Annex to the ISDA Master Agreement, due to the deterioration in the mark-to-market value of the reference obligation.  (Complaint at ¶30).

Thus, Citibank did not at that time claim that an actual credit default had taken place.  Rather, Citibank confirmed that the entire amount of collateral that it had collected

from VCG represented variation margin purportedly based on its calculation of "the current mark to market of the Transaction (or 'Secured Party's Exposure')" even though Citibank conceded that, "as of last week, our calculation of this amount found that [VCG] was entitled to have $667,822.88 returned." (Complaint at ¶31). VCG thereupon demanded the return of all of the sums that it had paid after the initial margin, but Citibank only returned $667,822.88. (Complaint at ¶32).

Even if Citibank had been entitled to demand credit support *after* the Independent Amount to secure Citibank against the deteriorating credit risk of the reference obligation – which was beyond the obligations accepted by VCG in the Confirmation Letter – Citibank failed even to make a proper valuation of the reference obligation (and hence, its "Exposure"). Had it attempted an *honest* calculation of its exposure, based upon the servicer's report, as required, Citibank could never have demanded anything approaching the sums that it collected from VCG. (Complaint at ¶33).

In actuality, Citibank contrived margin calls to collect money from its counterparty so that Citibank could protect its own position in a deteriorating credit market, and/or because it was concerned about the future creditworthiness of VCG.[7] (Complaint at ¶34).

---

[7] Ultimately, on January 15, 2008, Citibank announced that it had incurred $18.1 billion in pre-tax write-downs and credit costs on sub-prime related direct exposures in fixed income markets. VCG can only guess at this point how much larger that write-down might have been had Citibank not called in collateral from VCG and an as yet unknown number of similarly situated counterparties.

*Part Two of the Controversy: Citibank Jumps the Gun and*
<u>*Declares a Credit Default*</u>

On January 9, 2008, Citibank sent VCG a "Floating Amount Event Notice," stating, in relevant part:

> This letter is notice to you that an Implied Writedown has occurred with respect to the Reference Obligation on or about January 4, 2008. The Implied Writedown Amount in respect of such Floating Amount Event is USD 10,000,000.00 (the "Floating Amount"). (Complaint at ¶35).

Put another way, Citibank announced that the insured risk had come to pass and VCG, as the seller of credit default protection, had to make good the entire amount. Citibank purportedly based its determination that an "Implied Write-down" had taken place upon an inferred under-collateralization of the Millstone CDO. Specifically, Citibank informed VCG that the entire $10,000,000 of the notional amount was due and payable on the ground that the reference obligation had failed the "overcollateralization test" set forth in the Millstone CDO's Indenture. (Complaint at ¶36).

While the Confirmation Letter recites that the concept of Implied Write-down is "applicable," a complete reading of the swap documents, in conjunction with the Millstone CDO Indenture, shows that Citibank does not have the right to demand any Floating Payments based upon an "Implied Write-down"; rather, Citibank may only require VCG to pay in the event of an actual "Write-down" to the reference obligation. (Complaint at ¶37).

According to the definition of the term "Implied Writedown Amount" provided in the Standard Terms Supplement:

"Implied Writedown Amount" means, (i) *if the Underlying Instruments*[8] *do not provide* for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, an amount determined by the Calculation Agent [Citibank] equal to the excess, if any, of the Current Period Implied Writedown Amount over the Previous Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, *and (ii) in any other case, zero.*

(Emphasis added).  (Complaint at ¶38; McCormick Decl., <u>Exhibit 5</u> at p. 19).

"Writedown," in turn, is defined in relevant part as "the occurrence at any time on or after the Effective Date of:

(A)     a writedown or applied loss (*however described in the Underlying Instruments*) resulting in a reduction in the Outstanding Principal Amount (other than as a result of a scheduled or unscheduled payment of principal); or

(B)     the attribution of a principal deficiency or realized loss (*however described in the Underlying Instruments*) to the Reference Obligation resulting in a reduction or subordination of the current interest payable on the Reference Obligation; . . . "

(Emphasis added).  (Complaint at ¶39; McCormick Decl., <u>Exhibit 5</u> at p. 23).

As demonstrated in Part II, below, the "Underlying Instruments" of the reference obligation in this case, and particularly the Millstone Indenture, do, in fact, provide for "writedowns, applied losses, principal deficiencies and/or realized losses."  (Complaint at ¶40).  Thus, any "Implied Writedown" is zero and no Floating Payment will be due. Accordingly, Citibank erroneously issued its Floating Amount Event Notice, and no credit default has taken place requiring VCG to pay the sums demanded by Citibank.

---

[8]     The Underlying Instruments of the reference obligation are the "indenture, trust agreement, pooling and servicing agreement or other relevant agreement(s) setting forth the terms of the Reference Obligation."

(Complaint at ¶41).  VCG therefore immediately disputed Citibank's assertion that a Floating Amount Event had actually taken place.  (Complaint at ¶42).

However, by letter dated January 30, 2008, Citibank notified VCG that it intended to treat VCG's refusal to pay the sums demanded as an event of default under the swap agreement.  (Complaint at ¶43).  Upon an event of default under the CDS, Citibank would immediately terminate the swap and foreclose on the collateral.  (*Id*. at ¶44).  On February 1, 2008, Citibank made good on its threat and issued a Notice of Default and Early Termination, stating that it intended to "liquidate, close out and/or otherwise exercise our rights and remedies with respect to the [ISDA] Agreement."  (*Id*. at ¶45).

## <u>ARGUMENT</u>

In deciding a motion for judgment on the pleadings under Rule 12(c), the federal courts apply the same standard that governs the determination of motions brought under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party.  *See, e.g., Desiano v. Warner-Lambert & Co*., 467 F.3d 85, 89 (2d Cir. 2006); *Dargahi v. Hymas*, No. 05 Civ. 8500, 2007 WL 2274861, *1 (S.D.N.Y. Feb. 9, 2007)(Jones, *J*.).  Accordingly, in deciding the instant motion, the Court must determine whether the complaint alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*,  – U.S. – , 127 S.Ct. 1955, 1974 (2007).  The plaintiff is not required to set forth particularized facts establishing each element of a *prima facie* case as to each cause of action, but need only provide the defendant with fair notice of the basis for the plaintiff's claims.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002).

**I.**

**THE COMPLAINT STATES A CAUSE OF ACTION ARISING OUT OF
CITIBANK'S IMPROPER DEMANDS FOR CREDIT SUPPORT**

> A.      The Confirmation Letter Does Not Authorize Demands for Credit Support
> After the Posting of the Independent Amount

The parties differ over a central economic term of the transaction. VCG asserts, and the Confirmation Letter so provides, that at the time it entered into the swap with Citibank it was selling protection ***against a credit default only***. In its motion, Citibank insists that paragraph 3 of the Credit Support Annex requires VCG to hold Citibank harmless against daily variations in the mark-to-market value of the reference obligation (marks that *Citibank* determines) by delivering a corresponding amount of credit support according to a formula driven by the Credit Support Annex. Citibank is wrong.

It is a fundamental rule of contract construction that "separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated." Restatement (Second) of Contracts §203(d). *See also Trans Pacific Leasing Corp. v. Aero Micronesia, Inc.*, 26 F.Supp.2d 698, 709 (S.D.N.Y. 1998); *SportsChannel Assoc's v. Sterling Mets, L.P.*, 25 A.D.3d 314, 314, 807 N.Y.S.2d 61, 62 (N.Y. App. Div. 1st Dep't 2006). Thus, typewritten riders to a contract control over standard, pre-printed form portions of the integrated contract. *See, e.g., Ruiz v. Chwatt Associates*, 247 A.D.2d 308, 669 N.Y.S.2d 47 (N.Y. App. Div. 1st Dep't 1998). The rationale underlying this rule is that specifically negotiated terms (such as those set forth in the Confirmation Letter) "are the immediate language and terms selected by the parties themselves for the expression of their meaning, while the printed form is intended for

15

general use without reference to particular objects and aims." *Lanni v. Smith*, 89 A.D.2d 782, 783, 453 N.Y.S.2d 497, 498 (4th Dep't 1982)(citations omitted). *See also* 22 N.Y. Jur.2d Contracts § 254.

In this case, the Confirmation Letter differs from the pre-printed, standard form ISDA Master Agreement and Credit Support Annex in that, unlike the form ISDA documentation, the Confirmation Letter sets forth the economic terms of the swap and other transaction-specific modifications to the Master Agreement. *Aon Financial Products, Inc. v. Société Générale*, 476 F.3d 90, 93 & n.4 (2d Cir. 2007)(citing Amicus Brief of International Swaps and Derivatives Association ("ISDA")). The benefit of the ISDA Master Agreement is that it enables swap counterparties to enter into multiple derivative contracts with each other, all grounded in the same document that defines the legal and credit relationship between them, subject to their right to vary particular economic obligations in the negotiated Schedule to the ISDA Master Agreement and/or the Confirmation Letter.[9]

Thus, VCG could have entered into *any number* of different swaps with Citibank, some containing a duty to deposit margin in response to daily changes in the mark-to-market of the reference obligation, and others, like the Millstone CDO swap at issue here, expressing *no* such obligation. In the former case, the collateral delivery obligations in the Credit Support Annex would have applied because that would have been consistent with the economic substance of the deal; in the latter case (like this case) they would not.

---

[9]     *See id.* (citing Introduction to the Documentation of OTC Derivatives, "Ten Themes" (May 2002) by Allen & Overy, published on the ISDA website at http://www.isda.org/educat/pdf/ten-themes.pdf).

But the same ISDA Master Agreement, including the Credit Support Annex, would still apply to all of the swaps – that is, to the extent that the Confirmation Letter (or the Schedule) of the particular swap were not otherwise inconsistent with the boilerplate terms in the ISDA Master Agreement and Credit Support Annex.

Critically, the Confirmation Letter in this case *does* explicitly provide for the payment of the Independent Amount (initial margin), in the amount of $2,000,000, to protect Citibank against its counterparty risk.  (*See* McCormick Decl. at Exhibit 1, p. 3). This term is entirely consistent with the corresponding obligation contained in paragraph 13(b)(iv)(A) of the ISDA Credit Support Annex, which cross-references and adopts the Independent Amount identified in the ***confirmation*** for each credit derivative transaction entered into by the parties.  (*See* McCormick Decl. at Exhibit 4, p. 11).  However, when it came time for the parties to negotiate the remaining economic terms of the transaction, they identified Floating Amount Events and Credit Events, but did *not* specify ongoing credit support obligations in the Confirmation Letter.  That is because VCG had agreed to undertake exposure to the ***default*** risk of the reference obligation, ***not*** exposure to its periodic fluctuations in the market (that is, to the extent an illiquid investment such as the Class B Notes could be said to experience measurable fluctuations at all).  Since the Confirmation Letter supersedes any contrary obligation in the standard form ISDA Credit Support Annex to deliver collateral after the Independent Amount, the inquiry ends right there, and the motion must be denied.

B.     Even if Citibank's Claims for Credit Support Were Permissible Under the
       ISDA Master Agreement, the Complaint States a Cause of Action for a
       <u>Material Breach of Contract</u>

1.     The Complaint Adequately Alleges that Citibank Breached the Swap
       <u>Agreement by Improperly Valuing the Reference Obligation</u>.

Even assuming *arguendo* that the Credit Support Annex were not superseded by

the Confirmation Letter, and VCG had been obligated to deposit further collateral under

the Credit Support Annex, the complaint sets forth an inherently plausible claim that

Citibank grossly undervalued the reference obligation.  Unlike publicly traded stocks and

bonds, which financial institutions and portfolio managers can mark-to-market on a daily

basis, CDOs are issued in private transactions, to accredited investors only, and are

classically illiquid instruments for which reliable market data are not always readily

available.  "CDO securities are thinly traded and, as such, there is little market data to

which one may "mark" the security; that is, buyers cannot mark the value of such

holdings to recent sales prices in a broad and efficient market ("mark to market").  John

P. Doherty and Richard F. Hans, *The Changing Landscape of Subprime Litigation*, 14

No. 6 Andrews Derivatives Litig. Rep. 2 (Feb. 4, 2008).

Accordingly, the allegation in the complaint that Citibank's demands for credit

support were invalid is more than sufficient to state a cause of action, and is not the

proper subject of a motion for judgment on the pleadings. *Bell Atlantic Corp. v. Twombly*,

127 S.Ct. at 1974.  Plaintiff intends to prove through discovery and expert testimony at

the trial of this matter that Citibank's mark-to-market throughout 2007 was persistently

implausible and therefore amounted to a material breach of the swap contract.

18

2.      Citibank's Self-Serving Valuation of the Reference Obligation Was Commercially Unreasonable and Undertaken in Bad Faith.

Citibank's demands for collateral were so unreasonable and infected by such evident bad faith as to constitute a material breach of the swap agreement.  Combined with the lack of reliable market data to support an objectively reasonable mark-to-market, Citibank's motives created the opportunity for a perfect storm.  As alleged in the complaint, Citibank was demanding margin, supposedly on the basis of deterioration in the creditworthiness of the reference obligation, at a time when the reference obligation was still an investment grade instrument.   (Complaint at ¶21).  Almost immediately after the parties entered into the swap, and over a period of five months thereafter, Citibank demanded $9,960,277.78 in collateral as compared to a total default risk of $10,000,000.  *Id*.  In essence, Citibank was telling VCG that the reference obligation was already completely worthless, even though the servicer's report for the Millstone CDO supported no such conclusion.

This part of the case will be a question of first impression for the Court.  In an analogous case, however, Justice Gammerman, formerly of the Commercial Division of the New York Supreme Court, held that when a swap counterparty obtains market quotations in support of its valuation of a derivative, it must do so in good faith.  *See High Risk Opportunities Hub Fund, Ltd. v. Credit Lyonnais and Société Générale*, Index No. 600229/2000 (Sup. Ct. N.Y. Co. July 6, 2005)(Gammerman, *J.S.C.*)(opinion

withdrawn).   A copy of Justice Gammerman's decision in *High Risk* is annexed as

Exhibit 6 to the McCormick Declaration.[10]

In *High Risk*, the derivative instruments at issue were nondeliverable forward

contracts ("NDFs"), which were based upon the exchange rate between the United States

dollar and the Russian ruble.   In *High Risk*, the parties executed an ISDA Master

Agreement and a Credit Support Annex.   Justice Gammerman held there that Credit

Lyonnais had breached the NDF contracts by improperly calculating the amounts that

Credit Lyonnais would have to pay High Risk upon early termination of the NDFs under

the ISDA Master Agreement.

Under the ISDA Master Agreement in the *High Risk* case, the mechanism for

calculating the settlement amount upon early termination of the NDF trade was

substantially the same one that would be followed under the dispute resolution provisions

of the Credit Support Annex that the parties executed in this case, *i.e.*, in cases where one

or both parties have agreed to deliver credit support following a change in the mark-to-

market of the reference obligation but disagree over the amount of credit support that

should be delivered in a given instance. [11] Specifically, both mechanisms contemplate

---

[10]     In *High Risk*, the parties stipulated to a determination of the action based upon motion papers, affidavits and documentary evidence.  Curiously, Justice Gammerman's opinion was withdrawn at the request of the parties pursuant to a settlement agreement.

[11]     Citibank makes much of the fact that VCG did not invoke the dispute resolution provision under the Credit Support Annex.  (Citibank Mem. at 24-5.)  This is a red herring.  VCG did, in fact, dispute Citibank's entitlement to demand credit support and even obtained a partial return of the collateral after doing so. (Complaint at ¶¶28-32).  But before VCG could go through the formality of invoking the dispute resolution mechanism under the Credit Support Annex (assuming *arguendo* that VCG even had an obligation to deliver collateral after the Independent Amount), Citibank pre-empted the procedure by improperly declaring a Floating Payment, then terminating the swap upon a purported Event of Default and closing out the trade.

that the calculation agent (or valuation agent) will base the determination upon quotations obtained from independent market makers.

Justice Gammerman found that Credit Lyonnais had interfered with the independence of the market makers in *High Risk*, thus manipulating the market quotation process, and had presented four market quotations that did not represent a good faith valuation of the NDFs.  On that basis, Justice Gammerman set aside Credit Lyonnais' calculations, found that High Risk was "in the money" and that Credit Lyonnais was in breach of the swap agreement with High Risk.

Accepting the allegations of the complaint as true, the Court should apply the same skepticism to Citibank's calculation of its "exposure," and hence VCG's supposed obligation to deposit credit support, that Justice Gammerman applied to the self-serving calculation of the settlement amount in *High Risk*.  Here, the complaint alleges that when Citibank was supposedly calculating its exposure under the swap and demanding credit support, Citibank **could not possibly** have made a good faith valuation of the position because its valuation was irreconcilable with the actual financial condition of the reference obligation, as reflected by the servicer's report, which should have formed the basis for any such valuation.  (Complaint at ¶33).

Rather, Citibank extorted variation margin for an entirely different purpose: to further secure itself against the perceived counterparty risk, and/or to cushion itself against the consequences of its overall exposure to the credit crunch of 2007.  (Complaint at ¶34).  Thus, the demands for Eligible Credit Support, even if otherwise permissible, were purely pretextual and were therefore made in breach of the swap agreement.  VCG,

of course, was in a very poor position to resist such demands, inasmuch as Citibank had already locked VCG into the swap as of June 29, 2007 and had collected the Independent Amount of $2,000,000 from the plaintiff.  Accordingly, VCG is entitled to proceed to discovery to establish the particulars of how and why Citibank came to demand nearly 100% collateralization for a reference obligation that never defaulted, thereby allowing it to simply steal nearly $10,000,000 soon after VCG objected.

C.    VCG's Remedy for Citibank's Improper Margin Practices Has Been Neither "Waived" Nor "Mooted"

Citibank erroneously proposes that VCG is powerless to challenge its conduct in this manner because it failed to invoke the dispute resolution mechanism of the Credit Support Annex.  (Citibank Mem. at 25).  As stated above, there would have been no point to such a procedure, since Citibank (erroneously) declared a Floating Amount Event and demanded a Floating Payment in the full notional amount of $10,000,000 before the parties had even finished discussing the issue of margin.  Moreover, the caselaw upon which Citibank relies for this proposition is utterly inapposite, inasmuch as each of the cases that it cites involved contractual dispute resolution procedures that affirmatively required resort to those procedures as a pre-condition to bringing a civil action.  No such pre-condition is to be found in paragraph 5 of the Credit Support Annex.  Accordingly, Citibank's attempt to shut the courthouse door, *nunc pro tunc*, is misleading and futile.

Citibank's fall-back position on this point is that the entire issue is "moot," inasmuch as the early termination of the trade entitled it to set off the entire notional amount against the collateral.  (Citibank Mem. at 26).  However, Citibank's extortionate

demands for credit support **prior** to its issuance of the Floating Amount Event Notice constituted a material and total breach of the agreement. From that point forward, Citibank had forfeited the ability to require VCG to perform any duties that would otherwise exist under the swap (*i.e.*, making Floating Payments), thereby justifying VCG in suspending its performance altogether and rescinding the agreement. *See* Restatement (Second) of Contracts § 237 (1981). Any other result would reward flagrantly inequitable behavior and send the wrong signal to the credit markets.

## II.

### CITIBANK WAS NOT ENTITLED TO TERMINATE THE SWAP BECAUSE NO FLOATING AMOUNT EVENT EVER TOOK PLACE

Citibank's unconscionable conduct in this matter did not stop with extortionate and unjustified demands for credit support. Soon after VCG challenged Citibank's determination that the reference obligation was essentially worthless and demanded the return of its collateral, Citibank responded by declaring a Floating Amount Event based upon a purported "Implied Writedown" to the reference obligation. (Complaint at ¶35). Upon the termination of the trade, of course, Citibank conveniently determined that the "Floating Payment" (*i.e.*, the amount by which the reference obligation would be deemed to have defaulted), was the full $10,000,000. (*See id.*).

However, Citibank's position cannot be squared with the terms of the contract or economic reality, because there was no Floating Amount Event at all. As noted above, after payment of the Independent Amount, the only sums that VCG could be required to pay Citibank were Floating Payments, based upon the occurrence of certain defaults

enumerated in the Confirmation Letter, which incorporated the Standard Terms Supplement.  They are (1) a Writedown, (2) a Failure to Pay Principal or (3) an Interest Shortfall.  (*See* McCormick Decl., ISDA Standard Terms Supplement, <u>Exhibit 5</u>, at p. 7). It is undisputed that the reference obligation has ***not*** experienced either a Failure to Pay Principal or an Interest Shortfall.  Nor has an actual Writedown taken place.  Since Citibank decided that it no longer wished to be in a risk position with regard to the reference obligation, it contrived to close out the trade and seize VCG's collateral based upon an "Implied Writedown."

As demonstrated above, the amount of an "Implied Writedown" is, by definition, zero in any case where the "Underlying Instruments" – most importantly, the Indenture – provide for writedowns, applied losses, principal deficiencies or realized losses to occur in respect of the reference obligation.  Moreover, Citibank concedes, as it must, that "[u]nder the parties' CDS Contract, an "Implied Writedown" could only occur where the Reference Obligation's Underlying Instruments did not provide for express writedowns of the Reference Obligation").  *See* Citibank Mem. at 3-4.  Unfortunately for Citibank, the Millstone CDO Indenture expressly provides at various points for writedowns, applied losses, principal deficiencies and realized losses, which are passed on directly to the reference obligation (the Class B Notes).

To begin with, the Indenture particularly defines one instance in which the securities within the Millstone CDO may be written down, thereby potentially impairing the ability of the Millstone noteholders to realize a complete payment of the sums due under the Indenture:

24

"Written Down Amount" means the sum, [sic] respect to each Written Down Security, of the amount to which the original Principal Balance of such Written Down Security is reduced as notified by or on behalf of the related issuer or trustee to the holders of such Written Down Security (including appraisal reductions on CMBS Securities).

"Written-Down Security" means any Collateral Asset (other than a Defaulted Obligation) as to which the aggregate par amount of such Collateral Asset and all other securities secured by the same pool of collateral that rank *pari passu* with or senior in priority of payment to such Collateral Asset exceeds the aggregate par amount (including reserved interest or other amounts available for overcollateralization) of all collateral securing such securities (excluding defaulted collateral).

*See* Millstone Indenture, attached as <u>Exhibit 7</u> to the McCormick Declaration, at p. 77-8.

The Millstone CDO issued several classes (or "tranches") of Notes.  Sums payable to the noteholders are allocated according to a priority of payments identified in <u>Section 11.1</u> of the Indenture (the "<u>waterfall</u>").   After the payment of taxes and certain fees owed to the CDO's Trustee and the collateral manager, regular distributions from the Millstone CDO's "Payment Account" are allocated first to the Class A-1A Notes, then to the Class A-1B Notes, then the Class A-2 Notes, then the Class B Notes (the reference obligation in this case), and so forth.  (*See* McCormick Decl. at <u>Exhibit 7</u>, pp. 181-87).

Just before payments are allocated under the waterfall, the issuer of the CDO is required to prepare a "<u>Note Valuation Report</u>," pursuant to <u>Section 10.6(a)</u> of the Indenture.  Among the other data taken into account in the Note Valuation Report are "a calculation showing the determination of the Net Outstanding Portfolio Collateral Balance" – which, in turn, takes into account "Written Down Amount" quoted above. Pursuant to <u>Section 10.6(b)</u> of the Indenture, submission of the Note Valuation Report also constitutes an instruction to the Trustee to withdraw available funds from the

25

Payment Account and distribute them according to the priority of payments established in the waterfall.

It logically follows that, if a Written Down Amount is reported, less than 100% of the original outstanding principal amount of the collateral in the pool will be available for distribution to the noteholders under the waterfall. The deficiency will be passed through in the first payment period when the sums available from the Payment Account are insufficient to make a periodic distribution. Assuming that the first tranche affected were to be the Class B Notes (and, of course, each junior tranche in the same payment period), "writedowns, applied losses, principal deficiencies or realized losses" would, by definition, occur in respect of the reference obligation. Put another way, Citibank's recitation that "Implied Writedown" is applicable in the Confirmation Letter is only the first step of the analysis; by proceeding to examine the Indenture, one finds that the Implied Writedown is, by definition, zero, and no Floating Payment is due.

Faced with this inconvenient interplay between the controlling transactional documents, Citibank offers nothing more than the peremptory assertion that "the documentation underlying CDOs *generally* does not provide for express writedowns of, or the application of realized losses to, the debt instruments issued by the CDO." Citibank purports to give substance to this pronouncement by contrasting CDOs with other forms of asset-backed securities that (Citibank says) do pass-through realized losses. (*See* Citibank Mem. at p. 12, n. 7)(emphasis supplied).

Citibank's self-serving, *ipse dixit* assertion as to what "generally" happens is not only proffered without any support whatsoever but, more important, is patently

26

insufficient to overcome the presumption of truth accorded to the facts alleged in the complaint, which are entitled to every favorable inference in a motion brought under Rule 12(c). *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007); *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 (2002); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993); *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 125-26 (2d Cir. 2001). With all due respect to Citibank's counsel, this issue is the proper subject of expert testimony, developed through discovery and under oath, and does not form the basis of a motion for judgment on the pleadings pursuant to Rule 12(c). Here, the fact entitled to be presumed is that no Floating Amount Event, either in the form of an Implied Writedown or otherwise, ever took place before Citibank unilaterally terminated the trade and seized VCG's collateral. Accordingly, Citibank's motion must be denied.

## III.

## VCG HAS STATED A
## CLAIM FOR RESCISSION

Contrary to Citibank's contentions in Point III of its Memorandum of Law, VCG's complaint adequately asserts a cause of action for rescission. Indeed, New York law on the question of contract rescission is not nearly as narrow as Citibank suggests.

Under New York law, a unilateral mistake as to a party's "basic assumption on which he made the contract" may form the basis of rescission where the mistake "has a material effect on the agreed exchange of performance that is adverse to him" and "the other party had reason to know of the mistake . . . ." *Koam Produce, Inc. v. DiMare*

27

*Homestead, Inc.*, 329 F.3d 123, 126-27 (2d Cir. 2003)(citing Restatement (Second) of Contracts §§ 151, 153); *see Albert Elia Building Co. v. American Sterilizer Co.*, 622 F.2d 655, 656-657 (2nd Cir. 1980) (per curiam); *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 346-347 (1986); *see also Kraft Foods, Inc. v. All These Brand Names, Inc.*, 213 F. Supp. 2d 326, 330 (S.D.N.Y. 2002)("[u]nder New York law, in order for a court to allow rescission of a contact on the basis of a unilateral mistake, a party must establish that (i) he entered into a contract under a mistake of material fact, and that (ii) the other contracting party either knew or should have known that such mistake was being made").  Both *Loyalty Life Ins. Co. v. Fredenberg*, 214 A.D.2d 297, 632 N.Y.S.2d 901 (N.Y. App. Div. 3rd Dep't 1995), and *NCR Corp. v. Lemelson Medical, Education and Research Foundation*, No. 99 Civ. 3017 (KNF), 2001 WL 1911024, *7 (S.D.N.Y. 2001), *aff'd*, 33 Fed. Appx. 7 (2nd Cir. 2002), on which Citibank relies, recognize this principle.

Here, VCG has pleaded that it believed it was agreeing "to sell credit protection on a credit default swap" and "not to take the risk of daily mark-to-market movements in the value of the reference obligation." (Complaint ¶ 49).  The Complaint also describes how such credit default swaps typically work and what the industry's expectations about the resulting obligations are.  (*See id.* ¶¶ 11, 12 n.1).  On its face, the complaint presents questions that can only be resolved by discovery and expert testimony at trial.  For its part, Citibank, itself a sophisticated player in the financial services industry, had *every* reason to know that VCG would enter into this particular credit default swap arrangement on the assumption that its risk would be no different.  If, as Citibank now contends, this

transaction imposed significantly greater risk on the part of VCG, the "seller" of credit

protection, VCG will have established all three critical elements of its claim for

rescission, *i.e.*, that (1) VCG was unilaterally mistaken in the "basic assumption on which

[it] made the contract"; (2) the mistake had a material adverse effect on the agreed

exchange; and (3) Citibank had reason to know of the mistake.  *Koam Produce, Inc. v.*

*DiMare Homestead, Inc.*, 329 F.3d at 126.  Thus, there is no basis to dismiss VCG's

rescission cause of action at this point in the proceeding.

     Nor is the fact that VCG has also pleaded a cause of action for breach of contract a

valid ground for dismissing its rescission claim.  It is elementary that an aggrieved party

is entitled to *plead* claims for both rescission and damages in the same action.  *See, e.g.*,

*Gulf Ins. Co. v. Transatlantic Reinsurance Co.*, 13 A.D.3d 278, 788 N.Y.S.2d 44 (N.Y.

App. Div. 1st Dep't 2004).  While it is true that an aggrieved party may not

simultaneously disavow a contract by seeking rescission and seek to recover damages for

its breach, *see, e.g.*, *Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland*, 768 F.

Supp. 115, 117 (S.D.N.Y. 1991), the election of remedies does not have to be made at the

very outset of the litigation.  *See, e.g.*, *Ungewitter v. Toch*, 31 A.D.2d 583, 294 N.Y.S.2d

1013 (N.Y. App. Div. 3rd Dep't 1968), *aff'd*, 26 N.Y.2d 687, 308 N.Y.S.2d 858 (1970).

Indeed, the party opposing rescission has no right to compel its adversary to choose

rescission over damages (or vice versa) prior to trial.  *See Libasssi v. Chelli*, 206 A.D.2d

508, 615 N.Y.S.2d 77 (N.Y. App. Div. 2nd Dep't 1994).

     The foregoing principle is wholly consistent with *BGW Develop. Corp. v. Mount*

*Kisco Lodge No. 1552*, 247 A.D.2d 565, 669 N.Y.S.2d 56 (N.Y. App. Div. 2nd Dep't), *lv.*

*denied*, 92 N.Y.2d 813, 704 N.E.2d 227, 681 N.Y.S.2d 474 (1998).  In that case, the

plaintiff was not permitted to continue its claim for rescission *once it had proceeded to*

*trial*.  Similarly, in *American Woolen Co. of N.Y. v. Samuelsohn*, 226 N.Y. 61, 123 N.E.

154 (1919), also cited by Citibank, the party seeking breach of contract damages had

already secured the remedy of rescission in *a prior proceeding*.  It was in *that* context

that the court held that "[w]hen an election of remedies is made between such claims, . . .

an action may not thereafter be maintained upon the inconsistent claim."  226 N.Y.2d at

66.

In this case, VCG has merely pleaded rescission and breach of contract as two

separate and alternative theories for relief.  At some point, it will undoubtedly become

necessary and appropriate for VCG to elect between these two potentially inconsistent

theories.  However, any demand for such an election at the pleading stage of the action is,

quite simply, premature.

## IV.

### VCG HAS STATED A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

It is beyond dispute that a covenant of good faith and fair dealing is implied in

every contract.  *E.g.*, *Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E.

163 (1933); *Rowe v. Great Atlantic & Pacific Tea Co.*, 46 N.Y.2d 62, 412 N.Y.S.2d 827

(1978); *Outback/Empire I, Partnership v. Kamitis, Inc.*, 35 A.D.3d 563, 825 N.Y.S.2d

747 (N.Y. App. Div. 2nd Dep't 2006).   It is also beyond dispute that a breach of this

implied covenant can give rise to a cause of action independent of any claim the plaintiff

may have based on the express terms of the contract itself.  *E.g.*, *Dalton v. Educational Testing Services*, 87 N.Y.2d 384, 639 N.Y.S.2d 977 (1995); *Richbell Information Services, Inc. v. Jupiter Partners, LP*, 309 A.D.2d 288, 302-303, 765 N.Y.S.2d 575 (N.Y. App. Div. 1st Dep't 2003).

Citibank has relied on a line of cases holding that New York law does not recognize a separate cause of action for breach of the covenant of good faith and fair dealing if the claim is based on the same allegations as a parallel claim for breach of contract.  (*See* Citibank Mem. at p. 31).  However, this line of cases does not preclude a claim based on the implied good-faith covenant where the plaintiff has alleged that the defendant acted in bad faith to deny it the benefit of its bargain.  *See, e.g.*, *Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.*, 873 F. Supp. 808, 815 (S.D.N.Y. 1994); *Dalton v. Educational Testing Services*, 87 N.Y.2d 384, 639 N.Y.S.2d 977; *Gross v. Empire Healthchoice Assurance, Inc.*, 16 Misc.3d 1112(A), 847 N.Y.S.2d 896, 2007 WL 2066390, *3-5 (Sup. Ct. N.Y. Co. 2007) (n.o.r.) (discussing case law).

Included among the situations in which a breach of the covenant of good faith and fair dealing can give rise to a valid claim are those cases in which the contract gave the defendant a measure of discretion and the plaintiff alleges that the discretion was exercised in bad faith.  *See, e.g.*, *Dalton v. Educational Testing Services*, 87 N.Y.2d 384, 639 N.Y.S.2d 977 (1995); *Outback/Empire I, Partnership v. Kamitis, Inc.*, 35 A.D.3d 563, 825 N.Y.S.2d 747; *Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 41 A.D.3d 269, 838 N.Y.S.2d 536 (N.Y. App. Div. 1st Dep't 2007); *Gross v. Empire Healthchoice Assurance, Inc.*, 16 Misc. 3d 1112(A), 847 N.Y.S.2d 896, 2007 WL 2066390; *see also*

31

*Richbell Information Services, Inc. v. Jupiter Partners, LP*, 309 A.D.3d 288.  That is precisely the situation presented here.

VCG's complaint (¶16) alleges that Citibank's contractual right to demand Floating Payments depended on its exercising its discretionary authority as the Calculation Agent in "good faith."  In the same vein, VCG has alleged (¶ 57) that "[t]o the extent that the swap agreement gave Citibank any discretion as [C]alculation [A]gent in the determination of the credit risk of the reference obligation, the implied covenant of good faith and fair dealing included a promise on the part of Citibank not to act arbitrarily or irrationally in exercising that discretion."  Finally, the VCG complaint asserts (¶ 56) that "[b]y gradually making oppressive margin demands without justification, Citibank acted in a manner so as to deprive [VCG] of the right to receive the benefit of the swap agreement . . . ."  These allegations are more than sufficient to state a claim under New York law that Citibank exercised its contractual discretion in bad faith and thereby breached its obligation of good faith and fair dealing.

## V.

## VCG HAS STATED VALID CLAIMS FOR UNJUST ENRICHMENT AND CONVERSION

In arguing for dismissal of VCG's unjust enrichment cause of action, Citibank has, once again, cited cases that are inapplicable to VCG's pleading.  It is true that a party generally cannot recover for unjust enrichment where there is a valid and enforceable contract, *see, e.g.*, *Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 807 N.Y.S.2d 583 (2005); *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 799 N.Y.S.2d 170

(2005); *Feigen v. Advance Capital Management Corp.*, 150 A.D.2d 281, 541 N.Y.S.2d

797 (N.Y. App. Div. 1st Dep't), *lv. dismissed in part and denied in part*, 74 N.Y.2d 874,

547 N.Y.S.2d 840 (1989). However, it is also the law in New York that a party is not

precluded from proceeding on both breach of contract and unjust enrichment (or quasi-

contract) theories where there is a bona fide dispute as to the existence of the contract.

*See Sergeants Benevolent Association Annuity Fund v. Renck*, 19 A.D.3d 107, 796

N.Y.S.2d 77 (N.Y. App. Div. 1st Dep't 2005); *Zuccarini v. Ziff-Davis Media, Inc.*, 306

A.D.2d 404, 762 N.Y.S.2d 621 (N.Y. App. Div. 2nd Dep't 2003); *Curtis Properties Corp.*

*v. Grief Companies*, 236 A.D.2d 237, 653 N.Y.S.2d 569 (N.Y. App. Div. 1st Dep't 1997).

     As noted above VCG has pleaded a cause of action for rescission as an alternative

to its breach of contract claim. If successful, the rescission cause of action would vitiate

the contract and thereby give rise to a claim for unjust enrichment arising from Citibank's

acquisition and retention of the "large amount of collateral" it extracted from VCG. For

the same reason, VCG's conversion cause of action should be upheld. Accordingly, the

causes of action for unjust enrichment and conversion should not be dismissed.

## VI.

### CITIBANK IS NOT ENTITLED TO JUDGMENT IN ITS FAVOR ON ITS COUNTERCLAIM FOR BREACH OF CONTRACT

     Citibank is not entitled to judgment on the pleadings as to its counterclaim

because, as stated above, VCG is entitled to rescission of the swap on the ground of

Citibank's material breaches prior to declaring an early termination of the contract and/or

pursuant to the equitable doctrine of mistake. Moreover, even if Citibank had been

correct in determining that a Floating Amount Event had occurred, there remains a live

controversy over whether Citibank's conduct in determining the Floating Payment (the

full $10,000,000) was commercially reasonable.  This question is also one of first

impression in this Court.

In *Peregrine Fixed Income Limited (In Liquidation) v. Robinson Dep't Store*

*Public Company Limited*, [2000] EWHC (QB) Commercial 99 (Eng.), the Queen's Bench

Division of the High Court of Justice in London held that, under the 1992 ISDA Master

Agreement, which was the predecessor form to the 2002 ISDA Master Agreement used in

this case, when a non-defaulting party determines the settlement amount of a terminated

swap transaction, its calculation of the settlement amount was subject to an overriding

requirement of commercial reasonableness. [12]  A copy of the decision in *Peregrine* is

attached as Exhibit 8 to the McCormick Declaration.

In brief, the facts of the *Peregrine* case are as follows.  Peregrine, the claimant,

was a company incorporated in Hong Kong which was engaged in the business of trading

financial products, including derivatives.  Robinson was a company incorporated in

Thailand and operated department stores in that country.  Pursuant to a confirmation

letter dated November 20, 1997, Robinson agreed to pay Peregrine 25 annual installments

of $6.85 million, beginning in November 1998 and ending in November 2022.  However,

in January 1998, Peregrine sought the appointment of a provisional liquidator, which

constituted an event of default under the swap agreement and resulted in an automatic

---

[12]  Consulting English law is appropriate in this case because ISDA has designed different sets of form credit derivative documentation, with the standard choice of law being either New York law or English law.

early termination of the swap. Since Peregrine's performance under the swap was complete, the only question was how much Peregrine was entitled to receive in the liquidation proceeding by way of a settlement payment from Robinson under the prescribed mechanism that applied to early termination of swap trades under the then existing ISDA Master Agreement.

The method identified in the ISDA documents specified that Robinson would obtain independent market quotations from no fewer than three "Reference Market Makers," just as had happened in *High Risk, supra*. When it approached the Reference Market Makers, Robinson secured quotations from which it calculated that the replacement value of the transaction to Peregrine was $9.7 million. However, twenty-five years of annual payments of $6.85 million would have yielded $171.25 million, which, discounted to then present-day value, would have been worth $87.3 million to Peregrine.

Robinson took the position that it was entitled, in its unfettered discretion, to fix the settlement amount as the mid-market quotation obtained from the three Reference Market Makers, according to the formula stipulated in the ISDA Master Agreement in force between the parties. However, in view of the glaring inconsistency between the true market loss to Peregrine and the sums quoted by Robinson, and the resulting windfall gain that Robinson would receive as a result, the High Court of Justice held that Peregrine was entitled to challenge Robinson's calculation as commercially unreasonable on its face and one that Robinson could not have seriously considered to be valid.

In 2002, ISDA changed the Market Quotation and Loss mechanism with a new provision, the "Close-out Amount," which is a defined term in the form ISDA Master Agreement and is (ostensibly) the method Citibank applied in the instant case.[13] However, the same fundamental problem that the court identified in *Peregrine* is equally present here. Citibank's determination of the Close-out Amount and, consequently, its determination of the Early Termination Amount are out of all proportion to any damage that it supposedly incurred by reason of VCG's supposed breach. In this connection, under the 2002 form ISDA Master Agreement, there is an over-arching rule, built into the definition of the term "Close-out Amount," i.e., "[a]ny Close-out Amount will be determined by the Determining Party (or its agent), which will ***act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result.*** . . ." (Emphasis added). These are quintessential issues of fact.

Citibank is not entitled to judgment as a matter of law on its counterclaim because there remain serious issues of fact regarding the true replacement cost of the swap, *i.e.*, even assuming that an early termination of the swap was authorized by the agreement. Plaintiff has alleged that, market jitters notwithstanding, the reference obligation is worth

---

[13] The definition of "Close-out Amount" under the 2002 ISDA Master Agreement between Citibank and VCG accordingly identifies some factors that the non-defaulting party may consider in assessing its losses and costs. For example, it may consider a non-exclusive set of factors, including (i) quotations from third parties; (ii) relevant market data provided by third parties; and (c) similar information from internal sources, if such information is of the sort used by the non-defaulting party in the regular course of its business. However, the definition of "Close-out Amount" preserves the central, "overarching principle" that was present in the former definition of "Settlement Amount" under the 1992 standard form ISDA Master Agreement: the determining party must ***always*** use commercially reasonable procedures to produce a commercially reasonable result. User's Guide to the ISDA 2002 Master Agreement (2003 ed.) at 25. Here, Citibank declared the "Close-out Amount" to be zero, added the full "Floating Payment" of $10,000,000, improperly set off that amount against the previously deposited collateral and demanded payment of the remaining $674,252.38.

far more than Citibank (and whatever third parties it may have consulted) think it is worth.  That is the reason why VCG repeatedly challenged Citibank's margin determinations in the first place – and probably why its requests for clarification went unanswered at the time.  (Complaint at ¶¶25-7).

Reasonableness is a highly fact-intensive question.  Moreover, it is a well-settled principle of New York law that even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith, and in a manner that comports with commercially reasonable business judgment.  *See, e.g., Travellers Intern., A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994); *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291, 639 N.Y.S.2d 977, 979 (1995); *Enron Power Marketing, Inc. v. Nevada Power Co.*, No. 03 Civ. 9318 (BSJ), 2004 WL 2290486, *2 (S.D.N.Y. Oct. 12, 2004)(Jones, *J.*).  Here, the complaint alleges that Citibank's action in declaring a Floating Amount Event, declaring an early termination and closing out the swap were taken in bad faith and could not possibly have formed a commercially reasonable judgment as to the financial condition of the reference obligation.  Accordingly, VCG is entitled to discovery and an evidentiary hearing to test, among other things, whether Citibank exercised good faith, reasonable judgment in measuring the replacement value of the swap transaction; whether it considered the data in the servicer's report in making the Floating Payment calculation; whether the market conditions at the time of termination were such that Citibank actually had an urgent economic need to replace the

cash-flows expressed by the swap; or whether Citibank had an underlying hedged

position that was actually exposed to market risk.

## CONCLUSION

For the foregoing reasons, Citibank's motion must be denied in its entirety and the

action should proceed to full discovery and a trial on the merits.

Dated:   New York, New York
         August 19, 2008


Respectfully submitted,

**MINTZ & GOLD LLP**


/s/  Terence W. McCormick
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, NY 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
*Attorneys for Plaintiff/Counterclaim-Defendant*
*VCG Special Opportunities Master Fund Ltd.,*


To:   **PAUL, WEISS, RIFKIND, WHARTON &**
      **GARRISON LLP**
      Allan J. Arffa, Esq.
      Karen R. King, Esq.
      David W. Wang, Esq.
      1285 Avenue of the Americas
      New York, New York 10018-6064
      Tel:    (212) 373-3203
      Fax:    (212) 373-0203
      *Attorneys for Defendant/*
      *Counterclaim-Plaintiff Citibank N.A.*

38