UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VCG SPECIAL OPPORTUNITIES MASTER FUND LIMITED,<br><br>        Plaintiff,<br><br>        -against-<br><br>CITIBANK, N.A.,<br><br>        Defendant. | 08 CV 01563 (BSJ) |

| |
|---|
| CITIBANK, N.A.,<br><br>        Counterclaim-Plaintiff,<br><br>        -against-<br><br>VCG SPECIAL OPPORTUNITIES MASTER FUND LIMITED,<br><br>        Counterclaim-Defendant. |

## CITIBANK N.A.'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212 373-3203
Facsimile: 212-757-3990

Attorneys for Defendant/Counterclaim-Plaintiff Citibank, N.A.

## Table of Contents

                                                           **Page**

Table of Authorities ............................................................................................. ii

Preliminary Statement ........................................................................................ 1

Argument ............................................................................................................ 3

I.      CITIBANK'S DEMANDS FOR COLLATERAL WERE AUTHORIZED AND PROPER; IN ANY EVENT, VCG'S COMPLAINTS HAVE BEEN WAIVED AND ARE MOOT.............................................................................. 4

      A.     Citibank Was Authorized to Demand Additional Collateral ........................ 4

      B.     In Any Event, VCG Has Waived Any Issues as to Citibank's Demands for Collateral ............................................................................. 11

      C.     VCG'S Complaints as to Citibank's Collateral Demands Are Also Moot .................................................................................................... 14

II.     A FLOATING AMOUNT EVENT OCCURRED ................................................. 16

III.    VCG FAILS TO STATE ANY REMAINING CLAIMS AS WELL .................... 21

Conclusion ......................................................................................................... 24

i

## Table of Authorities

Page(s)

### CASES

*Acme Supply Co., Ltd.* v. *City of New York*,
834 N.Y.S.2d 142 (1st Dep't 2007).................................................................. 11, 12

*Albany Med. College* v. *Lobel*,
296 A.D.2d 701 (3d Dep't 2002)........................................................................ 13

*AM Cosmetics, Inc.* v. *Solomon*,
67 F.Supp.2d 312 (S.D.N.Y. 1999) .............................................................. 13, 15

*Babylon Assocs.* v. *County of Suffolk*,
101 A.D.2d 207 (2d Dep't 1984).......................................................................... 15

*Dalton* v. *ETS*,
87 N.Y.2d 384, 663 N.E.2d 289, 649 N.Y.S.2d 977 (1995).......................... 10, 23

*Fasolino Foods Co. Inc.* v. *Banca Nazionale del Lavoro*,
961 F.2d 1052 (2d Cir. 1992) .............................................................................. 22

*Ferguson Elec. Co. Inc.* v. *Kendal at Ithaca Inc.*,
711 N.Y.S.2d 246 (3d Dep't 2000)................................................................. 11, 12

*Frank Felix Assocs., Ltd.* v. *Austin Drugs, Inc.*,
111 F.3d 284 (2d Cir. 1997) ............................................................................... 15

*Frontier-Kemper Constructors, Inc.* v. *American Rock Salt Co., LLC*,
2005 WL 3018720 (W.D.N.Y. 2005) ................................................................... 21

*Granite Partners, L.P.* v. *Bear, Stearns & Co. Inc.*,
17 F.Supp.2d 275 (S.D.N.Y. 1998) ..................................................................... 10

*Harris* v. *Provident Life & Accident Ins. Co.*,
310 F.3d 73 (2d Cir. 2002) ................................................................................. 22

*High Risk Opportunities Hub Fund, Ltd.* v. *Credit Lyonnais and Societe Generale*,
Index No. 600229/2000 (Sup. Ct. N.Y. Co. July 6, 2005) ..................................... 8

*Jofen* v. *Epoch Biosciences, Inc.*,
2002 WL 1461351 (S.D.N.Y. 2002)....................................................................... 8

*Lanni* v. *Smith*,
89 A.D.2d 782 (4th Dep't 1982)............................................................................. 5

*National Westminster Bank, USA* v. *Ross*,
130 B.R. 656 (S.D.N.Y. 1991) ............................................................................ 13

ii

*Norwest Fin., Inc.* v. *Fernandez,*
　　1999 WL 946786 (S.D.N.Y. 1999)........................................................................ 13

*Outback/Empire I, Partnership* v. *Kamitis, Inc.,*
　　35 A.D.3d 563 (N.Y. 2006) ................................................................................. 23

*Peregrine Fixed Income Limited (In Liquidation)* v. *Robinson Dep't Store Public Company Limited,*
　　[2002] EWHC (QB) Commercial 99 (Eng.) .......................................................... 9

*R/S Assoc.* v. *New York Job Dev. Auth.,*
　　98 N.Y.2d 29 (2002)............................................................................................. 8

*Retty Financing, Inc.* v. *Morgan Stanley Dean Witter & Co.,*
　　740 N.Y.S.2d 198 (1st Dep't 2002)..................................................................... 23

*Ruiz* v. *Chwatt Associates,*
　　247 A.D.2d 308 (1st Dep't 1998) ......................................................................... 6

*Sea Trade Co. Ltd.* v. *FleetBoston Fin. Corp.,*
　　2007 WL 1288592 (S.D.N.Y. 2007)..................................................................... 5

*Society for Advancement of Educ., Inc.* v. *Gannett Co., Inc.,*
　　1999 WL 33023 (S.D.N.Y. 1999).......................................................................... 3

*Two Guys From Harrison-N.Y.,* 482 N.Y.S.2d 465 (N.Y. 1984) ..................................... 13

*Westinghouse Elec. Corp.* v. *New York City Tr. Auth.,*
　　603 N.Y.S.2d 404 (N.Y. 1993)............................................................................ 12

Defendant and counterclaim-plaintiff Citibank respectively submits this reply memorandum of law in further support of its motion pursuant to Federal Rules of Civil Procedure 12(c) for judgment on the pleadings (the "Motion for Judgment on the Pleadings"), dismissing the complaint of plaintiff and counterclaim-defendant VCG and entering judgment in favor of Citibank on its counterclaim in this action.[1]

### Preliminary Statement

VCG's opposition papers reflect a frantic attempt to manufacture some disputed factual issue that might keep this case alive. Unfortunately for VCG, its effort fails because this action boils down to a simple matter of contract interpretation, where the relevant contract language disposes of all of VCG's arguments.

In particular, as VCG concedes in its complaint (Compl. ¶ 1), VCG's claims are based on two assertions. Yet, both of those assertions clearly fail in the face of the applicable contract language.

First, VCG's belated assertion that Citibank's demands for additional collateral with respect to the parties' CDS Contract were improper is based on a clear misreading of that Contract. As predicted in our initial memorandum, VCG bases its assertion on language in the ISDA 2002 Master Agreement (the "ISDA Master Agreement") (at ¶ 1(b)), merely stating that, in the event of a conflict between the provisions of the Confirmation (which formed a part of the integrated CDS Contract) and the ISDA Master Agreement (which also formed a part of the CDS Contract), the

---

[1]    Capitalized terms used in this reply memorandum of law have the same meaning as set forth in Citibank's initial memorandum of law in support of the Motion for Judgment on the Pleadings.

provisions of the Confirmation controlled.  This argument has no merit, because there simply was no such conflict.

The Credit Support Annex, which was expressly incorporated in the ISDA Master Agreement (and hence also formed part of the CDS Contract), authorized Citibank to demand additional collateral from VCG in the event of changes in the market value of the CDS Contract.  There is simply *nothing* in the Confirmation that contradicts the provisions of the Credit Support Annex (and hence the ISDA Master Agreement) authorizing Citibank to demand such additional collateral from VCG.  Indeed, the Confirmation (at p. 3) expressly states that the parties' transaction is "subject to" the terms of the Credit Support Annex.  In short, because there are no conflicting provisions, VCG's argument fails.

Even if the contract language did not dispel VCG's argument (and it clearly does), VCG's complaints as to Citibank's collateral demands also fail because (a) VCG never invoked the dispute resolution mechanism set forth in the CDS Contract with respect to the additional collateral Citibank demanded (and, instead, VCG posted such amounts and continued to perform and receive benefits under the CDS Contract, thereby waiving any such complaints), and (b) these complaints are all moot, given the occurrence of a "Floating Amount Event," requiring VCG to pay Citibank $10,000,000 – an amount in excess of the collateral Citibank had demanded.

As to VCG's second claim – that no "Floating Amount Event" occurred – VCG simply (and perhaps intentionally) misreads the key language at issue.  VCG concedes that an "Implied Writedown" with respect to the Reference Obligation (the Class B Notes issued by the Millstone III CDO) would trigger VCG's "Floating Amount

2

Event" payment obligation. Yet, VCG argues that no Implied Writedown occurred (or ever could occur) here, because the underlying instrument governing the Reference Obligation (the Indenture relating to the Class B Notes) provided for express writedowns of principal and interest.

VCG is trying to confuse the Court. The Indenture makes reference to writedowns that may occur with respect to the *collateral* held by (*i.e.*, the securities that are *owned by*) the Millstone III CDO, but makes *no* reference to any writedowns with respect to *the Reference Obligation*, which are Notes *issued by* the CDO. The Reference Obligation is the only instrument that matters for this purpose, and there is no question that the Indenture does not provide for any express writedowns of those Notes.

Because the clear language of the CDS Contract reveals the meritless nature of VCG's claims and Citibank's entitlement to the $10,000,000 Floating Amount, Citibank respectfully requests that the Court now dismiss VCG's complaint and enter judgment in Citibank's favor on its counterclaim against VCG.

### Argument

Judgment on the pleadings is appropriate in a breach of contract action where, as here, the parties' dispute is a matter of contract interpretation that the Court can resolve on the basis of the express language of the underlying contract. *See Society for Advancement of Educ., Inc.* v. *Gannett Co., Inc.*, 1999 WL 33023 at *4 (S.D.N.Y. 1999) ("Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court. Such questions of law are properly disposed of through a motion for judgment on the pleadings.") (citing *State Bank of India* v. *Walter E. Heller & Co.*, 655 F.Supp. 326,

3

326-27 (S.D.N.Y. 1987) (issues of contract interpretation are questions of law that are properly disposed of through a motion for judgment on the pleadings)).

The dispute between Citibank and VCG, as VCG itself asserts in its complaint (Compl. ¶ 1), involves two main issues:  (a) whether, under the parties' CDS Contract, Citibank properly demanded from VCG additional collateral (beyond the $2,000,000 initial collateral, known as the "Independent Amount"), and (b) whether, also under that Contract, Citibank properly declared a Floating Amount Event, triggering VCG's obligation to pay Citibank $10,000,000.  Despite VCG's efforts to misread the parties' CDS Contract, that Contract clearly answers both questions in Citibank's favor, and nothing in VCG's opposition papers proves otherwise.

I.

### CITIBANK'S DEMANDS FOR COLLATERAL WERE AUTHORIZED AND PROPER; IN ANY EVENT, VCG'S COMPLAINTS HAVE BEEN WAIVED AND ARE MOOT

VCG principally argues that Citibank's demands for additional collateral were improper because Citibank was not authorized to demand credit support beyond the Independent Amount.  That is plain wrong, in addition to which, as noted below, any such complaint (a) has been waived, and (b) is now moot.

A.    <u>Citibank Was Authorized to Demand Additional Collateral</u>

Simply put, VCG's complaints as to Citibank's demands for additional collateral fail because the CDS Contract expressly authorized Citibank to demand such additional collateral.  As expected from allegations in its pleadings, VCG argues that (a) the ISDA Master Agreement provides that, in the event of an inconsistency between the provisions of the Confirmation and those of the ISDA Master Agreement (both of

4

which constitute parts of the CDS Contract), the provisions in the Confirmation govern (VCG Mem. 6), and (b) here, the Credit Support Annex (which was incorporated into the ISDA Master Agreement) authorized Citibank to demand additional collateral, while the Confirmation is silent on that subject. (VCG Mem. 8-9, 17.)  But silence simply does not create an "inconsistency," let alone any "inconsistency" between the *provisions* of the Confirmation and the ISDA Master Agreement.

Indeed, proof that silence does not constitute a contradiction comes from the fact that the Confirmation expressly states that the parties' transaction is "subject to" the Credit Support Annex.  (Arffa Ex. 3 at 3.[2])  The terms of the Credit Support Annex are therefore effectively *part of* the Confirmation.  *See, e.g., Sea Trade Co. Ltd.* v. *FleetBoston Fin. Corp.*, 2007 WL 1288592, at *4 (S.D.N.Y. 2007) (supplement to a contract is incorporated by reference "when the [supplement] specifically references and sufficiently describes the document to be incorporated such that the latter 'may be identified beyond all reasonable doubt'" and when it is "clear that the parties to the agreement had knowledge of and assented to the incorporated terms") (*quoting PaineWebber, Inc.* v. *Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996)).

VCG's argument about more specific language overriding more general (or pre-printed form) language thus misses the point.  The decisions VCG cites involve situations where the language in a supplement (or rider) and the language in a form agreement were irreconcilable.  *See, e.g., Lanni* v. *Smith*, 89 A.D.2d 782, 783 (4th Dep't 1982) ("Moreover, where there is a repugnancy between the particular language in the

---

[2]  Citations to "Arffa Ex. ___" refer to exhibits to the Declaration of Allan J. Arffa in Support of Citibank's Motion for Judgment on the Pleadings, dated July 16, 2008, submitted with Citibank's initial papers on this motion.

typewritten portion of the instrument and the general wording in the printed form, the accepted rule of construction is that the typewritten words should be given greater effect"); *Ruiz v. Chwatt Associates*, 247 A.D.2d 308 (1st Dep't 1998) (addressing situation where a typewritten contract and the rider are "irreconcilable"). Here, no conflict at all exists.

Indeed, VCG's attempt to turn silence into contradiction would mean that the language in the Confirmation stating that the transaction was "subject to" the Credit Support Annex had no real effect. Under VCG's view, to be at all effective, the provisions of the Credit Support Annex would have to be expressly repeated in full in the Confirmation. Not only does this view beg the question of how the Credit Support Annex then has any meaning at all, it is also inconsistent with (a) the language of the Confirmation stating that the transaction was "subject to" the Credit Support Annex, and (b) VCG's selective acceptance of the effectiveness of other provisions in the Credit Support Annex that are *not* expressly specified in the Confirmation. (VCG Mem. at 22.)

VCG also attempts to justify its position more broadly by distinguishing between (a) the default risk of the Reference Obligation (which VCG says it agreed to accept) and (b) Citibank's demands for collateral under the Credit Support Annex based upon periodic fluctuations in the market (which VCG claims it never agreed to accept). This theoretical distinction is simply irrelevant here. Here, the Credit Support Annex, which undeniably formed part of the CDS Contract, expressly permitted Citibank to demand additional collateral based on Citibank's "Exposure" – the amount of losses Citibank would incur, or gains Citibank would realize, in replacing the CDS transaction with an economically equivalent transaction at that time of calculation. (*See* Arffa Ex. 1,

Part 5(l); Arffa Ex. 5 at Annex 14(c).) Thus, whatever VCG now says, the CDS Contract expressly permitted Citibank to demand more collateral based on its calculation of its Exposure.

In that regard, we note that the fact that Citibank ultimately demanded additional collateral amounting to nearly full collateralization of the Reference Obligation – something VCG repeatedly points to as somehow suggesting Citibank did something wrong here – was entirely validated by the occurrence (discussed further below) of an Implied Writedown Floating Amount Event that eventually required VCG to pay Citibank the $10,000,000 Floating Amount Event.

In sum, VCG cannot escape its express obligations under the terms of the Credit Support Annex, and hence the CDS Contract, to post additional collateral. (Arffa Ex. 1, Part 5(l); Arffa Ex. 2 at ¶¶ 3, 4(c), 12; Arffa Ex. 5 at Annex 14(c).)

Finally, VCG's argument that Citibank "grossly undervalued the reference obligation" and made its Exposure calculations in bad faith (VCG Mem. at 18-19) again simply ignores the relevant contractual provisions. VCG appears to complain that Citibank conducted internal valuations to determine Exposure, as opposed to using "reliable market data to support an objectively reasonable mark-to-market," and this somehow amounted to "bad faith." (*Id.*) Yet, Annex 14 of the 2002 ISDA Master Agreement Protocol, which unambiguously replaced the definition of "Exposure" in the Credit Support Annex, explicitly provided that the Valuation Agent (here, Citibank) should make its calculations "using **its estimates** at mid-market of the amounts that would be paid for transactions." (*See* Arffa Ex. 1, Part 5(l); Arffa Ex. 5 at Annex 14(c); emphasis added.) Thus, the definition of "Exposure," as amended, did not require

7

consultation with external sources in determining the Exposure amount (as VCG appears to argue), nor does any other provision in the CDS Contract.[3]

In short, as noted above, the CDS Contract expressly authorized Citibank to act as the Valuation Agent and hence to calculate its Exposure with respect to the CDS Contract, and to demand additional collateral if that calculation led to such a result. Given that Citibank's conduct was in full conformity with the relevant contract language, there is no need to resort to any other extrinsic evidence. *See, e.g., Jofen* v. *Epoch Biosciences, Inc.*, 2002 WL 1461351, at *9 (S.D.N.Y. 2002) ("Extrinsic evidence of industry custom and practice is not relevant to the question of contractual interpretation where, as here, the parties have expressed their intent clearly in a written contract."); *see also R/S Assoc.* v. *New York Job Dev. Auth.*, 98 N.Y.2d 29, 33 (2002) (holding that "[w]hen interpreting an unambiguous contract, term evidence outside the four corners of the document is generally inadmissible to add to or vary the writing.").

*High Risk Opportunities Hub Fund, Ltd.* v. *Credit Lyonnais and Societe Generale*, Index No. 600229/2000 (Sup. Ct. N.Y. Co. July 6, 2005), cited by VCG on this point, is entirely inapposite. *High Risk Opportunities* involved a different type of contract (non-deliverable forward contracts) under a different ISDA form (the 1992 ISDA Master Agreement) and a different type of determination (the settlement value of the non-deliverable forward contracts upon early termination, not a determination of "Exposure" for purposes of calculating collateral requirements). Indeed, in *High Risk Opportunities*, the 1992 form of the ISDA Master Agreement the parties had used

---

[3]    Nor did the CDS Contract anywhere require Citibank, as VCG appears to suggest in its Opposition Memorandum, to calculate its Exposure based on the Millstone III's CDO's Servicer Reports.

8

specifically provided that the non-defaulting party would base its determination of

settlement value *on quotations obtained from independent market makers*.  Here, there

was no such agreement with respect to the calculation of Citibank's Exposure; in fact, the

2002 Protocol expressly removed the obligation to consult independent sources for

valuation and empowered Citibank, as the Valuation Agent, to use its own estimates in

determining its Exposure.[4]

     *Peregrine Fixed Income Limited (In Liquidation)* v. *Robinson Dep't Store*

*Public Company Limited*, [2002] EWHC (QB) Commercial 99 (Eng.), also cited by

VCG, is equally irrelevant.  To begin with, it is, of course, an English court decision

construing English law, while the CDS Contract specifically states that it is to be

"governed by and construed in accordance with the laws of the State of New York."

(*See* Arffa Ex. 1 at 12.)  Further, like the Court in *High Risk Opportunities*, the *Peregrine*

Court did not construe the ISDA 2002 Master Agreement at issue in this case, but rather

the 1992 ISDA Master Agreement predecessor form.  Finally, like the contract in *High*

*Risk Opportunities*, the contract in *Peregrine expressly required* that the calculation at

issue (which, as in *High Risk Opportunities*, involved the calculation of the settlement

amount owing on early termination of the transaction at issue there, not the protection

buyer's calculation of its Exposure for determining collateral requirements) be based on

---

[4]    If anything, VCG's discussion of *High Risk Opportunities* merely highlights VCG's
failure (discussed further below) to invoke the dispute resolution procedure in the
CDS Contract as to Citibank's determination of its Exposure.  VCG argues that the
calculation of the settlement amount in *High Risk Opportunities* is similar to the
procedure that *would have been followed* had VCG invoked the dispute resolution
procedures in the CDS Contract.  (VCG Mem. at 20.)  Whatever the validity of that
assertion, there is no question that here, unlike the situation in *High Risk*
*Opportunities*, VCG concededly *failed* to invoke the CDS Contract's dispute
resolution procedures with respect to Citibank's collateral demands.

9

"Market Quotation[s]" from independent market-makers. Again, the CDS Contract, to the contrary, authorizes Citibank, as the Calculation Agent, to use its own market estimates to calculate its Exposure and to make demands for additional collateral, as necessary, based on that calculation. (Arffa Ex. 2 at ¶¶ 3(a), (4)(c), 13(c)(i); Arffa Ex. 5 at Annex 14(c).)[5]

Citibank thus fully complied with the express terms of the CDS Contract, and those terms foreclose any VCG claim – even one of purported "bad faith" – as to Citibank's demands for additional collateral. *Granite Partners, L.P.* v. *Bear, Stearns & Co. Inc.*, 17 F.Supp.2d 275, 306 (S.D.N.Y. 1998) ("While an implied covenant of good faith and fair dealing is recognized in most contracts under New York law, the duty cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract."); *Dalton* v. *ETS*, 87 N.Y.2d 384, 663 N.E.2d 289, 389, 649 N.Y.S.2d 977 (1995) (quoting *Murphy* v. *Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304) ("the duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that 'would be inconsistent with the other terms of the contractual relationship.'").

---

[5]     We further note that the mechanism for obtaining quotations from independent market makers in *Peregrine* case is also irrelevant on the issue of the determination of the Floating Amount in the CDS Contract. As explained in our initial memorandum of law (and discussed further below), the CDS Contact authorized Citibank, as the Calculation Agent, to determine a Floating Amount in accordance with a mechanical formula for the calculation of the Implied Writedown Amount, using numbers taken directly from "Servicer Reports" issued with respect to the CDO that serves as the Reference Entity, not based on quotations from third parties. (Citibank Mem. 12-13; *see* Ex. 4 at 16, 19, 20.)

**B.**    **In Any Event, VCG Has Waived Any Issues**
**as to Citibank's Demands for Collateral**

Even if VCG were raising some legitimate issue as to Citibank's demands

for additional collateral (and it is not), VCG has waived any such issue, both because

(a) it failed to invoke the procedure expressly set forth in the CDS Contract for resolving

disputes over collateral demands, and (b) it posted the collateral and continued to receive

the benefits under the Contract (including its receipt of continued payments from

Citibank), rather than suing for breach at that point.  Either conduct would have been

sufficient in itself to waive any such complaints; together, there is simply no question that

a waiver occurred here.

As to the first waiver, there is no dispute that VCG was aware of the

expedited dispute resolution process set forth in the Credit Support Annex for disputes

over collateral demand calculation, and that VCG chose not to invoke that protocol.

Having made that decision, VCG cannot now revive claims that it chose not pursue in a

timely manner through the contractual dispute resolution process.  *See, e.g., Acme Supply*

*Co., Ltd.* v. *City of New York*, 834 N.Y.S.2d 142 (1st Dep't 2007) (dismissing complaint

where plaintiffs failed to comply with contractual dispute resolution procedures);

*Ferguson Elec. Co. Inc.* v. *Kendal at Ithaca Inc.*, 711 N.Y.S.2d 246, 246-49 (3d Dep't

2000).

VCG (incorrectly) argues that the dispute resolution procedures set forth

in the CDS Contract were not mandatory, but rather optional.  VCG also appears to

suggest that, unless an agreement is absolutely clear that submission of disputes is

mandatory, then it is optional, and asserts, without detailed analysis, that all of the

decisions Citibank relies upon involved contracts that expressly required that the parties

11

exhaust those procedures as a pre-condition to bringing a civil action. (VCG Mem. at 22.) Neither proposition is correct.

Here, in fact, there is no suggestion that the Contract was intended to make the dispute resolution process "optional." The language (under the heading "Paragraph 5, Dispute Resolution") states that "If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount. . . the Disputing Party will notify the other party," the Disputing Party "will" transfer the amount not in dispute, the parties "will" try to resolve the dispute for a period of time, and, failing that, the Valuation Agent "will" recalculate the Exposure by seeking market quotations. (Arffa Ex. 2 at 3, ¶ 5.) There is nothing about this language to suggest it is optional.

Nor does there appear to be any "presumption" – as VCG suggests (without any authority) – that resort to dispute resolution procedures is optional. In *Acme Supply Co., Ltd.*, for example, the First Department expressly rejected a party's argument that, under the contract at issue, a dispute resolution mechanism was optional, and held that resort to such procedures was in fact mandatory.

Indeed, New York public policy favors alternative dispute resolution mechanisms that reflect the informed negotiation and endorsement of the parties. *See, e.g., Ferguson Elec. Co. Inc.*, 711 N.Y.S.2d at 249 (citing *Matter of Nationwide Gen. Ins. Co. v. Investors Ins. Co. of Am.*, 37 N.Y.2d 91, 95 (N.Y. 1975); *Westinghouse Elec. Corp. v. New York City Tr. Auth.*, 603 N.Y.S.2d 404 (N.Y. 1993)). Further, as the Court noted in *Acme Supply Co.*, 39 A.D.3d at 332, 834 N.Y.S.2d at 143, construing clauses providing for alternative dispute resolution mechanisms as mandatory is further supported by the long-standing principle under New York law that contracts are to be

12

interpreted in a manner that would give full effect to all provisions of the contract. *See Norwest Fin., Inc.* v. *Fernandez*, 1999 WL 946786, at *3 (S.D.N.Y. 1999); *Two Guys From Harrison-N.Y.*, 482 N.Y.S.2d 465, 468 (N.Y. 1984).

        In sum, here, the parties clearly anticipated potential disputes over the valuation of the CDS Contract for purposes of collateral demands and negotiated and agreed to a specific dispute resolution mechanism to resolve such disputes. Having elected not to pursue the dispute resolution mechanisms set forth in the Contract, VCG's arguments regarding the propriety of Citibank's additional collateral demands have now been waived.

        As if that were not enough to establish a waiver (and it is), under well-settled New York law, VCG also waived its arguments as to Citibank's demands for collateral by complying with those requests, continuously posting the collateral over a period of time, and continuing to receive benefits (that is, Citibank's funds) under the Contract. Under New York law, a party who believes a contract has been breached but nevertheless continues performance of the contract "surrenders his right to terminate later based on that breach." *AM Cosmetics, Inc.* v. *Solomon*, 67 F.Supp.2d 312, 317 (S.D.N.Y. 1999) (applying New York law); *National Westminster Bank, USA* v. *Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991) (noting that "[i]t is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach."); *Albany Med. College* v. *Lobel*, 296 A.D.2d 701, 702 (3d Dep't 2002). Such a waiver clearly occurred here.

For this reason as well, VCG waived its complaints about Citibank's collateral demands.

### C.    VCG'S Complaints as to Citibank's Collateral Demands Are Also Moot

As if all the above were not enough to dispose of VCG's complaints as to Citibank's demands for additional collateral (and it is), the fact is that all of these complaints are now moot in light of the undeniable fact (discussed further below), that a Floating Amount Event occurred under the CDS Contract, and hence VCG owed Citibank $10,000,000 in any event – an amount in excess of the collateral VCG in fact posted.

VCG's only response to this argument (aside from its misleading argument as to the Floating Amount Event, which is readily disposed of below) is the extraordinary argument that, by virtue of Citibank's collateral demands, which VCG claims were improper, Citibank materially breached the CDS Contract, and, as a result of that, VCG was completely excused from any further performance under the CDS Contract.  (VCG Mem. at 23.)  Interestingly, even VCG is not taking the argument all that seriously.  Otherwise, logically taken to its full extent, it would completely override all of VCG's other arguments, including those as to whether a Floating Amount Event took place.

The likely reason even VCG does not push its argument too hard is that it is clearly wrong.  Apart from the fact (as noted above) Citibank did nothing wrong and thus did not breach the CDS Contract, the argument fails for two simple reasons.  First, there is no support for the notion – and VCG cites none – that demanding too much

14

collateral would ever undermine the fundamental purpose of the CDS Contract. Second, even if there had been a breach, VCG has waived any claim relating to that breach.

In order for a breach to constitute a "material breach," it must "go to the root of the agreement between the parties" and be "so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd.* v. *Austin Drugs, Inc.*, 111 F.3d 284 (2d Cir. 1997) (*citing Septembertide Pub., B.V.* v. *Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989)); *see also Babylon Assocs.* v. *County of Suffolk*, 101 A.D.2d 207, 215 (2d Dep't 1984). Citibank's demands for collateral payments to secure VCG's commitments in light of changing market conditions did not disrupt the fundamental "purpose" of the CDS Contract – to provide Citibank with protection with respect to VCG's obligations under the CDS Contract. Therefore, even if Citibank's requests for collateral were improper – which they were not – they would not constitute material breaches that would somehow enable VCG to escape its contractual obligations to pay the Floating Amount.

But, in any event, VCG's argument also fails for the same reason described above, namely, because, by virtue of VCG's continued posting of collateral and continued acceptance of benefits under the CDS Contract, VCG clearly waived any argument as to any purported "material breach." *See, e.g., AM Cosmetics*, 67 F.Supp.2d at 317 (noting that when a party to a contract has actual knowledge of a breach, but elects to continue performing under the contract, that party waives the right to sue the breaching party).

Accordingly, given that VCG owes Citibank the full $10,000,000 payment amount, Citibank's demands for collateral, and VCG's claims with respect to those demands, are simply moot at this point.

## II.

## A FLOATING AMOUNT EVENT OCCURRED

There is no dispute that, if a Floating Amount Event occurred, Citibank was entitled to terminate the swap and receive a Floating Amount Payment of $10,000,000 from VCG.

And, at this point, it is more than clear – despite VCG's effort to confuse the Court – that the parties' dispute with respect to the determination of the Floating Amount Event can be resolved on this motion based on the unambiguous language of the CDS Contract.

From the parties' papers on this motion, it is now clear that the parties agree that, under the CDS Contract, "Writedown" is one of the three applicable Floating Amount Events with respect to the Reference Obligation that trigger VCG's obligation to pay the Floating Amount to Citibank. (*See* VCG Mem. at 26; Arffa Ex. 3 at 2.) The parties also agree that the parties elected to make the "Implied Writedown" feature, a subcategory of "Writedown," applicable to the transaction. (*See* Citibank's Opening Mem. at 11; VCG Mem. at 26; Arffa Ex. 3 at 2.)

Thus, the only question is whether Citibank was entitled to calculate an Implied Writedown Amount.

The definition of "Writedown" in the ISDA Standard Terms Supplement provides:

16

"Writedown" means the occurrence at any time on or after the Effective
Date of: . . .

(iii)    if Implied Writedown is applicable and the Underlying Instruments
do not provide for writedowns, applied losses, principal
deficiencies or realized losses as described in (i) above[6] to occur **in
respect of the Reference Obligation**, an Implied Writedown
Amount being determined in respect of the Reference Obligation
by the Calculation Agent.[7]

Based on VCG's opposition papers, it is now clear the parties disagree

solely about whether or not the "Underlying Instrument" (here, the Millstone III CDO

Indenture) provides for writedowns, applied losses, principal deficiencies or realized

losses **with respect to the Reference Obligation**.  That is, even VCG recognizes that the

definition of "Writedown" in its clause (iii) cited above provides that the Implied

Writedown feature applies so long as the applicable Indenture does not provide for

writedowns, applied losses or principal deficiencies **in respect of the Reference

Obligation.** (VCG Mem. at 24.)  The language of the Millstone III CDO Indenture

readily resolves this issue, and VCG's argument to the contrary simply gets the issue

wrong.

VCG argues that "the Millstone CDO Indenture expressly provides at

various points for writedowns, applied losses, principal deficiencies and realized losses"

and quotes the definitions of "Written Down Amount" and "Write-Down Security" from

---

[6]    Section (i) states that "(A) a writedown or applied loss (however described in the
Underlying Instruments) resulting in a reduction in the Outstanding Principal Amount
(other than as a result of a scheduled or unscheduled payment of principal) or (B) the
attribution of a principal deficiency or realized loss (however described in the
Underlying Instruments) to the Reference Obligation resulting in a reduction or
subordination of the current interest payable on the Reference Obligation." (Arffa Ex.
4 at 23 (emphasis added).)

[7]    The parties selected Citibank to be the Calculation Agent under the CDS Contract.
(Arffa Ex. 4 at 14-15.)

17

the Indenture. (VCG Mem. at 24-25.) Yet, in so arguing, VCG cites language that does *not* involve writedowns of the Reference Obligation (the Class B Notes *issued by* the CDO), but rather plainly refers to securities (generally referred to as the CDO's "collateral") *owned by* the Millstone III CDO. (VCG Mem. at 25; *see* Indenture at 77-78.) In short, VCG is confusing (perhaps willfully) the CDO's *liabilities* (the securities it issues) with its *assets* (the securities it owns).

Thus, VCG cites the Millstone III CDO Indenture's definition of "Written Down Amount," which expressly refers to a reduction in the Principal Balance of a "Written Down Security," which in turn means "any **Collateral Asset**. . . as to which the aggregate par amount. . . exceeds the aggregate par amount … of all collateral securing such securities." (*Id.*) The Reference Obligation (the Class B Notes of the CDO), however, is a debt obligation *issued by* the Millstone III CDO, not a type of collateral asset *held by* the CDO. (Arffa Ex. 7 at 14.)

In short, the Indenture – even by VCG's admission – does not provide that *the Reference Obligation itself* can get written down. That is why no express writedown can occur with respect to the Reference Obligation, and the "Implied Writedown" feature applies – and why the parties explicitly agreed in the Confirmation that Implied Writedown would be "[a]pplicable." (Arffa Ex. 3 at 2.) Instead, the writedown of the Reference Obligation is "implied" from the mathematical calculation explained in Citibank's moving papers – which calculation VCG does not challenge in its papers.

In sum, VCG's citation to potential writedowns of the CDO's collateral securities (whose own Indentures might provide for such writedowns) has no bearing on the interpretation of an "Implied Writedown" under the CDS Contract.

Tacitly conceding that the Indenture language at issue does not apply to the Reference Obligation, VCG tries to concoct a strained argument to the effect that writedowns of the collateral assets owned by the Millstone III CDO might "affect" the Class B Notes because a reduced collateral pool will be available for distribution to the noteholders in accordance with the priorities of payments of the CDO's obligations. (VCG Mem. at 24, 26.) But that completely misses the point: under the Millstone III CDO's Indenture, deterioration in the CDO's collateral assets and even any payment shortfalls do *not* result in any writedown of the principal amount of the Reference Obligation -- which is the type of writedown contemplated under clause (i) of the definition of "Writedown." Even if the collateral securities realize losses, the Class B Notes remain outstanding at their full principal amount, entitled to full respective principal and interest payments, subject only to the availability of funds. That is precisely why, in such a situation, the Implied Writedown feature applies, and the mathematical calculation set forth in the CDS Contract determines whether an Implied Writedown has occurred.[8]

In fact, further proof of VCG's confusion of the issues comes from the fact that any actual payment default with respect to the Reference Obligation would constitute its own Floating Amount Event. Thus, any shortfall in principal and interest payments

---

[8]   VCG claims that expert testimony and discovery is somehow necessary to determine the accuracy of Citibank's statement in its moving brief that CDO indentures generally do not provide for express writedowns of, or the application of realized losses to, the debt instruments the CDOs issue. (VCG Mem. at 26.) Although Citibank is convinced its position is correct, this is a side issue. The only indenture needed to resolve the parties' dispute is the Millstone III CDO Indenture and that indenture does not provide for express writedowns or realized losses to the Millstone III CDOs debt instruments such as the Class B Notes.

with respect to the Reference Obligation may give rise to one of the other applicable Floating Amount Events: "Failure to Pay Interest" and "Failure to Pay Principal." It does not constitute a "Writedown."

Because the Millstone III CDO Indenture does not provide for "writedowns, applied losses, principal deficiencies or realized losses . . . in respect of the Reference Obligation," it was Citibank's responsibility, as the Calculation Agent, to determine whether an Implied Writedown Amount in respect of the Reference Obligation had occurred. Citibank made such a determination and issued a Floating Amount Event Notice on January 9, 2008. (Arffa Ex. 8.)

VCG's assertion that the "Implied Writedown Amount" should have been zero (VCG Mem. at 26) is based on its mistaken reading of the Millstone III CDO Indenture (as discussed above) and is thus contradicted by the express language of the CDS Contract. As explained in detail in Citibank's moving papers on this motion (Citibank Opening Mem. at 12-18), the Implied Writedown Amount is based on a straight-forward mathematical calculation (based on the Servicer Reports published by the Trustee of the Millstone III CDO), and resulted in an Implied Writedown Amount of $10 million.

In sum, because a Floating Amount Event occurred under the CDS Contract, VCG owed Citibank a Floating Amount payment of $10 million. Thus, Citibank is entitled to judgment in its favor dismissing VCG's claims and in Citibank's favor on its counterclaim against VCG.

## III.

## <u>VCG FAILS TO STATE ANY REMAINING CLAIMS AS WELL</u>

VCG also makes a token (and entirely meritless) effort to resuscitate its

remaining claims: those for recession, breach of implied covenant of good faith and fair

dealing, conversion and unjust enrichment. All of those claims fail as a matter of law.

<u>Rescission</u>. While VCG now claims it was "mistaken" as to the collateral

provisions of the CDS Contract (a highly dubious assertion), as a matter of law,

rescission is improper where, as here, VCG's purported view of the transaction at issue is

clearly contradicted by the express terms of the CDS Contract. As a sophisticated hedge

fund, which is familiar with multi-million dollar transactions and has the assistance of

experienced counsel, there is simply no excuse for VCG's purported misunderstanding of

clear-cut contract terms. Indeed, it is well-established that rescission is not a remedy for

a purported mistake when that mistake was a product of a negligent understanding of the

terms of the contract. *Frontier-Kemper Constructors, Inc.* v. *American Rock Salt Co.,*

*LLC*, 2005 WL 3018720, at *13 (W.D.N.Y. 2005) (finding that "rescission of a contract

is not appropriate where a unilateral mistake is the product of negligence") (quoting *NCR*

*Corp.* v. *Lemelson Med., Educ. and Research Found.*, 2001 WL 1911024, at *7

(S.D.N.Y. 2001)). Thus, no rescission claim can exist here.

<u>Implied Duty of Good Faith and Fair Dealing</u>. VCG's arguments as to its

purported claim of breach of implied duty of good faith and fair dealing fail for a number

of reasons. VCG's "implied duty" assertions all relate to Citibank's demands for

additional collateral. As already noted above, those complaints fail because

(a) Citibank's conduct was expressly authorized by the CDS Contract, and the "implied

21

duty" VCG appears to be trying to impose is contrary to those terms, (b) in any event, any such complaints have been waived by VCG's failure to invoke the CDS Contract's dispute resolution process and VCG's continued performance under the CDS Contract, and (c) any such complaints are now moot. Thus, for all of the reasons discussed in detail above, this claim fails.

In addition, in response to VCG's further arguments as to an implied breach of the duty of good faith claim (VCG Mem. at 30-32), two further points are warranted. First, contrary to VCG's argument, this is indeed a case where a party is simply trying to base an implied duty claim on the same allegations as its breach of contract claims. That does not work, as New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled." *Harris* v. *Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *Fasolino Foods Co. Inc.* v. *Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992).

Second, VCG argues that it should nonetheless be permitted to assert an implied duty of good faith claim based upon a line of authority holding that a plaintiff can allege that the defendant exercised its contractual discretion in a manner designed to deny the plaintiff "the benefit of its bargain." Again, the argument fails for all of the same reasons described above. But, in addition, how did the collateral demands in fact deprive VCG of the benefit of its bargain? VCG was still entitled to receive periodic payments from Citibank (and was still required to make a Floating Amount Payment to Citibank if

a Floating Amount Event occurred).  Thus, the line of authority to which VCG cites is simply irrelevant.[9]

    Quasi-Contract Claims.  Finally, VCG's quasi-contract claims for conversion and unjust enrichment fail because they are entirely duplicative of (that is, they are based on precisely the same allegedly wrongful conduct as) VCG's purported breach of contract claims, and accordingly, under well-settled principles of New York law, should be dismissed.  *See, e.g., Retty Financing, Inc.* v. *Morgan Stanley Dean Witter & Co.,* 740 N.Y.S.2d 198 (1st Dep't 2002) (conversion and breach of fiduciary duty claims were properly dismissed, since they were duplicative of the breach of contract cause of action).  Because a concededly valid and enforceable contract exists between the parties here, and clearly covers the matters in dispute, quasi-contract claims for conversion and unjust enrichment are improper.

---

[9] The cases VCG cites on this point are entirely distinguishable.  They involve situations where allegations of bad faith and unfair dealing merely supported a breach of contract claim, or where allegations of breach of implied duty of good faith were asserted along with tort claims.  *See, e.g., Dalton* v. *Educational Testing Services,* 87 N.Y.2d 384 (1995); *Outback/Empire I, Partnership* v. *Kamitis, Inc.,* 35 A.D.3d 563 (N.Y. 2006).  None involved a situation where a party was permitted (as VCG seems to want to do here) to claim the same conduct was both a breach of contract and a separate breach of the implied duty of good faith and fair dealing.

## **Conclusion**

For all of the reasons set forth above, Citibank respectfully requests that the Court grant Citibank's motion for judgment on the pleadings, and enter an order granting judgment in Citibank's favor dismissing all of VCG's claims and granting Citibank's counterclaim against VCG in full.

Date:   New York, New York
        September 5, 2008

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:_____
    Allan J. Arffa
    Karen R. King
    David W. Wang

1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212-373-3203
Facsimile: 212-757-3990
Email: aarffa@paulweiss.com
Email: kking@paulweiss.com
Email: dwang@paulweiss.com

Attorneys for Defendant/Counterclaim-Plaintiff Citibank, N.A.

24