UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------- X
                            :

VCG SPECIAL OPPORTUNITIES MASTER  :
FUND LIMITED,                      :

                Plaintiff,    :         **08-CV-01563 (BSJ)**

                           :         **OPINION AND ORDER**

        -v-                 :

CITIBANK, N.A.,                 :

                Defendant.    :

--------------------------------- X
                            :

CITIBANK, N.A.,                 :

                Counterclaim-  :
                Plaintiff     :

        -v-                 :

VCG SPECIAL OPPORTUNITIES MASTER  :
FUND LIMITED                     :

                Counterclaim-  :
                Defendant.  :

--------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/5/08
```

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

    Defendant and Counterclaim-Plaintiff Citibank, N.A.

("Citibank") moves this Court for judgment on the

pleadings, pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure, dismissing the complaint of Plaintiff and

Counterclaim-Defendant VCG Special Opportunities Master

Fund Limited ("VCG") and entering judgment in its favor on

1

its counterclaim.  For the reasons that follow, Citibank's
motion is GRANTED; thus, the request for a stay of
discovery pending the resolution of the instant motion is
DENIED as moot.

### BACKGROUND[1]

This action arises from a credit default swap (or
"CDS") transaction between VCG and Citibank, by which VCG
sold Citibank credit protection against the risk of a
credit default by a collateralized debt obligation (or
"CDO").  (Compl. ¶ 10.)  In a typical CDS transaction of
this kind, the "protection buyer" makes regular payments to
a "protection seller," with "reference" to a specific
credit obligation.  (Citibank's Mem. Supp. J. on Pleadings
("Citibank's Mem.") at 1.)  The credit obligation is
generally referred to as the "reference obligation," and
the issuer of that obligation is generally referred to as
the "reference entity."  (Id.)  In return for receiving the
protection buyer's payments, the protection seller agrees
to undertake the credit exposure of the underlying
reference obligation.  (Compl. ¶ 11.)

---

[1]  The following facts are drawn from the pleadings, the parties' motion
papers, and the contractual documents submitted as exhibits to the
instant motion.  Unless otherwise noted, these facts are not in
dispute.

**The Parties' CDS Transaction**

The primary contract documents governing the parties' rights and obligations under the CDS transaction are the 2002 version of the Master Agreement of the International Swap Dealers Association ("ISDA"), dated September 1, 2006 (the "ISDA Master Agreement"); the Schedule to the ISDA Master Agreement, dated September 1, 2006 (the "Schedule"); the 1994 ISDA Credit Support Annex, dated September 1, 2006 (the "Credit Support Annex"); and the Confirmation Letter by Citibank, dated July 5, 2007 (the "Confirmation Letter"). (Compl. ¶ 13.) The Confirmation Letter incorporates the 2003 ISDA Credit Derivatives Definitions and the ISDA Standard Terms Supplement for use with Credit Transactions on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement (the "Standard Terms Supplement"). (Compl. ¶ 13.) In the event of any inconsistency between the Confirmation Letter and the ISDA Master Agreement, the terms of the Confirmation Letter control. (Compl. ¶ 14; Arffa Decl., Ex. 1 (ISDA Master Agreement), at 1.)

Pursuant to these documents (collectively, the "CDS Contract"), Citibank acted as the protection buyer in the parties' transaction. (Compl. ¶ 10.) Citibank agreed to

3

make, for the term of the CDS Contract,[2] periodic "Fixed

Payments" to VCG based on a fixed percentage of 5.50% per

annum on an "Initial Face Amount" of the reference

obligation, Class B Notes.  The Class B Notes were issued

by the reference entity, the Millstone III CDO Ltd. III-A

(the "Millstone III CDO").[3]  (Compl. ¶ 12.)

    VCG acted as the protection seller for the CDS

transaction.  As protection seller, VCG undertook the

default risk of the reference obligation; that is, VCG

agreed to pay Citibank a "Floating Payment" if certain

credit events (or "Floating Amount Events") took place

during the term of the CDS Contract.  (Compl. ¶ 16.)  VCG

also agreed to deposit collateral at the time of the

execution of the CDS Contract to secure Citibank against

the risk that VCG would not be in a position to make the

Floating Payments.  (Compl. ¶ 15.)  This collateral is

called the "Independent Amount," the amount of which was

specified in the Confirmation Letter.  (Arffa Decl., Ex. 3

(Confirmation Letter), at 3.)

---

[2]  The term of the CDS Contract was to run until the final maturity date
of the reference obligation in July 2046, subject to any earlier
amortization or liquidation of the reference obligation, or any early
termination of the CDS Contract. (Arffa Decl., Ex. 3 (Confirmation
Letter), Ex. 4 (Standard Terms Supplement) ¶¶ 1, 2.)
[3]  Neither VCG nor Citibank own the Millstone III CDO. (Compl. ¶ 12,
n.1.) Rather, the parties simply trade in, or "hedge," the CDO's
credit risk. Aon Fin. Prods., Inc. v. Société Générale, 476 F.3d 90,
96 (2d Cir. 2007). The swap is not a contract of indemnity, but an
instrumentality to shift default risk.

4

## Citibank Demands Additional Credit Support

Apart from the Independent Amount, some CDS transactions allow the protection buyer to demand additional collateral (or "variation margin") based upon a downward movement in the daily "mark-to-market value" of the underlying reference obligation.[4]  (Compl. ¶ 18.)  The parties disagree on whether the CDS Contract allowed Citibank to demand variation margin from VCG.  (Compl. ¶ 17.)  The record reflects, however, that on August 1, 2007, Citibank demanded additional collateral from VCG.  (Compl. ¶ 20.)  Citibank demanded additional collateral from VCG three more times over the weeks that followed.  (Compl. ¶ 20.)  VCG alleges that while it delivered the sums requested, it nonetheless questioned Citibank's evaluation of the credit risk of the Class B Notes.  (Compl. ¶ 25.)  Further, VCG maintains that it delivered the sums out of fear that Citibank might seize upon VCG's refusal to post variation margin as a reason to declare a technical default and seize VCG's collateral.  (Compl. ¶ 26.)

---

[4]  "Mark-to-market" is a term of art in the financial and accounting industries.  (Pl.'s Mem. Opp'n Citibank's Mot. for J. on Pleadings ("Pl.'s Opp'n") at 7.)  When an institution marks an asset to market, it assesses and records on its books a change in the asset's value since the last time a valuation took place, whether the gain (or loss) is realized or not.  (Id.)

### Declaration of a Floating Amount Event

Pursuant to the Standard Terms Supplement, the Floating Amount Events included a "Failure to Pay Principal," an "Interest Shortfall," or a "Writedown," each with respect to the reference obligation.  (Arffa Decl., Ex. 4 (Standard Terms Supplement), at 7.)  On January 9, 2008, Citibank sent VCG a "Floating Amount Event Notice," stating in relevant part:

> This letter is notice to you that an Implied
> Writedown has occurred with respect to the
> Reference Obligation on or about January 4, 2008.
> The Implied Writedown Amount in respect of such
> Floating Amount Event is USD 10,000,000.00 (the
> "Floating Amount").

(Compl. ¶ 35.)  In other words, Citibank informed VCG that the Floating Payment Amount was due on the ground that an Implied Writedown had taken place.  (Compl. ¶ 36.)

According to the definition of "Implied Writedown Amount" provided in the Standard Terms Supplement,

> "Implied Writedown Amount" means, (i) if the
> Underlying Instruments do not provide for
> writedowns, applied losses, principal
> deficiencies or realized losses as described in
> (i) of the definition of "Writedown" to occur in
> respect of the Reference Obligation, on any
> Reference Obligation Payment Date, <u>an amount
> determined by the Calculation Agent [Citibank]
> equal to the excess, if any, of the Current
> Period Implied Writedown Amount over the Previous
> Period Implied Writedown Amount, in each case in
> respect of the Reference Obligation Calculation
> Period to which such Reference Obligation Payment
> Date relates,</u> and (ii) in any other case, zero.

6

(Compl. ¶ 38; Arffa Decl., Ex. 4 (Standard Terms

Supplement), at 19 (emphasis added).)  "Writedown," in

turn, is defined in relevant part as the occurrence at any

time on or after the Effective Date of:

>   (i)  (A)  a writedown or applied loss (however,
>   described in the Underlying Instruments)
>   resulting in a reduction in the Outstanding
>   Principal Amount (other than as a result of
>   a scheduled or unscheduled payment of
>   principal); or
>
>   (B)  the attribution of a principal
>   deficiency or realized loss (however
>   described in the Underlying Instruments) to
>   the Reference Obligation resulting in a
>   reduction or subordination of the current
>   interest payable on the Reference
>   Obligation; . . .
>
> > (iii) _if Implied Writedown is_
> > _applicable and the Underlying_
> > _Instruments do not provide for_
> > _writedowns, applied losses,_
> > _principal deficiencies, or_
> > _realized losses as described in_
> > _(i) above to occur in respect of_
> > _the Reference Obligation, an_
> > _Implied Writedown Amount being_
> > _determined in respect of the_
> > _Reference Obligation by the_
> > _Calculation Agent_.

(Compl. ¶ 39; Arffa Decl., Ex. 4, at 23 (emphasis added).)

As reflected in the Confirmation Letter, an "Implied

Writedown" was "Applicable" to this CDS transaction.

(Arffa Decl., Ex. 3, at 2.)  The parties disagree, however,

on whether the Implied Writedown provision in the CDS

Contract was exercised properly.  This requires an initial

determination of whether the Underlying Instruments to the

Class B Notes provide for writedowns.  If so, the Implied

Writedown Amount is zero; if not, Citibank, as Calculation

Agent, could determine an Implied Writedown Amount.

**DISCUSSION**

**I.    Standard of Review**

Judgment on the pleadings "is appropriate where

material facts are undisputed and where a judgment on the

merits is possible merely by considering the contents of

the pleadings."  Sellers v. M.C. Floor Crafters Inc., 842

F.2d 639, 642 (2d Cir. 1988).  "In deciding a Rule 12(c)

motion, we apply the same standard as that applicable to a

motion under Rule 12(b)(6) . . . accept[ing] the

allegations contained in the complaint as true, and

draw[ing] all reasonable inferences in favor of the non-

movant."  Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir.

1994).  When analyzing a Rule 12(c) motion, the Court

considers "the pleadings and exhibits attached thereto,

statements or documents incorporated by reference in the

pleadings, matters subject to judicial notice, and

documents submitted by the moving party, so long as such

documents either are in the possession of the party

opposing the motion or were relied upon by that party in

8

its pleadings." <u>Prentice v. Apfel</u>, 11 F. Supp. 2d 420, 424

(S.D.N.Y. 1998) (citing <u>Brass v. Am. Film Techs., Inc.</u>, 987

F.2d 142, 150 (2d Cir. 1993)).  A court should dispose of

the claims on the pleadings "if, from the pleadings, the

moving party is entitled to judgment as a matter of law."

<u>Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant</u>

<u>Guard Workers of Am.</u>, 47 F.3d 14, 16 (2d Cir. 1994).

**II.  The Parties' Arguments**

The gravamen of VCG's complaint is that Citibank

improperly demanded from VCG additional collateral beyond

the Independent Amount, and improperly declared a Floating

Amount Event.  (Compl. ¶¶ 26, 41, 47.)  The Court turns

first to the issue of whether a Floating Amount Event

occurred.

**A.  Floating Amount Event**

There is no dispute that the Floating Amount Events

that would trigger VCG's payment obligation to Citibank

include: a "Failure to Pay Principal," an "Interest

Shortfall," or a "Writedown."   (Citibank's Mem. at 28;

Pl.'s Opp'n at 23-24; Arffa Decl., Ex. 4 (Standard Terms

Supplement), at 7.)  There is also no dispute that the

reference obligation has not experienced either a Failure

to Pay Principal or an Interest Shortfall.  (Pl.'s Opp'n at

24.)  Thus, the remaining question is whether a Writedown

has taken place such that Citibank was entitled to demand VCG's Floating Payment obligation.

As reflected in the Confirmation Letter, the parties agree that "Implied Writedown" was "Applicable" to this CDS transaction and hence would constitute a "Writedown" as relevant to the CDS Contract. (Citibank's Mem. at 11; Pl.'s Opp'n at 24-26; Arffa Decl., Ex. 3 (Confirmation Letter), at 2.) Pursuant to the terms of the Standard Terms Supplement incorporated by the Confirmation Letter, the amount of an Implied Writedown is zero in any case where the reference obligation's "Underlying Instruments" expressly provide for "writedowns, applied losses, principal deficiencies or realized losses" to occur. (Arffa Decl., Ex. 4 (Standard Terms Supplement), at 23.) Where the reference obligation's Underlying Instruments do not provide for such events, the Calculation Agent is to determine whether an Implied Writedown has occurred. (Id.)

VCG asserts that the Indenture between Millstone III CDO, Ltd., Millstone III CDO, LLC, and JP Morgan Chase Bank, N.A., dated July 5, 2006 (the "Millstone III Indenture"), actually provides for writedowns, applied losses, principal deficiencies and realized losses, which are passed on to the reference obligation, the Class B Notes. (Pl.'s Opp'n at 24.) In response, Citibank argues

10

that there can be no "serious dispute" that the Millstone
III Indenture does <u>not</u> permit any express writedowns, or
any of the other events listed, of the principal amounts of
the Class B Notes. (Citibank's Mem. at 28.)  Thus,
Citibank, as the designated Calculation Agent, properly
calculated the Implied Writedown Amount resulting in the
Floating Payment obligation.  (<u>Id.</u> at 29.)

The crux of the parties' disagreement centers on
whether the portion of the Millstone III Indenture that
accounts for a "Written Down Amount" concerns the reference
obligation at issue, the Class B Notes, or instead refers
to the possibility of the Millstone III CDO's securities
being written down, which is not the type of Writedown
contemplated in the CDS Contract.  The Millstone III
Indenture provides in relevant part:

> "Written Down Amount" means the sum, [sic]
> respect to each Written Down Security, of the
> amount to which the original Principal Balance of
> such Written Down Security is reduced as notified
> by or on behalf of the related issuer or trustee
> to the holders of such Written Down Security
> (including appraisal reductions on CMBS
> Securities).

> "Written-Down Security" means any Collateral
> Asset (other than a Defaulted Obligation) as to
> which the aggregate par amount of such Collateral
> Asset and all other securities secured by the
> same pool of collateral that rank <u>pari passu</u> with
> or senior in priority of payment to such
> Collateral Asset exceeds the aggregate par amount
> (including reserved interest or other amounts

11

> available for overcollateralization) of all
> collateral securing such securities (excluding
> defaulted collateral)

(McCormick Decl., Ex. 7, at 77-78.)  Based upon this

language, VCG contends that if a "Written Down Amount" is

reported,[5] the outstanding principal amount of collateral in

the pool available for distribution to noteholders,

including Class B noteholders, is decreased.  (Pl.'s Opp'n

at 25-26.)  Assuming that the first class of notes affected

were the Class B Notes, "writedowns, applied losses,

principal deficiencies or realized losses" would, by

definition, occur in respect of the reference obligation.

(Id. at 26.)  In this regard, pursuant to the terms of the

Standard Terms Supplement, VCG posits that the amount of

the Implied Writedown is zero.  (Id.; Arffa Decl., Ex. 4

(Standard Terms Supplement), at 19 ("'Implied Writedown

Amount' means, (i) if the Underlying do not provide for

writedowns . . . an amount determined by the Calculation

Agent . . . , and (ii) in any other case, zero.").)

   VCG's interpretation of the Millstone III Indenture is

flawed in that the cited definition of "Written Down

---

[5]  Before sums payable to the noteholders are allocated according to a priority of payments identified in Section 11.1 of the Millstone III Indenture (the "waterfall"), the issuer of the CDS is required to prepare a "Note Valuation Report," pursuant to Section 10.6(a) of the Indenture.  Among other data taken into account in the Note Valuation Report is "a calculation showing the determination of the Net Outstanding Portfolio Collateral Balance," which in turn takes in to account the "Written Down Amount," quoted above.  (Pl.'s Opp'n at 25.)

Amount" does not involve writedowns of the Class B Notes
issued by the Millstone III CDO.  Instead, the "Written
Down Amount" refers to securities owned by the CDO.  In
other words, VCG confuses the CDO's assets (the securities
it owns) with its liabilities (the securities it issues).
The Class B Notes of the CDO are debt obligations <u>issued by</u>
the Millstone III CDO; they are not a type of collateral
asset <u>held by</u> the CDO.

    Moreover, the Court is unpersuaded by VCG's claim that
writedowns of the collateral assets owned by the Millstone
III CDO is the equivalent of a writedown of the Class B
Notes because a reduced collateral pool will be available
for distribution to the noteholders in accordance with the
priorities of payments of the CDO's obligations.  (Pl.'s
Opp'n at 24-26.)  Rather, under the Millstone III
Indenture, deterioration in the CDO's collateral assets and
any payment shortfalls do not result in any writedown of
the principal amount of the <u>reference obligation</u>, which is
the type of writedown contemplated under the CDS Contract.
(Arffa Decl., Ex. 4 (Standard Terms Supplement), at 23
("[I]f Implied Writedown is applicable and the Underlying
Instruments to not provide for writedowns . . . <u>in respect</u>
<u>of the Reference Obligation</u>, an Implied Writedown Amount
being determined <u>in respect of the Reference Obligation</u> by

13

the Calculation Agent.") (emphasis added).)  Thus, even if the collateral securities realize losses, the Class B Notes remain outstanding at their full principal amount, subject to the availability of funds.  That is presumably why, in such a situation, the parties agreed that an Implied Writedown feature applies.

In sum, the Confirmation Letter makes clear that Implied Writedowns are applicable to this CDS transaction. Because the Millstone III Indenture does not expressly provide for writedowns of the Class B Notes, under the terms of the CDS Contract it is Citibank's responsibility, as the Calculation Agent, to determine whether an Implied Writedown has occurred.  The CDS Contract sets forth a mathematical formula by which to calculate the Implied Writedown Amount.  VCG does not challenge the use of this formula.[6]  Accordingly, the Court holds that Citibank properly determined that a Floating Amount Event in the form of an Implied Writedown occurred under the CDS Contract.  Citibank's motion for judgment on the pleadings is therefore granted, and VCG's claim for a declaratory

---

[6]  Rather, VCG claims that even if Citibank had been correct in determining that a Floating Amount Event occurred, there remains a controversy over whether Citibank's conduct in determining the Floating Payment Amount was commercially reasonable.  (Pl.'s Opp'n at 33-34.) For reasons described infra, Part II.D, this challenge fails.

judgment based upon the non-occurrence of a Floating Amount
Event is dismissed.

### B. Additional Collateral

VCG argues that Citibank's requests for additional
collateral were inconsistent with the terms set forth in
the Confirmation Letter that the parties signed as part of
the CDS Contract.  The Court disagrees.  The Credit Support
Annex allowed for Citibank to request additional collateral
from VCG depending upon Citibank's calculation of its
"Exposure," or the amount of loss Citibank would incur (or
gains it would realize) in replacing the CDS transaction
with an economically equivalent transaction at the time of
calculation.  (Arffa Decl., Ex. 2 (Credit Support Annex)
¶¶ 3-4; Citibank's Mem. at 7.)  In turn, the Confirmation
Letter states clearly that "[t]his Transaction shall be
subject to the Credit Support Annex . . . between Citibank
and [VCG]."  (Arffa Decl., Ex. 3, at 3.)  The Court finds
nothing in the Confirmation Letter that modifies VCG's
obligation to transfer additional collateral as set forth
in the Credit Support Annex.

Further, whether or not any inconsistency exists,
VCG's challenge is waived in light of its continued
agreement to post additional collateral.  "It is well-
established that where a party to an agreement has actual

15

knowledge of another party's breach and continues to
perform under and accepts the benefits of the contract,
such continuing performance constitutes a waiver of the
breach." Nat'l Westminster Bank, U.S.A. v. Ross, 130 B.R.
656, 675 (S.D.N.Y. 1991), aff'd sub nom, Yaeger v. Nat'l
Westminster, 962 F.2d 1 (2d Cir. 1992). Although VCG
maintains that it "believed it was not obligated to pay the
sums demanded by Citibank," it nonetheless continued to
post the sums requested "because it was concerned that
Citibank might seize upon [VCG's] refusal to post variation
margin as an excuse to declare a technical default and
seize [its] collateral." (Compl. ¶ 26.) Given VCG's
actual posting of the disputed credit support, and its
receipt of Citibank's regular payments during this time,
VCG cannot now claim that Citibank breached the CDS
Contract by wrongly demanding additional collateral.

The Court also notes that the Credit Support Annex
contains a Dispute Resolution provision as a mechanism to
challenge Citibank's Exposure determinations or demands for
additional collateral. (Citibank's Mem. at 10; Arffa
Decl., Ex. 2 (Credit Support Annex), at 3.) VCG concedes
that it did not invoke this Dispute Resolution provision.
(Pl.'s Opp'n at 22.) It argues that doing so would have
been meaningless, as the parties had not yet finished

16

discussing the issue of variation margin before Citibank
declared that a Floating Amount Event had occurred.  (Id.)
This position suggests that the Dispute Resolution process
was optional instead of mandatory.  New York public policy,
however, favors alternative dispute resolution mechanisms
that reflect the informed negotiation and endorsement of
the parties.  See, e.g., Ferguson Elec. Co. Inc. v. Kendal
at Ithaca Inc., 711 N.Y.S.2d 246, 249 (N.Y. App. Div. 2000)
(citing Matter of Nationwide Gen. Ins. Co. v. Investors
Ins. Co. of Am., 332 N.E.2d 333 (N.Y. 1975)); Westinghouse
Elec. Corp. v. N.Y. City Transit Auth., 623 N.E.2d 531
(N.Y. 1993).  As VCG was aware of the expedited Dispute
Resolution clause set forth in the CDS Contract, VCG cannot
now challenge Citibank's request for additional collateral
without having first vetted this claim in the manner agreed
upon in the CDS Contract.  See Acme Supply Co., Ltd. v.
City of New York, 834 N.Y.S.2d 142, 143 (N.Y. App. Div.
2007) (construing clauses providing for alternative dispute
resolution mechanisms as mandatory is supported by the
long-standing principle under New York law that contracts
are to be interpreted in a manner that would give full
effect to all provisions).  VCG's claim that Citibank
wrongly demanded variation margin therefore fails.

17

### C.    VCG's Alternative Claims

VCG alleges in the alternative claims of rescission,
breach of the implied covenant of good faith and fair
dealing, unjust enrichment, and conversion. (Compl. ¶¶ 48-
50, 55-66.) For the following reasons, these claims are
without merit.

### 1.    Rescission

VCG claims that it believed it was agreeing "to sell
credit protection on a credit default swap" and "not to
take the risk of daily mark-to-market movement in the value
of the reference obligation." (Compl. ¶ 49.) It further
claims that the Complaint presents questions "that can only
be resolved by discovery and expert testimony at trial."
(Pl.'s Opp'n at 28.) The Court disagrees. The CDS
Contract is governed by New York law. (Arffa Decl., Ex. 1
(Schedule), at 12 ("This Agreement will be governed by and
construed in accordance with the laws of the State of New
York.").) Under New York law, rescission of a contract on
the basis of a unilateral mistake may be had if a party
establishes that "(i) he entered into a contract based upon
a mistake as to a material fact, and that (ii) the other
contracting party either knew or should have known that
such a mistake was being made." NCR Corp. v. Lemelson
Medical, Educ. and Research Foundation, No. 99 Civ. 3017

18

(KNF), 2001 WL 1911024, at *7 (S.D.N.Y. 2001), <u>aff'd</u>, 33 F.

App'x 7 (2d Cir. 2002). Furthermore, "[a] contract may be

voided on the ground of unilateral mistake of fact only

where the enforcement of the contract would be

unconscionable, the mistake is material and made despite

the exercise of ordinary care by the party in error."

<u>William E. McClain Realty, Inc. v. Rivers</u>, 534 N.Y.S.2d

530, 531 (N.Y. App. Div. 1988); <u>see</u> <u>Morey v. Sings</u>, 570

N.Y.S.2d 864, 867 (N.Y. App. Div. 1991). But rescission of

a contract is not appropriate where a unilateral mistake is

the product of negligence. <u>See</u> <u>NCR Corp.</u>, 2001 WL 1911024,

at *7.

VCG's claim of entitlement to recission based upon

unilateral mistake is not supportable here. First, the

language of the Credit Support Annex makes clear that

Citibank may request additional collateral from VCG

depending on the current value of the CDS Contract at the

time of Citibank's calculation of its Exposure. (Arffa

Decl., Ex. 2 ¶¶ 3-4; Citibank's Mem. at 7.) Second, VCG is

a sophisticated hedge fund. No claim has been made by VCG

that it was limited in its ability to review drafts of the

agreement or to discuss the provisions of the CDS Contract

before it was executed. Notwithstanding VCG's assertions

to the contrary, it appears that the instant case presents

19

a circumstance where VCG, a sophisticated hedge fund,

simply failed to review carefully the terms of the parties'

agreement.  If VCG was negligent in this regard, this does

not justify rescission.  See DaSilva v. Musso, 428 N.E.2d

382, 386 (N.Y. 1981).

> **2.    Breach of the Implied Covenant of Good Faith and Fair Dealing**

VCG next contends that Citibank breached the implied

covenant of good faith and fair dealing by "making

oppressive [variation] margin demands without

justification" (Compl. ¶ 56), and by abusing the measure of

discretion given to it as Calculation Agent.  (Pl.'s Opp'n

at 31-32.)  With regard to VCG's allegation of a breach of

the implied covenant on the basis of variation margin, as

discussed supra, this claim is waived in light of VCG's

continued posting of the demanded collateral and acceptance

of the benefits of the CDS Contract.  See Part II.B.  With

regard to VCG's allegation that Citibank abused its

discretion as Calculation Agent, while it is true that

under New York law a claim for arbitrary or irrational

exercise of discretion under a contract can be separate and

apart from a breach of contract claim, see e.g., Maddaloni

Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 838 N.Y.S.2d

536 (N.Y. App. Div. 2007); Outback/Empire I, Ltd. P'ship v.

Kamitis, Inc., 825 N.Y.S.2d 747 (N.Y. App. Div. 2006)), VCG
does not adduce specific facts of arbitrary or irrational
conduct relating to Citibank's position as Calculation
Agent.  Indeed, in its opposition papers, VCG supports its
claim by relying upon Citibank's supposedly unjustified
demands of variation margin.  (Pl.'s Opp'n at 32.)  Because
that challenge is waived, however, the Court concludes that
VCG has failed to state a claim for breach of the implied
covenant of good faith and fair dealing.[7]

### 3.    Unjust Enrichment and Conversion

In the alternative of its breach of contract claim,
VCG asserts claims for unjust enrichment and conversion.
In New York, a party is not precluded from proceeding on
both breach of contract and unjust enrichment (or quasi-
contract) theories where there is a bona fide dispute as to
the existence of the contract, or where the contract does
not cover the dispute in issue.  Sergeants Benevolent Ass'n
Annuity Fund v. Renck, 796 N.Y.S.2d 77, 81 (N.Y. App. Div.
2005); Zuccarini v. Ziff-Davis Media, Inc., 762 N.Y.S.2d
621 (N.Y. App. Div. 2003).  Here, VCG alleges that it has
pled a cause of action for rescission and, if successful,
the rescission cause of action would vitiate the CDS

---

[7]  To the extent VCG alleges that Citibank acted arbitrarily or
irrationally because of its commercially unreasonable financial
assessment of the Class B Notes, this claim fails for the reasons
stated infra, see Part II.D.

21

Contract and give rise to a claim for unjust enrichment and conversion, arising from Citibank's demand for variation margin from VCG.  (Pl.'s Opp'n at 33.)  In light of the Court's conclusion that VCG cannot state a claim for rescission, VCG's claims for unjust enrichment and conversion necessarily fail as being duplicative of VCG's claim for breach of contract.  These claims are therefore dismissed.  See, e.g., State v. Indus. Site Serv., Inc., 862 N.Y.S.2d 118, 124-25 (N.Y. App. Div. 2008) (dismissing unjust enrichment claim as being duplicative of breach of contract claim); Retty Fin., Inc. v. Morgan Stanley Dean Witter & Co., 740 N.Y.S.2d 198 (N.Y. App. Div. 2002) (upholding dismissal of conversion and breach of fiduciary duty claims because they were duplicative of the breach of contract cause of action); Peters Griffin Woodward, Inc. v. WCSC, Inc., 452 N.Y.S.2d 599 (N.Y. App. Div. 1982).

### D.  Citibank's Counterclaim

Citibank asserts a counterclaim for VCG's breach of contract due to VCG's failure to meet its Floating Payment obligation under the CDS Contract.  (Citibank's Mem. at 20.)  In response, VCG argues that Citibank is not entitled to judgment on the pleadings because the CDS Contract should be rescinded "on the ground of Citibank's material breaches prior to declaring an early termination of the

22

contract and/or pursuant to the equitable doctrine of
mistake." (Pl.'s Opp'n at 33.) As discussed above, these
claims are without merit.

VCG also maintains that even if a Floating Amount
Event occurred, there is an issue of fact regarding the
commercial reasonableness of Citibank's Floating Payment
calculation. (Id. at 33-34.) Specifically, VCG contends
that it is entitled to discovery and an evidentiary hearing
to test, inter alia, "whether [Citibank] considered the
data in the servicer's report in making the Floating
Payment calculation." (Pl.'s Opp'n at 37.) This argument
might have merit if it related to a theory pled in the
Complaint. It does not. The Complaint states: "Even if
Citibank had been entitled to demand variation
margin . . ., Citibank failed even to make a proper
estimate of the required collateral. Had it based its
calculation on the servicer's report, it would never have
demanded anything approaching the sums that it collected
from Plaintiff." (Compl. ¶ 33.) The Complaint speaks to
commercial unreasonableness in the context of the variation
margin demands, not the Floating Payment calculation. VCG
may not use its moving papers to amend the Complaint by
arguing that the determination of the Floating Payment

23

Amount in the CDS Contract was commercially unreasonable.[8]
See Shah v. Helen Hayes Hosp., No. 06-4068-CV, 2007 U.S.
App. LEXIS 25323, at *4 (2d Cir. Oct. 29, 2007) ("A party
may not use his or her opposition to a dispositive motion
as a means to amend the complaint.") (citing Wright v.
Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998)).
Further, any challenge, including commercial
reasonableness, to Citibank's requests for variation margin
is waived.   See Part II.B.   Citibank is thus entitled to
judgment on the pleadings as to its counterclaim request
for the remaining balance of the Floating Payment Amount
minus the previously deposited variation margin –
$674,252.38.

---

[8]  In any event, VCG's moving papers fail to support its broad
assertion.  Notably, VCG primarily discusses commercial
unreasonableness in the context of Citibank's demands for additional
collateral.  (Pl.'s Opp'n at 19-22.)  With respect to Citibank's
counterclaim, VCG supports its argument by referencing "the replacement
value of the swap transaction," the "market conditions at the time of
termination," and whether Citibank was "actually exposed to market
risk" – all issues relating to whether Citibank improperly demanded
variation margin from VCG.  (Pl.'s Opp'n at 37-38.)  Although VCG makes
a passing reference to whether Citibank considered "data in the
servicer's report in making the Floating Payment calculation," VCG does
not specify which data was supposedly overlooked.  (Pl.'s Opp'n at 37.)
Assuming that VCG is referring to its assertion in the Complaint that
the Servicer's Report "revealed that no credit event had yet taken
place" for the monthly period of October 31, 2007 to November 29, 2007
(Compl. ¶¶ 28-29), this still does not help VCG's argument.  The CDS
Contract requires that the mathematical ratios used in the Calculation
Agent's Implied Writedown Amount be taken directly from the "Servicer
Reports."  (Arffa Decl., Ex. 4, at 20, 22.)  Citibank argues, and the
record demonstrates, that the Servicer Report was, in fact, consulted.
(Citibank's Mem. at 12-13; Citibank's Reply Mem. at 10 n.5; Arffa
Decl., Ex. 8 (Floating Amount Event Notice, attaching a copy of "the
relevant Servicer Report").)  Thus, it is unclear what, if any, merit
there is to VCG's claim.  Without any pleadings in the Complaint,
however, the Court need not decide the issue.

24

**CONCLUSION**

For reasons discussed above, Citibank's motion for judgment on the pleadings is GRANTED.  The Clerk of the Court is requested to enter judgment dismissing the complaint and granting Citibank's counterclaim.

**SO ORDERED:**

_____
**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Dated:    New York, New York
          November 4, 2008

25